# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| MUBASHIR KHALIF HUSSEN, MAHAMED EYDARUS, and JAVIER DOE *on behalf of themselves and others similarly situated,* | |
| *Plaintiffs,* | |
| v. | Case No. 0:26-cv-324-ECT-ECW |
| KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; DAVID EASTERWOOD, *in his official capacity as U.S. Immigration and Customs Enforcement Field Office Director for St. Paul, Minnesota*; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection*; U.S. BORDER PATROL; MICHAEL W. BANKS, *in his official capacity as Chief of U.S. Border Patrol*; and GREGORY BOVINO, *in his official capacity as Commander-at-Large of U.S. Border Patrol,* | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>**<span style="color:red">EXPEDITED HANDLING REQUESTED</span>** |
| *Defendants.* | |

# TABLE OF CONTENTS

Table of Contents..................................................................................................i

Introduction ......................................................................................................1

Background........................................................................................................3

     A.     DHS's Stops and Arrests of Plaintiffs and Class Members. .........................4

     B.     Statements by Senior Officials. ...................................................................9

Legal Standard.................................................................................................10

Argument .........................................................................................................11

I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims............................11

     A.     Defendants Are Systematically Stopping Somali and Latino Individuals Without Reasonable Suspicion, in Violation of the Fourth Amendment....11

     B.     Defendants Have a Policy and Practice of Arresting People Without Probable Cause of Removability and Flight Risk, in Violation of the Fourth Amendment and 8 U.S.C. § 1357(a). .........................................................18

          1.     The Fourth Amendment and Warrantless-Arrest Statute Require Probable Cause. ...................................................................................18

          2.     Defendants Are Arresting People Without Probable Cause of Removability, in Violation of the Fourth Amendment and Section 1357(a)(2)....................................................................................20

          3.     Defendants Are Arresting People Without Probable Cause of Flight Risk..................................................................................................22

II.     Absent Immediate Injunctive Relief, Plaintiffs and the Putative Class Will Continue Facing Irreparable Harm. ...................................................................25

III.     The Equities and the Public Interest Favor Plaintiffs...........................................28

IV.     Scope of Relief ................................................................................................29

V.     Security.............................................................................................................30

Conclusion .......................................................................................................30

## INTRODUCTION

Thousands of masked federal immigration agents are carrying out a campaign of unlawful stops and arrests in Minnesota, targeting immigrants and U.S. citizens alike based only on their ethnicity. In doing so, Department of Homeland Security ("DHS") agents are disregarding foundational limits on their authority, employing unprecedented levels of violence, and upending daily life across the Twin Cities Metropolitan Area ("Twin Cities"). These police-state tactics are anathema to the Constitution and federal law.

Masked agents are systematically stopping people whom they believe to be Somali or Latino on the street, in their cars, at work, and at their homes, purportedly for immigration purposes—even though these agents have no relevant information about the individuals' citizenship or immigration status. After approaching people without any reasonable suspicion of removability, DHS agents are forcing them to the ground, pinning them in headlocks, and tightening their handcuffs when they complain of pain. DHS agents are arresting U.S. citizens—even ignoring their offers to provide documentation of U.S. citizenship. They are snatching people off the street and forcing them into unmarked vehicles. Plaintiffs and witnesses in this case have experienced all of these harms. They, and the other members of the putative classes, are likely to keep experiencing them, as DHS continues saturation patrols in their neighborhoods and sends thousands more agents. These actions are clear violations of the Constitution and federal law. Plaintiffs and the proposed classes seek preliminary relief against three specific policies and practices.

First, Defendants are systematically performing investigative stops, purportedly for immigration reasons, without reasonable suspicion that a person is removable. This policy

1

and practice violate the Fourth Amendment. As the accompanying declarations demonstrate, agents are approaching Somali and Latino people at random, with no information about their identity or their citizenship or immigration status, and detaining them for questioning.

Second, Defendants are arresting people without probable cause to believe that the person is a removable noncitizen. This is an explicit policy and practice: DHS has even asserted, through statements from senior officials and the agency itself, that less than probable cause—only "reasonable suspicion"—is required to conduct warrantless arrests. That is contrary to black letter law, which requires probable cause for an arrest. And in practice, DHS is arresting people with *no* indications of removability, as the experiences of Plaintiffs and declarants make clear. Agents approached them in public places without any information about them (much less a warrant). Many told the agents that they were U.S. citizens, and some offered to provide documentation. Yet the agents escalated each encounter, often handcuffing them, forcing them into unmarked cars, driving them to a different location, holding them for extended periods, and scanning their faces, before releasing them. DHS agents had no reason to believe these individuals and others similarly situated were removable noncitizens. By arresting people without probable cause, DHS is committing textbook violations of the Fourth Amendment and the warrantless immigration arrest statute, 8 U.S.C. § 1357(a)(2).

Third, just as egregiously, Defendants are ignoring Congress's prohibition on warrantless arrests where a person does not pose a flight risk. 8 U.S.C. § 1357(a)(2). Through this requirement, Congress imposed a clear check against random street

2

enforcement. Yet DHS is routinely violating this rule. As the record makes clear, DHS agents are systematically omitting *any* assessment of flight risk. And they are arresting people, like Plaintiffs and declarants, who have homes, families, and jobs in the Twin Cities—clear indications that they are not flight risks. Courts across the country have enjoined this same violation, finding that, during similar surges in other cities, DHS is rampantly conducting warrantless arrests of people who pose no flight risk.

These abuses by DHS are causing extensive harm to people throughout this District. Plaintiffs and thousands of class members have been deprived of their liberty and subject to often-violent stops and arrests. They live in fear of going to work, taking their children to school, even leaving their homes. Regardless of their citizenship or immigration status, they are aware that any encounter with masked immigration agents—thousands of whom are roaming their neighborhoods—could lead to a stop, an arrest, a face scan, a violent assault, or worse. Businesses and schools in their neighborhoods are empty, as customers, employees, teachers, and students are afraid to leave their homes.

The Fourth Amendment and federal law do not allow the federal government to inflict this kind of police state on American communities. Plaintiffs are concurrently filing a motion for class certification. The Court should issue a classwide preliminary injunction and/or a stay of agency action on Counts 1-4 of the Complaint.

## BACKGROUND

Under the Fourth Amendment, law enforcement can initiate an investigatory stop only if they have reasonable suspicion that the person stopped has committed a violation of law. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968). They can arrest only if they have probable

3

cause to believe that there has been a violation. *See Bell v. Neukirch*, 979 F.3d 594, 603 (8th Cir. 2020). Federal law also requires probable cause, for civil immigration arrests, that the person is "in the United States in violation of [immigration] law." 8 U.S.C. § 1357(a)(2); *see United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010) ("[T]he term 'reason to believe' in § 1357(a)(2) means constitutionally required probable cause."). And it forbids warrantless arrests unless the officer has probable cause to conclude that the person is "likely to escape before a warrant can be obtained." *Id.*

The record demonstrates that Defendants are engaged in stunning, systematic violations of these bedrock protections against arbitrary and abusive police action.

