# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MUBASHIR KHALIF HUSSEN, MAHAMED EYDARUS, and JAVIER DOE *on behalf of themselves and others similarly situated,* | Case No. 0:26-cv-00324-ECT-ECW |
| Plaintiffs, | |
| v. | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PROVISIONAL CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL** |
| KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; DAVID EASTERWOOD, *in his official capacity as U.S. Immigration and Customs Enforcement Field Office Director for St. Paul, Minnesota*; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection*; U.S. BORDER PATROL; MICHAEL W. BANKS, *in his official capacity as Chief of U.S. Border Patrol*; and GREGORY BOVINO, *in his official capacity as Commander-at-Large of U.S. Border Patrol,* | |
| Defendants. | |

## INTRODUCTION

Since the federal government began "Operation Metro Surge" in early December 2025—announced with President Donald Trump's denigration of Somali people as "garbage"[1]—agents from the Department of Homeland Security ("DHS") have descended on the Twin Cities in unprecedented numbers. Only about 1.5% of Minnesotans are undocumented immigrants.[2] And more than 90% of Minnesota's Somali population, an explicit target of Operation Metro Surge, are citizens;[3] the same is true of around three-quarters of its Latino population.[4] Nonetheless, the federal government has flooded the Minneapolis and St. Paul area with 3,000 DHS agents over the last six weeks—more than double the total number of officers in the police departments of Minneapolis and St. Paul combined.[5]

---

[1] Exhibits 1 to 19 referenced herein are attached to the Declaration of Kshithij Shrinath in Support of Plaintiffs' Motion for Provisional Class Certification and Appointment of Class Counsel. Ex. 1, Isabella Murray, Lalee Ibssa, & Ivan Pereira, *Trump Describes Somali Immigrants as "Garbage" Amid Feud with Minnesota Congresswoman, Governor*, ABC News (Dec. 3, 2025), https://abcnews.go.com/Politics/trump-describes-somali-immigrants-garbage-amid-feud-minnesota/story?id=128069199.

[2] Ex. 2, Cameron Macht, *The Role of Undocumented Immigrants in Minnesota's Workforce*, Minn. Dep't of Econ. Dev. (Mar. 2025), https://mn.gov/deed/newscenter/publications/trends/mar-2025/immigrants.jsp.

[3] *See* Ex. 3, Alyssa Chen, *Most Somali People in America and Minnesota Are Citizens*, Minn. Reformer (Dec. 5, 2025), https://minnesotareformer.com/briefs/most-somali-people-in-america-and-minnesota-are-citizens.

[4] Ex. 4, UnidosUS, *Minnesota State Fact Sheet*, National Council of La Raza, https://unidosus.org/wp-content/uploads/2021/07/MN.pdf.

[5] *See* Ex. 5, Jeff Hargarten & Jake Steinberg, *Homeland Security Presence in Minnesota Dwarfs Twin Cities' Largest Police Forces*, Star Trib. (Jan. 13, 2026), https://www.startribune.com/how-ice-numbers-compare-to-twin-cities-largest-police-forces/601562617.

Since arriving in the Twin Cities, DHS has detained people going about their daily lives with no reason to believe they are removable noncitizens—particularly targeting Somali and Latino individuals—and engaged in swift arrests, often by snatching people off the street and shoving them into unmarked vehicles. DHS's implementation of these policies and practices is corroborated by scores of media reports and the declarations submitted in this case. DHS agents, including from U.S. Immigration & Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"), have repeatedly detained people without reasonable suspicion, and arrested people without a warrant and without probable cause that the arrestee is unlawfully in the United States or presents a risk of flight before a warrant can be obtained. Indeed, the common thread uniting those targeted by DHS is not removability or flight risk, but rather that they are, or appear to be, Somali or Latino. It is thus no surprise that the government's dragnet has illegally swept up numerous U.S. citizens and residents with immigration status.

Therefore, on behalf of themselves and others similarly situated, Plaintiffs Mubashir Khalif Hussen, Mahamed Eydarus, and Javier Doe[6] seek class-wide relief to constrain Defendants' abuse of authority and to protect Minnesotans from being subjected to these unlawful stops and arrests. Courts around the country have certified similar classes in similar cases challenging DHS's unlawful stop and arrest practices. *See Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. 25-cv-3417 (BAH), 2025 WL 3465518, at *38 (D.D.C.

---

[6] Plaintiffs have filed a motion to proceed pseudonymously for Plaintiff Javier Doe. ECF No. 15.

Dec. 2, 2025); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 742–73 (E.D. Cal. 2025) (similar); *Castañon Nava v. Dep't of Homeland Sec.*, No. 18-cv-3757, slip op. at 4 (N.D. Ill. Feb. 8, 2022), Dkt. No. 158 (final approval order).

