## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

MUBASHIR KHALIF HUSSEN,
MAHAMED EYDARUS, and JAVIER DOE
*on behalf of themselves and others similarly
situated,*

        Plaintiffs,

v.

KRISTI NOEM, *in her official capacity as
Secretary of the U.S. Department of Homeland
Security*; U.S. Department of Homeland Security;
U.S. Immigration and Customs Enforcement;
TODD LYONS, *in his official capacity as Acting
Director of U.S. Immigration and Customs
Enforcement*; DAVID EASTERWOOD, *in his
official capacity as Acting Director, Saint Paul
Field Office, U.S. Immigration and Customs
Enforcement; ;* U.S. Customs and Border
Protection; RODNEY SCOTT, *in his official
capacity as Commissioner of U.S. Customs and
Border Protection;* U.S. Border Patrol; MICHAEL
W. BANKS, *in his official capacity as Chief of
U.S. Border Patrol*; and GREGORY BOVINO, *in
his official capacity as Commander of the U.S.
Border Patrol,*
*in their official capacities,*

        Defendants.

Case No. 0:26-cv-00324-ECT-ECW

**DEFENDANTS'
MEMORANDUM OF LAW
IN OPPOSITION TO
PLAINTIFFS' MOTION
FOR PRELIMINARY
INJUNCTION**

---

## Table of Contents

INTRODUCTION ................................................................................................. 1

STANDARD OF REVIEW ............................................................................... 14

ARGUMENT ...................................................................................................... 15

   I.   Plaintiffs Are Unlikely to Succeed on the Merits of their Claims. ........................ 15

      A.   Plaintiffs Lack Standing to Enjoin Lawful Investigative Stops and Warrantless Arrests ................................................................................................. 16

      B.   Plaintiff Cannot Show a Fourth Amendment Violation for Investigative Stops 24

      C.   Plaintiffs Cannot Show a Fourth Amendment Violation, a Federal Law Violation, or a Valid APA Claim for Warrantless Arrests ......................................... 33

      D.   Many of Plaintiffs Claims are Barred by 8 U.S.C. § 1252 .................................. 42

   II.   Plaintiffs Fail to Show Irreparable Harm ................................................................ 43

   III.   The Equities and Public Interest Favor Denial of Injunction ................................ 45

   IV.   The Requested Injunction Is Overbroad and Improper in Scope ........................... 46

   V.   Plaintiffs Should Be Ordered to Post Security ....................................................... 51

# Table of Authorities

**Federal Cases**

*Abel v. United States*,
    362 U.S. 217 (1960) ............................................................................................... 6

*Aguirre v. INS*,
    553 F.2d 501 (5th Cir. 1977) ............................................................................... 39

*Alabama v. White*,
    496 U.S. 325 (1990) ............................................................................................. 26

*Anderson v. Creighton*,
    483 U.S. 635 (1987) ............................................................................................. 50

*Arc of Iowa v. Reynolds*,
    24 F.4th 1162 (8th Cir. 2022) ............................................................................. 47

*Arizona v. United States*,
    567 U.S. 387 (2012) ............................................................................................... 4

*Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016) ...................................................................................... 34, 36

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*,
    950 F.2d 1401 (9th Cir. 1991) ............................................................................. 44

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*,
    501 U.S. 1301 (1991) ........................................................................................... 45

*Beattie v. Barnhart*,
    663 F. Supp. 2d 5 (D.D.C. 2009) ........................................................................ 44

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...................................................................................... 34, 36

*Biden v. Texas*,
    597 U.S. 785 (2022) ...................................................................................... 35, 36

*Caribbean Marine Servs. Co. v. Baldrige*,
    844 F.2d 668 (9th Cir. 1988) ............................................................................... 27

*CASA*,
    606 U.S. .............................................................................. 45, 46, 48, 49

*Chaplaincy of Full Gospel Churches v. Navy*,
    697 F.3d 1171 (D.C. Cir. 2012) ................................................................. 19

*Chaplaincy of Full Gospel Churches*,
    454 F.3d............................................................................................................ 44

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ................................................................................ passim

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .............................................................................. passim

*Contreras v. United States*,
    672 F.2d 307 (2d Cir. 1982) ............................................................... 39, 40

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
    603 U.S. 799 (2024) ....................................................................................... 34

*County of Mille Lacs v. Benjamin*,
    262 F. Supp. 2d 990 (D. Minn. 2003) ...................................................... 28

*Dataphase Sys., Inc. v. CL Sys., Inc.*,
    640 F.2d 109 (8th Cir. 1981) ...................................................................... 14

*DeLite Outdoor Adver., Inc. v. City of St. Paul*,
    167 F. Supp. 2d 1072 (D. Minn. 2001) .................................................... 14

*District of Columbia v. Wesby*,
    583 U.S. 48 (2018) ........................................................................ 38, 39, 50

*E.F.L. v. Prim*,
    986 F.3d 959 (7th Cir. 2021) ...................................................................... 43

*EEOC v. AutoZone, Inc.*,
    707 F.3d 824 (7th Cir. 2013) ...................................................................... 49

*Elend v. Basham*,
    471 F.3d 1199 (11th Cir. 2006) .................................................................. 49

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ................................................................................ 16, 23

*Florida v. Bostick*,
    501 U.S. 429 (1991) ........................................................... 4, 5, 29, 33

*Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*,
  542 U.S. 177 (2003) ............................................................................................. 21, 30

*Hill v. Xyquad, Inc.*,
  393 F.2d 627 (8th Cir. 1991) ................................................................................ 51

*Illinois v. Gates*,
  462 U. S. 213 (1983) ............................................................................................ 38

*Illinois v. Wardlow*,
  528 U.S. 119 (2000) ........................................................................................ 21, 31

*Indep. Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004) ....................................................................... 36, 38

*INS v. Delgado*,
  466 U.S. 210 (1983) ............................................................................................ 29

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) ............................................................................. 42, 43, 46

*Kaley v. United States*,
  571 U.S. 320 (2014) ...................................................................................... 25, 38

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ............................................................................................ 23

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ................................................................................ 34, 35, 36

*Maldonado v. Olson*,
  795 F.Supp.3d 1134 (D. Minn. 2025) ................................................................. 14

*Melendres v. Arpaio*,
  784 F.3d 1254 (9th Cir. 2015) ............................................................................ 48

*Morales v. Chadbourne*,
  793 F.3d 208 (1st Cir. 2015) .............................................................................. 38

*Morehouse Enters., LLC v. BATFE*,
  78 F.4th 1001 (8th Cir. 2023) ............................................................................ 14

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................. 14, 45, 46

*Noem v. Perdomo*,
 146 S. Ct. 1 (2025) ............................................................................................... passim

*Noem v. Tincher,* __F.4th__, No. 26-1105,
 2026 WL 194768 (8th Cir., Jan. 26, 2026) .................................................... 48

*Norton v. S. Utah Wilderness All.*,
 542 U.S. 55 (2004) ......................................................................................... 34

*Novus Franchising, Inc. v. AZ Glassworks, LLC*,
 Case No. 12-cv-1771, 2012 WL 5057095 (D. Minn., Sept. 27, 2011) ......................... 51

*Oliva-Ramos v. Att'y Gen.*,
 694 F.3d 259 (3d. Cir. 2012) ........................................................................... 42

*Price v. City of Stockton*,
 390 F.3d 1105 (9th Cir. 2004) ......................................................................... 48

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
 525 U.S. 471 (1999) ....................................................................................... 43

*Sanchez v. Sessions*,
 904 F.3d 643 (9th Cir. 2018) ........................................................................... 42

*Schmidt v. Lessard*,
 414 U.S. 473 (1974) ....................................................................................... 48

*Smook v. Minnehaha Cnty.*,
 457 F.3d 806 (8th Cir. 2006) ........................................................................... 20

*Spokeo, Inc. v. Robins*,
 578 U.S. 330 (2016) ....................................................................................... 20

*St. Louis Effort for AIDS v. Huff*,
 782 F.3d 1016 (8th Cir. 2015) ......................................................................... 47

*Starbucks Corp. v. McKinney*,
 602 U.S. 339 (2024) ....................................................................................... 14

*Tazu v. Att'y Gen.*,
 975 F.3d 292 (3d Cir. 2020) ........................................................................... 43

*Terry v. Ohio*,
 392 U.S. 1 (1968) ............................................................................... 29, 30, 38

*Trump v. Boyle,*
    145 S. Ct. 2653 (2025) ........................................................................... 17

*United States ex rel. Accardi v. Shaughnessy,*
    347 U.S. 260 (1954) ............................................................................... 41

*United States v. Arvizu,*
    534 U.S. 266 (2002) ......................................................................... 25, 26

*United States v. Brignoni-Ponce,*
    422 U.S. 873 (1975) ........................................................................ passim

*United States v. Carbajal,*
    449 F. App'x 551 (8th Cir. 2012) ......................................................... 26

*United States v. Lemon,*
    84 F.4th 766 (8th Cir. 2023) ................................................................ 21

*United States v. Manning,*
    361 F. Supp. 3d 839 (D. Minn. 2019) .................................................. 26

*United States v. Meza-Campos,*
    500 F.2d 33 (9th Cir. 1974) .................................................................. 39

*United States v. Montero-Camargo,*
    208 F.3d 1122 (9th Cir. 2000) ......................................................... 31, 40

*United States v. Murillo-Gonzalez,*
    524 F. Supp. 3d 1139 (D.N.M. 2021) ............................................. 39, 40

*United States v. Puebla-Zamora,*
    996 F.3d 535 (8th Cir. 2021) ................................................................ 39

*United States v. Quintana,*
    623 F.3d 1237 (8th Cir. 2010) ......................................................... 38, 39

*United States v. Sagastume-Galicia,*
    Mag. No. 19-0287 (BAH), 2020 WL 2486423 (D.D.C. Apr. 22, 2020) ................ 39, 46

*United States v. Sokolow,*
    490 U.S. 1 (1989) .................................................................................. 25

*United States v. Texas,*
    599 U.S. 670 (2023) .............................................................................. 23

*United States v. Thabit*,
   56 F.4th 1145 (8th Cir. 2023)........................................................................26

*Vazquez-Medrano v. Sessions*,
   726 F. App'x 92 (2d Cir. 2018)....................................................................39

*Watkins Inc. v. Lewis*,
   346 F.3d 841 (8th Cir. 2003).........................................................................14

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008)...................................................................................14, 16

*Yam Sang Kwai v. Immigration & Naturalization Service*,
   411 F.2d 683 (D.C. Cir. 1969) ......................................................................39

*Yanez-Marquez v. Lynch*,
   789 F.3d 434 (4th Cir. 2015).........................................................................42

## Federal Statutes

5 U.S.C. § 551(13) ..............................................................................................34

5 U.S.C. § 706 ......................................................................................................1

8 U.S.C. § 1225 ....................................................................................................4

8 U.S.C. § 1225(b)(1) ..........................................................................................4

8 U.S.C. § 1252 ..................................................................................................42

8 U.S.C. §§ 1252(a)(5) ...................................................................................2, 43

8 U.S.C. § 1252(b)(9) .....................................................................................2, 42

8 U.S.C. § 1252(g) ..........................................................................................2, 43

8 U.S.C. § 1325 ....................................................................................................4

8 U.S.C. § 1357 ..............................................................................................23, 38

8 U.S.C. § 1357(a)(1) ...........................................................................................5

8 U.S.C. § 1357(a)(2) ..................................................................................passim

**Federal Rules**

Fed. R. Civ. P. 65(c) ...................................................................................51

