UNITED  STATES  DISTRICT  COURT
DISTRICT OF MINNESOTA

MUBASHIR KHALIF HUSSEN,
MAHAMED EYDARUS, and JAVIER DOE
*on behalf of themselves and others similarly
situated,*

        Plaintiffs,

v.

KRISTI NOEM, *in her official capacity as Secretary
of the U.S. Department of Homeland Security*; U.S.
Department of Homeland Security; U.S. Immigration
and Customs Enforcement; TODD LYONS, *in his
official capacity as Acting Director of U.S.
Immigration and Customs Enforcement*; DAVID
EASTERWOOD, *in his official capacity as Acting
Director, Saint Paul Field Office, U.S. Immigration
and Customs Enforcement*; *;* U.S. Customs and Border
Protection; RODNEY SCOTT, *in his official capacity
as Commissioner of U.S. Customs and Border
Protection;* U.S. Border Patrol; MICHAEL W.
BANKS, *in his official capacity as Chief of U.S.
Border Patrol*; and GREGORY BOVINO, *in his
official capacity as Commander of the U.S. Border
Patrol*,

*in their official capacities,*

        Defendants.

Case No. 0:26-cv-00324-ECT-ECW

**Declaration of Michael Bottjen**

I, Michael Bottjen, hereby declare as follows:

1.      I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as an Assistant Field Office Director (AFOD) with the St. Paul Field Office. I have held this position since July 28, 2024.

2.      I have been employed by ICE since November 2003. Since that time, I have held several positions with ICE: Immigration Enforcement Agent (2003-2006); Deportation Officer (2006-2009) with experience in all aspects of the identification, arrest, case management, and removal of aliens present in the United States in violation of law; Supervisory Detention and Deportation Officer (2009-2024), overseen various units as first-line supervisor for fugitive operations, custody management, non-detained case management, prosecutions, and the alternatives to detention program;  Assistant Field Office Director (2024-Present) managing a portfolio of programs that included the non-detained case management, alternatives to detention, and sub-offices in South Dakota and North Dakota.

3.      This declaration is submitted in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction and Defendants' Opposition to Plaintiffs' Motion for Provisional Class Certification.

4.      The statements contained in this declaration are based upon my personal knowledge, reasonable inquiry, and information made available to me in the course of my official duties from information obtained from records, systems, databases, other ICE employees, and/or information portals maintained and relied upon by ICE.

**Background**

5.      ICE is the largest investigative branch of DHS and is charged with enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001 terrorist

attacks by combining components of the former Immigration and Naturalization Service and the former U.S. Customs Service, among other agencies, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor (OPLA), which includes 25 field locations led by Chief Counsel.

6.      ERO deportation officers are immigration officers under Title 8 of the U.S. Code and have been delegated limited customs officer warrantless arrest authority under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor in the first instance and a felony on repeat offenses (8 U.S.C. § 1325), and those who illegally reenter after having been removed, which is a felony (8 U.S.C. § 1326)—or otherwise undermine the integrity of our immigration laws and our border control efforts.

7.      The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer

them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them or otherwise overseeing their departure from the United States.

**Operation Metro Surge**

8.      Operation Metro Surge is an exclusive federal operation. ICE executes federal law through immigration enforcement by its federal officers and agents. No State, County, or Municipal officials from Minnesota participate in Operation Metro Surge. ICE has not coerced, conscripted or commandeered any State, County, or Municipal officials from Minnesota to participate in Operation Metro Surge.

9.      During Operation Metro Surge, approximately 2,000 additional ERO officers and HSI agents were detailed to the St. Paul Field Office. These details have come at different times and for varying lengths of time. Typically, the ERO St. Paul Office is staffed with approximately 190 officers covering the five states of Minnesota, North Dakota, South Dakota, Nebraska, and Iowa. In the Twin Cities of St. Paul and Minneapolis, ERO has approximately 80 officers.

10.      The mission of Operation Metro Surge is to significantly increase "at-large" arrests of illegal aliens in the Twin Cities metropolitan area, focusing on individuals with executable final orders. This effort is a joint effort between ICE ERO and ICE HSI, with assistance from other federal components. Since commencement of Operation Metro Surge, ICE has arrested more than 3,000 illegal aliens.

