UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| MUBASHIR KHALIF HUSSEN, MAHAMED EYDARUS, and JAVIER DOE *on behalf of themselves and others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, *in her official capacity as Secretary of the U.S Department of Homeland Security*, U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; DAVID EASTERWOOD, *in his official capacity as U.S. Immigration and Customs Enforcement Field Office Director for St. Paul, Minnesota*; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection*; U.S. BORDER PATROL; MICHAEL BANKS, *in his official capacity as Chief of U.S. Border Patrol*; Director, Homeland Security and GREGORY BOVINO, *in his official capacity as Commander-at-Large of U.S. Border Patrol*, <br><br> Defendants. | Case No. 0:26-cv-324-ECT-ECW <br><br><br><br><br><br><br><br> **DECLARATION OF KYLE C. HARVICK** |

_____

I, Kyle C. Harvick, hereby declare as follows:

1.   I am employed by U.S. Customs and Border Protection (CBP).  CBP is charged with enforcing the Nation's immigration laws in order to protect national security and uphold the integrity of the immigration system.  As part of this mission, CBP agents and officers are responsible for preventing the unlawful entry of individuals into the United States, apprehending those who attempt to enter illegally or who have violated the immigration laws.  Through these activities, CBP seeks to secure the border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States.

2.   I am the Patrol Agent in Charge, El Centro Station.  In this role, I oversee Border Patrol Operations for the El Centro Station, with responsibility for 35 miles of land border; a permanent traffic checkpoint; 320 employees; a fleet of 160 government vehicles; and an annual budget of approximately $800,000.00.  I have been in this position since 2023.

3.   I entered on duty with the U.S. Border Patrol on September 10, 2000, with my first duty assignment in the El Paso Sector.  In 2015-2016, I served as Acting Assistant Chief within the Strategic Planning and Analysis Directorate, Operational Requirements Management Division in Washington, D.C.  I have also served as the Deputy Patrol Agent in Charge of the Yuma Sector Border Patrol Station and the first Customs and Border Protection Advisor to Israel, where I was responsible for facilitating in-country liaison with various Israeli Law Enforcement entities and Ministry of Defense agencies.  I have served in the El Centro Sector since 2021, including service as the Professional Standards Assistant Chief Patrol Agent.

4.   Currently, for the Minneapolis operation ("Operation Metro Surge"), I am Deputy Incident Commander, and I operate out of the Border Patrol Incident Command Post (ICP).  In this position, I have operational oversight and am responsible for all U.S. Border Patrol assets and operations in the

greater Minneapolis area. I ensure the Border Patrol Agents have all the proper equipment and supplies to do their job. I oversee personnel, logistics, referrals for criminal prosecutions, the execution the of the Agency's use of force policy, and tactical information gathering. I report to the Incident Commander or act as the Incident Commander in his absence. The ICP is the lowest level operational headquarters for CBP personnel in support of Operation Metro Surge in Minnesota.

5.      The statements contained in this declaration are based upon my personal knowledge and information made available to me in the course of my official duties, consisting of internal, evolving situation reports, preliminary reports in CBP's Enforcement Action Statistical Analysis and Reporting (E-STAR) System, and other reports made available to me. This declaration is based on my preliminary assessment of the developing body of documentation.

6.      In early January 2026, in support of U.S. Immigration and Customs Enforcement (ICE), CBP personnel began deploying to Minneapolis to assist ICE Enforcement and Removal Operations (ERO). As part of Operation Metro Surge, CBP personnel, along with personnel from partner federal agencies, participate in a variety of different law enforcement actions in and around Minneapolis. These enforcement actions primarily revolve around immigration enforcement authorities granted under Title 8 of the U.S. Code but may also involve enforcement of certain portions of the U.S. criminal code under Title 18. CBP officers and agents regularly engage in consensual encounters, investigative detentions, warrantless arrests, and arrests pursuant to both immigration and criminal judicial warrants.

7.      Based on intelligence driven targeted enforcement areas, CBP officers and agents participated in consensual encounters during the operations in Minneapolis. During those consensual encounters, the individuals were free to walk away and terminate the encounter, decline to answer questions, and refuse to provide requested identification documents.

8.     CBP agents and officers are typically divided into teams who contact individuals in public places such as streets and sidewalks, parking lots, or the publicly accessible portions of businesses.

9.     Since CBP agents and officers deployed to Minnesota in support of Operation Metro Surge, they have been confronted with hostility, aggression, and obstruction of immigration enforcement operations.  The incidents have obstructed enforcement operations, interfered with officers' official duties, and posed safety risks to CBP agents and officers.

10.    CBP agents and officers also engaged in lawful investigative detention encounters during Operation Metro Surge.  Officers and agents are trained that prior to engaging in investigative detentions, they must have reasonable suspicion that the individual committed or was committing a federal crime or federal immigration violation.  This reasonable suspicion is based on various factors including intelligence sources; information from law enforcement and open-source databases; analysis of trends; facts developed in the field by agents or officers; rational inferences that led an agent or officer to suspect criminal or immigration violations; and the officers or agents' observations, training, and experience.  Officers and agents are trained to consider the totality of the circumstances when determining whether reasonable suspicion exists.  Requiring law enforcement to ignore certain facts in this analysis would be unworkable on a practical level in the operational environment.  For example, the particular location where the stop occurs is relevant to the officer's overall analysis. As an additional example, an individual's vocation may be relevant to the officer's overall consideration of the totality of the circumstances. Additionally, 8 C.F.R. § 287.5(a)(1) specifically authorizes CBP officers and agents conducting a temporary, investigative detention based on reasonable suspicion to interrogate any alien or person believed to be an alien concerning his or her right to be, or to remain, in the United States.  Furthermore, pursuant to 8 C.F.R. § 287.8(b)(2), if CBP officers and agents have a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United

States, CBP officers and agents may briefly detain the person for questioning.

11. During Operation Metro Surge, CBP officers and agents have conducted warrantless arrests for immigration violations pursuant to applicable legal authorities, including 8 U.S.C. § 1357 and 19 U.S.C. § 1589a and federal criminal statutes, such as 18 U.S.C. § 111.

12. During Operation Metro Surge, CBP agents and officers have also produced affidavits for criminal judicial arrest and search warrants.

13. The actions undertaken by CBP law enforcement officers are informed by their experience and the comprehensive training they receive at various stages of their careers. During the CBP Officer Basic Training program at FLETC, in Glynco, Georgia, and the U.S. Border Patrol Agent Basic Training program in Artesia, New Mexico, trainees receive comprehensive tactical, operational, and legal training over the course of the months-long training program. During this time, they receive approximately 100 hours of legal instruction that is prepared and presented by attorneys within the CBP Office of Chief Counsel (OCC), including First and Fourth Amendment topics. Agents and officers also receive training concerning the Immigration and Nationality Act. This legal training provides officers and agents with the framework necessary to recognize violations of the laws they enforce and to take appropriate law enforcement actions. Legal topics covered include criminal law, criminal procedure, courtroom testimony, customs law, forfeiture, immigration law, use of force, nationality law, and report writing.

14. Following their time at the Basic Academies, CBP law enforcement officers and agents receive additional on-the-job training and periodic refreshers on a full range of topics including the First and Fourth Amendment to the U.S. Constitution. CBP mandated that all CBP law enforcement officers and agents received First and Fourth Amendment refresher training in June of 2025.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief, and in accordance with the preliminary information I have received.

Executed this 30th day of January 2026 at Fort Snelling, Minnesota.

*Kyle Harvick*
Kyle C. Harvick