UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MUBASHIR KHALIF HUSSEN,
MAHAMED EYDARUS, and JAVIER DOE
*on behalf of themselves and others similarly
situated,*

        Plaintiffs,

v.

                                        Case No. 0:26-cv-00324-ECT-ECW

KRISTI NOEM, *in her official capacity as Secretary
of the U.S. Department of Homeland Security;* U.S.
Department of Homeland Security; U.S. Immigration
and Customs Enforcement; TODD LYONS, *in his
official capacity as Acting Director of U.S.
Immigration and Customs Enforcement;* DAVID
EASTERWOOD, *in his official capacity as Acting
Director, Saint Paul Field Office, U.S. Immigration
and Customs Enforcement; ;* U.S. Customs and Border
Protection; RODNEY SCOTT, *in his official capacity
as Commissioner of U.S. Customs and Border
Protection;* U.S. Border Patrol; MICHAEL W.
BANKS, *in his official capacity as Chief of U.S.
Border Patrol;* and GREGORY BOVINO, *in his
official capacity as Commander of the U.S. Border
Patrol,*
*in their official capacities,*

        Defendants.

**Declaration of William A. Berry**

I, William A. Berry, hereby declare as follows:

1.      I am a Detention and Deportation Officer (DDO) with ICE Enforcement and Removal Operations (ERO). I have been an ERO DDO since 2020. I am currently assigned to the ERO Office in Miami, Florida. Before then, I was a U.S. Border Patrol Agent.

2.      I am familiar with the ICE encounter of Mubashir Hussen. The statements contained in this declaration are based upon my personal knowledge and information made available to me in the course of my official duties. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry in the above-captioned case.

3.      I was assigned to participate in Operation Metro Surge on December 5, 2025. I arrived in Minneapolis, Minnesota, on December 7, 2025.

4.      After my arrival, I was given Fourth Amendment refresher training on December 8, 2025. I also recently completed Fourth Amendment trainings on January 28, 2025, and April 4, 2025.

5.      On December 9, 2025, I was assigned to an ERO Team that was conducting an investigation in the Cedar Avenue area, in Minneapolis, Minnesota. The location was known for housing and concealing illegal aliens and for criminal activity.

6.      At approximately 8:00 am, my team arrived at the scene. Upon exiting the vehicle, a male later identified as Mubashir Hussen observed our "POLICE ICE" insignia and fled on foot toward a nearby restaurant.

7.      I followed him because I suspected him of being a possible illegal alien after noticing my ICE badges and deciding to flee.

8.      I pursued Hussen on foot for about 100-150 yards, and I caught up to him as he was opening the door into a stairwell. While attempting to gain physical control of Hussen, he

began to actively resist by aggressively pulling his arms and hands away in an attempt to avoid restraint. Due to Hussein's violent obstruction and physical resistance, it took several minutes to gain control of him. Another ERO officer joined me shortly thereafter to assist. During this time, there was a nearby crowd of 5-6 people.

9.      We then exited the same door and escorted Hussen to our vehicle. While walking to the vehicle, Hussen was struggling aggressively the entire time. Hussen was yelling extremely loud with an apparent intent to incite the crowd. There was a large confrontational crowd of protesters that began to surround our vehicles. After the crowd surrounded us, we began to fear for our safety.

10.     While escorting Hussen to the vehicle, we slipped on icy ground and Hussen fell to his knees. To maintain control of him as he continued to resist and pull away, I briefly placed my arm around Hussen's neck area. I then transitioned to a modified escort hold, positioning my hands on Hussen's arm to guide and place him in the vehicle.

11.     While we were driving off, the crowd continued to approach and confront our vehicle. To ensure our safety, we immediately left the scene. I did not observe anyone attempting to present us with Hussen's passport card as our vehicle was attempting to leave the scene.

12.     After leaving the scene, we stopped briefly at another location about a mile away to continue questioning Hussen and use facial recognition to determine his alienage.

13.     We asked him his name and date of birth. We asked him to produce identification. He refused to answer and he ignored our questions. We attempted to use our facial recognition software, but he continued to resist and shield his face.

14.     He said that he was looking for his cell phone. I found it on the floor and asked if it was his. He said yes, and I told him I would put it in his jacket pocket, and I did. He did not

3

ask to show it to us. He did not ask for our names or badge numbers. He also said that he had to go to work and that we were holding him up.

16. We then tried contacting the field office to advise that we would be bringing him in, but could not reach anyone. We then proceeded to the Whipple federal building and turned Hussen over for processing.

16. If we were able to determine citizenship of Hussen at any point before that time, we would have released him immediately and not brought him to the Whipple federal building.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief, and in accordance with the preliminary information I have received.

Executed this 30th day of January 2026 in Miami, Florida.

_____
William A. Berry