UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

MUBASHIR KHALIF HUSSEN,
MAHAMED EYDARUS, and JAVIER DOE
*on behalf of themselves and others similarly situated,*

      Plaintiffs,

v.

          Case No. 0:26-cv-00324-ECT-ECW

KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; U.S. Department of Homeland Security; U.S. Immigration and Customs Enforcement; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*; *;* U.S. Customs and Border Protection; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection;* U.S. Border Patrol; MICHAEL W. BANKS, *in his official capacity as Chief of U.S. Border Patrol*; and GREGORY BOVINO, *in his official capacity as Commander of the U.S. Border Patrol*,
*in their official capacities,*

      Defendants.

**DEFENDANTS'
MEMORANDUM OF LAW IN
OPPOSITION TO
PLAINTIFFS' MOTION FOR
PROVISIONAL CLASS
CERTIFICATION**

---

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................ 1

I.    Procedural History ................................................................................ 2

II.   Legal Standards .................................................................................... 3

    A. Investigative Stops ...................................................................... 4

III.  Factual Background ............................................................................. 7

    A. Operation Metro Surge ............................................................... 7

    B. Individual Claims........................................................................ 9

       1. Named Plaintiffs.............................................................. 10

       2. Non-Party Declarants ...................................................... 11

STANDARD OF REVIEW............................................................................................ 13

ARGUMENT ............................................................................................................... 15

I.    The Court Should Deny Plaintiffs' Motion to Provisionary Certify Two Classes ............................................................................................. 15

    A. Plaintiffs Cannot Represent a Class Because they Lack Standing .................. 16

    B. Plaintiffs Proposed Classes Fail Rule 23(b)(2) by Including All Lawful Stops and Arrests ........................................................................ 18

    C. Plaintiffs Proposed Classes Fail the Rule 23(a) Requirements ....................... 21

       1. Numerosity ...................................................................... 22

       2. Plaintiffs Fail to Establish a Policy of Discrimination to Satisfy the Commonality Requirement ................................ 23

       3. The Named Plaintiffs' Claims Are Not Typical of the Putative Class ....... 26

       4. The Named Plaintiffs Are Inadequate Representatives ............................... 29

CONCLUSION ............................................................................................................ 30

# TABLE OF AUTHORITIES

**Federal Cases**

*Abel v. United States*,
  362 U.S. 217 (1960) ................................................................................ 5

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................ 14, 15

*Arizona v. United States*,
  567 U.S. 387 (2012) ................................................................................ 4

*Avritt v. Reliastar Life Ins. Co.*,
  615 F.3d 1023 (8th Cir. 2010) ............................................................... 16

*Belles v. Schweiker*,
  720 F.2d 509 (8th Cir. 1983) ................................................................. 22

*C.G.B. v. Wolf*,
  464 F. Supp. 3d 174 (D.D.C. 2020) ....................................................... 29

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) .............................................................................. 13

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) .......................................................................... 17, 18

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................ 17, 18

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .......................................................................... 13, 15

*E. Tex. Motor Freight System, Inc. v. Rodriguez*,
  431 U.S. 395 (1977) .............................................................................. 29

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) .................................................................... 14, 25, 27

*Gonzalez v. ICE*,
  975 F.3d 788 (9th Cir. 2020) ................................................................. 28

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ................................................................. 27

*In re St. Jude Med., Inc.*,
   425 F.3d 1116 (8th Cir. 2005) .................................................................. 14, 19

*McCarthy v. Kleindienst*,
   741 F.2d 1406 (D.C. Cir. 1984) ....................................................................... 14

*Parker v. Bank of Am., N.A.*,
   99 F. Supp. 3d 69 (D.D.C. 2015) ..................................................................... 24

*Postawko v. Missouri Dep't of Corr.*,
   910 F.3d 1030 (8th Cir. 2018) ........................................................................ 25

*Prado-Steiman v. Bush*,
   221 F.3d 1266 (11th Cir. 2000) ...................................................................... 16

*Rattray v. Woodbury Cnty., IA*,
   614 F.3d 831 (8th Cir. 2010) .......................................................................... 14

*Schwartz v. Harp*,
   108 F.R.D. 279 (C.D. Cal. 1985) .................................................................... 27

*Shook v. Bd. Of County Comm'rs*,
   543 F.3d 597 (10th Cir. 2008) ........................................................................ 19

*Simon v. E. Ky. Welfare Rts. Org.*,
   426 U.S. 26 (1976) .......................................................................................... 16

*Spokeo, Inc. v. Robins*,
   578 U.S. 330, (2016) ................................................................................. 16, 17

*Twelve John Does v. District of Columbia*,
   117 F.3d 571 (D C. Cir. 1997) ....................................................................... 29

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................. 13, 14, 15, 19, 20, 21, 23, 24, 25, 27, 29

**Statutes**

5 U.S.C. § 706 ..................................................................................................... 1

8 U.S.C. § 1225 .................................................................................................. 4

8 U.S.C. § 1225(b)(1) ........................................................................................ 4

8 U.S.C. § 1226 ...................................................................................................... 4

8 U.S.C. § 1325 ...................................................................................................... 4

8 U.S.C. § 1326 ...................................................................................................... 4

8 U.S.C. § 1357 ................................................................................................. 1, 28

8 U.S.C. § 1357(a)(1) ........................................................................................ 4, 5

8 U.S.C. § 1357(a)(2) .................................................................................. 5, 6, 20

**Federal Rules**

Fed. R. Civ. P. 23 ............................................................................................ 1, 13

Fed. R. Civ. P. 23(a) ....................................................................................... 2, 14

Fed. R. Civ. P. 23(a)(2) ......................................................................................... 23

Fed. R. Civ. P. 23(a)(4) ......................................................................................... 29

Fed. R. Civ. P. 23(b)(2) ............................................................................ 15, 19, 29

**Federal Regulations**

8 C.F.R. § 287.5 ............................................................................................... 5, 6

8 C.F.R. § 287.8 ..................................................................................................... 1

8 C.F.R. § 287.8(c)(2)(i) ............................................................................... 6, 20

## INTRODUCTION

The Court should deny Plaintiffs' motion for class certification because Plaintiffs lack standing,[1] and fail to satisfy the necessary requirements of numerosity, commonality, and typicality to qualify for class certification. Fed. R. Civ. P. 23 ("Rule 23"). Plaintiffs seek to represent two overbroad classes of individuals who they contend were stopped or arrested in violation of the Fourth and Fifth Amendments, 8 U.S.C. § 1357, 5 U.S.C. § 706, and 8 C.F.R. § 287.8. Plaintiffs seek to certify two classes (a "Stops Class" and a "Warrantless Arrest Class") and two subclasses within the Warrantless Arrest Class (the "Removability Subclass" and the "Flight Risk Subclass") for certification.[2] The relevant legal analysis for each alleged interaction of every member of all of these proposed classes hinges on a highly individualized, fact-intensive inquiry that makes Plaintiffs' claims entirely inappropriate for resolution on a class-wide basis.

