**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| MUBASHIR KHALIF HUSSEN, MAHAMED EYDARUS, and JAVIER DOE, *on behalf of themselves and others similarly situated*,<br><br>        Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; DAVID EASTERWOOD, *in his official capacity as U.S. Immigration and Customs Enforcement Field Office Director for St. Paul, Minnesota*; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection*; U.S. BORDER PATROL; MICHAEL W. BANKS, *in his official capacity as Chief of U.S. Border Patrol*; and GREGORY BOVINO, *in his official capacity as Commander-at-Large of U.S. Border Patrol*,<br><br>        Defendants. | Court File No.  0:26-cv-324-ECT-ECW<br><br><br>**AMICUS CURIAE BRIEF OF THE MINNESOTA STATE BAR ASSOCIATION, HENNEPIN COUNTY BAR ASSOCIATION, RAMSEY COUNTY BAR ASSOCIATION, MINNESOTA HISPANIC BAR ASSOCIATION, SOMALI AMERICAN BAR ASSOCIATION, MINNESOTA ASIAN PACIFIC AMERICAN BAR ASSOCIATION, MINNESOTA ASSOCIATION OF BLACK LAWYERS, MINNESOTA LAVENDER BAR ASSOCIATION, MINNESOTA DISABILITY BAR ASSOCIATION, AND MINNESOTA WOMEN LAWYERS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

**[Remainder of page intentionally left blank]**

**TABLE OF CONTENTS**

<u>Page</u>

INTRODUCTION ................................................................................................... 1

IDENTITY OF AMICI CURIAE AND STATEMENT OF PUBLIC INTEREST ............ 2

ARGUMENT ......................................................................................................... 3

    I.      JUSTICE REQUIRES ISSUING A PRELIMINARY INJUNCTION ......... 3

    II.     INJUNCTIVE RELIEF IS NECESSARY TO ENSURE ACCESS
           TO JUSTICE, A CORE ASPECT OF THE BAR ASSOCIATIONS'
           MISSION ................................................................................................ 5

    III.    THE PUBLIC INTEREST IN THE RULE OF LAW STRONGLY
           FAVORS INJUNCTIVE RELIEF ............................................................ 11

CONCLUSION ..................................................................................................... 18

**TABLE OF AUTHORITIES**

Page

Cases

*Boddie v. Connecticut*,
  401 U.S. 371 (1971) ...................................................................................................... 5
*Chicago Headline Club v. Noem*,
  ___ F.Supp.3d ___, 2025 WL 3240782 (N.D. Ill. Nov. 20, 2025) ......................... 17, 18
*DHS v. D.V.D.*,
  145 S. Ct. 2153 (2025)................................................................................................. 16
*Dataphase Sys. v. C L Sys., Inc.*,
  640 F.2d 109 (8th Cir. 1981) ......................................................................................... 3
*Dunaway v. New York*,
  442 U.S. 200 (1979) .................................................................................................... 13
*Eight N. Indian Pueblos Council, Inc. v. Kempthorne*,
  No. 06-745 WJ/ACT, 2006 WL 8443876 (D.N.M. Sept. 15, 2006) ............................. 15
*Elrod v. Burns*,
  427 U.S. 347 (1976) .................................................................................................... 15
*Exodus Refugee Immigr., Inc. v. Pence*,
  165 F. Supp. 3d 718 (S.D. Ind. 2016)........................................................................... 18
*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*,
  467 U.S. 51 (1984) ...................................................................................................... 18
*Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*,
  182 F.3d 598 (8th Cir. 1999) ......................................................................................... 3
*Illinois v. Wardlow*,
  528 U.S. 119 (2000) .................................................................................................... 13
*Juan T.R. v. Noem*,
  No. 26-CV-0107 (PJS/DLM), 2026 WL 232015 ......................................... 1, 11, 16, 17
*Lopez-Fernandez v. Holder*,
  735 F.3d 1043 (8th Cir. 2013) ..................................................................................... 14
*Mehrdad v. Noem*,
  No. 3:25-CV-337, 2025 WL 2497988 (N.D. Ind. Apr. 24, 2025)................................. 18
*Missouri v. Trump*,
  128 F.4th 979 (8th Cir. 2025)................................................................................... 4, 18
*Morales v. Chadbourne*,
  793 F.3d 208 (1st Cir. 2015) ....................................................................................... 15
*New York Times Co. v. United States*,
  403 U.S. 713 (1971) .................................................................................................... 15
*Ng v. Bd. of Regents of the Univ. of Minn.*,
  64 F.4th 992 (8th Cir. 2023)........................................................................................... 4

