**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

MUBASHIR KHALIF HUSSEN,
MAHAMED EYDARUS, and JAVIER
DOE, *on behalf of themselves and others*
*similarly situated*,

   Plaintiffs,

  v.

KRISTI NOEM, *in her official capacity as*
*Secretary of the U.S. Department of*
*Homeland Security*; U.S. DEPARTMENT
OF HOMELAND SECURITY; U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT; TODD M. LYONS, *in*
*his official capacity as Acting Director of*
*U.S. Immigration and Customs*
*Enforcement*; DAVID EASTERWOOD, *in*
*his official capacity as U.S. Immigration*
*and Customs Enforcement Field Office*
*Director for St. Paul, Minnesota*; U.S.
CUSTOMS AND BORDER
PROTECTION; RODNEY S. SCOTT, *in*
*his official capacity as Commissioner of*
*U.S. Customs and Border Protection*; U.S.
BORDER PATROL; MICHAEL W.
BANKS, *in his official capacity as Chief*
*of U.S. Border Patrol*; and GREGORY
BOVINO, *in his official capacity as*
*Commander-at-Large of U.S. Border*
*Patrol*,

   Defendants.

Case No: 26-cv-324 (ECT/ECW)

**CITY OF MINNEAPOLIS AMICUS**
**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR**
**PRELIMINARY INJUNCTION**

1

## STATEMENT OF INTEREST OF THE AMICUS CURIAE[1]

In early December, the federal government announced 100 Immigration and Customs Enforcement ("ICE") agents would be deployed to Minnesota for "Operation Metro Surge." This "surge" announcement corresponded with truly shocking vitriol from the President of the United States against the Somali population in Minnesota. It was followed by the addition of more and more agents from ICE and then from Customs and Border Protection ("CBP") ending with approximately 3,000 federal immigration agents deployed in the Twin Cities metro area.

ICE agents immediately began to engage in actions targeting the Somali and Latino population of the City of Minneapolis and the Twin Cities area. The City of Minneapolis has an interest in protecting the wellbeing of all those who reside, work in, or visit its jurisdiction and Minneapolis is home to the largest Somali population in the state. Federal immigration agents' tactics of violently targeting individuals who appear to be of non-European ancestry, or targeting others who attempt to stand up for the rights of their neighbors, is having a seriously detrimental effect on the City of Minneapolis and its entire community.

---

[1] No party has opposed the filing of this memorandum. No counsel for a party authored this memorandum in whole or in part, no counsel for a party made a monetary contribution intended to fund the preparation or submission of this memorandum, and no person other than *amicus curiae* and its counsel made a monetary contribution to its preparation or submission.

A culture of fear has taken hold in Minneapolis in the wake of these unconstitutional tactics by federal immigration agents – tactics which appear to have no respect for the rule of law and are causing the people of Minneapolis to fear that there are no laws that can protect them.

ICE's unlawful tactics are also undermining public trust in state and local law enforcement because individuals either cannot distinguish between federal immigration activities and local police actions or blame local police for failing to stop federal immigration agents' unconstitutional conduct. Deteriorating public trust has consequences: it suppresses the reporting and prosecuting of serious crimes, especially those that affect the immigrant population.  Finally, ICE's tactics sap local resources when local officers need to be called away from their work to monitor and respond to incidents created by federal immigration agents' actions.

This amicus brief focuses on why the equities and the public interests support a preliminary injunction. A preliminary injunction will serve the public interest by protecting Minneapolis residents' rights to be present in public without fear of unlawful arrest and assuring the general public that any unlawful actors will have to account for their reasons for stopping Minneapolis residents and will be held accountable if their reasons do not meet constitutional muster. The simple reporting requirements requested by Plaintiffs will allow residents of

Minneapolis, and the Twin Cities generally, to stop living in fear. Moreover, Minneapolis is certain that federal immigration agents will not be burdened if the Court grants Plaintiffs' motion for a preliminary injunction because, like many other law enforcement officers throughout the country, Minneapolis Police Department officers are required to document investigatory stops and it does not prevent effective law enforcement; rather, it increases public trust in law enforcement.