### A.   DHS's Stops and Arrests of Plaintiffs and Class Members.

The record illustrates a widespread pattern of stops without reasonable suspicion, and warrantless arrests without probable cause of removability or flight risk.

**Plaintiff Mubashir Hussen** is a naturalized U.S. citizen of Somali ethnicity. He has lived in the Twin Cities for more than a decade, and he works at a mental-health services provider in the Cedar-Riverside neighborhood of Minneapolis. Hussen Decl. ¶¶ 1–3.

On December 10, 2025, Mr. Hussen left his office to get lunch. While he was standing on the street, an unmarked SUV approached. A tall, masked individual wearing a police-style vest exited the SUV and wordlessly walked toward Mr. Hussen. Mr. Hussen walked in the other direction, "hoping he would leave [him] alone." *Id.* ¶ 6.

The masked man quickened his pace, grabbed Mr. Hussen forcefully, and pushed him into the restaurant. *Id.* ¶ 6. Mr. Hussen assumed that the man was an ICE officer

based on his clothing and because he had seen ICE agents on the street earlier that day. *Id*. ¶ 7. Mr. Hussen "immediately" started "repeating over and over again": "I'm a citizen, I'm a citizen." *Id*. ¶ 8. Another masked ICE officer joined. *Id*. ¶ 9. The two dragged Mr. Hussen outside and put him in a headlock on the ground, and when Mr. Hussen continued to repeat, "I'm a citizen," they responded: "That don't matter." *Id*. ¶ 10.

Mr. Hussen asked to show the agents a photo of his passport card, which was on his phone, but they refused to look at it, and instead put him into the back of their SUV and handcuffed him. *Id.* ¶¶ 11–12. The officers told Mr. Hussen repeatedly that they needed to "scan [his] face." *Id.* ¶ 18. Mr. Hussen's supervisor came outside and tried to show the officers a copy of Mr. Hussen's passport card through the windshield of the SUV. *Id*. ¶ 15. The officers ignored him and drove Mr. Hussen first to a nearby street, where they held him for thirty minutes while continuing to insist on a face scan, and then to an ICE office seven miles away. *Id.* ¶¶ 15–24. At the ICE office, he was forced to submit to a face scan, had his ankles shackled, was refused water and medical assistance, and was told that he was going to be deported. *Id.* ¶¶ 25–26.

After almost an hour and a half in the officers' custody, Mr. Hussen finally managed to show his passport card to a woman who was fingerprinting him. *Id.* ¶ 27. The officers then sent him outside, seven miles from his work in 28-degree weather, and refused to give him a ride back to where they had arrested him. *Id.* ¶ 29. At no point during this interaction was Mr. Hussen asked about his citizenship or immigration status, or his ties to the community, such as work, family, or duration of residence in Minnesota. *Id.* ¶¶ 27–28.

**Plaintiff Mahamed Eydarus** is a United States citizen by birth and of Somali ethnicity. Eydarus Decl. ¶¶ 1, 3, 7, 27. On the same day that Mr. Hussen was arrested, Mr. Eydarus was leaving an overnight shift as a home care assistant. *Id.* ¶¶ 6–7. He left the home where he was working to meet his mother, who was doing the next person-care shift. *Id.* ¶ 7.

Mr. Eydarus and his mother were in the process of shoveling out a parking space on the street when several unmarked vehicles drove up. *Id.* ¶¶ 8–10. Six to eight men, many of whom were masked, surrounded Mr. Eydarus and his mother and demanded to see Mr. Eydarus's identification to ensure that he was "not illegal." *Id.* ¶¶ 10–11, 16. Mr. Eydarus's mother handed over her driver's license in tears, and the ICE agents asked her about when she was naturalized. *Id.* ¶¶ 24–25. They told her to remove her niqab, a cultural and religious face covering, and separated Mr. Eydarus from her—telling him that he could not be close to her because they were investigating. *Id.* An agent asked why Mr. Eydarus and his mother were "speaking that foreign language" (Somali). *Id.* ¶ 27. The officers never asked Mr. Eydarus about his community ties, nor did Mr. Eydarus hear them ask his mother about hers, and the officers never explained why they had approached them. *Id.* ¶ 25. The encounter lasted approximately thirty minutes. *Id.* ¶ 31.

**Plaintiff Javier Doe** was also arrested outside his place of work. Javier is Hispanic and a U.S. citizen by birth. Javier Doe Second Decl. ¶ 1. On January 8, 2026, while Javier was working at Target in Richfield, Minnesota, unmarked SUVs and masked agents wearing "Border Patrol" vests, accompanied by Defendant Bovino, pulled into the parking lot. *Id.* ¶¶ 3–4. The agents asked Javier and his coworker how they were; Javier responded,

6

"fuck you[,]" consistent with his First Amendment rights. *Id.* ¶ 4. Defendant Bovino approached Javier and his coworker and asked if they were U.S. citizens. *Id.* Another agent approached Javier and asked him, "[A]re you from here?" *Id.* ¶ 5. Javier repeated, "fuck you," and said, "I don't need to tell you anything." *Id.*

As Javier entered the store, the agent lunged and tackled him to the ground in the store's entrance vestibule. *Id.* Multiple federal agents "pil[ed] on top" of him. *Id.* ¶ 6. Javier felt one of them pressing his knee into his neck. *Id.* ¶ 7. The agents handcuffed Javier and his coworker and dragged them toward an SUV. *Id.* ¶ 8. Javier repeated loudly, "I am a U.S. citizen. I am literally a U.S. citizen." *Id.* As he was being shoved into the SUV, Javier slipped because the handcuffs were limiting his movement, and slammed his head on the car. *Id.* The agents drove off with Javier and his coworker. *Id.* ¶ 11. In the SUV, the agents attempted to take scans of Javier's and his coworker's faces and examined Javier's passport. *Id.* ¶ 11, 13-14. The agents held Javier and his coworker in a Walmart parking lot in Bloomington, where they eventually released Javier. *Id.* They kept his coworker—also a U.S. citizen—who did not have his passport on him. *Id.* ¶¶ 16–17. At no point did the agents ask Javier any questions about his citizenship or immigration status, or his ties to the community. *Id.* ¶ 23.

After this encounter, Javier went to an emergency room, where a doctor examined his arm, shoulder, neck, and head and performed a CT scan to ensure that he did not have a concussion from slamming his head or blood clots from the pressure of the federal agent kneeling on his neck. *Id.* ¶ 20.