Plaintiffs satisfy all the requirements for class certification under Federal Rule of Civil Procedure 23, including provisional class certification. To begin, they meet the requirements of Rule 23(a). Members of the proposed Classes and Subclasses are numerous—so numerous that joinder is impracticable. Hundreds (if not thousands) have already been arrested over the past six weeks, with more every day as DHS's siege continues. Even more have been stopped for questioning without reasonable suspicion. There are numerous questions of law and fact common to the Classes and Subclasses— among other things, whether DHS has followed three specific unlawful policies and practices alleged in this case. Plaintiffs' claims are also typical of the Classes' and Subclasses' claims because they all arise from the same illegal policies and practices. And finally, Plaintiffs are adequate class representatives, because they have no conflicts with other class members and are represented by experienced class counsel. Provisional class certification is also appropriate under Rule 23(b)(2), because Defendants have "acted . . . on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

For these reasons, to facilitate class-wide relief on the motion for preliminary injunction, Plaintiffs respectfully request that the Court grant provisional class certification under Rule 23(b)(2), appoint the Plaintiffs as Class Representatives as set forth below, and appoint the undersigned as Class Counsel.

## BACKGROUND

Federal law and the Fourth Amendment of the U.S. Constitution prohibit immigration officers from arbitrarily detaining individuals for interrogation. Instead, immigration officers must have "a reasonable suspicion, based on specific articulable facts, that the person being questioned . . . is an alien illegally in the United States" before even a brief detention for questioning is permitted. 8 C.F.R. § 287.8(b)(2) (2025); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975); *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Federal law and the Fourth Amendment also prohibit immigration officers from making warrantless arrests, except in narrow circumstances. Before making a warrantless arrest, immigration agents must have individualized probable cause that: (1) the person to be arrested is in the United States in violation of immigration laws, *and* (2) the person is likely to escape before a warrant can be obtained. *See* 8 U.S.C. § 1357(a)(2) (2024); *Arizona v. United States*, 567 U.S. 387, 408 (2012); *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010) ("Because the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in § 1357(a)(2) means constitutionally required probable cause."); 8 C.F.R. § 287.8(c)(2)(ii).

In recent months, following executive directives, DHS agents in Minnesota have trampled these legal requirements. These agents, in both individual stops and large-scale raids, have detained hundreds (if not thousands) of people for purported immigration purposes without the requisite reasonable, articulable suspicion. And they have made

hundreds (if not thousands) of warrantless arrests,[7] again for purported immigration purposes, but without probable cause that the arrestee is subject to removal, and without probable cause that the arrestee poses a flight risk. These unlawful detentions have affected citizens and non-citizens alike, and without this Court's intervention, will continue and likely worsen. Indeed, the government continues to send more masked and armed federal agents to carry out this dragnet—nearly 3,000 agents so far.[8] With this increased presence, DHS recently touted arresting 150 people in one day, on Monday, January 5, 2026.[9]

As detailed in the Complaint, the preliminary injunction motion, and the accompanying declarations, DHS has adopted and executed an unlawful policy and practice of stopping people—especially targeting Somali and Latino individuals—without reasonable suspicion and arresting them without a warrant and without probable cause of removability or flight risk. For example:

---

[7] *See* Ex. 6, *2,400 Have Been Arrested By Immigration Officials Since Operation Metro Surge Began, DHS Says*, KARE 11 (Jan. 13, 2026), https://www.kare11.com/article/news/local/ice-in-minnesota/ice-arrests-twin-cities-department-of-homeland-security-nbc/89-1b55f7f3-0a44-4b23-9950-c6513fe6c608.

[8] Ex. 7, Nicole Sganga & Camilo Montoya-Galvez, *2,000 Federal Agents Deploying to Minneapolis in Immigration Crackdown, Fraud Probe*, CBS News (Jan. 5, 2026), https://www.cbsnews.com/news/minneapolis-federal-agents-crackdown; Ex. 8, U.S. Department of Homeland Security (@DHSgov), X (Jan. 6, 2026 at 3:21 PM), https://x.com/DHSgov/status/2008650038847959106; Ex. 9, Madison McVan, *Homeland Security Sec. Kristi Noem Visits Minnesota as ICE Agents Arrive*, S.C. Times (Jan. 7, 2026), https://www.sctimes.com/story/news/2026/01/07/kristi-noem-speaks-in-minnesota-as-ice-agents-move-in/88063262007.

[9] Ex. 10, Rebecca Santana & Michael Balsamo, *2,000 Federal Agents Sent to Minneapolis Area to Carry Out 'Largest Immigration Operation Ever,' ICE Says*, PBS News (Jan. 6, 2026), https://www.pbs.org/newshour/politics/2000-federal-agents-sent-to-minneapolis-area-to-carry-out-largest-immigration-operation-ever-ice-says.

- On December 10, 2025, ICE agents arrested Plaintiff Hussen, a United States citizen, as he was walking to get lunch at a restaurant in the Cedar-Riverside neighborhood. Mr. Hussen repeatedly told the agents, "I'm a citizen" and said "I have an I.D." But the agents responded, "That don't matter." They dragged him out of the restaurant, put him in a headlock on the ground, handcuffed him, and forced him into an unmarked SUV. The agents also ignored Mr. Hussen's supervisor, who attempted to show them copies of Mr. Hussen's passport card while Mr. Hussen was being detained in the SUV. The agents took Mr. Hussen to the ICE facility at Fort Snelling, where they finally reviewed his passport card. Once they did, a woman working at the ICE facility said to "Kick him out," after which Mr. Hussen was released at Fort Snelling and told to walk home nearly seven miles in freezing temperatures. Mubashir Hussen Decl. (filed Jan. 16, 2026).