**Federal Regulations**

8 C.F.R. § 287.5 .......................................................................................... 5

8 C.F.R. § 287.8 ......................................................................................... 23

8 C.F.R. § 287.8(b)(2) ...........................................................................25, 28

8 C.F.R. § 287.8(c)(2)(i) ............................................................................. 6

8 C.F.R. § 287.8(c)(2)(ii) ...................................................................1, 6, 40

## INTRODUCTION

Federal immigration officers are dutifully enforcing this nation's laws by stopping, detaining, and arresting people in accordance with the Constitution. Operation Metro Surge in the Twin Cities was launched because of unprecedented fraud and increased difficulty of enforcing basic immigration laws given various sanctuary policies. As a result, in order to adequately enforce federal law, Defendants surged law enforcement to locate and remove illegal aliens. Plaintiffs seek an astonishing preliminary injunction that would purposefully obstruct the government's ability to effectively enforce federal immigration laws by micromanaging every stop and arrest. Plaintiffs' unsupported claims fail on numerous fronts for the same reasons the Supreme Court stayed a similar injunction in *Perdomo v. Noem*. In addition, almost all the allegedly unlawful interactions in this case were short consensual encounters where law enforcement officers verified citizenship and then left Plaintiffs and declarants alone. Nothing about these fleeting encounters suggests they are likely to recur. This Court should not countenance Plaintiffs' baseless accusations of a policy of racially profiling that is merely grounded in the unsupported subjective belief of three Plaintiffs and cherry-picked atmospherics. No such policy exists and this Court must deny Plaintiffs sweeping motion.

Plaintiffs Mubashir Khalif Hussen, Mahamed Eydarus, and Javier Doe are U.S. citizens living in the Twin Cities metro area who were encountered by federal immigration agents in December 2025 and January 2026. They seek to represent a class alleging an unlawful policy and practice of investigative stops, detentions, and arrests in violation of the Fourth and Fifth Amendments, 8 U.S.C. § 1357(a)(2), 5 U.S.C. § 706, 8 C.F.R.

1

§ 287.8(c)(2)(ii), and the *Accardi* doctrine. Plaintiffs allege Defendants are stopping individuals for immigration investigations based on racial profiling rather than reasonable suspicion of removability; and of making warrantless immigration arrests without probable cause either that a person is removable from the United States or that such a person is a flight risk. The Court should deny Plaintiffs any of the injunctive relief they seek because they have not satisfied any of the four factors necessary to demonstrate entitlement to preliminary injunctive relief.

Most importantly, Plaintiffs are unlikely to succeed on the merits of their claims. First, Plaintiffs lack standing because the injuries that they allege have already occurred and their assertion that those injuries will occur again is based on rank speculation. Second, Plaintiffs cannot show a Fourth Amendment violation for investigative stops. The Fourth Amendment allows consideration of various factors, including perceived ethnicity, in making investigative stops. Moreover, the stops they rely on do not even support their claims. Third, Plaintiffs cannot demonstrate a Fourth Amendment violation, federal law violation, or valid APA claim for any warrantless arrests. Plaintiffs have not shown that Defendants established a new policy or practice of warrantless arrests that constitutes a final agency action reviewable under the APA. And because immigration arrests are part of the removal process, the Immigration and Nationality Act ("INA"), specifically 8 U.S.C. §§ 1252(a)(5), (b)(9), and (g), strips the Court of jurisdiction to hear many of Plaintiffs' claims.

Even if Plaintiffs could succeed on the merits, the extraordinary preliminary injunctive relief that Plaintiffs request should be denied because they have not established

irreparable harm. Plaintiffs assert that they are at risk of being stopped again and/or rearrested but have not established that either action is imminent and thus fall short of carrying their burden to establish irreparable harm. Finally, the balance of equities and public interest, merged in cases involving the federal government, favor the government because the injunction would interfere with the Executive Branch's prerogative to enforce the Nation's immigration laws as enacted by Congress. Finally, Plaintiffs seek an impermissible "follow the law" injunction that is overly broad and improper in scope.

## BACKGROUND

### I. Procedural History

Plaintiffs filed this action on January 15, 2026, seeking declaratory and injunctive relief. Class Action Complaint for Declaratory and Injunctive Relief, ECF No. 2 ("Compl."). On January 16, 2026, Plaintiffs filed four motions and memoranda of law supporting those motions, including the motion for preliminary injunction (Pls. Mot.), along with 22 declarations and accompanying exhibits. *See* ECF Nos. 15, 17, 18, 25, 27, 29, 31, 32, 34-46, 48, 50, 52-57, 60, and 62.[1] Plaintiffs failed to meet and confer in advance of these filings, requesting the meeting on the same day as the filings. *See* ECF. Nos. 19, 47, 58, 63. Plaintiffs requested emergency injunctive relief and, on January 21, 2026, following a status conference, the Court granted an expedited briefing schedule. ECF No. 75.

---

[1] Plaintiffs also filed motions to proceed pseudonymously for Plaintiff Javier doe and non-party declarants. *See* ECF Nos. 15, 17, 60, 62.

## II. Legal Background

To facilitate enforcement of the immigration laws, Congress vested the Executive Branch with broad authority to inspect, investigate, arrest, detain, and remove aliens who are unlawfully in the United States. *See, e.g.*, 8 U.S.C. § 1225 (requiring the inspection of applicants for admission and mandating the detention of certain aliens during immigration proceedings), § 1226(a) (permitting arrest and detention upon warrant issued by Secretary of Homeland Security), § 1226(c)(1) (Secretary "shall take into custody" aliens who have committed certain crimes), § 1231(a)(1)(A), (2) (authorizing detention of aliens with final removal orders and mandating it for certain criminal aliens), § 1357(a)(1), (2) (listing powers of DHS that may be exercised without warrant, including interrogation of "any alien or person believed to be an alien as to his right to be or remain in the United States" and arrest in certain circumstances). Aliens may be detained pending removal. 8 U.S.C. §§ 1225(b)(1), 1226. And aliens may also be subject to federal criminal prosecution based on their illegal entry. *See, e.g.*, 8 U.S.C. §§ 1325, 1326. "A principal feature of [this]" congressionally established "removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012).

### A. Consensual Encounters

It is a basic principle of the Fourth Amendment that law enforcement officers, including federal agents conducting immigration enforcement, can approach individuals and ask them questions in a consensual fashion. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Officers are trained to engage in consensual encounters in order to develop reasonable suspicion. Harvick Decl. ¶ 10. When officers encounter non-targets, they use

consensual interviews to assess whether a crime or immigration violation is afoot and make an individualized determination of reasonable suspicion. *Id.* Federal immigration officers have specialized expertise and practical knowledge of factors that are most indicative of immigration violations, illegal activity, and behaviors typically associated with unlawful presence. *Id.* These consensual encounters simply do not implicate the Fourth Amendment.

### B. Investigative Stops

Federal immigration agents pursuant to 8 U.S.C. § 1357(a)(1) are authorized to interrogate, without a warrant, any alien or person believed to be an alien regarding their right to be or remain in the United States based on reasonable suspicion.

In accordance with 8 U.S.C. § 1357(a)(1), 8 C.F.R. § 287.5, and the limits imposed by the Fourth Amendment, federal immigration agents receive specific immigration enforcement training, including periodic instruction on Fourth Amendment requirements. Bottjen Decl. ¶¶ 13, 15, 17; Harvick Decl. ¶¶ 12, 13. They are trained to evaluate reasonable suspicion and probable cause under the totality-of-the-circumstances standard. Bottjen Decl. ¶¶ 14, 15; Harvick Decl. ¶ 10. The factors that contribute to reasonable suspicion include, but are not limited to, information from intelligence sources, information from law enforcement and open-source databases, analysis of trends and patterns associated with immigration violations, previous encounters with undocumented individuals at a specific location, and information provided by human sources, which may include confidential informants. *See* Bottjen Decl. ¶ 15; Harvick Decl. ¶ 10.

ICE agents also receive training on the statutory provisions of the Immigration and Nationality Act ("INA"), immigration regulations, and are instructed to follow procedures

emphasizing targeted investigations and arrests of aliens with final removal orders and/or serious criminal histories. Bottjen Decl. ¶¶ 13, 17; s*ee also* Harvick Decl. ¶¶ 13, 14. For non-targeted individuals, federal immigration agents are trained to develop reasonable suspicion through information gleaned through consensual encounters, records checks, database checks, surveillance, and intelligence collection. Harvick Decl. ¶ 10. *See also* Bottjen Decl. ¶ 15. When officers and agents encounter non-targets, they are trained to use consensual interviews and other methods to determine if reasonable suspicion exists to justify a brief investigatory detention. Harvick Decl. ¶¶ 7, 10.

### C. Warrantless Arrests

Federal immigration agents are also authorized by the INA to perform the warrantless arrest based on probable cause of:

> [A]ny alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrestee shall be taken without unnecessary delay . . . before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States.

8 U.S.C. § 1357(a)(2); *see Abel v. United States*, 362 U.S. 217, 232-37 (1960) (discussing longstanding administrative arrest procedures in deportation cases).

Regulations promulgated under the INA track the statute, specifying that "an arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States." 8 C.F.R. § 287.8(c)(2)(i). These arrests require a warrant unless "the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." *Id.* § 287.8(c)(2)(ii).

An alien arrested without a warrant must be "examined by an officer other than the arresting officer." *Id.* § 287.3(a). "If the examining officer is satisfied that there is prima facie evidence that the arrested alien . . . is present in the United States in violation of the immigration laws, the officer will either refer the case to an immigration judge for further inquiry . . . , order the alien removed . . . , or take whatever other action may be appropriate or required under the laws or regulations applicable to the particular case." *Id.* § 287.3(b).

The government ordinarily will make an initial determination within forty-eight hours of the apprehension whether the alien will remain in custody, be paroled, be released on bond or be released on recognizance. *Id.* § 287.3(d).

## III.    Factual Background

For the last year, DHS has surged resources to enforce immigration laws enacted by Congress to remove aliens who entered this country illegally. This includes specific operations in some of the country's most densely populated areas.

### A. Operation Metro Surge

In December 2025, DHS launched Operation Metro Surge to address the dangers arising from the presence of illegal aliens in the Minneapolis area, including dangerous criminal aliens engaged in violent crimes and drug trafficking. Operation Metro Surge is an exclusive federal operation with approximately 2,000 additional officers and agents detailed to the St. Paul Field Office. Bottjen Decl. ¶¶ 8, 9. Part of this surge was in response to the unprecedented levels of fraud committed by certain immigrants in the area. Another piece is that immigration enforcement is exceedingly difficult in Minnesota due to various sanctuary policies. Since most state and local officials refuse to cooperate with federal

agents on basic detainers or information requests, federal law enforcement must expend significantly more resources to locate and detain illegal aliens. This also requires riskier and more public at-large arrests, which results in public confrontations and increased danger.