11.      Based on available data, approximately 66,000 aliens in Minnesota appear to be or may be subject to enforcement actions under the Immigration and Nationality Act (INA).

12.      Operation Metro Surge has led to the successful arrest and apprehension of criminal aliens, including aliens with convictions for murder, aggravated assaults, domestic

abuse/violence, drug trafficking, counterfeiting, identity theft, robbery with a dangerous weapon, sexual assault and rape convictions.

**<u>Warrantless Arrests</u>**

13.    ICE officers and agents may conduct warrantless arrests if there is reason to believe that the alien to be arrested is present in the United States in violation of any U.S. immigration law and is likely to escape before a warrant can be obtained. ERO officers receive initial training at the Federal Law Enforcement Training Center that includes Fourth Amendment and arrest authorities.  ERO officers also receive OPLA-administered refresher Fourth Amendment training twice a year, which includes training on warrantless arrest authority under 8 U.S.C. § 1357, and standards for enforcement activity under 8 C.F.R. § 287.8. Additionally, ERO may request that OPLA provides Fourth Amendment refresher training to ERO officers before a large scale operation.  This was the case with the officers who were processed into the St. Paul AOR to participate in Operation Metro Surge between late-November 2025 and early January 2026.

14.    The "reason to believe" standard requires probable cause to make an arrest. *See, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015); *United States v. Varkonyi*, 645 F.2d 453, 458 (5th Cir. 1981); *United States v.* Cantu, 519 F.2d 494, 496 (7th Cir. 1975). In considering the "likelihood of escape," an ICE officer or agent must consider the totality of the circumstances known to the officer before the arrest. There is no exhaustive list of factors that should be considered in determining whether an individual is "likely to escape before a warrant can be obtained."

15.    ERO officers are also trained to identify when there is reasonable suspicion to briefly detain an individual for further investigation into alienage and immigration status. ERO officers may develop reasonable suspicion in any number of ways. Examples include: subjects

making incriminating statements or exhibiting suspicious behavior during consensual encounters; subjects failing to produce any documentation during consensual encounters or producing documentation suspected to be fraudulent; information from open-source investigations, other law enforcement agencies, informants, and surveillance; and information gleaned from records and database checks.

16.    ERO officers do not develop reasonable suspicion or probable cause solely based on an individual's race, ethnicity, or national origin.

17.    ERO officers also receive training on the statutory and regulatory provisions of the INA and relevant DHS and ICE policies. They are instructed to follow procedures emphasizing targeted investigations and arrests of aliens with final removal orders and/or serious criminal histories. That being said, ERO officers have the statutory authority to arrest any alien for whom there is probable cause to believe he/she is illegally present in, or otherwise removable from, the United States regardless of their criminal history.

**Individual Allegations**

**Santiago Doe**

18.    ERO officers encountered Santiago Doe on December 12, 2025 during a targeted enforcement operation. Officers conducted record checks on a vehicle traveling in Chaska, Minnesota. They identified the owner as Santiago Doe, a citizen and national of Honduras, who is illegally present in the United States. The officers conducted a vehicle stop, identified themselves as Deportation Officers with ICE, confirmed Santiago Doe's identity, and informed him that he was under arrest for being unlawfully present in the United States.

**Julio Doe**

19.    ERO officers encountered Julio Doe on December 24, 2025, while conducting surveillance in Lakeville, Minnesota, where multiple arrests had previously occurred. During

surveillance, they observed four males flee the area in a vehicle registered to a female alien and at an extremely high rate of speed. When the vehicle stopped, ICE agents approached the vehicle and arrested the occupants, including Julio Doe.

**Luisa Doe**

20.     ERO officers encountered Luisa Doe on December 12, 2025. Immigration Officers determined that she was unlawfully present and placed her under arrest for an immigration violation.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief, and in accordance with the preliminary information I have received.


Executed this 30th day of January 2026 in St. Paul, Minnesota.


_____

Michael Bottjen