First, the proposed classes are overly broad because they include all individuals who have been or will be stopped and every individual who has been or will be subject to a warrantless arrest in the state of Minnesota—but stops and warrantless arrests are not inherently unlawful. The classes will necessarily include hundreds or even thousands of

---

[1] Defendants refer the Court to their Brief in Opposition of Plaintiffs' Motion for Preliminary Injunction, filed concurrently, for arguments that Plaintiffs lack standing to bring this action.

[2] In their Complaint, Plaintiffs reference an "equal protection subclass" for those individuals in the stops class that are stopped "pursuant to a policy of stopping Somali or Latino people based on race or ethnicity," but do not seek certification of such a subclass in their motion. *See* Compl. at 53.

1

individuals subject to lawful stops and arrests for whom this Court can grant no relief. Second, it would be impossible to determine which individual aliens were stopped without reasonable suspicion or arrested without probable cause or an individualized flight risk determination without closely examining the individual circumstances of each stop and arrest. That necessary individualized assessment is antithetical to Rule 23(b)(2)'s requirement that Plaintiffs show Defendants have "acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." This determination should be made in the immigration court, the appropriate forum for these claims, where the unique facts of each encounter can be properly considered.

Independently, the proposed classes, if they could be properly narrowed to satisfy Rule 23(b)(2), would not be sufficiently numerous, would encompasses dissimilarly situated individuals whose claims are not common, whose injuries are not typical, and who possibly have different alternative forms of relief already available to them. Thus, even if Plaintiffs were to prevail in this Court with regard to the named Plaintiffs, it would be impossible to craft an injunction to provide class-wide relief. Plaintiffs therefore have not met their burden to show by a preponderance of the evidence that the requirements under Fed. R. Civ. P. 23(a) or (b)(2) are met.

## BACKGROUND

### I.    Procedural History

Plaintiffs filed this action on January 15, 2026, seeking declaratory and injunctive relief. Class Action Complaint for Declaratory and Injunctive Relief, ECF No. 2

("Compl."). On January 16, 2026, Plaintiffs filed four motions and memoranda of law supporting those motions, including the instant motion for provisional class certification. *See* Memorandum in Support of Plaintiffs' Motion for Provisional Class Certification and Appointment of Class Counsel ("Class Mot."), ECF No. 52. Plaintiffs failed to meet and confer in advance of these filings, requesting the meeting on the same day as the filings. *See* ECF. Nos. 19, 47, 58, 63. Plaintiffs requested emergency injunctive relief and class certification, and, on January 21, 2026, following a status conference, the Court granted an expediting briefing schedule. ECF No. 75.

> Plaintiffs seek provisional certification of two classes and two subclasses:
>
> Stops Class: All persons who, since December 1, 2025, have been or will be subject to an investigatory stop for immigration purposes by DHS in Minnesota.
>
> Warrantless Arrests Class: All persons who, since December 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in Minnesota.
>
> Removability Subclass: All persons who, since December 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in Minnesota without probable cause that the person is a non-citizen who is subject to removal from the United States.
>
> Flight Risk Subclass: All persons who, since December 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in Minnesota without probable cause that the person is likely to escape before a warrant can be obtained.

Class Mot. at 10.

## II.    Legal Standards

To facilitate enforcement of the immigration laws, Congress vested the Executive Branch with broad authority to inspect, investigate, arrest, detain, and remove aliens who

are unlawfully in the United States. *See, e.g.*, 8 U.S.C. § 1225 (requiring the inspection of applicants for admission and mandating the detention of certain aliens during immigration proceedings), § 1226(a) (permitting arrest and detention upon warrant issued by Secretary of Homeland Security), § 1226(c)(1) (Secretary "shall take into custody" aliens who have committed certain crimes), § 1231(a)(1)(A), (2) (authorizing detention of aliens with final removal orders and mandating it for certain criminal aliens), § 1357(a)(1), (2) (listing powers of DHS that may be exercised without warrant, including interrogation of "any alien or person believed to be an alien as to his right to be or remain in the United States" and arrest in certain circumstances). Aliens may be detained pending removal. 8 U.S.C. §§ 1225(b)(1), 1226. And aliens may also be subject to federal criminal prosecution based on their illegal entry. *See, e.g.*, 8 U.S.C. §§ 1325, 1326. "A principal feature of [this]" congressionally established "removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012).

## A. Investigative Stops

Federal immigration agents pursuant to 8 U.S.C. § 1357(a)(1) are authorized to interrogate, without a warrant, any alien or person believed to be an alien regarding their right to be or remain in the United States. Federal immigration agents are also authorized to perform the warrantless arrest of:

> [A]ny alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrestee shall be taken without unnecessary delay . . . before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States.

8 U.S.C. § 1357(a)(2); *see Abel v. United States*, 362 U.S. 217, 232-37 (1960) (discussing longstanding administrative arrest procedures in deportation cases).

In accordance with 8 U.S.C. § 1357(a)(1), 8 C.F.R. § 287.5, and the limits imposed by the Fourth Amendment, federal immigration agents receive specific immigration enforcement training, including periodic instruction on Fourth Amendment requirements. Bottjen Decl. ¶¶ 12, 14, 16 (ECF No. 82); Harvick Decl. ¶¶ 14, 15 (ECF No. 83). They are trained to evaluate reasonable suspicion and probable cause under the totality of the circumstances standard. Bottjen Decl. ¶¶ 13, 14; Harvick Decl. ¶ 10. Federal immigration agents also receive training on the statutory provisions of the Immigration and Nationality Act ("INA"), immigration regulations, and are instructed to follow procedures emphasizing targeted investigations and arrests of aliens with final removal orders and/or serious criminal histories. Bottjen Decl. ¶¶ 12, 16; s*ee also* Harvick Decl. ¶¶ 14, 15. For non-targeted individuals, federal immigration agents are trained to develop reasonable suspicion through information gleaned through consensual encounters, records checks, database checks, surveillance, and intelligence collection. Harvick Decl. ¶ 10. *See also* Bottjen Decl. ¶ .14. When agents encounter non-targets, they are trained to use consensual interviews to assess individualized reasonable suspicion. Harvick Decl. ¶¶ 7, 10.