# TABLE OF AUTHORITIES

Page

*Noem v. Abrego Garcia*,
   145 S. Ct. 1017 (2025)......................................................................................... 16
*Noem v. Vasquez Perdomo*,
   146 S. Ct. 1 (2025)............................................................................................... 13
*Shaik v. Noem*,
   801 F.Supp.3d 825 (D. Minn. 2025) ................................................................... 16
*Shaik v. Noem*,
   No. 25-1584 (JRT/DJF), 2025 WL 1170447 (D. Minn. Apr. 22, 2025) ................ 16, 17
*Tincher v. Noem*,
   No. 0:25-cv-04669 (KMM/DTS), 2026 WL 125375 (D. Minn. Jan 16, 2026) ............. 2
*Tincher v. Noem*,
   No. 26-1105, 2026 WL 160525 (8th Cir. Jan. 21, 2026) ............................................ 16
*Trump v. Illinois*,
   607 U.S. ___, 2025 WL 3715211 n.4 (2025) ............................................................... 14
*U.H.A. v. Bondi*,
   No. 26-417 (JRT/DLM), 2026 WL 222226 ..........................................................passim
*United States* v. *Puebla-Zamora*,
   996 F.3d 535 (8th Cir. 2021) ....................................................................................... 15
*United States v. Quintana*,
   623 F.3d 1237 (8th Cir. 2010) ............................................................................... 13, 14
*Whren v. United States*,
   517 U.S. 806 (1996) ............................................................................................... 13, 14
*Winter v. Nat. Res. Def.,*
   *Couns.*, 555 U.S. 7 (2008) ............................................................................................. 4
*Ziliang J. v. Noem*,
   No. 25-CV-1391 (PJS/DLM), 2025 WL 1358665 (D. Minn. Apr. 17, 2025) .............. 15

Statutes

Minn. Stat. § 358.07(9)..................................................................................................... 3

## INTRODUCTION

*"ICE is not a law unto itself."*
*Juan T.R. v. Noem*, No. 26-CV-0107 (PJS/DLM), 2026 WL 232015, at \*3
(D. Minn. Jan. 28, 2026).

*"At its best, America serves as a haven of individual liberties in a world too often full of tyranny and cruelty. We abandon that ideal when we subject our neighbors to fear and chaos."*
*U.H.A. v. Bondi*, No. 26-417 (JRT/DLM), 2026 WL 222226, at \*13
(D. Minn. Jan. 28, 2026).

Minnesota has become a proving ground for whether the core American principles of access to justice and respect for the rule of law can survive. The effects of Operation Metro Surge have touched every aspect of life in Minnesota, emptying classrooms, devastating small businesses, and preventing families from getting groceries. Minnesotans have been unlawfully stopped, arrested, and in some cases subjected to horrific abuse, based on nothing more than what they look or sound like.

The legal system has not been immune from these impacts. Terrified people are not reporting crimes. Attorneys cannot access clients. And court orders have been treated as inconveniences, when they have been acknowledged at all. *Juan T.R.*, 2026 WL 232015, at \*1 ("ICE has likely violated more court orders in January 2026 than some federal agencies have violated in their entire existence.").

The unprecedented surge of federal immigration enforcement activity challenged in this action continues to run roughshod over the rule of law and has a chilling effect on Minnesotans' ability to seek protection from the courts, report crimes, and engage in constitutionally protected activity. These harms are not speculative. Amici Bar

Associations[1] here focus on why the equities and the public interests discussed below support a preliminary injunction.

This Court recently recognized that those elements of the *Dataphase* analysis are closely intertwined with irreparable harm where governmental action threatens constitutional rights, the orderly administration of justice, and the rule of law. *See Tincher v. Noem*, No. 0:25-cv-04669 (KMM/DTS), 2026 WL 125375, at *15 (D. Minn. Jan 16, 2026); *U.H.A.*, 2026 WL 222226, at *9–10. Granting the relief requested will advance, not hinder, these public interests. It will preserve access to justice and promote the rule of law—core missions of the Bar Associations—by ensuring that all Minnesotans remain free from unlawful government action based on nothing more than what they look or sound like.

## IDENTITY OF AMICI CURIAE AND STATEMENT OF PUBLIC INTEREST

The Bar Associations collectively represent over thirteen thousand Minnesota attorneys and judges from diverse backgrounds and lived experiences. (Declaration of Cheryl Dalby in Support of Amicus Curiae Brief (hereinafter "Dalby Decl.")[2] ¶ 2 (Feb 3, 2026).) Upon admission to the Minnesota bar, all lawyers admitted to practice in

---

[1] Amici include the Minnesota State Bar Association, Hennepin County Bar Association, Ramsey County Bar Association, Minnesota Hispanic Bar Association, Somali American Bar Association, Minnesota Asian Pacific American Bar Association, Minnesota Association of Black Lawyers, Minnesota Lavender Bar Association, Minnesota Disability Bar Association, and Minnesota Women Lawyers (collectively the "Bar Associations").