## ARGUMENT

Plaintiffs have requested an injunction to end Defendants' practice of stopping individuals based on race instead of on reasonable articulable suspicion and their practice of arresting those people who they do not have probable cause to believe are here in violation of federal immigration laws and likely to escape before a warrant may be obtained. They are also requesting that Defendants be required to document the facts and circumstances surrounding each stop or arrest, specifically the necessary reasonable articulable suspicion or probable cause. These requirements are consistent with the Constitution and what Minneapolis law enforcement officers, and law enforcement all over the country, already practice, and therefore are proven, workable measures that enhance public safety and are in the public interest. Defendants' agents' current modus operandi is an active detriment to the public interest because it:

4

- Generates a culture of fear that keeps individuals from going out into the community lest they be targeted;

- Depresses economic activity;

- Allows criminal activity to go unreported or unprosecuted; and

- Wastes the time and resources of local police officers who could be better used responding to emergencies that were not created by ICE's unconstitutional tactics.

A preliminary injunction will be granted if the moving party can demonstrate: (1) the moving party's probability of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) the public interest in the issuance of the injunction. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). The balance-of-harms and public-interest factors "merge when the Government" is the non-moving party. *Eggers v. Evnen*, 48 F.4th 561, 564 (8th Cir. 2022). Courts must "consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Additionally, the Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (quoted in *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019)).

Here, the balance of harms and the public interest weigh in favor of the proposed injunction.

## I. Law enforcement agencies generally require documentation of the reasons for investigative detentions.

The equities and public interest favor Plaintiffs because the proposed injunction terms are very similar to what the Minneapolis Police Department, and other agencies all over the country, already require of their own officers, without negative effects on public safety.   It has been the MPD's policy since at least 2016 to require that, on investigative detentions (otherwise known as suspicious person stops or *Terry* stops), MPD officers must document the following:

- The basis for the stop,

- The location of the stop,

- The race of the suspicious person(s),

- The age of the suspicious person(s),

- The gender of the suspicious person(s),

- Whether a person or vehicle was searched, and

- The reasons for any Terry frisk or other search of the person(s) prior to clearing the call.

(Robertson Decl. Ex. A at 5-6.)  This includes all traffic stops, suspicious person stops, and suspicious vehicle stops.  (*Id.* at 5.) These policies are not unique or

6

novel.  There are similar policies in police departments all over the country including Dallas, Chicago, Cleveland, New Orleans, New York City, and Baltimore.  (Robertson Decl. Exs. B at 14 (Dallas requires documenting reason for traffic stops, among other facts, whether or not a citation issued), C at 1-2 (Chicago requires documentation "including a statement of the facts establishing Reasonable Articulable Suspicion to stop a person"), D at 8 (Cleveland requiring documentation of stops to include reason for the stop and the facts creating reasonable suspicion), E at 9 (New Orleans requires documenting reason for police encounter during vehicle stop or investigatory stop of suspicious person), F at 10 (New York City requiring documentation of the law the stopped individual was suspected of committing and the circumstances leading to conclusion there was reasonable articulable suspicion of criminal activity), G at 12-14 (Baltimore requiring a report of specific facts establishing reasonable articulable suspicion for the stop).) Plaintiffs' injunction is not asking ICE agents to do anything meaningfully different than what normal policing requires.

In fact, the International Association of Chiefs of Police ("IACP") recommends such reporting measures in their model policies as means of promoting effective law enforcement:

> Interactions with community members form the cornerstone of effective law enforcement operations. All officers should follow the provisions of this policy to maximize the usefulness of police-public contacts to include voluntary contacts, investigatory

> detentions, pat-downs, and arrests.
>
> ***
>
> Regular documentation of officer interactions with members of the public while conducting enforcement activities, to include voluntary contacts, investigatory detentions, pat-downs, and arrests, is a key component to ensuring agency transparency and provides an agency with a means of auditing these encounters for policy compliance.

(Robertson Decl. Ex. H at 3, 23.)  The balance of harms and public interest in this case clearly favor Plaintiffs as the terms of the proposed injunction are measures that have been voluntarily adopted by other law enforcement agencies and not only do not harm the objectives of law enforcement but promote effective law enforcement.