Plaintiffs are not alone. Many other Minnesotans have been subjected to the same policies and similar abuses.  For instance, Said Osman, a legal permanent resident of Somali ethnicity, was walking down the street in a neighborhood where many Somali Americans live, worship, shop, and work, when an SUV pulled up beside him and two masked men got out.  They asked Mr. Osman if he was a citizen, and he replied that he was "legal to be here."  With no further questions, the DHS agents grabbed his arm and attempted to force him into the SUV.  Mr. Osman refused to enter the car, worried that he was being kidnapped.  The agents pinned him to the ground.  Mr. Osman offered to show his identification, which was in his pocket, but the agents refused to allow him to present it.  They then forced Mr. Osman into the SUV.  The agents told him, "Trump is the president.  This is what he wants."  They examined Mr. Osman's ID, scanned his face, and eventually released him.  Osman Decl. ¶¶ 5–16, 21–22.

Ali Dahir, a U.S. citizen of Somali ethnicity, was detained while leaving his apartment building.  Five or six masked agents stopped him and asked if he was a citizen. When he answered affirmatively, they demanded proof of citizenship.  Mr. Dahir provided his passport card, but the agents took it and told him he could not leave.  The agents detained Mr. Dahir outside for at least 25 minutes in 19-degree weather.  Dahir Decl. ¶¶ 2–3, 5–6, 10–12, 15–16.

A.A., a legal permanent resident of Somali ethnicity, was taking groceries to his car when masked ICE agents approached him and, without asking any questions, grabbed his arms and handcuffed him.  A.A. had his green card in his wallet.  Without saying a word to A.A., agents placed him in a car and drove him half an hour away to what appeared to

8

be a police station. The officers then spoke to A.A. for the first time and asked him where he came from. When he responded that he was from Ethiopia, they asked if he was Somali. After 20 minutes of questioning in the parking lot, they drove him back in handcuffs to his car. A.A. Decl. ¶¶ 1–12.

Crisarelli Castillo, a U.S. citizen of Latina ethnicity, was standing outside as her Latina coworker helped her parallel park. Unmarked SUVs approached and boxed in the car. Officers ordered Ms. Castillo to remain in place and asked for her identification. They asked for her coworker's identification, ordered her coworker out of the car, and arrested her. Ms. Castillo did not hear the officers ask her coworker about her ties to the community, nor did she hear her coworker say that she was in the country without authorization. Officers did not ask approximately ten white bystanders for their identification. C. Castillo Decl. ¶¶ 1–3, 5–14.

This is happening to Minnesotans on a daily basis. *See, e.g.*, Luisa Doe Decl. ¶¶ 1–9 (Latina arrested by DHS in traffic stop without a warrant or any questions about flight risk); Santiago Doe Decl. ¶¶ 1–16 (similar); Julio Doe Decl. ¶¶ 1–17, 20 (Latino stopped at work, arrested without a warrant, with no questions about flight risk); Vogt Decl. ¶¶ 6–12 (describing a Latino man approached by unmarked SUVs and arrested for no apparent reason); Martinez Garcia Decl. ¶¶ 1, 7–17; Aguirre Castrejon Decl. ¶¶ 1–23; Moreno Decl. ¶¶ 1, 5–21; M. Castillo Decl. ¶¶ 1–11; Compl. ¶¶ 63–71 (more incidents).

### B.    Statements by Senior Officials.

Defendants have openly flouted their disregard for the constraints imposed by the Fourth Amendment and the warrantless arrest statute. Defendant Bovino explained

9

Defendants' policy to reporters as follows: "We need reasonable suspicion to make an immigration arrest. . . . You notice I did not say probable cause."[1]  Commenting on its operations in Minnesota, DHS likewise stated its policy that "DHS law enforcement uses 'reasonable suspicion' to make arrests[,]" not probable cause.[2]  In response to this very lawsuit, a DHS spokesperson issued a similar statement that "DHS law enforcement uses 'reasonable suspicion' to make arrests."[3]

Senior government officials have made clear that the point of these dragnet stops and arrests in Minnesota is to intimidate and harm Somali and Latino communities.  In launching this campaign, the President called Somali-Americans "garbage" and said, "I don't want them in our country."[4]  Speaking about DHS's current activities in Minnesota, he said "Illegal Somalian Criminals" "must pay a big price, NOW!!!"[5]  He has also said that Latino migrants are "poisoning the blood of our country" and are here to "prey upon innocent, American citizens."[6]

## LEGAL STANDARD

Courts consider four factors in deciding whether to grant a preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this

---

[1] All exhibits in this memorandum are attached to the Declaration of Kshithij Shrinath. Shrinath Decl. Ex. 1.

[2] Shrinath Decl. Ex. 2.

[3] Shrinath Decl. Ex. 3.

[4] Shrinath Decl. Ex. 4.

[5] Shrinath Decl. Ex. 5.

[6] Shrinath Decl. Ex. 6-7.

harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).[7]

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

#### A.    Defendants Are Systematically Stopping Somali and Latino Individuals Without Reasonable Suspicion, in Violation of the Fourth Amendment.

The Fourth Amendment permits law enforcement officers to seize individuals in investigatory stops only in limited circumstances: where "specific and articulable facts," "taken together with rational inferences from those facts," provide an "objective" rationale for suspecting a legal violation. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). In other words, a detaining officer must have a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Corrales-Portillo*, 779 F.3d 823, 829 (8th Cir. 2015) (quoting *United States v. Arvizu*, 534 U.S. 266, 266 (2002)).

DHS is engaging in a policy and practice of stopping individuals ostensibly for investigation of their immigration status, but without reasonable suspicion of removability. Rather, agents are approaching Somali or Latino people at random and demanding to know if they are U.S. citizens, with no individualized suspicion prior to the stop. These stops lack any specific, particularized basis and instead are based on nothing more than perceived ethnicity. Defendants' lack of particularized knowledge about removability is evident from

---

[7] In addition to granting preliminary injunctive relief, the Court may stay agency action pursuant to 5 U.S.C. § 705. The standards are the same. *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010).

their many stops of U.S. citizens and individuals with immigration status—including fourteen plaintiffs and witnesses with the bravery to come forward in this litigation, seven of whom are U.S. citizens and four of whom are permanent residents.

Their experiences illustrate DHS's policy and practice of unconstitutional stops. First, DHS is widely engaging in investigatory stops, which trigger the Fourth Amendment's requirement of reasonable suspicion. Under the Fourth Amendment, "a seizure occurs when, in the totality of the circumstances surrounding the encounter, a reasonable person would believe that she is not free to leave." *United States v. Pena-Saiz*, 161 F.3d 1175, 1177 (8th Cir. 1998) (quoting *Moore v. Indehar*, 514 F.3d 756, 759 (8th Cir. 2008)). It may be the result of "an officer restrain[ing] an individual's liberty through physical force or a show of authority." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009). The touchstone is the "coercive effect" of law enforcement conduct. *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008). All the Plaintiffs and declarants were subject to investigatory stops under the Fourth Amendment, because the circumstances clearly indicated that they were not free to leave.