- On December 10, 2025, armed ICE agents surrounded Plaintiff Mahamed Eydarus and his mother, both U.S. citizens, and detained them for nearly 30 minutes, while a social media influencer who was accompanying the agents filmed the encounter. The agents demanded to see Mr. Eydarus's identification, to confirm that he was "not illegal." The agents demanded that Mr. Eydarus's mother remove her niqab, a cultural and religious face covering. Eventually, the agents left without ever presenting a warrant or identifying any basis to detain Mr. Eydarus and his mother. Mahamed Eydarus Decl. (filed Jan. 16, 2026).

- On January 8, 2026, DHS agents showed up at the parking lot of a Target where Javier Doe, a U.S. citizen, worked. Defendant Bovino asked Doe and his co-worker—both of whom were Latino—if they were citizens, and another agent asked, "Are you from here?" When Javier said that he did not need to answer them, the agent tackled him to the ground, and multiple agents pinned him down. Even as Javier said he was a U.S. citizen, the agents dragged Javier and his co-worker into an SUV. The agents drove around for a while, playing Mexican music loudly, before finally looking at Javier's passport and eventually releasing him in a Walmart parking lot. Javier Doe Second Decl. (filed Jan. 16, 2026).

- On January 9, 2026, ICE agents arrested A.A., a Somali lawful permanent resident and green card holder in the parking lot of a Burnsville Walmart. Despite seizing A.A.'s green card, the agents handcuffed him and detained him for approximately 90 minutes. The agents also made no attempt to assess whether A.A. might have presented a flight risk, such as by asking about his family and ties to the local community. A.A. Decl. (filed Jan. 16, 2026).

- On December 2, 2025, ICE agents detained Ali Dahir, a United States citizen, for approximately 30 minutes outside his Minneapolis apartment in below-

freezing weather. Even after Dahir informed the ICE agents that he is a citizen and provided his passport as proof, the agents told him he was not free to leave. The agents never presented a warrant or gave any indication that they knew who Dahir was before detaining him. Ali Dahir Decl. (filed Jan. 16, 2026).

- On December 24, 2025, ICE agents arrested Julio Doe, a Salvadoran man with a pending asylum application, in Rosemount, Minnesota. ICE agents pulled over the vehicle in which Julio was a passenger for no apparent reason; one officer pulled out his gun. Without making any inquiry into whether Julio was a flight risk, the agents handcuffed and arrested him, ultimately taking him to the Freeborn County Jail in Albert Lea, where he remained as of January 12, 2026. The agents did not ask for information to assess whether Julio presented a flight risk. Julio Doe Decl. (filed Jan. 16, 2026).

- On December 12, 2025, ICE agents arrested Luisa Doe, a Honduran woman with a pending asylum application, an immigration court hearing in May, and a valid work permit. The agents pulled over Luisa's vehicle for no apparent reason, made her get out, handcuffed her, and drove her to an ICE facility in Bloomington, Minnesota, all without asking her immigration status, or asking to see her documents. Eventually, the agents took her to the Douglas County Jail in Wisconsin, where she remained in custody as of January 12, 2026, without access to diabetes medication. At no point did the ICE agents ask questions to determine whether Luisa presented a flight risk. Luisa Doe Decl. (filed Jan. 16, 2026).

These and numerous other stories illustrate three clear policies and practices that DHS is carrying out at a wide scale in Minnesota. One is to stop people without reasonable suspicion of removability—a violation previously enjoined class-wide in the Eastern District of California as to Border Patrol. *United Farm Workers*, 785 F. Supp. 3d at 742–43. Another is to arrest people without a warrant and without probable cause of removability. And a third is to arrest people without a warrant and without probable cause of flight risk—a violation that multiple courts have enjoined class-wide in districts around the country.

8

Defendants' public statements confirm their disregard for the applicable legal standards. Defendants have repeatedly made public statements highlighting their policy of making warrantless immigration arrests based on *reasonable suspicion* alone, rather than the legally required probable cause. For example, in a September 25, 2025 post that has not been deleted, DHS's official X account stated that "[u]nder the [F]ourth [A]mendment of the U.S. Constitution, DHS law enforcement uses 'reasonable suspicion' to make arrests."[10] On December 16, 2025, DHS again asserted in an X post that "DHS law enforcement uses 'reasonable suspicion' to make arrests."[11] In a video posted on DHS's account on December 21, 2025, Deputy Assistant Secretary Lauren Bis made the same misstatement of law.[12] And yesterday, in response to this lawsuit, DHS provided a statement saying, "DHS law enforcement uses 'reasonable suspicion' to make arrests."[13]

Border Patrol commander Gregory Bovino, who has overseen immigration enforcement actions in the Twin Cities and other cities in the United States, has also told

---

[10] Ex. 11, U.S. Department of Homeland Security (@DHSgov), X (Sep. 25, 2025 at 3:45 PM) https://x.com/DHSgov/status/1971315047201694042; *see also* Ex. 12, Teo Armus & Jenny Gathright, *Lawsuit Accuses ICE of Illegally Arresting Latino Immigrants in D.C.*, The Washington Post (Sept. 25, 2025), https://www.washingtonpost.com/immigration/2025/09/25/dc-ice-arrests-lawsuit-trump/.