The mission of Operation Metro Surge is to significantly increase arrests, "focusing on individuals with executable final orders" of removal. Bottjen Decl. ¶ 10. Operation Metro Surge has led to the successful arrest of more than 3,000 illegal aliens, including aliens with criminal convictions for murder, aggravated assaults, domestic abuse/violence, drug trafficking, counterfeiting, identity theft, robbery with a dangerous weapon, sexual assault, and rape. Bottjen Decl. ¶¶ 10, 12.[2]

Unfortunately, the success of Operation Metro Surge and other similar operations has come with enormous risk to federal law enforcement personnel due to repeated attacks against them. DHS reports that violence against federal law enforcement officers and agents has increased approximately 1,300 percent.[3] The attacks against immigration

---

[2] DHS has issued regular public updates about the criminal illegal aliens arrested in Minnesota during the operation. *See, e.g.*, https://www.ice.gov/news/releases/under-president-trumps-leadership-ice-has-arrested-members-some-worlds-most-dangerous; https://www.dhs.gov/news/2026/01/08/dhs-highlights-worst-worst-criminal-illegal-aliens-including-rapists-pedophiles-and; https://www.dhs.gov/news/2026/01/13/dhs-highlights-worst-worst-criminal-illegal-aliens-arrested-yesterday-during; https://www.dhs.gov/news/2026/01/12/ice-removed-heinous-criminals-minnesota-streets-over-weekend-including-child; https://www.dhs.gov/news/2026/01/14/dhs-highlights-worst-worst-criminal-illegal-aliens-arrested-yesterday-minneapolis

[3] DHS, Press Release, Three Violent Criminal Illegal Aliens Who Violently Beat a Law Enforcement Officer with Weapons (Jan. 15, 2026), https://www.dhs.gov/news/2026/01/15/dhs-releases-more-details-about-three-violent-criminal-illegal-aliens-who-violently; DHS, Press Release, Radical Rhetoric by Sanctuary Politicians Leads to an Unprecedented 1,300% Increase in Assaults Against ICE Officers

enforcement personnel are widespread, take on many forms, and are occurring across the United States. An "Anti-ICE" sniper attempted to assassinate ICE officers in the Dallas, Texas area by shooting indiscriminately into the sally port of an ICE facility, leading to the deaths of multiple detainees.[4] ICE facilities have faced multiple bomb threats.[5] Federal officers and agents face violent attacks at federal buildings,[6] at immigration processing facilities, and while in the field conducting enforcement operations. DHS even reports foreign criminal organizations have offered thousands of dollars as bounties for the murder of federal immigration agents.[7] Because federal immigration agents have faced doxing, including revelation of their home addresses, these threats extend to their families.[8]

---

and a 3,200% Increase in Vehicular Attacks, https://www.dhs.gov/news/2026/01/08/radical-rhetoric-sanctuary-politicians-leads-unprecedented-1300-increase-assaults.

[4] DHS, Press Release, DHS Issues Statement on Targeted Attack on Dallas ICE Facility (Sept. 24, 2025), https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-dallas-ice-facility.

[5] *See, e.g.*, DHS, Press Release, Law Enforcement Arrests Suspect Who Made Bomb Threat on ICE Dallas Facility (Aug. 26, 2025), https://www.dhs.gov/news/2025/08/26/law-enforcement-arrests-suspect-who-made-bomb-threat-ice-dallas-facility; DHS Statement on Sanctuary Politicians' Obstruction of Law Enforcement and Bomb Threat at 26 Federal Plaza in New York City (September 18, 2025), https://www.dhs.gov/news/2025/09/18/dhs-statement-sanctuary-politicians-obstruction-law-enforcement-and-bomb-threat-26.

[6] DHS Press Release, DHS Releases Statement on Violent Rioters Assaulting ICE Officers in Los Angeles, CA and Calls on Democrat Politicians to Tone Down Dangerous Rhetoric About ICE (June 7, 2025), https://www.dhs.gov/news/2025/06/07/dhs-releases-statement-violent-rioters-assaulting-ice-officers-los-angeles-ca-and.

[7] DHS, Press Release, Bounties Originating From Mexico Offered to Shoot ICE and CBP Officers in Chicago (Oct. 14, 2025), https://www.dhs.gov/news/2025/10/14/bounties-originating-mexico-offered-shoot-ice-and-cbp-officers-chicago.

[8] See, e.g., DHS, Press Release, DHS Condemns Dangerous Doxxing and Escalating Threats Against Federal Law Enforcement Officers (Oct. 9, 2025), https://www.dhs.gov/news/2025/10/09/dhs-condemns-dangerous-doxxing-and-

In and around Minneapolis, federal immigration agents operating out of the St. Paul Office have been confronted with increased threats, violence, aggression, attacks, vehicle block-ins, and obstruction of immigration enforcement operations. Harvick Decl. ¶ 9. The increase in these types of incidents has obstructed enforcement operations, interfered with officers' official duties, and posed significant safety risks to not only federal immigration agents but also the public. *Id.*

### B. Individual Claims

Plaintiffs and non-party declarants allege unlawful immigration operations by Defendants in Minnesota throughout the months of December 2025 and January 2026. *See* Compl., ECF Nos. 25, 29, 32, 34-46, 48. However, these alleged encounters, when viewed in the totality of the circumstances, demonstrate the overall baselessness of their claimed Fourth Amendment and federal law violations. Specifically, both the Plaintiffs and non-party declarants' allegations can be categorized as: (A) *Terry* stops with additional lawful justifications; (B) lawful arrests; (C) self-initiated contact with federal immigration agents; and (D) consensual encounters which do not implicate the Fourth Amendment.

### 1. Named Plaintiffs

Plaintiff Mubashir Khalif Hussen is a U.S. citizen. Declaration of Mubashir Khalif Hussen, ECF No. 34, ¶ 1. On December 10, 2025, federal immigration agents encountered Hussen outside of a restaurant located below his workspace. *Id.* ¶ 5. Hussen states he turned

---

escalating-threats-against-federal-law; ABC News, 33/40, Report: Whistleblower leaks personal data of 4,500 DHS and ICE agents to doxxing website, (Jan. 13, 2026), https://abc3340.com/news/nation-world/report-whistleblower-leaks-personal-data-of-4500-dhs-and-ice-agents-to-doxxing-website-anti-ice-prtotesters.

to walk away from the approaching agent and the agent asked why he was running away. *Id*. ¶ 6. While being questioned, a crowd gathered and Hussen was placed into an SUV for safety purposes. Berry Decl. ¶¶ 9, 11. When agents requested Hussen complete a facial recognition scan to confirm his identity, he refused. Hussen Decl. ¶ 13. Berry Decl. ¶¶ 12, 13. The agents then transported Hussen to an ICE processing center near Bloomington, Minnesota where he was fingerprinted and released after confirming his identity. Hussen Decl. ¶¶ 24, 27, 29; Berry Dec. ¶ 15.

Plaintiff Mahamed Rufai Eydarus, a U.S. citizen, has lived in Minnesota since 2001. Mahamed Rufai Eydarus Decl. ¶ 1 (ECF No. 42). Federal immigration agents encountered Eydarus with his mother on the street shoveling snow on December 10, 2025. *Id*. ¶ 8, 10. The agents asked for identification, and after determining he was a U.S. citizen, told Eydarus he was free to leave. *Id*. ¶¶ 16, 26.

Plaintiff Javier Doe is a U.S. citizen living in Richfield, Minnesota. Javier Doe Decl. ¶ 1 (ECF No. 30). Federal immigration agents encountered Javier Doe outside of his workplace and asked for information about his citizenship. Javier Doe Decl. ¶ 4, 5. After confirming his identity and citizenship, Javier Doe was released. *Id*. ¶¶ 11, 16.

### 2. Non-Party Declarants

Several non-party declarants offer "examples" of consensual encounters, stops, and arrests involving U.S. citizens (ECF Nos. 32, 37-39, 43), lawful permanent residents (ECF Nos. 29, 44, 45), and individuals without current valid immigration status but with pending immigration applications or petitions (ECF Nos. 40, 41, 46). Crisareli Castillo was stopped by federal immigration agents near her worksite. Crisareli Castillo Decl. ¶¶ 2, 6 (ECF No.

38). The agents asked for her identification and questioned her, showing her a photo of someone they believed worked with her. *Id*. at ¶ 8. She advised the agents that she did not recognize the individual and that they did not work at her worksite. *Id*. The agents then returned her passport. *Id.* at ¶ 9. Mark Castillo was encountered while taking out his trash. Mark Castillo Decl. ¶¶ 2, 5 (ECF No. 43). Federal immigration agents asked for his identification and he provided it. *Id*. at ¶¶ 7-9. After confirming his identify, they left. *Id*. at ¶ 11.

Ali Dahir encountered federal immigration agents as he was leaving his apartment building. Ali Dahir Decl. ¶ 5 6 (ECF No. 32). An agent approached and explained he was looking for someone who resembled Dahir. *Id*. ¶¶ 6,7, The agent asked for Dahir's identification. *Id*. ¶ 9. After providing his driver's license, the agent asked Dahir if he was a U.S. citizen and Dahir responded affirmatively providing his passport card. *Id.* ¶¶ 10-12. After checking the documentation, the agent returned Dahir's passport card and license and left. *Id*. ¶ 21. A.A. was encountered in a Walmart parking lot and detained after being mistaken for a target. A.A. Decl. ¶¶ 3, 4, 7 (ECF No. 37). Julio Cesar Martinez Garcia was encountered while moving his truck at a worksite. Julio Cesar Martinez Garcia Decl. ¶¶ 5-7 (ECF No. 39). Agents asked where he was born and he told them he was a U.S. citizen, providing them with his driver's license and paperwork he obtained when applying for a REAL ID. *Id.* ¶¶ 8-9. He was released after a second review determined his identity. *Id.* ¶¶ 14-15.

Said Osman was encountered on the street on his way to a mosque. Said Osman Decl. ¶¶ 6-7 (ECF No. 29). Agents asked if he was a citizen and when agents confirmed

his identity, Osman was released. *Id.* ¶¶ 9-21. Pedro Moreno was encountered at a worksite and questioned about his status and length of time spent in the United States. Pedro Moreno Decl. ¶¶ 3, 6, 15. After confirming his identity and status at Fort Snelling, he was released and returned to his worksite. *Id.* ¶¶ 13, 16, 17.. Raul Aguirre Castrejon was encountered while driving home from getting groceries. Raul Aguirre Castrejon Decl. ¶¶ 3, 8, 10 (ECF No. 45). He was released after confirming his identity. *Id.* ¶ 18.