Federal immigration agents have specialized expertise and practical knowledge of factors that are most indicative of immigration violations, illegal activity, and behaviors typically associated with unlawful presence. *See*. Harvick Decl. ¶ 14. Prior to engaging in investigative detentions, agents are trained to have developed reasonable suspicion that the individual has committed or is committing a federal crime or federal immigration violation.

Harvick Decl. ¶ 10. This determination is evaluated based on the totality of the circumstances. *Id.* The factors that contribute to reasonable suspicion include, but are not limited to, information from intelligence sources, information from law enforcement and open-source databases, analysis of trends and patterns associated with immigration violations, previous encounters with undocumented individuals at a specific location, and information provided by human sources, which may include confidential informants. Bottjen Decl. ¶ 14; Harvick Decl. ¶ 10.

## B. Warrantless Arrests

The INA permits an immigration enforcement officer to arrest an alien in the United States without a warrant if the officer "has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2). Regulations promulgated under the INA track the statute, specifying that "an arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States." 8 C.F.R. § 287.8(c)(2)(i). These arrests require a warrant unless "the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." *Id.* at § 287.8(c)(2)(ii).

An alien arrested without a warrant must be "examined by an officer other than the arresting officer." *Id.* at § 287.3(a). "If the examining officer is satisfied that there is prima facie evidence that the arrested alien . . . is present in the United States in violation of the immigration laws, the officer will either refer the case to an immigration judge for further

inquiry . . . , order the alien removed . . . , or take whatever other action may be appropriate or required under the laws or regulations applicable to the particular case." *Id.* at § 287.3(b).

The government ordinarily will make an initial determination within forty-eight hours of the apprehension whether the alien will remain in custody, be paroled, be released on bond or be released on recognizance. *Id.* at § 287.3(d).

### III. Factual Background

For the last year, DHS has surged resources to enforce immigration laws enacted by Congress to remove aliens who entered this country illegally. This includes specific operations in some of the country's most densely populated areas.

### A. Operation Metro Surge

Operation Metro Surge is an exclusive federal operation with approximately 2,000 additional officers and agents detailed to the St. Paul Field Office. Bottjen Decl. ¶¶ 7, 8. The mission of Operation Metro Surge is to significantly increase arrests, "focusing on individuals with executable final orders" of removal. Bottjen Decl. ¶ 9. Operation Metro Surge has led to the successful arrest of more than 3,000 illegal aliens, including aliens with criminal convictions for murder, aggravated assaults, domestic abuse/violence, drug trafficking, counterfeiting, identity theft, robbery with a dangerous weapon, sexual assault, and rape. Bottjen Decl. ¶¶ 9, 11. [3]

---

[3] DHS has issued regular public updates about the criminal illegal aliens arrested in Minnesota during the operation. *See e.g.*, https://www.ice.gov/news/releases/under-president-trumps-leadership-ice-has-arrested-members-some-worlds-most-dangerous; https://www.dhs.gov/news/2026/01/08/dhs-highlights-worst-worst-criminal-illegal-aliens-including-rapists-pedophiles-and;        https://www.dhs.gov/news/2026/01/13/dhs-highlights-worst-worst-criminal-illegal-aliens-arrested-yesterday-during;

Unfortunately, the success of Operation Metro Surge and other similar operations has come with enormous risk to federal law enforcement personnel due to repeated attacks against them. DHS reports that violence against federal law enforcement officers and agents has increased approximately 1,300 percent.[4] The attacks against immigration enforcement personnel are widespread, take on many forms, and are occurring across the United States. An "Anti-ICE" sniper attempted to assassinate ICE officers in the Dallas, Texas area by shooting indiscriminately into the sally port of an ICE facility, leading to the deaths of multiple detainees.[5] ICE facilities have faced multiple bomb threats.[6] Federal officers and agents face violent attacks at federal buildings,[7] at immigration processing

---

https://www.dhs.gov/news/2026/01/12/ice-removed-heinous-criminals-minnesota-streets-over-weekend-including-child; https://www.dhs.gov/news/2026/01/14/dhs-highlights-worst-worst-criminal-illegal-aliens-arrested-yesterday-minneapolis

[4] DHS, Press Release, Three Violent Criminal Illegal Aliens Who Violently Beat a LawEnforcement Officer with Weapons (Jan. 15, 2026), https://www.dhs.gov/news/2026/01/15/dhs-releases-more-details-about-three-violent-criminal-illegal-aliens-who-violently; DHS, Press Release, Radical Rhetoric by Sanctuary Politicians Leads to an Unprecedented 1,300% Increase in Assaults Against ICE Officers and a 3,200% Increase in Vehicular Attacks, https://www.dhs.gov/news/2026/01/08/radical-rhetoric-sanctuary-politicians-leads-unprecedented-1300-increase-assaults.

[5] DHS, Press Release, DHS Issues Statement on Targeted Attack on Dallas ICE Facility (Sept. 24, 2025), https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-dallas-ice-facility.

[6] *See, e.g.*, DHS, Press Release, Law Enforcement Arrests Suspect Who Made Bomb Threat on ICE Dallas Facility (Aug. 26, 2025), https://www.dhs.gov/news/2025/08/26/law-enforcement-arrests-suspect-who-made-bomb-threat-ice-dallas-facility; DHS Statement on Sanctuary Politicians' Obstruction of Law Enforcement and Bomb Threat at 26 Federal Plaza in New York City (September 18, 2025), https://www.dhs.gov/news/2025/09/18/dhs-statement-sanctuary-politicians-obstruction-law-enforcement-and-bomb-threat-26.

[7] DHS Press Release, DHS Releases Statement on Violent Rioters Assaulting ICE Officers in Los Angeles, CA and Calls on Democrat Politicians to Tone Down Dangerous Rhetoric

facilities, and while in the field conducting enforcement operations. DHS even reports foreign criminal organizations have offered thousands of dollars as bounties for the murder of federal immigration agents.[8] Because federal immigration agents have faced doxing, including revelation of their home addresses, these threats extend to their families.[9]

In and around Minneapolis, federal immigration agents operating out of the St. Paul Office have been confronted with increased threats, violence, aggression, attacks, vehicle block-ins, and obstruction of immigration enforcement operations. Harvick Decl. ¶ 9. The increase in these types of incidents has obstructed enforcement operations, interfered with officers' official duties, and posed significant safety risks to not only federal immigration agents but also the public. *Id*.