[2] Declarant is Chief Executive Officer of the Minnesota State Bar Association, Hennepin County Bar Associaton, and Ramsey County Bar Association.

Minnesota, many of whom are now members of the Bar Associations, take an oath to uphold the Constitutions of the United States and the State of Minnesota. *See* Minn. Stat. § 358.07(9). That oath is more than ceremonial. For generations, the Bar Associations have remained committed to improving accessibility, fairness, and trust in Minnesota's legal system.

Amici members include, and amici regularly work with, judges, prosecutors, criminal defense attorneys, legal aid providers, attorneys in the full range of private practice, and community organizations committed to reducing barriers to justice and to upholding the rule of law. Plaintiffs' requested relief directly implicates these institutional and professional interests by seeking to require Defendants and their agents to abide by the U.S. and Minnesota Constitutions and applicable statutory law. In short, amici are before this Court seeking unimpeded access to justice and advocating on behalf of the rule of law.

## ARGUMENT

## I.  JUSTICE REQUIRES ISSUING A PRELIMINARY INJUNCTION

In determining whether to issue injunctive relief, the essential question is always "whether the balance of equities so favors the movant that justice requires the court to intervene" to preserve the status quo. *U.H.A.*, 2026 WL 222226, at *4 (quoting *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999)); *see also Dataphase Sys. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc) (stating the same).

That standard is amply met in this case. As persuasively set out in Plaintiffs' memorandum and further addressed below, the racial-profiling and warrantless-arrest policies and practices against which injunctive relief is sought violate black-letter principles of Constitutional law. *See infra* Part III. Plaintiffs thus have a high likelihood of succeeding on the merits of their claims. "[T]he denial of a constitutional right," moreover, undisputedly constitutes irreparable harm, *Ng v. Bd. of Regents of the Univ. of Minn.*, 64 F.4th 992, 998 (8th Cir. 2023) (citation omitted), as do the loss of liberty and physical violence detailed in the extensive sworn declarations accompanying Plaintiffs' preliminary-injunction motion. On both of these *Dataphase* factors, the Bar Associations agree with the Plaintiffs.

The Bar Associations offer a unique perspective on the remaining factors: the balance of harms and the public interest. In this case, those factors merge because the federal government is the opposing party. *Missouri v. Trump*, 128 F.4th 979, 996–97 (8th Cir. 2025). But that does not diminish their importance. *See, e.g.*, *Winter v. Nat. Res. Def. Couns.*, 555 U.S. 7, 26 (2008) (stressing "the importance of assessing the balance of equities and the public interest in determining whether to grant a preliminary injunction"). And as explained in this brief, Defendants' unprecedented policies and practices inflict significant public harms on the Bar Associations' membership, on Minnesotans who seek legal assistance, and on the rule of law more generally.

These public harms implicate the Bar Associations' core missions: to promote access to justice, to preserve and advance the rule of law, and to ensure the professional

4

excellence and wellbeing of those in the legal profession. Amici accordingly urge the Court to grant the requested injunctive relief.

## II. INJUNCTIVE RELIEF IS NECESSARY TO ENSURE ACCESS TO JUSTICE, A CORE ASPECT OF THE BAR ASSOCIATIONS' MISSION

Accessing justice means that individuals can safely report crimes, interact with counsel, attend hearings, provide information to investigators, testify in court, and seek legal redress. "At its core, the right to due process reflects a fundamental value in our American constitutional system": the right of "all individuals [to] a meaningful opportunity to be heard." *Boddie v. Connecticut*, 401 U.S. 371, 374, 379 (1971). Fear of accessing or utilizing the legal system because the risk that doing so will expose a person to unrelated consequences, including unlawful detention and violence, is incompatible with the orderly administration of justice.

The injunctive relief sought here, including halting unlawful targeted stops and arrests based on racial profiling, promotes access to justice in a number of ways while causing no harm to any governmental interest. That means the equities weigh heavily in favor of granting the requested injunctive relief.