## II.   When federal agents terrorize the public with random unlawful detentions, they actively harm local law enforcement officers and public safety.

The public interest is enhanced by the proposed preliminary injunction because ICE's unlawful tactics actively harm local law enforcement and public safety.[2]

### A.  Undermining trust in local law enforcement

Public trust in local law enforcement is paramount to effective community policing – including trust between law enforcement and immigrant communities.

---

[2] *See, e.g.,* Robertson Decl. Ex. F (Liz Sawyer, *Police Walk a Tightrope to Maintain Community Relations amid Twin Cities ICE arrests*, Minnesota Star Tribune, Dec. 21, 2025).

ICE's tactics undermine public trust in local law enforcement because ICE agents are engaging in unnecessarily provocative and unlawful behavior while clothed in garb and using resources that makes them look like local law enforcement. For example, the Complaint documents how federal immigration agents have used deceptive tactics to resemble local police, like using vests that say "POLICE". (ECF 2 ¶ 62.)

Additionally, the disgraceful invectives of the President of the United States about Somalia, and Minneapolis' Somali residents, at the very outset of "Operation Metro Surge," give an even more sinister appearance to all of ICE's activities in the Twin Cities metro area.[3] The Twin Cities metro area is home to the largest Somali diaspora in the country.[4] Operation Metro Surge began with an influx of hundreds, and then thousands of Immigration and Customs Enforcement and Customs and Border Protection agents to Minnesota, and principally to the Twin Cities metro area.  (Robertson Decl. ¶ 12.)  As of January 26, 2026, there were approximately 3,000 officers and agents of ICE and CBP

---

[3] At a December 2, 2025, televised cabinet meeting the President stated that Somalia "stinks and we don't want [Somalis] in our country" and, "we're going to go the wrong way if we keep taking in garbage into our country." Robertson Decl. Ex. I (Aamer Madhani, *Trump says he doesn't want Somalis in the US, urges them to go back to their homeland and fix it*, Associated Press, Dec. 2, 2025).

[4] Robertson Decl. Ex. J (*U.S. Foreign-Born Population: 2019-2023*, United States Census Bureau (December 12, 2024)).

9

conducting immigration enforcement actions in the greater Twin Cities area. (*Id.*) The operation is still ongoing.  (*Id.*)

Consistent with Plaintiffs' allegations, 911 callers have reported that in conducting this "surge" ICE agents have stopped, and sometimes arrested, individuals who are citizens and have legal status.[5]  (Robertson Decl. ¶ 13.) Defendants' agents have been observed traveling in unmarked vehicles and switching vehicles' license plates.[6]  Additionally, Defendants' agents continue to wear masks concealing their faces.[7]  The President's rhetoric, coupled with ICE's tactics to conceal their identity, are clearly meant to provoke fear, and are undermining trust in local law enforcement.

On multiple occasions individuals have assumed that local law enforcement officers were ICE agents.  (Robertson Decl. ¶¶ 18-21.)  In one incident, callers were blowing whistles and calling 911 when it was not ICE but

---

[5] *See e.g.* Robertson Decl. Ex. K (Ari Bergeron and Susie Jones, *WATCH: 20-year old U.S. citizen detained by ICE on Tuesday draws condemnation from Minneapolis' mayor and police chief*, WCCO News, Dec. 10, 2025).

[6] *See* Robertson Decl. Ex. L (Pong Xiong, Director, Minnesota Driver and Vehicle Services, *Letter to Secretary Kristi Noem, Re: Misuse of Minnesota License Plates on Unmarked DHS Vehicles*, December 23, 2025); *See also,* Robertson Decl. Ex. M (Jon Collins, *Minnesota DVS warns ICE agents they're violating state law by switching license plates*, MPR News, Dec. 24, 2025).

[7] Robertson Decl. Ex. N (Alexander Bolton, *Democrats lay out immigration enforcement demands to avert shutdown*, The Hill, January 28, 2026).

the Bloomington Police Department executing a high-risk warrant in Minneapolis. (*Id.* at ¶ 19.) In another incident, MPD officers, responding to a call of an altercation where someone was requesting police assistance, could not get in the building because residents believed they were ICE agents. (*Id.* at ¶ 20.)