For example, the evidence demonstrates that DHS agents regularly engage in "physical touching"—frequently violent. *Id.* at 983; *Torres v. Madrid*, 592 U.S. 306, 325 (2021); *see, e.g.*, Hussen Decl. ¶¶ 6, 10 (officer grabbed Mr. Hussen while he was on the street and pushed him inside a restaurant); Javier Doe Second Decl. ¶¶ 5–10 (officers grabbed Javier, lunged at him, piled on top of him, pressed knee on his neck, dragged, and shoved him); A.A. Decl. ¶ 3 (Somali man was pushing shopping cart with groceries to his car in Walmart parking lot when ICE officers approached him and grabbed his arms);

Osman Decl. ¶¶ 9–11 (officers grabbed Somali man on the street and attempted to pull him into a black SUV, then pinned him to the ground when he refused to get in); Aguirre Castrejon Decl. ¶¶ 10, 15–16. Officers also "position[] themselves in a way to limit the person's freedom of movement." *Griffith*, 533 F.3d at 983; *see, e.g.*, Eydarus Decl. ¶ 10–11; Dahir Decl. ¶ 6; M. Castillo Decl. ¶ 5; Moreno Decl. ¶ 5. "Several officers" are frequently present. *Griffith*, 533 F.3d at 983; Javier Doe Second Decl. ¶¶ 5–6; Eydarus Decl. ¶¶ 10–11; Dahir Decl. ¶ 6; C. Castillo Decl. ¶ 6; Julio Doe Decl. ¶ 7; Aguirre Castrejon Decl. ¶ 10; Moreno Decl. ¶ 3. Officers frequently display weapons. *Griffith*, 533 F.3d at 983; Eydarus Decl. ¶ 12; C. Castillo Decl. ¶ 7; Julio Doe Decl. ¶ 7 (officer pointed gun at window in front of car while additional officers aggressively knocked on car windows); Aguirre Castrejon Decl. ¶ 17. Officers regularly use "language or intonation indicating compliance is necessary." *Griffith*, 533 F.3d at 983; Eydarus Decl. ¶ 16; C. Castillo Decl. ¶ 7 ("The officers ordered me to stand where I stood and not move."); Martinez Garcia Decl. ¶ 8. And officers "indicat[e] the person is the focus of a particular investigation" into their immigration status, demanding information, identification, and face scans. *Griffith*, 533 F.3d at 983; Eydarus Decl. ¶¶ 16, 25; Dahir Decl. ¶¶ 7–10; Osman Decl. ¶ 9; Julio Doe Decl ¶ 9; Martinez Garcia Decl. ¶¶ 7–9.

Second, DHS systematically lacks "specific and articulable facts" that provide an "objective" rationale for these seizures. *Terry*, 392 U.S. at 21. Indeed, Defendants regularly seize Somali and Latino people whose identities they do not know and who are going about everyday activities, such as buying groceries, A.A. Decl. ¶ 2; Aguirre Castrejon Decl. ¶ 2, shoveling out a parking space, Eydarus Decl. ¶¶ 8–10, heading to

13

lunch, Hussen Decl. ¶¶ 5–6, walking down the street, Osman Decl. ¶¶ 6–7, arriving at work, C. Castillo Decl. ¶¶ 4–6, working, Javier Doe Second Decl. ¶¶ 1–3; Martinez Garcia Decl. ¶¶ 5–6; Moreno Decl. ¶ 3, and taking out the trash, M. Castillo Decl. ¶ 2. In most of these instances, at the time of the stop, Defendants did not know the stopped individual's name or possess any other particularized information.

Rather, the basis for Defendants' stops—as is evident from Plaintiffs' and declarants' experiences—is the stopped individual's Somali or Latino ethnicity. But law enforcement *cannot* ascribe reasonable suspicion as to immigration status based generally on race or ethnicity. *See supra* Background § B. This precept is fundamental. "A decision to arrest and detain based on race or appearance" is "an egregious constitutional violation." *Lopez-Fernandez v. Holder*, 735 F.3d 1043, 1047 (8th Cir. 2013). An individual's "race . . . clearly c[an]not create a reasonable and articulable suspicion of criminal activity." *Buffkins v. City of Omaha*, 922 F.2d 465, 470 (8th Cir. 1990); *see also United States v. Clay*, 640 F.2d 157, 159-60 (8th Cir. 1981) ("Police cannot have grounds for suspicion based solely on the race of the suspect."). This principle—that race or ethnicity cannot be the basis of reasonable suspicion—directly applies in the immigration context. *Accord Trump v. Illinois*, 2025 WL 3715211, *1 n.4 (U.S. Dec. 23, 2025) (Kavanaugh, J., concurring) ("The basic constitutional rules are clear . . . officers must not make interior immigration stops or arrests based on race or ethnicity."). Indeed, any adverse evidence as to immigration status that results from an arrest or detention "based on race or appearance" must be suppressed in federal immigration proceedings. *Lopez-Fernandez*, 735 F.3d at 1047.

The Eighth Circuit has been clear on this matter: "[T]here is nothing inherently suspicious about a black man walking up to a private home on a street in a black neighborhood." *Clay*, 640 F.2d at 159. "A generalized suspicion that any black person driving an auto with out-of-state license plates might be engaged in criminal activity," or the presence of black men in a predominantly black neighborhood, forms no basis for an investigatory stop. *United States v. Nichols*, 448 F.2d 622, 625 & n.4 (8th Cir. 1971). And similarly, there is no basis for Defendants to assume that a Somali or Latino person walking or going about daily life in a predominantly Somali or Latino neighborhood, or anywhere else in Minnesota, is a removable noncitizen.

Moreover, the overwhelming majority of Somali and Latino individuals in Minnesota are U.S. citizens. *See* Shrinath Decl. Ex. 9 (95% of Somali Minnesotans are U.S. citizens, according to 2024 U.S. Census Bureau data); Shrinath Decl. Ex. 10 (same for 76% of Latino Minnesotans).[8] The small percentage who are not U.S. citizens include legal permanent residents (green card holders) and others with immigration status. *See, e.g.*, A.A. Decl. ¶ 1; Osman Decl. ¶ 2; Compl. ¶ 136. Defendants' policy of indiscriminately stopping Somali and Latino people is essentially guaranteed to capture U.S. citizens and individuals with immigration status, whom federal agents have no business stopping. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1131 (9th Cir.

---

[8] The U.S. Census Bureau estimates that there are 76,320 people of Somali ethnicity in Minnesota, and the Bureau's data shows that roughly 94.4% are U.S. citizens. Shrinath Decl. Ex. 9. It estimates that there are 388,435 Latinos in Minnesota, and the data shows that 76.1% are U.S. citizens. Shrinath Decl. Ex. 10.