[11] Ex. 13, U.S. Department of Homeland Security (@DHSgov), X (Dec. 16, 2025 at 11:21 AM) https://x.com/DHSgov/status/2000979658179752224.

[12] Ex. 14, U.S. Department of Homeland Security (@DHSgov), X (Dec. 21, 2025 at 3:31 PM) https://x.com/dhsgov/status/2002854584272974223.

[13] Ex. 15, Alicia Victoria Lozana, *Lawsuit Accuses Federal Agents of Racial Profiling in Minneapolis Immigration Operation*, NBC News (Jan. 15, 2026), https://www.nbcnews.com/news/us-news/lawsuit-accuses-federal-agents-racial-profiling-minneapolis-immigratio-rcna254245.

the press that "[w]e need reasonable suspicion to make an immigration arrest. . . . You notice I did not say probable cause, nor did I say I need a warrant. We need reasonable suspicion of illegal alienage that's well-grounded within the United States immigration law."[14] Defendant Bovino was present during the arrest of Javier Doe.

These statements show a stunning disregard for the clear legal limits that constrain DHS's power, and they come directly from high-level policymakers. Class-wide injunctive relief is necessary to protect the targets of Defendants' widespread campaign of illegal stops and arrests. Plaintiffs seek provisional certification for the following classes, for purposes of preliminary injunctive relief:

> **Stops Class:**  All persons who, since December 1, 2025, have been or will be subject to an investigatory stop for immigration purposes by DHS in Minnesota.

> **Warrantless Arrests Class:** All persons who, since December 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in Minnesota.

>> **Removability Subclass:** All persons who, since December 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in Minnesota without probable cause that the person is a non-citizen who is subject to removal from the United States.

>> **Flight Risk Subclass:** All persons who, since December 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in Minnesota without probable cause that the person is likely to escape before a warrant can be obtained.

---

[14] Ex. 16, Hanna Park et al., *October 7, 2025: National Guard Deployments*, CNN (Oct. 8, 2025), https://www.cnn.com/us/live-news/national-guard-chicago-portland-trump-10-07-25.

As detailed below, the proposed classes easily satisfy the requirements for certification under Rules 23(a) and 23(b)(2).[15]

## LEGAL STANDARD

A plaintiff whose suit satisfies the requirements of Rule 23 has a "categorical" right "to pursue his claim as a class action." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). Rule 23(c) requires courts to determine "whether to certify the action as a class action" at "an early practicable time after a person sues . . . as a class representative." Fed. R. Civ. P. 23(c)(1)(A); *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 611 (8th Cir. 2011).

Although the Eighth Circuit has not had occasion to address the issue, courts across the country "routinely grant provisional class certification for purposes of entering injunctive relief." *Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013, 1046 (D. Idaho 2025); *see also Padres Unidos de Tulsa v. Drummond*, 783 F. Supp. 3d 1324, 1350–51 (W.D. Okla. 2025) ("Numerous courts have found provisional certification alone sufficient for purposes of awarding preliminary relief." (collecting cases)); *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041-43 (9th Cir. 2012) (affirming provisional class certification for purposes of a preliminary injunction); *Trump v. CASA, Inc.*, 606 U.S. 831, 869 (2025) ("plaintiffs who challenge the legality of a new federal statute or executive action and request preliminary injunctive relief may sometimes seek to proceed by class action under Federal Rule of Civil Procedure 23(b)(2) and ask a court

---

[15] Plaintiffs will in due course seek class certification for all pleaded classes for purposes of permanent injunctive relief.

to award preliminary classwide relief that may, for example, be statewide, regionwide, or even nationwide") (Kavanaugh, J. concurring).

"To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b)." *In re St. Jude Medical, Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005). Rule 23(a) requires that: (1) the plaintiff class is sufficiently numerous as to render the joinder of all members in a suit impracticable, (2) the class contains common questions of law or fact, (3) the representative parties have brought claims or defenses that are typical of those of the broader class, and (4) the interests of the class will be sufficiently protected by the representative parties. *See id.*

A certifiable class must also meet one of three criteria set out in Rule 23(b). Fed. R. Civ. P. 23(b). Here, class certification is proper under Rule 23(b)(2) because Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," Fed. R. Civ. P. 23(b)(2), and "a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).[16]

---

[16] Some courts have stated that, "[a]lthough a plaintiff requesting provisional certification must still demonstrate that Rule 23's requirements are met, the court's normally rigorous analysis is tempered by the understanding that such certifications may be altered or amended before the decision on the merits." *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (brackets and quotations omitted). Plaintiffs easily satisfy the class certification requirements, regardless of whether the standard is "tempered" or not for provisional class certification.