Luisa Doe was encountered by federal immigration agents on her way to work. Luisa Doe Decl. ¶ 2 (ECF No. 41). Immigration Officers determined that she was unlawfully present and placed her under arrest for an immigration violation. Bottjen Decl. ¶ 19. She was transferred to Douglas County jail where she remains detained. Luisa Doe Decl.¶¶ 11-12. Julio Doe was encountered with co-workers driving between construction sites. Julio Doe Decl. ¶¶ 5-6 (ECF No. 40). Agents observed Julio Doe and three others flee the area in a vehicle at an extremely high rate of speed. Bottjen Decl. ¶ 19. Agents asked for his documents and asked why they left the job site so quickly. Julio Doe Decl. ¶ 9. An agent reviewed Julio Doe's documents and asked how long he had been in the country and how long he had lived there. *Id.* ¶ 10. He was arrested and taken to an ICE processing facility and is currently detained at Freeborn County jail. *Id.* ¶¶ 12, 13, 16. Santiago Doe was stopped near a Culver's. during a targeted enforcement operation. Bottjen Decl. ¶ 18; Santiago Doe Decl. ¶¶ 6, 9 (ECF No. 46). A vehicle registration records check identified Santiago Doe as an illegal alien and agents stopped to confirm his identify. Bottjen Decl. ¶ 18. After confirming his identity, Santiago Doe was arrested. *Id.* He remains detained at Freeborn County jail. Santiago Doe Decl. ¶19.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). District courts balance four factors in deciding preliminary injunction motions: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003); *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Morehouse Enters., LLC v. BATFE*, 78 F.4th 1001, 1018 (8th Cir. 2023). "Plaintiffs bear the burden of proof on all four factors*." DeLite Outdoor Adver., Inc. v. City of St. Paul,* 167 F. Supp. 2d 1072, 1075 (D. Minn. 2001).

A plaintiff "seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Winter*, 555 U.S. at 20). "The purpose of a preliminary injunction is to maintain the status quo." *Maldonado v. Olson*, 795 F.Supp.3d 1134, 1147 (D. Minn. 2025); *Morehouse*, 78 F.4th at 1015 (8th Cir. 2023).

## ARGUMENT

### I.    Plaintiffs Are Unlikely to Succeed on the Merits of their Claims.

Plaintiffs are unlikely to succeed on the merits of their claims for four reasons. First, Plaintiffs lack standing because the injuries they allege have already occurred and their assertion that those injuries will occur again is based on rank speculation. Second, Plaintiffs cannot show a Fourth Amendment or federal law violation nor a valid claim under the Administrative Procedure Act (APA) for investigative stops. The Fourth Amendment allows consideration of various factors in making investigative stops and the stops at issue were lawful. Third, Plaintiffs cannot show a Fourth Amendment or federal law violation nor a valid APA claim for any warrantless arrests. Plaintiffs have not established that there is a new policy or practice of warrantless arrests without probable cause of an immigration law violation or likelihood of escape; much less that such a theoretical policy is a final agency action and thus reviewable under the APA. In fact, the opposite is true. The most recent policy makes clear that arrests require probable cause of a violation and risk that the person will be gone if a warrant is obtained. *See* Exhibit A, Memorandum: Civil Immigration Arrest Authority: Administrative Arrest Warrants and Warrantless Arrests, Todd Lyons, January 26, 2026 ("Lyons Memo"). Further, the arrests were conducted according to law. Fourth, Plaintiffs cannot show a Fifth Amendment Violation of the Due Process Clause under any standard of review as they cannot establish discriminatory animus. Finally, Plaintiffs seek an impermissible "follow the law" injunction that is overly broad and improper in scope.

### A. Plaintiffs Lack Standing to Enjoin Lawful Investigative Stops and Warrantless Arrests

This case is squarely controlled by the Supreme Court's standing jurisprudence which requires Plaintiffs to show a real and immediate risk of future injury—not merely past contact or generalized allegations. Plaintiffs fail to meet that burden and therefore lack Article III standing for forward-looking relief. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013). To secure an injunction, the irreparable harm must also be immediate, concrete, and "likely." *Winter*, 555 U.S. at 22. Past contact does not create a presumption of imminent repetition. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983). Plaintiffs identify no written policy of conducting stops particularly targeting people who appear to be Somali or Latino, nor is there allegation or evidence that any of the Plaintiffs have been stopped since. Without a concrete, near-term risk that these Plaintiffs will again be stopped without individualized suspicion, their injunctive claim fails for a lack of standing and they necessarily fail to establish the irreparable harm requirement for a preliminary injunction.

To establish standing, a plaintiff must demonstrate (i) that he has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). The Supreme Court has rejected "past-is-prologue" standing. Specifically, in *Lyons,* 461 U.S. at 101-11, the Supreme Court held that a plaintiff previously subjected to a chokehold lacked standing to enjoin future chokeholds absent a concrete, imminent threat that he personally would be

16

choked again; a past incident and an alleged departmental practice were not enough. Here, the individual Plaintiffs' standing theory is a redux of *Lyons*.

The Supreme Court's recent order in *Noem v. Perdomo*, 146 S. Ct. 1 (2025), further supports the conclusion that Plaintiffs lack standing here. In *Perdomo*, the plaintiffs alleged that federal immigration agents engaged in a pattern of stops without reasonable suspicion of an immigration violation in the state of California, and the Supreme Court stayed a district court's injunction based on those allegations pending appeal. *Id.* Although the Court did not elaborate on why it viewed the federal government as likely to succeed on the merits, Justice Kavanaugh explained in a concurrence that under the "Court's decision in [*Lyons*], plaintiffs likely lack[ed] Article III standing to seek a broad injunction restricting immigration officers from making . . . investigative stops." *Id.* at *2 (Kavanaugh, J., concurring). Justice Kavanaugh explained that in his view, the plaintiffs did not have "standing to obtain future injunctive relief . . . merely because [they] experienced past harm and fear its recurrence," and otherwise had "no good basis to believe that law enforcement will unlawfully stop them in the future . . . and certainly no good basis for believing that any stop . . . is imminent." *Id.* Such "interim orders" from the Supreme Court "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). This is a like case. The Supreme Court's ruling in *Perdomo* thus supports a finding that Plaintiffs lack Article III standing to seek prospective injunctive relief because they have not shown that they will likely be imminently stopped without reasonable suspicion or arrested without a warrant and with no probable cause of immigration law violations or likelihood of escape.

Plaintiff Hussen speculates that he was stopped and arrested because of his skin color and appearance in his neighborhood and that he will be harmed again as he sees federal agents every day in his neighborhood. Hussen Decl. ¶¶ 38-39, 45. Plaintiff Eydarus's encounter does not constitute a Fourth Amendment seizure, yet he speculates that he will be subjected to further stops and potentially arrested because of his Somali ethnicity. Eydarus Decl. ¶¶ 33, 42. Javier Doe speculates retaliation for his involvement in this case. Javier Doe Decl. ¶ 2 (ECF No. 15). No named Plaintiff has established that he or she was stopped based solely on their perceived ethnicity, and the Supreme Court is clear that ethnicity "can be a relevant factor when considered along with other salient factors." *Noem v. Perdomo*, 146 S. Ct. 1, *3 (2025) (Kavanaugh, J., concurring) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 887 (1975)). Plaintiffs' only evidence to the contrary is baseless speculation. Plaintiffs therefore cannot demonstrate that ethnicity factored into the reason for their interactions with law enforcement—let alone that it was the *sole* factor. Much less can they show that they face any *immediate* and likely risk of being subjected to such a stop in the future that would also be based solely on ethnicity.

Further, Plaintiffs offer no evidence or argument that any of them have been stopped or arrested since the incidents they describe in their respective declarations or the Complaint. Plaintiffs offer nothing to substantiate their premise that they—out of the over 3.6 million people living in the Twin Cities metro area[9]—would be stopped *illegally* again.

---

[9] Metropolitan and Micropolitan Statistical Area Population Totals: 2020-2024, U.S. Census Bureau, available at https://www.census.gov/data/tables/time-series/demo/popest/2020s-total-metro-and-micro-statistical-areas.html (last accessed Jan. 28 2026).

In fact, the evidence is to the contrary. No Plaintiff or declarant has claimed to be stopped again. Indeed, Hussen says he sees officers in his neighborhood all the time yet was only stopped once. Hussen Decl. ¶¶ 39-40. And each Plaintiff was promptly released once their citizenship was established. That makes it much less likely that they will be stopped again.

Even if Plaintiffs were stopped in the future, they have no basis for alleging that they would be stopped *solely* based on their perceived ethnicity, not for some additional reasons. Like *Lyons*, it is insufficient to just speculate that federal agents may continue a general, unstated policy of relying solely on perceived ethnicity. 461 U.S. at 107 n.7; *see also Clapper*, 568 U.S. at 401 (holding that the plaintiffs' claim "[wa]s too speculative to satisfy the well-established requirement that threatened injury must be certainly impending") (internal quotations omitted). Plaintiffs cannot establish standing to seek an injunction, much less irreparable harm, "[a]bsent a sufficient likelihood that [they] will again be wronged *in a similar way*." *Lyons*, 461 U.S. at 111 (emphasis added). Without a concrete, imminent risk that the individual Plaintiffs will be rearrested without a warrant or probable cause and based solely on their perceived ethnicity, their injunctive claim fails for lack of standing. *Chaplaincy of Full Gospel Churches v. Navy*, 697 F.3d 1171, 1175 (D.C. Cir. 2012) ("Where, as here, plaintiffs seek forward-looking injunctive relief, past injuries alone are insufficient to establish standing. Instead, Plaintiffs must show that they face an imminent threat of future injury." (citation modified)).

As in *Lyons*, Plaintiffs cannot show standing because they have no basis beyond mere speculation to believe that they will be subjected to the allegedly unlawful treatment, namely that they were stopped without a reasonable suspicion or arrested/will be arrested

again without probable cause of an immigration law violation or an individualized likelihood of escape determination. Failing to establish "a sufficient likelihood that he will again be wronged in a similar way," Plaintiffs are "no more entitled to an injunction than any other citizen []; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Smook v. Minnehaha Cnty.*, 457 F.3d 806, 816 (8th Cir. 2006) (quoting *Lyons*, 461 U.S. at 111); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-40 (2016) (holding that an "injury in fact must also be 'concrete,'" which "must be 'de facto'; that is, it must actually exist."). Without concrete evidence that they will be unlawfully arrested again, Plaintiffs claims are based on "subjective apprehensions," not the "reality of the threat of repeated injury," that is necessary to establish standing. *Lyons*, 461 U.S. at 107.

As explained further below (infra § I(D)), there is no doubt that agents had authority to question Eydarus about his identification and to detain Hussen and Javier Doe in part based on the officers' training and experience. Even if the Court accepted Plaintiffs' factual allegations over Defendants' rebuttal declarations, Plaintiffs cannot demonstrate that they were questioned or detained solely based on perceived ethnicity, much less that they face any immediate and likely risk of being subjected to an unlawful stop or detention in the future. See Clapper, 568 U.S. at 412.

Moreover, Plaintiffs did not demonstrate that they experienced a seizure rising to the level of a Fourth Amendment violation, undermining their argument relating to standing and future irreparable harm. Eydarus's interaction with federal immigration agents in a public place where he was asked for his identification and was told he could

leave did not constitute a Fourth Amendment seizure. Eydarus Decl. ¶¶ 16, 26; *see Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 185 (2003) ("[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."). Plaintiff Hussen admitted he turned and walked away from a federal immigration agent approaching him and the agent questioned why he ran away. Hussen Decl. ¶ 6. Agents followed him after he fled on foot towards a nearby restaurant. Berry Decl. ¶¶ 6, 7; *see, e.g., Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *United States v. Lemon*, 84 F.4th 766, 769 (8th Cir. 2023) ("'nervous, evasive behavior,' and unprovoked flight are also highly pertinent"). Plaintiff Javier Doe, when encountered by federal immigration agents and asked about his citizenship, responded with expletives and refused to provide any information. Javier Doe Decl. ¶¶ 4, 5. (ECF No. 30). Defendants were unable to develop specific information around this encounter as Plaintiffs failed to provide the individual's identity in a timely manner.