### B. Individual Claims

Plaintiffs and non-party declarants allege unlawful immigration operations by Defendants in Minnesota throughout the months of December 2025 and January 2026. *See* Compl., ECF Nos. 25, 29, 32, 34-46, 48. However, these alleged encounters, when viewed

---

About ICE (June 7, 2025), https://www.dhs.gov/news/2025/06/07/dhs-releases-statement-violent-rioters-assaulting-ice-officers-los-angeles-ca-and.

[8] DHS, Press Release, Bounties Originating From Mexico Offered to Shoot ICE and CBP Officers in Chicago (Oct. 14, 2025), https://www.dhs.gov/news/2025/10/14/bounties-originating-mexico-offered-shoot-ice-and-cbp-officers-chicago.

[9] See, e.g., DHS, Press Release, DHS Condemns Dangerous Doxxing and Escalating Threats Against Federal Law Enforcement Officers (Oct. 9, 2025), https://www.dhs.gov/news/2025/10/09/dhs-condemns-dangerous-doxxing-and-escalating-threats-against-federal-law; ABC News, 33/40, Report: Whistleblower leaks personal data of 4,500 DHS and ICE agents to doxxing website, (Jan. 13, 2026), https://abc3340.com/news/nation-world/report-whistleblower-leaks-personal-data-of-4500-dhs-and-ice-agents-to-doxxing-website-anti-ice-prtotesters.

within the totality of the circumstances, demonstrate the baselessness of their claimed Fourth Amendment and federal law violations.

### 1. Named Plaintiffs

Plaintiff Mubashir Khalif Hussen, a U.S. citizen, has lived in the United States since the age of six or seven. Mubashir Khalif Hussen Decl. ¶ 1 (ECF No. 34). On December 10, 2025, federal immigration agents encountered Hussen outside of a restaurant located below his workspace. *Id*. ¶ 5. Federal immigration agents stopped Hussen as he attempted to flee when they approached a restaurant. Berry Decl. ¶ 6 (ECF No. 84). Hussen states he turned to walk away from the approaching agent and the agent asked why he was running away. *Id*. ¶ 6. While being questioned, a crowd gathered and Hussen was placed into an SUV for safety purposes. Berry Decl. ¶¶ 9, 11. When agents requested Hussen complete a facial recognition scan to confirm his identity, he refused. Hussen Decl. ¶ 13. Berry Decl. ¶¶ 12, 13. The agents then transported Hussen to an ICE processing center near Bloomington, Minnesota where he was fingerprinted and released after confirming his identity. Hussen Decl. ¶¶ 24, 27, 29; Berry Dec. ¶ 15.

Plaintiff Mahamed Rufai Eydarus, a U.S. citizen, has lived in Minnesota since 2001. Mahamed Rufai Eydarus Decl. ¶ 1 (ECF No. 42). Federal immigration agents encountered Eydarus with his mother on the street shoveling snow on December 10, 2025. *Id*. ¶ 8, 10. The agents asked for identification, and after determining he was a U.S. citizen, told Eydarus he was free to leave. *Id*. ¶¶ 16, 26.

Plaintiff Javier Doe is a U.S. citizen living in Richfield, Minnesota. Javier Doe Decl. ¶ 1 (ECF No. 30). Federal immigration agents encountered Javier Doe outside of his workplace and asked for information about his citizenship. Javier Doe Decl. ¶ 4, 5. After confirming his identity and citizenship, Javier Doe was released. Javier Doe Decl. ¶ 11, 16. Defendants were unable to develop specific information around this encounter as Plaintiffs failed to provide the individual's identity in a timely manner.

### 2. Non-Party Declarants

Several non-party declarants offer "examples" of consensual encounters, stops, and arrests involving U.S. citizens (ECF Nos. 32, 37-39, 43), lawful permanent residents (ECF Nos. 29, 44, 45), and individuals without current valid immigration status but with pending immigration applications or petitions (ECF Nos. 40, 41, 46). Crisareli Castillo was questioned by federal immigration agents near her worksite. Crisareli Castillo Decl. ¶¶ 2, 6 (ECF No. 38). The agents asked for her identification and questioned her, showing her a photo of someone they believed worked with her. *Id*. at ¶ 8. She advised the agents that she did not recognize the individual and that they did not work at her worksite. *Id*. The agents then returned her passport. *Id.* at ¶ 9. Mark Castillo was encountered while taking out his trash. Mark Castillo Decl. ¶¶ 2, 5 (ECF No. 43). Federal immigration agents asked for his identification and he provided it. *Id*. at 7-9. After confirming his identify, they left. *Id*. at 11.

Ali Dahir encountered federal immigration agents as he was leaving his apartment building. Ali Dahir Decl. ¶¶ 5 6 (ECF No. 32). An agent approached and explained he was looking for someone who resembled Dahir. *Id*. ¶¶ 6,7, The agent asked for Dahir's

identification. *Id*. ¶ 9. After providing his driver's license, the agent asked Dahir if he was a U.S. citizen and Dahir responded affirmatively providing his passport card. *Id*. ¶¶ 10-12. After checking the documentation, the agent returned Dahir's passport card and license and left. *Id*. ¶ 21. A.A. was encountered in a Walmart parking lot and detained after being mistaken for a target. A.A. Decl. ¶¶ 3, 4, 7 (ECF No. 37). Julio Cesar Martinez Garcia was encountered while moving his truck at a worksite. Julio Cesar Martinez Garcia Decl. ¶¶ 5-7 (ECF No. 39). Agents asked where he was born and he told them he was a U.S. citizen, providing them with his driver's license and paperwork he obtained when applying for a REAL ID. *Id*. ¶¶ 8-9. He was released after a second review determined his identity. *Id*. ¶¶ 14-15.

Said Osman was encountered on the street on his way to a mosque. Said Osman Decl. ¶¶ 6-7 (ECF No. 29). Agents asked if he was a citizen and when agents confirmed his identity, Osman was released. *Id*. ¶¶ 9-21. Pedro Moreno was encountered at a worksite and questioned about his status and length of time spent in the United States. Pedro Moreno Decl. ¶¶ 3, 6, 15. After confirming his identity and status at Fort Snelling, he was released and returned to his worksite. *Id*. ¶¶ 13, 16, 17. Raul Aguirre Castrejon was encountered while driving home from getting groceries. Raul Aguirre Castrejon Decl. ¶¶ 3, 8, 10 (ECF No. 45). Agents advised that he was stopped because his niece was driving a vehicle registered to a man. *Id*. ¶ 20.