*First*, Minnesota is experiencing the ubiquitous presence of masked, heavily armed federal immigration officials engaging in a pattern of stopping, detaining, and arresting people based solely on perceived race as part of Operation Metro Surge. These actions erode public trust and inhibit civic participation, magnifying the existing risk that residents will not report crimes, participate as witnesses in prosecutions, or seek legal redress for

harms they have suffered. City leaders have highlighted this problem, noting that the "tactics [ICE is employing] erode hard-earned community trust being rebuilt by Minneapolis police day by day—particularly where the tactics being used by Defendants' agents are at odds with the carefully developed, trained, and enforced policies designed to increase that trust, like impartial policing and de-escalation." (Declaration of Jacob Frey (hereinafter "Frey Decl.")[3] ¶ 5 (*Minnesota v. Noem*, No. 26-cv-00190 (KMM/DJF) (ECF No. 9) (D. Minn. Jan 12, 2026)); *see also* Dalby Decl. ¶ 10, Ex. 2 (news article).[4]) Echoing Mayor Frey's concerns, Minneapolis Police Chief Brian O'Hara recently noted that "[p]ublic safety suffers when people are afraid to leave their homes, attend worship, go grocery shopping, or contact the police when they are victims of crime. Violence goes unreported, victims remain isolated while offenders remain free." (Dalby Decl. ¶ 11, Ex. 3.[5])

These concerns of local leaders are borne out by the experiences of Bar Association members and their colleagues. Victims and witnesses "no longer feel safe to testify, due to fear of being detained by ICE at the courthouse" and they "become effectively unreachable for case follow-up, subpoena service, and trial preparation." (Declaration of Isabella

---

[3] Declarant is the Mayor of Minneapolis.

[4] Pross, Katrina, *'It makes us … less safe': How federal immigration actions are affecting local prosecutions in Hennepin County*, Sahan Journal (Aug. 18, 2025), https://sahanjournal.com/public-safety/immigration-arrests-impact-hennepin-county-court-cases/.

[5] Minneapolis Police Department Chief Brian O'Hara, *Fear undermines public safety – naming it is not politics*, The Hill (Dec. 30, 2025), https://thehill.com/opinion/immigration/5665347-fear-undermines-public-safety-naming-it-is-not-politics/.

Smetana (hereinafter "Smetana Decl.")[6] ¶¶ 3(c)–(e) (*Minnesota v. Noem*, No. 0:26-cv-00190 (KMM/DJF) (ECF No. 104) (D. Minn. Jan. 24, 2026)).) And even seeking legal advice brings its own risks: immigration attorney members "report a pattern of intimidation by ICE agents, including circling and/or surrounding their offices and stopping and questioning individuals entering or leaving their law firms" and in one instance, using "a member's law firm parking lot as a staging area for over a week." (Declaration of Andrea C. Mejia Narvaez in Support of Amicus Curiae Brief (hereinafter "Mejia Narvaez Decl.")[7] ¶ 6 (Jan. 31, 2026).) To minimize personal risk to clients, attorneys are seeing an increase in requests for alternative meeting locations or hearing accommodations. (Smetana Decl. ¶ 3(a) ("Defense attorneys ask if our [prosecutors are] amenable to utilize pleas-by-mail, or attempt to resolve cases administratively, as their client is afraid of being detained by ICE at the courthouse."); Declaration of Caroline H. Brunkow in Support of Amicus Curiae Brief (hereinafter "Brunkow Decl.")[8] ¶¶ 4, 7 (Feb. 2, 2026) (describing clients seeking to appear via Zoom, and requesting meetings in their homes and other areas outside the metro for safety); *see also* Mejia Narvaez Decl. ¶ 6.) Immigration and criminal cases are not the only legal proceedings impacted when vulnerable populations fear retribution for accessing justice—abused people may be deterred from requesting civil orders for protection, forgoing their safety rather than risk detention or deportation. Those with civil claims and

---

[6] Declarant is a paralegal at a law firm near Minneapolis that handles criminal prosecutions.

[7] Declarant is the President of the Minnesota Hispanic Bar Association.

[8] Declarant is a practicing attorney in Minneapolis.

7

housing, child custody, family, or public benefits issues, likewise may abandon those claims or resort to self-help.

And beyond those alarming concerns, even the most basic constitutional right—access to an attorney—has become uncertain in this environment. Attorneys "report that ICE agents have improperly met with detained clients without their attorney present to persuade them to accept voluntary departures." (Mejia Narvaez Decl. ¶ 7.) Reports are also emerging that clients are not being told why they were arrested and detained and are not being provided with bond hearings in a timely manner. (Declaration of Santiago Doe (hereinafter "Santiago Decl.")[9] ¶¶ 19–20 (*Hussen v. Noem*, No. 0:26-cv-00324 (ECT/ECW) (ECF No. 46) (D. Minn. Jan. 16, 2026)).) And multiple news outlets have reported that attorneys are being denied access to their clients at the Bishop Henry Whipple Federal Building in Minneapolis, conduct that is now the subject of a lawsuit. (*E.g.*, Dalby Decl. ¶ 7, Ex. 1 (news article).[10])[11]

Fear of unlawful detention or arrest for reporting crimes or hiring a lawyer undermines the proper functioning of the justice system and subverts the constitution's promise of equal access to justice under law. There can be no greater impediment to justice

---

[9] Santiago Doe is a resident of Minnesota who has been detained by U.S. Immigration and Customs Enforcement Officers.