Because Defendants' agents are not clearly identifying themselves as federal agents, community members frequently cannot distinguish between immigration enforcement activities by federal agents, and local law enforcement officers. Local law enforcement has been working for years to improve police-community relations. Defendants' agents' hidden identities combined with the apparently unlawful tactics makes it difficult for community members to know what agency the agents represent, which in turn erodes hard-earned community trust being rebuilt by local law enforcement day by day-- particularly where the tactics being used by immigration agents are at odds with the carefully developed, trained, and enforced local policies designed to increase that trust.

B. Redirection of local resources

Since Minneapolis began tracking 911 calls related to immigration enforcement activity on December 9, 2025, a little over a week after the start of Operation Metro Surge, Minneapolis has received over three hundred such 911 calls. (Robertson Decl. ¶ 22.) A police lieutenant is scheduled to be available at all times to monitor public safety needs due to federal immigration enforcement

11

activities. (Robertson Decl. Ex. O at ¶ 9.) Every 911 call that comes in related to immigration enforcement activities is assessed by the lieutenant on duty to determine whether there needs to be a response by MPD officers. (*Id.* Ex. O ¶ 10.) This often requires additional investigation, such as attempting to locate a reported incident with City cameras, sending a drone, or sending an officer to assess the situation. (*Id.*) This takes the time and resources not only of the 911 call-taker, the lieutenant, but all the MPD personnel who gather the intelligence needed to make those urgent decisions about whether a response is necessary to maintain public safety. (*Id.*)

Some of the calls are individuals reporting suspected kidnappings or other crimes but are not certain whether it is criminals or federal immigration enforcement. (Robertson Decl. ¶¶ 24-25.) There have been seven reported kidnappings where the callers are not sure whether the individuals taking people were ICE agents, and MPD has investigated and confirmed they were, in fact, ICE detentions. (Robertson Decl. ¶ 24.)

Likewise, ICE's heavy-handed and unlawful tactics unsurprisingly escalate tensions at the scene among observers and protesters. For instance, in the documented incident where an ICE agent dragged a reportedly pregnant individual on the ground by one handcuff at the site of an immigration operation

in Minneapolis, many individuals present were loudly objecting.[8] On January 7, 2026, the same day an ICE agent shot and killed Minneapolis resident Renee Good, Defendants' agents were outside Roosevelt High School.  (Robertson Decl. ¶ 29.)  Callers reported that approximately 30 agents were present and refusing to leave.  (*Id.*)  CBP agents also called 911 asking for assistance with the crowd that was upset in reaction to their conduct.  (*Id.*) Agents were reported using pepper spray and running down the block with guns drawn.  (*Id.*)  The day that CBP agents shot Minneapolis resident Alex Pretti, MPD officers and officers from multiple jurisdictions, had to respond to the scene to maintain public order, at great cost to Minneapolis.  (Robertson Decl. Ex. S ¶¶ 6-39.)

Being called to the scene of these tense situations creates difficulties for local officers as they are called to the scene of a confrontation by both Minneapolis residents and by federal agents, and MPD officers must try to maintain public safety.[9] Additionally, ICE agents carry and brandish weapons and use firearms and have already killed two Minneapolis residents and shot another.  (Robertson Decl. Ex. S ¶ 3.)  The presence of numerous weapons on an

---

[8] *See* Robertson Decl. Ex. P (Conor Wight, *ICE put themselves, others at risk during south Minneapolis operation, former agent says*, CBS News, Dec. 18, 2025); Robertson Decl. Ex. Q (Mike Manzoni, *Witness, ICE offer conflicting accounts of chaotic clash in Minneapolis*, Fox 9, Dec. 16, 2025).

[9] *See, e.g.*, Robertson Decl. Ex. R (Reis Thebault and Chelsea Rose Marcius, *'No Win' for Minneapolis Police Caught Between Trump and City Residents*, New York Times, January 28, 2026).

already-tense scene increases the complexity and potential danger for local police who may need to respond to a scene. The preliminary injunction requested by Plaintiffs will result in fewer unpredictable public encounters, take down the temperature of those encounters, and make federal immigration agents less likely to need a local law enforcement response.