2000) (en banc) ("Where, as here, the majority (or any substantial number) of people share a specific characteristic, that characteristic is of little or no probative value in such a particularized and context-specific analysis.").

In fact, the Eighth Circuit recently held that it was impermissible to target a group for immigration investigation where even a simple majority of the group were U.S. citizens. *Parada v. Anoka County*, 54 F.4th 1016, 1021 (8th Cir. 2022).   The *Parada* Court invalidated a county jail's policy of referring all foreign-born individuals to ICE, where "more than half" were U.S. citizens.   *Id.* (emphasis omitted).   The Court called this "a classic example of national-origin discrimination," noting that the policy could have been replaced by "a reasonable-suspicion-like requirement" predicating referrals on "specific and articulable facts."   *Id.* at 1020–21.   While *Parada* was an equal-protection case, the logic—that a policy using ethnicity or national origin as a proxy for immigration status lacks reasonable suspicion—directly applies here.   Defendants' at-best indiscriminate stopping of Somali and Latino individuals violates the Fourth Amendment.

In addition to initiating stops with no reasonable suspicion that stopped individuals are removable, DHS is also *disregarding* affirmative indications that they are not— including repeated statements that they are citizens or have affirmative status, and efforts to present passports and immigration documents.   For instance, agents detained Mr. Dahir for half an hour even though he showed them his passport card at the outset.   Dahir Decl. ¶¶ 12–16.   When Mr. Osman, who was walking on the street, told agents that he was "legal to be here," they grabbed him and pinned him to the ground.   Osman Decl. ¶¶ 9–11; *see also, e.g.*, Moreno Decl. ¶¶ 6–7 (arrested after handing ICE agent his green card); Martinez

16

Garcia Decl. ¶¶ 8, 12–14 (arrested after telling agents he is a U.S. citizen); Aguirre Castrejon ¶ 12. This disregard would make these stops impermissible *even if* the initial stop were based on reasonable suspicion. *Cf. Kansas v. Glover*, 589 U.S. 376, 386 (2020) ("presence of additional facts might dispel reasonable suspicion"); *Maryland v. Buie*, 494 U.S. 325, 326 (1990) (stop should last "no longer than is necessary to dispel the reasonable suspicion"). These actions drip with contempt for the Constitution's protections.

Against the backdrop of this widespread overreach, Defendants continue to exhibit flagrant disregard for the Fourth Amendment in ostensible immigration stops. Just this week, Defendant Noem was asked why so many Americans are getting stopped in Minnesota, and whether Americans need to start carrying proof of citizenship. In response, she confirmed that, if a person is near a suspected immigrant, DHS's policy is "detain them as well" to "validate their identity" and determine "if they are breaking our federal laws." Shrinath Decl. Ex. 12. But "a person's mere propinquity to others independently suspected of criminal activity" cannot give rise to reasonable suspicion. *United States v. Owens*, 101 F.3d 559, 562 n.2 (8th Cir. 1996) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979), and applying in reasonable suspicion context).

These kinds of unconstitutional suspicionless stops are not new to Defendants: Less than a year ago, a district court held that Border Patrol engaged in a "pattern and practice" of "detentive stops without reasonable suspicion" in California's El Centro Sector, where Defendant Bovino was Chief Patrol Agent. *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 735 (E.D. Cal. 2025). This Court should enjoin Defendants' policy and practice of stopping Minnesotans without reasonable suspicion.

17

## B. Defendants Have a Policy and Practice of Arresting People Without Probable Cause of Removability and Flight Risk, in Violation of the Fourth Amendment and 8 U.S.C. § 1357(a).

Defendants are systematically arresting people in violation of constitutional and statutory protections. The Fourth Amendment and federal statute require probable cause of removability before effectuating warrantless arrests. Yet Defendants have a policy and practice of arresting Somali and Latino people—including U.S. citizens—with *no* evidence of removability, and in some cases, even after being presented with documents establishing U.S. citizenship. The warrantless arrest statute also requires probable cause that an individual is a flight risk. Yet Defendants have a policy and practice of carrying out warrantless arrests with *zero* inquiry into flight risk—while targeting people who have homes, jobs, and family in the Twin Cities, and thus cannot reasonably be deemed flight risks. The Court should enjoin these arrest practices and the unlawful stops.

### 1. The Fourth Amendment and Warrantless-Arrest Statute Require Probable Cause.

Section 1357(a)(2) bars ICE agents from making warrantless arrests unless and until two conditions are met. The arresting agent must have "reason to believe" both (1) "that the [noncitizen] so arrested is in the United States in violation of any" immigration-related "law or regulation[,]" and (2) that the noncitizen "is likely to escape before a warrant can be obtained for his arrest." *See also* 8 C.F.R. § 287.8(c)(2)(i) ("An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is [a noncitizen] illegally in the United States."); *id.* § 287.8(c)(2)(ii) ("A warrant of arrest shall be obtained except

when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained.").

The Eighth Circuit has held that "reason to believe" in § 1357(a)(2) means "probable cause." *Quintana*, 623 F.3d at 1239; *United States v. Puebla-Zamora*, 996 F.3d 535, 538–39 (8th Cir. 2021) (same); *United States v. Sanchez-Velasco*, 956 F.3d 576, 581 (8th Cir. 2020) (same); *see also Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) ("Courts have consistently held that the 'reason to believe' phrase in § 1357 must be read in light of constitutional standards, so that 'reason to believe' must be considered the equivalent of probable cause.") (citations and quotation marks omitted).

Thus, as to removability, the Fourth Amendment and statutory requirements are the same: for an immigration agent to make an arrest, there must be probable cause that the arrested individual is removable. An arresting officer has probable cause if, "at the moment the arrest was made . . . the facts and circumstances within [the arresting officer's] knowledge . . . were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). It is a standard higher than "mere suspicion," *United States v. Everroad*, 704 F.2d 403, 405 (8th Cir. 1983), and is assessed from an "objective" standpoint, *Brown v. City of St. Louis*, 40 F.4th 895, 900 (8th Cir. 2022). Probable cause must also be "particularized with respect to [the] person" arrested, and—as with reasonable suspicion—"a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search [or seize] that person." *Ybarra*, 444 U.S. at 91; *see also Dunn v. Does, 1-22*, 116 F.4th 737, 747 (8th Cir. 2024).

19

For an arrest to be authorized under Section 1357(a)(2), an officer must have probable cause not only as to removability, but also as to flight risk. In other words, ICE agents must have probable cause that the person they are arresting without a warrant is both (1) in the United States unlawfully and (2) likely to escape arrest before a warrant can be obtained. *See, e.g.*, *Quintana*, 623 F.3d at 1241 (officer was required to have "'reason to believe' (i.e., probable cause to believe) that the person [being arrested] was an alien subject to deportation because [he was] illegally present in this country," and that he was "likely to escape before a warrant could be obtained" (cleaned up)).