## ARGUMENT

Other courts have recently certified classes similar to those proposed here in cases challenging DHS's policies and practices of unlawful detention. *See, e.g., Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. 25-cv-3417 (BAH), 2025 WL 3465518, at *30-31, 38 (D.D.C. Dec. 2, 2025) (certifying an "unassessed escape risk class"); *Ramirez Ovando v. Noem*, No. 25-cv-03183-RBJ, 2025 WL 3293467, at *14 (D. Colo. Nov. 25, 2025); *United Farm Workers*, 785 F. Supp. 3d at 730 (Suspicionless Stop Class and Warrantless Arrest Class).

As in those cases, certification is appropriate in this case under Rule 23(a). *First*, the proposed classes are sufficiently numerous, as hundreds (if not thousands) of people have been detained for questioning without the legal prerequisite of reasonable, articulable suspicion, and/or arrested without a warrant and without probable cause of removability or flight risk. *Second*, all class members have suffered or will suffer the same injury: illegal detention and/or arrest in violation of the U.S. Constitution and federal law (8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8). The classes therefore raise common questions that will generate common answers, including whether Defendants are enforcing the policies and practices as alleged, and whether those policies and practices violate the Constitution and federal law. *Third*, Plaintiffs' legal claims are typical of those whom they seek to represent, as each was detained without reasonable, articulable suspicion, and/or arrested without a warrant or probable cause of removability and of flight risk. *Finally*, Plaintiffs have no conflicts with other class members and are represented by qualified counsel with experience litigating class actions and cases involving the rights of noncitizens.

The proposed classes also easily satisfy Rule 23(b)(2) because Defendants have acted, or have refused to act, on grounds that apply generally to the classes by summarily detaining and arresting individuals without legal basis. Accordingly, the classes would be amenable to uniform, class-wide remedies, such as declaring Defendants' policies and practices unlawful and enjoining them moving forward.

## I. THE PROPOSED CLASSES SATISFY RULE 23(a)'s REQUIREMENTS.

### A. The Proposed Classes Are So Numerous that Joinder is Impracticable.

The most relevant factor to the numerosity analysis is the "number of persons in the proposed class," although "[n]o arbitrary rules regarding the necessary size of classes have been established." *Paxton v. Union Nat. Bank,* 688 F.2d 552, 559 (8th Cir. 1982). Courts have previously cited as few as 16 class members as sufficient to meet the requirement of numerosity. *Id.* at 561 (citations omitted). "Generally, a putative class size of forty will support a finding of numerosity, and much smaller classes have been certified by courts in the Eighth Circuit." *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 944 (D. Minn. 2018). Indeed, courts have recognized that "[s]maller classes are less objectionable where [plaintiffs are] seeking injunctive relief on behalf of future class members as well as past and present members." *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019) (quoting *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975)).

Plaintiffs have plainly satisfied the numerosity requirement as to all four classes. While precise arrest and detention figures for Operation Metro Surge are not available, DHS itself reported more than 2,400 arrests as part of Operation Metro Surge as of

January 13, 2026.[17] DHS has not defined the scope of this number, and it likely does not include the stops and arrests of Plaintiffs who are U.S. citizens. News reports and the experiences of the Plaintiffs and declarants in this case show that DHS agents have repeatedly made stops without reasonable suspicion that the subject lacks immigration status and warrantless arrests without probable cause that the arrestee is in the country unlawfully or presents a flight risk. *See supra* at 5–10; *see also* Said Osman Decl.; Santiago Doe Decl.; Julio Cesar Martinez Decl.; Pedro Moreno Decl.; Raul Aguirre Castrejon Decl.; Mark Castillo Decl; Lindsay Vogt Decl. (all filed Dec. 16, 2026). These classes are significantly larger than the 40-member number that triggers a presumption of impracticability. *Portz*, 297 F. Supp. 3d at 944. Accordingly, the hundreds or thousands of members of these classes make joinder impracticable and satisfy the numerosity requirement for class certification.

Additionally, the proposed class also includes numerous future members who are currently unknown but who will inevitably be caught up in DHS's escalating assault on Minnesota. Indeed, the scope of "Operation Metro Surge" expands almost daily, with DHS

---

[17] Ex. 6, *2,400 Have Been Arrested By Immigration Officials Since Operation Metro Surge Began, DHS Says,*, KARE 11 (Jan. 13, 2026), https://www.kare11.com/article/news/local/ice-in-minnesota/ice-arrests-twin-cities-department-of-homeland-security-nbc/89-1b55f7f3-0a44-4b23-9950-c6513fe6c608.

sending 2,000 agents on January 6, 2026,[18] adding another 1,000 agents on January 12,[19] and President Trump threatening a "day of reckoning & retribution" the next day.[20] This surge of immigration agents promises to ensnare hundreds, if not thousands, of additional U.S. citizens and other Minnesota residents given DHS officers' demonstrated disregard for constitutional and statutory requirements in making stops and arrests. Joinder of all of these as-yet unknown Minnesotans is by definition impracticable. *See, e.g., id.* (finding numerosity "where an unknown group" of prospective college students "may in the future suffer harm").