Additionally**,** the mere fact that an allegedly unlawful government enforcement operation has been authorized does not satisfy the "certainly impending" requirement. In *Clapper,* the plaintiffs claimed that the government's allegedly unlawful surveillance activities injured them by interfering with their foreign contacts. 568 U.S. at 412. But the Supreme Court rejected their concerns about enforcement as insufficient, as their speculated harm relied on a legal provision that "authorizes—but does not mandate or direct—the surveillance that respondents fear." *Id*. Similarly, the Court in *Lyons* concluded that, even if the defendant police department did have a practice of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force," the

plaintiff had still failed to show a "real and immediate" injury. 461 U.S. at 105. In other words, showing that the police department was generally likely to continue to employ chokeholds was not enough to show that the plaintiff himself would likely be subject to that chokehold again.

Here, Plaintiffs claim there is an alleged policy of unlawful immigration stops and arrests, but as in *Lyons*, even if such a policy existed (it does not), it is insufficient to show standing. Moreover, Plaintiffs' showing of a purported unlawful enforcement policy is far weaker than the one the Court considered in *Lyons*. Here, ICE's directives expressly prohibit the precise conduct that Plaintiffs allege: warrantless arrests under § 1357(a)(2) without probable cause of an immigration violation and without prior consideration of likelihood of escape. Plaintiffs assert that ICE has a pattern and practice of acting otherwise, but that evidence consists of their subjective accounts of individual arrest experiences and media articles. *See* Declarations, ECF Nos. 15, 17, 18, 25, 27, 29, 31, 32, 34-46, 48, 50, 52-57, 60, and 62. At most, those declarations describe varying, unconnected encounters—the tone and substance of which are subject to reasonable dispute—not an official, routinely applied, metro-wide warrantless arrest pattern and practice. Plaintiffs thus have not even shown an unlawful immigration enforcement policy—let alone that they face a "real and immediate" threat of being harmed by it. *Lyons*, 461 U.S. at 102. Plaintiffs identify no written policy authorizing the arrests that they complain of because there is none.

None of the named Plaintiffs have Article III standing to obtain injunctive relief barring stops or warrantless arrests. Crucially, the policy that Plaintiffs allege led to their

stops and arrests does not exist. Rather, "[t]he mission of Operation Metro Surge is to significantly increase 'at-large' arrests of illegal aliens in the Twin Cities metropolitan area, focusing on individuals with *executable final orders.*" Bottjen Decl. ¶ 10 (emphasis added). Immigration law enforcement agents are trained to make individualized probable cause and likelihood of escape determinations prior to making arrests including refresher trainings that include training on 8 U.S.C. § 1357 and 8 C.F.R. § 287.8. Bottjen Decl. ¶¶ 13, 15, 17.

Finally, Plaintiffs also lack standing to challenge these purported investigative stops and warrantless arrest policies as it may apply to nonparties because individuals do not have standing to challenge immigration stop or arrest practices as they relate to nonparties. In *United States v. Texas*, 599 U.S. 670 (2023), certain states claimed that the federal government's immigration arrest policies violated certain statutes and sought "to order the Executive Branch to alter its arrest policy." *Id.* at 674. The Supreme Court held that the states lacked standing to bring such claims because it had "long held 'that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.'" *Id. (*quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 619 (1973)). For this reason, even if Plaintiffs were correct that the federal government's immigration arrest policies violated the immigration statute, they lack standing to bring claims challenging federal immigration arrest policies. *Id.* (taking "no position on whether the Executive Branch here is complying with its legal obligations under" the relevant statutes). After all, a cognizable injury requires more than "an asserted right to have the Government act in accordance with law." *Hippocratic Med.*, 602 U.S. at

381. Accordingly, the Court's decision in *Texas* confirms that Plaintiffs here lack standing to challenge arrest policies affecting other nonparties.

### B. Plaintiff Cannot Show a Fourth Amendment Violation for Investigative Stops

Even putting standing aside, Plaintiffs cannot show that the Defendants violated the Fourth Amendment or are likely to do so again. Plaintiffs' request for extraordinary injunctive relief hinges on demonstrating irreparable harm stemming from likely Fourth Amendment violations. For there to be a Fourth Amendment violation, there first had to be conduct by federal officers that implicates the Fourth Amendment. Consensual encounters do not raise Fourth Amendment issues and a number of interactions raised by Plaintiffs were just that. Furthermore, the perceived Fourth Amendment violations rely on allegations about federal officers' perceptions of ethnicity. But the Fourth Amendment does not allow such categorical restrictions on which facts may be considered in the totality of the circumstances analysis. "To be clear, apparent ethnicity *alone* cannot furnish reasonable suspicion; under this Court's case law regarding immigration stops, however, it can be a relevant factor when considered along with other salient factors." *Perdomo*, 146 S. Ct. at *2, (Kavanaugh, J., concurring) (quotations omitted) (emphasis added). Federal officers do not stop individuals based on ethnicity alone. If they did, there would essentially be a dragnet and far more stops. In any event, Plaintiffs have failed to establish that the stops of Plaintiffs were not supported by reasonable suspicion and factors beyond perceived ethnicity, and so have not established any Fourth Amendment violations in the past, much less a likelihood of imminent future violations.

### 1.  The Fourth Amendment Allows Consideration of Various Factors

Reasonable suspicion is inherently individualized and context specific, so no set of bright line rules can cabin what facts federal immigration agents can consider in the moment. The Fourth Amendment guarantee against unreasonable searches and seizures "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest," including stops of individuals suspected of being in the United States illegally. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). By virtue of "the limited nature of the intrusion," however, "stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest." *Brignoni-Ponce*, 422 U.S. at 880. Instead, an officer may conduct such a stop based on reasonable suspicion—supported by "specific articulable facts, together with rational inferences from those facts"—that a person is an illegal alien. *Id.* at 884; *see* 8 C.F.R. § 287.8(b)(2). Reasonable suspicion requires only "'some minimal level of objective justification' for making the stop," a standard that is "obviously less demanding than that for probable cause," *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citation omitted)—which is itself "not a high bar," *Kaley v. United States*, 571 U.S. 320, 338 (2014).

Given that probable cause "is something more than a bare suspicion, but need not reach the fifty percent mark," reasonable suspicion requires even less certainty. In other words,

> Probable cause does not require evidence demonstrating that it is more likely than not that the suspect committed a crime. Rather, probable cause exists when, given the totality of the circumstances, a reasonable person could

believe there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*United States v. Carbajal*, 449 F. App'x 551, 554 (8th Cir. 2012); *see also United States v. Manning*, 361 F. Supp. 3d 839, 845 (D. Minn. 2019) ("Probable cause exists even when there is less than a 50/50 chance of finding evidence of a crime."). Conversely, "reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *United States v. Thabit*, 56 F.4th 1145, 1151 (8th Cir. 2023) (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)). The reasonable-suspicion inquiry also "turn[s] on the totality of the particular circumstances." *Brignoni-Ponce*, 422 U.S. at 885 n.10; *see Arvizu*, 534 U.S. at 273. By definition, *no particular circumstantial factor is categorically off-limits*—whether that factor is a person's appearance, behavior, or the officer's past experience with the particular offense, location, or suspect. *See, e.g., Perdomo*, 146 S. Ct. at *3, (Kavanaugh, J., concurring) ("those circumstances include: that there is an extremely high number and percentage of illegal immigrants in the Los Angeles area; that those individuals tend to gather in certain locations to seek daily work; that those individuals often work in certain kinds of jobs, such as day labor, landscaping, agriculture, and construction, that do not require paperwork and are therefore especially attractive to illegal immigrants; and that many of those illegally in the Los Angeles area come from Mexico or Central America and do not speak much English"). Reasonable suspicion is accordingly context-dependent and cannot be reduced to per se rules that treat certain factors as categorically insufficient.

Perceived ethnicity can be a factor supporting reasonable suspicion in appropriate circumstances—for instance, if agents know that the members of a criminal organization under investigation are disproportionately members of one ethnic group—even if it would not be relevant in other circumstances. *See Brignoni-Ponce*, 422 U.S. at 885-86 ("apparent Mexican ancestry" did not "alone" supply reasonable suspicion). The Supreme Court recently directly addressed the use of perceived ethnicity in determining reasonable suspicion. Justice Kavanaugh's concurrence is clear that "apparent ethnicity alone cannot furnish reasonable suspicion; under this Court's case law regarding immigration stops, however, it can be a relevant factor when considered along with other salient factors." *Perdomo*, 146 S. Ct. at *3, (Kavanaugh, J., concurring) (quotations omitted). Perceived ethnicity can be a relevant factor to support reasonable suspicion for a brief investigative stop in at least some circumstances along with other probative factors. On this basis alone, Plaintiffs' request for an injunction must fail.

### 2. The Plaintiffs Fail to Show the Challenged Stops were Unlawful

Plaintiffs have not shown that the stops were unlawful because officers relied on far more than perceived ethnicity. As such, they have not established any Fourth Amendment violations, much less a policy or practice. Any future violations are wholly speculative. Plaintiffs claim that the government partakes in an "unlawful policy and practice of stopping individuals ostensibly for investigation of their immigration status, but without reasonable suspicion of removability" and based on perceived ethnicity. Pls. Mot. at 11. But that is highly speculative and unsupported by their evidence. *See also Caribbean*

27

*Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988); *Clapper*, 568 U.S. at 410; *County of Mille Lacs v. Benjamin*, 262 F. Supp. 2d 990 (D. Minn. 2003). Their evidence is a handful of anecdotal experiences during an operation where over 3,000 illegals have been detained, many of them violent criminals. That is hardly evidence of a policy or practice. As noted above, such a policy does not exist. Federal immigration agents do not develop reasonable suspicion or probable cause "solely based on an individual's race, ethnicity, or national origin." Bottjen Decl. ¶ 16. Instead, federal immigration agents apply a totality-of-the-circumstances, noncategorical approach that recognizes that the strength of particular factors may vary in context and that factors in combination can supply reasonable suspicion even if they do not individually. Harvick Decl. ¶¶ 10, 13, 14. Agents are repeatedly trained on this standard. Bottjen Decl. ¶¶ 13-15, 17; Harvick Decl. ¶¶ 13, 14. Plaintiffs provide nothing but anecdotal subjective allegations that Defendants have abandoned this policy.

Consistent with 8 C.F.R. § 287.8(b)(2), a federal immigration agents' reasonable suspicions are based on "specific articulable facts" that the person being questioned is an alien illegally present in the United States. *See* Bottjen Decl. ¶ 15; Harvick Decl. ¶ 10. This analysis is fact-specific and includes factors such as "intelligence sources, querying law enforcement and open-source databases, analysis of trends, facts developed in the field by agents, rational inferences that lead an agent or officer to suspect that criminal activity has or is occurring, and the officers or agents' observations, training, and experience." *See* Bottjen Decl. ¶ 15; Harvick Decl. ¶ 10. Moreover, consistent with the totality of the

28

circumstances approach, agents do not develop reasonable suspicion "solely based on an individual's race, ethnicity, or national origin." Bottjen Decl. ¶ 16.