Luisa Doe was encountered by federal immigration agents on her way to work. Luisa Doe Decl. ¶ 2 (ECF No. 41). Agents asked for her name, asked if she had little kids, and took her to an ICE processing facility. *Id*. ¶¶ 4, 6, 10. She was transferred to

Douglas County jail where she remains detained. *Id.* ¶¶ 11-12. Julio Doe was encountered with co-workers driving between construction sites. Julio Doe Decl. ¶¶ 5-6 (ECF No. 40). Agents observed Julio Doe and three others flee the area in a vehicle at an extremely high rate of speed. Bottjen Decl. ¶ 18. Agents asked for his documents and asked why they left the job site so quickly. Julio Doe Decl. ¶ 9. An agent reviewed Julio Doe's documents and asked how long he had been in the country and how long he had lived there. *Id.* ¶ 10. He was arrested and taken to an ICE processing facility and is currently detained at Freeborn County jail. *Id.* ¶¶ 12, 13, 16. Santiago Doe was stopped down the street from a Culver's restaurant during a targeted enforcement operation. Bottjen Decl. ¶ 17; Santiago Doe Decl. ¶¶ 6, 9 (ECF No. 46). A vehicle registration records check identified Santiago Doe as an illegal alien and agents stopped to confirm his identity. Bottjen Decl. ¶ 17. After confirming his identity, Santiago Doe was arrested. *Id.* He remains detained at Freeborn County jail. Santiago Doe Decl. ¶19.

## STANDARD OF REVIEW

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979); *see also Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013) (same). To fall within this exception, a plaintiff "must affirmatively demonstrate his compliance" with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). As the Supreme Court has explained, "Rule 23 does not set forth a mere pleading standard." *Id*. Indeed, "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the

prerequisites of Rule 23(a) have been satisfied[.]'" *Id.* at 350–51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

To meet this "affirmative" burden of compliance with Rule 23, Plaintiffs must demonstrate the existence of each and every element required by Rule 23(a) that: (1) there are sufficiently numerous parties ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims of the named plaintiff are typical of those of the class ("typicality"); and (4) the named plaintiff will fairly and adequately protect the interests of the class ("adequacy of representation").  Fed. R. Civ. P. 23(a); *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997); *see also Rattray v. Woodbury Cnty., IA*, 614 F.3d 831, 835 (8th Cir. 2010) (same).

The Supreme Court has emphasized that "Rule 23 does not set forth a mere pleading standard" and, thus, a plaintiff "must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original); *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005); *see also McCarthy v. Kleindienst*, 741 F.2d 1406, 1414 n.9 (D.C. Cir. 1984). Consequently, the Court must conduct a "rigorous" class certification analysis, which may "entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc.*, 564 U.S. at 351. If the Court is not fully satisfied that all Rule 23 requirements are met, the Court cannot certify the class. *Id.* at 351-52; *see Falcon*, 457 U.S. at 160 ("[A]ctual, not presumed, conformance with Rule 23(a) [is] indispensable."). Rule 23(a)

also requires that "a class representative must be part of the class" he seeks to certify. *Wal-Mart*, 564 U.S. at 349.

After satisfying the requirements of Rule 23(a), the proposed class must also qualify under Rule 23(b)(1), (2), or (3). *AmChem Prods.*, 521 U.S. at 614. Plaintiffs here assert that their class should proceed under Rule 23(b)(2), which permits class action litigation where "the party opposing the class has acted . . . on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *Wal-Mart Stores, Inc.*, 564 U.S. at 360 (under Rule 23(b)(2), "a single injunction or declaratory judgment would provide relief to each member of the class.").

## ARGUMENT

### I. The Court Should Deny Plaintiffs' Motion to Provisionally Certify Two Classes

Plaintiffs seek to certify a "stops class" and a "warrantless arrest class." Class Mot. at 10. The "stops class" includes "[a]ll persons who, since December 1, 2025, have been or will be subject to an investigatory stop for immigration purposes by DHS in Minnesota." *Id.* In their Complaint, Plaintiffs reference an "equal protection subclass" for those individuals in the stops class that are stopped "pursuant to a policy of stopping Somali or Latino people based on race or ethnicity," but do not seek certification of such a subclass in their motion. *See* Compl. at 53. The "warrantless arrest class" includes "[a]ll persons who, since December 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in Minnesota." *Id*. at 54. Within the "warrantless arrest

class," Plaintiffs seek two subclasses: (1) a "removability subclass" for those in the warrantless arrest class that were arrested "without probable cause that the person is a non-citizen who is subject to removal from the United States" and (2) a "flight risk subclass" for those in the warrantless arrest class that were arrested "without probable cause that the person is likely to escape before a warrant can be obtained." Class Mot. at 10. The court should not certify these classes for the threshold reason that Plaintiffs lack standing to raise their underlying claims. Independently, the Court should deny this motion because Plaintiffs do not meet the requirements of Rule 23(a) or (b)(2).

### A. Plaintiffs Cannot Represent a Class Because they Lack Standing.

Plaintiffs lack Article III standing to bring a class action and "[a]ny analysis of class certification must begin with the issue of standing." *Prado-Steiman v. Bush*, 221 F.3d 1266, 1280 (11th Cir. 2000); *see also Spokeo*, 578 U.S. at 338 n.6 ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.'" (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976)); *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010) ("Although federal courts do not require that each member of a class submit evidence of personal standing, a class cannot be certified if it contains members who lack standing").

To have standing to certify a class, Plaintiffs must demonstrate that they have suffered a concrete and particularized legal harm, coupled with a sufficient likelihood that they will again be wronged in a similar way.") (citations and quotations omitted)). As

16

Defendants explain in greater detail in their Brief in Opposition of Plaintiffs' Motion for Preliminary Injunction, filed concurrently, that Plaintiffs lack standing because they have not established an injury stemming from the consensual encounters, stops, and arrests they challenge, and even if they have established such injury, they cannot demonstrate sufficient likelihood that they will be wronged again in a similar way in the future. *See Spokeo*, 578 U.S. at 340 (for purposes of standing, the Court has "made it clear time and time again that an injury in fact must be both concrete and particularized.").