[10] Matt Rivers, et al., *Lawyers allege Dept. of Homeland Security is denying legal counsel to Minnesota detainees*, ABC News (Jan. 18, 2026), https://abcnews.go.com/US/lawyers-allege-dept-homeland-security-denying-legal-counsel/story?id=129335914.

[11] For detailed allegations of detainees' denial of right to counsel and other violations impeding access to justice, please see the complaint and memorandum of law with accompanying declarations in *The Advocates for Human Rights v. DHS* (Case No. 0:26-cv-00749 (NEB/DLM) (*See* ECF Nos. 1, 17, 19–30).

than to be literally and practically prohibited from accessing attorneys and the courts. The injunctive relief sought by Plaintiffs would address that harm.

*Second*, and of just as great concern to the Bar Associations, is the chilling effect of the type of conduct alleged in Plaintiffs' complaint which the Bar Associations' members also report experiencing as they perform their work as attorneys. (Mejia Narvaez Decl. ¶ 12 ("A license to practice law does not alter our members' immutable characteristics. Like the rest of Minnesota's Hispanic community, our members fear for their freedom, livelihoods, and safety, because of how they look, speak, and the places they frequent.").) One after another, the Bar Associations' leaders reveal an environment of terror and intimidation for attorneys, particularly attorneys of color in Minnesota, who report taking additional steps to protect themselves and their families due to the very real concerns that their safety is in jeopardy from doing their jobs. (*See* Mejia Narvaez Decl. ¶¶ 5–13 (describing pervasive atmosphere of intimidation and fear felt by bar association members, including being followed by ICE agents on public roads, having their LinkedIn profiles accessed by government officials, carrying passports to prove status, and feeling afraid to express opinions); Declaration of Valerie Narcy in Support of Amicus Curiae Brief (hereinafter "Narcy Decl.")[12] ¶¶ 6–10 (Jan. 31, 2026) (describing impacts on members, including lawyers avoiding working in person and forgoing professional opportunities and travel, and relocating out of Minnesota and in some cases the United States); Declaration of Ikraan

---

[12] Declarant is the President of the Minnesota Asian Pacific American Bar Association.

9

Abdurahman in Support of Amicus Curiae Brief (hereinafter "Abdurahman Decl.")[13] ¶¶ 4–7 (describing mental health impact, fear and anxiety related to legal appearances, and difficulty performing professional duties due to being a member of targeted group); Dalby Decl. ¶¶ 3–6 (describing personal and professional impacts on lawyers as a result of Operation Metro Surge).) Shockingly, at least one attorney reported being attacked while attempting to interact with detainees. (*See generally* Declaration of N.S.[14] (*Minnesota v. Noem*, No. 0:26-cv-00190 (KMM/DJF) (ECF No. 86-6) (D. Minn. Jan. 22, 2026)).)

Defendants' unconstitutional practices also make it more difficult to represent clients and force attorneys to take personal risks when performing routine legal work. (*See* Narcy Decl. ¶ 7 (noting member attorneys "expressed fear of volunteering for, accepting, or continuing work involving immigration or immigrant clients, out of concern that they themselves may become targets of retaliation or heightened scrutiny by federal agents"); Abdurahman Decl. ¶¶ 4–5 (describing fear of encountering ICE while traveling to the law office, being detained as they appear for hearings and check-ins, and apprehension about entering the Whipple Federal building to represent clients due to visible Somali identity).) Some legal employers have accommodated this reality by offering flexible work arrangements such as working from home. But those accommodations have a cost: today, as a result of Defendant's actions, lawyers in our Associations are turning down clients, avoiding work-related travel, and hiding in their homes. (Narcy Decl. ¶ 8 (describing

---

[13] Declarant is the President of the Somali American Bar Association.

[14] Declarant is an attorney employed by the State of Minnesota who was operating in their personal capacity during the incident.

attorneys' behavior alteration resulting from federal immigration actions and the detrimental impacts).) Attorneys must be free to perform their jobs without fear of harassment, detention, or arrest.

*Finally*, Defendant's unlawful conduct weakens Minnesota's legal community by discouraging many lawyers—particularly attorneys of color—from public visibility and engagement, goals at the heart of the Bar Associations' missions to foster a more representative and inclusive legal profession. (Mejia Narvaez Decl. ¶ 13 ("Defendant's conduct . . . discourag[es] full participation in the legal system by the Hispanic community . . . ."); Abdurahman Decl. ¶ 7 ("When members are forced to limit their public presence due to safety risks, their ability to practice law is significantly impacted [and] hinders the Association's broader goal of building a strong, inclusive, and impactful legal community.").)