Should Defendants attempt to argue that the balance of harms favors them because they are attempting to capture "dangerous criminals," this argument loses all force when held up to scrutiny.  According to libertarian think-tank Cato Institute's analysis of ICE data, as of June 14, of the more than 200,000 individuals who had been arrested by ICE at that point in fiscal year 2025, 65% had no criminal convictions and more than 93% had no violent convictions.[10] During Operation Metro Surge, the arrests of many of the individuals identified by Defendants with the most serious criminal conviction history, which they call "the worst of the worst", did not occur during random encounters, but because they were directly transferred from the custody of the Minnesota Department of

---

[10] ICE had booked into detention 204,297 individuals (since October 1, 2024, the start of fiscal year 2025).  Robertson Decl. Ex. T (David J. Bier, *65 Percent of People Taken by ICE Had No Convictions, 93 Percent No Violent Convictions*, Cato Institute June 20, 2025); *see also*, Robertson Decl. Ex. U (Tim Henderson, *An ever-larger share of ICE's arrested immigrants have no criminal record*, Stateline, Dec. 12, 2025 (The share of immigration arrests of violent criminals from January through October 2025 has actually dropped relative to the same period in 2024.)).

Corrections, or other federal or state agencies.  (Robertson Decl. Exs. V, W at ¶¶ 5-11.)  Many individuals who are being randomly stopped on the street are not the dangerous and violent criminals who Defendants claim they are looking for but citizens, legal residents, or individuals with pending immigration matters going about their daily lives. (*See* ECF 2 at 12-24.) Even many without legal status are being ordered to be released by the federal courts because their continued detentions are unlawful.  *See* ECF Doc. 13, *Fernando T. v. Noem, et al*, 26-CV-445 (ECT/EMB) (individual entered country without inspection in 2005, has no criminal history, arrested by ICE without warrant, release ordered).  The Court should contrast this with the harm to the public from ICE's violent investigatory stops and arrests, making the work of local law enforcement more difficult, and diverting the resources of local law enforcement away from preventing, investigating, and prosecuting crimes. The balance of harms overwhelmingly favors Plaintiffs.

> **III.    The culture of fear created when individuals are forcefully detained or arrested without cause or based on impermissible characteristics harms the entire community and cannot be in the public interest.**

As Plaintiffs point out, it is always in the public interest to prevent violations of constitutional rights.  *See D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019).  The fraught situation created by Operation Metro Surge shows how very important that principle is.  When ICE

agents detain, arrest, or use force on individuals who are citizens or who entered the country lawfully and have legal permission to be living and working here, it creates a culture of fear that pervades the entire community.  Individuals are afraid to call 911 for medical aid for fear that ICE will show up with the paramedics.  (Robertson Decl. ¶ 35.) Community members are not certain if an individual has been arrested, detained by ICE, or kidnapped. (Robertson Decl. ¶¶ 24, 36.)  Additionally, besides the incidents where Defendants' agents have killed Minneapolis residents, Minneapolis has received many reports of Defendants' agents engaging in concerning behavior such as brandishing weapons, pepper spraying, shoving, using tear gas, and assault.  (Robertson Decl. ¶ 37.)  Community members, including citizens and legal residents, especially of ethnicities or national origins apparently disfavored by the current federal administration, are afraid to go outside, go to work, send their kids to school, or go shopping, lest their entire lives are upended because they get stopped by an ICE agent.  (Robertson Decl. Exs. W ¶¶ 5-6, X ¶¶ 16-19.)

Defendants' agents targeting of Minnesota's immigrant communities, apparently regardless of immigration status, also has caused significant economic impact. According to the Minnesota Department of Employment and Economic Development, foreign-born workers made up 10.9% of Minnesota's labor force as of 2023, and "provide healthcare and childcare, produce needed

goods, provide vital services, start their own companies and contribute in many other ways. Certain sectors such as Manufacturing and Transportation, and occupations like Nursing Assistants, Drivers, Software Developers and Production Workers rely more upon foreign-born workers."[11] And the Minnesota Chamber of Commerce earlier this year concluded, based on its research, "that new Americans contribute significantly—not only as workers but also as entrepreneurs, consumers, taxpayers, and connections to the global economy," with immigration "account[ing] for about 60% of total [Minnesota] job and labor force growth so far this decade."[12]