A warrantless arrest is a "direct violation of the statute" where "there is no evidence that [the arrestee] was likely to escape before a warrant could be obtained for her arrest." *Westover v. Reno*, 202 F.3d 475, 479–80 (1st Cir. 2000*); see also, e.g.*, *Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 945 (D. Minn. 2017) ("[Plaintiff's] admission regarding his immigration status provided probable cause for the first half of what § 1357(a)(2) demands"); *accord Arizona v. United States*, 567 U.S. 387, 408 (2012) (absent a warrant, "officers . . . may arrest an alien for being 'in the United States in violation of any [immigration] law or regulation,' . . . only where the alien 'is likely to escape before a warrant can be obtained.'") (quoting § 1357(a)(2), alteration in original).

### 2. Defendants Are Arresting People Without Probable Cause of Removability, in Violation of the Fourth Amendment and Section 1357(a)(2).

Defendants are implementing a policy and practice of arresting Somali and Latino people in the Twin Cities without probable cause that they are noncitizens subject to removal. This includes numerous U.S. citizens whom Defendants have arrested while

ignoring their attempts to show documents that prove their U.S. citizenship. These abuses are no surprise given express policy statements from senior DHS officials that agents do not need probable cause to make arrests. *See* Shrinath Dec. Ex. 1–3; *Escobar Molina v. DHS*, 2025 WL 3465518, *26 (D.D.C. Dec. 2, 2025) (enjoining DHS arrest tactics based in part on these statements).

Typically, agents secure probable cause that an individual is removable from the United States through a direct "admission regarding [the person's] immigration status." *Orellana*, 230 F. Supp. 3d at 945; *see also, e.g.*, *United States v. Sanchez-Velasco*, 956 F.3d 576, 581 (8th Cir. 2020) ("When Sanchez-Velasco admitted he was in the country illegally, the officers had probable cause to arrest under 8 U.S.C. § 1357(a)(2)."). Generalizations about a specific ethnicity cannot establish probable cause, just as they are insufficient for the less demanding standard of reasonable suspicion. *Supra*; *Buffkins*, 922 F.2d at 470; *Clay*, 640 F.2d at 159-60; *Illinois*, 2025 WL 3715211, *1 n.4 (U.S. Dec. 23, 2025) (Kavanaugh, J., concurring). Neither can mere association with others suspected of the activity targeted by law enforcement, or proximity to a location associated with such activity. *See United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th Cir. 1998).

As the evidence demonstrates, DHS is routinely arresting people without probable cause of removability, including numerous U.S. citizens and individuals with permanent immigration status. With no basis to believe they were removable noncitizens, DHS physically restrained them, placed them in squad cars, drove them to other locations, and held them for hours or overnight. *See, e.g.*, Hussen Decl. ¶¶ 10–27 (officers placed Mr. Hussen in a headlock on the ground, tightly handcuffed him, put him in an SUV, and drove

21

him to an ICE office, where they scanned his face and fingerprints); Javier Doe Second Decl. ¶¶ 5–16 (officers pinned Javier Doe handcuffed him, drove him from Richfield to Bloomington, and held him in a parking lot); A.A. Decl. ¶¶ 4–8 (officers tightly handcuffed A.A. and drove him half an hour to a parking lot, where they held him in handcuffs for an additional 20 minutes, then drove him back in handcuffs); Osman Decl. ¶¶ 11–21 (officers pinned Mr. Osman to the ground, shoved him into a car, and drove away with him); Martinez Garcia Decl. ¶¶ 8–14; Moreno Decl. ¶¶ 7–21. In each instance, DHS officers had no probable cause to believe they were removable noncitizens.

Not only is DHS arresting people without reason to believe they are removable, DHS has in arrests as well as stops repeatedly ignored people's assertions and evidence of citizenship and immigration status. For instance, agents refused repeated offers by Mr. Hussen and his supervisor to show his passport card before arresting him. Hussen Decl. ¶¶ 11–15. They continued to hold Javier Doe after seeing his passport. Javier Doe Second Decl. ¶¶ 11–15; *see also supra* at 17. DHS is engaged in shocking abuses of police power that plainly violate the Fourth Amendment and 8 U.S.C. § 1357(a)(2). These protections exist precisely to prevent arbitrary arrests like these.

### 3.    Defendants Are Arresting People Without Probable Cause of Flight Risk.

The evidence also establishes that DHS has a policy and practice of violating the second prong of 8 U.S.C. § 1357(a)(2), because DHS is systematically conducting warrantless arrests without probable cause that the arrested individuals pose a flight risk.

Absent direct evidence of a specific intent to flee, probable cause of flight risk requires establishing an individual's lack of ties to the community. *See, e.g.*, *United States v. Abdi*, No. 2:04-CR-88, 2005 WL 6119695, at *6 (S.D. Ohio Sept. 12, 2005) (concluding an arresting officer lacked probable cause of flight risk where, for example, the individual owned a local business, leased a local storefront, rented a local apartment, and lived with his then-pregnant wife and children), *rev'd on other grounds*, 463 F.3d 547 (6th Cir. 2006); *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 890 (S.D. Ohio 2016) (no probable cause of flight risk where defendant "had a stable job as a painter; lived with his fiancée; helped pay the rent on their home; and helped her raise her two kids" (internal citations omitted)); *United States v. Khan*, 324 F. Supp. 2d 1177, 1187 (D. Colo. 2004) (facts establishing defendant "worked two jobs" in the community where he lived, and "contributed to rent payments for the apartment he shared with a roommate" made flight risk unlikely even though he lacked specific familial ties in the United States); *United States v. Bautista-Ramos*, No. 18-CR-4066, 2018 WL 5726236, at *7 (N.D. Iowa Oct. 15, 2018) (similar).

DHS is jettisoning this rule. Each arrest documented here was made without an administrative warrant. And for each, DHS completely disregarded the statute's flight-risk requirement, failing to engage in a meaningful flight risk analysis. In most cases, agents failed to ask a single question informing flight risk prior to arrest. Arresting officers could have asked where the person lives, how long the person has lived in their community, whether they have family in the community, their place of employment, or anything else about ties to the community. None attempted to run away from the encounter. *Cf. United*

23

*States v. Cantu*, 519 F.2d 494, 497 (7th Cir. 1975) (finding probable cause where arrestee was speeding cross country). The arresting officers had *no* information indicating any of these individuals was a flight risk, much less probable cause. Yet Defendants arrested them without a warrant, in blatant violation of Section 1357(a)(2).