All three classes proposed for provisional certification meet Rule 23(a)(1)'s numerosity requirement.

### B.    The Proposed Classes Meet the Commonality Requirement.

The classes also meet Rule 23(a)'s requirement of "questions of law or fact common to [each] class." Fed. R. Civ. P. 23(a)(2). Rule 23(a)(2) commonality is a relatively low bar, requiring only "a *single* common question," *Ebert*, 823 F.3d at 478 (emphasis added), that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one

---

[18] Ex. 17, Rebecca Santana & Mike Balsamo, *Homeland Security Plans 2,000 Officers in Minnesota for Its 'Largest Immigration Operation Ever'*, AP News (January 6, 2026), https://apnews.com/article/immigration-enforcement-ice-noem-minnesota-somali-db661df6de1131a034da2bda4bb3d817.

[19] Ex. 18, Hamed Aleaziz & Madeleine Ngo, *Trump Officials Are Sending 1,000 More Immigration Officers to Minnesota*, N.Y. Times (Jan. 12, 2026), https://www.nytimes.com/2026/01/12/us/politics/border-patrol-minnesota-surge.html.

[20] Ex. 19, Donald J. Trump (@realDonaldTrump), Truth (Jan. 13, 2026 at 7:40 AM), https://truthsocial.com/@realDonaldTrump/posts/115888070937502023.

stroke." *Dukes*, 564 U.S. at 350. Factual "dissimilarities . . . do not defeat the existence of commonality if there is a single common question that can drive answers." *Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*, 577 F. Supp. 3d 970, 991 (D. Minn. 2021) (citing *Dukes*, 564 U.S. at 359). The fact that individual class members may have "claims of differing strengths" based on their unique facts "does not impact on the commonality of the class as structured." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995).

"The commonality requirement is satisfied as long as the members of the class have allegedly been affected by a general policy of the defendant, and the general policy is the focus of the litigation." *Arnold v. Cargill Inc.*, No. 01-cv-2086 (DWF/AJB), 2006 WL 1716221, at *11 (D. Minn. June 20, 2006). Accordingly, courts in this Circuit have found commonality met where plaintiffs challenge governmental policies or practices, because the existence and legality of those policies and practices can be determined on a classwide basis. *See, e.g., Postawko v. Missouri Dep't of Corr.*, 910 F.3d 1030, 1038-39 (8th Cir. 2018) (whether "policy or custom of withholding treatment with DAA drugs" constituted "deliberate indifference to a serious medical need" satisfied commonality). Here, there are clearly defined questions of law and fact capable of classwide resolution as to each of the classes proposed for provisional certification.

***Stops Class.*** Notwithstanding factual variations across individual investigative stops, class members' claims all hinge on common questions:

- Whether DHS has a policy, pattern, or practice of making immigration stops without the required reasonable suspicion that the stopped individual is present in the United States unlawfully, and

- Whether such policy, pattern or practice is unlawful.

17

Individual differences in the facts of class members' detentions do not undermine commonality. "[F]actual variations among the class members will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members." *Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476, 483 (D.D.C. 2019) (quotations omitted). "Indeed, (b)(2) classes have been certified in a legion of civil rights cases where commonality findings were based primarily on the fact that defendant's conduct is central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the conduct." *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994). Here, the Stops Class members "allege a common policy that unites all class members' claims and 'touch and concern' all class members." *Taqueria El Primo*, 577 F. Supp. 3d at 991–92 (citing *Dukes*, 564 U.S. at 359, 359 n.10). That suffices to meet Rule 23(a)(2)'s commonality requirement.

***Warrantless Arrest Class, and Removability and Flight Risk Subclasses.*** Similarly, the claims of the Warrantless Arrest Class, including the Removability Subclass and Flight Risk Subclass, hinge on legal and factual questions that can be resolved on a classwide basis:

- Whether DHS has a policy, pattern, or practice of making immigration arrests without probable cause that the arrestee is removable,

- Whether DHS has a policy, pattern, or practice of making immigration arrests without probable cause that the arrestee is likely to escape before a warrant may be obtained, and

- Whether these policies and practices violate 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(i)–(ii), and/or the Fourth Amendment to the Constitution.

18

Here again, the facts of any single class member's arrest do not undermine commonality because they are irrelevant to the determination of these questions. "[T]he legality of the challenged policy and practice" of making warrantless arrests without meeting statutory prerequisites "is not a question that requires wading into 'fact-specific and individualized' determinations about each class members' [sic] arrest." *Escobar Molina*, 2025 WL 3465518, at *33 (certifying class in challenge to DHS's warrantless arrests).

Ultimately, the claims of all class members focus on Defendants' policies and practices of conducting unlawful stops and arrests—claims which depend largely, if not entirely, on the existence and legality of those policies and practices. The "common answers" to these questions will "drive the resolution of the litigation" as to each of the classes for which Plaintiffs seek provisional certification. *Dukes*, 564 U.S. at 350 (internal citation omitted). Rule 23(a)(2) commonality is met.