Plaintiffs' record to the contrary is long on unauthenticated social media clips and news reports but short on the key link their theory requires: that supervisors ordered, approved, or ratified non-individualized stops or that individual agents did or routinely do stop individuals based solely on perceived ethnicity. Anecdote is not policy. Rather, Defendants' declarations reiterate that agents use a totality of the circumstances approach and do not develop reasonable suspicion or probable cause solely based on an individual's perceived ethnicity or race. Bottjen Decl. ¶¶ 14-16; Harvick Decl. 10. The evidence reflects the realistic probability that the federal agents' actions involved with the named Plaintiffs and non-party encounters fell into one of four possible categories: (1) consensual encounters, which are not seizures under the Fourth Amendment; (2) outright arrests based on probable cause, rather than investigative stops; (3) *Terry* stops with additional lawful justifications; and (4) self-initiated contact with federal agents.

It is a basic principle of the Fourth Amendment that law enforcement officers, including federal agents conducting immigration enforcement, can approach individuals and ask them questions in a consensual fashion. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Specifically, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions[,]" and as long "as a reasonable person would feel free to disregard the police and go about his business . . . the encounter is consensual and no reasonable suspicion is required." *Id.* (internal citations omitted); *see Terry v. Ohio,* 392 U.S. 1, 19 n.16 (1968); *see also INS v. Delgado*, 466 U.S. 210, 218 (1983) (holding that no

29

seizure occurred when immigration agents raided a factory to search for undocumented workers and did not create the impression that individuals would not be free to leave).

Where individuals were approached and questioned about their identity, no Fourth Amendment seizure occurred. S*ee Hiibel*, 542 U.S. at 185 (explaining that law enforcement "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure"). As explained above, federal immigration agents encountered Plaintiff Eydarus and asked for his identification in a public place. Similarly, Crisareli Castillo, Mark Castillo, and Ali Dahir all interacted with federal agents in public places. *See* Crisareli Castillo Decl. ¶¶ 2, 4, 6, 8; Mark Castillo Decl. ¶¶ 2, 5, 7; Dahir Decl. ¶¶ 5-7, 9. These interactions with federal immigration agents in public places where individuals were asked for identification did not constitute Fourth Amendment stops or seizures. Thus, Plaintiffs have failed to demonstrate that these interactions with law enforcement trigger any Fourth Amendment violation such that they demonstrated a "pattern" of prohibited conduct.

Similarly, the declarations of Plaintiff Hussen and Javier Doe and non-party declarants do not support Plaintiffs' theory of the existence of a policy or practice of unlawful investigative stops. These allegations constitute lawful "Terry" stops in which the federal agent possessed "reasonable suspicion" that the individual is or will soon be engaged in illegal activity, and therefore it is appropriate to briefly stop the person to assess the situation. *See Terry*, 392 U.S. at 22 ("Through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation."). Importantly, the Supreme Court has held that "nervous, evasive behavior is a pertinent factor in

determining reasonable suspicion[,]" which as noted previously involves a totality of the circumstances approach. *Wardlow*, 528 U.S. at 124 ("[I]t was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his *unprovoked flight* upon noticing the police.") (emphasis added); *see also Brignoni-Ponce*, 422 U.S. at 885.

Here, federal immigration agents had reasonable suspicion to stop Plaintiff Hussen as he attempted to flee when federal agents approached a restaurant. Berry Decl. ¶ 6; *see also United States v. Montero-Camargo*, 208 F.3d 1122, 1130 (9th Cir. 2000) ("In short, conduct that is not necessarily indicative of criminal activity may, in certain circumstances, be relevant to the reasonable suspicion calculus."). Hussen detailed that while standing outside of the restaurant talking to another individual, he saw who he believed to be federal immigration agents approach and immediately turned to walk away. Hussen Decl. ¶ 6. The officers contest that account, noting that he ran from them. Berry Decl. ¶ 6. Based on the agents' training on reasonable suspicion and Fourth Amendment principles, Hussen's behavior was indicative of unlawful activity and the agents acted properly within the scope of a *Terry* stop to briefly detain Plaintiff Hussen and later ascertain his status in the United States. *Id.* ¶¶ 6-9. Hussen was transported away from the scene for both his and the officers' safety because a crowd began to gather around them. *Id.* ¶¶ 8-11. Once agents confirmed that he was a U.S. citizen, he was immediately released. Hussen Decl. ¶ 27. Agents would have released him and not taken him in for processing if they could have confirmed his identity and citizenship sooner. Berry Decl. ¶ 16.

Similarly, Plaintiff Javier Doe refused to answer questions about his citizenship and attempted to flee when federal agents approached him outside of his department store worksite. Javier Doe stated he went outside when he was notified that ICE agents might be in the parking lot of his workplace. Javier Doe Decl. ¶ 3. He refused to answer questions when approached by federal immigration agents. Javier Doe Decl. ¶¶ 4, 5. Once agents determined he was a United States citizen, they ended the detention. Javier Doe Decl. ¶¶ 11, 16,

Plaintiffs have failed to demonstrate that non-party declarants were stopped without appropriate Fourth Amendment principles of reasonable suspicion. For example, one non-party declarant was stopped based on misidentification. A.A. Decl. ¶¶ 3, 4, 7. Upon confirming identification, he was released. A.A. Decl. ¶ 9. Two non-party declarants were encountered at construction worksites that traditionally indicate illegal aliens. Martinez Garcia Decl. ¶¶ 5-7; Pedro Moreno Decl. ¶ 3. Two other non-party declarants were encountered while driving on their way to work/worksites. Luisa Doe Decl. ¶ 2. Julio Doe Decl. ¶¶ 5-6. One non-party declarant, Santiago Doe, was encountered in a traffic stop following a vehicle record check that identified the vehicle owner as a citizen of Honduras illegally present in the United States. Bottjen Decl. ¶ 18. ("The officers conducted a vehicle stop, identified themselves as Deportation Officers with ICE, confirmed Santiago Doe's identity, and informed him that he was under arrest for being unlawfully present in the United States."). One declarant was briefly detained while officers confirmed his identity and then he was released. Osman Decl. ¶¶ 6-7.

These interactions establish that federal immigration agents properly followed Fourth Amendment procedures in which they looked to a variety of factors to determine whether there was reasonable suspicion warranting investigation through a *Terry* stop. Plaintiffs have not and cannot establish that Defendants' exhibit a pattern of prohibited conduct amounting to a policy or practice subject to relief in this Court.

Finally, to the extent any individual initiated contact on their own with federal agents involved in a law enforcement action, this is a far cry from demonstrating a Fourth Amendment violation or a "pattern" or "policy" of prohibited conduct such that Plaintiffs merit an injunction. *See, e.g.*, *Bostick*, 501 U.S. at 439 ("Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation"). According to the news reports Plaintiffs rely on to present Emmanuel Sackie's encounter, he voluntarily engaged in his interactions with federal immigration agents, contributing to a volatile environment that does not demonstrate a Fourth Amendment violation. *See* Compl. ¶¶ 75-78.

### C. Plaintiffs Cannot Show a Fourth Amendment Violation, a Federal Law Violation, or a Valid APA Claim for Warrantless Arrests

#### 1. Plaintiffs Have Not Shown that the Purported Policy and Practice of Making Warrantless Arrests is a Final Agency Action

Plaintiffs' APA claim asserts that Defendants adopted a "policy and practice" of warrantless arrests without probable cause of removability and without a likelihood of escape determination, and that this amounts to a final agency action subject to challenge under the APA. Compl. ¶¶ 59-61. But Plaintiffs fail to show that there is a final agency

action to challenge here. In general, judicial review under the APA "is available only for 'final agency action.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (quoting 5 U.S.C. § 704). The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent[,] or denial thereof, or failure to act." 5 U.S.C. § 551(13). In limiting APA review to "final" agency action, Congress restricted "pervasive oversight by federal courts over the manner . . . of agency compliance with . . . congressional directives," which would "inject[] the judge into day-to-day agency management." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004).

The Supreme Court has articulated "two conditions that generally must be satisfied for agency action to be 'final' under the APA." *Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (citing *Bennett v. Spear*, 520 U.S. 154 (1997)). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* (quoting *Bennett*, 520 U.S. at 177). "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett*, 520 U.S. at 177–78). The APA thus permits courts to consider only those claims that challenge discrete, "identifiable" final actions with "concrete effects." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990). Plaintiffs are not challenging an action that meets either condition.

### 2. Plaintiffs Have Not Challenged a Final Ageny Action

An agency's final policy decision that binds its employees may reflect a discrete, consummated decision-making process and meet the first condition for final agency action.

For example, in *Biden v. Texas*, 597 U.S. 785, 808 (2022), the Supreme Court held that two DHS memoranda terminating a policy (the Migrant Protection Protocols) under which certain aliens were returned to Mexico met the first condition for final agency action, because the memoranda marked the consummation of the agency's decision-making process and "bound DHS staff" to not follow the Protocols. In contrast, an agency practice is not enough, without more, to meet this condition. In *Lujan*, 497 U.S. at 877–78, the Court explained that the mere fact that an agency has taken multiple similar actions does not suffice to show that a different, discrete final agency action exists knitting them all together. There, the plaintiffs characterized various individual decisions about public land management as a "land withdrawal review program," and sought review under the APA. The Supreme Court held that the agency decisions could not be combined in this way and considered a single, final "agency action" under the APA. *Id.* at 890; *see also id.* at 891 (APA does not allow plaintiffs to amalgamate actions into a purported overarching policy and then "seek wholesale improvement of th[e] program by court decree").

Plaintiffs also have not shown that Defendants are "applying some particular measure across the board" in all law enforcement encounters that result in warrantless arrests. *Lujan*, 497 U.S. at 890 n.2 (conceding that such a measure may be susceptible to APA review). Federal immigration agents in the Twin Cities metro area do not make a warrantless arrest each time they encounter an alien who they have reason to believe is in the United States unlawfully. [need client declaration]. And even if Plaintiffs had shown an across-the-board practice, that still would be insufficient in this case, as they have not shown that such an across-the-board practice is the result of some other "specific order or

35

regulation" that is "final." *Lujan*, 497 U.S. at 890 n.2. In short, the first condition for final agency action is not met because Plaintiffs have not shown that the purported wrongful pattern and practice is the result of a concrete, identifiable, consummated decision-making process. Instead, Plaintiffs rely only on their own declarations as evidence of an unlawful profiling policy. *See, e.g.*, Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction ("Pls. Mot."), ECF No. 27, at 14 ("[Plaintiffs and declarants] experiences illustrate DHS's policy and practice of unconstitutional stops.").

### 3. Plaintiffs Have Not Shown the Alleged General Policy and Practice Itself Has Direct Consequences for Them

Plaintiffs also have not met the second condition for final agency action: that the challenged action itself determined "rights or obligations" or is a source "from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78. For agency action to be "final," the "legal consequences" of the challenged action must be "direct and appreciable." *Hawkes*, 578 U.S. at 597. An internal directive can meet this test if it "b[inds] [agency] staff" to act a certain way that affects third parties. *Texas*, 597 U.S. at 808–09 (memo that "forb[ade]" agency employees from "continu[ing] a program" determined rights and obligations of program's beneficiaries); *cf. Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 426 (D.C. Cir. 2004) (no final agency action where agency letter did not "[c]ompel[] [any] one to do anything").