Plaintiffs must show a real and immediate risk of future injury—not merely past contact or generalized allegations. As such, Plaintiffs lack Article III standing for forward-looking relief. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013). Past contact does not create a presumption of imminent repetition. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983). The Supreme Court has rejected "past-is-prologue" standing. Plaintiffs cannot show standing because they have no basis beyond mere speculation that they were stopped or arrested based solely on race or ethnicity or that they will be stopped or arrested again in the future based solely on race or ethnicity. Failing to establish "a sufficient likelihood that he will again be wronged in a similar way," Plaintiffs are "no more entitled to an injunction than any other citizen []; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Lyons*, 461 U.S. at 111; *see also Spokeo*, 578 U.S. at 339-40 (2016) (holding that an "injury in fact must also be 'concrete,'" which "must be 'de facto'; that is, it must actually exist."). Without concrete evidence that they will be unlawfully arrested again, Plaintiffs claims are based on "subjective apprehensions," not

17

the "reality of the threat of repeated injury," that is necessary to establish standing. *Lyons*, 461 U.S. at 107.

Here, Plaintiffs claim there is an alleged policy of unlawful immigration stops and arrests. There isn't one. But as in *Lyons*, even if such a policy existed, it is insufficient to confer standing. Plaintiffs identify no written policy of conducting stops particularly targeting people who appear to be Somali or Latino, nor is there allegation or evidence that any of the Plaintiffs have been stopped since. Plaintiffs offer nothing to substantiate their premise that they—out of the over 3.6 million people living in the Twin Cities metro area[10]—would be stopped again. Even if Plaintiffs could definitively prove they would be stopped in the future, that is not enough. They need to establish that they would be stopped *solely* based on their perceived ethnicity, with law enforcement officers eschewing reliance on any additional reasons. Plaintiffs' evidence utterly fails to meet this standard. This case is squarely controlled by *Lyons*: it is insufficient to speculate that federal agents may continue a general, unstated policy of relying solely on perceived ethnicity. 461 U.S. at 107 n.7; *see also Clapper*, 568 U.S. at 401 (holding that the plaintiffs' claim "[wa]s too speculative to satisfy the well-established requirement that threatened injury must be certainly impending") (internal quotations omitted).

---

[10] Metropolitan and Micropolitan Statistical Area Population Totals: 2020-2024, U.S. Census Bureau, available at https://www.census.gov/data/tables/time-series/demo/popest/2020s-total-metro-and-micro-statistical-areas.html (last accessed Jan. 28 2026).

### B. Plaintiffs Proposed Classes Fail Rule 23(b)(2) by Including All Lawful Stops and Arrests

Plaintiffs fail to satisfy the requirements of Rule 23(b)(2), which requires a showing that Defendants have acted on "grounds that apply generally to the class" and that injunctive or declaratory relief is "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs fail to meet their burden to show that "relief is available to the class as a whole" and that the challenged conduct "can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360; *see also In re St. Jude Med. Inc.*, 425 F.3d 1116, 1121-1122 (8th Cir. 2005) ("Although Rule 23(b)(2) contains no predominance or superiority requirements, class claims thereunder still must be cohesive. . . . A suit could become unmanageable and little value would be gained in proceeding as a class action if significant individual issues were to arise consistently.") (citations and quotations omitted). In other words, "if redressing the class members' injuries requires time-consuming inquiry into individual circumstances or characteristics of class members or groups of class members, the suit could become unmanageable and little value would be gained in proceeding as a class action." *Shook v. Bd. Of County Comm'rs*, 543 F.3d 597, 604 (10th Cir. 2008); *id*. ("And individual issues cannot be avoided simply by formulating an injunction at a stratospheric level of abstraction; as we have explained before, injunctions simply requiring the defendant to obey the law are too vague to satisfy Rule 65.") (citations and quotations omitted).

Plaintiffs' proposed classes sweep in every single stop and warrantless arrest conducted in the entire state of Minnesota since early December, demonstrating Plaintiffs'

failure to make any effort at all to define an actual class, much less one with a common injury subject to a single fix. Because immigration stops and warrantless arrests are not inherently unlawful, the classes will necessarily include hundreds or even thousands of individuals subject to lawful stops and arrests for whom this Court can grant no relief. And Plaintiffs' proposed subclasses do not cure this deficiency. Instead of establishing an unlawful policy and then defining a class of individuals subject to a common answer for relief from that policy, Plaintiffs seek to define the class by the very question of whether such a policy exists at all:

> [T]he claims of the Warrantless Arrest Class, including the Removability Subclass and Flight Risk Subclass, hinge on legal and factual questions that can be resolved on a classwide basis:
>
> [1.] Whether DHS has a policy, pattern, or practice of making immigration arrests without probable cause that the arrestee is removable,
>
> [2.] Whether DHS has a policy, pattern, or practice of making immigration arrests without probable cause that the arrestee is likely to escape before a warrant may be obtained, and
>
> [3.] Whether these policies and practices violate 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(i)–(ii), and/or the Fourth Amendment to the Constitution.").

Class Mot. at 18. Such a broad, searching class definition would require deep individual analysis of each stop and arrest to determine whether and what relief is appropriate; and for all, or at least many, class members, no relief at all would be appropriate because no wrongdoing occurred. But "[p]ermitting the combination of individualized and classwide relief in a (b)(2) class is also inconsistent with the structure of Rule 23(b)." *Wal-Mart*, 564 U.S. at 361. Rather, "the most traditional justifications for class treatment" under Rule 23(b)(2) is "that the relief sought must perforce affect the entire class at once." *Id.*

20

The putative class members in Plaintiffs' sweeping classes will have widely varying fact patterns regarding the circumstances of their investigative stops and/or warrantless arrests. Some may have merely participated in a consensual encounter. Others may have been stopped as they attempted to flee federal immigration agents. *See* Barry Decl. ¶ 6. Some may have been detained as a result of collateral arrests during targeted operations, such as those targeting gangs, related human smuggling rings, or worksite enforcement. All of these factors would be important to individually evaluate the lawfulness of each putative class member's stop or arrest before determining whether there is an injury and whether and what relief is appropriate.

It is irrefutable that "the key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal-Mart*, 564 U.S. at 360 (citation omitted). Because Plaintiffs fail to establish a common violation subject to a common remedy applicable to the whole class, Rule 23(b)(2) is not satisfied. The Court should deny class certification is inappropriate.