When the people making up the legal community themselves are afraid to participate in the system through which they serve as officers of the Court, the strength of Minnesota's bar suffers and access to justice is extinguished. Granting Plaintiffs' requested relief will assist in restoring and preserving that access for Minnesotans.

## III.   THE PUBLIC INTEREST IN THE RULE OF LAW STRONGLY FAVORS INJUNCTIVE RELIEF

Advocating for the rule of law is a core function of the Bar Associations. While defining the "rule of law" may be difficult, describing its absence is not: the rule of law is absent when a federal agency violates at least 96 court orders in the span of a month. *Juan*

11

*T.R.*, 2026 WL 232015, at *1 (stating that so many violations of court orders "should give pause to anyone . . . who cares about the rule of law"). The rule of law is absent when there are prolonged unlawful detentions of refugees fleeing persecution who have the legal right to remain, undetained, in the United States while their refugee status is adjudicated. *U.H.A.*, 2026 WL222226, at *7. The rule of law is not being respected when the federal government seeks to bypass a federal judge's review by filing a sealed mandamus petition that the judge cannot read. Letter from Patrick Schiltz, Chief Judge of U.S. District of Minnesota, to Steven M. Colloton, Chief Judge of U.S. Court of Appeals for the Eighth Circuit (Jan. 23, 2026), https://clearinghouse.net/doc/167534/. And the rule of law cannot exist when a local police department is forced to obtain a search warrant for a public sidewalk following a shooting death by federal agents who block state investigators' access to the scene. (*See* Dalby Decl. ¶ 12, Ex. 4 (news article).[15]) As this Court is well aware, these are not hypothetical examples. As court officers and members of the legal profession, Amici Bar Associations bring these examples to the Court's attention to support Plaintiffs' request that injunctive relief be granted to restore the rule of law in Minnesota.

Defendants' policy of detaining and conducting warrantless arrests on the basis of Minnesotans' apparent race or ethnicity, often accompanied by force, violates settled constitutional norms governing the exercise of Executive power. It is axiomatic that

---

[15] Krueger, Andrew, *Judge grants order barring feds from altering or destroying evidence in Pretti shooting*, MPR News (Jan. 25, 2026), https://www.mprnews.org/story/2026/01/25/alex-pretti-shooting-judge-grants-restraining-order-on-altering-evidence.

probable cause is required for a warrantless arrest. *Dunaway v. New York*, 442 U.S. 200, 212 (1979); *see also United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010) (statute governing warrantless immigration arrests requires probable cause). And officers may conduct "a brief investigatory stop" *only* when they have "a reasonable, articulable suspicion that criminal activity is afoot," which must be significantly more than an "inchoate and unparticularized suspicion or 'hunch.'" *Illinois v. Wardlow*, 528 U.S. 119, 123-124 (2000). Plainly, Defendants may not stop 'suspected' noncitizens on the basis of their physical appearance alone. *Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race."). Defendants' documented policy of escalating interactions with Minnesotans who appear to be Somali or Latino into arrests, even as they offer proof of United States citizenship or legal immigration status, violates these elementary Fourth Amendment principles.[16]

Remarkably, Defendants and their superiors have repeatedly confirmed their intent not to follow Federal constitutional requirements. For example, Defendant Border Patrol Commander Gregory Bovino told CNN months ago: "We need [only] reasonable suspicion to make an immigration arrest . . . . You notice I did not say probable cause, nor did I say

---

[16] The Supreme Court's non-precedential order in *Noem v. Vasquez Perdomo* does not suggest otherwise. *See Noem v. Vasquez Perdomo*, 146 S. Ct. 1 (2025) (Kavanaugh, J., concurring) (explaining that, when "officers learn that the individual they stopped is a U.S. citizen or otherwise lawfully in the United States," they must "*promptly let the individual go*" and that officers may "arrest" an individual for purposes of enforcing the immigration laws only when the suspect "is illegally in the United States" (emphasis added)).

13

I need a warrant." (*See* Compl. ¶ 100 (news article).[17]) Similarly, "Border Czar" Tom Homan has asserted that "ICE officers and Border Patrol don't need probable cause to walk up to somebody, briefly detain them, and question them . . . *based on their physical appearance*." (*See* Dalby Decl. ¶ 13, Ex. 5 at 3 n.27 (Sept. 9, 2025, Letter of Members of Congress to Kristi Noem) (emphasis in original).)