In Minneapolis, Defendants' activities are having a disastrous effect on the local economy.  Minneapolis' Convention Center has had two events cancel so far, which has caused $3 million in lost revenue to local hotels and $700,000 in direct wages for employees.  (Robertson Decl. ¶ 43.)  Additionally, many clients of the Minneapolis Convention Center were questioning whether Minneapolis was still a safe place to visit.  (Robertson Decl. Ex. BB ¶ 10.)  A survey conducted by the Meet Minneapolis Convention and Visitors Association found that in a survey of 2,030 American travelers, 20.6% of Minneapolis-interested travelers

---

[11] Robertson Decl. Ex. Z (Carson Gorecki, Tim O'Neill and Amanda Blaschko, *The Growth and Impact of Minnesota's Foreign-Born Workforce* (March 2025)).
[12] Robertson Decl. Ex. AA (Doug Loon, *The Economic Contributions of New Americans in Minnesota* (February 28, 2025)).

have altered plans to travel to a destination because of ICE activity, and half of the general travelling population surveyed have said they are likely to avoid a destination if they expect a visible federal law-enforcement presence. (Robertson Decl. ¶ 44.) Events at the Convention Center are booked five years in advance, so current damage to Minneapolis' economy and reputation will have significant effect for years to come. (Robertson Decl. Ex. BB ¶ 9.) Other events scheduled to take place in the city have also been cancelled and altogether Operation Metro Surge has been catastrophic for the event industry in Minneapolis. (Robertson Decl. Ex. CC ¶¶ 5, 11, 16.)

More alarmingly, a survey of Minneapolis' licensed businesses reported an average reduction in customer traffic and sales by nearly 50% since the start of Operation Metro Surge. (Robertson Decl. ¶ 46.) The harm to local businesses translates to collective revenue losses of as much as $10-$20 million per week as Operation Metro Surge continues. (Robertson Decl. ¶ 47.) Many businesses have made the comparison to operating during the COVID-19 pandemic, except during the pandemic there was support from the federal government, which they are not receiving now. (Robertson Decl. ¶ 48.)

The Court can mitigate these harms by granting the injunction. The injunction requested by Plaintiffs, particularly the terms requiring that Defendants' agents not only have legal cause to stop or arrest individuals, but

18

also clearly document the reasons for doing so, will allow transparency and accountability to follow. If individuals who are unlawfully detained can hold individual federal agents legally accountable, that will help deter any unconstitutional conduct.  It would also give individuals confidence that Defendants' agents will follow the rule of law, rather than being able to act with impunity.  The fear of unlawful and racially-biased investigatory stops, detentions, and arrests, would ease with the preliminary injunction and more people would be able and willing to participate in public life again.  This requirement would provide benefits to Defendants as well because it would protect Defendants' agents from unfounded claims.  Both the balance of harms and the public interest clearly favor Plaintiffs' preliminary injunction.

**CONCLUSION**

The incendiary tactics being used by Defendants' agents are creating a culture of fear which is slowly suffocating the City of Minneapolis and its community.  These actions create harms to local law enforcement and the community and are not in the public interest.  There would be no harm to Defendants' agents from the reasonable restrictions requested by Plaintiffs here as they are what law enforcement agencies already do and are considered to be best practices.  The City of Minneapolis asks that the Court enter a preliminary injunction enforcing constitutional limits on Defendants' agents, to require that

19

they have legally sufficient cause for stops and arrests and, to ensure transparency and public confidence, that they document those reasons and subject them to Court scrutiny.

Dated: February 4, 2026                    Respectfully submitted,

                                           KRISTYN ANDERSON
                                           City Attorney
                                           By */s Heather P. Robertson*
                                           HEATHER ROBERTSON (#0390470)
                                           Assistant City Attorneys
                                           350 South Fifth Street, Room 210
                                           Minneapolis, MN 55415
                                           (612) 299-2742
                                           heather.robertson@minneapolismn.gov
                                           *Attorneys for Amicus City of Minneapolis*