Defendants have adopted similar policies and practices in other cities where they have surged enforcement. And in response, courts throughout the country have concluded that DHS has systematically violated Section 1357(a)(2)'s flight-risk requirement. *See, e.g.*, *Escobar Molina*, 2025 WL 3465518, at *26 (finding that plaintiffs had "established a substantial likelihood of an unlawful policy and practice by defendants of conducting warrantless civil immigration arrests without probable cause," supported by "defendants' own official public statements that they apply a 'reasonable suspicion' standard to conduct warrantless arrests" and examples "of arrests conducted without any questions as to escape risk"); *United Farm Workers*, 785 F. Supp. 3d at 723 (concluding that plaintiffs were likely to succeed in demonstrating that Border Patrol had a policy, pattern, or practice of warrantlessly arresting suspected noncitizens in California's Central Valley "without the required individualized flight risk analysis"); *Ramirez Ovando v. Noem*, No. 25-CV-03183, 2025 WL 3293467, at *17 (D. Colo. Nov. 25, 2025) (concluding that plaintiffs had established that defendants "likely have a pattern or practice of ignoring the individualized flight risk determinations mandated by § 1357(a)(2) and § 287.8(c)(2)(ii)").

This Court, too, should enjoin Defendants from continuing to defy statutory limits on warrantless arrests. Congress authorized DHS to make warrantless arrests only in "limited" circumstances where the person is "likely to escape." *Arizona*, 567 U.S. at 408

24

(quoting Section 1357(a)(2)).  Congress thus sought to prevent the kind of indiscriminate warrantless arrests DHS is undertaking in the Twin Cities.  DHS's persistent refusal to obey Congress's command demonstrates that an injunction is necessary here.

## II.    Absent Immediate Injunctive Relief, Plaintiffs and the Putative Class Will Continue Facing Irreparable Harm.

Plaintiffs and class members face immense harm from Defendants' unlawful stops and arrests.  These harms establish "a clear and present need for equitable relief." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (quotation omitted).  "[T]he denial of a constitutional right is a cognizable injury and an irreparable harm."  *Ng v. Bd. of Regents of the Univ. of Minn.*, 64 F.4th 992, 998 (8th Cir. 2023) (quotation omitted).  And the loss of liberty from detention or arrest is "perhaps the best example of irreparable harm."  *Matacua v. Frank*, 308 F. Supp. 3d 1019, 1025 (D. Minn. 2018); *Francisco T. v. Bondi*, 797 F. Supp. 3d 970, 976 (D. Minn. 2025).  Given Defendants' indiscriminate stop and arrest practices, Plaintiffs and countless class members plainly face "a real possibility" that they will "again be stopped or detained and subjected to unlawful detention." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

Plaintiffs' experiences so far demonstrate the magnitude of the harm that they and other class members are facing.  Plaintiffs have already been detained and arrested, often at or near their workplace, causing immediate disruption to their employment and their lives.  *See* Hussen Decl. ¶¶ 5, 29 (arrested during lunch break from work); Javier Doe Second Decl. ¶¶ 2, 5 (arrested while working); Martinez Garcia Decl. ¶ 5 (same); Moreno Decl. ¶ 3 (same); Eydarus Decl. ¶ 6 (arrested shortly after completing overnight shift); Julio

Doe Decl. ¶¶ 5, 12 (arrested in transit to job site); Santiago Doe Decl. ¶¶ 4–6, 19–20 (arrested while working); Vogt Decl. ¶¶ 5, 8 (witnessing Latino man arrested while working). They have also been subjected to significant physical force, including being tackled, placed in headlocks, shackled, and restrained. *See* Hussen Decl. ¶¶ 6, 10, 26 (grabbed, pushed, headlock, handcuffed); Javier Doe Second Decl. ¶¶ 5–9 (tackled, knee pressed on his neck, handcuffed, dragged, head slammed into vehicle); Osman Decl. ¶¶ 11 (pushing and pinning to the ground, shoving into car); Aguirre Castrejon Decl. ¶¶ 10, 15–16 (pulled, handcuffed, and pushed); Moreno Decl. ¶¶ 7–8 (pushed and handcuffed). These injuries are immediate, concrete, and "surely cannot be remediated after the fact." *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 31 (D.D.C. 2018); *see also Matacua*, 308 F. Supp. 3d at 1025. Even brief unlawful restraint constitutes irreparable harm. *See Matacua*, 308 F. Supp. 3d at 1025; *Francisco T.*, 797 F. Supp. 3d at 976 ("[B]y virtue of Petitioner's ongoing loss of liberty, he has demonstrated significant irreparable harm.").

In addition to this loss of liberty and physical violence, DHS's actions are forcing Plaintiffs to go about their daily lives in fear of further abuse. Plaintiffs and putative class members suffer from sleeplessness, physical pain, nightmares, fear, hypervigilance, and an impaired ability to work and function in daily life. *See, e.g.*, Hussen Decl. ¶¶ 35, 43-45 (sleeplessness, physical pain, nightmares, fear, hypervigilance); Javier Doe Second Decl. ¶ 25 ("We have talked about whether we need to try to limit the amount of work we all do outside the home to keep us safer, even though we need the income to pay our bills."); Eydarus Decl. ¶ 32 (sleeplessness, fear, stress); C. Castillo Decl. ¶ 17–18 (nightmares, feeling "traumatized"); Sharkey Decl. ¶ 10 ("Too afraid to leave their homes, many

employees have stopped showing up for work altogether."); Santiago Doe Decl. ¶ 22 ("hard for my family to manage financially while I am detained"); Aguirre Castrejon Decl. ¶¶ 22, 26 ("terrified," and "emotionally traumatized"). These harms also include a persistent fear of renewed targeting, forcing Plaintiffs and their families to live and work under the constant threat of unlawful stops and arrests. *See* Hussen Decl. ¶ 45 ("I am afraid that federal immigration agents will continue to cause great physical and emotional harm to me, my family, and my community."); Javier Doe Second Decl. ¶ 31 (same); Eydarus Decl. ¶ 33 (similar); C. Castillo Decl. ¶ 17 (similar); Aguirre Castrejon Decl. ¶ 26 (similar).

This threat is imminent. DHS is continuing and intensifying the challenged practices in Minnesota. Agents are targeting neighborhoods where Plaintiffs and putative class members live, work, and travel on a daily basis. *See* Hussen Decl. ¶ 40; Javier Doe Second Decl. ¶¶ 27, 31 (same); Eydarus Decl. ¶¶ 33, 40 (same); M. Castillo Decl. ¶ 2. Their activities are concentrated in neighborhoods like Lake Street, which is home to several Latino and East African shopping malls and centers. Sharkey Decl. ¶¶ 4, 8. DHS's ominous presence has created a devastating impact on immigrant-run businesses, many of which have closed out of fear and may never recover. *Id.* ¶¶ 10–13. At this point there are thousands of DHS agents combing their neighborhoods for Somali and Latino people to detain.[9] That easily satisfies the requirement of irreparable harm. *See United Food & Com.*

---

[9] Ex. 8, Rebecca Santana & Mike Balsamo, *Homeland Security plans 2,000 officers in Minnesota for its 'largest immigration operation ever'*, AP News (Jan. 6, 2026), https://apnews.com/article/immigration-enforcement-ice-noem-minnesota-somali-db661df6de1131a034da2bda4bb3d817/.