### C.    Plaintiffs' Claims are Typical of Class Members' Claims.

Federal Rule of Civil Procedure 23(a) also requires "the claims or defenses of the representative parties" to be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The burden of showing typicality is not an onerous one." *Paxton*, 688 F.2d at 562. The typicality requirement, "is fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer*, 64 F.3d at 1174. Moreover, "[f]actual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the

same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).

Typicality is satisfied here because the proposed class representatives' claims are typical of those of the putative class members. Plaintiff and U.S. citizen Mahamed Eydarus was detained for nearly 30 minutes by federal agents demanding to see his identification to "confirm" he was "not illegal." Mahamed Eydarus Decl. ¶¶ 16, 31. Without ever asking his name or seeing his identification documents, the agents told Mr. Eydarus that they had determined he was a U.S. citizen, confirming that they never had any reasonable suspicion that he was in the United States unlawfully to begin with. *See id.* ¶ 38. Mr. Eydarus's claims are typical of those of the Stops Class.

ICE agents accosted Plaintiff and U.S. citizen Mubashir Hussen on the sidewalk near his place of work. Mubashir Hussen Decl. ¶ 10. Despite Mr. Hussen repeatedly telling the agents, "I'm a citizen" and said "I have an I.D.," they ignored him, dragging him outside, handcuffing him, forcing him into an unmarked SUV, and taking him to an ICE facility. *Id.* ¶¶ 10–12, 24. The agents never presented a warrant and never asked any questions relevant to whether Mr. Hussen may have posed a flight risk, such as whether he had family in the area, where he worked, or what his ties to the community were. *Id.* ¶ 37. When ICE finally examined his passport, which demonstrated his citizenship, they released him to walk home in freezing December weather. *Id.* ¶¶ 27–29. Mr. Hussen's claims are typical of the Stops Class as well as the Warrantless Arrest Class and both Subclasses.

Similarly, CBP agents tackled Plaintiff and U.S. citizen Javier Doe outside of the Richfield, Minnesota Target store where Javier worked, after Javier refused to respond to

the question, "Are you from here?" Javier Doe Second Decl. ¶ 5. As the agents handcuffed him, Javier stated repeatedly that he is a U.S. citizen. *Id.* ¶ 8. The agents forced Javier into their SUV, then drove him to a Walmart in Bloomington before eventually releasing him. *Id.* ¶¶ 9, 14–16. The agents never presented a warrant, never asked Javier's name, and never asked any questions to determine whether Javier might pose a flight risk. *Id.* ¶ 23. Javier Doe's claims are typical of both Classes and Subclasses. *See Gonzalez v. U.S. Immigration and Customs Enf't*, 975 F.3d 788, 810-12 (9th Cir. 2020) (finding typicality despite the purportedly "unique" factual circumstances of plaintiff's probable cause determination, because plaintiff's legal claim was "no different than [that of] any other class member").

### D.    Plaintiffs and Plaintiffs' Counsel Will Adequately Protect the Interests of the Proposed Class.

Finally, Plaintiffs and Plaintiffs' counsel "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Class representatives meet Rule 23(a)(4) adequacy if they "(1) have common interests with the members of the class[;] and (2) will vigorously prosecute the interests of the class through qualified counsel." *In re Target Corp. Customer Data Sec. Breach Litig.,* 847 F.3d 608, 613 (8th Cir. 2017) (quotations omitted).

As to the first element, the proposed class representatives share common interests with the members of the classes and subclasses. Plaintiffs and putative class members all are subject to Defendants' policies and practices of unlawful detention. All of them have suffered and are suffering similar injuries, including detention, assaults during arrest, separation from their families, physical and emotional harm, constant fear of future abuse,

and routines altered by DHS's tactics. They seek the same remedies to order DHS to abide by the legal limits on its policing powers. No Plaintiff seeks any relief that is in any way at odds with the relief sought by the classes or subclasses.

As to the second element, Plaintiffs have retained qualified counsel with significant experience in complex immigration cases and class action litigation to represent the class's interests. *See* Kshithij Shrinath Decl. (Greene Espel PLLP); Oscar Sarabia Decl. (ACLU); Teresa Nelson Decl. (ACLU of Minnesota); Robert Fram Decl. (Covington & Burling LLP); Stacey Slaughter Decl. (Robins Kaplan LLP). Plaintiffs will fairly and adequately represent the class's interests, as required by Rule 23(a)(4).

## II.    THE PROPOSED CLASSES AND SUBCLASSES SATISFY THE REQUIREMENTS OF RULE 23(b).

In addition to satisfying the requirements of Rule 23(a), a putative class must also fall within one of the three subparts of Rule 23(b). Plaintiffs here seek provisional class certification under Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see also DeBoer*, 64 F.3d at 1175. "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (quotations omitted).