Here, Plaintiffs do not challenge the actual directives Defendants have issued that direct immigration law enforcement agents to comply with § 1357(a)(2) and warrantless arrests. Rather, they point to an alleged policy and practice of violating § 1357(a)(2), but

they have not shown that Defendants have made a decision that will assuredly affect Plaintiffs if immigration law enforcement agents encounter them. Plaintiffs have not shown, for example, that Defendants required that warrantless arrests in the Twin Cities metro area be made without assessing the statutory factors. Such assertions would be untrue. *See* Bottjen Decl. ¶¶ 13, 14; Harvick Decl. ¶¶ 11, 13. Nor are federal immigration agents trained to simply ignore the likelihood of escape when deciding whether to make a warrantless arrest. *See* Bottjen Decl. ¶ 14. There is no policy that predetermines the outcome before the encounter happens—i.e., that mandates an unlawful arrest. For that matter, there is no such practice, either—namely, immigration agents do not arrest every alien they encounter whom they have reason to believe is in the country unlawfully. *See* Bottjen Decl. ¶ 13. The purported policy and practice of unlawful warrantless arrests thus does not meet the second condition for final agency action.

In sum, neither condition for final agency action is met. Plaintiffs' APA claims challenging the purported policy and practice thus are unlikely to succeed.

### 4. The Arrests Were Valid and Supported by Probable Cause and an Individualized Escape Risk Assessment.

Even if Plaintiffs had identified a final agency action, their APA claims still fail because they have not shown Defendants have a practice of making warrantless arrests in the Twin Cities metro area without regard to immigration law violations or escape risk, or that such a practice was applied to them. Because Plaintiffs' APA claims fail their claims under the *Accardi* doctrine similarly fail. Under §1357(a)(2), immigration officials "have power without warrant . . . to arrest any alien in the United States, if [they have] reason to

believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest." *Id.* The "reason to believe" phrase in 8 U.S.C. § 1357 "must be considered the equivalent of probable cause." *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010) ("Because the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in § 1357(a)(2) means constitutionally required probable cause."). *See also Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015). The phrase "likelihood of escape" means "if an immigration officer determines he or she is unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained." Exhibit A at 3.

Plaintiffs' reliance on statements by DHS officials that arrests are made without probable cause is unavailing. *See, e.g.*, Pls. Mot. at 10 (citing ECF No. 48, Declaration of Kshithij Shrinath, Exhibits 1-3). The Lyons Memo, issued January 28, 2026, reiterates longstanding DHS policy that warrantless arrests require "probable cause to believe that: (1) the subject is a removable alien; **and** (2) the subject is 'likely to escape' before a warrant for his arrest can be obtained." Exhibit A at 3 ("These determinations must be made before a warrantless arrest is effectuated."); *see id.* at 2 ("This memorandum serves as a reminder of this essential authority and provides guidance for the lawful and consistent exercise of warrantless arrest authority for civil violations of immigration laws.").

Establishing probable cause "is not a high bar." *Kaley*, 571 U. S. at 338. "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Illinois v. Gates*,

462 U. S. 213, 243-44 (1983)). "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *Wesby*, 583 U.S. at 57 (citation modified).

Numerous contextual factors may signal that escape is likely before a warrant can be obtained. These include "[w]hen an alien's removability 'is clear and undisputed,'" *Vazquez-Medrano v. Sessions*, 726 F. App'x 92, 93 (2d Cir. 2018) (quoting *Contreras v. United States*, 672 F.2d 307, 309 (2d Cir. 1982)), when the alien admitted that he "had been picked up before," *Aguirre v. INS*, 553 F.2d 501, 502 (5th Cir. 1977), or appeared "extremely nervous" and seemed to be "looking for an opportunity to run," *United States v. Meza-Campos*, 500 F.2d 33, 34 (9th Cir. 1974), or admitted that he had previously been removed, *United States v. Puebla-Zamora*, 996 F.3d 535, 538 (8th Cir. 2021), or attempted to evade custody, *Contreras*, 672 F.2d at 309, or was "stopped in a vehicle," *United States v. Murillo-Gonzalez*, 524 F. Supp. 3d 1139, 1151 (D.N.M. 2021), *aff'd*, No. 22-2123, 2024 WL 3812480 (10th Cir. Aug. 14, 2024) (citing *Quintana*, 623 F.3d at 1241 ), or presented conflicting documents when questioned about his status. *Yam Sang Kwai v. Immigration & Naturalization Service*, 411 F.2d 683, 687 (D.C. Cir. 1969); *see also United States v. Sagastume-Galicia*, Mag. No. 19-0287 (BAH), 2020 WL 2486423, at *4 (D.D.C. Apr. 22, 2020) (Defendant is an escaperisk because he is "not currently employed," and "[c]ombined with defendant's history of physical violence and his inability to conform his conduct to court-ordered removal, his undocumented status and the existence of the detainer tip this factor in favor of detention.").

Finally, neither 8 U.S.C. § 1357(a)(2) nor 8 C.F.R. § 287.8(c)(2)(ii) imposes any affirmative obligation on federal immigration agents to make the assessment of the risk of escape in any particular manner. Given that an alien is free to leave at any point during a consensual encounter, agents must make these assessments quickly and based on limited information. *United States v. Murillo-Gonzalez*, 524 F. Supp. 3d 1139, 1151 (D.N.M. 2021) (deferring "to the officer's on-the-scene judgments" and upholding an arrest under § 1357(a)(2)). "Because of the difficulty of making an on-the-spot determination as to the likelihood of escape without any opportunity to verify information provided or to conduct a full-scale interview, an [immigration] officer's determination will not be upset if there is any reasonable basis for it." *Contreras*, 672 F.2d at 308 (citation modified).

Plaintiffs' arrests do not show that federal immigration agents have a practice of ignoring probable cause or the risk of escape before making warrantless arrests. The circumstances behind each arrest demonstrate that agents approached each of the named Plaintiffs and non-party declarants seeking information about their identification or based on reasonable suspicion and those named Plaintiffs and non-party declarants were arrested with probable cause that they had committed an immigration violation and were an escape risk.

In each of the encounters where Plaintiffs claim they were arrested, federal immigration agents' further detention of the individuals was based on probable cause. Federal immigration agents had reasonable suspicion to stop named Plaintiff Hussen as he attempted to flee when federal agents approached him outside of a restaurant. Berry Decl. ¶¶ 6-8; *see also Montero-Camargo*, 208 F.3d at 1130 ("In short, conduct that is not

necessarily indicative of criminal activity may, in certain circumstances, be relevant to the reasonable suspicion calculus."). After stopping Hussen, federal immigration agents sought to confirm his identity and claim to U.S. citizenship through a facial recognition scan, but Hussen refused. Berry Decl. ¶¶ 12, 13. Hussen Decl. ¶¶ 13, 17. Agents took Hussento a processing center to confirm his identity. Berry Decl. ¶ 15; Hussen Decl. ¶ 24, 25, 27.

Plaintiff Javier Doe was asked for information about his citizenship and refused to provide information to officers. Javier Doe Decl. ¶¶ 4, 5.. Javier Doe "kept his distance" from the agents while shouting expletives and stating "I don't need to tell you anything." Javier Doe Decl. ¶ 5. Only after being detained did Javier Doe state he was a U.S. citizen. Javier Doe Decl. ¶ 8.

When stopped for questioning regarding their identification and immigration status, federal immigration agents determined three of the non-party declarants had petitions and/or applications pending but those cases did not provide valid immigration status, giving rise to probable cause they were in the United States in violation of U.S. immigration laws. *See* Bottjen Decl. ¶¶ 18-20. One individual was stopped based on targeted activities looking for a specific individual and, due to mistaken identity, was briefly detained until confirming their identity. A.A. Decl. ¶¶ 7, 9. Four individuals were stopped and further detained until confirming their identities with two of those individuals requiring confirmation the documentation they provided was not fraudulent. *See* Osman Decl. ¶¶ 6,7 19, 21; Castrejon Decl. ¶¶ 9, 10, 14, 18; Martinez Garcia Decl. ¶ 2-4, 7-10, 12, 14, 15; Moreno Decl. ¶.3, 5-7, 16. Plaintiffs' claim that Defendants violated the *Accardi* doctrine is inaccurate. *See* Compl. ¶ 200. The *Accardi* doctrine binds an agency to its own legislative rules. *United*

*States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954). Defendants fully complied with that command as the arrests were made consistent with 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i)-(ii).

### D.  Many of Plaintiffs Claims are Barred by 8 U.S.C. § 1252

Finally, to the extent any plaintiffs or putative class members are in removal proceedings,[10] the INA strips this Court of jurisdiction to hear their claims. Under 8 U.S.C. § 1252(b)(9), "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provision, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final [removal] order." *See Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (finding § 1252(b)(9) inapplicable because "they are not challenging the decision to detain them in the first place.").

A petition for review filed in the appropriate court of appeals is the sole and exclusive means for judicial review of a final removal order. *See* 8 U.S.C.§ 1252(a)(5). Indeed, petitions for review commonly consider challenges related to whether immigration authorities had reasonable suspicion to stop, or probable cause to arrest, an alien. *See, e.g.*, *Sanchez v. Sessions*, 904 F.3d 643 (9th Cir. 2018); *Yanez-Marquez v. Lynch*, 789 F.3d 434, 461 (4th Cir. 2015); *Oliva-Ramos v. Att'y Gen.*, 694 F.3d 259, 274 (3d. Cir. 2012). Thus, Plaintiffs' claims are barred because the "legal questions" in this case challenging the

---

[10] While the three named Plaintiffs are U.S. citizens and thus not subject to the INA, certain non-party declarants are not U.S. citizens or lawful permanent residents, and arguably most putative class members will be aliens subject to the INA. Defendants did not have sufficient time to determine yet which declarants are presently subject to removal proceedings.

arrests are directly part of the removal process. *Jennings*, 583 U.S. at 295 n.3. Accordingly, the Court lacks jurisdiction pursuant to 8 U.S.C. § 1252(a)(5) and (b)(9) to entertain Plaintiffs' challenges here.

Section 1252(g) also bars Plaintiffs' claims. Section 1252(g) provides that "notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary] to [1] commence proceedings, [2] adjudicate cases, or [3] execute removal orders against any alien," except through a petition for review from a final order of removal filed in a court of appeals. Although this section "does not sweep broadly," *Tazu v. Att'y Gen.*, 975 F.3d 292, 296 (3d Cir. 2020), its "narrow sweep is firm," *E.F.L. v. Prim*, 986 F.3d 959, 964-65 (7th Cir. 2021).

Courts "cannot entertain challenges to the enumerated executive branch decisions or actions" outside a petition for review. *E.F.L.,* 986 F.3d at 964. Section 1252(g) is "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 & n.9 (1999) ("Section 1252(g) seems clearly designed to give some measure of protection to . . . discretionary determinations."). Thus, agents' discretion here to arrest individuals subject to removal proceedings or removal orders is not reviewable.

## II.   Plaintiffs Fail to Show Irreparable Harm

Even if the Court finds that Plaintiffs have a likelihood of success on the merits, the Court should still deny the preliminary injunction because Plaintiffs have failed to establish that they will suffer irreparable harm absent preliminary relief. The "high standard for

irreparable injury" requires a two-fold showing: First, because an irreparable injury "must be both certain and great," Plaintiffs "must show '[t]he injury complained of [is] of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" *Morehouse Enters., LLC*, 78 F.4th at 1018 (citations and quotations omitted); *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Second, the injury must be "beyond remediation." *Id.* Importantly, irreparable harm "is a threshold requirement for granting temporary injunctive relief." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 8 (D.D.C. 2009).