### C. Plaintiffs Proposed Classes Fail the Rule 23(a) Requirements

For this Court to satisfy itself that each proposed class member merits relief would require a fact-intensive inquiry into whether or not every single consensual encounter, stop, or arrest that was allegedly unsupported by reasonable suspicion was in fact unsupported. The legal standard for reasonable suspicion is a fact-intensive inquiry into what the officer initiating the encounter considered at the time. The officer is permitted to consider the totality of the circumstances—which will vary widely across every single interaction with

the public. For this reason alone, and others, Plaintiffs' proposed class fails the Rule 23(a) requirements of numerosity, commonality, and typicality.

### 1. Numerosity

Numerosity requires "an inquiry into whether the class is so numerous that joinder of all members is impracticable." *Belles v. Schweiker,* 720 F.2d 509, 515 (8th Cir. 1983). While the Eight Circuit has not adopted a particular number that satisfies numerosity, a plaintiff "bears the burden of establishing that numerosity does exist." *Id.* Here, the evidence presented by Plaintiffs on this point does not accurately identify even an approximate size of the class, much less demonstrate impracticability of joinder. Indeed, all Plaintiffs say on this point is "[w]hile precise arrest and detention figures for Operation Metro Surge are not available, DHS itself reported more than 2,400 arrests as part of Operation Metro Surge as of January 13, 2026." Class Mot. at 14-15. But those numbers include all arrests, not just the ones Plaintiffs assert are unlawful. Accepting those figures to define the class renders the class untenable under Rule 23(b)(2), as explained above.

Where Plaintiffs make no effort to identify a number of individuals who have been stopped unlawfully or arrested unlawfully—meaning those even possibly entitled to relief—they fail to meet the elementary requirement for Rule 23(a) numerosity. Where even the named Plaintiffs fail to show their own stops or arrests were unlawful or that they face an imminent threat of being stopped or arrested in the future based solely on a prohibited factor, there are no established class members, much less enough to make joinder impracticable. *See Belles*, 720 F.2d at 515 ("The only evidence presented by Belles

does not accurately identify even an approximate size of the class, much less demonstrate impracticability of joinder").

Where Plaintiffs' estimated class size is based on an impermissibly broad class definition that will necessarily sweep many lawful stops and arrests, they have failed to meet the numerosity requirement. The Court should deny class certification.

### 2. Plaintiffs Fail to Establish a Policy of Discrimination to Satisfy the Commonality Requirement.

For much the same reason, Plaintiffs' proposed class fails to establish "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs' proposed class here is so broad as to sweep in not just lawful stops and arrests but stops and arrests that are lawful for a variety of reasons. But to establish commonality, Plaintiffs must demonstrate that "the class members 'have suffered the same injury.'" *Wal-Mart*, 564 U.S. at 349-50. This does not mean that class members merely "suffered a violation of the same provision of law" or raise some common questions. *Id*.; *id*. at 349 ("[a]ny competently crafted class complaint literally raises common 'questions.'"). Class members suffer the same injury only if their claims turn on a common contention "of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. Thus, "[w]hat matters to class certification [is] the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id*. "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.*

Under Plaintiffs' unbounded class definitions, each putative class member's record would have to be reviewed to assess the veracity of the officer's objective determination, based on his or her experience and training, that reasonable suspicion or probable cause existed. The Court would have to also weigh the subjective facts of each encounter to determine, e.g., whether it agrees that the individual was in custody prior to a flight risk assessment or after. This is precisely what the Federal Rules and Supreme Court disallow.

Further, where a plaintiff alleges the defendant has engaged in a policy or practice that has "consistently and uniformly injured the putative class members, the plaintiff must provide 'significant proof' that such a policy or practice exists." *Parker v. Bank of Am., N.A.*, 99 F. Supp. 3d 69, 81 (D.D.C. 2015) (citing *Wal-Mart*, 564 U.S. at 354). Fatal to the plaintiffs in *Wal-Mart*—and directly applicable here—was the existence of a non-discrimination policy that plaintiffs failed to rebut with their anecdotal evidence of discriminatory actions by individual managers. *See* 564 U.S. at 355–56 ("In such a company [that forbids sex discrimination], demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's."). Plaintiffs' evidence here is even less compelling than the record before the Supreme Court in *Wal-Mart*, and Defendants have strong nondiscrimination policies in place.[11] *See also* Bottjen Decl. ¶ 15.

---

[11] "CBP Policy on Nondiscrimination in Law Enforcement Activities and all other Administered Programs," available at https://www.cbp.gov/about/eeo-diversity/policies/nondiscrimination-law-enforcement-activities-and-all-other-administered (last accessed Jan. 30, 2026).

Instead of proving a common injury, Plaintiffs apply circular logic: presuming the existence of a discriminatory policy or practice in order to argue the commonality element is satisfied because "courts in this Circuit have found commonality met where plaintiffs challenge governmental policies or practices, because *the existence and legality of those policies and practices can be determined on a classwide basis*." Class Mot. at 17 (emphasis added) (citing *Postawko v. Missouri Dep't of Corr.*, 910 F.3d 1030, 1038-39 (8th Cir. 2018)). But class litigation is not designed to certify a class and then go in search of a common injury or unlawful policy. *See Wal-Mart*, 564 U.S. at 358 ("[T]o certify a companywide class," plaintiffs must "demonstrate that the entire company 'operate[s] under a general policy of discrimination.'") (citing *Falcon,* 457 U.S. at 159, n.15). And Plaintiffs' challenge is much closer to that of the plaintiffs in *Wal-Mart* than of the *Postawko* plaintiffs.

In *Postawko*, the Eighth Circuit upheld the district court's determination that plaintiffs had adequately established a policy of withholding particular antiviral (DAA) drugs from inmates with chronic Hepatitis C (HCV) when those inmates' medical evaluations showed a particular blood test score, regardless of other indications that the treatment was needed. *Id*. at 1035-36. The court relied in part on the defendant prisons' "own evidence referencing standardized 'protocols' for the treatment of chronic HCV." *Id*.

It was only *after* rigorous analysis to find this policy existed that the district court determined the proposed class of inmates who had been denied treatment based on their blood test score alone met the commonality requirement. *Id*. at 1038 ("[A]ll class members share the common question of whether the Defendants' policy or custom of withholding

treatment with DAA drugs from individuals who have been or will be diagnosed with chronic HCV constitutes deliberate indifference to a serious medical need."). Thus, the common question in *Postawko* was not whether they were mistreated, but whether the mistreatment the court determined they all experienced—stemming from a policy established in the record before the court—amounted to deliberate indifference.