As Plaintiffs explain, both Commander Bovino and Mr. Homan are wrong. (*See* Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. at 11–25 (ECF 27).) Detention in this context requires reasonable suspicion that the person is removable, a specific, technical designation that cannot be assessed based on someone's appearance or accent. *Trump v. Illinois*, 607 U.S. ___, 2025 WL 3715211, at *1 n.4 (2025) (Kavanaugh, J., concurring) ("The basic constitutional rules . . . are longstanding and clear . . . . [O]fficers must not make interior immigration stops or arrests based on race or ethnicity."); *Whren*, 517 U.S., at 813; *Lopez-Fernandez v. Holder*, 735 F.3d 1043, 1047 (8th Cir. 2013). Warrantless arrests are held to an even higher standard, requiring an officer to have both "reason to believe" that the individual is in the U.S. in violation of an immigration law or regulation (understood by the 8th Circuit and other courts to be the equivalent of probable cause) *and* that the individual is likely to "escape" before a warrant can be obtained. *Quintana*, 623 F.3d at 1239 ("Because the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in [the immigration arrest statute] means constitutionally required

---

[17] Hanna Park, et al., *October 7, 2025: National Guard deployments,* CNN (Oct. 8, 2025), https://www.cnn.com/us/live-news/national-guard-chicago-portland-trump-10-07-25.

probable cause."); *United States* v. *Puebla-Zamora*, 996 F.3d 535, 538 (8th Cir. 2021) (same); *see also Morales* v. *Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) ("Courts have consistently held that the 'reason to believe' phrase in [the immigration arrest statute] must be read in light of constitutional standards, so that 'reason to believe' must be considered the equivalent of probable cause." (citation modified)).

The well-documented environment in Minnesota of unlawful detentions and arrests, along with public misstatements of the law by Federal officials, suggest a breakdown in the rule of law. When Federal leaders publicly question the Constitution's most basic commands—to arrest only upon probable cause and to extend to *all* persons the equal protection of the law—individuals no longer know how to conform their conduct to the law, lawyers cannot reliably advise clients, and courts cannot ensure compliance with their orders. That is why the public has a weighty interest in having "federal agencies comply with their own policies and with federal statutes." *Eight N. Indian Pueblos Council, Inc. v. Kempthorne*, No. 06-745 WJ/ACT, 2006 WL 8443876, at *5 (D.N.M. Sept. 15, 2006).

More fundamentally, where law enforcement actions depart from settled constitutional norms—particularly those governing the Executive Branch's use of force and the fundamental public freedoms guaranteed by the Bill of Rights—the resulting harm is systemic. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)) (stating that policies that threaten or impede First Amendment freedoms, "for even minimal periods of time, unquestionably [cause] irreparable injury"); *see also Ziliang J. v. Noem*, No. 25-CV-1391 (PJS/DLM), 2025 WL 1358665, at *2 (D. Minn. Apr. 17, 2025) ("[T]here is a substantial public interest in

15

ensuring that government agencies comply with federal law[,]" and the public interest is not served "by permitting federal officials to flaunt the very laws that they have sworn to enforce."); *Shaik v. Noem*, 801 F.Supp.3d 825, 837 (D. Minn. 2025) (finding that there is a substantial public interest "in Americans trusting their own government to follow the rule of law" (quoting *Shaik v. Noem*, No. 25-1584 (JRT/DJF), 2025 WL 1170447, at *3 (D. Minn. Apr. 22, 2025))).

Recent events starkly illustrate the need for injunctive relief to restore the rule of law. Following the administrative stay of the preliminary injunction entered in *Tincher*, an unrestrained force of ICE agents caused yet another death on the streets of Minneapolis. *Tincher v. Noem*, No. 26-1105, 2026 WL 160525 (8th Cir. Jan. 21, 2026). (Dalby Decl. ¶ 12, Ex. 4 (news article).[18]) After that tragedy, this Court was forced to intervene in numerous cases in which Federal agents failed to abide by the law and relevant policies. *See*, *e.g.*, *Juan T.R.*, 2026 WL 232015, at *2 (enumerating ICE violations of nearly 100 court orders). And defendants' conduct in Minnesota is itself a continuation of a long-running pattern of non-compliance with federal court orders. *See, e.g.*, *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025) (noting federal government's refusal to return noncitizen deported to El Salvador prison due to confessed "administrative error"); *DHS v. D.V.D.*, 145 S. Ct. 2153, 2158 (2025) (Sotomayor, J., dissenting) ("[I]n violation of an

---

[18] Krueger, Andrew, *Judge grants order barring feds from altering or destroying evidence in Pretti shooting*, MPR News (Jan. 25, 2026), https://www.mprnews.org/story/2026/01/25/alex-pretti-shooting-judge-grants-restraining-order-on-altering-evidence.

unambiguous TRO, the Government flew four noncitizens to Guantanamo Bay, and from there deported them to El Salvador. Then, in violation of [a] preliminary injunction . . . the Government removed six class members to South Sudan with less than 16 hours' notice and no opportunity to be heard.").