*Workers Union, Local No. 663 v. U.S. Dep't of Com.*, 532 F. Supp. 3d 741, 767 (D. Minn. 2021) (holding that the risk of future harm was substantial enough when a policy concretely and "substantially increased the [plaintiffs'] risk of physical injury"); *see also Postawko v. Mo. Dep't of Corrs.*, No. 16-cv-4219, 2017 WL 3185155, at *11 (W.D. Mo. July 26, 2017) (noting the "significant risk of harm" that a policy posed to plaintiffs); *Caroline C. ex rel. Carter v. Johnson*, 174 F.R.D. 452, 461 (D. Neb. 1996) (same).

## III.    The Equities and the Public Interest Favor Plaintiffs.

The balance of equities and public interest "merge when the Government is the party opposing the preliminary injunction." *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And both decisively weigh in favor of Plaintiffs.

The public is served by requiring the government to comply with the Constitution and federal law. "[T]here is a substantial public interest in ensuring that government agencies comply with federal law," and the public interest is not served "by permitting federal officials to flaunt the very laws that they have sworn to enforce." *Ziliang J. v. Noem*, No. 25-cv-1391, 2025 WL 1358665, at *2 (D. Minn. Apr. 17, 2025); *Shaik v. Noem*, No. 25-cv-1584, 2025 WL 2307619, at *8 (D. Minn. Aug. 11, 2025) (finding that there is a substantial public interest "in Americans trusting their own government to follow the rule of law"); *see* Vogt Decl. ¶ 13 ("No part of [witnessing] this arrest made me feel safer."); Sharkey Decl. ¶ 16 ("ICE activity has not made Lake Street safer."); Moreno Decl. ¶ 25.

28

On the other side of the scale, Defendants have no colorable interest in continuing unlawful and unconstitutional stops and arrests. *See Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025). The public interest and equities therefore strongly favor Plaintiffs.

## IV.    Scope of Relief

The Court should enjoin (or stay) the three policies and practices. Preliminary relief should also include documentation requirements, to provide meaningful interim relief that promotes Defendants' compliance and allows for a mechanism to address any noncompliance that harms class members. These kinds of documentation requirements are common in preliminary injunction orders in similar class-action cases challenging unlawful stops and arrests.[10] *See, e.g.*, *Melendres v. Arpaio*, 784 F.3d 1254, 1266 (9th Cir. 2015) (affirming injunction requiring, *inter alia*, the development of a system that collected traffic stop data, including audio and video recordings); *United Farm Workers*, 785 F. Supp. 3d at 743 (preliminary injunction required defendants to document facts of arrest, similar to the documentation requests in Plaintiffs' proposed order here); *Escobar Molina*, 2025 WL 3465518, at *39 (same); *Ramirez Ovando*, 2025 WL 3293467, at *24 (same); *Floyd v. City of New York*, 959 F. Supp. 2d 668, 681-83, 689 (S.D.N.Y. 2013) (preliminary injunction order required NYPD to begin documenting the bases for stops in narrative form). As courts have recognized, this kind of injunction is "narrowly tailored to remedy the harm" of suspicionless stops and warrantless arrests lacking probable cause on a classwide basis. *Ramirez Ovando*, 2025 WL 3293467, at *23 (citation omitted).

---

[10] Indeed, Defendants previously complied with similar requirements as a matter of course. Shrinath Decl. Ex. 13.

## V.    Security

District courts may dispense with a bond where the requested injunction serves an important public interest and poses no realistic risk of harm to defendants.  *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps. of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016).  The proposed preliminary relief simply requires ICE and its agents to conform their conduct to existing law, and Defendants cannot claim cognizable harm from being ordered to stop unlawful conduct.  The Court should therefore require no bond, or at most a nominal bond.

## CONCLUSION

The Court should grant a preliminary injunction or a stay of agency action.

Dated: January 16, 2026                           s/ *Kshithij Shrinath*

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT**

Spencer Amdur*
Oscar Sarabia Roman*
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
samdur@aclu.org
osarabia@aclu.org

Kathryn Huddleston*
Lucia Goin*
915 15th Street NW, 7th Floor
Washington, D.C. 20005
T: (212) 549-2500
khuddleston@aclu.org
lgoin@aclu.org

**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**
Teresa Nelson (#269736)
Catherine Ahlin-Halverson (#350473)
Alicia Granse (#400771)
Benjamin Casper (#0276145)
P.O. Box 14720
Minneapolis, MN 55414
Tel: (651) 529-1692
tnelson@aclu-mn.org
cahlin@aclu-mn.org
agranse@aclu-mn.org
bcasper@aclu-mn.org

Ian Bratlie (#319454)
424 N. Riverfront Dr. No. 34
Mankato, MN 56001
Tel: (507) 995-6575
ibratlie@aclu-mn.org

Omar C. Jadwat*
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
ojadwat@aclu.org

**COVINGTON & BURLING, LLP**

Robert Fram*
415 Mission Street, Suite 5400
San Francisco, CA 94105
rfram@cov.com
415-591-7025

Gregg Levy*
Paul Killebrew*
850 Tenth Street, NW
Washington, DC 20001
glevy@cov.com
pkillebrew@cov.com

Bree Peilen*
30 Hudson Yards
New York, NY 10001
bpeilen@cov.com

**GREENE ESPEL PLLP**

Amran A. Farah, Reg. No. 0395354
Aaron P. Knoll, Reg. No. 0393066
Benjamin Larson, Reg. No. 0504146
Michelle E. Morrow, Reg. No. 0504419
Nicholas Scheiner, Reg. No. 0402470
Kshithij Shrinath, Reg. No. 0505164
X. Kevin Zhao, Reg. No. 0391302
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
afarah@greeneespel.com
aknoll@greeneespel.com
blarson@greeneespel.com
mmorrow@greeneespel.com
nscheiner@greeneespel.com
kshrinath@greeneespel.com
kzhao@greeneespel.com
(612) 373-0830

**ROBINS KAPLAN, LLP**

Raoul Shah, Reg. No. 0399117
Bahram Samie, Reg. No. 0392645
Ellen Levish, Reg. No. 0400878
Stacey Slaughter, Reg. No. 0296971
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
rshah@robinskaplan.com
bsamie@robinskaplan.com
elevish@robinskaplan.com
sslaughter@robinskaplan.com
(612) 349-8500

*Attorneys for Plaintiffs*

* *Pro Hac Vice admissions pending*