Actions which seek to enjoin unlawful government conduct, like this one, are particularly appropriate for 23(b)(2) certification. As the Eighth Circuit explained,

"[b]ecause one purpose of Rule 23(b)(2) was to enable plaintiffs to bring lawsuits vindicating civil rights, the rule must be read liberally in the context of civil rights suits." *Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980) (quotations omitted); *see also Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 949 (D. Minn. 2018) ("The rule is particularly appropriate in civil rights actions."); *Braggs v. Dunn*, 317 F.R.D. 634, 667 (M.D. Ala. 2016) ("Rule 23(b)(2) has been liberally applied in the area of civil rights." (quotations omitted)). Indeed, the Supreme Court has recognized that "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of class actions permissible under Rule 23(b)(2). *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *see also DL v. D.C.*., 860 F.3d 713, 726 (D.C. Cir. 2017) (explaining that Rule 23(b)(2) exists precisely "so that parties and courts, especially in civil rights cases like this, can avoid piecemeal litigation when common claims arise from systemic harms that demand injunctive relief"). Indeed, "courts have regularly certified classes challenging immigration-related policies." *Escobar Molina*, 2025 WL 3465518, at *36 (collecting cases).

This case presents a textbook example of certification under Rule 23(b)(2). Defendants have acted on grounds that apply generally to the class and subclasses by engaging in the same unlawful practices and policies against them—detentions that are unsupported by reasonable articulable suspicion, and warrantless arrests without probable cause. The class members' injuries can be remedied through a single injunction, without differentiating between class members. Courts have previously certified near-identical classes under Rule 23(b)(2). *See, e.g.*, *Escobar Molina*, 2025 WL 3465518, at *38

23

(certifying a Rule 23(b)(2) class of "[a]ll persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses an escape risk"); *United Farm Workers*, 785 F. Supp. 3d at 742–73 (similar); *Castañon Nava v. Dep't of Homeland Sec.*, No. 18-cv-3757 (N.D. Ill. Feb. 8, 2022), Dkt. No. 158 (final approval order) (certifying for purposes of settlement regional class of all current and future persons arrested without a warrant for a violation of immigration laws).

Class certification is especially warranted here because many members of the proposed class and subclasses are likely to be in detention, lack immigration counsel, and be indigent. Moreover, they may be detained in various facilities around the country. It is far more efficient for this Court to grant injunctive and declaratory relief protecting all class members than to require individuals to pursue piecemeal litigation.

## CONCLUSION

Plaintiffs respectfully request that the Court grant provisional certification of the proposed classes and subclasses for the purpose of entering a preliminary injunction under Rule 23(b)(2), appoint the Plaintiffs as Class Representatives, and appoint the undersigned as Class Counsel.

Dated:  January 16, 2026

s/ *Kshithij Shrinath*

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT**

Spencer Amdur*
Oscar Sarabia Roman*
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
samdur@aclu.org
osarabia@aclu.org

Kathryn Huddleston*
Lucia Goin*
915 15th Street NW, 7th Floor
Washington, D.C. 20005
T: (212) 549-2500
khuddleston@aclu.org
lgoin@aclu.org

Omar C. Jadwat*
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
ojadwat@aclu.org

**COVINGTON & BURLING, LLP**

Robert Fram*
415 Mission Street, Suite 5400
San Francisco, CA 94105
rfram@cov.com
415-591-7025

Gregg Levy*
Paul Killebrew*
850 Tenth Street, NW
Washington, DC 20001
glevy@cov.com
pkillebrew@cov.com

**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**

Teresa Nelson (#269736)
Catherine Ahlin-Halverson (#350473)
Alicia Granse (#400771)
Benjamin Casper (#0276145)
P.O. Box 14720
Minneapolis, MN 55414
Tel: (651) 529-1692
tnelson@aclu-mn.org
cahlin@aclu-mn.org
agranse@aclu-mn.org
bcasper@aclu-mn.org

Ian Bratlie (#319454)
424 N. Riverfront Dr. No. 34
Mankato, MN 56001
Tel: (507) 995-6575
ibratlie@aclu-mn.org

**GREENE ESPEL PLLP**

Amran A. Farah, Reg. No. 0395354
Aaron P. Knoll, Reg. No. 0393066
Benjamin Larson, Reg. No. 0504146
Michelle E. Morrow, Reg. No. 0504419
Nicholas Scheiner, Reg. No. 0402470
Kshithij Shrinath, Reg. No. 0505164
X. Kevin Zhao, Reg. No. 0391302
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
afarah@greeneespel.com
aknoll@greeneespel.com
blarson@greeneespel.com
mmorrow@greeneespel.com
nscheiner@greeneespel.com
kshrinath@greeneespel.com
kzhao@greeneespel.com
(612) 373-0830

25

Bree Peilen*
30 Hudson Yards
New York, NY 10001
bpeilen@cov.com

* *pro hac vice applications pending*

**ROBINS KAPLAN, LLP**

Raoul Shah, Reg. No. 0399117
Bahram Samie, Reg. No. 0392645
Ellen Levish, Reg. No. 0400878
Stacey Slaughter, Reg. No. 0296971
800 LaSalle Avenue, Suite 2800
Minneapolis, MN  55402
rshah@robinskaplan.com
bsamie@robinskaplan.com
elevish@robinskaplan.com
sslaughter@robinskaplan.com
(612) 349-8500

*Attorneys for Plaintiffs*