Here, Plaintiffs are not seeking to prevent irreparable harm. Instead, they seek an injunction to prevent past harms from possibly recurring. As explained above, past law enforcement contact does not create a presumption of imminent repetition. *Lyons*, 461 U.S. at 105-06. "Absent a sufficient likelihood that [they] will again be wronged in a similar way," Plaintiffs cannot establish standing to seek an injunction much less irreparable harm. *Id.* at 111. Additionally, Plaintiffs' belief that they will be stopped again without reasonable suspicion or rearrested without probable cause is speculative and it is well established that a movant cannot show "certain[] impending" injury when the asserted injury is based on a "speculative chain of possibilities." *Clapper*, 568 U.S. at 410. Because Plaintiffs cannot establish standing to seek an injunction, they likewise cannot establish irreparable harm. *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity,* 950 F.2d 1401, 1410 (9th Cir. 1991).

Thus, because Plaintiffs have failed to demonstrate that they will suffer irreparable harm absent preliminary relief, the Court should deny Plaintiffs' motion for a preliminary injunction.

44

### III.    The Equities and Public Interest Favor Denial of Injunction

Finally, where the government is a party, the balance of equities and public interest factors merge. *Nken*, 556 U.S. 418, 435 (2009). Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991). Here, the balance of the equities and public interest tips decisively in Defendants' favor. Plaintiffs' motion fails to acknowledge the substantial governmental harm an injunction imposes by usurping authority over enforcement of our Nation's immigration laws, which the Constitution and federal statutes commit to the Executive Branch. *Perdomo,* 146 S. Ct. at *4 (Kavanaugh, J., concurring) (quoting *CASA*, 606 U.S. at 861 ("Any time that the Government is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury"). The Twin Cities metro area is a crucial priority for immigration enforcement where an estimated 66,000 aliens have broken the law and remain illegally. Bottjen Decl. ¶ 11. Yet, this proposed preliminary injunction would throw central elements of immigration enforcement, investigative stops and warrantless arrests, into intolerable uncertainty. The granting of this order would risk unintended operational consequences and officer/public-safety concerns. *Perdomo,* 146 S. Ct. at *4 (Kavanaugh, J., concurring) (quoting *Brignoni-Ponce*, 422 U.S. at 878) (acknowledging the "myriad 'significant economic and social problems' caused by illegal immigration[.]"). Indeed, as shown by Plaintiffs' proposed preliminary injunction order, such an injunction would inject the judiciary into micromanaging every operation and stop conducted in a metro area of over 3 million people. That is untenable for the Executive and the Judiciary. It will

45

effectively hamper immigration enforcement in a metro area with thousands of illegal aliens.

The public interest favors lawful, effective enforcement carried out within constitutional limits. *Nken*, 556 U.S. at 435; *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). Preventing the Executive Branch from implementing a major enforcement priority and effectuating the immigration laws Congress enacted weighs in favor of the denial of the preliminary injunction. *Perdomo*, 146 S. Ct. at *6, (Kavanaugh, J., concurring) ("we now likewise must decline to step outside our constitutionally assigned role to improperly restrict reasonable Executive Branch enforcement of the immigration laws."). It is axiomatic that "[t]he Judiciary does not set immigration policy or decide enforcement priorities" but merely "ensure[s], in justiciable cases, that the Executive Branch acts within the confines of the Constitution and federal statutes." *Id.* at *5-6. As explained above, Defendants are acting within these parameters.

The proposed injunction also would inflict irreparable harm on Defendants by supplanting the political branches' judgments and intruding on the separation of powers. *See CASA*, 606 U.S. at 857-58. In contrast, "[t]he interests of individuals who are illegally in the country in avoiding" arrest "is ultimately an interest in evading the law[,]" which "is not an especially weighty legal interest." *Perdomo*, 146 S. Ct. at *5, (Kavanaugh, J., concurring). Accordingly, the equities favor Defendants.

## IV.    The Requested Injunction Is Overbroad and Improper in Scope

Plaintiffs' requested relief is legally improper because it misapprehends the Fourth Amendment by placing under judicial supervision all immigration-enforcement stops and

warrantless arrests within the Twin Cities metro area and subjecting every such encounter between agents and potential illegal aliens to the threat of contempt. First, Petitioners' request for an injunction is impermissibly vague and overbroad. The proposed order requires Defendants and their agents to stop the "policy and practice of stopping individuals" in the Twin Cities metro area for immigration purposes "without a valid individualized determination made by the agent making the stop of reasonable suspicion that the person being stopped is in the United States in violation of law or regulation regarding the admission, expulsion, or removal of noncitizens." Proposed Order at 2. The proposed order prohibits Defendants and their agents from "making warrantless civil immigration arrests" in the Twin Cities metro area "without a valid pre-arrest individualized determination by the arresting agent of probable cause that the person being arrested is in the United States in violation of law or regulation regarding the admission, expulsion, or removal of noncitizens." *Id*. at 3. The proposed order further prohibits Defendants and their agents from implementing a "policy and practice of making warrantless arrests" in the Twin Cities metro area "without a valid pre-arrest individualized determination by the arresting agent of probable cause that the person being arrested is likely to escape before a warrant can be obtained." Proposed Order at 3.

This order is impermissibly vague, overbroad, and constitutes a "follow the law" injunction. The Eighth Circuit has held that an "injunction must be tailored to remedy the specific harm suffered." *Arc of Iowa v. Reynolds*, 24 F.4th 1162, 1181 (8th Cir. 2022). *See also St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022-23 (8th Cir. 2015) ("[A] preliminary injunction 'must be narrowly tailored to remedy only the specific harms shown

by the plaintiffs, rather than to enjoin all possible breaches of the law.'" (quoting *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004)). Just this week, the Eighth Circuit issued an order lifting a district court injunction because it was a follow-the-law command. *Noem v. Tincher*, __F.4th__, No. 26-1105, 2026 WL 194768 (8th Cir., Jan. 26, 2026) ("Directions not to [r]etaliat[e] against persons who are engaging in peaceful and unobstructive protest activity or [s]top[ ] or detain[ ] drivers . . . where there is no reasonable articulable suspicion are simply commands to obey the law, which are not specific enough." (citations and quotations omitted)); *see also Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) ("[A]n injunction against state actors must directly address and relate to the constitutional violation itself and must not require more of state officials than is necessary to assure their compliance with the constitution.").

Plaintiffs' premise—that restating existing law suffices—is incorrect; Rule 65(d) forbids non-specific "obey-the-law" injunctions. Rule 65(d)(1) requires that any injunction be "specific in terms" and "describe in reasonable detail—and not by reference to the complaint or other document—the act or acts sought to be restrained." "[T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). And this limitation prevents federal courts from arrogating to themselves the power to generally superintend the Executive Branch's execution of the laws. *See Trump v. CASA, Inc.*, 606 U.S. 831, 858 (2025) ("[T]he Judiciary does not have unbridled authority to enforce" the Executive's "duty to follow the law.");

see also *Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006) (court cannot fashion an injunction that abstractly commands the Secret Service to obey the First Amendment, noting that injunction requiring party to do nothing more specific than 'obey the law' is impermissible."); *accord EEOC v. AutoZone, Inc.*, 707 F.3d 824, 841 (7th Cir. 2013). As the Supreme Court has explained in *Schmidt v. Lessard*, 414 at 476, Rule 65(d) "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." Reiterating existing law as an injunction does not perform this function. In violation of these rules, the Plaintiffs' proposed order simply restates the law. Pls. Mot. at 2.

In addition, issuing an injunction encompassing anyone within the Twin Cities metro area, which encompasses potentially millions of nonparties, is contrary to the Supreme Court's decision in *CASA*, 606 U.S. at 841-42. The scope of the Plaintiffs' proposed injunction improperly extends beyond what is necessary to provide Plaintiffs' relief, and granting their proposed order would exceed the District Court's equitable powers. Under *CASA*, any injunctive relief should be applied only to named Plaintiffs, and this Court cannot broadly enjoin Defendants from stopping any individual in the Twin Cities metro area for immigration purposes "without a valid individualized determination made by the agent making the stop of reasonable suspicion that the person being stopped is in the United States in violation of law or regulation regarding the admission, expulsion, or removal of noncitizens."

Further, this Court cannot broadly enjoin Defendants from making warrantless arrests "without a valid pre-arrest individualized determination by the arresting agent of probable cause that the person being arrested is in the United States in violation of law or regulation regarding the admission, expulsion, or removal of noncitizens" and/or "is likely to escape before a warrant can be obtained." This is merely a restatement of the statutory requirements without any further explanation specifying what Defendants are prohibited from doing. And probable cause is a fact-specific, totality-of-the-circumstances inquiry—a "fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *Wesby*, 583 U.S. at 57.

Thus, an injunction simply restating the requirement of probable cause as specified in 8 U.S.C. § 1357(a)(2) is impermissible under the law. With no particularized contours for probable cause, the district court's injunction is an unqualified weapon for Plaintiffs to chill immigration agents' ability to effectively perform their duties. *Cf. Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Plaintiffs would risk nothing by alleging each arrest violates the injunction, insulated by the vagueness of what constitutes probable cause, but Defendants will always be held to account. The injunction in effect would sanction keeping immigration enforcement agencies entangled in constant litigation, disrupting operations, deterring recruitment, and chilling the ardor of current agents. *Perdomo*, 146 S. Ct. at *4 ("[A]fter-the-fact judicial second-guessing and contempt proceedings will inevitably chill lawful immigration enforcement efforts."). Ultimately, the proposed injunction improperly extends beyond what is necessary and this Court cannot interfere with the Executive Branch's comprehensive immigration enforcement decisions.

## V.  Plaintiffs Should Be Ordered to Post Security

For the reasons stated above, the Court should deny Plaintiffs' motion in its entirety. Nevertheless, should the Court issue any injunctive relief, the Court should also order Plaintiffs to post security. Under Rule 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. *See Novus Franchising, Inc. v. AZ Glassworks, LLC*, Case No. 12-cv-1771, 2012 WL 5057095 at *9 (D. Minn., Sept. 27, 2011) ("A district court has wide discretion in determining the amount of bond required and will be reversed only if it 'abuses that discretion due to some improper purpose, or otherwise fails to require an adequate bond or to make the necessary findings in support of its determination.'") (quoting *Hill v. Xyquad, Inc.*, 393 F.2d 627, 632 (8th Cir. 1991)).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion.


DATE: January 30, 2026               Respectfully Submitted,

                                     BRETT A. SHUMATE
                                     Assistant Attorney General, Civil Division

                                     TIBERIUS DAVIS
                                     SEAN SKEDZIELEWSKI
                                     Counsel to the Assistant Attorney General

JAMES J. WALKER
Senior Litigation Counsel
Office of Immigration Litigation

/s/ Lori S. MacKenzie
LORI S. MACKENZIE (NC #25363)
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 514-4565
Lori.S.MacKenzie@usdoj.gov

*Attorneys for Defendants*