Plaintiffs here have not established the existence of a policy or practice of conducting unconstitutional stops or arrests of all (or any) purported class members. And under a *Wal-Mart* analysis they cannot. Instead, Plaintiffs impermissibly ask the Court to certify a class on the "common question" of whether such a policy exists. *See* Class Mot. at 17 ("[The stops] class members' claims all hinge on common questions: [1.] Whether DHS has a policy, pattern, or practice of making immigration stops without the required reasonable suspicion that the stopped individual is present in the United States unlawfully, and [2.] Whether such policy, pattern or practice is unlawful."); *id*. at 18 (supporting the warrantless arrest class and subclasses with the same questions).

The record before the Court fails to establish the existence of an unlawful stop and arrest policy, and the Court should not presume one exists or certify a class in order to find out. Absent proof of such a policy, Plaintiffs fail to satisfy Rule 23(a)(2), and the Court should deny class certification.

### 3.  The Named Plaintiffs' Claims Are Not Typical of the Putative Class.

Rule 23(a)'s commonality and typicality requirements occasionally merge: "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and

the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart, Inc.*, 131 S. Ct. at 2551 n.5 (quoting *Falcon*, 457 U.S. at 157-58, n. 13). Plaintiffs' proposed class lacks typicality for the same reasons it lacks commonality: The proffered class definitions fail to address the many factors that are involved in making an assessment of each immigration officer's application of reasonable suspicion or probable cause.

To establish typicality, Plaintiffs must show that "other members have the same or similar injury," "the action is based on conduct which is not unique to the named plaintiffs," and "other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)). The typicality requirement is not met if the proposed class representatives are subject to unique defenses. *Id.* Notably, Plaintiffs Hussen, Eydarus, and Javier Doe are U.S. citizens. Plaintiffs have made no effort to show that their alleged experiences, atypical even as between one another,[12] are typical of the overwhelming majority of putative class members who are not citizens and who would not be able to end an encounter with immigration officers by proving their citizenship.

---

[12] Plaintiff Hussen alleges he tried to evade immigration officers and subsequently asserted his citizenship and tried repeatedly to show immigration officers his passport card as evidence of his citizenship during the encounter. Compl. ¶ 36. Plaintiff Eydarus alleges he was detained by immigration officers who eventually acknowledged he was a citizen and let him go, without looking at his identification. *Id.* at ¶¶ 40-41. Plaintiff Doe did not attempt to evade immigration officers approaching him at his job, instead he engaged with them, refused to identify himself, and "repeatedly said to the agents 'fuck you.'" *Id.* at ¶¶ 42, 44.

Plaintiffs rely on a media report of 2,400 arrests under Operation Metro Surge to support their claim to numerosity, Class Mot. at 14-15, but specifically acknowledge in that context that the number "likely does not include the stops and arrests of Plaintiffs who are U.S. citizens." *Id*. Plaintiffs offer no estimate of how many class members may be U.S. citizens, nor any explanation for how the experiences of three U.S. citizens who were briefly questioned or detained are typical of the 2,400 arrested non-citizens whom they say make up their class.

Plaintiffs instead rely on a Ninth Circuit case, *Gonzalez v. ICE*, 975 F.3d 788 (9th Cir. 2020), to show typicality was found there between citizens and non-citizens detained by ICE under a challenged detainer policy. *Id*. at 20 (citing 975 F.3d at 810-12) (plaintiff's legal claim was "no different than [that of] any other class member"). But, as explained above, Plaintiffs have not established a policy of unlawful stops or arrests, much less one in which citizens and non-citizens are treated the same. Because immigration officers have a limited mandate to stop and arrest aliens known or suspected to be subject to removal from the United States, 8 U.S.C. § 1357, the Court cannot simply assume that U.S. citizens are being arrested in the same numbers or manner, or under the same legal framework, as aliens. Absent such a showing by Plaintiffs, the typicality requirement is not met.

And because individualized assessments are necessary to the challenged reasonable suspicion and probable cause analyses even beyond the effect of citizenship, and thus relevant to the Court's consideration of whether class members share similar injury, Plaintiffs' proposed classes fail to meet the typicality requirement.

28

### 4.  The Named Plaintiffs Are Inadequate Representatives.

The adequacy-of-representation requirement under Rule 23(a)(4) requires that the named parties "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Adequacy is particularly important for a Rule 23(b)(2) class because members of such a class have 'no opportunity . . . to opt out' and no entitlement to 'notice of the action.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 207 (D.D.C. 2020) (quoting *Wal-Mart,* 564 U.S. at 362). There are generally two criteria recognized by courts to satisfy adequacy: "(1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and (2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel.'" *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D C. Cir. 1997). Plaintiffs cannot satisfy the first element.

Class representatives must "possess the same interest and suffer the same injury" as the class members, otherwise, they are "simply not eligible to represent a class of persons who did allegedly suffer injury." *E. Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403-04 (1977) (internal quotation marks and citation omitted). The three named Plaintiffs, as proposed class representatives, cannot fairly and adequately protect the class interests for the same reasons their claims are not typical of the proposed classes. As discussed above, Plaintiffs primarily stand apart from the class as U.S. citizens, and the proposed class otherwise encompasses a broad range of aliens with substantially different alleged injuries, stopped or arrested under factually different circumstances with different

avenues of possible relief, and likely many who lack a cognizable injury or any eligibility for relief entirely.

Thus, the adequacy-of-representation requirement is not met.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion to provisionally certify their overbroad classes and subclasses.


DATE: January 30, 2026                          Respectfully Submitted,

                                                BRETT A. SHUMATE
                                                Assistant Attorney General, Civil Division

                                                TIBERIUS DAVIS
                                                SEAN SKEDZIELEWSKI
                                                Counsel to the Assistant Attorney General

                                                JAMES J. WALKER
                                                Senior Litigation Counsel
                                                Office of Immigration Litigation

                                                */s/ Lori S. MacKenzie*
                                                LORI S. MACKENZIE (NC #25363)
                                                Trial Attorney
                                                U.S. Department of Justice
                                                Civil Division
                                                Office of Immigration Litigation
                                                P.O. Box 868, Ben Franklin Station
                                                Washington, D.C. 20044
                                                Telephone: (202) 514-4565
                                                Lori.S.MacKenzie@usdoj.gov

                                                *Attorneys for Defendants*