Few would dispute that a functioning rule of law includes a fair and just immigration system with a carefully supervised enforcement mechanism. But "ICE is not a law unto itself." *Juan T.R.*, 2026 WL 232015, at *3. The people of Minnesota have a "right not to be subjected to the terror of being arrested and detained without warrants or cause." *U.H.A.*, 2026 WL 222226, at *13. Defendants' actions unambiguously violate that right. Without an injunction requiring Defendants' compliance with black-letter principles of Constitutional law, Americans' ability to "trust[] their own government to follow the rule of law" will be irreparably damaged. *Shaik*, 2025 WL 1170447, at *3. To prevent that harm, this Court "should continue to ensure that the Government lives up to its obligations to follow the law." *Abrego Garcia*, 145 S. Ct. at 1020.

Even if "Operation Metro Surge" had been designed to promote public safety by enforcing immigration laws consistent with established state and federal law—which the public record calls greatly into question—that interest would not outweigh the public's interest in "bodily integrity, the right to peaceful protest, the right to assemble, the right to a free press, and the right to a peaceful free exercise of religion," which Defendants' actions inhibit. *Chicago Headline Club v. Noem*, ___ F.Supp.3d ___, 2025 WL 3240782, at *88 (N.D. Ill. Nov. 20, 2025). In the end, even the Government's interest "in ensuring that [it] can enforce the law . . . might be outweighed by the countervailing interest of citizens in

17

some minimum standard of decency, honor, and reliability in their dealings with their Government." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60-61 (1984).

Nor does the requested injunction in any way impede Defendants' ability to execute the law. To the contrary: an injunction would "simply require[] Defendants to comply with the Constitution and their own stated policies, which Defendants can—and should—do during the implementation and enforcement of immigration laws. This does not constitute irreparable harm." *Chicago Headline Club*, 2025 WL 3240782, at *88. There is no harm in an injunction "requiring [a party] to comply with the Constitution." *Exodus Refugee Immigr., Inc. v. Pence*, 165 F. Supp. 3d 718, 739 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir. 2016). After all, "the Government has 'no public interest in perpetuating unlawful agency action.'" *U.H.A.*, 2026 WL 222226, at *9 (quoting *Missouri v. Trump*, 128 F.4th at 997). By contrast, "the public has a clear interest in ensuring that Defendants implement and enforce immigration laws in a manner that complies with the Constitution." *Chicago Headline Club*, 2025 WL 3240782, at *88 (citing *Mehrdad v. Noem*, No. 3:25-CV-337, 2025 WL 2497988, at *4 (N.D. Ind. Apr. 24, 2025)).

For these reasons, the public interest in maintaining a government under laws overwhelmingly favors granting the requested injunction.

## CONCLUSION

Injunctive relief is required to protect Minnesotans' constitutional rights to be free from unlawful detention, arrest, and terror. Injunctive relief will protect access to attorneys

18

and the courts, prohibit unconstitutional racial profiling, and ensure that existing guardrails

on the use of governmental power are preserved.

Dated:  February 3, 2026          **MASLON LLP**


By: */s/ Anna Petosky*
      Anna Petosky (#388163)
      Peter C. Hennigan (#031089X)
      Ashley Patyk (#0505315)
225 South Sixth Street, Suite 2900
Minneapolis, MN  55402
(612) 672-8200
Email:   anna.petosky@maslon.com
            peter.hennigan@maslon.com
            ashley.patyk@maslon.com


**WILKINSON STEKLOFF**


By:*/s/ Guus Duindam*
      Guus Duindam (*pro hac vice* pending)
      (DC Bar No. 90004862)
2001 M Street NW, 10th Floor
Washington, DC 20036
(202) 847-4000
Email: gduindam@wilkinsonstekloff.com


**ATTORNEYS FOR AMICUS CURIAE
MINNESOTA STATE BAR ASSOCIATION,
HENNEPIN COUNTY BAR ASSOCIATION,
RAMSEY COUNTY BAR ASSOCIATION,
MINNESOTA HISPANIC BAR
ASSOCIATION, SOMALI AMERICAN BAR
ASSOCIATION, MINNESOTA ASIAN
PACIFIC AMERICAN BAR ASSOCIATION,
MINNESOTA ASSOCIATION OF BLACK**

19

**LAWYERS, MINNESOTA LAVENDER BAR ASSOCIATION, MINNESOTA DISABILITY BAR ASSOCIATION, AND MINNESOTA WOMEN LAWYERS**