UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MUBASHIR KHALIF HUSSEN, MAHAMED EYDARUS, and JAVIER DOE, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; DAVID EASTERWOOD, *in his official capacity as U.S. Immigration and Customs Enforcement Field Office Director for St. Paul, Minnesota*; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection*; U.S. BORDER PATROL; MICHAEL W. BANKS, *in his official capacity as Chief of U.S. Border Patrol*; and GREGORY BOVINO, *in his official capacity as Commander-at-Large of U.S. Border Patrol*,<br><br>Defendants. | Case No: 26-cv-324 (ECT/ECW)<br><br><br><br>**DECLARATION OF HEATHER ROBERTSON** |

Your Declarant is Heather Robertson, and she submits the following declaration:

1.      I am an Assistant City Attorney with the Minneapolis City Attorney's Office.  I submit this declaration in support of the Memorandum of Amicus Curie.

2.      Attached as Exhibit A is a true and accurate excerpt from the Minneapolis Police Department Policy and Procedure Manual, consisting of Section 9-201 Search and Seizure, last updated on January 1, 2026.

3.      Attached as Exhibit B is a true and accurate excerpt from the Dallas Police Department General Orders,  302.00 Traffic Enforcement, available at https://www.dallaspolice.net/resources/Pages/General_Orders_300_Combined.aspx.

4.       Attached as Exhibit C is a true and accurate excerpt from the Chicago Police Department Directives, General Order G03-08-03 Reporting Temporary Detentions, available at https://directives.chicagopolice.org/.

5.      Attached as Exhibit D is a true and accurate excerpt from the Cleveland Division of Police General Police Order 2.02.01, Investigatory Stops, available at https://www.clevelandohio.gov/sites/clevelandohio/files/policies-procedures/2.02.01%20Investigatory%20Stops.pdf.

6.      Attached as Exhibit E is a true and accurate excerpt from the New Orleans Police Department Operations Manual, Chapter 82.1 – Report Preparations, available at https://nola.gov/nola/media/NOPD/Documents/NOPD-Regulations-Manual-Reduced-Size_3.pdf.

7.      Attached as Exhibit F is a true and accurate excerpt from the New York City Police Department Patrol Guide, Procedure No. 212-11, Investigative Encounters: Requests for Information, Common Law Right of Inquiry and Level 3 Stops, available at https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/public-pguide2.pdf.

8.      Attached as Exhibit G is a true and accurate excerpt from the Baltimore Police Department Policies 1112, Field Interviews, Investigative Stops, and Weapons Pat-Downs, available at

https://public.powerdms.com/BALTIMOREMD/documents/51035.

9.      Attached as Exhibit H is a true an correct copy of the Internation Association of Chiefs of Police's Law Enforcement Policy Center's Model Policy and Concepts and Issues Paper on Arrests and Investigatory Stops, last updated in September 2019, available at https://www.theiacp.org/sites/default/files/2020-06/Arrests%20etc.%20June%202020.pdf.

10.      Attached as Exhibit I is a true and correct copy of the news media article *Trump says he doesn't want Somalis in the US, urges them to go back to their homeland and fix it*, published by the Associated Press on December 2, 2025, authored by Aamer Madhani, downloaded on December 29, 2025, and is available at

https://apnews.com/article/trump-somalia-immigration-afghanistan-421eaa7ff218c43ccaed3cbab8ed37f5

11.     Attached as Exhibit J is a true and correct copy of a printout from the

official website of the United States Census Bureau which allows the user to access

census data, *U.S. Foreign-Born Population: 2019-2023*, United States Census Bureau

(December 12, 2024), downloaded on December 29, 2025, and is available at:

https://www.census.gov/library/visualizations/interactive/foreign-born-population-

2019-2023.html

12.     On December 1, 2025, the Department of Homeland Security launched

"Operation Metro Surge," which involved an influx of hundreds, and then thousands

of Immigration and Customs Enforcement and then Customs and Border Protection

agents to Minnesota, and principally to the Twin Cities metro area.  As of January 26,

2026 there were approximately 3,000 officers and agents of ICE and CBP conducting

immigration enforcement actions in the greater Minneapolis area.  *See* ECF Doc. 120,

*State of Minnesota, et al v. Kristi Noem, et al*, 26-cv-190 (KMM/DJF).  As date of the

signing of this Declaration, Operation Metro Surge continues to operate in

Minneapolis.

13.     On December 9, 2025, Minneapolis received a 911 call from a concerned

citizen who informed dispatchers that people who announced themselves as federal

agents grabbed an American citizen and drove away with the citizen at a high rate of

speed. They told 911 that the agents had refused to look at the detained individual's

identification.

14.     Attached as Exhibit K is a true and correct copy of the news media article *WATCH: 20-year old U.S. citizen detained by ICE on Tuesday draws condemnation from Minneapolis' mayor and police chief*, published by WCCO News, on December 10, 2025, authored by Ari Bergeron and Susie Jones, downloaded on December 31, 2025, and available at https://www.audacy.com/wccoradio/news/local/us-citizen-detained-ice-draws-condemnation-minneapolis.

15.     Attached as Exhibit L is a true and correct copy of a letter from Pong Xiong, Director of Minnesota Driver and Vehicle Services to Department of Homeland Security Secretary Kristi Noem, regarding "Misuse of Minnesota License Plates on Unmarked DHS Vehicles" sent on December 23, 2025, and downloaded on December 31, 2025 from https://www.mprnews.org/story/2025/12/24/ice-agents-in-minnesota-are-violating-state-law-by-switching-license-plates.

16.     Attached as Exhibit M is a true and correct copy of the news media article *Minnesota DVS warns ICE agents they're violating state law by switching license plates*, published by MPR News on December 24, 2025, authored by Jon Collins, downloaded on December 29, 2025, and available at https://www.mprnews.org/story/2025/12/24/ice-agents-in-minnesota-are-violating-state-law-by-switching-license-plates

17.     Attached as Exhibit N is a true and correct copy of the news media article *Democrats lay out immigration enforcement demands to avert shutdown*, published by The

Hill on January 28, 2026, authored by Alexander Bolton, downloaded on February 4, 2026, and available at https://thehill.com/homenews/senate/5711343-democrats-schumer-immigration-demands-dhs-funding/

18.    On January 15, 2026, Minneapolis received a 911 call from an individual upset that an ICE agent would not leave their parking lot, but it turned out the reported ICE agent was actually a member of the Hennepin County Sheriff's Office.

19.    On January 16, 2026, Minneapolis received an alert from the Bloomington Police Department that they were executing a high-risk warrant in Minneapolis and that ICE had been seen nearby and had been asked to leave.  Then in the course of Bloomington's execution of the warrant, Minneapolis residents began calling 911 reporting that ICE agents were trying to arrest individuals, whistles could be heard blowing in the background, and the callers were skeptical of the assurances of 911 operators who had confirmed that this was Bloomington PD's operation and unrelated to any ICE enforcement activities.

20.    On February 1, 2026, Minneapolis received a 911 call from an individual reporting that there had been an altercation and asking for police assistance and medical aid.  When officers arrived at the house to take a report, the residents would not let them in because they believed they ICE agents.

21.    On February 1, 2026, a Minneapolis police officer was flagged down by an individual who asked the officer what he was doing there and whether it had to do

with ICE.

22.     Since December 9, 2025, when Minneapolis began tracking federal immigration-related calls, there have been over three hundred 911 calls related to federal immigration agent activities in Minneapolis. Each call takes Minneapolis' personnel and resources to deal with the issues created by the presence of these federal immigration agents.

23.     Attached as Exhibit O is a true and correct copy of the Declaration of Toddrick Barnette, Minneapolis Commissioner of Community Safety, which was filed as ECF Doc. 63, *State of Minnesota, et al v. Kristi Noem, et al*, 26-cv-190 (KMM/DJF).

24.     Minneapolis 911 received 7 calls between December 11, 2025, and January 8, 2026, from concerned citizens who have seen individuals being kidnapped by unidentified people or people they were not sure were ICE agents.  Upon investigation the Minneapolis Police were able to confirm later that these individuals were detained by ICE as part of immigration enforcement.

25.     On January 8, 2026, Minneapolis 911 received a call reporting that when the caller pulled up in front of her home individuals got out of an SUV and tried to open her car doors, so she left the scene, she was unsure if they were ICE agents or criminals, they were masked and wearing black jackets.  MPD attempted to investigate but was not able to determine whether this was ICE activity.

26.     Attached as Exhibit P is a true and correct copy of the news media article

*ICE put themselves, others at risk during south Minneapolis operation, former agent says*, published by CBS News on December 18, 2025, authored by Conor Wight, downloaded on December 29, 2025, and available at

https://www.cbsnews.com/minnesota/news/ice-operation-minneapolis-former-agent-reviews-video/.

27.     Attached as Exhibit Q is a true and correct copy of the news media article *Witness, ICE offer conflicting accounts of chaotic clash in Minneapolis*, published by Fox 9 on December 16, 2025, authored by Mike Manzoni, downloaded on December 29, 2025, and available at https://www.fox9.com/news/witness-ice-offer-conflicting-accounts-chaotic-clash-minneapolis.

28.     Attached as Exhibit R is a true and correct copy of the news media article *'No Win' for Minneapolis Police Caught Between Trump and City Residents*, published by the New York Times on January 28, 2026, authored by Reis Thebault and Chelsea Rose Marcius, downloaded on February 4, 2026, and available at

https://www.nytimes.com/2026/01/28/us/politics/minneapolis-police-trump.html?u

29.     On January 7, 2026, Minneapolis 911 received several calls from Roosevelt High School, reporting there were approximately five ICE vehicles and 30 agents present and that the federal agents were refusing to leave.  Border Patrol also called 911 relating to this incident asking for assistance with a crowd that was upset in reaction to

the federal officers' conduct.  Agents were reported using pepper spray and running on the block with guns drawn.

30.     Attached as Exhibit S is a true and correct copy of the Second Declaration of Heather Robertson, which was filed as ECF Doc. 106, *State of Minnesota, et al v. Kristi Noem, et al*, 26-cv-190 (KMM/DJF).

31.     Attached as Exhibit T is a true and correct copy of the article from the Cato Institute *65 Percent of People Taken by ICE Had No Convictions, 93 Percent No Violent Convictions*, posted on June 20, 2025, authored by David J. Bier, downloaded on December 29, 2025 and available at https://www.cato.org/blog/65-people-taken-ice-had-no-convictions-93-no-violent-convictions.

32.     Attached as Exhibit U is a true and correct copy of the news media article *An ever-larger share of ICE's arrested immigrants have no criminal record*, published by Stateline on December 12, 2025, authored by Tim Henderson, downloaded on December 31, 2025 and available at https://stateline.org/2025/12/12/an-ever-larger-share-of-ices-arrested-immigrants-have-no-criminal-record/

33.     Attached as Exhibit V is a true and correct copy of a news release from the Minnesota Department of Corrections from January 15, 2026, *Minnesota Department of Corrections Addresses False Claims by the Department of Homeland Security*, downloaded on February 3, 2026, and available at https://mn.gov/doc/about/news/news-releases/#/detail/appId/1/id/719911

34. Attached as Exhibit W is a true and correct copy of the Declaration of Emilio Vega, which was filed as ECF Doc. 82, *State of Minnesota, et al v. Kristi Noem, et al*, 26-cv-190 (KMM/DJF).

35. On December 19, 2025, Minneapolis 911 received a phone call where the caller had to be assured that ICE agents would not arrive with the paramedics if an ambulance was sent to his house to respond to a medical event.

36. Between January 8, and January 24, 2026, there were four calls where individuals reported family members missing but they were not sure if they had been taken by ICE or something else had happened to them.

37. Since December 10, 2025, Minneapolis 911 received over 20 calls related to federal immigration agents' engaging in inappropriate force or threats of force including brandishing weapons, pepper spraying, shoving, and using tear gas.

38. Attached as Exhibit X is a true and correct copy of the Declaration of Zoe Thiel, which was filed as ECF Doc. 12, *State of Minnesota, et al v. Kristi Noem, et al*, 26-cv-190 (KMM/DJF).

39. Attached as Exhibit Y is a true and correct copy of the Declaration of Stephanie Graff, Deputy Commissioner of Minnesota Department of Education, which was filed as ECF Doc. 75, *State of Minnesota, et al v. Kristi Noem, et al*, 26-cv-190 (KMM/DJF).

40. Attached as Exhibit Z is a true and correct copy of a publication from the

Minnesota Department of Employment and Economic Development, *The Growth and Impact of Minnesota's Foreign-Born Workforce* posted in March of 2025, authored by Carson Gorecki, Tim O'Neill and Amanda Blaschko, downloaded on December 31, 2025, and available at https://mn.gov/deed/newscenter/publications/trends/mar-2025/foreign-born.jsp.

41.     Attached as Exhibit AA is a true and correct printout of the transcript of a the Minnesota Business podcast, episode titled *The Economic Contributions of New Americans in Minnesota*, from the Minnesota Chamber of Commerce, the podcast was hosted by Doug Loon and the transcript posted on February 28, 2025, downloaded on December 31, 2025, and available at https://www.mnchamber.com/blog/economic-contributions-new-americans-minnesota.

42.     Attached as Exhibit BB is a true and correct copy of the Declaration of Jeffrey Johnson, general manager of the Minneapolis Convention Center, which was filed as ECF Doc. 65, *State of Minnesota, et al v. Kristi Noem, et al*, 26-cv-190 (KMM/DJF).

43.     Since the start of Operation Metro Surge, the Minneapolis Convention Center has had two events cancel so far (that is one additional event since the filing of the Declaration of Jeffrey Johnson referenced in ¶ 43), which has cost $3 million in lost revenue to local hotels and an additional $700,000 in lost wages for hotel employees.

44.     A survey conducted by the Meet Minneapolis Convention and Visitors Association, found that in a survey of 2,030 American travelers, 20.6% of Minneapolis-

interested travelers have altered plans to travel to a destination because of ICE activity, and half of the general travelling population have said they are likely to avoid a destination if they expect a visible federal law-enforcement presence.

45.     Attached as Exhibit CC is a true and correct copy of the Declaration of Erik Hansen, which was filed as ECF Doc. 64, *State of Minnesota, et al v. Kristi Noem, et al*, 26-cv-190 (KMM/DJF).

46.     A survey of Minneapolis' licensed businesses that was launched on January 27, 2026, showed preliminary results that businesses reported an average reduction in customer traffic and sales by nearly 50% since the start of Operation Metro Surge.

47.     The harm to local businesses translates to collective revenue losses of as much as $10-$20 million per week as Operation Metro Surge continues.

48.     Many businesses have made the comparison to operating during the COVID-19 pandemic, except during the pandemic there was support from the federal government, which they are not receiving now.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed in Ramsey County, Minnesota.

Dated: February 4, 2026

*/s/Heather Robertson*
Heather P. Robertson
Assistant City Attorney
Minneapolis City Attorney's Office

|  | **Minneapolis Police Department**<br>**Policy and Procedure Manual** | Number:<br>9-201 |
|---|---|---|
| | | |

**Volume Nine - Enforcement Policies**

**Search and Seizure**

## Table of Contents

Purpose ..........................................................................................................................................2

Policy ...........................................................................................................................................2

Procedures / Rules / Regulations ..................................................................................................2

    A.Searching People.......................................................................................................................2

    B.Searching Vehicles...................................................................................................................6

    C.Searching Dwellings and Buildings..........................................................................................7

Ex. A

| | |
|---|---|
| Volume Nine - Enforcement Policies | 9-201 |
| Search and Seizure | Page 2 of 8 |

## Purpose

The purpose of this section is to provide employees with legal guidance in order to conduct lawful searches and seizures.
The term "officer" is used generically in this section and does not assume a level of rank, such as Patrol Officer. It includes all applicable sworn and non-sworn personnel.

## Policy

A. Minneapolis Police Department employees shall conduct searches in as minimally intrusive a manner as possible, adhere to all MPD policies and to the rights given to persons under the United States Constitution and the Minnesota State Constitution.

B. Minneapolis Police Department employees shall be responsible for understanding and performing assigned duties in accordance with the MPD's Search and Seizure Policy.

## Procedures / Rules / Regulations

A. Searching People

1. An officer may conduct a Terry Frisk of a stopped person if the officer reasonably believes, based on specific and articulable facts, that the person may be armed and dangerous. A Terry Frisk is limited to a pat down of the person's outer clothing for weapons.

2. A full search of a person is not justified with reasonable suspicion. Generally, officers can legally conduct a full search of a person without a warrant only in the following circumstances:

   a. Probable Cause and Exigent Circumstances;

   b. Search Incident to Arrest;

   c. Medical Emergency/Life-Saving;

   d. Plain View;

   e. Consent Search.

1. Searching an Arrestee's Property:

   a. A custodial arrestee's property (purse, backpack, etc.) shall be searched prior to arrival at any jail, detention center, chemical testing unit, or investigative unit.

   b. A non-custodial arrestee's property is not subject to search without consent unless reasonable articulable suspicion exists to believe that the individual is engaged in other criminal activity and the personal property may contain a weapon.

Ex. A

Volume Nine - Enforcement Policies                                        9-201

Search and Seizure                                                      Page 3 of 8

   c.  Items property inventoried will be searched according to protocol set forth by the
       Property and Evidence Unit.

2. Searching Persons of the Opposite Sex

   a.  When practical, persons should be searched by an officer of the same gender if such an
       officer is on the scene or can arrive within a reasonable period of time. If the gender of
       the person to be searched is in question, officers shall ask the person to identify their
       gender before proceeding with the search.

   b.  Prior to the execution of an arrest or search warrant, where a female officer is likely to
       be needed, a female officer shall be included in the operation if possible.

   c.  A strip search shall be conducted and witnessed by at least two officers of the same
       gender as the person being searched.

3. Strip Searches

   a.  A strip search includes the removal or rearrangement of clothing to permit the visual or
       manual inspection of any skin surfaces of a person's genitals, buttocks, anus or female
       breasts.

   b.  Strip Searches may be conducted only in the following circumstances:

     i.  Officers have probable cause to believe that evidence, or contraband exists and will be
         destroyed or lost in the absence of an immediate strip search; or

     ii. Officers have probable cause to believe that an immediate search is necessary to
         prevent imminent danger to the suspect, officer or others.

   c.  The following procedure shall be followed when conducting a strip search, whether the
       person has been arrested or not:

     i.  Approval shall be obtained from a supervisor at the rank of Lieutenant or above
         before conducting a strip search. Such approval shall only be given after an on-scene
         assessment by the supervisor, unless the circumstances prevent the supervisor from
         being on-scene. If the supervisor is unable to respond to the scene, they shall
         document the reason why in a CAPRS supplement.

     ii. The supervisor approving the search shall be present when the search is conducted
         unless precluded from doing so by the issue of gender or other circumstances.

       a.  If the supervisor who authorized the strip search is prohibited from being present, a
           supervisor of the same sex as the person to be searched should be present when the
           search is conducted.

Ex. A

| Volume Nine - Enforcement Policies | 9-201 |
|---|---|
| Search and Seizure | Page 4 of 8 |

    b.  If it is not reasonable or possible to have a supervisor of the same sex witness the strip search, the supervisor approving the search shall ensure that at least two officers of the same sex conduct/witness the search.

iii.  The search shall be performed in a location that affords the suspect privacy from persons not involved in the search. Officers shall be aware that strip searches conducted in the field could require extraordinary measures to ensure the suspect's privacy.

iv.  The supervisor authorizing the strip search shall complete a CAPRS supplement articulating why the search was justified and necessary. The supplement will also explain:

- Which officers conducted the search;

- Which officers were present for the search;

- Where the search was conducted; and

- How the search was conducted.

- The reason for the supervisor's absence if the supervisor was unable to conduct an on-scene assessment or be present for the search.

v.  Nothing stated in this policy shall preclude an officer from immediately recovering a weapon if the officer can articulate that any delay would cause imminent danger to the safety of the officer or others.

vi.  Nothing stated in this policy shall preclude an officer from collecting a urine sample for evidentiary purposes (e.g. DWI).

4. Body Cavity Searches

a.  A body cavity search is a search that goes beyond visual or manual inspection of skin surfaces, so that it involves internal physical examination of body cavities, and in some instances, organs such as the stomach.

b.  With the exception of the mouth, body cavity searches shall only be performed by medical personnel, in a medical facility, pursuant to a search warrant or court order.

c.  Obtaining a warrant or court order for a body cavity search is not required if exigent circumstances exist.

d.  Minimal physical force (which includes low control options such as joint manipulation, pressure points and verbal directions) may be used to recover suspected narcotics from a suspect's mouth. Force used shall not include any strikes or any type of force which restricts breathing or blood flow in the neck.

Ex. A

| | |
|---|---|
| Volume Nine - Enforcement Policies | 9-201 |
| Search and Seizure | Page 5 of 8 |

5.Stopping or Searching People – Documentation

a.  Terry Stops (Investigative Detentions), Terry Frisks, and all other searches (including consent searches) must be justified under the law. Officers shall document the justification for any frisk(s) and/or search(es) conducted.

b.  Absent extreme circumstances, such as a medical emergency or the existence of a threat, officers are responsible for knowing certain facts, to include: the name of the person encountered, as well as the reasonable suspicion, probable cause or other circumstances which served as the basis for the officer's actions.

c.  Documentation should be made via added remarks to the call in CAD (Computer Aided Dispatch) or by another method, unless a CAPRS report and supplement is required.

i.   Mobile Digital Computer (MDC)

a.  Officers shall document information related to the detention in the Clear Call Disposition/Comments screen of their MDC for the following types of calls:

- Traffic Stop,

- Suspicious Person Stop,

- Suspicious Vehicle Stop,

- Attempt Pick-Up,

- Curfew Violation, and

- Truancy.

b.  Officers shall document the following information in their MDC for the required call types:

- The basis for the stop,

- The location of the stop,

- The race of the suspicious person(s),

- The age of the suspicious person(s),

- The gender of the suspicious person(s),

- Whether a person or vehicle was searched, and

Ex. A

| | |
|---|---|
| Volume Nine - Enforcement Policies | 9-201 |
| Search and Seizure | Page 6 of 8 |

- The reasons for any Terry frisk or other search of the person(s) prior to clearing the call.

    d. A strip search of a person always requires a CAPRS report and supplement. All officers who witness and/or conduct a strip search shall complete a supplement.

B. Searching Vehicles

    1. Generally, officers can legally search a vehicle in the following circumstances:

       a. Plain View;

       b. Medical Emergency/Life-Saving;

       c. Probable Cause;

       d. Protective Weapons Sweep;

       e. Search Incident to Custodial Arrest (this exception is limited in the context of vehicle searches);

       f. Inventory Search;

       g. Consent Search.

    2. Searching Vehicles – Documentation

    a. If the search of a vehicle results in an arrest or seizure of evidence or contraband, a CAPRS report and supplement shall be completed and the officer must articulate in his/her supplement the legal justification for the search. The supplement shall contain all pertinent information concerning the search including:

       i. Legal justification for the search;

       ii. Results of the search;

       iii. Any damages that occurred;

       iv. Officers who conducted the search; and

       v. The name and date of birth of the consenting person (if applicable).

    b. If damage to property was caused during the course of a search and/or resulting seizure:

       i. A supervisor shall be notified;

       ii. Photographs shall be taken and property inventoried to document any known damages.

Ex. A

    c. If the search of a vehicle does not result in an arrest, property damage or seizure of evidence or contraband, the fact that a search occurred and the legal justification for it should be documented via added remarks to the call in CAD (Computer Aided Dispatch) or by another method.

C. Searching Dwellings and Buildings

    1. A search warrant is always required to search dwellings and non-public areas of buildings, absent consent or exigent circumstances. Without a search warrant, officers may legally search a dwelling or building in the following circumstances:

        a. Hot Pursuit;

        b. Protect and Preserve Life;

        c. To Prevent the Destruction of Evidence;

        d. Serving an Arrest Warrant;

        e. Consent Search;

    2. Searching Dwellings and Buildings – Documentation

    a. If the search of a building/dwelling results in an arrest or seizure of evidence or contraband, a CAPRS report and supplement shall be completed and the officer must articulate in his/her statement the legal justification for the search. The supplement shall contain all pertinent information concerning the search including:

        i. Legal justification for the entry/search;

        ii. Results of the search;

        iii. Any injuries that occurred;

        iv. Any property damages that occurred;

        v. Officers who entered the property; and

        vi. The name and date of birth of the consenting person (if applicable) and their relationship to the property searched.

    b. If the search of a building/dwelling does not result in an arrest, property damage or seizure of evidence or contraband, the fact that a search occurred and the legal justification for it should be documented via added remarks to the call in CAD (Computer Aided Dispatch) or by another method.

    c. Officers assigned to a search warrant shall complete a supplement stating their assignment and actions taken if they were responsible for:

Ex. A

| Volume Nine - Enforcement Policies | 9-201 |
|---|---|
| Search and Seizure | Page 8 of 8 |

- Using force to subdue or detain individuals;

- Causing damage;

- Locating, recovering or documenting evidence; or

- When directed by a supervisor.

d. If damage to property or occurs during the course of a search and/or the resulting arrest or property seizure:

- A supervisor shall be notified;

- Photographs shall be taken to document any known damages.

**Note**: If entry for a search is made forcibly to windows or interior or exterior doors, the report shall be additionally titled FENTRY.

e. When applicable, officers shall property inventory:

- Photographs documenting damages;

- Consent to Search form; and/or

- Audio and/or video recording of consent granted.

Ex. A



# Dallas Police Department General Order

# 302.00 Traffic Enforcement

Revised 11/21/2022

**302.00 TRAFFIC ENFORCEMENT**

**302.01 General Policy**

A. Age Limitations on Citations

    1. Traffic citations will not be issued to persons under twelve years of age or to persons over 65 years of age for pedestrian violations.

    2. Citations may be issued to persons over 65 for moving traffic violations.

B. Officers should exercise discretion when taking enforcement action on out-of-town or out-of-state visitors. Traffic citations may be issued to out-of-town or out-of-state visitors. If the violation appears intentional or flagrant, the violator may be taken into custody and required to post bond. If unable to post bond, the individual may be placed in jail.

C. Obtaining Arrested Person's Name and Address

    1. If a violator is unable to produce proper identification showing name and address, or satisfy the officer as to his/her identity, such person may be taken into custody and required to post bond. If the violator is unable to post bond, he/she may be placed in jail.

    2. After arrival at jail, if the violator is able to establish identity and proper address to the satisfaction of the jail supervisor, the jail supervisor will instruct the officer to issue the violator a citation and release the individual.

D. If a violator refuses to sign a citation, he/she may be arrested and required to post bond.

E. When an officer is in the process of having a parking violator's vehicle impounded and the driver returns to the scene before the wrecker leaves with it, a citation will be issued, and the vehicle released to the driver. No wrecker fee will be charged.

F. Officers will not take minor traffic enforcement action when transporting a citizen on a Signal 62 (Public Service), unless public safety would be adversely affected by lack of action.

G. Warnings: Written warnings are not utilized by the Department. Verbal warnings may be used when there is a new enforcement program going into effect and the preliminary phase calls for a period of public education. Newly enacted laws or regulations may be enforced on their effective date. A verbal warning may be sufficient in certain minor violations.

H. Officers responding to a vehicular accident incident with a disturbance between principals will:

    1. Determine if an assault has occurred at the scene

    2. Investigate the assault, request Dallas Fire Rescue for any injuries and prevent any further assaults

Ex. B

prior to investigating the accident.

3.      Notate in the narrative section of the state crash form the case or incident number used for any assault that might have occurred during the disturbance.

I.      Officers that come into contact with a licensed driver who demonstrates symptoms of a possible health condition that may interfere with the safe operation of a motor vehicle will:

1.      Determine if the driver is capable of continuing to operate a motor vehicle at the time of contact, if so record the full name, date of birth and Texas driver's license number of the driver and release them, if the officer determines that it is not safe to allow the driver to continue to operate a motor vehicle the officer will find a safe alternative to releasing the driver.

2.      Report the driver to the Texas Department of Public Safety Driver Improvement and Compliance Bureau by completing a memo with the driver's information and a description of the contact and the medical or other condition that the officer feels may interfere with the safe operation of a motor vehicle. The memo will be forwarded through the officer's chain of command to the commander of the Tactical Operations Division.

3.      The Commander of the Tactical Operations Division or their designee will forward the information to the Texas Department of Public Safety Driver Improvement and Compliance Bureau.

J.      When completing the race/ethnicity field on a citation, officers will use the race or ethnicity category listed in the Texas Code of Criminal Procedure Article 2.132 that most accurately reflects that individual's race/ethnicity. Officers will not ask an individual for their race, but will make that determination to the best of their ability.

| RACE/ETHNICITY | Citation Code |
|---|---|
| Black | B |
| Asian or Pacific Islander | A |
| White | W |
| Hispanic or Latino | H |
| Alaska Native or American Indian | I |

**302.02    Traffic Enforcement in Accident Investigations**

A.      During the investigation of traffic accidents, any officer who on-viewed and witnessed an accident may issue a citation for any violation occurring in his/her presence.

B.      During the investigation of traffic accidents, the investigating officer, although not a witness to the accident, will issue citations for "No Operators License" and "No Liability Insurance", when these violations have been committed. If any party wishes to file additional charges, he or she will be referred to the City Attorney's Office. Officers issuing "No Operators License" and "No Liability Insurance" citations will be guided by the following:

1.      The officer must have a 'fact witness' who is willing to testify in City Court that the violator was, in

Ex. B

fact, operating a motor vehicle on a public street, or the violator must admit to the investigating officer that he or she was the operator of the vehicle.

2.  The name of the witness, his/her address, zip code, and telephone number will be placed in the space provided on the court's copy of the citation.

3.  Any corroborating information, (such as statements of witnesses, direction of travel of vehicles, lane of traffic, block numbers) should be placed in the narrative portion of the court's copy of the citation.

C.  In all cases involving serious injury or death, the appropriate state law covering the incident will be used.

D.  Enforcement action will not be taken under the following circumstances:

1.  When a motor vehicle overturns in the roadway or runs off the roadway without colliding with another vehicle or object and only the driver is injured and/or the overturned vehicle is damaged.

2.  When ice or snow is on the street and is the principal cause of an accident and no reckless disregard of safety is indicated.

3.  When an unforeseen hazard exists without forewarning and the hazard is the principal cause of the accident and no reckless disregard of safety is indicated (such as oil slicks, unusual mud deposits, unlighted barricades, piles of dirt or debris, objects left or fallen onto the street).

4.  Sections 2 and 3 above do not apply if persons other than the drivers are injured or killed. In this type of accident, the drivers at fault may be charged as appropriate under Chapters 19, 22, or 49 of the Penal Code. The officer conducting the accident investigation will make a reasonable attempt to ensure that the next-of-kin is notified when:

  a.  An adult or juvenile is killed.

  b.  An adult is injured or incapacitated to the point that he/she is unable to make his or her own notification.

  c.  A juvenile is injured.

E.  DART Bus Accidents

1.  Non-injury and Non-fatality Accidents

  a.  The bus driver may continue on the route after exchanging all necessary information with the other driver and reporting the accident by telephone to a DART supervisor.

  b.  Any traffic ticket issued to a DART bus driver, out of the driver's presence, will be delivered to a DART supervisor. It will be noted on the Accident Report that the ticket was Delivered to a DART supervisor.

2.  Injury and/or Fatality Accidents

  a.  The DART driver will remain at the accident scene until released by the investigating officer.

  b.  A DART adjuster will be ordered through the police dispatcher.

**302.03  Investigation of Minor Accidents**

A.  The investigating officer will complete an Accident Report Form ST-3 for any minor accident when:

1.  Any person involved in the accident is injured or claims injury.

2.  There is damage to public or private property other than the involved vehicles.

3.  An unattended vehicle is involved or damaged.

Ex. B

3. An unattended vehicle is involved or damaged.

4. Any criminal action, other than the issuance of citations for "No Operators License" and "No Liability Insurance", is involved. This will include, but is not limited to, FSRA, FLID, DWI, or when a stolen vehicle is involved. As a rule, officers will investigate FLID and FSRA accidents when either/or both parties have left the scene to:

   a. Pursue the suspect;

   b. Seek medical attention; and/or

   c. Call the police from a telephone in close proximity.

5. There is damage to City equipment. The accident investigator will determine the type of report to be made in accordance with state law and Traffic Section Standard Operating Procedure.

6. A vehicle belonging to any governmental agency is involved.

B. When an accident involves disabled or non-movable vehicles, a field element will be dispatched to the location. If necessary, the element may order a city contract wrecker. Unless the accident involves a situation outlined in 302.03A, an Accident Report is not required. A Miscellaneous Incident Report (MIR), outlining owner information and disposition of vehicle, will be completed instead. An MIR will be completed on any impounded vehicle.

C. When the vehicles can be driven and none of the exceptions listed in 302.03A or B exist, the field element will notify the dispatcher to clear the call with an N-5 (non-police incident) designation.

D. If the damage to the vehicle/property of any one person exceeds $500 and the accident is not investigated by an officer, the responding field element will do one of the following:

1. Provide state blue forms (ST-2) to the persons involved in the accident and advise them that in accordance with state law, they must complete and submit the form to the Statistical Services Bureau of the Texas Department of Public Safety.

2. Direct the parties to any of the police substations where they may pick up a state blue form.

E. When Fire Department 911/311 personnel receive a call reporting an accident, they will:

1. Determine if either Section 302.03A or B is applicable.

2. If the call does not meet the criteria established in Section 302.03A or B, advise the person that the Police Department does not investigate minor accidents.

3. Advise the person that the damage to the property of any one person is $500 or more, the accident must be reported to the state in accordance with 302.03D, and explain where the state blue forms may be obtained.

### 302.04   FLID and FSRA Reporting Procedure

A. Officers will be required to complete an Offense/Incident Report in conjunction with the Accident Report on FLIDs (Duty to Give Information) or FSRAs (Duty to Give Information and Render Aid). The Offense/Incident Report will be entered on a station RLN, an MDC, or called in to Direct Entry.

B. State and Departmental Reporting Requirements

1. Two service numbers are required: one for the Accident Report and another for the FLID or FSRA Offense Report. Each report must contain a complete narrative of what occurred and be cross-referenced

Ex. B

to its related service number.

2. A Polaris Report must be completed and submitted through the reporting officer's chain-of-command to the Traffic Section. The Accident Report must be completed according to the guidelines in ST-100 (State of Texas Instructions [To Police] for Reporting Accidents on the Texas Peace Officer's Accident Report Form and Commercial Motor Vehicle Supplement Form).

C. Unless an exception is indicated, each FLID or FSRA Offense Report will contain the following:

1. Property Page - Include a description of the damage done to the complainant's vehicle only.

2. Vehicle Page - Complete one for each vehicle involved in the accident. If more than two vehicles are involved, the report must be called in to Direct Entry as there are only two vehicle pages available via the MDC.

3. Suspect Page - Required only if suspect information is available.

4. Witness Page - Required only if a witness is located.

5. Narrative Page - The first sentence must be, "See Accident Report on Service #." (Use the service number of the accident). Include all other information related to the offense such as directions of travel, collision points, vehicle damage, injuries, etc. Do not include any identifying information on witnesses or suspects in the narrative.

D. All other procedures pertaining to FLID offenses shall remain in effect.

E. FLID-type accidents involving property damage that occur on private property (if defined as a non-reportable area in the Patrol Bureau S.O.P.), will be investigated as Reckless Damage or Criminal Mischief incidents, as appropriate.

**302.05    Use of Police Vehicles to Protect Accident Scenes**

A. Police elements arriving at the scene of an accident may use the police vehicle to block off or protect the scene to determine if there are injuries and what type of assistance is needed.

B. The officer will determine if the police vehicle is needed to protect his/her safety and prevent further injuries. If not, flares will be set out to protect or block off the scene and then the police vehicle will be moved to the shoulder or center median of the roadway.

C. When police vehicles are used to protect the scene of an accident, they will be parked with emergency lights operating in a position that will be clearly visible to oncoming traffic. If possible, flares should also be put out to further secure the area.

D. All officers will ensure that the trunk lid of their squad car does not remain open at an accident scene. An open trunk lid will obstruct emergency lights and render them ineffective.

**302.06    Accidents Involving City Owned Equipment**

A. Employee Responsibilities

1. A City employee driving a city-owned vehicle involved in an accident will ensure that a supervisor is called to the scene.

2. The involved City employee will complete and submit an Accident Report Involving City Equipment or Privately Owned Equipment Used on City Business form (P-8 Rev.). All accidents involving privately

Ex. B

owned vehicles used on City business (mileage reimbursed) will be handled as if city-owned equipment is involved.

B.    Property Damage Accidents

    1.    Involving Only City-Owned Vehicle/Property - No Injuries

      a.    The investigating officer will complete and submit the following forms:

        i.    A computer-generated Miscellaneous Incident Report.

        ii.    Accident Investigator's Report Form 69-12R1 - as an Attachment.

      b.    The involved City employee is responsible for completing and submitting Accident Report Involving City Equipment or Privately Owned Equipment Used on City Business form (P-8 Rev.).

      c.    Drivers are not required to submit state blue forms ST-2 or SR-21.

    2.    Involving Private Property or Private Vehicle - No Injuries

      a.    Damage Less Than $500 Per Person

        i.    Unless a private citizen requests an Accident Report filed, the investigating officer will complete and submit the following forms:

          (1)    Miscellaneous Incident Report.

          (2)    Accident Investigator's Report Form 69-12R1 – as an Attachment.

        ii.    When a private citizen requests an accident report be filed, the investigating officer will complete and submit the following forms:

          (1)    Motor Vehicle Accident Report Form ST-3.

          (2)    An Accident Investigator's Report 69-12R1.

        iii.    The involved City employee will complete and submit Accident Report Involving City Equipment or Privately Owned Equipment Used on City Business form (P-8 Rev.).

      b.    Damage at Least $500 Per Person

        i.    The investigating officer will complete and submit the following reports:

          (1)    Motor Vehicle Accident Report Form ST-3.

          (2)    Accident Investigator's Report Form 69-12R1 - as an Attachment.

        ii.    The involved City employee will complete and submit Accident Report Involving City Equipment or Privately Owned Equipment Used on City Business Form (P-8 Rev.).

      c.    Drivers are not required to submit state blue forms ST-2 or SR-21 in the following situations:

        i.    Damage to property or vehicle is less than $500 per person.

        ii.    The investigating officer submits Motor Vehicle Accident Report Form ST-3.

C.    Injury or Fatality Accidents

    1.    The investigating officer will complete and submit the following reports:

      a.    Motor Vehicle Accident Report Form ST-3.

      b.    Accident Investigator's Report Form 69-12R1 - Attachment.

      c.    A computer-generated Miscellaneous Incident Report - (required only on a fatality).

    2.    The City employee will complete and submit Accident Report Involving City Equipment or Privately Owned Equipment Used on City Business form (P-8 Rev.).

D.    When a DART vehicle is involved, it is not necessary for the investigating officer to complete an Accident

Ex. B

D.      When a DART vehicle is involved, it is not necessary for the investigating officer to complete an Accident Investigator's Report (Form 69-12 R1).

E.      Damage Estimates

1.      It is unnecessary to call a city mechanic to the scene of an accident involving city- owned vehicles or vehicles working under contract with the City of Dallas.

2.      Southeast Service Center body shop personnel will estimate vehicle damages at their office. The body shop will be open for estimates between the hours of 7:00 a.m. and 3:30 p.m., Monday - Friday. The following vehicles, however, will not be estimated at the Southeast Service Center body shop:

a.      DART vehicles.

b.      Privately owned equipment (including city contract wreckers) on city business.

c.      Fire Department vehicles.

d.      Park Department vehicles.

3.      City equipment vehicles that cannot be driven will be taken to the body shop.

4.      If the City vehicle sustained very minor damage and will remain in service, the City vehicle driver will:

a.      Report to the body shop with the damaged vehicle if the accident occurred during body shop hours.

b.      Report to the body shop with the damaged vehicle the next day if the accident occurred after business hours or on Monday if the accident occurs on the weekend. If the driver will not be on duty, they will advise a supervisor who will designate someone to deliver the damaged vehicle to the body shop.

F.      Supervisor's Report on City Equipment Accidents (SO2001-16)

1.      After reviewing the employee's P-8 form and the Accident Investigator's reports concerning the accident, the employee's immediate supervisor will complete a Supervisor's Investigation of Accident/ Injury Report.

2.      The employee's immediate supervisor will assemble a collision packet according to the procedures outlined in General Order 419.06-Police Equipment Collision Guidelines.

G.      Damage to Certain Types of Property

1.      Fire Hydrant - The investigating officer will contact the dispatcher, who will then notify the Water Utilities Department.

2.      Light Pole - The investigating officer will include the light pole number on the Motor Vehicle Accident Report Form.

**302.07    Police Jurisdiction on the Dallas North Tollway**

A.      The Department of Public Safety (DPS) will have primary responsibility for enforcement of traffic laws and investigation of traffic accidents on the Dallas North Tollway and President George Bush Turnpike. DPD officers may take traffic enforcement on the Dallas North Tollway and President George Bush Turnpike for those portions that lie within the Dallas City limits. DPD officers will not use fixed radar locations anywhere on President George Bush Turnpike, Dallas North Tollway or Parkway extension.

B.      Criminal offenses, except traffic-related offenses, will be investigated by the local law enforcement officers

Ex. B

in whose jurisdiction the offense occurred.

C.      Should a vehicle pursued by DPD enter on to the Dallas North Tollway before it can be stopped, the officers may pursue the car. The dispatcher will call DPS and request their assistance in apprehending the driver of the wanted vehicle.

D.      Dallas North Tollway Procedure

1.      DPD officers who receive a call on the Dallas North Tollway will proceed to the call location. If the element receives an accident call on the Dallas North Tollway, the officers will request DPS officers to meet them at the scene. Immediately upon the arrival of the DPS officers, DPD officers will relinquish the investigation to the DPS officers and return to service.

2.      The North Texas Tollway Authority (NTTA) equips DPD with non-revenue toll tags for official police department vehicles through the DPD liaison, stationed at the quartermaster. The liaison is responsible for coordinating all DPD toll tags and communications with the NTTA.

3.      Fleet coordinators will be responsible for communications with the liaison regarding any toll tag inquiries, requests or changes (i.e. vehicles to be taken out of service). The liaison will be responsible for ensuring the DPD portion of the NTTA toll tag database is current.

4.      All toll tags have individual identification numbers that are entered into the DPD portion of the NTTA database. A toll tag is issued to a vehicle and must remain with the vehicle and be accounted for at all times. Lost, stolen or damaged toll tags must be reported immediately.

5.      Non-revenue Toll Tags are not accepted at:

   a.      Love Field

   b.      DFW Airport

   c.      The Harris County Toll Road Authority

6.      By agreement, DPS jurisdiction on the Dallas North Tollway begins at the point where a vehicle leaves the City of Dallas right-of-way and enters the Tollway ramp and cannot reverse its action without backing up. The vehicle is said to have reached the point of decision and is thereby committed.

7.      The same formula is applied when a vehicle leaves the Tollway right-of-way and completely enters the City of Dallas right-of-way. The vehicle is said to be committed.

**302.08    Juvenile Traffic Offenders**

A.      Under 10 Years of Age

1.      Upon detaining a traffic offender under ten years of age, the officer will take the youth home and release him/her to the parents, guardian, or other responsible adult. If no adult is at the location, the officer will take the child into Protective Custody and transport him/her to Child Protective Services at 8700 N. Stemmons Freeway #104.

2.      The officer will complete a Field Interrogation Report (FIR) on the incident in accordance with Section 314.02 and forward it to the Youth Operations Unit.

3.      If the initial traffic contact is within reasonable distance from the child's home, the officer may allow the juvenile to push home any involved two-wheel, three-wheel, or four-wheel off-road vehicle/go-cart or impound the vehicle as circumstances warrant.

Ex. B

impound the vehicle as circumstances warrant.

B.    Ages 10 - 16

1.    These juveniles detained as traffic violators will be issued a traffic citation that will be set in Municipal Court.

2.    After the citation has been issued, a FIR will be issued and the juvenile will be released.

3.    If the juvenile is issued a traffic citation for No Operator's License during the initial traffic contact and is within a reasonable distance from home, the officer may allow the juvenile to push home any involved two-wheel, three- wheel, or four-wheel off-road vehicle/go-cart or impound the vehicle as circumstances warrant.

C.    Juveniles Involved in Motor Vehicle Accidents

1.    Officer may issue a driver (Ages 10 - 16) involved in a vehicle accident a Municipal Court citation for any violations occurring in the officer's presence.

2.    If the officer did not observe the accident, he/she may issue citations for No Operator's License and/ or No Liability Insurance if the officer has a fact witness. Officers will use the same guidelines established for adults in Section 302.02.

D.    Juvenile Driving While Intoxicated procedures are described in Section 314.08.


**302.09    Driving While Intoxicated or Under the Influence of Drugs**

A.    General Provisions

1.    Intoxicated juveniles (10-16 years of age) will be processed according to Section 314.08. Juveniles who are not intoxicated, but have any detectable amount of alcohol on their breath will be processed according to General Order 315.18 (Underage Alcohol Consumption Laws).

2.    Adults (without obvious injury) will be taken to the Lew Sterrett Criminal Justice Center and processed according to the Detention Services Section Standard Operating Procedures, which will be available for reference. While at the scene, the arresting officer may read the Statutory Warning on Body Worn Camera or the In-Car camera. Once an adult is arrested for DWI the officer has the option to offer a breath and/or blood test. If the arrestee refuses a breath and/or blood test, an affidavit for an evidentiary search warrant will be prepared by the officer and submitted to the Magistrate at Lew Sterrett for signature to obtain a blood specimen to be tested for alcohol and/or drugs. Officers are required to have DWI blood draw evidence drawn at Parkland Hospital Emergency Room, or any of the Hospital Emergency Rooms in the area. If the arrestee voluntarily agrees to provide a blood specimen after being read the Statutory Warning at the scene, the officer may transport the arrestee directly to the hospital for the blood draw prior to going to Lew Sterrett for processing.

3.    Adult minors (17 - 20 years of age) who have a breath/blood test result below .08 or adult minors with any detectable amount of alcohol on their breath will be processed according to General Order 315.18 (Underage Alcohol Consumption Laws). Adult minors who refuse to take a breath/blood test will be processed according to the provisions outlined in the remainder of this General Order.

4.    Drivers involved in accidents may be charged with D.W.I. under either of these circumstances:

a.    A fact witness, either an officer or another person, can identify that the suspect was the

Ex. B

driver of the vehicle at the time of the accident.

b.       The suspected driver admits to the investigating officer that he/she was driving when the accident occurred.

c.       The officer has evidence that the suspect was the driver. Example: Seatbelt marks indicating the suspect was in the driver seat, abrasions on the arms from airbag deployment, etc...

5.       The arresting officer is responsible for checking the arrested person's driving record for previous D.W.I. convictions. It will be noted in the Officer's Comments section who checked for previous conviction information, or if not checked, the reason why (i.e. computers down, etc.).

6.       D.W.I. Charges - If the arrested person has:

a.       No previous D.W.I. conviction - charge will be DWI M/B.

b.       Only one previous D.W.I. conviction - charge will be DWI-Enhanced M/A.

c.       Two or more convictions for D.W.I., the charge will be DWI-Enhanced F/3.

7.       For enhancement purposes, the following information is required on prior D.W.I. convictions:

a.       Date of conviction;

b.       County of conviction;

c.       Convicting court name;

d.       Case or docket number; and

e.       Sentence.

8.       A conviction prior to January 1, 1984 punished by probation, deferred adjudication, and suspended sentences cannot be used to enhance a D.W.I. case.

B.       Procedures for Conducting a Drug Evaluation - This procedure will be used when a suspect is arrested for D.W.I. whether or not it was accident involved.

1.       The arresting officer will take the suspect to Lew Sterrett where the subject will be offered a breath test. If the breath test is refused, the subject will be offered a blood test. If the subject refuses to be tested or the test result is .08 or higher, the suspect will be charged with D.W.I. and procedures from 302.09 A.4-7 will be followed.

2.       Arresting officers may request a Drug Recognition Expert be called to evaluate a suspect who has a breath alcohol level below .08 and whose impairment is not consistent with the BAC.

C.       Public Intoxication in Car

1.       An intoxicated person involved in an accident may be charged with Public Intoxication if there is no fact witness and the person does not admit to driving the vehicle when the accident occurred.

2.       An intoxicated person found in a parked vehicle may be charged with Public Intoxication if the vehicle is in a public place.

3.       Drivers of motor vehicles will be charged with and placed under custodial arrest for Public Intoxication, whenever, in the officer's opinion, the driver does not meet the statutory .08 limit, but is too impaired to drive.

D.       Arrests on Parking Areas - An intoxicated person operating a motor vehicle on a private parking lot (either public or private property) may be charged with Driving While Intoxicated if the parking lot is a public place as defined in Section 1.07, Texas Penal Code. (This normally includes parking lots of apartment complexes,

Ex. B

defined in Section 46.7, Texas Penal Code. (This normally includes parking lots of apartment complexes, restaurants, bars, and shopping centers where a substantial portion of the public has ready access to such areas).

**302.10    Driving While License Suspended**

A.    Mandatory Suspension

    1.    Definition: A D.W.I. charge is usually the cause of this type of suspension.

    2.    Procedure

        a.    When a subject check is made and it is determined the operator is Driving While License is Suspended (DWLS) with a mandatory suspension, the Communications Section personnel will notify the officer of the following applicable information:

            i.    Reason suspended.

            ii.    Location (county) of suspension.

            iii.    Expiration date of suspension.

        b.    The subject will be arrested for the county charge of Investigation of D.W.L.S., if driving with this type of suspension. The information provided in A.2.a above (reason, location, expiration) will be included in the Arrest Report.

B.    Habitual Violator Suspension

    1.    Definition: Repeated violations are the cause of this type of suspension.

    2.    Procedure

        a.    When a subject check is made and it is determined the operator is D.W.L.S. with a habitual violator suspension, the Communications Section personnel will notify the officer of the following applicable information:

            i.    Location (county) of suspension.

            ii.    Expiration date.

        b.    The subject will be arrested for the county charge of Investigation of D.W.L.S. if driving with this type of suspension and the information provided in B.2.a above (location, expiration) will be included in the Arrest Report.

C.    Safety Responsibility Suspension

    1.    Definition: A liability problem with a motor vehicle accident is the cause of this type of suspension.

    2.    Procedure

        a.    If a judgment number (i.e., a number containing a "J" that is listed after the SR Suspension on the printout) is present, a judgment has been rendered on the D.W.L.S. charge by the court. Regardless of the date given or the absence of one, the subject will be arrested on the county charge of Investigation of D.W.L.S.

        b.    If there is no "J" present in the number, the date of the suspension determines whether the subject may be arrested for the county charge of Investigation of D.W.L.S.

            i.    Prior to June 19, 1975, citizens did not have the opportunity to challenge a safety responsibility suspension. Therefore, it was ruled an illegal suspension and the subject cannot be arrested on the county charge of Investigation of D.W.L.S. if it is dated before

Ex. B

June 19, 1975. However, the operator may be written a citation or arrested for No Valid Texas Driver's License.

ii.  Since June 19, 1975, citizens have had the opportunity to challenge a safety responsibility suspension. Therefore, a subject who has had a license suspended since that date will be arrested on the county charge of Investigation of D.W.L.S.

c.  When a check is made on a subject and it is determined the operator is D.W.L.S. with a safety responsibility suspension, the Communications Section personnel will notify the officer of the following applicable information:

i.  Judgment number.

ii.  Date the safety responsibility suspension was rendered if there is no judgment number.

d.  When a subject with a safety responsibility suspension is arrested for the county charge of Investigation of D.W.L.S., the information provided in C.2.c above will be listed on the Arrest Report.

D.  Occupational Driver's License

1.  Definition

a.  A restricted driver's license ordered by a court.

b.  It specifies time and/or geographical conditions under which a person is permitted to operate a vehicle while the person's driver's license has a mandatory, habitual or safety responsibility suspension.

c.  The fact that a subject has an occupational driver's license will not appear on the computer printout.

2.  Procedure

a.  If a subject has violated the restriction of the occupational driver's license, the operator will be arrested for the charge of Violation Code Restriction, Occupation License, M/B.

b.  The type of suspension given to the individual prior to receiving the occupational driver's license will be listed on the Arrest Report.

c.  The restrictions on the occupational driver's license will be listed on the Arrest Report.

E.  Charging Suspects with Driving While License Suspended

1.  Suspects may be charged with D.W.L.S. based on witness observation that the suspect was operating a motor vehicle. The suspect must be under arrest for an offense other than D.W.L.S. before the D.W.L.S. charge can be added.

2.  The civilian witness may be used at the trial to testify that he/she observed the suspect driving the vehicle at the time in question. For that reason, the arresting officer must obtain the name and address of the civilian witness so that the witness can be contacted at a later date to testify, if needed.

3.  D.W.L.S. arrests based on witness observation of driving cannot be made in situations where that is the only charge.

F.  Revoked Driver's License

1.  Definition: Non-compliance with Administrative procedures outlined in the Texas Transportation Code is usually the reason for Driver's License Revocation.

Ex. B

Code is usually the reason for Driver's License Revocation.

  2. Procedure

    a. When a Driver's License check is made and it is determined that the license has been revoked, the Communications Section personnel will notify the officer of the following applicable information:

      i. That the Driver's License has been revoked.

      ii. The reason for the revocation as defined in the Texas Transportation Code, Section 521.294

    b. The Driver may be charged with No Valid Texas Operators License.

**302.11 Strategic Targeting Against Aggressive Driving and Road Rage**

  A. The primary goal of this program is proactive traffic enforcement to reduce the number of traffic accidents at high accident locations using a mandated zero tolerance approach. Each Patrol Operations Division will be assigned an unmarked vehicle to handle traffic problems, such as reducing the number of accidents at specific intersections, as identified by Traffic Section accident analysis. The unmarked vehicles will also be used in responding to neighborhood concerns of speeding, traffic violations at red light or stop sign controlled intersections, aggressive driving, road rage, and other non-traffic neighborhood concerns. Officer safety will not be minimized.

  B. Definitions

    1. Aggressive Driving - Inconsiderate and other forms of negligent driving that may include following too closely, speeding, unsafe lane changes, or failure to signal, etc.

    2. Road Rage - That behavior that typically surfaces as an angry, frequently violent response to an aggressive driving incident.

  C. Unmarked vehicles used in this enforcement are for traffic stops only and will be operated only under the exceptions as described in Section 301.02. If involved in a self-initiated pursuit, the operator of the STARR vehicle will immediately abandon the pursuit and reduce to a Code 1 status once a marked element is able to take over the pursuit. STARR vehicles will not become involved in a pursuit initiated by any other element.

  D. When used for traffic enforcement, the unmarked vehicle may be staffed by one or two officers. If staffed by only one officer, that officer must have successfully completed a basic radar certification school. If staffed by two officers, one officer must have successfully completed a basic radar certification school.

  E. To avoid citizen confusion, assigned officers must be in full uniform and carry their departmental identification cards.

  F. Violators may be cautious when stopped by an unmarked vehicle; therefore, officers should not become offended or overly assertive if someone refuses to stop.

**302.12 Multiple Violation Citations**

  A. The goal of this program is to reduce the amount of paper citations that an officer must write out in order to complete an enforcement action against a violator in the field.

  B. Officers will not place more than three violations on one citation.

  C. Officers will inform the violator of the number and types of charges they are issuing to the violator.

Ex. B

CASE 0:26-cv-00324-ECT-ECW     Doc. 130-2     Filed 02/04/26     Page 35 of 242

C.      Officers will inform the violator of the number and types of charges they are issuing to the violator

D.      Officers will not add charges to the citation without providing the violator with documentation of the added charges at the time of contact.

## 302.13    Reports Required

During all motor vehicle stops (regardless if a citation is issued or not), officers are required to record and report the following information:

A.      The gender of the individual stopped

B.      The race or ethnicity of the individual

C.      If the race or ethnicity was known prior to the stop

D.      A reason for the stop

E.      Location of the stop

F.      If a search was conducted

G.      The reason for the search

H.      If any contraband was discovered

I.      Description of discovered contraband

J.      Result of the stop

K.      If there was an arrest, what the arrest was based on

L.      If any physical force resulting in bodily injury was used

Officers shall ensure all data is gathered from every motor vehicle stop and submitted prior to the end of their shift. Supervisors shall ensure officers comply with this order.

Ex. B

| Chicago Police Department | General Order G03-08-03 |
|---|---|
| **REPORTING TEMPORARY DETENTIONS** | |

| **ISSUE DATE:** | 29 December 2025 | **EFFECTIVE DATE:** | 03 February 2026 |
|---|---|---|---|
| **RESCINDS:** | 10 July 2017 Version of S04-13-09 titled "Investigatory Stop System" | | |
| **INDEX CATEGORY:** | 03 - Field Operations | | |
| **CALEA:** | | | |

> This General Order has been moved from a pre-implementation status and issued in the Department Directives System. **It will become effective on 03 February 2026.** G03-08 and its addenda will replace the procedures outlined in Special Order S04-13-09, "Investigatory Stop System" on conducting, reporting, and reviewing Investigatory Stops and other Temporary Detentions (Stops).

**I.    PURPOSE**

This directive:

A.    introduces the:

1.    Stop Report (CPD-11.910), which discontinues the Investigatory Stop Report, to report and document Temporary Detentions.

2.    Temporary Detention (Stop) Application, which discontinues the Investigatory Stop System, as the electronic application to enter, manage, and maintain Temporary Detention data and information.

3.    Stop Receipt (CPD-11.912), which discontinues the Investigatory Stop Receipt.

> **NOTE:**    The Stop Receipt contains instructions on how to obtain a copy of a Stop Report from the Department through an Illinois Freedom of Information Act request.

B.    complies with the Illinois Traffic and Pedestrian Stop Statistical Study's data collection procedures.

**II.    GUIDELINES**

A.    The Temporary Detention (Stop) Application is one of the ways the Chicago Police Department ensures that it protects the public, preserves the rights of all members of the community, and enforces the law impartially. Adherence to this policy allows the Department to serve all people equally with fairness, dignity, and respect, and to uphold its pledge to not use racial profiling and other bias-based policing.

B.    Sworn members who conduct Temporary Detentions and Protective Pat Downs are required to complete a Stop Report (CPD-11.910) within the Temporary Detention (Stop) Application.

1.    The completion of a Stop Report satisfies the requirements data collection requirements of Illinois state statute 625 ILCS 5/11-212 titled "Illinois Traffic and Pedestrian Stop Statistical Study."

2.    Department members will continue to follow the Department directive titled "Illinois Traffic and Pedestrian Stop Statistical Study" to ensure full compliance with the law.

C.    The Temporary Detention (Stop) Application and the completion of a Stop Report will ensure:

1.    sworn members document the facts and circumstances of:

a.    a Probable Cause Stop;

Ex. C

b.      an Investigatory Stop, including a statement of the facts establishing Reasonable Articulable Suspicion to stop a person;

c.      a Protective Pat Down, including a statement of the facts establishing Reasonable Articulable Suspicion that a person is armed and dangerous to pat down an individual for potential weapons; and

d.      any search other than a Protective Pat Down conducted during a Temporary Detention, including a statement providing the basis, facts, and circumstances of the search.

2.   appropriate information from the Investigatory Stop, Probable Cause Stop, Protective Pat Down, or search other than a Protective Pat Down is entered and retained within the application; and

3.   supervisors review the facts and circumstances of Investigatory Stops, Probable Cause Stops, Protective Pat Downs, or searches other than a Protective Pat Down.

D.   All of the facts that support Reasonable Articulable Suspicion or Probable Cause to temporarily detain an individual and, if applicable, all of the facts that support reasonable articulable suspicion to perform a protective pat down of a person will be documented on a Stop Report within the Temporary Detention (Stop) Application.

1.   A Temporary Detention can be fluid, and its status may change as the encounter evolves. For instance, a Probable Cause Stop may be extended as an Investigatory Stop if information not related to the reason for the initial stop is developed that leads to an additional investigation. For example, a Probable Cause Stop for an observed traffic offense that leads to a theft investigation because the driver matches the description used in a flash message. When this happens, Department members must document both the Probable Cause for the initial stop and the Reasonable Articulable Suspicion for extending the encounter into an Investigatory Stop.

2.   Sworn Department members will not justify an investigatory stop solely by describing an individual's behavior as "suspicious" without further articulating specific facts that the individual has committed, is committing, or is about to commit a crime.

E.   Members will document on the Stop Report any body-worn camera footage viewed prior to completion of the report.

III.   **THE TEMPORARY DETENTION (STOP) APPLICATION**

A.   The Temporary Detention (Stop) Application is an investigative tool consisting of information obtained in the field, documented on a Stop Report, and entered into the electronic application.

1.   The Temporary Detention (Stop) Application will only be used to document:

a.      Investigatory Stops, Probable Cause Stops, Protective Pat Downs, or searches other than a Protective Pat Down during Temporary Detentions;

b.      enforcement of the Gang and Narcotics-Related Loitering Ordinances consistent with the Department directive titled "Gang and Narcotics-Related Loitering;" and

c.      statistical information for the Illinois Traffic and Pedestrian Stop Statistical Study.

2.   The Temporary Detention (Stop) Application contains:

a.      information concerning persons and, when appropriate, vehicles temporarily detained for Investigatory Stops and Probable Cause Stops.

b.      narrative sections for sworn Department members to document Reasonable Articulable Suspicion for their Investigatory Stops and Protective Pat Downs, the facts on which the suspicion is based, and other information from an investigatory stop or protective pat down.

> **NOTE:** A Probable Cause Stop that does not require further investigation (e.g., a sworn Department member observes a violation of the Illinois Vehicle Code) will not require the completion of the narrative section.

    c. Sworn members are required to complete the applicable narrative fields in the Temporary Detention (Stop) Application using specific and clear language that does not rely solely on standardized or boilerplate terms.

3. Sworn members will complete hard copy Stop Reports only when the electronic Temporary Detention (Stop) Application is unavailable and after approval is obtained by their immediate supervisor.

4. Sworn members are responsible for entering all Stop Reports created during their tours of duty into the electronic application as soon as possible but no later than the end of their tours of duty.

5. Supervisors will review all Stop Reports, electronic and hard copy, created by subordinates and either approve it, return it for correction, or take other appropriate action before the end of their tours of duty consistent with the Department directive titled "<u>Department Review of Temporary Detentions</u>."

B. **Access to the Temporary Detention (Stop) Application**

1. All Temporary Detention (Stop) Application information will be accessible to any sworn Department member and select civilian members for one year after the initial Stop Report was generated.

2. Pursuant to supervisory approval, personnel assigned to the following bureaus will be allowed access to Temporary Detention (Stop) Application information for three years based upon reasonable, articulated investigative need:

    a. Bureau of Detectives,

    b. Bureau of Counterterrorism, and

    c. Bureau of Internal Affairs.

> **NOTE:** The bureau chiefs will establish appropriate record keeping relevant to access and approval. Bureau chiefs that have members who have access to the Temporary Detention (Stop) Application beyond one year will ensure access is consistent with articulated investigative need and that supervisory authorization for access is maintained within unit files.

3. Other Department members who require access beyond this policy will submit a To-From-Subject Report through the chain of command to the Director, Information Services, Office of Public Safety Administration (OPSA), articulating the investigative need for access. If necessary, the Director, Information Services, OPSA, will consult with the Legal Affairs Division regarding the requested access.

4. After three years, personal identification data contained within the Temporary Detention (Stop) Application will be deleted pursuant to Information Services, Office of Public Safety Administration (OPSA), practice and record-retention requirements, statutory or judicial. Thereafter, no member will have access to personally identifying data from those Stop Reports.

> **NOTE:** The aggregate data from a Temporary Detention event, such as the date, time, and address of occurrence, in addition to the descriptive racial and demographic data, will be retained by Information Services, Office of Public Safety Administration (OPSA).

## IV. PROCEDURES

A.      Sworn members who conduct an Investigatory Stop, Probable Cause Stop, and, if applicable, a Protective Pat Down or any search other than a Protective Pat Down during the stop in a public place are required to complete a Stop Report within the Temporary Detention (Stop) Application as soon as possible but no later than by the end of their tour of duty.

B.      The Stop Report will document all of the facts that support or establish:

    1.      Probable Cause for a Probable Cause Stop;

    2.      Reasonable Articulable Suspicion for an Investigatory Stop;

    3.      Reasonable Articulable Suspicion to perform a Protective Pat Down; and

    4.      justification for any searches other than a Protective Pat Down during the stop.

C.      The justifications for the Temporary Detention will be documented on the Stop Report.  Additionally, the justifications for an Investigatory Stop, Protective Pat Down, and any search other than a Protective Pat Down must be documented separately in the designated narrative fields of the application.

D.      In addition, Stop Reports will be submitted for all Investigatory Stops, Probable Cause Stops, Protective Pat Downs, and any search other than a Protective Pat Down that lead to an arrest, Personal Service Citation, Administrative Notice of Violation (ANOV), Curfew Violation Report, School Absentee Report, or other reporting or enforcement action.

E.      Upon the completion of an Investigatory Stop or a Probable Cause Stop, sworn members are required to provide the person stopped a completed Stop Receipt.

    1.      The Stop Receipt will include the Office of Emergency Management and Communications Police computer-aided dispatch (PCAD) event number, the reason for the stop, the sworn member's name and star number, and whether a consent search was conducted.

    2.      If a required Stop Receipt was not provided to or received by the person, the Department member will articulate in the Stop Report the reasons why the receipt was not provided or received by the person stopped.

        **EXCEPTION:**      A Stop Receipt will not be provided if the person stopped is arrested and transported to a Department facility, or the Temporary Detention ends in the issuance of a citation and release from the scene under the Illinois Pre-Trial Fairness Act.

F.      If an arrest is made based on a Probable Cause Stop or an Investigatory Stop, a Stop Report will be completed in addition to the Arrest Report. Members will indicate in the Stop Report that an arrest is related to a Probable Cause Stop or an Investigatory Stop by checking the appropriate box.

G.      If, at the conclusion of an Investigatory Stop, the individual is unable or refuses to provide identification and there is no Probable Cause to arrest, the sworn member will:

    1.      enter "John Doe" or "Jane Doe," as appropriate, in the name field;

    2.      provide as much of the stop information as possible;

    3.      indicate the refusal in the narrative field; and

    4.      describe the reason and circumstances for the stop in as much detail as possible, including a description of unusual clothing, manner, or behavior.

H.      If a vehicle with multiple occupants is stopped for a traffic violation, a Stop Report will be completed only for the operator of the vehicle, unless an act of furtherance (such as a name check or an order to remain) is made to detain another occupant of the vehicle.

I.      When Stop Reports are submitted for more than one person in a group, sworn Department members will cross-reference the reports for each person within the Temporary Detention (Stop) Application.

V.    **EXAMPLES OF REPORTING STOPS**

The following examples illustrate instances when Stop Reports, Stop Receipts, and other Department reports are required and are intended to serve as guidelines that can be applied in various circumstances.

A.    **Investigatory Stop**

An officer receives a flash message of a person wanted for theft of a watch from a jewelry store that just occurred. The flash message provides a description of the offender as a male white approximately six feet tall, 180 to 200 pounds, and wearing a red hat, white t-shirt, blue jeans, and white gym shoes. The officer, who happens to be traveling in the immediate area of the jewelry store, starts touring the area for a person fitting the description of the wanted offender. A few blocks away from the jewelry store, the officer spots a person fitting the description provided in the flash message. The officer detains the person to conduct an investigation into the theft. Shortly after, the jewelry store clerk arrives on the scene and informs the officer that the person stopped was not the theft offender. Upon receiving that information, the officer tells the detained person that he is free to leave and provides him with a Stop Receipt. The officer then completes the applicable sections of the Stop Report to document the facts that support Reasonable Articulable Suspicion for the stop, including the description provided in the flash message and how the person stopped matched that description.

B.    **Probable Cause Stops**

1.    An officer performs a traffic stop on a vehicle after observing the vehicle disregard a stop sign. The officer issues the driver a Personal Service Citation for failure to stop at a stop sign. The officer completes the applicable sections of a Stop Report to document the Probable Cause Stop. In addition, the officer completes a Stop Receipt and provides the completed Stop Receipt to the driver.

2.    An officer performs a traffic stop on a vehicle after observing the vehicle disregard a stop sign. The officer issues a verbal warning to the driver for failure to stop at a stop sign. The officer completes the applicable sections of the Stop Report to document the Probable Cause Stop. In addition, the officer completes a Stop Receipt and provides the completed Stop Receipt to the driver.

3.    An officer observes a man smoking a cigarette on a Chicago Transit Authority platform. The officer detains the individual and obtains his identification for the purpose of issuing an Administrative Notice of Ordinance Violation (ANOV). During the detention, it is learned that the man just lost a family member. The officer decides to issue a verbal warning to the individual. The officer completes the applicable sections of the Stop Report to document the Probable Cause Stop. In addition, the officer completes a Stop Receipt and provides the completed Stop Receipt to the stopped person.

4.    An officer performs a traffic stop on a vehicle after observing the vehicle disregard a stop sign. During the stop, the officer receives a flash message that provides a description of a wanted offender and vehicle for a theft that just occurred in the area of the traffic stop. The driver and the vehicle match the description. The officer conducts an investigation for the theft by questioning the driver regarding his whereabouts at the time of the theft. The officer determines that he does not have probable cause to arrest. The officer issues the driver a Personal Service Citation for failure to stop at a stop sign. The officer completes the applicable sections of the Stop Report to document the Probable Cause Stop and the circumstances, including the Reasonable Articulable Suspicion pertaining to the Investigatory Stop. In addition, the officer completes a Stop Receipt and provides the completed Stop Receipt to the driver.

C.    **Probable Cause Stop with a Search**

Ex. C

An officer performs a traffic stop on a vehicle after observing the vehicle disregard a stop sign. During the traffic stop, the officer observes various facts that develop Reasonable Articulable Suspicion that the driver may be "armed and dangerous." The officer conducts a Protective Pat Down on the driver and searches the vehicle for weapons. No weapons are discovered. The officer issues the driver a Personal Service Citation for failure to stop at a stop sign. The officer completes the applicable sections of the Stop Report to document the Probable Cause Stop and the circumstances, including the Reasonable Articulable Suspicion pertaining to the Protective Pat Down. In addition, the officer completes a Stop Receipt and provides the completed Stop Receipt to the driver.

    D.    **Consensual Encounter**

An officer responds to a call of shots fired. Upon the officer's arrival on the scene, the officer observes several people in the area. The officer approaches and asks people in the area as to whether or not they heard or saw anything pertaining to the shots-fired call. Some people respond "no" and walked away from the officer. Others do not respond at all while walking away from the officer. The officer did not detain any of the individuals and after further investigation by the officer, the officer determines the incident is not bona fide. A Stop Report will not be completed.

**VI.    TEMPORARY DETENTION (STOP) APPLICATION DATA ENTRY**

A.    Sworn members will enter the Stop Report into the Temporary Detention (Stop) Application and submit an electronic Stop Report as soon as possible but no later than the end of their tours of duty.

B.    If electronic access to the Temporary Detention (Stop) Application is not available, after receiving approval from a supervisor, sworn members will complete the hard copy Stop Report.

    1.    If electronic access to the Temporary Detention (Stop) Application becomes available before the end of their tour of duty, the reporting Department member will:

        a.    accurately enter the information from the hard copy Stop Report into the Temporary Detention (Stop) Application.

> **NOTE:**    **The information entered into the Temporary Detention (Stop) Application must directly correspond with the information initially documented on the hard copy Stop Report.**

        b.    select "yes" in the Temporary Detention (Stop) Application that a hard copy Stop Report was completed.

        c.    record the Stop Report number generated by the Temporary Detention (Stop) Application onto the hard copy Stop Report.

        d.    forward the completed, hard copy Stop Report to their supervisor for approval.

    2.    If electronic access to the Temporary Detention (Stop) Application continues to be unavailable and is restored after the sworn member's tour of duty has ended, unit executive officers will determine the method of data entry and ensure that the Stop Report is entered into the Temporary Detention (Stop) Application within a reasonable period of time.

> **NOTE:**    For units without executive officers, the unit commanding officer will designate a unit supervisor the rank of lieutenant or above to perform these duties.

**VII.    OTHER RESPONSIBILITIES**

A.    **District and Department-Level Review.**  Supervisors will review and approve Stop Reports consistent with the Department directive titled "Department Review of Temporary Detentions."

B.    The Department will collect the data and records related to Investigatory Stops and Protective Pat Downs necessary to:

1.  accurately evaluate the Department's practices concerning Investigatory Stops and Protective Pat Downs, and

2.  post de-identified Investigatory Stop data derived from Stop Reports on its website as provided for in Item IX of this directive.

C.  The Office of Public Safety Administration, Information Technology:

1.  is responsible for the maintenance and integrity of the Temporary Detention (Stop) Application.

2.  will maintain and preserve all electronic versions of any Stop Reports submitted or re-submitted by Department members.

3.  maintain the data and records related to Investigatory Stops and Protective Pat Downs necessary to:

a.  accurately evaluate the Department's practices concerning Investigatory Stops and Protective Pat Downs, and

b.  facilitate the Department posting de-identified Investigatory Stop data derived from Stop Reports on its website as provided for in Item IX of this directive.

D.  The commanding officer, Tactical Review and Evaluation Division (TRED), will ensure the 4th Amendment Stop Unit (4ASRU) conducts random reviews and audits of Stop Reports within the Temporary Detention (Stop) Application on a continual basis, consistent with the Department directive titled "Department Review of Temporary Detentions."

E.  Bureau chiefs that have members who have access to the Temporary Detention (Stop) Application beyond one year will ensure access is consistent with articulated investigative need and that supervisory authorization for access is maintained within unit files.

## VIII.   RETENTION

A.  Pursuant to 705 ILCS 405/1-7, titled "Confidentiality of Law Enforcement Records," juvenile Stop Reports will be filed and retained separately from adult Stop Reports.

B.  The Director, Administrative Support Division, will:

1.  ensure that hard copy Investigatory Stop Reports are destroyed and that information in the Temporary Detention (Stop) Application is purged consistent with this directive and Local Records Commission requirements.

2.  dispose of both electronic and hard copy Stop Reports consistent with this and other applicable Department directives, court orders, the Local Records Act, and other applicable laws.

C.  All Stop Reports, electronic and hard copy, will be retained for a period of six months after the completion of the Illinois Traffic and Pedestrian Stop Statistical Study (TPSSS).

1.  Six months after the completion of the TPSSS:

a.  all hard copy Stop Reports three years and older will be purged.

b.  all personal identifying information entered into the electronic application three years and older will be purged.

2.  All hard copy Stop Reports and personal identifying information contained within the application generated after the TPSSS retention period and beyond will be retained for a period of three years from the date the Stop Report was generated.

**NOTE:** Pursuant to a court order entered in Hall, et al. v. City of Chicago, et al., 12 C 6834, the Chicago Police Department and its members are ordered to preserve all data in the Temporary Detention (Stop) Application and to preserve ALL hard copies of Stop Reports until further notice.

## IX.   PUBLIC ACCESS TO STOP REPORT DATA

To facilitate transparency and accountability regarding Investigatory Stops, the Department will continue to post de-identified Investigatory Stop data derived from Stop Reports on its website (currently, **https://home.chicagopolice.org/statistics-data/isr-data/)** on an annual basis, including fields for which information is collected on the Stop Report. The Department will also post on its website a data dictionary for Stop Report data.


Larry Snelling
Superintendent of Police

23-069 DK

Ex. C



# CLEVELAND DIVISION OF POLICE
## GENERAL POLICE ORDER



| EFFECTIVE DATE: | CHAPTER: | | PAGE: | NUMBER: |
|---|---|---|---|---|
| January 1, 2020 | 2 - Legal | | 1 of 10 | 2.02.01 |
| SUBJECT: | | INVESTIGATORY STOPS | | |
| CHIEF: | | *Calvin D. Williams, Chief* | | |

**PURPOSE:**  To establish Cleveland Division of Police guidelines to ensure all investigatory stops are conducted in accordance with the rights secured or protected by the Constitution and federal and state laws. The Division will conduct investigatory stops fairly and respectfully, consistent with its commitment to procedural justice, community and problem-oriented policing, and community values.

**POLICY:**  It is the policy of the Division of Police that all investigatory stops will be conducted in a manner that not only promotes the safety of police officers and the public but also conforms to the constitutions of the United States and the State of Ohio.   Officers shall not use an individual's gender, race, ethnicity, national origin, or perceived sexual orientation as a factor, to any extent, in establishing reasonable suspicion or probable cause, unless such information is part of an actual and credible description of a specific subject in an investigation that includes other identifying factors.

**DEFINITIONS:**

**Arrest -** the act of taking of an individual into custody by an officer based upon a warrant or probable cause.  There must be an actual restraint of the individual to constitute an arrest.  The restraint may be imposed by force or may result from the submission of the individual arrested to the custody of the officer arresting him/her.  An arrest is a restraint of greater scope or duration than an investigatory stop or detention.

**Consensual Encounter -** a voluntary encounter between the police and an individual with the intent of engaging in casual, and/or non-investigative conversation.  A reasonable individual in the individual's position would feel free to leave and/or decline any of the officer's requests at any point.

**Investigatory Stop (Terry Stop) -** a brief, minimally intrusive detention of an individual, including the occupants of a vehicle, during which a reasonable individual in his/her position would not feel free to leave, as defined in *Terry v. Ohio, 392 U.S. 1.*  To justify a stop the officer must have reasonable suspicion that the stopped individual has, is, or is about to engage in criminal conduct.  The stop must be based on specific, objective, articulable facts that the officer knew before the stop.  Information learned during a stop may lead to additional reasonable suspicion or probable cause that a crime has occurred, but it cannot serve as justification for the original stop.

**Juvenile -** an individual under the age of 18.

**Non-Custodial Interview -** a voluntary and consensual investigatory interview that an officer conducts with an individual during which the individual is free to leave and/or decline any of the officer's requests at any point.

**Pat Down/Frisk -** a limited search during an investigatory stop in which an officer conducts a pat down of the outer clothing of an individual for weapons when the officer reasonably suspects that the particular

Ex. D

| PAGE:<br>2 of 10 | SUBJECT:<br>INVESTIGATORY STOPS | NUMBER:<br>2.02.01 |
|---|---|---|

individual is armed and dangerous.  It is limited to what is necessary to detect weapons and must be based on reasonable articulable suspicion that the individual is armed.  An officer may not manipulate objects that are discovered under the clothing to determine whether they are contraband.

**Probable Cause -** the facts and circumstances known to the officer that would lead a reasonable individual to believe that an individual has more likely than not committed or is committing a crime.

**Reasonable Suspicion -** an objectively, justifiable suspicion that is based on specific and articulable facts or circumstances that justifies an officer stopping an individual that has committed, is committing, or is about to commit an offense.  Reasonable suspicion is more than a hunch but less than probable cause.  A police officer stopping an individual must be able to point to specific facts or articulable circumstances even though the level of suspicion need not rise to that of probable cause.

**Search -** a search is either a physical intrusion into a constitutionally protected area (i.e., an individual, house, papers, or effects) for the purpose of gathering information or any conduct that violates a reasonable expectation of privacy by officers or civilians acting as an agent of law enforcement.

**Seizure -** any instance or encounter where an officer's words or actions would make a reasonable individual believe that they are not free to leave or terminate the encounter.

**PROCEDURES:**

I.      Levels of Civilian-Police Encounters

   A.      There are three levels of civilian-police encounters.  The following are the three types of encounters, listed in order from consensual to most intrusive: voluntary contacts, investigatory (Terry) stops, and arrests.

      1.      There are two categories of voluntary contacts that do not constitute a seizure:

         a.      Consensual Encounters.

         b.      Non-Custodial Interviews.

      2.      Investigatory (Terry) Stops.  A seizure based on reasonable suspicion.

      3.      Arrests.  A seizure based on probable cause.  Separate guidelines govern searches in the context of an arrest (Refer to 2.02.02 Search and Seizure).

   B.      Officers must distinguish between voluntary contacts and Terry stops.

      1.      The inquiry into whether an individual would feel free to leave and/or decline any of the officer's requests at any point is an objective one, depending on all of the circumstances surrounding the contact between an officer and an individual, including but not limited to:

         a.      Number of officers present.

Ex. D

| PAGE: 3 of 10 | SUBJECT: INVESTIGATORY STOPS | NUMBER: 2.02.01 |
|---|---|---|

      b.      Blocking the individual's vehicle or freedom to move.

      c.      Physical contact with the individual.

      d.      Whether the officer's language or tone of voice indicates that compliance with the officer's requests is required.

      e.      Display of a weapon.

      f.      Display of official police vehicle indicators such as signals of flashing, oscillating, or rotating lights.

  2.      Officers shall be aware that a juvenile may not feel free to leave when adults in the same circumstances would feel free to leave.

II.    Basis for an Investigatory Stop

    A.    Law enforcement and investigatory decisions must be based upon observable behavior, facts, and/or specific intelligence, which form the basis for, among other things, determinations of reasonable suspicion and probable cause.

    B.    Officers shall not conduct investigatory stops unless they have developed the necessary reasonable suspicion or probable cause. An individual's unwillingness to engage or cooperate with the police, choosing not to answer questions, or ignore police is not a sole basis for reasonable suspicion.

      1.      An individual exercising the right to openly carry a firearm, standing alone or in connection with a call to police that only reports the open carry itself (no other suspicious behavior), does not justify an investigatory stop and frisk.

    C.    An officer may conduct an investigative stop of an individual after identifying themselves as a Cleveland Police Officer, if they have reasonable suspicion that the individual has committed, is committing, or is about to commit an offense.

    D.    A vehicle stop for a traffic code violation is not an investigative stop.  An officer shall have probable cause to conduct a vehicle stop for a traffic code violation or completed misdemeanor.

    E.    Every officer conducting a stop must be prepared to articulate specific facts and circumstances in support of the officer's determination that reasonable suspicion or probable cause was present and identified.

    F.    Pedestrians, individuals in vehicles, and individuals on bicycles may be stopped.

    G.    Officers may take into account the race, ethnicity, age, gender or other demographic characteristics of an individual in establishing reasonable suspicion or probable cause only when the characteristics are part of an actual and credible description of a specific subject in an investigation that includes other identifying factors.

Ex. D

| PAGE: 4 of 10 | SUBJECT: INVESTIGATORY STOPS | NUMBER: 2.02.01 |
|---|---|---|

H.  Officers shall not use or rely on information the officer knows or reasonably suspects to be materially false or incorrect in effectuating an investigatory stop or detention, or in establishing reasonable suspicion for a search.

I.  Officers shall not rely <u>solely</u> upon an individual's geographic location, or presence in a high-crime area without any other specific and articulable facts indicating that the individual has been, is, or is about to engage in criminal activity, as the basis for an investigatory stop.

III.  Articulating Reasonable Suspicion

A.  The existence of reasonable suspicion is determined by the totality of the circumstances. The totality of the circumstances is based on all of the facts known to the officer and the circumstances that existed prior to the stop.

B.  Officers shall not rely <u>solely</u> upon any single factor listed below without other specific and articulable facts indicating that the individual has been, is, or is about to engage in criminal activity as the basis for an investigatory stop.

1.  When formulating reasonable suspicion, officers may rely on activity they perceive through their own senses, through information obtained from other credible individuals, or through a combination of both factors, including but not limited to the following:

a.  The Individual's Appearance. Does this individual fit the specific description of a subject in a particular unlawful incident?

b.  The Individual's Actions. What suspicious activity has been observed? Is the individual attempting to flee, making inexplicable movements, displaying signs of nervousness or involved in activity commonly known to the officer as criminal in nature?

c.  Prior Knowledge of the Individual. Does the individual have a criminal history? Has the individual been arrested in the past for certain types of criminal behavior? What information has been received from other parties about the individual?

d.  Area of Stop. Is the individual in the area of or at the location of a recently committed crime? Is this area known for high levels of criminal activity like drug trafficking? Has this area been inundated with a certain type of crime?

e.  Time of Day. Is it unusual for people to be in this area at this time? Is it the time of day when a certain type of crime has been taking place according to reports or your knowledge?

f.  Law Enforcement Training and Experience. Is the individual's appearance or demeanor consistent with specific criminal activity?

Ex. D

g.     Law Enforcement Purpose.  Are you investigating a specific crime, type of crime or pattern of criminal activity?

h.     Source of Information.  From whom did you receive your information? How credible is the individual you are receiving information from? How did this individual obtain their information? Can you corroborate the information?

IV.     Police Conduct During Investigatory Stops

A.     If during an investigatory stop, probable cause is developed resulting in a custodial arrest for obstructing official business, resisting arrest, or assaulting a police officer with no other substantive violation alleged, officers shall request a supervisor respond to the scene.

B.     Officers shall limit the investigatory stop to a reasonable scope.

    1.     Actions that would indicate to a reasonable individual that they are being arrested or indefinitely detained may convert an investigatory (Terry) stop into an arrest requiring probable cause or an arrest warrant.

    2.     Unless justified by the reasons articulated for the original stop, officers must have additional articulable justification for further limiting an individual's freedom during an investigatory (Terry) stop. Actions that would further limit an individual's freedom of movement may include actions such as:

       a.     Taking an individual's identification/driver's license away from the immediate vicinity.

       b.     Ordering a motorist to exit a vehicle.

       c.     Placing a pedestrian up against a wall.

       d.     Directing an individual to stand or remain standing, or to sit on a zone car bumper or any other place not of their choosing.

       e.     Directing an individual to lie or sit on the ground.

       f.     Applying handcuffs.

       g.     Transporting any distance away from the scene of the initial stop, including for the purpose of witness identification.

       h.     Placing the individual into a police vehicle.

       i.     Pointing a firearm.

       j.     Pat down/frisking for weapons.

Ex. D

| PAGE:<br>6 of 10 | SUBJECT:<br>INVESTIGATORY STOPS | NUMBER:<br>2.02.01 |
|---|---|---|

C.   Officers shall limit the investigatory stop to a reasonable amount of time.

1.   Individuals may be stopped for only that period of time necessary to affect the purpose of the stop.  Any delays in completing the necessary actions must be objectively reasonable and supplemented by additional reasonable suspicion or probable cause and specifically articulated in any applicable reports documenting the investigatory stop.

2.   Officers shall not extend a detention solely to await the arrival of a supervisor.

D.   Officers shall be courteous and professional during all investigatory stops.

1.   When feasible and as early in the contact as safety permits, officers shall inform the subject of the following:

a.   The officer's last name and badge number.

b.   The fact that the officer is a Cleveland Police Officer.

c.   The reason for the stop.

d.   The fact that the stop is being recorded, if applicable (Refer to 4.04.06 Wearable Camera System).

2.   During the stop officers may offer further explanation of the circumstances and reason for stop.  Officers will not extend a detention unreasonably to explain the stop.

3.   Wherever time and circumstances permit, officers shall listen to the individual and answer any reasonable questions that the individual has relating to the interaction

V.   Rights of Individuals Subject to Investigatory Stops

A.    No individual who is in a public place shall refuse to disclose their legal name, address, or date of birth when requested by a law enforcement officer who reasonably suspects the following:

1.   The individual is committing, has committed, or is about to commit a criminal offense.

2.   The individual witnessed any of the following:

a.   An offense of violence that would constitute a felony under the laws of the state.

b.   A felony offense that causes or results in, or creates substantial risk of, serious physical harm to another individual or to property.

Ex. D

| PAGE:<br>7 of 10 | SUBJECT:<br>INVESTIGATORY STOPS | NUMBER:<br>2.02.01 |
|---|---|---|

B.    A detained individual must also, by statute, provide identification when:

    1.    The individual is a driver stopped for a traffic violation.

    2.    The individual is attempting to purchase liquor.

    3.    The individual is a concealed carry permit holder.

C.    Officers may not transport an individual to any police facility or jail merely for the purpose of identifying them unless they have probable cause for arrest.

D.    During the investigatory stop, the detained individual need not be advised of their Miranda rights until probable cause to arrest develops or until the questioning becomes sustained and coercive rather than brief and casual.

VI.    Anonymous Tips

A.    Officers cannot search or seize a subject based on an anonymous tip alone.

B.    Information from an individual not known by police is not to be assumed trustworthy without additional details which point to criminal activity.

C.    Officers must carefully develop reasonable suspicion in cases involving anonymous tips by corroborating information received with what the officer observes on scene.

D.    Officer's observations while on scene, securing more complete information from an anonymous individual and/or other circumstances that would tend to support the information received are all ways that officers can use to articulate reasonable suspicion allowing a Terry stop.

VII.    Documentation and Reporting/Review of Investigatory Stops

A.    Documentation of investigatory stops.

    1.    Officers conducting investigatory stops shall complete an entry into the data collection software program.  Officers shall complete an individual entry, a vehicle entry or both, recording the information of individuals involved, subject to the following guidelines:

        a.    Officers shall complete a data collection entry in connection with a stop, whether or not an arrest, report, citation, or summons is completed.

        b.    The primary unit initiating the stop shall be responsible for completion of the data collection entry.

    2.    All data collection entries shall be completed using the approved software.

Ex. D

3.    All data collection entry forms shall be completed prior to the end of the officer's assignment or tour of duty.

4.    The documentation should contain all information requested in the data collection software, but at a minimum, must contain at least the following elements:

    a.    Location of the stop.

    b.    Subject's race, ethnicity, age, and gender.

    c.    If a vehicle stop, the presence and number of any passengers.

    d.    If a vehicle stop, whether the driver or any passenger was required to exit the vehicle, and the reason for doing so.

    e.    Reason for the stop, including brief description of the facts creating reasonable suspicion.

    f.    Whether any individual was asked to consent to a search and whether such consent was given.

    g.    Whether a pat down, frisk, or other non-consensual search was performed on any individual or vehicle, including a brief description of the facts justifying the action.

    h.    A full description of any contraband or evidence seized from any individual or vehicle.

    i.    Disposition of the investigatory stop, including whether a citation or summons was issued to, or an arrest made of any individual, including charges.

    j.    Disposition of any search conducted including if a search was conducted and nothing was found.

B.    Reporting and review of investigatory stops.

    1.    Officer responsibilities:

        a.    Officers shall articulate the justification for an investigatory stop in a specific and transparent manner in their reports. Officers must be able to provide the specific information (not influenced by bias or prejudice) they relied upon in determining reasonable suspicion exists.

        b.    Officers shall not use "canned" or conclusory language without supporting detail in reports documenting investigatory stops. Instead, officers will use specific and individualized descriptive language in reports.

Ex. D

| PAGE: 9 of 10 | SUBJECT: INVESTIGATORY STOPS | NUMBER: 2.02.01 |
|---|---|---|

2. Supervisor responsibilities:

    a. Supervisors shall review all documentation of investigatory stops for completeness and adherence to law and Division policy.

    b. Within seven days of the stop, supervisors shall document and report investigatory stops that appear unsupported by reasonable suspicion, or that are otherwise in violation of CDP policy and investigatory stops that, while adhering with law and policy, indicate a need for corrective action or review of policy, tactics, or training.

    c. If a supervisor concludes that a stop appears to be inconsistent with Division policy, the supervisor, in consultation with the Commander, shall address the concern with the officer involved and either:

        i. Provide non-disciplinary corrective action and document such action in the tracking software, or

        ii. Refer the matter to Internal Affairs for administrative or criminal investigation**.**

3. Commander responsibilities:

    a. The officer's commander shall review, within seven days of their completion, all supervisory reports of investigatory stops not supported by reasonable suspicion, were otherwise in violation of CDP policy, or otherwise indicated a need for corrective action or review of agency policy, strategy, tactics, or training.

    b. The commander shall evaluate the supervisor's assessment and recommendations and ensure that all appropriate action is taken, including referring the incident to Internal Affairs for investigation if warranted.

    c. The commander shall take appropriate non-disciplinary corrective action and/or will initiate the disciplinary process against supervisors who fail to conduct complete, thorough, and accurate reviews of officers' investigatory stops.

4. The Division shall take into account the quality and completeness of these supervisory and commander reviews of officers' investigatory stops in supervisory and commander performance evaluations.

VIII. Training

    A. The Division shall provide officers with annual search and seizure/investigatory stops training that is adequate in quality, quantity, type, and scope.

Ex. D

| PAGE:<br>10 of 10 | SUBJECT:<br>INVESTIGATORY STOPS | NUMBER:<br>2.02.01 |
| --- | --- | --- |

**THIS ORDER SUPERSEDES ANY PREVIOUSLY ISSUED DIRECTIVE OR POLICY FOR THIS SUBJECT AND WILL REMAIN EFFECTIVE UNTIL RESCINDED OR SUPERSEDED.**

CDW/rcs
Bureau of Compliance

Ex. D



# NEW ORLEANS POLICE DEPARTMENT OPERATIONS MANUAL

# CHAPTER: 82.1

# TITLE: REPORT PREPARATION

**EFFECTIVE: 01/14/2018**
**REVISED: 1/11/2026**

## PURPOSE

This Chapter establishes guidelines for determining when officers are required to complete offense/incident reports, supplemental reports, arrest reports, and stop, search, and arrest cards, and the processing of incident reports written by officers of the New Orleans Police Department.

## GENERAL

1.  Communication Services shall create a record in the computer aided dispatch system of every call for service or self-initiated activity or incident communicated to them. This will include:
    (a) Reports of crime by community members;
    (b) Non-criminal complaints by community members;
    (c) Incidents resulting in a member of NOPD being dispatched or assigned;
    (d) Investigations initiated by department members; and
    (e) Incidents involving the stop, detention, arrest, or summons of an individual by NOPD members.

2.  Members who have access may also create a record in the computer-aided dispatch system of an incident, investigation, call for service, or self-initiated activity.

3.  An incident report shall be written whenever specifically directed by a Departmental regulation or when ordered by a supervisor.

## DEFINITIONS

**Body-Worn Camera ("BWC") recording**—A digital recording made by equipment worn by a Department member that captures audio/video signals.

**Custodian of Records**—The Superintendent is the official Custodian of Records and is responsible for the public records of the New Orleans Police Department, regardless of whether the records are in his/her personal custody and control. Duties of the Custodian of Records may be delegated to other members of the New Orleans Police Department.

**Data Transformation Services**, or **DTS**—Is a set of objects and utilities to allow the automation of extract, transform and load operations to or from a database. The objects are **DTS** packages and their components, and the utilities are called **DTS** tools.

Ex. E

**Public Record**—All records used, prepared, possessed or retained for use in the performance of any public function, unless exempted by law.

**Record**—All books, records, writings, accounts, letters and letter books, maps, drawings, photographs, cards, tapes, recordings, memorandums, and papers, and all copies, duplicates, photographs, including microfilm, or other reproductions thereof, or any other documentary materials, regardless of physical form or characteristics, including information contained in electronic data processing equipment.

**Offense/Incident Report –** A report that details offenses and incidents associated with a specific event.  Each offense/incident report can have up to ten individual offenses with ten suspects (acting in concert), with up to 99 victims.

**Offense –** A felony, misdemeanor, or infraction that could result in arrest, summons, or citation.

**Incident –** An occurrence in which no criminal act was committed, such as a crash with no injuries or a miscellaneous incident report.

**Incident Arrest Report –** A reporting documenting the arrest of an individual for an offense. The Incident Arrest Report may be included with the initial Offense/Incident Report or may be a supplemental report documenting the arrest of a known offender from an already documented Offense/Incident report.  In the event the Incident Arrest Report is completed after the Offense/Incident Report has already been completed, an offense modifying supplement report is required to document the LIBRS/NIBRS updated reporting.

**Event Information Card –** A section of the report that contains relevant information about the date, time, incident number, incident type, owner (reporting officer), and location data.

**Offense Modifying Supplement Report –** A supplemental report that modifies the LIBRS/NIBRS reported offense.  Offense Modifying Supplements are to be completed by detectives and supervisors conducting follow-up regarding the initial offense/incident report and require information that changes the status of LIBRS/NIBRS data reporting.

**Supplemental Information Card –** This includes patrol supplement reports in which additional information is added to an existing offense/incident report without modifying the offense/incident reporting to LIBRS/NIBRS.  Supplemental Information Cards may contain information that requires an offense modifying supplement report, such as vehicle recoveries or other property status changes.

**Stop, Search, and Arrest Card (FIC/SSA) –** An information card that documents the required reporting for a Field Interview Card (FIC).  The FIC/SSA card may be completed as a portion of an offense/incident report, incident arrest report, or as a stand-alone report when a Field Interview Card is required under NOPD Policy.  In the event an offense/incident report is required for any incident that would also require an FIC, the SSA card portion of the report documents the FIC information and a separate FIC is not required.

**Investigatory Stop**—The temporary involuntary detention and questioning of a person and/or vehicle and its occupants to investigate potential criminal conduct. To conduct an investigatory stop, the officer must have reasonable suspicion that the individual or vehicle occupant has engaged, is engaging, or is about to engage in criminal conduct.

**Stop**—A brief, minimally intrusive detention of a subject, including pedestrians, bikers, and/or the occupants of a vehicle, during which a reasonable person in the subject's position would not feel free to leave, as defined in *Terry v. Ohio*, 392 U.S. 1 (1968).

**Vehicle Stop**—The involuntary detention of a motor vehicle and its occupants. Vehicle stops may be conducted (1) where there is probable cause to believe that the driver has committed a traffic violation

Ex. E

or (2) where there is reasonable suspicion that a vehicle occupant has engaged, is engaging, or is about to engage in criminal conduct.

## REPORT PREPARATION

4.    Members shall ensure that their reports are sufficiently detailed for the purpose intended and reasonably free of errors prior to submission for review by a supervisor.

5.    It is the responsibility of the assigned member to complete and submit all incident reports assigned during their shift before going off-duty, unless permission to delay submission of the report has been approved by their supervisor.

6.    Absent articulable exigent circumstances, reports requiring prompt follow-up action on active leads or arrest reports where the suspect remains in custody should not be delayed.

7.    All incident reports shall accurately reflect the identity of the persons involved, witnesses, all pertinent information gathered including what was seen, heard, or assimilated by any other sense and any actions taken.

8.    Members shall not suppress, conceal or distort the facts of any reported incident, nor shall any member make an intentionally false, inaccurate or incomplete report orally or in writing.

9.    The reporting member's opinions should not be included in reports unless specifically identified as such.

10.   When listing offense types in any report, the most egregious offense shall be listed as the first offense (i.e. if an incident involves both an aggravated battery with a firearm and criminal damage, the aggravated battery shall be listed as the first offense).

## REQUIRED REPORTING

11.   Completed incident reports are required in all of the following situations as specifically covered herein or by other Chapters:
        (a) Criminal activity,
        (b) Non-criminal activity,
        (c) Death reports,
        (d) Injury or damage caused by City personnel, or
        (e) Certain miscellaneous injuries.

12.   The above reporting requirements are not intended to be all-inclusive. A supervisor may direct an employee to document any incident they deem necessary.

## CRIMINAL ACTIVITY REPORTING

13.   When in response to a call for service, or as a result of self-initiated activity, a member becomes aware of any activity where a crime has occurred, the member is required to document the activity in the designated records management system.

14.   The fact that a victim does not desire prosecution is not an exception to documentation.

15.   Examples of incidents that require documentation include, but are not limited to:
        (a) All arrests and summons (including municipal offenses).
        (b) A custodial arrest of a juvenile.
        (c) Cases involving a wanted subject (known or unknown) who is to be charged with a state or municipal offense.

Ex. E

        (d) Cases involving domestic violence.
        (e) All LIBRS reportable offenses (see below list).

16.     The following LIBRS reportable offenses shall be documented in the designated records management system:

        (a) Arson
        (b) Assault and/or Battery
        (c) Bribery
        (d) Burglary
        (e) Counterfeiting/Forgery
        (f) Destruction/Damage/Vandalism of Property
        (g) Drug/Narcotic Offenses
        (h) Embezzlement
        (i) Extortion/Blackmail
        (j) Fraud Offenses
        (k) Gambling Offenses
        (l) Homicide Offenses
        (m) Kidnapping/Abduction
        (n) Larceny/Theft
        (o) Motor Vehicle Theft
        (p) Pornography/Obscene Material
        (q) Prostitution related offenses
        (r) Robbery
        (s) Sex Offenses
        (t) Stolen Property
        (u) Weapon Law Violations

## NON-CRIMINAL ACTIVITY

17.     Non-crime related incidents that shall be documented include, but are not limited to:

        (a) Anytime an officer points a firearm or TEW at a person.
        (b) Any use of physical force by a member of this department.
        (c) Any firearm discharge.
        (d) Anytime a person is reported missing (regardless of jurisdiction).
        (e) Any found property or found evidence.
        (f) Any incident involving the death of a human being.
        (g) Any traffic crashes above the minimum reporting level.
        (h) Incidents which result in damage to city owned property.
        (i) Suspicious incidents that may indicate a potential for crimes against children or that a child's safety is in jeopardy.
        (j) All protective custody detentions involving juveniles or suicide attempts.
        (k) Suspicious incidents that may place the public or others at risk.
        (l) Searches and seizures.
        (m) Whenever the member believes the circumstances should be documented or at the direction of a supervisor.

## DEATH REPORTS

18.     Death investigations require specific investigation methods depending on circumstances and should be handled in accordance with **Chapter 41.33 – Death Investigations**. An officer handling a death investigation should notify his/her supervisor of the circumstances surrounding the incident for a determination on how to proceed. The following cases shall be appropriately investigated and documented using the approved reporting method (see generally R.S. 33:5713A):

Ex. E

(a) Suspicious, unexpected, or unusual deaths;
(b) Sudden, accidental or violent deaths;
(c) Suicides;
(d) Homicide or suspected homicide;
(e) Deaths due to criminal activity;
(f) Unattended deaths (no physician or qualified hospice care during the period immediately preceding death); and
(g) Found dead bodies or body parts.

## INJURY OR DAMAGE BY CITY PERSONNEL

19. Reports shall be taken if an injury occurs that is a result of an act of any City of New Orleans employee. Reports also shall be taken when there is damage to city property or city equipment.

## MISCELLANEOUS INJURIES

20. Any injury that is reported to this department shall require a report when:
(a) The injury is a result of an apparent drug overdose.
(b) There is an attempted suicide.
(c) The injury is significant enough where death <u>could</u> reasonably result.
(d) Based on the circumstances, there is a reasonable belief the incident is may be criminal in nature.

## REPORT CORRECTIONS

21. Supervisors shall review reports for sufficiency, content, and accuracy. If a correction is necessary, the reviewing supervisor shall return the report to the reporting member for correction as soon as practicable. It shall be the responsibility of the originating member to ensure that any report returned for correction is processed in a timely manner.

22. Field Training Officers should review their trainee's reports and have them make corrections before they are submitted to a supervisor.  Prior to submission, the trainee should note the report was reviewed by their Field Training Officer in the appropriate section of the report, or narrative.

## REPORT CHANGES OR ALTERATIONS

23. Reports that have been approved by a supervisor **shall not** be modified or altered except by way of a supplement report. Reviewed reports that have not yet been approved in the records management system may be corrected or modified by the authoring member only with the knowledge and authorization of their supervisor.

## ELECTRONIC SIGNATURES

24. NOPD has established an electronic signature procedure for use by all members of the Department. Members shall only use their electronic signature for official reports or communications.

25. Each member shall be responsible for the security and use of their electronic signature and shall promptly notify a supervisor and/or the City Information Technology department if the electronic signature or reporting system login has or may have been compromised or misused.

## NIBRS/LIBRS

26. NOPD reporting in the records management system will be classified based on pre-determined incident types in the system.  These incident types will automatically be

Ex. E

linked in the records management system to the correct LIBRS coding.

27.  NIBRS groups offenses into Group A and Group B offenses based on the seriousness of the offense, the frequency and nationwide prevalence of the offense, the probability and likelihood that law enforcement will be aware of the offense and collect data, and the burden placed on law enforcement to collect that data.

28.  LIBRS/NIBRS classifies offenses into three categories: crimes against persons, crimes against property, and crimes against society.

29.  Several offenses are mutually exclusive, so that one offense includes other lesser offenses.  The table below depicts those offenses that are mutually exclusive:

| Offense | 09C - Justifiable Homicide cannot occur with any other offense | 09A - Murder | 09B - Negligent Manslaughter | 11A - Rape | 11B - Sodomy | 11C - Sexual Assault w/Object | 11D - Fondling | 120 - Robbery | 13A - Aggravated Assault | 13B - Simple Assault | 13C - Intimidation | 23A - Pocket-picking | 23B - Purse-snatching | 23C - Shoplifting | 23D - Theft From Building | 23E - Theft From Coin Machine | 23F - Theft From Motor Vehicle | 23G - Theft of Motor Vehicle Part | 23H - All Other Larceny | 240 - Motor Vehicle Theft | 36A - Incest | 36B - Statutory Rape |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09A - Murder | | X | X | | | | | | X | X | X | | | | | | | | | | | |
| 09B - Negligent Manslaughter | | X | X | | | | | | X | X | X | | | | | | | | | | | |
| 11A - Rape | | | | X | | X | | | X | X | X | | | | | | | | | | X | X |
| 11B - Sodomy | | | | | X | X | | | X | X | X | | | | | | | | | | X | X |
| 11C - Sexual Assault w/Object | | | | | | X | X | | X | X | X | | | | | | | | | | X | X |
| 11D - Fondling | | | | X | X | X | X | | X | X | | | | | | | | | | | X | X |
| 120 - Robbery | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | | |
| 13A - Aggravated Assault | | X | X | X | X | X | | X | X | X | X | | | | | | | | | | | |
| 13B Simple Assault | | X | X | X | X | X | X | X | X | X | X | | | | | | | | | | | |
| 13C - Intimidation | | X | X | X | X | X | X | X | X | X | X | | | | | | | | | | | |
| 23A - Pocket-picking | | | | | | | | X | | | | X | | | | | | | | | | |
| 23B - Purse-snatching | | | | | | | | X | | | | | X | | | | | | | | | |
| 23C - Shoplifting | | | | | | | | X | | | | | | X | | | | | | | | |
| 23D - Theft From Building | | | | | | | | X | | | | | | | X | | | | | | | |
| 23E - Theft From Coin Machine | | | | | | | | X | | | | | | | | X | | | | | | |
| 23F - Theft From Motor Vehicle | | | | | | | | X | | | | | | | | | X | | | | | |
| 23G - Theft of Motor Vehicle Part | | | | | | | | X | | | | | | | | | | X | | | | |
| 23H - All Other Larceny | | | | | | | | X | | | | | | | | | | | X | | | |
| 240 - Motor Vehicle Theft | | | | | | | | X | | | | | | | | | | | | X | | |
| 36A - Incest | | | | X | X | X | X | | | | | | | | | | | | | | X | |
| 36B - Statutory Rape | | | | X | X | X | X | | | | | | | | | | | | | | | X |

## CRASH REPORTS

30.  Officers shall complete crash reports in the Louisiana crash reporting system for all vehicular crashes which include violations of La. R.S. Title 14 statutes.

31.  **If a vehicular crash occurs on private property, a crash report is only required if the incident involves damage to city owned property, property damage over $500, violations of La. R.S. Title 14 statutes, serious injury or death, or required by a supervisor.**

32.  If a vehicular crash occurs on public roadways, a crash report shall be completed, with the following exceptions:
   (a) If a vehicular crash occurs involving property damage less than $500.00, no injuries, and all parties involved agree to settle the incident among themselves,

Ex. E

a crash report is not required.
(b) If an order is issued by the Superintendent of Police suspending this regulation, crash reports shall be completed in compliance with the order (i.e. Mardi Gras, Hurricane Incident Action Plan).

## OFFENSE/INCIDENT REPORT INSTRUCTIONS

33.   Except as indicated below or in other Chapters, offense/incident reports shall be generated and the offense information entered by reporting officers prior to the end of their tour of duty (ETOD).

34.   Whenever possible, reports shall be completed while the reporting officer is still assigned to the call, so accurate reporting times can be calculated.

35.   Unless a delay in completing the report is authorized by the reviewing supervisor, officers shall complete offense/incident reports before the end of their next tour of duty. If the officer will be on leave for more than five (5) days before returning to work, the offense/incident report shall be completed prior to the officer going on leave.

36.   Members may review the BWC recordings of any incident which is the subject of any police report prior to drafting their report as long as it does not delay the completion of the report.

37.   Failure or delay in submitting reports may result in corrective or disciplinary action against the member, unless the delay has been authorized by their supervisor.

38.   Supervisors shall ensure all reports written by their subordinates are completed and reviewed in accordance with this chapter. Failure or delay in reviewing reports may result in corrective or disciplinary action.

## ARREST REPORTS

39.   All arrest reports shall be completed and approved before the subject is booked.

40.   In the event of an emergency outage of the Department's Records Management System, arrest reports will be completed on the Department's designated arrest report forms under the NOPD resources page.

## SUPPLEMENTAL REPORTS (INCLUDING OFFENSE MODIFYING REPORTS)

41.   Investigative Supplement and Patrol Supplement reports shall be completed to document investigative steps that are not documented in the offense/incident report or the arrest report.

42.   Investigative Supplement reports shall be completed when an arrest warrant is issued, an arrest has been made, or a felony investigation has exhausted all leads and no further information is available, if that information is not already captured in the offense/incident report.

43.   In all open felony investigations where an Investigative Supplement has not been completed, investigators shall document investigative steps and *Brady* material discovered in the appropriate case file within the Department's Records Management System.

44.   Offense Modifying Supplements must be completed anytime the following events occur:
(a) Injuries are added or updated

Ex. E

(b) Offenses are added or updated
(c) Suspects or Victims are added or updated
(d) There is a change in property status
(e) There is a change in a vehicle status

45.     In all recovered identifiable property cases an Offense Modifying Supplement shall be completed containing all relevant information.

46.     In arrest cases where the perpetrator was originally unknown and was later identified, additional charges are added, or additional perpetrators are added who were not originally listed as known, an Offense Modifying Supplement shall be completed.

47.     Offense Modifying Supplements may only be completed when the initial Offense/Incident Report is approved.  If the initial Offense/Incident Report is still under review or revision, officers should consider including the supplemental information in the original Offense/Incident Report rather than in an Offense Modifying Supplement.

**PROCESSING INCIDENT/SUPPLEMENTAL REPORTS**

48.     All offense/incident reports, supplemental reports, and arrest reports shall be completed in the designated NOPD reporting system and records management system.  This includes all specialized unit reports, such as homicide, Sex Crimes, and PIB criminal reports.

49.     Once a report is completed and submitted, the member's supervisor shall be responsible for reviewing and approving or disapproving the report. Supervisors are responsible for reviewing all reports within the time frames outlined in this Chapter.

50.     All accompanying case file documents, video, and other digital evidence shall be uploaded into the designated Records Management System under the same designated item number as the report associated with the evidence and documents.

**DISTRICT/DIVISION COMMANDER RESPONSIBILITIES**

51.     District and Division Commanders shall administer an effective system for ensuring that all reports are submitted in accordance with this Chapter and completed reports for which delays have been authorized are submitted in a timely manner.

**BULLETINS**

52.     Bulletins shall be sent utilizing the Department's reporting and records management system for the following:
        (a) NCIC Entry and removal of all missing persons, wanted subjects and runaways;
        (b) NCIC Entry and Removal of Lost or stolen firearms;
        (c) NCIC Entry and Removal Lost, stolen or found identifiable property (e.g. property with known serial numbers, initials, and engravings);
        (d) NCIC Entry and Removal of stolen vehicles.

53.     The Supplemental Information card shall be completed whenever a bulletin is required. The reporting officer shall write the reason for the supplement to correspond to the data being entered for NCIC.

54.     When an offense/incident report requiring a crime bulletin is incomplete or cannot be completed before the officer ends their tour of duty (ETOD), the reporting officer shall complete the Supplemental Information Card sufficiently for a crime bulletin to be sent prior to ETOD.

Ex. E

55.     Active arrest warrants must still be verified through NCIC by phone or radio prior to booking an individual on the warrant.

56.     If an arrest is made on an active arrest warrant, the NOPD N.C.I.C. Unit contact person who verified the wanted status shall be noted in the Offense Modifying Supplement Report.

57.     For all Bulletins, the receiving member of NCIC shall accept or reject the bulletin in the designated records management system. Unless an officer requires an access number from NCIC, there is no need to contact NCIC by telephone or police radio. Confirmation of receipt by NCIC will be conducted through the designated records management system.

58.     All relevant sections of the Crime Bulletin shall be entered.

## REMOVAL OF BULLETINS ON LOCAL WANTED SUBJECTS ONLY

59.     If the warrant is local (**issued by NOPD**), the arresting officer shall send a notification to the investigative unit who issued the warrant for an "open" NOPD item.

60.     If the subject was issued a summons in lieu of physical arrest, the summons number shall be noted in the Arrest Report.

        **NOTE:**     *NOPD has no authority to modify, locate or cancel any warrant(s) from another department, agency, or jurisdiction. Therefore, no cancellation bulletins shall be sent for any fugitive arrest (17F), court capias (21), municipal or traffic attachments (17M/T), or probation violations.*

## STOP, SEARCH, AND ARREST CARD (FIC/SSA)

61.     The investigating officer or the primary unit on the scene shall document in the designated NOPD Records Management System the date, time, location, reason for the police encounter, all involved parties, and all actions taken by officers on scene during any of the following occurrences:
        (a) When conducting a self-initiated vehicle stop for any reason.
        (b) When conducting a self-initiated investigatory stop of a suspicious person.
        (c) When conducting any pat-down or search without a warrant that is not already documented in an arrest report.
        (d) When issuing a Juvenile Warning Notice.
        (e) When providing a public safety ride.

62.     All incidents requiring documentation through an FIC shall use the offense/incident report format to document the FIC, additional documentation outside of the designated records management system is not required for an FIC.

63.     A motor vehicle <u>crash</u>, including crashes resulting in citations, does **not** require documentation outside of required traffic crash reporting.

64.     Unless it involves one of the categories in this Chapter that requires a FIC, a dispatched call for service (CFS) <u>does not **automatically** require a Field Interview Card.</u>

65.     Officers <u>may</u> document any enforcement actions or suspicious activity in a FIC if they believe it is in the best interest of law enforcement and / or public safety, even if not specifically required by this Chapter.

66.     The investigating officer or primary unit on the scene shall be responsible for completion of a FIC. Only one FIC entry should be made for each incident.

Ex. E

67. Supervisors shall review all FICs entered by members of their unit to ensure that officers are complying with Departmental regulations regarding legal stops and that the FICs are completed using accurate and specific descriptive language.

68. Officers shall use accurate and specific descriptive language and not rely solely on "boilerplate" or "pat" language in any reports documenting stops, detentions, or searches. Articulation of reasonable suspicion and probable cause shall be specific and clear.

69. All FICs shall be completed prior to the end of the officer's tour of duty, unless specifically granted an extension by their supervisor to complete prior to the end of their next tour of duty. Extensions to complete a FIC may not be granted past the officer's next tour of duty and no longer than 72 hours from the incident under any circumstances.

70. If an officer is unable to complete the FIC within the timeframe required by this chapter, a supervisor may appoint another officer to complete the FIC, if available.

71. FICs for incidents that occur outside of regular duty times (e.g., during police secondary employment) must be made no later than the officer's next regular tour of duty and shall contain the date and time of the incident, and the date and time of the entry.  In all circumstances, FICs shall be completed within 72 hours of the incident.

72. The following information shall be required on all FICs:
    (a) Date and time of the stop / incident.
    (b) Location of the stop / incident.
    (c) Duration of the stop / incident.
    (d) Officer name, badge # and employee ID#.
    (e) Reason for the stop, including a clear and specific articulation of the facts creating reasonable suspicion or probable cause.
    (f) For vehicle stops:
        a. The presence and number of any passengers and the apparent race, ethnicity, gender, and age of each passenger.
        b. whether the driver or any passenger was required to exit the vehicle and why each person was asked to exit the vehicle (A legal vehicle search is a valid justification to require all occupants to exit the vehicle).
    (g) For all other investigatory-stops (e.g., pedestrian or bicycle), the number of individuals stopped and apparent race, ethnicity, gender, and age of each person.
    (h) Whether any individual was asked to consent to a search and whether such consent was given.
    (i) If a pat-down or frisk was performed on any individual, the officer shall document the specific facts creating articulable reasonable suspicion that the person was armed and dangerous.
    (j) If a probable cause search (Search Incident to Arrest) was performed on any individual, the officer shall document the facts creating probable cause.
    (k) A description of any items of contraband or weapons found.
    (l) Disposition of the stop, including whether a citation or summons was issued to, or an arrest was made of, any individual, including all subsequent related NOPD item numbers (i.e., if an officer conducts a stop-and-frisk and does the FIC under one item number, closes that item number and obtains an additional item number for a subsequent arrest report related to the stop, both item numbers should be referenced).
    (m) If a Public Safety Ride was offered, and a "Limited Consent Search" was performed on any individual, the reason the officer believed the individual may be armed.

73. The FIC shall be completed as thoroughly as possible depending on the nature of the stop or incident or action taken.

Ex. E

**SUPERVISORS SHALL APPROVE ALL FIC DOCUMENTATION**

74.    Supervisors shall ensure FICs are reviewed and approved within 72 hours of completion to determine if the stop, frisk, or search was based on reasonable suspicion or probable cause and consistent with NOPD policy, and federal and state law.

75.    If the supervisor determines during their review of an incident that NOPD should revisit policy, tactics, training, the supervisor should document that in a PRR Form #358. The supervisor submitting a PRR form #358 is responsible for thoroughly completing the form's "Request" section. The supervisor shall make a digital copy of the form and email it to PSAB@nola.gov.

76.    If a supervisor finds the FIC documentation to be inaccurate or insufficient, that supervisor shall require that the officer correct the documentation before the end of that officer's present tour of duty and, if necessary, take corrective action according to NOPD Policy.

Ex. E



# PATROL GUIDE

| | |
|---|---|
| Section: Command Operations | Procedure No: 212-11 |

**INVESTIGATIVE ENCOUNTERS: REQUESTS FOR INFORMATION, COMMON LAW RIGHT OF INQUIRY AND LEVEL 3 STOPS**

| DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|
| 06/26/25 | R.O. 53 | 1 of 16 |

**PURPOSE**  To describe the types of encounters a uniformed member of the service may initiate with a member of the public during the course of his or her official duties, the level of knowledge required for each type of encounter, the scope of a police officer's authority for each type of encounter, the measures that are permissible to protect uniformed members of the service from injury while engaged in such encounters, and the procedures to be followed by a member of the service during these encounters.

**SCOPE**  In accordance with their oath to uphold the law, uniformed members of the service must conduct investigative encounters in a lawful and respectful manner; however, nothing in this section is intended to deter an officer from initiating appropriate inquiries and investigative encounters, including stops, or using any lawful and appropriate tactics to ensure the officer's safety during such investigative encounters. Moreover, this procedure should not be interpreted to discourage an officer from engaging in voluntary consensual conversations with members of the public. Members of the service are encouraged to develop positive relationships in the communities they serve. Such positive interactions with the community foster trust and understanding that will in turn enhance public safety and officer safety.

**DEFINITIONS**  <u>INVESTIGATIVE ENCOUNTERS</u> - In the context of this procedure, an investigative encounter is a police interaction with a member of the public/civilian for a law enforcement or investigative purpose. The U.S. Supreme Court in the case of *Terry v. Ohio*, established the authority of the police to stop and possibly frisk a person, under certain circumstances, based upon reasonable suspicion. The New York State Court of Appeals in the case of *People v. DeBour* established the types or levels of investigative encounters and the authority of the police at each level, consistent with federal constitutional standards. These encounter levels and the authority of the police at each level are outlined in the definitions that follow.

<u>REQUEST FOR INFORMATION (LEVEL 1 ENCOUNTER)</u> - A request for information is an encounter between a civilian and a uniformed member of the service conducted for the purpose of requesting information from the civilian. The uniformed member of the service must have an objective credible reason to approach the civilian. This type of encounter does not require any suspicion of criminal activity. The objective is to gather information and not to focus on the person as a potential suspect. A police officer may seek information related to the reason(s) the person was approached, such as the person's name, address and destination, if those questions are related to the objective credible reason for the approach. The officer may not ask accusatory questions. The person may refuse to answer questions and/or walk or even run away. Refusal to answer questions and/or walking or running away does not escalate the encounter. However, providing false or inconsistent information at any level may escalate the encounter. At this level, the officer may not seek consent to search, may not use force, and may not create a

**NEW • YORK • CITY • POLICE • DEPARTMENT**

Ex. F

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|---|
| 212-11 | 06/26/25 | R.O. 53 | 2 of 16 |

**DEFINITIONS (continued)**

situation (either by words or actions) where a reasonable person would not feel free to leave. The officer may engage protective measures in the rare Level 1 encounter when he or she has a reasonable concern for his or her safety, either because of the nature of the approach or the individual's behavior.

OBJECTIVE CREDIBLE REASON - A reason is objectively credible if it is based on more than a hunch or a whim. The reason to gather more information may relate to a public safety/service function or a law enforcement function, but need not be based on any indication of criminality.

PROTECTIVE MEASURES - Even if an officer does not have reasonable suspicion that a person is armed and dangerous, there are tactics for officer safety that an officer may use short of a frisk when the officer reasonably perceives her/his safety is at risk. These include ordering the individual to take her/his hands out of her/his pockets, put down or step away from an otherwise lawful object that could be used as a weapon, grabbing the person's hands, if the circumstances suggest the person may be grabbing a weapon, or forcibly removing the person's hands from her/his pockets, if the individual refuses to remove them from her/his pockets. Any lawfully possessed article that is removed/safeguarded by a member of the service during an investigative encounter should be returned to the individual at the conclusion of the encounter (unless probable cause is developed and the individual is arrested). The officer can engage protective measures at Level 2 and Level 3. In rare occasions, the officer can engage protective measures at Level 1.

COMMON LAW RIGHT OF INQUIRY (LEVEL 2 ENCOUNTER) - A common law right of inquiry is an encounter between a civilian and a uniformed member of the service conducted for the purpose of asking the civilian pointed or accusatory questions because the police officer has a "founded suspicion" that criminal activity is afoot. "Founded suspicion" is a lower level of suspicion than the "reasonable suspicion" required to conduct a "stop" or Level 3 encounter. Upon a founded suspicion of criminality, the officer may approach a person to ask accusatory questions and may seek consent to search; however, consent must be voluntarily given. During an encounter, providing innocuous answers does not escalate the encounter. However, providing false or inconsistent information at any level may escalate the encounter. During a Level 2 encounter, force may not be used, the person is free to refuse to answer questions, and is free to leave. Refusal to answer questions or walking away does not raise the level of suspicion. However, flight (running away) during a Level 2 encounter does escalate the encounter to Level 3 and the officer is permitted to pursue the person. The officer may not create a situation (either by words or actions) where a reasonable person would not feel free to walk away. The officer may engage protective measures, when he or she has a reasonable concern for his or her safety.

FOUNDED SUSPICION - Founded suspicion of criminal activity arises when there is some present indication of criminality based on observable conduct or reliable hearsay information. In other words, the officer has sufficient information to begin to suspect the person of criminal conduct.

# NEW • YORK • CITY • POLICE • DEPARTMENT

Ex. F

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|---|
| 212-11 | 06/26/25 | R.O. 53 | 3 of 16 |

**DEFINITIONS (continued)**

TERRY STOP (LEVEL 3 ENCOUNTER) - A Terry Stop/Level 3 encounter is any encounter between a civilian and a uniformed member of the service in which a reasonable person would not feel free to disregard the officer and walk away. A Level 3 encounter may take place even without the threat or use of physical force by the officer. Encounters involving nothing more than commands or accusatory questions can rise to the level of a stop, provided that the commands and questions would lead a reasonable person to conclude that she/he was not free to terminate the encounter. Whether an encounter amounts to a stop will be judged by the facts and circumstances of the encounter. A stop may be conducted only when a police officer has an individualized reasonable suspicion that the person stopped has committed, is committing, or is about to commit a felony or Penal Law misdemeanor. The police officer may ask accusatory or pointed questions and detain the person while an expeditious investigation is conducted to determine if there is probable cause to arrest the person. During an encounter, providing innocuous answers or refusal to answer questions does not escalate the encounter. However, providing false or inconsistent information at any level may escalate the encounter. The police officer may seek consent to search. The consent must be voluntarily given. Reasonable force may be used to stop a person. The type and amount of force used must be objectively reasonable under the circumstances. The officer may engage protective measures, when he or she has a reasonable concern for his or her safety. The officer may frisk the person, if the officer has reasonable suspicion that the person is armed and dangerous.

REASONABLE SUSPICION - Reasonable suspicion exists when the information known to the member of the service would make an ordinarily prudent and cautious police officer under the circumstances believe that a felony or Penal Law misdemeanor has been, is being or is about to be committed. The officer must have a particularized and objective basis for suspecting the person stopped of the criminal conduct. The officer must be able to articulate specific facts establishing justification for the stop; hunches or gut feelings are not sufficient.

FRISK - A carefully limited running of the hands over the outside of a person's clothing feeling for a deadly weapon or any instrument, article or substance readily capable of causing serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons. A frisk is authorized when the member of the service reasonably suspects the person is armed and dangerous. This includes situations in which the officer reasonably suspects that the person has committed, is committing, or is about to commit a violent crime or when the officer observes something on the person that she/he reasonably suspects is a weapon. A frisk may not be conducted to discover evidence or the proceeds or instrumentalities of a crime. A police officer cannot "frisk" a bag or item of personal property unless the officer has a reasonable suspicion that the person is armed and dangerous and the bag or item could contain a weapon and is within the person's reach.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

Ex. F

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|---|
| 212-11 | 06/26/25 | R.O. 53 | 4 of 16 |

**DEFINITIONS (continued)**

SEARCH AFTER FRISK - In the context of the investigative encounters described in this section, a search occurs when the officer places her/his hands inside a pocket or other interior portions of a person's clothing or personal property to remove an object that the member felt during a frisk and reasonably suspects is a weapon or dangerous instrument.

**PROCEDURE**

When a uniformed member of the service engages in an investigative encounter with a civilian:

CONDUCTING A LEVEL 1 ENCOUNTER - A REQUEST FOR INFORMATION:

**UNIFORMED MEMBER OF THE SERVICE**

1. Activate Body-Worn Camera (BWC), if assigned, for encounters where activation is required, in accordance with *P.G. 212-123, "Use of Body-Worn Cameras."*
2. Approach the person if there is an objective credible reason to do so.
3. Identify yourself as a police officer verbally and by displaying your shield in a conspicuous manner, if practicable.
4. DO NOT detain the person, use or threaten the use of force, or request consent to search.
5. You may seek information and ask general, non-threatening questions related to the reason for the approach. However, pointed and accusatory questions are not permitted.
6. The person may refuse to answer questions and is free to leave. However, providing false or inconsistent information at any level may escalate the encounter.
7. You may inform the person that she/he is free to leave, but you are not required to do so unless she/he specifically asks.
8. You should provide the individual with an explanation for the encounter, unless providing such information would impair a criminal investigation.
9. You may engage protective measures in the rare Level 1 encounter when you have a reasonable concern for your safety, either because of the nature of the approach or the individual's behavior.

CONDUCTING A LEVEL 2 ENCOUNTER - THE COMMON LAW RIGHT OF INQUIRY:

**UNIFORMED MEMBER OF THE SERVICE**

10. Activate BWC, if assigned, in accordance with *P.G. 212-123, "Use of Body-Worn Cameras."*
11. Approach the person if you have a founded suspicion of criminality.
12. Identify yourself as a police officer by providing your rank, name, shield, and command, and display your shield in a conspicuous manner, absent exigent circumstances.
13. DO NOT detain the person or use or threaten the use of force.
14. You may seek information and ask questions, including pointed and accusatory questions.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

Ex. F

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|---|
| 212-11 | 06/26/25 | R.O. 53 | 5 of 16 |

**UNIFORMED MEMBER OF THE SERVICE (continued)**

a. Offer **RIGHT TO KNOW BUSINESS CARD (PD142-012)** or **RIGHT TO KNOW BUSINESS CARD – GENERAL (PD142-013)**, as appropriate, in accordance with *A.G. 304-11, "Compliance with NYC Right to Know Act."*

15. The person may refuse to answer questions and is free to walk away. If the person runs away, you may pursue.

16. You may request consent to search; the consent must be voluntarily given.

a. Ask for consent to search in a manner that elicits a clear 'yes' or 'no' response. When seeking consent, make clear that the search will not occur if the person does not consent. For example, in a non-threatening manner and without making promises, you may ask the following: "*I can only search you, if you consent. Do you understand? May I search you?*"

b. If a person does not consent to a search, you cannot conduct a search.

c. If you are seeking consent to search, you must video record the request and the person's response, if you have a Body - Worn Camera.

d. Document the time, location, and date of such request, consent, refusal, and search (if performed), and the apparent race, ethnicity, gender, and age of the person who was the subject of such request and search, and your name, precinct, tax number and/or shield number on the **COMMON LAW RIGHT OF INQUIRY – CONSENT SEARCH REPORT (PD541-161)**.

e. Offer the person who is the subject of the request a **RIGHT TO KNOW BUSINESS CARD**, as appropriate, in all cases, and, if applicable, provide information on how to obtain a copy of the video record of the request and search (if performed).

f. This section does not apply in the following situations:
(1) You are conducting a security search of a person entering a public building or facility, location, event, or gathering, including random security checks in MTA facilities
(2) Exigent circumstances require your immediate action
(3) You reasonably expect that you or someone else is in danger of physical injury, there is an imminent risk of property damage, to forestall the imminent escape of a suspect, or the imminent potential destruction of evidence.

17. You may inform the person that she/he is free to leave, but you are not required to do so unless she/he specifically asks.

18. You may engage protective measures, when you have a reasonable concern for your safety.

19. Provide the individual with an explanation for the encounter, unless providing such information would impair a criminal investigation.

20. Do not offer the person a **RIGHT TO KNOW BUSINESS CARD** or **RIGHT TO KNOW BUSINESS CARD – GENERAL**, if the encounter ends in an arrest or a summons, unless requested.



**NEW • YORK • CITY • POLICE • DEPARTMENT**

Ex. F

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|---|
| 212-11 | 06/26/25 | R.O. 53 | 6 of 16 |

**UNIFORMED MEMBER OF THE SERVICE (continued)**

21. You are not required to proactively identify yourself, explain the reason for the encounter, or offer a **RIGHT TO KNOW BUSINESS CARD**, or **RIGHT TO KNOW BUSINESS CARD – GENERAL**, in the following situations:

  a. If engaged in undercover activity or operations
  b. Exigent circumstances require your immediate action
  c. You reasonably expect that you or someone else is in danger of physical injury, there is an imminent risk of property damage, to forestall the imminent escape of a suspect, or the imminent potential destruction of evidence
  d. You are conducting a security search of a person entering a public building or facility, location, event, or gathering, including random security checks in MTA facilities, unless requested by the subject of the search
  e. You are verifying the identity of a person seeking entrance to an area that is restricted due to a public health, public safety, or security concern, such as a terrorist attack or a natural disaster.

*NOTE*

*During a Level 1 or Level 2 encounter, an officer may not create a situation (either by words or actions) where a reasonable person would not feel free to walk away. A person may be detained only if a properly conducted Level 1 or Level 2 encounter yields information to support a reasonable suspicion that the person committed, was committing, or was about to commit a felony or Penal Law misdemeanor.*

CONDUCTING A LEVEL 3 ENCOUNTER - A TERRY STOP:

**UNIFORMED MEMBER OF THE SERVICE**

22. Activate BWC, if assigned, in accordance with *P.G. 212-123, "Use of Body-Worn Cameras."*
23. Upon reasonable suspicion that the person has committed, is committing, or is about to commit a felony or Penal Law misdemeanor, stop and detain the person for the purpose of conducting a criminal investigation.
24. Notify the radio dispatcher and include the location, number of persons being stopped and whether additional units are needed.
25. Identify yourself as a police officer by providing your rank, name, shield, and command, and display your shield in a conspicuous manner, absent exigent circumstances.
26. Question the suspect to the extent necessary to determine whether there is probable cause to make an arrest.
27. You may ask pointed and accusatory questions related to the reason for the stop. Refusal to answer questions or produce identification does not establish probable cause.

  a. Offer **RIGHT TO KNOW BUSINESS CARD** or **RIGHT TO KNOW BUSINESS CARD – GENERAL**, as appropriate, in accordance with *A.G. 304-11, "Compliance with NYC Right to Know Act."*

28. You may request consent to search; the consent must be voluntarily given.

## NEW • YORK • CITY • POLICE • DEPARTMENT

Ex. F

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|---|
| 212-11 | 06/26/25 | R.O. 53 | 7 of 16 |

**UNIFORMED MEMBER OF THE SERVICE** *(continued)*

    a.    Ask for consent to search in a manner that elicits a clear 'yes' or 'no' response. When seeking consent, make clear that the search will not occur if the person does not consent.  For example, in a non-threatening manner and without making promises, you may ask the following: "*I can only search you, if you consent. Do you understand? May I search you?*"

    b.    If a person does not consent to a search, you cannot conduct a search.

    c.    If you are seeking consent to search, you must video record the request and the person's response, if you have a Body - Worn Camera.

    d.    Document request, as appropriate, on **STOP REPORT (PD383-151)**.

    e.    Offer the person who is the subject of the request a **RIGHT TO KNOW BUSINESS CARD** or **RIGHT TO KNOW BUSINESS CARD – GENERAL**, as appropriate, in all cases, and, if applicable, provide information on how to obtain a copy of the video record of the request and search (if performed).

    f.    This section does not apply in the following situations:

        (1)    You are conducting a security search of a person entering a public building or facility, location, event, or gathering, including random security checks in MTA facilities

        (2)    Exigent circumstances require your immediate action

        (3)    You reasonably expect that you or someone else is in danger of physical injury, there is an imminent risk of property damage, to forestall the imminent escape of a suspect, or the imminent potential destruction of evidence.

29.    Reasonable force may be used to stop a person.

30.    You may engage protective measures, when you have a reasonable concern for your safety.

31.    You may frisk the person if at any point during the encounter, you have reasonable suspicion that the person is armed and dangerous (see "Conducting a Frisk, and When Appropriate, a Search:" below).

32.    The suspect may be detained only as long as necessary to confirm or dispel your suspicion that she/he was committing, committed, or was about to commit a felony or Penal Law misdemeanor. Authority to detain the suspect ends when the tasks tied to the reason for the stop are completed or reasonably should have been completed.

33.    Provide the individual with an explanation for the encounter, unless providing such information would impair a criminal investigation.

34.    Obtain the suspect's name, address, and any additional information that will be required to complete your digital **Activity Log** entry regarding the stop.

35.    Do not transport or otherwise move the suspect from the location where she/he is stopped unless she/he voluntarily consents or there is an exigency necessitating relocation (e.g., hostile crowd, threat to safety, hospital show-up, etc.).

36.    Release the person immediately after completing the investigation if probable cause to arrest does not exist.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

Ex. F

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|---|
| 212-11 | 06/26/25 | R.O. 53 | 8 of 16 |

**UNIFORMED MEMBER OF THE SERVICE** *(continued)*

37. Do not offer the person stopped a **RIGHT TO KNOW BUSINESS CARD** or **RIGHT TO KNOW BUSINESS CARD – GENERAL**, if the encounter ends in an arrest or a summons, unless requested.

38. You are not required to proactively identify yourself, explain the reason for the encounter, or offer a **RIGHT TO KNOW BUSINESS CARD**, or **RIGHT TO KNOW BUSINESS CARD – GENERAL**, in the following situations:
    a. If engaged in undercover activity or operations
    b. Exigent circumstances require your immediate action
    c. You reasonably expect that you or someone else is in danger of physical injury, there is an imminent risk of property damage, to forestall the imminent escape of a suspect, or the imminent potential destruction of evidence
    d. You are conducting a security search of a person entering a public building or facility, location, event, or gathering, including random security checks in MTA facilities, unless requested by the subject of the search
    e. You are verifying the identity of a person seeking entrance to an area that is restricted due to a public health, public safety, or security concern, such as a terrorist attack or a natural disaster.

CONDUCTING A FRISK, AND WHEN APPROPRIATE, A SEARCH:

**UNIFORMED MEMBER OF THE SERVICE**

39. If a police officer develops a reasonable suspicion that a person is armed and dangerous, the officer may frisk the person for a deadly weapon or any instrument, article or substance readily capable of causing serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons. Reasonable suspicion that a person is armed and dangerous may arise from the officer's observations or the facts and circumstances of the encounter including:
    a. Reasonable suspicion that the suspect has committed, is committing, or is about to commit a violent crime (e.g., assault with a deadly weapon, burglary, rape, robbery, etc.)
    b. Observation of something on the person that the officer reasonably suspects is a weapon
    c. A statement by the suspect stopped that she/he is armed
    d. Information known by the officer that the suspect may be carrying a weapon, such as statements from a victim or witness.

40. The purpose of the frisk is to ensure the safety of the officer and not to locate evidence of a crime, such as drugs.

41. There is no requirement to question a suspect prior to conducting a lawful frisk.

42. Conduct the frisk by carefully running your hands down the outside of the person's clothing.

43. Where the frisk reveals an object that the member of the service reasonably suspects may be a weapon, the member of the service may search only those interior portions of the stopped person's clothing to remove the weapon.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

Ex. F

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|---|
| 212-11 | 06/26/25 | R.O. 53 | 9 of 16 |

**UNIFORMED MEMBER OF THE SERVICE (continued)**

44. An officer may not frisk a person's bag or other item of personal property unless the officer has reasonable suspicion to believe that the person is armed and dangerous and that the bag or item of personal property could contain a weapon and is within the person's reach. If the bag/item is soft, the officer should run her/his hands down the outside of the bag/item and open it only if she/he feels the contours of what she/he believes is a weapon. If the bag/item is rigid and unlocked, the officer may open it to ensure it does not contain a weapon. If the bag/item is locked, the officer must obtain a search warrant or get consent to search from the person in order to search the bag/item.

**NOTE**

*The guidelines in step "44" do not apply to mass transit system checkpoint type inspections of backpacks, containers and other carry-on items that are capable of containing explosive devices.*

*Requesting identification documents: At any level, an officer may ask an individual to verbally identify herself/himself or present an identification document to verify that person's identity and/or address. During Level 1 or 2 encounters, when performing this task, the officer must not create a situation where the person does not feel free to leave. Other than the operator of a motor vehicle/motorcycle, members of the public are not required to possess identification documents or present identification documents to police officers when requested. Refusal or inability to produce identification alone will not elevate the level of the encounter. Absent probable cause that the person committed an offense, she/he may not be arrested or removed to a Department facility for further investigation merely because she/he refused to produce identification.*

REQUIRED DOCUMENTATION:

**UNIFORMED MEMBER OF THE SERVICE**

45. Access video management system on Department intranet or Department smartphone to classify videos based upon nature of the event.
    a. For all investigative encounters that are captured on BWC that do not end in an arrest or summons:
       (1) Select "Investigative Encounters" as the category for BWC video retention
       (2) Select applicable final level of encounter (e.g., Level 1 encounter escalates to a Level 2 encounter, select "Level 2 Encounter.").
    b. For all Level 2 encounters that are captured on BWC, but do not escalate beyond Level 2:
       (1) Select race and gender of primary person encountered
       (2) Select whether or not encounter was with more than one individual.

46. For all consent searches requested during a Level 2 encounter, prepare a **COMMON LAW RIGHT OF INQUIRY – CONSENT SEARCH REPORT**, utilizing the Finest Online Records Management System (FORMS), for EACH person from whom you request consent to search. The **COMMON LAW RIGHT OF INQUIRY – CONSENT SEARCH REPORT** in FORMS is available through Department mobile devices (cellular telephones and tablets).

**NEW • YORK • CITY • POLICE • DEPARTMENT**

Ex. F

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|---|
| 212-11 | 06/26/25 | R.O. 53 | 10 of 16 |

**UNIFORMED MEMBER OF THE SERVICE (continued)**

a. Prior to the end of tour, complete all applicable captions and follow the directions for each section of the **COMMON LAW RIGHT OF INQUIRY – CONSENT SEARCH REPORT** in FORMS and select the "Check" icon to submit the **COMMON LAW RIGHT OF INQUIRY – CONSENT SEARCH REPORT**.

b. The **COMMON LAW RIGHT OF INQUIRY – CONSENT SEARCH REPORT** is only prepared for Level 2 requests to search. If you seek consent to search during a Level 3 Terry Stop, document that request on your **STOP REPORT** in the appropriate places.

c. The **COMMON LAW RIGHT OF INQUIRY – CONSENT SEARCH REPORT** is not prepared in the following situations:

    (1) You are conducting a security search of a person entering a public building or facility, location, event, or gathering, including random security checks in MTA facilities

    (2) Exigent circumstances require your immediate action

    (3) You reasonably expect that you or someone else is in danger of physical injury, there is an imminent risk of property damage, to forestall the imminent escape of a suspect, or the imminent potential destruction of evidence.

47. For all Terry Stops/Level 3 encounters, prepare a **STOP REPORT**, utilizing FORMS, for EACH person stopped. The **STOP REPORT** in FORMS is available through Department mobile devices (cell phones and tablets).

a. Prior to the end of tour, complete all applicable captions and follow the directions for each section of the **STOP REPORT** in FORMS and select the "Check" icon to submit the **STOP REPORT** to the patrol/unit supervisor.

b. Check "REFUSED" in the appropriate space, if the person stopped refused to identify herself/himself.

    (1) Request the patrol supervisor to respond to verify refusal.

    (2) Do not detain the person, however, if the investigation is complete and there is no probable cause to make an arrest.

c. Select all relevant factors that led to the stop if more than one descriptive term applies.

d. Describe in plain language (rather than numeric Penal Law section) the specific felony or Penal Law misdemeanor you suspected the person had committed, was committing, or was about to commit.

e. Describe in your own words, under the "Narrative (Describe the Circumstances That Led to the Stop)" caption, all of the facts and information relied upon to conclude that there was reasonable suspicion that the person stopped had committed, was committing, or was about to commit a felony or Penal Law misdemeanor.



## NEW • YORK • CITY • POLICE • DEPARTMENT

Ex. F

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|---|
| 212-11 | 06/26/25 | R.O. 53 | 11 of 16 |

**UNIFORMED MEMBER OF THE SERVICE (continued)**

    f.    Describe in your own words, under the "Narrative (Describe the Circumstances That Led to the Frisk and/or Search, if Conducted. Include Area Searched)" caption, all of the facts and information relied upon to conclude that there was reasonable suspicion that the person stopped was armed and dangerous. In addition, if a search was conducted, describe the basis for the search, the specific area searched, and whether a weapon or other contraband was recovered.

48.    Complete **VEHICLE REPORT** in FORMS for every vehicle, bicycle, motorized scooter, e-scooter, or e-bike stop, regardless of whether enforcement action is taken or not.

49.    When prompted to identify the "Reviewing Supervisor" in FORMS, enter the name or tax identification number of a supervisor currently performing duty with the platoon/unit and select that supervisor from the dropdown menu that appears.

    a.    Select immediate squad/unit supervisor, if he/she is assigned to perform duty with the squad/unit and is available to review the **STOP REPORT**.

    b.    If not assigned to an immediate squad/unit supervisor or he/she is not available, enter the name or tax identification number of another supervisor performing duty with the squad/unit (e.g, patrol supervisor, detail supervisor, etc.).

50.    Notify the reviewing supervisor that the **STOP REPORT** was prepared and submitted to the supervisor's electronic "INBOX" folder in FORMS for review.

**NOTE**

*The **STOP REPORT** is not prepared for Level 1 and Level 2 encounters, unless the encounter escalates to a Level 3 Terry Stop. Similarly, the **STOP REPORT** is not prepared when an officer makes a summary arrest for an offense/crime or issues a Criminal Court summons or a civil summons returnable to the Office of Administrative Trials and Hearings for an observed violation, unless the suspect was initially detained for investigation in a Level 3 Terry Stop. The **STOP REPORT** is not prepared for traffic stops based on violations of the Vehicle and Traffic Law, unless the suspect is frisked.*

*Uniformed members of the service (UMOS) should be mindful that users of FORMS will be timed out after 55 minutes, therefore UMOS should periodically click on the "Save" icon to ensure that entered data is not lost.*

51.    Record details in digital **Activity Log** and include the following information in the entry:

    a.    Date, time and location of stop

    b.    Pedigree information (name, date of birth, address, telephone number), unless refused, and detailed description of the person stopped

    c.    Document refusal to provide pedigree information, if applicable

    d.    ICAD number, if applicable.

52.    Prior to the end of your tour, submit the **STOP REPORT** and digital **Activity Log** printout to the patrol supervisor/unit supervisor for review.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

Ex. F

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|---|
| 212-11 | 06/26/25 | R.O. 53 | 12 of 16 |

**UNIFORMED MEMBER OF THE SERVICE (continued)**

a. The reviewing supervisor must be at least one rank higher than the member submitting the **STOP REPORT**.

53. Inform the patrol supervisor/unit supervisor of facts of the stop and, if conducted, frisk, and/or search.

*NOTE*

*The pedigree information of an individual who is stopped is not captured electronically and will only be recorded in the member's digital **Activity Log**. Accurately recording pedigree information in the digital **Activity Log** will enable members to later identify persons stopped and may aid investigators during the course of a criminal investigation. Do not put pedigree information into the **STOP REPORT** narratives.*

SUPERVISORY AND ADMINISTRATIVE FUNCTIONS:

**PATROL SUPERVISOR/ UNIT SUPERVISOR**

54. Respond to the scene of stops when feasible.

55. Discuss the circumstances of the stop with the member of the service and review the **STOP REPORT** in FORMS using a Department mobile device (e.g., cellphone, tablet, etc.), or desktop, if available, by selecting "Signoff."

   a. Determine whether all captions are completed and all relevant check boxes are checked.

   b. Confirm that the **STOP REPORT** states in plain language a specific suspected felony or Penal Law misdemeanor.

   c. Determine whether the officer's description in the "Narrative (Describe the Circumstances That Led to the Stop)" caption includes the facts and circumstances relied upon by the officer to conclude that there was reasonable suspicion that the person stopped had committed, was committing, or was about to commit a felony or Penal Law misdemeanor.

   d. If the person was frisked, determine whether the officer's description in the "Narrative (Describe the Circumstances That Led to the Frisk and/or Search, if Conducted. Include Area Searched)" caption includes the facts and circumstances relied upon by the officer to conclude that there was reasonable suspicion that the person was armed and dangerous and, if a search was conducted, the facts and circumstances that provided the basis for the search, the area searched and whether a weapon or other contraband was recovered.

   e. Complete the "Supervisory Action (Must Complete)" caption. Consider the facts and information as conveyed by the member and recorded on the **STOP REPORT** and determine whether:

      (1) The stop was based upon reasonable suspicion of a felony or Penal Law misdemeanor

      (2) If the person was frisked, whether the frisk was supported by a reasonable suspicion that the person was armed and dangerous; and

      (3) If the person was searched, whether there was a sufficient basis for the search.



**NEW • YORK • CITY • POLICE • DEPARTMENT**

Ex. F

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|---|
| 212-11 | 06/26/25 | R.O. 53 | 13 of 16 |

**PATROL SUPERVISOR/ UNIT SUPERVISOR (continued)**

    f.    If appropriate, instruct member of the service and/or refer for additional training and/or other remedial action, including, disciplinary action and indicate such in the "Follow-Up Action (If appropriate)" caption.

56. Complete all captions in the "Reviewing Supervisor" section.

57. If, based upon review of the **STOP REPORT**, digital **Activity Log** entry and discussion with the uniformed member of the service, the **STOP REPORT** requires additional information:

    a.    Check "No" following question "Report Accurate and Complete?"

    b.    Enter instruction to the reporting member of the service in the "Note" section in FORMS

    c.    Select the "Check" icon to return the **STOP REPORT** to the reporting member of the service for correction.

58. If the report is "Accurate and Complete" (i.e., all captions filled out and narrative contains adequate details) but after review it is determined there was not a sufficient basis for the stop and/or frisk and/or search, indicate such by checking the appropriate field(s) on the electronic form.

    a.    Select the action taken from the "Follow-Up Action (If appropriate)" section, and

    b.    Approve the **STOP REPORT**.

59. "Approve" and "Finalize" the **STOP REPORT** following the prompts in FORMS.

60. Review the member's digital **Activity Log** entry and ensure that the detailed description and the pedigree information of the person stopped is included, unless the person stopped refused to provide the information.

61. If force was used, determine whether the use of force was reasonable under the circumstances of the encounter.

62. Prior to the end of tour, electronically "sign-off" on **STOP REPORT** and return digital **Activity Log** back to member upon completion of the review.

*NOTE*    *If the **STOP REPORT** was submitted for an investigative encounter that did not rise to a Terry Stop, (e.g., Level 1/Request for Information or Level 2/Common Law Right of Inquiry) or for an arrest or summons that was not the result of a Terry Stop, then select the appropriate fields on the **STOP REPORT** and approve the **STOP REPORT**, but note in the comments section that the **STOP REPORT** was prepared in error and the reason a report should not have been prepared.*

**UNIFORMED MEMBER OF THE SERVICE**

63. Upon rejection of **STOP REPORT** from the reviewing supervisor, access the report from the FORMS "Inbox," go to the "Actions" tab, select "Edit" and make the directed corrections.

    a.    Select the "Check" icon to resubmit to supervisor for review and approval.

64. Prior to the end of tour, print the digital **Activity Log** entry detailing the Terry Stop and submit to the desk officer/designee.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

Ex. F

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|---|
| 212-11 | 06/26/25 | R.O. 53 | 14 of 16 |

**DESK OFFICER/ DESIGNEE**

65. Log into FORMS and select "SEARCH." A search must be conducted of all **STOP REPORTS** prepared during tour.

66. If a **STOP REPORT** was prepared, print out the "approved" **STOP REPORT** from the queue and attach it to the printed digital **Activity Log** entry submitted by the uniformed member of the service.

    a. Place **STOP REPORT** and photocopy of printed digital **Activity Log** entry into the command's **STOP REPORT** binder maintained at the desk in sequential order.

**INTEGRITY CONTROL OFFICER**

67. Personally conduct, in conformance with the Quality Assurance Division's self-inspection program, the command self-inspection of **STOP REPORTS**.

68. Ensure that the patrol supervisor/unit supervisor reviews the **STOP REPORTS** and digital **Activity Log** and that appropriate actions are taken where necessary.

    a. In assessing the patrol/unit supervisor's review of officers' Level 3 encounters, determine whether the supervisor appropriately reviewed the stop and, if conducted, the frisk and search, and any force used. In making these determinations, consider whether the supervisor examined the information recorded on the **STOP REPORT** and appropriately evaluated whether the information reasonably supports the conclusion that the member's actions were based upon reasonable suspicion.

    b. Take appropriate remedial action if warranted, including discipline, if appropriate.

    c. Inform commanding officer and training sergeant of any matters of importance, including deficiencies or patterns of deficiencies in regard to the bases of stops and/or frisks conducted, or in the preparation of **STOP REPORTS** and digital **Activity Log**.

**EXECUTIVE OFFICER**

69. Personally conduct, in conformance with the Quality Assurance Division's self-inspection program, the command self-inspection of "POLICE INITIATED ENFORCEMENT."

**COMMANDING OFFICER**

70. Assume responsibility for the integrity of the administration of this procedure.

71. Consult with the executive officer, integrity control officer, platoon commanders, special operations lieutenant, training sergeant, patrol supervisors/unit supervisors to ensure the constitutionality and effectiveness of stops.

    a. Identify training needs and necessary remedial or disciplinary actions required.

    b. Prepare a report on **Typed Letterhead** addressed to the Commanding Officer, Legal Bureau requesting remedial training for any members of the service identified as having a deficient understanding of the law pertaining to street encounters.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

Ex. F

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|---|
| 212-11 | 06/26/25 | R.O. 53 | 15 of 16 |

**NOTE**    *Minor or inadvertent mistakes in documentation or isolated cases of erroneous but good-faith stops or frisks by members of the service should ordinarily be addressed through instruction and training. In most instances, instruction and training should be accomplished at the command level. The application of the law in this area can be complicated, and investigative encounters are fluid situations in which one event or observation can alter the level of suspicion or danger. A single erroneous judgment will not generally warrant referral to the Legal Bureau for retraining. However, members of the service who evince a lack of comprehension of the core concepts of the law governing this procedure should be referred to the Legal Bureau.*

**TRAINING SERGEANT**
72.    Conduct command level training to help ensure compliance with the Department's policy regarding investigative encounters.
  a.    Periodically review and identify command-wide and individual training needs and necessary remedial actions.
  b.    Record training sessions in the Training Attendance Certification Transcript Integrated Collection System (TACTICS) to assist with future review and analysis of command's compliance and training in investigative encounters.
  c.    Identify members who have been referred for training in **STOP REPORTS** and ensure that the training is conducted.
    (1)    Track, record and report such training to the commanding officer on a quarterly basis.

**ADDITIONAL DATA**    *There are many facts and circumstances that may lead a police officer to conclude that there is reasonable suspicion that a person has committed, is committing or is about to commit a felony or Penal Law misdemeanor. Such factors may include information received from third parties as well as the actions of the suspect, the suspect's physical and temporal proximity to the scene of a crime, the suspect's resemblance to the specific description of a perpetrator of a crime (based on more than just race, age and gender) and information known to the officer about the suspect or particular location, among other factors. Each situation is unique and the information available to members of the service will vary.*

*"Furtive movements" or mere presence in a "high crime area," standing alone, are insufficient bases for a stop or frisk. Moreover, even when used in combination with other stop factors, the stopping officer must be able to specifically describe the suspicious nature of the "furtive movements" which she/he observed, and she/he must not define the "high crime area" too broadly, such as encompassing an entire precinct or borough. In addition, a person may not be stopped merely because he or she matches a generalized description of a crime suspect, such as an 18-25 year old male of a particular race. If a physical description is the only factor relied on by the stopping officer, it must be more specific to form the basis for a stop. Individuals may not be targeted for stops and frisks because they are members of a racial or ethnic group that appears more frequently in local crime suspect data. Race may only be considered where the stop is based upon a specific and reliable suspect description that includes not just race, age and gender, but other identifying characteristics and information. When a police officer carries out a stop based on reasonable suspicion that a person fits such a description, the officer may consider the race of the suspect, just as the officer may consider the suspect's height or hair color.*

## NEW • YORK • CITY • POLICE • DEPARTMENT

Ex. F

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|---|
| 212-11 | 06/26/25 | R.O. 53 | 16 of 16 |

**ADDITIONAL DATA (continued)**

*Commanding officers of commands other than patrol precincts, PSAs and transit districts (e.g., Detective Bureau, Strategic Response Group, etc.) will designate a supervisor to perform the desk officer duties listed above. Photocopies of the* **STOP REPORTS** *will be sent via Department mail to the precinct of occurrence daily. The precinct of occurrence will then place the photocopies in sequential order in their* **STOP REPORT** *command binder.*

*Desk officers/designees in commands other than patrol precincts, PSAs or transit districts will maintain a standardized* **STOP REPORT** *command binder with photocopies of* **STOP REPORTS** *prepared by their respective command. Additionally, a corresponding* **Stop Report Index** *for the command will be printed out daily and will likewise be maintained in the command binder. Commanding officers will ensure that photocopied* **STOP REPORTS** *maintained in the command binder are removed and filed in the command by year of occurrence every January 1st and quarterly thereafter (April 1st, July 1st and October 1st).*

***Activity Log*** *inserts including,* **INVESTIGATIVE ENCOUNTERS (PD383-090)** *and* **SUPPLEMENTAL INSTRUCTIONS FOR PREPARATION OF STOP REPORT (PD383-151A)** *are accessible via the Department smartphone.*

**RELATED PROCEDURES**

*Activity Logs (P.G. 212-08)*
*Interior Patrol of Housing Authority Buildings (P.G. 212-60)*

**FORMS AND REPORTS**

**RIGHT TO KNOW BUSINESS CARD (PD142-012)**
**RIGHT TO KNOW BUSINESS CARD – GENERAL (PD142-013)**
**COMMON LAW RIGHT OF INQUIRY – CONSENT SEARCH REPORT (PD541-161)**
**STOP REPORT (PD383-151)**
**INVESTIGATIVE ENCOUNTERS (PD383-090)**
**SUPPLEMENTAL INSTRUCTIONS FOR PREPARATION OF STOP REPORT (PD383-151A)**
**Stop Report Index**



# NEW • YORK • CITY • POLICE • DEPARTMENT

Ex. F

**Policy 1112**



| Subject |
|---|
| # FIELD INTERVIEWS, INVESTIGATIVE STOPS & WEAPONS PAT-DOWNS |

| Date Published | Page |
|---|---|
| **20 January 2026** | **1 of 29** |

*By Order of the Police Commissioner*

## TABLE OF CONTENTS

**CORE PRINCIPLES**   **2**

**DEFINITIONS**   **2**

**DIRECTIVES**   **4**

VOLUNTARY CONTACTS   4
FIELD INTERVIEWS   4
INVESTIGATIVE STOPS   6
WEAPONS PAT-DOWNS   14
VEHICLE STOPS   18

**REQUIRED ACTIONS**   **20**

FIRST-LINE SUPERVISOR   20
LIEUTENANT   22
COMMANDING OFFICER   22
ADMINISTRATIVE OFFICER, PATROL   22
PERFORMANCE STANDARDS SECTION   23
EDUCATION & TRAINING, DIRECTOR   23

**APPENDICES**   **23**

## PURPOSE

The purpose of this policy is to ensure that Baltimore Police Department (BPD) members conduct all Voluntary Contacts, Field Interviews, Investigative Stops, Vehicle Stops, Weapons Pat-Downs, Searches and Arrests in accordance with the rights secured and protected by the U.S. Constitution, federal and state law, as well as BPD policy. This policy instructs members on how to conduct any interaction with individuals fairly and respectfully, to enhance trust between the Department and the community it serves. Additionally, this policy provides guidance to supervisors on proper response, review, and documentation regarding the aforementioned law enforcement activities.

Ex. G

## CORE PRINCIPLES

**Constitutional Stops**. Members may conduct a brief stop of a person when there is Reasonable Articulable Suspicion (RAS) to believe that they have committed, are committing, or are about to commit a crime under the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968), and consistent with the 4th and 14th Amendments to the Constitution and Article 26 of the Maryland Declaration of Rights.

**Procedural Justice**. Procedural justice refers to the perception of fairness and impartiality in an encounter with police, achieved by treating all individuals with dignity and respect, giving individuals a voice during encounters, being impartial in decision making, and conveying trustworthy motives. Conduct that conforms to these principles has the potential of building community trust and confidence in the police and foster the community's willingness to cooperate with police to advance shared public safety goals.

**Distinct and Separate Actions**. A Voluntary Contact, Field Interview, Investigative Stop, Vehicle Stop, Weapons Pat-Down, Search, Arrest, and Booking are distinct and separate actions, and each is governed by different legal and policy standards depending on the action. An Investigative Stop or a Voluntary Contact between the police and the community **DOES NOT** automatically justify a Weapons Pat-Down or a Search (refer to the table in Appendix A of this policy).

**Non-Discriminatory Policing**. Members are prohibited from relying, to any extent or degree, on a person's race, ethnicity, national origin, religion, gender, sexual orientation, age, disability, gender identity or expression, or affiliation with any other similar identifiable group as a factor in conducting a Field Interview, Investigative Stop, Vehicle Stop, Weapons Pat-Down, Search or Arrest except when physically observable as part of an actual and credible description of a specific suspect or suspects in any criminal investigation that includes other appropriate non-demographic identifying factors (such as clothing or associated vehicle). (See Policy 317, *Fair and Impartial Policing*).

## DEFINITIONS

**Arrest** — An Arrest generally refers to the detention of a known or suspected offender for the purpose of prosecuting them for a crime. An Arrest can also occur when an Investigative Stop is extended past its legal limits. A lawful Arrest requires Probable Cause that a crime was committed or is being committed.

**Boilerplate Language** — Words or phrases that are standardized, "canned" or patterned and that do not describe a specific event, situation or set of circumstances (e.g., "furtive movement" without describing what that movement was or "fighting stance" without describing the body positioning involved).

**Booking** — An Arrest and transport of a suspect to a booking facility for the purpose of charging by causing Statement of Probable Cause and charges to be filed against that person.

**Demographic Category** — Race, ethnicity, color, national origin, age, gender, gender expression or identity, sexual orientation, disability status, religion, or language ability.

**Field Interview** — A consensual, non-hostile contact or approach during which a member may ask questions or try to gain information for a legitimate law enforcement purpose related to a criminal or civil

Ex. G

matter as long as the member does not indicate or imply that a person is not free to leave or is obligated to answer the member's questions.

**Investigative Stop —** The temporary involuntary detention and questioning of a person where the person is Stopped based on Reasonable Articulable Suspicion that the person is committing, is about to commit, or has committed a crime. It occurs whenever a member uses words or takes actions to make a person halt, to keep a person in a certain place, or to compel a person to perform some act. If a reasonable person under the circumstances would believe that they are not free to leave, a "stop" has occurred.

**Pretext Stop —** Stopping a person for an infraction to investigate other suspected or possible criminal activity for which the BPD member has neither RAS nor Probable Cause.  Members must have RAS for the infraction or violation for which they are stopping a person.

**Probable Cause —** Where facts and circumstances taken as a whole, known to the member at the time of the arrest, would lead a reasonable member to believe that a particular person has committed or is committing a crime. As with Reasonable Articulable Suspicion, Probable Cause is based upon an objective assessment of the facts and circumstances presented to the member.

**Reasonable Articulable Suspicion (RAS) —** A well founded suspicion based on specific, objective, articulable facts, taken together with the member's training and experience, that a subject has committed, is committing, or is about to commit a crime.

**Search —** In most instances, a Search refers to an inspection, examination, or viewing of persons, places, items, or information in which a person has a legitimate expectation of privacy. In a few cases, a Search may also include actions taken against someone's property to obtain evidence (such as placing a global position system (GPS) tracker on a private vehicle or in someone's backpack) even if the person is moving in public view. A Search need not be visual; it may include grasping, prying into or manipulating persons or objects (e.g., reaching into a purse or pocket, feeling inside of the trunk of a car, physical manipulation of a duffel bag, etc.).  An entry into the home or the curtilage (area immediately around the home) will generally be considered a Search. Other actions that may be considered a Search include: continuous monitoring of a person's GPS location over a prolonged period of time, collecting cell phone tower data to identify and track a person's movements, or a canine "sniff" Search, where the dog performing the Search was physically intruding on a location where a person has a reasonable expectation of privacy, such as the curtilage of a private home. (See Policy 1602, *Canine Procedures*).

**Traffic Violation —** A violation of Maryland's Transportation Article that carries a fine only. Does not include crimes in the Transportation Article that carry jail time such as DUI/DWI and hit-and-run.

**Vehicle Stop —** The involuntary detention of a vehicle and the driver and/or the occupants of the vehicle.

**Voluntary Contact —** A non-investigative consensual encounter between a BPD member and one or more person(s) with the intent of engaging in a casual and/or non-investigative conversation (e.g., chatting with a local business owner or resident about community relations). During a Voluntary Contact, the person(s) is/are free to leave or decline any request by the member at any point.

**Weapons Pat-Down —** A minimally intrusive check for weapons. When performed during an Investigative Stop where the member reasonably suspects a person is armed and dangerous, it is initially limited to a brief, non-probing pat down of the hands over the outside of a person's clothing feeling for a weapon. A Weapons Pat-Down is authorized as part of an Investigative Stop when the member has Reasonable Articulable Suspicion that the person is armed and dangerous, and the Pat-Down is

Ex. G

designed to ensure the safety of members and others. This can include situations in which the member reasonably suspects that the person has committed, is committing, or is about to commit a violent crime or when the member stops a person and observes something on the person that they reasonably suspect is a dangerous weapon.

**Weapons Pat-Down of a Vehicle —** When performed during an Investigative Stop where the member reasonably suspects the person is armed and dangerous and that the person may gain immediate control of a weapon in the passenger compartment of the vehicle that may be used to harm someone during the Stop or after returning the person to the vehicle at the conclusion of the Stop, the member is authorized to conduct a Weapons Pat-Down of a Vehicle. The Weapons Pat-Down of a Vehicle is limited to areas of the vehicle within the reach, lunge, and grasp of the subject of the Stop such as the interior passenger compartment of the vehicle or other areas accessible to the occupants or person believed to be armed.


## DIRECTIVES

NOTE:  A quick Reference Chart is provided as Appendix A to assist members in determining the minimum legal and reporting requirements for each type of contact with a person, and documentation to give to the person.

**Voluntary Contacts**

1.  Members are encouraged to conduct Voluntary Contacts in order to enhance communication, trust and understanding between BPD and members of the public.

2.  Strong relationships between members and community residents are a key aspect of community policing and a significant contributor to neighborhood safety. Voluntary Contacts are a great way to build strong relationships, as well as to foster community support in crime prevention and intervention efforts.

3.  Voluntary Contacts, like all other community contacts, shall be conducted in a friendly, professional manner.

4.  Voluntary Contacts do not require any written documentation or Body-Worn Camera (BWC) recording.

5.  If the member is seeking information about a suspected crime, the interaction is not a Voluntary Contact. It may be a Field Interview or even an Investigative Stop.

**Field Interviews**

Required Actions – Field Interviews

6.  A member may initiate Field Interviews for legitimate law enforcement purposes. The person is free to end the Field Interview at any time and refuse to answer the member's questions.

7.  Members conducting a Field Interview shall:

Ex. G

7.1. Exercise Procedural Justice principles. (See Policy 325, *Procedural Justice in Interactions*);

7.2. Activate BWC at the onset of the observation or activity on which they base their decision to conduct a Field Interview, and shall not deactivate BWC until the completion of the Field Interview;

    7.2.1. Members may Deactivate, where appropriate in accordance with Policy 824, *Body-Worn Camera (BWC)* and Appendix D, their BWC during a Field Interview where the victim(s), witness(es), or other individual(s) wish to make a statement or share information but refuse to do so while being recorded. The member shall clearly memorialize this request on the BWC prior to deactivating or document that they deactivated in their Incident Reports. (See Policy 824, *Body-Worn Camera*).

7.3. Before asking any questions, introduce themselves and notify the person(s) of the BWC recording unless exigent circumstances require gathering information immediately;

7.4. Use words, tone, and actions indicating that the person's responses are voluntary, and refrain from using words or actions that tend to communicate that the person(s) are not free to leave or that they must answer questions (e.g., blocking path of individual's vehicle, placing hands on shoulder, holding a person's property); and

7.5. If asked by the person(s) whether they are free to leave or may decline to answer questions, inform them that they may decline to answer and leave without consequences.

8. If a person refuses to answer questions during a Field Interview, they must be permitted to leave. A person's failure to stop, refusal to answer questions, decision to end the encounter, or decision to walk away, cannot be used as the basis for establishing RAS or to extend the encounter or further intrude on the person through an Investigative Stop, Weapons Pat-Down, Search, or Arrest of the person.

9. If asking a person to identify themselves, members shall inform the person(s) that providing identification is voluntary. People are not required to carry any means of identification, nor are individuals required to identify themselves to law enforcement or account for their presence in a public place.

10. The duration of the Field Interview should be as brief as possible to achieve its goals. The success or failure of a meaningful Field Interview rests on the member's ability to put the person at ease and establish a rapport.

Prohibited Actions – Field Interviews

11. Because a person is free to end the Field Interview at any time and to refuse to answer the member's questions, members shall not engage in conduct that would lead a reasonable person to believe they <u>must</u> comply, provide identification, or respond. Where many people view a marked patrol car, police uniform, firearm or other weapons as symbols of authority and potential coercion, members shall act in a manner that would inform a reasonable person that the contact

Ex. G

is voluntary, such as using a non-coercive tone of voice, asking questions, and refraining from giving orders.

12.     Members shall not conduct Field Interviews in a hostile or aggressive manner, or as a means of harassing any person or attempting to coerce a person to do anything (e.g., leave the area, consent to a Search, etc.).

13.     Members shall not take actions intended to create RAS without previous particularized facts to justify action. For example, a member may not drive at a high rate of speed toward a group congregated on a corner, perform a threshold brake, and exit quickly with the intention of stopping anyone in the group who flees.

14.     Members shall not target treatment facilities and prior arrestees for controlled dangerous substances (CDS) possession based solely on knowledge of drug addiction.

Documentation Requirements - Field Interviews

15.     Members shall document all Field Interviews in a Field Interview Report.

16.     Members shall complete all mandatory fields and include in the appropriate fields of the Field Interview Report:

16.1.    The Call for Service (CAD) Number.

16.2.    If applicable, select "yes" or "no" if the individual is under 18 years of age and whether their parent/guardian did or did not consent to an interview. If yes, add the parent/guardian's name and information to the Field Interview Report and identify their relationship to the youth.

16.3.    The demographic fields (DOB, Age, Sex, Race, and Ethnicity).

16.4.    If applicable, the vehicle's information.

17.     If the Field Interview is associated with an existing Incident Report, members shall link the Field Interview Report to the Incident Report.

18.     Members shall provide individuals who were Field Interviewed with a Baltimore Police Contact Card with all areas of the card completed. For "Reason," it is sufficient to use a summary statement such as "investigating burglary." (See Appendix B).

**Investigative Stops**

Justification – Investigative Stops

19.     The Fourth Amendment of the U.S. Constitution protects individuals from unreasonable seizure. It permits officers to briefly detain a person for investigation where an officer has a reasonable suspicion that a person is involved in criminal activity.

20.     Reasonable Articulable Suspicion (RAS) is an objective legal standard that is less than Probable Cause but more than a hunch or general suspicion. RAS depends on all of the circumstances

Ex. G

which the member observes and the reasonable assumptions that are drawn based on the member's training and experience. RAS can result from a combination of particular facts, which may appear harmless in and of themselves, but taken together amount to reasonable suspicion.

21. RAS should be founded on specific and objective facts or observations about how a person behaves, what the person is seen or heard doing, and the circumstances or situation in regard to the person that are/is either witnessed or known by the member. Accordingly, RAS must be described with reference to facts or observations about a particular person's actions or the particular circumstances that a member encounters. The physical characteristics of a person are never, by themselves, sufficient. Instead, those characteristics must be combined with other factors, including a specific, non-general description matching the suspect or the observed behaviors of the person.

<u>Required Actions – Investigative Stops</u>

22. For all Investigative Stops, a member shall possess specific and articulable facts which, combined with rational assumptions from these facts, reasonably warrant a belief that the person is committing, is about to commit, or has committed a crime.

<u>NOTE</u>: One factor alone is typically not sufficient to establish RAS and circumstances will vary in each case.

23. Before conducting an Investigative Stop, members <u>shall</u>:

23.1. Activate BWC at the onset of the observation or activity on which they base their reasonable suspicion, to the extent practicable and safe, and shall not deactivate BWC until the completion of the Investigative Stop.

23.2. Notify the dispatcher and include the location, number of persons being Stopped and whether additional units are needed, and when safe to do so, a brief basis for the Stop.

23.3. Always determine whether the circumstances warrant a request for backup assistance and whether the Investigative Stop can and should be delayed until such backup arrives.

<u>NOTE</u>: If it is unsafe, impossible, or impractical to do all of these prior to conducting a Stop, they must be done as soon as practical and safe to do so.

24. At the commencement of all Investigative Stops, including Vehicle Stops, absent exigent circumstances, members shall:

24.1. Introduce themselves, be professional and courteous, and exercise Procedural Justice principles. (See Policy 325, *Procedural Justice in Interactions*).

24.2. Provide notification of the BWC recording;

24.3. Display proper identification to the Stopped individual; and

24.4. Provide the following information to the Stopped individual:

24.4.1. The member's name;

Ex. G

24.4.2.  The member's badge number;

24.4.3.  That the member is a member of the Baltimore Police Department; and

24.4.4.  The reason for the Vehicle or other Stop.

24.5.   Inform the person(s) Stopped that they are not free to leave.

EXAMPLE:   "Good evening. My name is Officer John Doe of the Baltimore Police Department, badge number 123. This interaction is being recorded on my body-worn camera. The reason that I Stopped you is that…"

25.   During an Investigative Stop, members shall:

25.1.   Remain professional, courteous and respectful at all times;

25.2.   Limit questions to those relevant and necessary to resolve the member's suspicions; and

25.3.   Ensure that the person is Stopped for only that period of time necessary to confirm or dispel the RAS that was the basis for the Stop. If the Stop goes beyond this in scope or time, then it becomes an Arrest and must be supported by Probable Cause.

26.   The scope of the investigation taken during the Stop must be tied to the basis for it. Actions that would indicate to a reasonable person that they are being arrested or indefinitely detained convert an Investigative Stop into an Arrest, which would require Probable Cause or an Arrest warrant.

27.   Unless justified by the RAS for the original Stop, members shall have additional articulable justification for further limiting a person's freedom during an Investigative Stop by doing any of the following:

27.1.   Taking a person's identification or driver's license away from the immediate vicinity;

27.2.   Ordering a motorist to exit a vehicle;

27.3.   Directing a person to stand (or remain standing), or to sit any place not of their choosing; or

27.4.   Transporting the person any distance away from the scene of the initial Stop (including for the purpose of witness identification).

27.4.1.  Members may transport a Stopped person to a different location for questioning if the Stopped person requested to speak with members in a different location. For guidance regarding the transport of a witness, see Policy 1002, *Securing and Interviewing Witnesses*. Any requests by the person to be transported shall be captured on BWC or articulated in the Incident Report.

27.4.2.  Members are limited with regard to their ability to transport a suspect during an Investigative Stop and shall justify, to be articulated in the Incident Report, the need to do so based on a legitimate law enforcement purpose such as

Ex. G

CASE 0:26-cv-00324-ECT-ECW    Doc. 130-2    Filed 02/04/26    Page 89 of 242

identification at the scene of the crime. Involuntary transport beyond a short distance from the Stop will almost always be considered an Arrest, particularly if the transport is to a police station. (See Policy 1106, *Warrantless Arrest Procedures and Probable Cause Standard*).

28.    In addition to RAS for the Stop, members shall justify the following based on particularized facts suggesting a threat to safety or risk of flight:

28.1.    Directing a person to lie or sit on the ground;

28.2.    Applying handcuffs;

28.3.    Placing a person into a police vehicle;

28.4.    Pointing a firearm;

28.5.    In addition to RAS for the Stop, a Weapons Pat-Down must also be justified based on RAS that the suspect is armed and dangerous; or

28.6.    Any level of force (see Policy 1115, *Use of Force* and Policy 725, *Use of Force Reporting, Review, and Assessment*).

29.    Members shall notify a supervisor immediately, as soon as it is safe to do so, if the person is:

29.1.    Injured during the Investigative Stop or complains of injury;

29.2.    Transported from the initial place of contact, but not Arrested;

29.3.    Stopped for more than 20 minutes, but not Arrested;

29.4.    Handcuffed and/or subjected to a control technique but not Arrested. If Arrested and/or Booked, see Policy 1106, *Warrantless Arrest and Probable Cause*; or

29.5.    The subject of a use of force (see Policy 1115, *Use of Force*).

30.    Members shall not detain a person solely in order to wait for the arrival of a supervisor where there is no cause to do so related to the investigation. Once the Investigative Stop is concluded, the person is free to wait for the arrival of the supervisor.

31.    Members shall immediately release a person from an Investigative Stop if:

31.1.    The member no longer has RAS that the person is committing, is about to commit, or has committed a crime; or

31.2.    If the member fails to develop the Probable Cause necessary to Arrest within a reasonable time.

NOTE:    This may occur when, upon stopping the person, the member learns that the person is not a specific suspect being sought or that the person's actions or behaviors are justified and do not indicate a violation of law.

Ex. G

NOTE:    A "reasonable time" is measured by how long it would reasonably take a member to complete the investigation under the totality of the circumstance while working diligently to do so.  For example, a more complex investigation (multiple witnesses or suspects, difficult to recover evidence, identification issues, safety/weapon issues, a large crime scene, etc.) may require more time, while a straightforward investigation will require less time. The "reasonable time" a Stop may take is not measured by the clock alone and a twenty-minute Stop may be too long or not long enough depending on the particular circumstances. Members should be mindful that if the investigation has not developed Probable Cause to Arrest in a timely manner, they may need to identify and release a suspect from an Investigative Stop. Charges may then be sought at a later time.

32.    Members shall not transport or otherwise move the person more than a short distance from the location where they are Stopped unless the person is under Arrest, voluntarily consents, or there is an urgent reason necessitating relocation (e.g., hostile crowd, immediate threat to safety, etc.).

32.1.    If intending to move the person from the Stop location as a result of one of the above circumstances, obtain the approval of a permanent-rank supervisor before relocating the person and inform the supervisor where the person will be taken.

NOTE:    Involuntary transport beyond a short distance from the Stop will almost always be considered an Arrest, particularly if the transport is to a police station.

33.    If the person Stopped is to be released, the member shall:

33.1.    Immediately release the person and explain the reason for the Investigative Stop and the release;

33.2.    If the person was taken to another location, provide return transportation to the scene of the initial Stop; and

33.3.    Provide them with a Baltimore Police Contact Card (Appendix B).

Prohibited Actions – Investigative Stops

34.    Members are prohibited from conducting Stops that lack RAS that the person has committed, is committing, or is about to commit a crime.

35.    Members are prohibited from conducting Stops on the basis of a person's race, national origin, or other demographic categories. Such stops violate the Fourteenth Amendment, federal and state law, and BPD policies.

36.    Members are prohibited from conducting Pretext Stops in which there is no RAS for the pretext justification, or the pretext justification is loitering or trespass. This does not prohibit Stops that are not pretextual, such as a Stop in response to a call for service concerning loitering or misdemeanor trespass.

37.    Members shall only rely on information known at the time of receipt to be reliable and credible. This does not apply where the unreliable or incredible nature of the information is clearly explained

Ex. G

in the relevant report or document explaining justification for the action. Members who knowingly utilize materially false or incorrect information in effectuating an Arrest without clearly explaining the falsity in the statement of probable cause (SPC) shall be subject to discipline. A member may not leave material information out of a SPC if that information would defeat a finding of Probable Cause to Arrest and/or Charge.

38.     Members are prohibited from making an Investigative Stop based **solely** on a person's presence in a location known for criminal activity.

   38.1.   Despite this prohibition, a member may use the fact that a location is known for a particular type of criminal activity as one fact among multiple facts that, in combination, establish RAS. To conclude that the type of criminal activity in a specific location contributes to establishing RAS, the member should be able to articulate how the nature of the criminal activity in that location, its frequency, and its recency are relevant to the suspected crime. For example, the fact that drug dealing is known to occur on a specific corner at a particular time of day within the past two weeks could be one fact that, when considered together with other facts, establishes RAS that two people exchanging money on that corner at that time of day are engaged in a drug transaction. By contrast, the fact that there has been a recent rash of nighttime, forced rear window burglaries in a particular area does not help to establish RAS that a person flagging down cars in that area during the daytime is a burglar.

   38.2.   In order to be used as a fact that helps to establish RAS, a location known for a certain type of criminal activity must be a specific location (e.g., an address, a specific business location, a specific corner, a specific block or blocks, a park, etc.) and must not be a general location (e.g., a district, or an entire neighborhood for a crime that is location-specific (for example, CDS distribution)). Members shall avoid broad, boilerplate phrases such as "high crime area" when articulating RAS.

39.     Members may not make an Investigative Stop based **solely** on a person's response to the presence of police, including a person's attempt to avoid contact with a member (e.g., walking away, declining to talk, running away, or crossing the street to avoid contact). People may avoid contact with police for many reasons other than involvement in criminal activity.

NOTE AS TO 38 AND 39: Despite the prohibitions in Directives 38 and 39 members **may** conduct an Investigative Stop when a person in a location known for certain criminal activity runs, unprovoked, from the police **and** there is an articulable reason to believe the person is running because they are involved in the type of criminal activity prevalent in that location. In this situation, the member must be able to articulate the specific facts establishing RAS, including how the individual's unprovoked flight is linked to their suspected participation in the type of criminal activity prevalent in that location. Examples of facts that may establish a link between a person's unprovoked flight and the type of criminal activity prevalent in a location include: the member observes the person taking actions that are consistent with the commission of the particular crime prevalent at that location; the member has personal knowledge that a person has committed the crime previously; the member has personal knowledge that there was a recent call for service about that particular crime being committed at that location.

40.     Members are prohibited from intentionally provoking or attempting to provoke flight to justify an Investigate Stop or a foot pursuit. For example, a member may not drive at a high rate of speed

Ex. G

toward a group congregated on a corner, perform a threshold brake, and exit quickly with the intention of stopping anyone in the group who flees.

41.     Members are prohibited from making an Investigative Stop based **solely** on a person's proximity to the scene of a reported or suspected crime.

    41.1.   Members may use a person's proximity to the scene of a specific reported or suspected crime as a fact in formulating RAS that the person committed that specific crime but shall explain how close the person was to the scene and why it was reasonable to believe the person was involved in the reported or suspected crime based on their proximity to the scene. Facts to consider include:

        41.1.1.   How long ago was the crime committed and whether a person could have travelled that distance in that amount of time?

        41.1.2.   Whether the member observes the person taking actions that are consistent with someone who just committed that crime.

        41.1.3.   Whether the person matches any witness' descriptions or observations of the incident, etc.

NOTE:   The prohibition in #41 does not interfere with a member's ability to "freeze" a crime scene under Policy 1002, *Securing and Interviewing Witnesses*.

42.     Members may not prohibit or prevent a person from recording law enforcement officers' actions if the person is otherwise acting lawfully and safely. (See Policy 804, *First Amendment Protected Activity* and Policy 1016, *Public Observation/Recording of Officers*).


Documentation Requirements - Investigative Stops


43.     Members shall not use Boilerplate Language when describing the basis for an Investigative Stop. Members shall use specific and descriptive language individualized to the person Stopped and the circumstances of the Stop to describe the basis of the contact. The amount of detail required depends on the complexity of the encounter.

44.     Following an Investigative Stop, members shall:

    44.1.   If the Stop is associated with an existing Incident Report, edit the Incident Report and add information about the person and the Stop as described below.

        44.1.1.   If the stop results in developing probable cause for a violation unrelated to the Incident Report, the member shall continue adding the individual's information to the current report and then request a new central complaint number from police dispatch to generate a new Incident Report for the unrelated violation.

    44.2.   If the Investigative Stop is not associated with an existing Incident Report, request a central complaint number from police dispatch and complete an Incident Report.

Ex. G

44.3. Describe in detail the circumstances which led to the Investigative Stop in the designated narrative fields, including clearly and specifically documenting the facts on which the member's RAS was based.

44.4. The report shall include the following information in the designated fields. If there is not a designated field, include the information in the narrative:

44.4.1. Select the appropriate Incident Type that was being investigated.

44.4.2. A complete description of the person, including height, weight, hair color, eye color, complexion, identifying features (e.g., tattoos, scars), clothing type and color, and any notable features or descriptors relevant to RAS.

44.4.3. Perceived race, ethnicity, gender and age of the person Stopped;

44.4.4. The location of the Stop, including the address or nearest intersection;

44.4.5. Whether the Investigative Stop began as a Voluntary Contact or Field Interview;

44.4.6. Specific, individualized description of the facts that established RAS for the Stop, prior to the Stop being made;

44.4.7. Approximate duration of the Stop;

44.4.8. Outcome of the Stop, including whether member(s) issued a warning, civil or criminal citation, taken into custody and released, Booking, or took no action;

44.4.9. Whether member(s) conducted a Weapons Pat-Down, and if so, the RAS that the person was armed and dangerous;

44.4.10. Whether member(s) conducted a Search based on Probable Cause, and if so, the facts establishing Probable Cause for the Search;

44.4.11. Whether member(s) asked any person(s) to consent to a Search, whether such consent was given, and in what form (i.e., verbal or written) (See Policy 1109, Warrantless Searches);

44.4.12. Whether member(s) recovered any items and found any unlawful weapons, narcotics, or other contraband during a Search, and the nature of the contraband;

44.4.13. If a Weapons Pat-Down or Search occurred, add the Pat-Down and/or Search to the "Add Searches" area of the Incident Report and complete all associated fields;

44.4.14. If the person was moved from the initial Stop location, document that they were moved, where they were taken to, and why they were moved from the Stop location; and

Ex. G

44.4.15. If the member receives information during the call or if the member observes indications that the person has or is experiencing behavioral health disabilities. (See Policy 712, *Crisis Intervention Program*).

45. If the Stopped person is to be released because they were not Arrested or are no longer considered an offender or suspect, the member shall assign the role of "Subject of Stop" to the person.

46. If the person was not Booked or issued a citation, provide them with a Baltimore Police Contact Card (Appendix B) with all areas of the card completed.

NOTE: For the "reason" on the Baltimore Police Contact Card, it is sufficient to summarize the reason for the interaction, such as "investigating burglary."

47. If the person was Arrested, members shall complete any related reports. The completed reports shall include the Probable Cause and make it clear that the Arrest was the result of an Investigative Stop or Weapons Pat-Down.

## Weapons Pat-Downs

### Justification – Weapons Pat-Downs

48. For a Weapons Pat-Down of a person, members shall possess specific and articulable facts, combined with rational assumptions from these facts, that: 1) the person is subject to a legal Investigative Stop (RAS of criminal activity exists), and 2) the person is armed and dangerous. The Pat-Down shall be designed to ensure the safety of the member and others while a member is conducting a legitimate investigation. Pertinent factors may include the member's prior knowledge that the person carries a weapon. However, members shall also be mindful that most individuals carry mobile phones, wallets, or other personal items in their pockets.

NOTE: An Investigative Stop and a Weapons Pat-Down are two distinct actions – both require independent RAS (e.g., to Stop a person there must be RAS of criminal activity, but to Stop a person and perform a Weapons Pat-Down there must be RAS of criminal activity and RAS that the person is armed and dangerous).

### Justification – Weapons Pat-Down of a Vehicle

49. For a Weapons Pat-Down of a Vehicle, members shall possess specific and articulable facts, in light of the member's training and experience, that there is RAS that the subject of the Stop:

49.1. Is armed and dangerous, AND

49.2. May gain immediate control of a weapon in the passenger compartment of the vehicle that may be used to harm someone during the Stop or after returning the person to the vehicle at the conclusion of the Stop.

Ex. G

| Policy 1112 | FIELD INTERVIEWS, INVESTIGATIVE STOPS, & WEAPONS PAT-DOWNS | Page 15 of 29 |
|---|---|---|

Required Actions – Weapons Pat-Downs

50.    In determining whether sufficient RAS exists to support the Weapons Pat-Down, members should consider the following factors:

50.1.    The type of crime suspected, particularly in crimes of violence where the use or threat of deadly weapons is involved.

50.2.    The hour of the day and the location where the Stop takes place.

50.3.    Prior knowledge of the person's history of carrying deadly weapons or committing crimes of violence.

50.4.    Visual indications that suggest the person is carrying a firearm or other deadly weapon, such as a bulge in the shape of a handgun under the person's clothing. An undefined "bulge" could just as easily indicate personal items such as a cell phone or wallet; therefore, combining it with other observations is important.

51.    Whenever possible, Weapons Pat-Downs should be conducted by at least two members – one who performs the Weapons Pat-Down and another who provides protective cover.

52.    Absent exigent circumstances, when conducting a Weapons Pat-Down, members shall:

52.1.    Honor the person's preference about the gender identity of the member conducting the Search, and

52.2.    In the absence of a stated preference, the gender identity of the person being Searched shall be consistent with the gender identity of the member conducting a Search. (See Policy 720, *Interactions with Lesbian, Gay, Bisexual, Transgender, Queer/Questioning (LGBTQ) Individuals*).

53.    During an initial check, members are permitted only to pat the outer clothing of the person.

54.    If, during a Weapons Pat-Down, the member feels an item which is consistent with the shape and size of a weapon that could be used to harm the member or others, the member may, where necessary, manipulate the clothing or item to attempt to confirm the item's nature before reaching into or disturbing the article of clothing and removing the suspected weapon. If the weapon is immediately identifiable, no manipulation is required prior to separating the weapon from the suspect.

NOTE:    This action is taken for safety, and, therefore, it does not matter whether or not the weapon is legal. Legal weapons may be as dangerous as illegal weapons and if there is RAS that the individual is armed and dangerous, the legal weapon may be recovered and separated from the suspect for the duration of the Investigative Stop.

55.    If, during the process of removing the suspected weapon, the member discovers other items which are contraband or evidence of a crime, the member may lawfully seize those items, and the items may be considered when establishing Probable Cause to make an Arrest or to conduct a Search of the person.

Ex. G

56.     If the person Stopped is Arrested, members shall conduct a Search incident to Arrest in accordance with departmental training and procedures. (See Policy 1109, *Warrantless Searches*);).

57.     If the person Stopped is to be released because there is no Probable Cause for an Arrest, the member shall immediately release the person, comply with the **Documentation Requirements of Weapons Pat-Downs** below, and explain the reason for the Investigative Stop, the Weapons Pat-Down, and the release. If contraband was recovered, it shall be submitted to the Evidence Management Unit.

Containers

58.     While conducting a Weapons Pat-Down, members may not Pat-Down a container unless:

58.1.   The container is within reach of the person,

58.2.   The member has a reasonable suspicion that the person is armed and dangerous,

58.3.   There's reason to believe the bag or item contains a weapon, and

58.4.   The container cannot be safely placed outside of the person's reach or returned to them.

59.     While conducting a Weapons Pat-Down, members are required to minimize intrusion into the person's belongings. This means Patting Down and manipulating a container instead of opening it where that will reveal whether or not there is a dangerous weapon within. If that cannot be done, such as with a hard briefcase, then the member may open the container and perform a brief check sufficient to reveal whether or not there is a weapon inside.

59.1.   Members shall use the least intrusive means for the check to determine whether there is a dangerous weapon inside. A check of a bag for a gun shall be limited to areas where a gun could reasonably be concealed.

Vehicles

60.     While conducting a Weapons Pat-Down of a Vehicle, members may:

60.1.   Only Pat-Down areas of the vehicle within the reach, lunge, and grasp of the subject of the Stop such as the interior passenger compartment of the vehicle or other areas accessible to the occupants or person believed to be armed.

61.     Members shall not search compartments of the vehicle that are not accessible from the primary passenger compartment (e.g., a trunk in a sedan) without a Search Warrant or other exception to the Search Warrant requirement. (See Policy, *1109 Warrantless Searches*).

Ex. G

| | | |
|---|---|---|
| **Policy 1112** | **FIELD INTERVIEWS, INVESTIGATIVE STOPS, & WEAPONS PAT-DOWNS** | **Page 17 of 29** |

<u>Prohibited Actions – Weapons Pat-Downs</u>

62.    Members are prohibited from automatically engaging in a Weapons Pat-Down during an Investigative Stop for "member safety" without particularized facts suggesting that the person is armed and dangerous.

63.    Members shall not place their hands in pockets or reach into an article of clothing unless the member feels an object they reasonably believe is a weapon, such as a firearm, knife, club, or other item, that could be used to harm the member or others. The member <u>may not</u> manipulate an object underneath clothing in an effort to determine the nature of the object unless the initial touching suggested that it could be a weapon and manipulation is less intrusive than merely retrieving the item.

64.    Members shall not use a Weapons Pat-Down as a ruse to conduct full Searches designed to produce evidence or other incriminating material.

65.    Members may not request the consent of a person to conduct a Weapons Pat-Down without RAS that the person is carrying a weapon.

66.    A Weapons Pat-Down is performed for safety and members shall not conduct Pat-Downs to discover evidence or the proceeds or instrumentalities of a crime.

<u>Documentation Requirements of Weapons Pat-Downs</u>

67.    Member shall document all Weapons Pat-Downs that occur regardless of whether a weapon was found, or an Arrest was made.

68.    Members shall obtain a central complaint number from police dispatch and complete an Incident Report that:

68.1.    Describes in detail the circumstances which led to the Weapons Pat-Down in the narrative area(s),

68.2.    Uses specific and individualized descriptive language sufficient to describe the basis of the contact. The amount of detail required depends on the complexity of the encounter. Members shall not use Boilerplate Language when describing the basis for a Weapons Pat-Down, and

68.3.    Follows the reporting guidelines listed under **Documentation Requirements of Investigative Stops** and/or **Documentation Requirements of Vehicle Stops**.

69.    If the person Stopped is Arrested, a Search incident to Arrest may be conducted in accordance with departmental training and procedures. (See *Policy 1109, Warrantless Searches* and *Policy 1106, Warrantless Arrest Procedures and Probable Cause Standard*.)

<u>NOTE:</u>    The decision and legal authority to make a warrantless Arrest is separate from the decision and legal authority to charge the person with a crime. While a warrantless Arrest based on Probable Cause might have been justified initially based on the facts known to the member at the time, the decision to "Book" a person must take into account any exculpatory facts and not just

Ex. G

aggravating or inculpatory facts uncovered after the Arrest. In some cases, the investigation could demonstrate that an Arrested person should be released or should be issued a citation and released in lieu of being "Booked" (Policy 803, *Criminal Citation Procedures* and Policy 808, *Civil Citation Procedures*). Members are reminded that, even after an Arrest, the appropriate enforcement action is the Most Effective and Least Intrusive Response. However, in no case should a member who knows from the outset that they are only going to write a citation, Arrest someone purely in order to Search them.

**Vehicle Stops**

Required Actions – Vehicle Stops

70.     A member may conduct a Vehicle Stop only when they have Probable Cause to believe that the driver has committed a Traffic Violation, or RAS that the driver or an occupant of the vehicle has committed, is committing or is about to commit a crime.

71.     Members shall notify dispatch to report all Vehicle Stops and shall state the location of each Stop.

72.     Members shall activate BWC upon initiating a Vehicle Stop, prior to approaching the vehicle. The BWC shall not be deactivated until the completion of the Vehicle Stop.

73.     At the commencement of a Vehicle or other Stop, absent exigent circumstances, the member shall:

   73.1.   Consistent with #24 above: Introduce themselves, be professional and courteous, and exercise Procedural Justice principles. (See Policy 325, *Procedural Justice in Interactions*).

   73.2.   Provide notification of the BWC recording;

   73.3.   Display proper identification to the Stopped person; and

   73.4.   Provide the following information to the Stopped person:

      73.4.1. The member's name;

      73.4.2. The member's badge number;

      73.4.3. That the member is a member of the Baltimore Police Department; and

      73.4.4. The reason for the Vehicle or other Stop.

74.     Members may not prohibit or prevent a person from recording the member's actions if the person is otherwise acting lawfully and safely. (See Policy 804, *First Amendment Protected Activity* and Policy 1016, *Public Observation/Recording of Officers*).

Ex. G

| Policy 1112 | FIELD INTERVIEWS, INVESTIGATIVE STOPS, & WEAPONS PAT-DOWNS | Page 19 of 29 |
|---|---|---|

Documentation Requirements - Vehicle Stop

75.   Members will use specific and individualized descriptive language sufficient to describe the basis of the contact. The amount of detail required depends on the complexity of the encounter. Members shall not use Boilerplate Language when describing the basis for the contact.

EXAMPLE:   If a person is Stopped in a vehicle because they ran through a stop sign, member may write "Person ran through stop sign at XYZ location." Whereas, if a person is Stopped because they engaged in erratic driving near the scene of a homicide and matches the suspect description, a correspondingly more detailed report is required.

76.   Members shall document all Vehicle Stops, regardless of outcome.

77.   If a Vehicle Stop is conducted for the purpose of a Traffic Violation and no other interactions or reportable incidents occur, the member shall document the Stop in either:

77.1.   E-tix/DeltaPlus, if available; or

77.2.   A Field Interview Report if the traffic citation is handwritten or the warning was not entered into E-tix/DeltaPlus.

78.   Members shall document a Vehicle Stop in an Incident Report if either:

78.1.   The Vehicle Stop was NOT conducted for the purpose of a Traffic Violation and was conducted because the member had RAS that the driver or an occupant of the vehicle has committed, is committing or is about to commit a crime; or

78.2.   OR the Vehicle Stop was conducted for the purpose of a Traffic Violation, but other reportable interactions or incidents occurred (e.g. Searches or Weapon Pat-Downs).

79.   No matter the outcome of the Vehicle Stop, members shall document the following information in the designated fields, if applicable, and in the system used to document the Stop. This also includes the "Add Searches" area of the Incident Report. If there is no designated field, it must be included in the narrative/notes:

79.1.   Members' names and sequence numbers;

79.2.   Date and time of the Stop;

79.3.   Location of the violation and/or Stop;

79.4.   Duration of the Stop;

79.5.   The driver's apparent demographic category, to include race, ethnicity, gender and age;

79.6.   Vehicle details (e.g., make, model, and license plate);

79.7.   Reason for the Vehicle Stop, such as a statement of the traffic offense observed prior to the Vehicle Stop or other facts creating Probable Cause or RAS that were observed prior to initiating the Vehicle Stop;

Ex. G

79.8. Whether the driver or any passenger was ordered by a member to exit the vehicle, and the reason for order;

NOTE: If a passenger was required to produce an ID, answer questions, or exit the vehicle, that shall be included in the documentation, along with their name and information (if provided).

79.9. Whether any member approached the vehicle with a service weapon drawn;

79.10. Whether members conducted a Weapons Pat-Down and, if so, the specific RAS that the person(s) was/were armed and dangerous;

79.11. Whether members conducted a Search of the vehicle based on Probable Cause and, if so, the facts establishing the Probable Cause to conduct a Search;

79.12. Whether members asked any person(s) to consent to a Search and whether such consent was given, and in what form (i.e., verbal or written) (See Policy 1109, *Warrantless Searches*);

79.13. Whether members found any unlawful weapons, narcotics, or other contraband during a Search, and the nature of such contraband; and

79.14. Disposition of the Vehicle Stop, including whether member(s) issued a citation, warning or made an Arrest.

80. If the person was not Booked or issued a citation or paper warning, provide them with a Baltimore Police Contact Card (Appendix B) with all areas of the card completed.

NOTE: For the "reason" on the Baltimore Police Contact Card, it is sufficient to summarize the reason for the interaction, such as "investigating burglary."

**REQUIRED ACTIONS**

**First-line Supervisor**

81. Supervisors shall review all Field Interview and Incident Reports for every Investigative Stop submitted by members under their supervision. This should be completed by the end of their tour of duty. (See Policy 104, *Incident Reporting*).

NOTE: This deadline may be extended for Group A Offenses by three working days due to extenuating circumstances.

82. When reviewing Reports, the supervisor shall:

82.1. Ensure the encounter and law enforcement action taken was constitutional and complied with policy.

Ex. G

82.1.1. For any actions that require further review in order to confirm compliance, review the member's BWC footage and that of any other members present.

82.2. Ensure the documentation is complete and complies with policy. Review reports and forms for deficiencies, including:

82.2.1. Boilerplate Language and language that comes to a conclusion without providing supporting detail, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the reports or forms may contain information that was not accurate at the time it was reported;

82.2.2. Required fields left blank, inconsistencies between fields and the narrative, and/or inconsistencies within the report.

82.2.3. Consult with the member to assess whether additional information from the member may remedy the deficiency.

82.3. Upon confirming completion and sufficiency, sign off on the report and forward through proper channels.

83. Supervisors shall, after initial investigation (including watching relevant BWC or other video, speaking with members, reviewing relevant administrative reports) document and report to the Public Integrity Division (PID) per BPD policy and procedures:

83.1. Investigative Stops that are unsupported by RAS, or that otherwise violate BPD policy;

83.2. Searches that are without legal justification or are in violation of BPD policy; or

83.3. When a Search resulting in the recovery of contraband is unsupported by Probable Cause.

84. In reviewing Incident Reports, if there are Stops or Searches that indicate a need for BPD to review its agency policy, strategy, tactics, or training, the supervisor shall complete an Administrative Report, Form 95, detailing the issue and any proposed Departmental remedies, and forward to the Commanding Officer.

85. Supervisors shall take appropriate action to address all apparent violations or deficiencies in Field Interviews, Vehicle Stops, Investigative Stops, Weapons Pat-Downs, Searches, and Arrests including deficiencies in reporting. This includes:

85.1. When a member's actions comply with the law and policy but indicate a need for positive coaching or remedial action, training, mentoring, counseling or other appropriate measures, document non-punitive corrective action accordingly.

85.2. Referring policy and law violations to the Public Integrity Division (PID) for administrative or criminal investigation and document in BlueTeam. For these situations, it may still be appropriate to provide non-punitive counseling, mentoring, training, or other support as a complement to PID's investigation.

85.3. For each subordinate, the supervisor shall track each violation or deficiency and the remedial action taken, if any, to identify members needing repeated remedial action.

Ex. G

86.    Supervisors shall document evidence of employee negligence or repeated failures to accurately complete applicable reporting per BPD policy and procedure for progressive discipline.

87.    Supervisors shall consider the quality and completeness of members' reports for Field Interviews, Investigative Stops, Searches and Arrests in members' performance evaluations.

## Lieutenant

88.    Lieutenants shall confirm Sergeants' reviews are completed no later than the end of the Sergeant's tour of duty, but no later than three working days for Group A offenses if extenuating circumstances exist.

89.    Lieutenants shall mentor and counsel Sergeants, where needed, regarding their responsibilities towards members and the Department.

90.    Lieutenants shall refer a member or Sergeant's policy and law violations to PID for administrative or criminal investigation and document per BPD policy and procedure. Referral to PID does not preclude non-punitive counseling, mentoring, training, or other support, which should be provided as a complement to PID's investigation.

91.    Lieutenants shall consider the quality and completeness of supervisory reviews of Investigative Stops, Searches and Arrests in performance evaluations.

## Commanding Officer

92.    Commanding Officers shall provide training and conduct reviews of Incident and Field Interview Reports, as necessary, to ensure members understand and apply appropriate legal standards when conducting Field Interviews, Vehicle Stops, Investigative Stops, Weapons Pat-Downs, Searches, and Arrests.

NOTE:  For training issues, Commanding Officers are encouraged to have supervisors consult with Education & Training to ensure that training provided is consistent with departmental standards.

93.    If misconduct is identified through any audits or evaluations, Commanding Officers shall evaluate the supervisor's assessment and recommendations and ensure that all appropriate remedial action was taken, including referring the incident to PID for investigation when appropriate.

94.    Commanding Officers shall take appropriate remedial or disciplinary action against supervisors who fail to conduct complete, thorough, and accurate reviews of officers' Investigatory Stops or Detention, Searches, and Arrests.

95.    Commanding Officers shall consider the quality and completeness of supervisory reviews of Investigative Stops, Searches and Arrests in performance evaluations.

## Administrative Officer, Patrol

96.    Review all Field Interview, Investigative Stops, Weapons Pat-Down and Search documentation received.

Ex. G

      96.1.    If reporting errors or deficiencies are noted, reject the Incident Report and return to the member for correction.

## Performance Standards Section

97.    Audits of documentation in support of Field Interviews, Vehicle Stops, Investigative Stops, Weapons Pat-Downs, Searches and Arrests will be included in the yearly audit plan.

      97.1.    Documents to review may include, but are not limited to, Incident Reports, Form 8, Supplemental Reports, Form 7, Citizen/Police Contact Receipts, and Body-Worn Camera footage.

NOTE:  Audits will be conducted to identify deficiencies and gaps in practice of these activities, and those findings will assist in forming future trainings and/or policy on Field Interviews, Vehicle Stops, Investigative Stops, Weapons Pat-Downs, Searches, and Arrests.

98.    If a deficiency is identified, the Performance Standard Section will notify the Commanding Officer of the supervisor who conducted the review.

99.    These audits will be conducted by the Performance Standards Section on a monthly basis.  in accordance with the year's audit plan.

## Education & Training, Director

100.    The Education & Training Director shall ensure that entrance level and in-service training curriculum are consistent with the procedures of this policy.

101.    The Education & Training Director shall provide ongoing roll call training, as requested, on the contents and subject of this policy.

## APPENDICES

A.    Reference Chart
B.    Baltimore Police Contact Card
C.    Crime Victims and Witnesses Brochure

## REFERENCED POLICIES

Policy 104,    *Incident Reporting*
Policy 720,    *Interactions with Lesbian, Gay, Bisexual, Transgender, Queer/Questioning (LGBTQ) Individuals*
Policy 803,    *Criminal Citation Procedures*
Policy 804,    *First Amendment Protected Activity*
Policy 808,    *Civil Citation Procedures*
Policy 809,    *Cannabis Violation Procedures*

Ex. G

Policy 824,      *Body-Worn Camera (BWC)*
Policy 906,      *Traffic Citations*
Policy 1007,    *Search and Seizure Warrants*
Policy 1013,    *Strip Searches and Body Cavity Searches*
Policy 1016,    *Public Observation/Recording of Officers*
Policy 1018,    *Lesser Offenses and Alternatives to Arrest*
Policy 1106,    *Warrantless Arrest Procedures and Probable Cause Standard*
Policy 1109,    *Warrantless Searches*


**RESCISSION**

Rescind Policy 1112, *Field Interviews, Investigative Stops, Weapons Pat-Downs & Searches*, dated 9 February 2021.


**COMMUNICATION OF POLICY**

This policy is effective on the date listed herein. Each employee is responsible for complying with the contents of this policy.

Ex. G

| Policy 1112 | FIELD INTERVIEWS, INVESTIGATIVE STOPS, & WEAPONS PAT-DOWNS | Page 25 of 29 |
|---|---|---|

## APPENDIX A

Reference Chart

| TYPE OF CONTACT | JUSTIFICATIONS | | MINIMUM FORMS REQUIREMENT | | |
|---|---|---|---|---|---|
| | Reasonable Articulable Suspicion | Probable Cause | Field Interview Report | Incident Report | Document to Stopped Person |
| Voluntary Contact | | | | | |
| Field Interview | | | X | | BPD Contact Card |
| Investigative Stop | X* | | | X | BPD Contact Card |
| Weapons Pat-Down | X* | | | X | BPD Contact Card |
| Searches | | X | | X | BPD Contact Card |
| Arrest | | X | | X | |
| | | | | | |
| Vehicle Stop – Traffic Violation | | X | X** | | Citation/Warning or Contact Card for Verbal Warning |
| Vehicle Stop – criminal investigation | X | | | X*** | BPD Contact Card |

\* Remember that while an Investigative Stop requires RAS of criminal activity, a Weapons Pat-Down of a person and/or of a vehicle ALSO requires RAS that the person is armed and dangerous.

\** If the Traffic Violation is entered into E-tix/Delta Plus, a separate Field Interview Report in Axon Records is NOT required to be completed. Handwritten violations or warnings must be documented in a Field Interview Report.

\*** Members must complete an Incident Report if the Vehicle Stop was NOT conducted for the purpose of a Traffic Violation, or if the Vehicle Stop was conducted for the purpose of a Traffic Violation, but other reportable interactions or incidents occurred (e.g. Searches or Weapon Pat-Downs).

Ex. G

| Policy 1112 | FIELD INTERVIEWS, INVESTIGATIVE STOPS, & WEAPONS PAT-DOWNS | Page 26 of 29 |
|---|---|---|

**APPENDIX B**

Baltimore Police Contact Card

For the reason on the Baltimore Police Contact Card, it is sufficient to describe it in a summary way that indicates the basis for the Stop such as "investigating burglary".

Ex. G

| Policy 1112 | FIELD INTERVIEWS, INVESTIGATIVE STOPS, & WEAPONS PAT-DOWNS | Page 27 of 29 |
|---|---|---|

## APPENDIX C

Crime Victims and Witness Brochure, Page 1



**Maryland State Board of Victim Services**

The Maryland State Board of Victim Services was created by the Maryland General Assembly to address the unique needs of crime victims and to make recommendations for improving state and local crime victim services. To learn more about the State Board go to *www.goccp.maryland.gov*.

This pamphlet, published by the Maryland State Board of Victim Services and the Governor's Office of Crime Prevention, Youth, and Victim Services is designed to provide an overview of crime victims' rights and services. For information specific to your case, contact your local law enforcement agency or State's Attorney's Office. For information on services that may be available to help you as you recover from the crime, please refer to the National/Statewide Crime Victim Resources listed

Please keep this pamphlet as a reference.

Printed and Prepared by the Governor's Office of Crime Prevention, Youth, and Victim Services together with the Maryland State Board of Victim Services

Revised 11/2020

**Maryland — GOVERNOR'S OFFICE OF CRIME PREVENTION YOUTH AND VICTIM SERVICES**

### CRIME VICTIMS AND WITNESSES: Your Rights and Services

**MARYLAND**

MARYLAND

As a victim of crime, Maryland law provides you with specific rights. Know your rights. Know where to receive help.

**Complaint/Incident #** _____

**Officer** _____

**Badge #** _____

**Contact Phone #** _____

To obtain a written copy of the incident report, please contact the Records Department of your responding law enforcement agency. Costs may vary. Victims of domestic violence are entitled to a copy of the incident report without charge.

#### Introduction

Victims of crime have certain rights under Maryland law. This pamphlet provides general information about rights and services available to assist you through the aftermath of the crime and through the often complex criminal justice process.

In addition to personal losses suffered as a result of a criminal act committed against you, the experience may have created stress, fear and confusion. Victim/witness assistance programs and other local victim assistance programs may provide information, support and assistance to victims outside the formal criminal justice process.

#### Help Throughout the Criminal Justice Process

Throughout the criminal justice process, and even after its completion, you may experience physical, emotional or psychological distress as a result of your victimization. This is a normal reaction, and help is available in your community. Please refer to the *National/Statewide Crime Victim Resources* section on the reverse side of this pamphlet.

#### General Victims' Rights

A crime victim is generally defined under Maryland Annotated Code §11-1001(e) of the Criminal Procedure Article as a person who suffers direct or threatened physical, emotional, or financial harm as a result of a crime.

The definition of a victim may vary depending on the right afforded to that person and the type of crime committed.

#### Maryland Crime Victims' Rights

Under Maryland Law, victims of crime must be:

- Treated with dignity, respect, and sensitivity

- Informed of their rights & how to apply for services

- Notified of crisis intervention and counseling services

- Notified of domestic violence programs and support groups

- Notified of criminal injuries compensation and other social services available

- Informed of protections available to them and how to request protections for their safety

- Informed by the police or the State's Attorney of the arrest of a suspect and closing of the case

- Notified of court hearings and offender custody status

- Permitted to be present and heard at criminal justice proceedings, or request hearings when applicable

- Permitted to seek restitution from their offender(s)

- Permitted to request notice about any DNA

If you are a victim of crime in Maryland, and need more information about your rights visit, *www.goccp.maryland.gov*.

Ex. G

Crime Victims and Witness Brochure, Page 2

Ex. G

## STATE CRIME VICTIM SERVICES

### VINE

"Victim Information and Notification Everyday (VINE) is a free, anonymous, automated telephone service that provides victims of crime with two important services: information and notification. VINE will provide you with vital court case, custody, parole and probation information for an offender currently involved in the criminal justice system in Maryland.

Toll Free ...............................1-866-634-8463
Website ........................... www.vinelink.com

### MD Criminal Injuries Compensation Board

The Maryland Criminal Injuries Compensation Board (CICB) was established to provide financial assistance to Maryland crime victims. Under certain conditions, crime victims or surviving family members of deceased victims may be eligible to be reimbursed for their medical, mental health, funeral expenses and/or lost wages resulting from a crime. For further information, please contact the Maryland Criminal Injuries Compensation Board.

Toll Free ............................... (410) 585-3010
Website............wwww.goccp.maryland.gov/victims/cicb/

### Protective Orders Only

*VINE Protective Orders* is a free service that allows petitioners to be notified by telephone or email when a protective order has been served, along with other services.

Toll Free .........................................1-877-846-3420
Website........................................ www.vinelink.com

### Peace and Protective Orders

*Peace and protective orders* are civil orders issued by a judge or court commissioner to prevent one person from committing certain acts against others. The personal relationship between the respondent and the victim determines which order should be filed. Protective orders generally apply to people in domestic relationships. Peace orders apply to other relationships (dating, neighbors, co-workers, acquaintances, strangers).

A petition for protection from domestic violence may be filed in any District Court or Circuit Court in Maryland. If the clerk's office is open, you must file with the clerk. If the clerk's office is closed, file with a District Court Commissioner. To locate a courthouse, please visit www.courts.state.md.us or the government pages of your phone book. Some courthouses have on-site programs to assist victims with safety plans and filing for protection. Find your local domestic violence program by contacting the clerk's office or www.mnadv.org. For other help, call 911 or your local law enforcement agency.

## NATIONAL /STATEWIDE CRIME VICTIM RESOURCES
◆Information ◆Referrals ◆Legal Assistance ◆Counseling ◆Support Groups

### GENERAL VICTIM SERVICES/REFERRALS AND NOTIFICATION

First Call for Help or 211 MD ................. (410) 685-0525
Toll Free.................................1-800-492-0618
TTY ..................................... (410) 685-2159
Website...............................https://211md.org
MD Crime Victims' Resource Center, Inc..(301) 952-0063
Toll Free ......................... 1-877-VICTIM1
Website......................... www.mdcrimevictims.org
MD Department of Human Services
Toll Free .......................... 1-800-332-6347
Website .......................... http://dhr.maryland.gov/
National Center for Victims of Crime
Helpline .......................... 1-855-4-VICTIM
Website .......................... http://victims of crime.org/
Office of the Attorney General................... (410) 576-6300
Website..........www.marylandattorneygeneral.gov
Pro Bono Counseling Project................... (410) 825-1001
Toll Free .......................... 1-877-323-5800
Website...................www.probonocounseling.org
Rebuild, Overcome, and Rise Center.......(410) 706-2781
Website.............. https://www.umaryland.edu/roar/

### CHILD ABUSE SERVICES

Child Protective Services
Website....http://dhr.maryland.gov/child-protective-services
Childhelp
Toll Free ..............................1-800-4-A-CHILD
Website ............................. www.childhelp.org
Maryland Children's Alliance, Inc..........(443) 872-2116
Website...........www.marylandchildrensalliance.org

### DOMESTIC VIOLENCE SERVICES

Maryland Judiciary Family Law Forms
Petitions for Protection
http://www.courts.state.md.us/family/formsindex.html#petitionforprotection
MD Network Against Domestic Violence..(301) 429-3601
Toll Free ....................... 1-800-MD-HELPS
Website .......................www.mnadv.org
MD Safe at Home Address Confidentiality Program
Toll Free........................1-800-633-9657 ext 3875
Website.....http://sos.maryland.gov/ACP/Pages/default.aspx
National Domestic Violence Hotline........ 1-800-799-SAFE
Website............................http://www.thehotline.org/
TTY For the Hearing Impaired............ 1-800-787-3224

### DRUNK DRIVING SERVICES

Mothers Against Drunk Driving (MADD)(410) 964-5757
Toll Free .......................... 1-800-446-6233
Website................. www.madd.org/local-offices/md/

### HOMICIDE SURVIVORS SERVICES & LEGAL ADVOCACY SERVICES

National Organization of Parents of Murdered Children and Other Survivors of Homicide Victims
Toll Free .......................1-888-818-POMC
Website ............................. www.pomc.org
Roberta's House.............................(410) 235-6633
Website.........................https://robertashouse.org

### JUVENILE/SCHOOL VIOLENCE RESOURCES

Department of Juvenile Services
Toll Free .......................... 1-888-639-7499
Website.... http://djs.maryland.gov/Pages/default.aspx
National School Safety Center
Toll Free .......................... 1-805-373-9977
Website .......................... www.schoolsafety.us

### LEGAL SERVICES

Civil Justice                          (410) 706-0174
Website....................www.civiljusticenetwork.org
Legal Aid Bureau, Inc.
Toll Free .......................... 1-800-666-8330
Website .......................... www.mdlab.org
MD Volunteer Lawyers Service.............(410) 547-6537
Toll Free .......................... 1-800-510-0050
Website .......................... www.mvlslaw.org
People's Law Library of Maryland        (410) 260-1392
Website....................https://www.peoples-law.org

### SEXUAL ASSAULT SERVICES

MD Coalition Against Sexual Assault ......(301) 328-7023
Toll Free .........................1-877-496-SALI
Website .......................... www.mcasa.org
Rape, Abuse & Incest National Network
(RAINN) Hotline............................ 1-800-656-HOPE
Website .......................... www.rainn.org
Sexual Assault Legal Institute (SALI) .......(301) 565-2277
Toll Free .........................1-877-496-SALI
Website .......................... www.mcasa.org

## STATE CORRECTIONS VICTIM NOTIFICATION

MD Dept. of Public Safety & Correctional Services
Website.......... http://news.maryland.gov/dpscs/home/
MD Division of Correction ...................... (410) 585-3300
Toll Free .......................... 1-866-606-7789
MD Division of Parole & Probation.........(410) 585-3500
Toll Free..................................1-877-227-8031
MD Parole Commission..........................(410)-585-3200
Toll Free .......................... 1-877-241-5428
MD Sex Offender Registry
Website..................................www.socem.info

## STATE'S ATTORNEYS' OFFICES IN MARYLAND
*www.mdsaa.org*

| County | Phone |
|---|---|
| Allegany County | (301) 777-5962 |
| Anne Arundel County | (410) 222-1740 |
| Baltimore City | (410) 984-6000 |
| Baltimore County | (410) 887-6600 |
| Calvert County | (410) 535-1600 Ext. 2369 |
| Caroline County | (410) 479-0255 |
| Carroll County | (410) 386-2671 |
| Cecil County | (410) 996-5335 |
| Charles County | (301) 932-3350 |
| Dorchester County | (410) 228-3611 |
| Frederick County | (301) 600-1523 |
| Garrett County | (301) 334-1974 |
| Harford County | (410) 638-3500 |
| Howard County | (410) 313-2108 |
| Kent County | (410) 778-7450 |
| Montgomery County | (240) 777-7300 |
| Prince George's County | (301) 952-3500 |
| Queen Anne's County | (410) 758-2264 |
| St. Mary's County | (301)-475-7844 Ext. 4500 |
| Somerset County | (410) 651-3333 |
| Talbot County | (410) 770-8060 |
| Washington County | (240) 313-2000 |
| Wicomico County | (410) 548-4880 |
| Worcester County | (410) 632-2166 |

| Policy 1112 | FIELD INTERVIEWS, INVESTIGATIVE STOPS, & WEAPONS PAT-DOWNS | Page 29 of 29 |
|---|---|---|

**APPENDIX D**

Deactivation Upon Request for Field Interviews

(From Policy 824, *Body-Worn Camera*, November 5, 2025)

- During a Field Interview, where adult victim(s), witness(es), or other individual(s) wish to make a statement or share information but refuse to do so while being recorded, members:

  o May Deactivate their BWC:

    ▪ If the person is an adult, and

    ▪ The member has conducted a sufficient investigative inquiry to reasonably determine whether the person is a witness or victim and not a suspect in any crime.

    ▪ If at any point RAS develops that the individual may be a suspect, BWC Deactivation is immediately prohibited, and the member shall Activate their BWC or continue to record. This ensures continuous recording if a witness or victim transitions to a suspect.

  o Shall NOT Deactivate their BWC:

    ▪ When the need to continue recording outweighs the risk of losing material information, or even potential material information, from the surrounding environment, or

    EXAMPLE: An Individual at a chaotic scene says they want the member to Deactivate their BWC so that the individual can provide information to the member. It would be inappropriate to Deactivate because there is a high need to record the activities at the scene.

    ▪ If Activation is specifically required by this or another policy such as those outlined under the "Mandatory Recording" section of this policy.

- If the BWC is Deactivated or not Activated under this subsection, it shall be reported consistent with the "Ending a Recording" section below unless the request was made on camera and is immediately clear prior to Deactivation.

If the Field Interview began when the BWC was not actively recording, the member may, but is not required to, temporarily Activate the BWC for the sole purpose of documenting the individual's request they not be recorded.

Ex. G



**LAW ENFORCEMENT POLICY CENTER**

# Arrests and Investigatory Stops

September 2019

**IACP**®
International Association of
Chiefs of Police

Ex. H

The IACP Law Enforcement Policy Center creates four types of documents: Model Policies, Considerations Documents, Concepts & Issues Papers, and Need to Know one-page summaries. Typically, for each topic, either a Model Policy or a Considerations Document is created, supplemented with a Concepts & Issues Paper. This file contains the following documents:

- *Model Policy*: Provides police agencies with concrete guidance and directives by describing in sequential format the manner in which actions, tasks, and operations are to be performed.

- *Concepts & Issues Paper*: Designed to provide context and background information to support a Model Policy or Considerations Document for a deeper understanding of the topic.

Ex. H

**IACP Law Enforcement
Policy Center**

IACP®
International Association of
Chiefs of Police

| Model Policy | Updated: September 2019 |
|---|---|

# Arrests and Investigatory Stops

## I.    PURPOSE

The purpose of this policy is to define the limitations of authority and acceptable conduct and practices of law enforcement officers when making contact with individuals in the community. Included in this policy are voluntary contacts, investigatory detentions, pat-downs, and arrests.

## II.    POLICY

Interactions with community members form the cornerstone of effective law enforcement operations. All officers should follow the provisions of this policy to maximize the usefulness of police-public contacts to include voluntary contacts, investigatory detentions, pat-downs, and arrests. It is the policy of this agency that all community-police contacts made by agency personnel shall be conducted professionally and in accordance with established legal principles.[1]

## III.    DEFINITIONS

*Arrest:* Taking a person into custody.

*Arrest Warrant:* A written order issued by a judge, magistrate, or other proper authority that commands a law enforcement officer to place a person under arrest.

*Custody:* Placed under formal arrest or when a reasonable person in the individual's position would have understood the situation to constitute a restraint of freedom of movement of the degree that the law associates with formal arrest.[2]

*Exigent Circumstances:* Those circumstances that would cause a reasonable person to believe that a particular action is necessary to prevent physical harm to an individual, the destruction of relevant evidence, the escape of a suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.[3]

*Investigatory Detention:* Temporary detention of a person for investigative purposes based upon reasonable suspicion that the person has committed, is committing, or is about to commit a crime, under circumstances that do not amount to probable cause for arrest.[4]

---

[1] This policy does not apply to stops of motor vehicles. Please refer to the IACP's *Model Policy* and *Concepts & Issues Paper on Motor Vehicle Stops* for further information on that topic.

[2] Agencies should consult with their legal advisors to determine if there are any additional requirements related to custody based on applicable law.

[3] Based on the definition from *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir.), cert. denied, 469 U.S. 824 (1984).

[4] Agencies should consult with their legal advisor concerning applicable laws in their jurisdiction regarding specific definitions regarding seizures and detentions.

**Publications of the IACP Law Enforcement Policy Center
44 Canal Center Plaza, Suite 200, Alexandria, VA 22314**

These documents are the result of work performed by the IACP Law Enforcement Policy Center. The views and opinions expressed in these documents are sanctioned by the center's advisory group and do not necessarily represent the official position or policies of the International Association of Chiefs of Police.

Ex. H

*Pat-Down:* A frisk or external feeling by utilizing the hands without manipulation of the outer garments of an individual for weapons.

*Probable Cause:* When articulable facts and circumstances within an officer's knowledge are sufficient to warrant a prudent person or one of reasonable caution to believe that the suspect has committed, is committing, or is about to commit an offense.

*Reasonable Suspicion:* A particularized and objective basis, supported by specific and articulable facts, for suspecting a person of criminal activity.[5] Reasonable suspicion must be more than a hunch or feeling but need not meet the test for probable cause sufficient to make an arrest.

*Voluntary Contact:* An encounter between a law enforcement officer and an individual that may be initiated by the officer for any reason and during which the individual is free to leave at any time.

## IV.    PROCEDURES

### A.  Voluntary Contacts

Voluntary contacts may be initiated without probable cause, reasonable suspicion, or other indication of criminal activity by the individual when officers adhere to provisions of this policy.

1.  Initiation of Voluntary Contacts

    a.  Officers may initiate a voluntary contact in any location where they have a legal right to be.

    b.  Officers are prohibited from initiating contacts based on individual demographics to include, but not limited to race, ethnic background, national origin, gender, gender identity, sexual orientation, religion, socioeconomic status, age, disability, cultural group, or political status, except when such characteristics are part of a specific subject description.[6]

    c.  Officers shall not use contacts on a pretextual basis to intimidate, harass, or coerce individuals.

2.  Voluntary Contact Protocol – Voluntary contacts are based on the presumption that the individual is not under any reasonable suspicion of criminal activity.

    a.  Persons contacted may not be detained in any manner against their will or frisked unless they provide consent or reasonable suspicion is established during the course of the contact to believe they present a danger to the officer and the officer has reasonable suspicion that they have committed, are committing, or are about to commit a crime.[7]

    b.  An officer may not use force or coercion to require an individual to stop or respond to questions or directions absent any other legal reason.

    c.  Officers shall strive to ensure that their actions and requests could not be reasonably perceived by the individual as a restraint on their freedom to leave. As such, officers should"

        i.  Introduce themselves and explain the reason for making the contact;

        ii.  Act in a professional, respectful, and restrained manner at all times;

        iii.  Establish rapport;

        iv.  Avoid requests that sound like commands;

        v.  Phrase requests using optional words such as "may," "would you mind," or similar terms and phrases;

        vi.  Ensure the contact remains reasonable and voluntary; and

---

[5] *Black's Law Dictionary*, 9th ed., s.v. "Reasonable Suspicion."
[6] See the IACP Policy Center documents on Unbiased Policing at https://www.theiacp.org/resources/policy-center-resource/unbiased-policing.
[7] In the United States, see *Terry* v. *Ohio*, 392 U.S. 1 (1968).

Ex. H

vii.  Not create a physical or other barrier to the individual's ability to leave, to include keeping identification, such as a driver's license, or by creating a physically imposing and intimidating presence.

d.  If individuals ask whether they must respond to questions or remain in the officer's presence, they shall be informed that they do not have to answer any questions and are free to leave at any time.

e.  Where individuals refuse or cease to cooperate during a contact, they shall be permitted to leave.

f.  Refusal of the individual to cooperate cannot be used as the basis for turning the "contact" into a "detention."

## B. Investigatory Detentions

1.  Justification for Conducting an Investigatory Detention

   a.  Officers may stop individuals for the purpose of conducting an investigatory detention only where reasonable suspicion is present.

   b.  In justifying the stop, the officer must be able to point to specific articulable facts that, when taken together with rational inferences, reasonably warrant the stop. Such facts include but are not limited to the following:

      i.  The actions of the suspect suggest that they are engaged in a criminal activity.

      ii.  The suspect is carrying a suspicious object.

      iii.  The suspect's clothing bulges in a manner that suggests they are carrying a weapon.

      iv.  The suspect is located in proximate time and place to an alleged crime.

2.  Procedures for Conducting an Investigatory Detention

   a.  When approaching the suspect, officers shall clearly identify themselves as law enforcement officers. If not in uniform, officers should announce their identity and display agency identification.

   b.  Officers shall, as soon as feasible, explain to the stopped individual(s) why they were stopped.

   c.  Before approaching more than one suspect, individual officers should determine whether the circumstances warrant a request for backup assistance and whether the detention can and should be delayed until such assistance arrives.

   d.  Officers should confine their questions to those concerning the suspect's identity and other inquiries necessary to resolve the officer's suspicions. In no instance shall an officer detain a suspect longer than is reasonably necessary to make these limited inquiries and resolve suspicions. Officers shall be aware that prolonging an investigatory detention unnecessarily may cause a court to view the detention as an unlawful seizure if probable cause does not exist for an arrest.

   e.  Officers are not required to give suspects warnings related to custodial interrogation in order to conduct investigatory detentions.[8]

   f.  Individuals are not required nor can they be compelled to answer any questions posed during investigatory detentions.[9] Failure to respond to an officer's inquiries is not in and of itself sufficient grounds to make an arrest.

   g.  Officers shall take precautionary measures for their own safety and the safety of others during an investigatory detention, including display of firearms or handcuffing the detainee. Officers shall be

---

[8] Custodial interrogations occur when one or more law enforcement officers question an individual while they are in custody. In the United States, when an individual is not free to leave, officers are required to inform them of certain rights (e.g., *Miranda* warning). In some countries, warnings must be administered prior to non-custodial interviews. Agencies should consult with their legal advisor for guidance in this area.

[9] Agencies should consult with their legal counsel regarding applicable law dictating whether individuals are required to provide personal identification or information.

Ex. H

aware that unnecessary or prolonged display of firearms and handcuffing during the investigatory detention may cause a court to view the detention as an arrest.

    h. If the officer has no basis for making an arrest after conducting an investigatory detention, they shall record the facts of the detention as prescribed by agency policy or procedure.

## C. Pat-Downs

1. Justification for Conducting Pat-Downs

    a. Officers shall remain vigilant and strictly adhere to agency training when performing pat-down searches.

    b. A law enforcement officer has the right to perform a pat-down of the outer garments of a suspect for weapons when:

        i. The suspect has been legitimately stopped with reasonable suspicion, and

        ii. The officer has specific articulable facts that the suspect possesses weapons on their person and poses a threat to the officer's or another person's safety.

    c. Not every investigatory detention poses sufficient justification for conducting a pat-down. The following are some criteria that may form the basis for establishing articulable justification for performing a pat-down. Officers should note that these factors are not all-inclusive, and the totality of the circumstances should be considered. The existence of more than one of these factors may be required in order to justify a pat-down. Consider the following:

        i. The type of crime suspected—particularly in crimes of violence where the use or threat of deadly weapons is involved.

        ii. Prior knowledge of the suspect's use of force and/or propensity to carry deadly weapons.

        iii. Visual indications that suggest that the suspect is carrying a firearm or other deadly weapon.

    d. Pat-downs shall be performed only to protect the safety of officers and others and shall never be used as a pretext to obtain evidence or for other purposes.

2. Procedures for Performing a Pat-Down

    a. When reasonable suspicion justifies a pat-down, the search should be performed with due caution, restraint, and sensitivity.

    b. Whenever possible, pat-downs should be conducted by at least two officers – one who performs the search while the other provides protective cover.

    c. Whenever practical, pat-downs should be performed by officers of the same sex as the suspect.[10]

    d. Pat-downs should generally be conducted with a suspect in a standing position; however, circumstances may exist where an officer can articulate justification of a more secure position in which to conduct the cursory search.

    e. During the pat-down, officers shall feel only the outer clothing of the suspect using their hands but without manipulation of fingers. Officers shall not place their hands in pockets unless they feel an object that could reasonably be a weapon.

    f. If the suspect is carrying an object such as a handbag, suitcase, briefcase, sack, or other item that may conceal a weapon, the officer should not open the item, but instead place it out of the suspect's reach.

    g. If, during a pat-down, an officer recovers an illegal weapon or contraband, the officer may initiate an arrest based on probable cause.

---

[10] Agencies should follow their policy regarding conducting searches of transgender or gender non-conforming individuals.

Ex. H

**Arrests and Investigatory Stops**                                    Model Policy

## D. Arrests

Officers shall conduct arrests only when based upon probable cause or an arrest warrant.

1. Probable Cause

   a. Probable cause for arrest may be established by one of the following:

      i. Observations of the officer,

      ii. Information or evidence obtained during an investigatory detention or voluntary contact,

      iii. An identified individual's specific complaint,

      iv. Information provided by a law enforcement informant of proven reliability,

      v. Information provided by other law enforcement sources.

   b. Officers shall not make any arrest based solely on the following:

      i. Information received from an anonymous source,

      ii. Mere suspicion not amounting to probable cause.

2. Arrest Warrants

   a. Except when a warrantless arrest is justified by the existence of probable cause, arrests shall be made under an arrest warrant.

   b. Arrest warrants shall be obtained from the legal authority empowered to issue such warrants in this jurisdiction.

   c. Warrants shall be in the form prescribed by the law of this jurisdiction and shall adequately identify the person to be arrested. The warrant shall also provide such other information as is required by law.

   d. Any officer to whom an arrest warrant is delivered shall examine it to ensure that it is in proper form, that all information required by law is provided, and that the warrant appears to be valid. The officer shall also take note of any restrictions placed upon the arrest by the language of the warrant.

   e. Once received, an arrest warrant shall be executed without delay, except as otherwise may be required by the circumstances of the case.

3. Making the Arrest

   a. No arrest shall be made at a time or in a manner contrary to any express limitations included in a warrant or in a manner or at a time or place prohibited by:

      i. Agency regulation,

      ii. Applicable legislation, or

      iii. Relevant court decisions.

   b. Arrests shall be made at a time and place and in a manner that will maximize the probability of a successful arrest and minimize the danger to officers, innocent bystanders, and suspects.

   c. The arresting officers shall identify themselves, inform the suspect of their arrest, and specify the charges for which the arrest is being made.

   d. Officers not in uniform shall display their badges and credentials when making the arrest to ensure proper identification.[11]

   e. Officers shall follow agency policy and applicable law regarding knock and announce when executing arrest warrants.

---

[11] For more information, see the IACP Policy Center documents on Off-Duty Arrests at https://www.theiacp.org/resources/policy-center-resource/off-duty-arrests.

Ex. H

  f. No officer shall enter premises owned or occupied by a third person to make an arrest unless the officer has a separate legal basis for entering the premises. Such a basis may be provided by:

    i. Possession by the officer of a search warrant for those premises,

    ii. Consent of a person with apparent authority by law to give such consent, or

    iii. Exigent circumstances.

  g. Officers shall use only the level of force that they reasonably believe is necessary to make an arrest in accordance with this agency's use-of-force policy.

  h. Arrestees shall be advised of their rights pertaining to custodial interrogation before any questioning designed to elicit incriminating statements. Those rights should, whenever reasonably possible, be read verbatim from a standardized agency-approved form.[12]

4. Arrestee Requests

  a. Following the arrest, officers should not permit arrestees to leave the immediate area of the arrest for personal purposes (e.g., to get a coat).

  b. In exceptional cases where it is deemed necessary to grant the arrestee's request to leave the immediate area, they shall first be searched for weapons, contraband, evidence, or implements of escape and then be accompanied and closely monitored by the arresting or other officers.

5. Safety Precautions

  a. Officers shall approach every arrest situation with the knowledge that any arrest, regardless of the offense involved, may present an element of danger. Therefore, officers making arrests shall take all reasonable precautions to ensure their own safety.

  b. Restraint of the Arrestee

    i. Officers should handcuff arrestees in accordance with training and agency policy.

    ii. Officers may handcuff the arrestee with their hands in front, or use other appropriate and approved restraining device(s) where the arrestee:

- Is in an obvious state of pregnancy,
- Has a physical handicap,
- Displays behaviors consistent with mental illness or an intellectual/developmental disability,[13]
- Has injuries that could be aggravated by standard handcuffing procedures, or
- Where other special circumstances exist.

    iii. Multiple handcuffs shall be used when needed to prevent injury.

    iv. Additional approved restraint devices may be used to secure an individual who violently resists arrest or who acts in a manner that indicates they pose a threat to themselves or to the public. Officers should use only those restraints that appear necessary to control the situation and only for the period of time required.

    v. When restraining individuals on the ground, officers should position the subject in a manner that will assist breathing, such as placement on their side, and avoid pressure to the chest, neck, or head.

---

[12] See the IACP Policy Center documents on Interrogations and Confessions at https://www.theiacp.org/resources/policy-center-resource/interrogations-and-confessions.

[13] See the IACP Policy Center documents on Interactions with Individuals with Intellectual and Developmental Disabilities at https://www.theiacp.org/resources/policy-center-resource/intellectual-and-developmental-disabilities and Responding to Persons Experiencing a Mental Health Crisis at https://www.theiacp.org/resources/policy-center-resource/mental-illness.

Ex. H

   c. Search Incident to Arrest

      i. Officers shall conduct a thorough search of the person arrested.

      ii. Any criminal evidence discovered during the search of the arrestee's person shall be seized and preserved in accordance with agency procedures.

      iii. The search incident to arrest shall include not only the arrestee, but also areas within their reach and control.

      iv. Officers shall follow agency policy and protocol related to strip and body cavity searches.[14]

   d. Protective sweeps of the premises or area where the arrest occurs may be performed if there is a reasonable belief that there are third parties that pose a danger to those on the arrest scene.[15]

   e. Post-Arrest Protection

      i. Officers are responsible for the safety of the arrestee. In addition, officers shall take the steps reasonably necessary to protect:

- The officer from the arrestee,
- Victims and third persons from the arrestee, and
- The arrestee from self-injury or injury by others.

      ii. In particular, officers shall not allow victims into close proximity with the arrestee and shall prevent bystanders from approaching the arrestee.

      iii. Officers shall not allow the arrestee out of their immediate presence for any reason until the arrestee is properly secured and transported.[16]

6. Arrest of Juveniles – All officers shall be aware that the arrest, transportation, and booking of juveniles are subject to specific legal requirements. Officers shall be familiar with and observe these requirements at all times when arresting juveniles.[17]

7. Arrest of Agency Members – When arresting a member of their own agency, officers shall take all precautions and follow all procedures as provided by agency policy.

8. Citation in Lieu of Arrest – Officers shall issue citations in lieu of arrest in all situations where citation is directed by law. In situations where citation is discretionary, officers shall consider whether:

   a. The person is likely to disregard a citation;

   b. The person, if cited and released, is likely to cause harm to themselves or any other person; and/or

   c. There are other factors that should be considered and are permitted by law and agency policy.

9. Release after Arrest

   a. If it becomes apparent that there is no probable cause to support an arrest, the individual shall be released, and a supervisor shall be notified.

   b. The officer should document their actions as to the reason(s) for releasing the individual.

   c. If the person is released, officers shall ensure that they are released at a safe location and not otherwise placed at risk as a result of the incident. If necessary, officers should provide transportation for the released person to a safe location.

---

[14] See the IACP Policy Center documents on Strip and Body Cavity Searches at https://www.theiacp.org/resources/policy-center-resource/strip-and-body-cavity-searches.

[15] See *Arizona v. Gant* 556 U.S. 332 (2009) for restrictions on conducting warrantless searches of vehicles incident to arrest. Also see *Lankford v. City of Pullman*, No. 2:16-CV-00377-SMJ (E.D. Wash. Mar. 1, 2018) for more information regarding protective sweeps.

[16] Please refer to the IACP Policy Center documents on Transportation of Prisoners at https://www.theiacp.org/resources/policy-center-resource/transportation-of-prisoners.

[17] Please refer to the IACP Policy Center documents on Juvenile Diversion and Custody at https://www.theiacp.org/resources/policy-center-resource/juvenile-custody.

Ex. H

**Arrests and Investigatory Stops**                                    Model Policy

### E. Reporting

1.  The agency should provide an annual report regarding investigatory detentions and arrests to the public, indicating the total number of stops, location of stops, time and day information, outcome of the stops (arrest, non-arrest, etc.), weapon recovery, race, and gender of the stopped individual.

2.  The agency should consider an audit and review of voluntary contacts, investigatory detentions, pat-downs, and arrests and ensure they are conducted and performed within agency policy and applicable laws. Contacts, detentions, searches, or arrests that do not conform to policy or law shall result in an administrative investigation.

Ex. H

Model Policy

Every effort has been made by the IACP Law Enforcement Policy Center staff and advisory board to ensure that this document incorporates the most current information and contemporary professional judgment on this issue. However, law enforcement administrators should be cautioned that no model policy can meet all the needs of any given law enforcement agency. In addition, the formulation of specific agency policies must take into account local political and community perspectives and customs, prerogatives, and demands; often divergent law enforcement strategies and philosophies; and the impact of varied agency resource capabilities, among other factors. Readers outside of the United States should note that, while this document promotes procedures reflective of a democratic society, its legal basis follows United States Supreme Court rulings and other federal laws and statutes. Law enforcement administrators should be cautioned that each law enforcement agency operates in a unique environment of court rulings, state laws, local ordinances, regulations, judicial and administrative decisions, and collective bargaining agreements that must be considered and should therefore consult their legal advisor before implementing any policy.

© Copyright 2020. Agencies are encouraged to use this document to establish one customized to their agency and jurisdiction. However, copyright is held by the International Association of Chiefs of Police, Alexandria, Virginia, U.S.A. All rights reserved under both international and Pan-American copyright conventions. Further dissemination of this material is prohibited without prior written consent of the copyright holder.

Ex. H

**IACP Law Enforcement Policy Center**

## Concepts & Issues Paper

Updated: September 2019

# Arrests and Investigatory Stops

## I.    INTRODUCTION

### A.  Purpose of Document

This paper is designed to accompany the Model Policy on Arrests and Alternatives to Arrest established by the IACP Law Enforcement Policy Center. This paper provides essential background material and supporting documentation for greater understanding of the developmental philosophy and implementation requirements of the model policy. This material will be of value to law enforcement executives in their efforts to tailor the model policy to the requirements and circumstances of their communities and their law enforcement agencies.

### B.  Overview

Law enforcement officers must understand their powers, duties, and responsibilities when interacting with members of the public. Types of interactions fall into several distinct categories, arranged in order of the least to most intrusive to an individual's personal freedom rights: voluntary contacts, investigatory detentions, arrest alternatives, and arrests. This discussion paper provides overall legal principles guiding each of these categories, as well as pat-downs,[1] and reflects commonly held legal principles.[2]

## II.   VOLUNTARY CONTACTS

### A.  Background

Law enforcement contacts with members of the public that do not involve an interrogation or arrest are sometimes referred to as voluntary contacts. Voluntary contacts do not need to be based upon probable cause, reasonable suspicion, or other indication of criminal activity by an individual and are available to officers under a wide variety of circumstances.

The ultimate goal of making contact with the public in a non-enforcement capacity should be to forge relationships with communities and build trust between law enforcement and community members.[3] The ability to

---

[1] A pat-down is also referred to in this paper as a "frisk."

[2] Agencies should be aware that individual localities may impose more restrictive limitations. Officers should be aware of those departures where appropriate in individual jurisdictions.

[3] President's Task Force on 21st Century Policing, *Final Report of the President's Task Force on 21st Century Policing* (Washington, DC: Office of Community Oriented Policing Services, 2015), https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf.

**Publications of the IACP Law Enforcement Policy Center**
**44 Canal Center Plaza, Suite 200, Alexandria, VA 22314**

These documents are the result of work performed by the IACP Law Enforcement Policy Center. The views and opinions expressed in these documents are sanctioned by the center's advisory group and do not necessarily represent the official position or policies of the International Association of Chiefs of Police.

Ex. H

approach a member of the public and ask questions is a very valuable and useful tool that an officer may employ in a variety of situations. Obtaining cooperation in circumstances where the situation does not rise to the level of arrest or the issuance of a citation is important in most aspects of law enforcement patrol and investigations.

If conducted properly and skillfully, voluntary contacts can encourage cooperation with the public and, in many instances, may produce helpful information. As such, an understanding of the nature and limitations of such contacts is essential.

## B.  Initiating Voluntary Contacts

*Locations.* Officers may conduct a voluntary contact in any location where they have a legal right to be present. These locations generally include the following.

- *Public areas.* An officer normally may conduct a contact in any area that is intended for public use or one that is exposed to public view. A public street is a common example of such a location.
- *Locations where the officer has been legally admitted.* Even though an area is not a public place, an officer may conduct a voluntary contact in that area if they have been given permission to enter or be present there. This might include, for example, a residence or place of business. Such locations are not usually open to the public or to public view, but an officer may be admitted into them by an individual who is authorized to give legal consent. While in many cases, this individual is the owner of the location, this is not always the case. For example, a landlord, though the owner of the premises, is not normally authorized to give consent for an officer to enter or be present upon the portion of the premises that is lawfully occupied by a tenant. An apartment occupied by a lessee of that apartment is an example of such a location.
  The issue of who may give consent in a specific situation can be a complicated one. It usually arises in the context of searches and seizures, but it is equally applicable for the officer who merely wishes to initiate a routine voluntary contact. A contact initiated in an area that the officer has entered without proper consent is unlawful, unless certain conditions exist.
- *Locations entered pursuant to a court order.* Officers may lawfully enter areas pursuant to a search or arrest warrant or other court order. In such situations, contacts with those on the premises are often matters of arrest or investigatory detention, but consensual contacts may also occur with persons found in such areas who are not the subject of probable cause or reasonable suspicion.
- *Locations where an immediate law enforcement presence is required.* In an emergency, law enforcement officers may be authorized to enter areas where they would otherwise have no legal right to be present. Such entries may be for the purpose of saving life, protecting property, or for other legitimate reasons associated with an emergency. This is an exception to the search warrant requirement, but such emergency circumstances may also give the officer legal standing to be in a location where a voluntary contact may be initiated. However, this exception is a narrow one and is carefully scrutinized by the courts. It should not be used as a pretext for gaining access to an area for purposes other than those associated with the emergency.
- *Locations where law enforcement may effect a lawful warrantless arrest.* Where probable cause exists to arrest an individual without a warrant, the officer's presence in that location may be proper even in the absence of a search warrant or consent. During the period of presence in such locations, voluntary contacts may be properly initiated for legitimate purposes.
- *Other locations.* The foregoing list is provided as an example and is not intended to be exhaustive. Under the virtually limitless variety of circumstances that an officer may encounter in the field, voluntary contacts may be initiated in many places not specifically mentioned above. However, it must be remembered that if the officer is not authorized to be in a particular location, the voluntary contact is improper, just as the officer's presence in the unauthorized area is improper.

Ex. H

*Restrictions.* In an effort to ensure that officers are conducting themselves in a lawful manner and promoting community trust, agency policy should stress that voluntary contacts should never be used on a pretextual basis to intimidate, harass, or coerce individuals. In keeping with an agency's commitment to unbiased and fair and impartial policing, strict prohibitions should be included in policy regarding initiating contacts based on individual demographics.[4] These demographics include but are not limited to race, ethnic background, national origin, gender, gender identity, sexual orientation, religion, socioeconomic status, age, disability, cultural group, or political status. However, an exception to this prohibition occurs when such characteristics are part of a specific suspect description.

## C. Voluntary Contact Protocol

Voluntary contacts are primarily based on the presumption that the individual is not under any reasonable suspicion of criminal activity. Therefore, officers must adhere to the following agency protocols when conducting voluntary contacts.

*Freedom to leave.* Where there are no grounds for reasonable suspicion, a criminal violation has not occurred, or there is no probable cause that the individual being contacted is engaged in criminal behavior, the individual is not detained and is free to terminate or discontinue the contact at any time.[5] Officers may not require individuals to answer questions or prevent them from walking away. An officer may make requests of the individual, such as those related to safety, but the contacted individual may refuse the request.

In the United States, this is an important and inalienable right; the courts have determined that law enforcement officers have no authority to detain any individual where there is no reasonable suspicion based upon objective, articulable facts that the person is involved in a crime.

*Prohibition against use of force and coercion.* An officer may not use coercion of any kind to initiate or carry out a voluntary contact. No coercion may be employed to force the individual to stop or require them to respond to questions. The use of physical force, threats of arrest, and similar coercive measures is improper and may not be employed when initiating or conducting a voluntary contact. Should force or coercion be used, the contact by definition is no longer voluntary.

*Right to refuse the contact or to answer questions*. During a voluntary contact, individuals may ask whether they must remain there or respond to the officer's questions. The officer may not falsely state to the individual that there is any such requirement. When individuals make this type of inquiry, the officer must inform them that they do not have to answer any questions and are free to leave at any time.

Some agencies may require that, at the beginning of the contact, officers voluntarily advise individuals of their right to refuse to answer questions and their freedom to leave, whether or not an inquiry has been made. Even in the absence of such a requirement, the officer may elect to inform the individual of these rights in order to reduce the possibility of a later claim of coercion or improper behavior by the officer. Such assurances on the part of the officer may reduce hostility on the part of the individual and contribute to communication during the contact.

In some instances, an individual may refuse to consent to a contact or fail or cease to cooperate during the course of the contact, such as through silence or by not answering questions. This behavior, in and of itself, should not form the basis for any further action by the officer. After such a refusal or cessation of cooperation, the individual must be permitted to leave.

*Prohibition against pat-downs.* Pat-downs are not allowed during voluntary contacts unless consent is obtained or reasonable suspicion is established during the course of the contact to believe the individual presents a danger to

---

[4] See the IACP Law Enforcement Policy Center documents on Unbiased Policing at https://www.theiacp.org/resources/policy-center-resource/unbiased-policing.
[5] There may be circumstances during which an officer may detain a person for mental health evaluations or civil conditions, according to applicable law and agency policy.

Ex. H

the officer and there is reasonable suspicion that the individual has committed, is committing, or is about to commit a crime.[6]

## D.  Rapport and Communication During Voluntary Contacts

The ways in which members of the public develop opinions about a specific interaction with an officer are based primarily upon two things: the process of the encounter and its outcome. When community members perceive that they are treated with dignity and respect, they are more likely to recognize a law enforcement officer as has having legitimate authority to enforce laws.[7] Referred to as procedural justice, the process by which an officer engages with members of the public can be even more critical to public perceptions than the actual outcome of the encounter itself.[8]

Throughout a voluntary contact, officers should strive to ensure that their actions and requests are not perceived by individuals as a restraint on their freedom to leave. If an individual perceives a voluntary contact as coercive or as a restraint on their freedom, the possibility of hostility increases, and the officer's chances of obtaining useful information diminishes. Handled properly, such contacts can produce cooperation and useful information and may enhance goodwill and improve the agency image. Regardless of the outcome of the contact, the individual should feel that they were treated with dignity and fairness. Therefore, it is important for officers to keep in mind certain basic principles when conducting a voluntary contact.

*Provide an introduction and explain the reason for the contact.* Officers conducting a voluntary contact should introduce themselves and explain the reason for making the contact in an effort to establish a favorable personal relationship with the individual. The officer should address and treat the person being contacted in the same manner that might be used in establishing rapport with any person in any situation.

*Act in a professional and respectful manner.* Officers should act in a professional and respectful manner at all times. An authoritative business persona should not be utilized, as it might not be effective for these types of voluntary interactions. Adoption of an aggressive, officious, or belligerent attitude should be avoided. An officer should behave in a non-threatening manner. Even when the individual is uncooperative, officers should maintain a calm, professional demeanor.

*Establish rapport.* It is helpful to establish some sort of personal rapport during the course of a voluntary contact. How this is accomplished depends upon the officer, the individual, and the situation. It may involve a brief comment about matters unrelated to the purpose for the contact or other subjects pertinent to the situation. Even a comment about something outside of policing may provide a basis for building rapport.

*Be aware of language and phrasing.* The language and phrasing used by an officer is just as important as the manner in which the information is provided and questions are posed. Officers should be aware of the individual's reaction to the words they use and the demeanor they project in such situations. It is recommended that officers avoid requests that may be interpreted as commands. Instead, officers should phrase requests using words such as "may," "would you mind," or similar terms.

*Keep contacts reasonable and voluntary.* Where possible, officers should keep the contact brief. There is no exact time frame, as this depends on many circumstances surrounding the situation. However, extended contacts may generate complaints against the officer and even result in a court finding that the officer exceeded the permissible bounds of a consensual contact and turned it into an illegal investigatory detention.

Regarding the voluntariness of the stop, officers should be instructed not to create a physical or other barrier to the individual's ability to leave. For instance, officers should not keep an individual's identification or physically

---

[6] In the United States, see *Terry v. Ohio*, 392 U.S. 1 (1968).
[7] President's Task Force on 21st Century Policing, *Final Report*, https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf.
[8] Dennis P. Rosenbaum et al., "Measuring Procedural Justice and Legitimacy at the Local Level: The Police–Community Interaction Survey," *Journal of Experimental Criminology* 11, no. 3 (September 2015): 335–366.

Ex. H

place themselves in an imposing and intimidating manner that may lead an individual to believe they are not free to leave.

## III.  INVESTIGATORY DETENTIONS

### A.  Legal Basis

A law enforcement officer may stop a person for questioning if the officer reasonably suspects that the person has committed, is committing, or is about to commit a crime. It is not necessary that the officer have probable cause at the time that the stop is made to detain the individual. All that is required is that the officer have a *reasonable suspicion* that the individual is involved in criminal activity. However, to be reasonable, this suspicion must be based upon articulable facts that would lead a reasonable person to suspect that the individual is involved in criminal activity.[9]

Individual jurisdictions may place limits upon an officer's authority to detain and frisk suspects that are more restrictive than federal requirements. Consequently, when drafting a policy for investigatory detentions and pat-downs, law enforcement agencies should examine applicable statutes and decisions. Consultation with legal counsel is strongly advised— to include whether there are applicable laws in the jurisdiction regarding specific definitions pertaining to seizures and detentions.[10]

### B.  Voluntary Contact vs. Investigatory Detention

In some circumstances, what begins as a voluntary contact may become something more as the result of information developed by the officer during the interaction. During the course of the contact, circumstances may appear or statements be made that give rise to reasonable suspicion that the individual has committed, is committing, or is about to commit a criminal act. The contact may then become an investigatory detention.

If the officer feels that a voluntary contact has become an investigative detention, they should be prepared to describe very clearly the factors that, in the officer's mind, created this transition. The following factors, among others, may be considered in determining whether the contact was a voluntary contact or an investigatory detention.

- *Interference with the suspect's freedom of movement.* If officers position themselves or their vehicles in such a manner as to block the individual's path, this indicates that the individual is not free to leave and may render the encounter an investigatory detention.

- *Number of officers and their behavior.* Confrontation of the individual by more than one officer may create an atmosphere of intimidation that may cause the contact to be considered an investigatory detention. Excessive display of weapons, such as drawn or pointed firearms, or a threatening or bullying manner may have the same effect. Even the prolonged or repeated display of badges or other law enforcement identification may be considered intimidating.[11]

- *Physical contact with the individual.* Any physical contact with the individual for purposes of stopping or holding them or to search for weapons or evidence will almost certainly cause the contact to be considered a non-consensual investigatory detention or even a full-fledged arrest.

- *Retaining personal property of the individual.* If the officer wishes a contact to be regarded as consensual, any personal property taken from the individual, such as a driver's license or other identification, should

---

[9] *Terry v. Ohio*, 392 U.S. 1 (1968). In the United States, this is the landmark legal decision that grants officers the authority to conduct investigatory detentions (also called "field interviews" or "*Terry* stops") and pat-downs (often referred to as "frisks").

[10] In the United States, agency policies and procedures should also recognize that investigatory detentions are "seizures" of the person within the meaning of the Fourth Amendment, and the discovery of any physical evidence during such an interview is valid only if Fourth Amendment considerations are met.

[11] Officers must, for reasons of both legality and personal safety, adequately identify themselves as law enforcement officers. Proper identification as a law enforcement officer does not render an encounter non-consensual. It is only the excessive, unnecessary, or deliberately intimidating display of authority that affects the consensual nature of the encounter.

Ex. H

be returned promptly. Prolonged retention by the officer of such items may lead a court to conclude that the individual was not free to leave.

- *Refusal to cooperate.* Refusal of an individual to cooperate during a voluntary contact does not form the basis for reasonable suspicion; refusal of a person to cooperate does not, in and of itself, form the basis for turning the voluntary contact into an investigatory detention.

*Flight from voluntary contact.* In some instances, when a law enforcement officer attempts to make a voluntary contact, the individual may make efforts to avoid the contact by fleeing. An individual's flight from contact with law enforcement officers may be considered in determining whether reasonable suspicion exists to conduct an investigatory detention. In addition, certain types of behavior by the individual may be pertinent factors in determining whether or not reasonable suspicion exists.[12]

## C.  Initiating and Conducting Investigatory Detentions

An investigatory detention is justified only when the officer has a reasonable suspicion that the individual is engaged in criminal activity. Reasonable suspicion must be more than a hunch or feeling but does not have to meet the threshold for probable cause. In justifying the detention, officers must be able to point to specific articulable facts that, when taken together with rational inferences, reasonably warrant the stop. Such facts may include the actions of the suspect that suggest they are engaged in criminal activity; the fact that the suspect is carrying a suspicious object; objective evidence that the suspect may be armed, such as a bulge in the clothing; and/or officer knowledge that a crime has recently been committed in the area, especially if the suspect matches the description of the perpetrator of the crime. Knowledge by the officer that this particular individual has a prior criminal history or has been involved in criminal activity may also be considered; however, this shouldn't be the sole basis for the stop.

Officers should conduct an investigatory detention in a manner that will not be considered an unlawful arrest and act in a way that the suspect understands they are not under arrest. When conducting an investigatory detention, officers should do the following:

- Clearly identify themselves as law enforcement officers when approaching the suspect. If not in uniform, officers should announce their identities and display agency identification.

- Explain the reason for the stop as soon as feasible.

- Determine whether circumstances warrant a request for backup assistance and/or whether the contact can and should be delayed until such assistance arrives. This is especially important when there is only one officer and/or more than one suspect.

- Restrict questions to those concerning the suspect's identity and other inquiries necessary to resolve the officers' suspicions.

- Detain suspects no longer than is reasonably necessary to make these limited inquiries. Unnecessarily prolonging an investigatory detention may cause a court to view the detention as an unlawful seizure if probable cause does not exist for an arrest.

- Limit any movement of the suspect from the location of initial contact to a location that is reasonably necessary for officer safety and the determination of criminal involvement, such as to an area where there is more light.

Officers are generally not required to provide warnings related to custodial interrogations before beginning questioning during an investigatory detention.[13] Individuals are not required, nor can they be compelled to answer

---

[12] See Appendix B for more information regarding specific United States case law.

[13] Custodial interrogations occur when one or more law enforcement officers question an individual while they are in custody. In the United States, when an individual is not free to leave, officers are required to inform them of certain rights (e.g., *Miranda* warning). In some countries, warnings must be administered prior to non-custodial interviews. Agencies should consult with their legal advisor for guidance in this area.

Ex. H

questions posed during investigatory detention. An individual's refusal to answer questions in these situations does not provide the officer with probable cause to arrest.

Officers should take precautionary measures for their own safety during an investigatory detention, including displaying firearms or handcuffing the detainee as appropriate and allowed by agency policy or law. However, the prolonged displaying of firearms and handcuffing during the investigatory detention may also cause the detention to be viewed as an actual arrest.

If after conducting the investigatory detention, the officer has no basis for making an arrest, they should record the facts of the detention as prescribed by agency policy or procedure. Regular review of this documentation should occur to ensure that officers are following appropriate policy and procedures and to determine if any corrective action is necessary.

However, if during the investigatory detention it becomes apparent that there is probable cause that the individual has committed a criminal offense, the individual should be placed under arrest, a search incident to the arrest should be conducted, and all appropriate booking procedures should be completed as instructed by agency policy.

## IV.    PAT-DOWNS

Officers have the authority to conduct a pat-down or "frisk" of the outer garments of a suspect when (1) the suspect is the subject of a valid investigatory detention, and (2) the officer has specific articulable facts that the suspect possesses weapons on their person and poses a threat to the officer's or another person's safety.[14] Officers shall remain vigilant and strictly adhere to agency training when performing pat-down searches.

### A.  Justification for Conducting Pat-Downs

The following points are vital to a valid pat-down:

- Only a valid investigative detention based upon reasonable suspicion of criminal activity justifies a pat-down or consent search. If the stop is invalid, the pat-down is also invalid.

- The right to stop a suspect for questioning does not automatically give the officer the right to conduct the pat-down. Even if the stop is valid, before a pat-down may be conducted, there must be a separate basis for believing that the person who has been stopped may possess a weapon and may be a threat to the officer.

- Factors that may justify an officer's reaching the conclusion that a suspect who has been validly stopped may possess a weapon include:
    - the type of crime suspected, particularly in crimes of violence where the use or threat of use of deadly weapons is involved;
    - any visual indication that the suspect may be carrying a weapon, such as a bulge in the clothing;[15] and
    - any prior knowledge of the suspect's use of force and/or propensity to carry deadly weapons.

Some agencies link justification to perform a pat-down directly to indications that the suspect is armed and dangerous. However, agencies may also consider including the circumstances of the stop, to include the number of suspects and officers present; the time of day and location or neighborhood of the stop; and the demeanor or behavior of the suspect, such as belligerence, as factors to consider when making the justification decision.

---

[14] Specifically, in the United States, the Supreme Court declared that an officer who has stopped a suspect may "search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27.
[15] Even the fact that the suspect is wearing loose or voluminous clothing such as a large, heavy overcoat or raincoat that may easily conceal the presence of a weapon may justify a pat-down.

Ex. H

### B. Performing a Pat-Down[16]

When reasonable suspicion justifies a pat-down, the search should be performed with due caution, restraint, and sensitivity. The goal of these types of searches is to protect the safety of officers and others. They should never be used as a pretext to obtain evidence or for other purposes. In fact, if the pat-down itself is not justified, any evidence found during the search may not be admissible in court.

Whenever possible, pat-downs should be conducted by at least two officers. One officer should perform the search, while the other provides protective cover. The pat-down should generally be conducted with the suspect in a standing position. However, circumstances may exist where an officer can articulate a more secure position to conduct the search.

The pat-down should be limited to a frisk of the suspect's outer clothing only. Officers should utilize their hands, but not manipulate their fingers, when conducting the search and should not reach into the suspect's clothing or pockets unless and until the presence of a weapon has been detected. Once the officer has detected the presence of a weapon, or what the officer reasonably believes to be a weapon, the officer may reach into the clothing to remove the object. If the object proves to be a weapon or contraband or other evidence that would justify an arrest, the officer may then place the individual under arrest and conduct a full-scale search of the person.

There may be situations where an individual is stopped for an investigatory detention and is carrying an object such as a handbag, suitcase, briefcase, sack, or other item that may conceal a weapon. These items should not be opened. Rather, the officer should place such items out of reach of the suspect during the investigatory detention. This ensures the officer's safety while avoiding the risk of an unlawful search.

## V.    ARRESTS

### A. Basis for Making Arrests

An arrest should be conducted only based on probable cause or an arrest warrant. There are several general factors that should be taken into account when establishing probable cause:

- Observations made by the officer
- Information or evidence obtained during an investigatory detention or a voluntary contact
- Specific, verifiable information or complaints provided by a member of the public
- Information provided by an informant of proven reliability
- Information provided by other law enforcement sources

Probable cause for arrest exists when facts and circumstances within an officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing that the suspect has committed, is committing, or is about to commit an offense.

### B. Arrest Warrants

Arrest warrants should identify the individual to be arrested, the criminal offense, and other information as required by law. Once the arrest warrant has been issued, the officer who is responsible for its execution should examine it to ensure that it is in proper form, that all information required by law is provided, and that the warrant appears to be valid. The arresting officer should also be aware of any restrictions that may be placed upon the arrest by the warrant (i.e., time of day, no-knock, and notice requirement), as well as limitations issued by agency regulation, legislation, or applicable court decisions.

---

[16] For a discussion of the "plain touch" rule in the United States, see Appendix A.

Ex. H

An arrest warrant authorizes limited invasion of a person's privacy interest when it is necessary to arrest the individual in their home. Arrest warrants do not authorize law enforcement entry into the residence of a third party in order to arrest the individual named in the warrant. As such, absent exigent circumstances[17] or consent, law enforcement officers cannot legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant or consent.

### C.  Anonymous Informants[18]

Anonymous tips to law enforcement are among the most productive pieces of information available for solving crimes and interdicting criminal conspiracies and are generally regarded as acts of persons concerned for the safety of themselves and their communities. In some cases, cause to question the veracity and motivation of a particular tipster can be present. However, the act of coming forward openly with information absent an identifiable ulterior motive—distinct from criminal informants who are paid or receive other concessions—means that tips from community members are normally taken at face value. Identifying oneself, allowing officers to question one's knowledge and veracity, and being aware that filing a false report could result in criminal prosecution, all affect the greater willingness to accept such statements as credible and reliable.

Compared to the identified informant, or even a criminal informant with a known record of good performance, the anonymous informant carries no known reliability. Many anonymous informers are undoubtedly concerned members of the public who fear for their safety and the safety of their families. However, anonymous informants can also be disgruntled persons who are acting on personal vendettas or prejudices. Whatever the case, the fact that a tip comes from an anonymous person means that officers have no indication of the tipster's ability to provide accurate and credible information. For these and related reasons, independent verification of such information by law enforcement officers or others of known reliability to justify enforcement action is required.

Verification requires that the tipster be able to provide sufficient details of the perpetrator or incident to demonstrate specific personal knowledge. Without this information, officers are without the necessary details to provide verification of the tip. Details concerning the tipster's observations, such as identification of vehicles; clear description of persons and places; the proximity of the tipster to the event or other basis for knowledge of events; exact locations and times; and present and anticipated actions of suspects and their identities, are among the types of information that should be solicited from an anonymous informant when possible. As many details about anticipated behavior or actions of the suspect as possible should be obtained, as this is the type of information that can be corroborated by officers to support enforcement actions. Gathering as much predictive and related information from anonymous callers as possible is paramount in these situations. Communications personnel and others should be made aware of this fact and provided with appropriate prompts that they can use to assist them in gathering information from callers in these cases.

### D.  Pre-Arrest Diversion or Deflection Programs

Agencies should consider developing guidelines for when to utilize alternatives to arrest, such as pre-arrest diversion or deflection programs. Such programs can help prevent vulnerable individuals from developing a pattern of offending or cycling through the criminal justice system. Pre-arrest diversion programs not only help low-level, non-violent offenders avoid the collateral consequences of arrest and reduce the changes of further criminal offending, but

---

[17] The phrase *exigent circumstances* generally refers to those circumstances that would cause a reasonable person to believe that a particular action is necessary to prevent physical harm to an individual, the destruction of relevant evidence, the escape of a suspect, or some other consequence improperly frustrating legitimate law enforcement efforts. In short, circumstances which, when viewed as of the time of the entry would lead a reasonable person to believe that unless an entry and arrest are made immediately, the suspect may escape, destroy evidence, or continue the commission of an ongoing crime (of the violent type), represent exigencies of the type justifying immediate law enforcement action on probable cause without first obtaining a warrant.

[18] For additional discussion regarding U.S. case law concerning anonymous informants, please refer to Appendix B.

Ex. H

also enhance community-police relations by contributing to police legitimacy, reducing incarceration rates, and more effectively using governmental resources.[19]

## E.  Citation in Lieu of Arrest

There are also many instances when issuing a citation instead of physically taking a person into custody for the offense is preferred. Citations can typically be issued for misdemeanors that are nonviolent and do not expose the public to additional dangers by allowing the suspect to remain out of jail. These offenses may include driving offenses, larceny, and other nuisance crimes. There are several benefits of issuing citations. First, research has shown that issuing a citation rather than arrest produces an average time savings of approximately one hour per incident.[20] Another benefit for officers is that allowing them to cite and release emphasizes their ability to use discretion to make decisions that are best for the offender, community, and officer. In allowing officers discretion, the public's trust and opinion of law enforcement officers may be improved.[21]

When determining whether a particular situation is appropriate for citation in lieu of arrest, officers should consider whether the person is likely to disregard the citation; if cited and released, whether they are likely to cause harm to themselves or another; and whether there are any other factors that should be considered and are permitted by law and agency policy.

## F.  Arrest Planning

The location, timing, and manner of the arrest should be planned carefully in order to maximize the probability of a successful arrest and minimize the danger to officers, suspects, and third parties. For example, wherever possible, arrests should not be made in a location where they will pose a threat to the safety of the public, for example, crowded places where bystanders may be injured should the arrestee offer resistance. If time permits and/or the situation is high-risk, an arrest may be planned in advance in consultation with a supervisor or other experienced officers.

Advance planning may include deconfliction with surrounding agencies and a risk assessment, which may identify information concerning the suspect and location. Specific information to be collected may include items such as the suspect's:

- Potential for violence;
- Past law enforcement encounters;
- Possession of firearms; and
- Probation and parole status.

Likewise, information about the location is extremely important, to include:

- The owner;
- Past incidents of violence with law enforcement;
- Entrances/exits;
- The presence of other individuals who might interfere with the arrest; and
- Any potential known hazards.

Agencies should also check with other government entities to obtain information regarding environmental, animal, and community development concerns.

---

[19] For more information, visit The Police, Treatment, and Community Collaborative (PTACC) website at https://ptaccollaborative.org/.
[20] See IACP, *Citation in Lieu of Arrest: Examining Law Enforcement's Use of Citation Across the United States* (Alexandria, VA: IACP, 2016), https://www.theiacp.org/sites/default/files/all/i-j/IACP%20Citation%20Final%20Report%202016.pdf.
[21] For more information, see the IACP resources available on citation in lieu of arrest at http://www.theiacp.org/citation.

Ex. H

## Arrests and Investigatory Stops — Concepts & Issues

Some agencies develop a scoring or matrix system to assess various risk factors pertaining to the suspect(s) and location. Once a certain number of risk factors are met, consideration is given to including tactical personnel.

Officers should approach every arrest situation with the knowledge that any arrest, regardless of the offense, involves an element of danger. Therefore, all arresting officers should take reasonable precautions to ensure their own safety in addition to the safety of third parties. General precautions include the following:

- Restraining the arrestee as soon as possible,
- Searching the arrestee for weapons, and
- Conducting a protective sweep of the premises or the immediate area where the arrest occurs when there is reasonable suspicion that a dangerous person may be present.

### G. Making the Arrest

As soon as practical once the individual to be arrested has been positively identified and located, the arresting officers should identify themselves as law enforcement officers, inform the suspect of their arrest, and specify the charges for which the arrest is being made. Officers should follow agency policy and applicable law regarding knock and announce when executing arrest warrants. Officers not in uniform should display their shields and credentials when making the arrest to ensure proper identification.

While conducting the arrest, officers should follow their agency's policy on use of force and use only that degree of force that is reasonably necessary to ensure the safety of the officers, the suspect, and the public. The arrestee should be restrained by use of handcuffs or other authorized devices after being taken into custody, except as otherwise provided by agency policy. Other lawful forms of restraint may be used in order to ensure the safety of the arresting officers. Officers should use only those restraints that appear necessary to control the situation and only for the period of time required. When restrained on the ground, officers should position the subject in a manner that will assist breathing, such as placement on their side, and avoid pressure to the chest, neck, or head.

### H. Post-Arrest Procedures[22]

Officers are responsible for the safety of the arrestee(s). Generally, officers should not allow victims or other bystanders to come into close proximity with the arrestee. In addition, officers should not allow the arrestee out of their immediate presence for any reason until the arrestee is properly secured and transported. For example, officers should not permit arrestees to leave the immediate area of the arrest to acquire personal items or to perform other tasks prior to being transported. In exceptional cases where such requests are granted, the arrestee should first be searched for weapons and then be accompanied and closely monitored by the arresting or other officers.

Once the arrestee is completely secured and out of reach from both victims and the public, officers should conduct a thorough search of the person for weapons and contraband if they have not already done so. Agencies should develop policies and procedures regarding searches incident to arrest.[23] Specifically, this may include policies that individuals should be searched by an officer of the same sex, where available. However, agencies should also offer guidance for when there are no officers available that are the same sex of the arrestee. In addition, agencies should consider their policies for searching transgender prisoners.[24] The search incident to arrest may include not only the person of the arrestee, but also the areas within their reach and control. Officers should follow their agency policy and protocol related to strip and body cavity searches.[25]

---

[22] See the IACP Law Enforcement Policy Center documents on Transportation of Prisoners available at https://www.theiacp.org/resources/policy-center-resource/transportation-of-prisoners.

[23] See *Arizona v. Gant*, 556 U.S. 332 (2009) for restrictions on conducting warrantless searches of vehicles incident to arrest.

[24] See the IACP Policy Center document on Interactions with Transgender and Gender-Nonconforming Individuals at https://www.theiacp.org/resources/policy-center-resource/transgender.

[25] See the IACP Law Enforcement Policy Center documents on Strip and Body Cavity Searches available at https://www.theiacp.org/resources/policy-center-resource/strip-and-body-cavity-searches.

Ex. H

Agencies may also wish to consider whether officers who use force on an arrestee during the arrest process should be allowed to transport the suspect in situations where no transport officer is available. This determination should include the level of force necessary to trigger this requirement.

### I.  Arrest of Juveniles

Arrest, transportation, and booking of juveniles is subject to special legal requirements. When interacting with juveniles, law enforcement officers are given reasonable discretion on deciding appropriate enforcement options. Generally, based on the seriousness of and circumstances surrounding the offense and the background and demeanor of the juvenile and other relevant factors, an officer may release a juvenile to their parents, guardian, or other responsible adult. Therefore, officers should follow their agency's policy regarding juvenile diversion and custody.[26]

### J.  Release after Arrest

If it becomes apparent that there is no probable cause to justify the arrest, the individual must be released. The officer should first be satisfied that there are insufficient grounds for making an arrest based on probable cause and a supervisor should be notified of the decision to release.

If the person is released, officers should ensure that they are released at a safe location and not otherwise placed at risk as a result of the incident. If necessary, officers should provide transportation for the individual to a safe location.

## VI.  REPORTING

Regular documentation of officer interactions with members of the public while conducting enforcement activities, to include voluntary contacts, investigatory detentions, pat-downs, and arrests, is a key component to ensuring agency transparency and provides an agency with a means of auditing these encounters for policy compliance. Agencies should develop specific procedures that outline what information should be collected and in what circumstances. For instance, it is unreasonable to expect officers to fully document each interaction that they have with every member of the public, as these may include a casual greeting or providing directions. However, agencies should ensure that contacts involving suspicious activity and reasonable suspicion, at a minimum, are documented. Agencies may elect to create standardized forms for officers to complete in these situations.

When practical, agencies should attempt to collect information with data related to investigatory detentions and arrests, collectively referred to herein as stops, conducted by the agency and should provide a report to the public on a regular basis. Agencies may elect to include such items as the total number of stops, location of stops, time and date information, outcome of the stops (arrest, non-arrest, etc.), weapon recovery, and race and gender of the stopped individual in this report. This data should also be reviewed by the chief executive or their designee to ensure that officers are conducting lawful, unbiased voluntary contacts, investigatory detentions, and arrests. Any of these types of interactions that do not conform to policy or law should result in an administrative investigation.[27]

---

[26] See the IACP Law Enforcement Policy Center documents on Juvenile Diversion and Custody available at https://www.theiacp.org/resources/policy-center-resource/juvenile-custody.

[27] See the IACP Law Enforcement Policy Center documents on Investigation of Allegations of Employee Misconduct available at https://www.theiacp.org/resources/policy-center-resource/employee-misconduct.

Ex. H

## APPENDIX A: THE "PLAIN-TOUCH" RULE IN THE UNITED STATES

The plain-touch rule, where it is applicable, enables officers to seize contraband or other evidence discovered by sense of touch during a pat-down for weapons, even though the officer conducting the search is aware that the item detected through the suspect's clothing is not a weapon. Not all courts accept the plain-touch doctrine, and those that do, including the U.S. Supreme Court, draw a very fine line between what is acceptable and what is not.

To understand the plain-touch rule, officers must understand two basic concepts of search and seizure law: the rules of stop-and-frisk and the plain-view doctrine. The validity of a plain-touch seizure depends upon compliance with these requirements.

*Plain View.* Under the plain-view doctrine, an object may lawfully be seized if, at the time of the seizure, the object was in plain sight of law enforcement. This rule is subject to the following requirements:

1. The officers must lawfully be in the place or position from which the evidence was first seen. For example, officers could not illegally gain entry to a dwelling and then successfully contend that evidence found inside the dwelling was admissible because it was lying in plain view on the kitchen table. The illegal entry would make the plain-view rule inapplicable.[28]

2. The officers must have probable cause to believe that the items observed are contraband or evidence of a crime. Even though officers are lawfully in a position to observe the evidence, and even though the object is in plain view from that position, there must be probable cause to believe that what is observed is in fact contraband or evidence of a crime. If the officers lack probable cause to believe that the object is contraband or evidence of a crime, the object may not be seized under the plain-view doctrine.[29]

3. The incriminating character of the evidence must be "immediately apparent." If the probable cause to believe that the observed object is contraband or evidence of a crime does not arise unless and until the officers have conducted some further investigation of the object, the plain-view doctrine is not applicable.

*Stop-and-Frisk Plus Plain View Equals Plain Touch.* The U.S. Supreme Court has held that the plain-view rule applies to evidence discovered during an investigatory detention. In *Michigan v. Long*,[30] police approached a man who had driven his vehicle into a ditch. The man exited his car and appeared to be intoxicated. As they approached this individual, who was by then attempting to reenter the car, the officers observed a knife on the floor of the vehicle. The officers then stopped the man, frisked him, and inspected the interior of the vehicle for other weapons. During this inspection, the officers discovered an open pouch of marijuana.

The Supreme Court held that if, during a roadside detention, law enforcement officers have a reasonable suspicion, based upon specific and articulable facts, to believe that the driver of the vehicle may be armed and dangerous, they may conduct a "protective search" (i.e., a *Terry* "frisk") for weapons; this protective search, it was held, could extend not only to the person concerned, but also to the passenger compartment of the vehicle.[31] As with any other protective search, this "frisk" of the vehicle must be limited to those areas in which a weapon may be placed or hidden. The court then further held that if, while conducting a valid "frisk" of the vehicle, the officer should discover contraband other than weapons, such contraband may be seized as evidence under the plain-view doctrine.[32]

*The Plain-Touch Doctrine.* Under *Terry*, if an officer frisks a suspect, and if, during that frisk, the officer by sense of touch detects an object in the suspect's clothing that feels like a weapon, the officer may seize the weapon. Further, as noted above, if the object that was believed to be a weapon turns out not to be a weapon after all, but it is nevertheless something that is contraband or evidence of a crime, the seizure of that item is still lawful.

---

[28] See *Horton v. California*, 496 U.S. 128 (1990); *Texas v. Brown*, 460 U.S. 730 (1983).
[29] *Horton*, 496 U.S. 128; and *Brown*, 460 U.S. 730.
[30] *Michigan v. Long*, 463 U.S. 1032 (1983).
[31] As with any other protective search, this "frisk" of the vehicle must be "limited to those areas in which a weapon may be placed or hidden." *Long*, 463 U.S. at 1049.
[32] *Long*, 463 U.S. 1032.

Ex. H

## Arrests and Investigatory Stops <span style="float:right">Concepts & Issues</span>

The issue addressed by the modern plain-touch doctrine concerns situations where while conducting a pat-down for weapons during an investigatory detention, an officer detects an object in the suspect's clothing. If an officer knows immediately by the way an object feels through the clothing that it is not a weapon, but, through knowledge and experience, the officer by sense of touch alone recognizes the object as being contraband or some other item of incriminating evidence, "its warrantless seizure would be justified by the same practical considerations that inhere in the plain view context."[33]

---

[33] *Minnesota v. Dickerson*, 508 U.S. 366 (1993).

Ex. H

## APPENDIX B: ANONYMOUS INFORMANTS – UNITED STATES CASE LAW

### A.  United States Supreme Court Cases.

The United States Supreme Court has addressed whether information gleaned from an anonymous tip provides justification for law enforcement action in several cases.

- In 2014, in *Navarette v. California*, the court held that a 911 call had sufficient indicia of reliability and, under the totality of the circumstances, the officer had a reasonable suspicion that the truck's driver was intoxicated, thereby justifying the traffic stop.[34]

- In 2000, in *Florida v. J.L.*, the court held that an anonymous tip that an individual was carrying a firearm was not sufficient to justify a police officer's stopping a person and conducting a *Terry* frisk for weapons.[35]

- In a 1990 decision, *Alabama v. White*, the court found that an anonymous tip that a suspect was carrying cocaine was sufficient to conduct a stop and frisk since the officers obtained independent corroboration of the information provided by the tipster.[36]

- In the 1983 *Illinois v. Gates* case, the U.S. Supreme Court broke away from a more confining test for reliability of tipsters by adopting the "totality of the circumstances" rule in determining the veracity and reliability of such information.[37]

In the *Gates* case, police received an anonymous handwritten letter that provided the name and address of a couple who were allegedly engaged in drug trafficking. The letter provided information on the location of their buys, the logistics for transporting the contraband, and the location of stored drugs and those being purchased.

A Drug Enforcement Administration (DEA) agent subsequently established surveillance on the couple and documented their independent travel to and from Florida. These facts along with their mode of transportation, vehicle identification, and contact while in Florida confirmed the information in the letter. The court examined the totality of the facts contained in the letter and the accuracy of predicted actions spelled out by the tipsters that would not have been obtained by someone who was not familiar with the actions of the suspects. In light of these verifiable facts, the court upheld the probable cause basis upon which the warrant was issued for a search of the suspect's home and car.

Several years following *Gates*, the court again upheld the validity of law enforcement action taken on the basis of an anonymous tip, this time in relation to determining whether an anonymous tip provided reasonable suspicion to conduct an investigative vehicle stop. In *White*, an anonymous telephone caller provided police with information concerning a woman who the caller said would be leaving an apartment complex at a particular time and proceeding to a designated motel with an attaché case containing a small quantity of cocaine. The caller identified the model of the car and the damage to its taillight. Officers observed the woman in question leave the designated building and proceed in a direct route toward the motel identified by the caller. Just prior to arriving at the motel, the undercover officers requested that a marked unit conduct an investigative stop of the vehicle. Officers conducting the stop were granted consent to search the vehicle and subsequently found marijuana in the attaché case and, during booking, cocaine in her purse.

This case lacks the number of detailed observations concerning the suspect and anticipated actions as was evident in *Gates*. However, the court noted that the officers' actions required the establishment of only reasonable suspicion rather than the greater burden of probable cause required to issue the warrant in *Gates*. In addition, the caller was able to predict future actions of the suspect. As in *Gates*, the court attached great significance to the issue of predictability because it indicated that the caller was particularly familiar with the suspect and had an understanding of the suspect's

---

[34] *Navarette v. California,* 572 U.S. 393, 134 S. Ct. 1683 (2014).
[35] *Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375 (2000).
[36] *Alabama v. White*, 496 U.S. 325 (1990).
[37] *Illinois v. Gates*, 462 U.S. 23, 103 S. Ct. 2317 (1983).

Ex. H

future actions that goes beyond merely describing facts that could be observed at the time of the tip. The court found these combined factors sufficient to support reasonable suspicion to conduct the vehicle stop.

In *Navarette*, the court found that a California Highway Patrol officer did have reasonable suspicion to stop a pick-up truck because it matched the description of a truck that a 911 caller reported as having run her off the road. The court, using a totality of the circumstances test, held that the officer had reasonable suspicion that the driver was intoxicated and that the traffic stop complied with the Fourth Amendment. In reaching its decision, the court noted that the 911 call had "indicia of reliability" for the officer to rely upon; by stating that she had been run off the road, the 911 caller was identifying herself as an eyewitness victim of reckless driving. Also, only a short time had passed between the incident and the 911 call, which the court found allowed little time for the caller to fabricate information. Finally, the officer's corroboration of the description of the truck, the direction of travel, and its location helped establish that the tip was reliable and justified the stop.

In contrast to the *Gates*, *White*, and *Navarette* opinions, in *Florida v. J.L.*, the court did not find sufficient reliability in an anonymous caller's tip to support a stop and frisk. In that case, police received a tip from an anonymous caller that a certain person, described by the caller as a young, black male wearing a plaid shirt and standing at a specified bus stop, was carrying a handgun. Officers dispatched to the scene subsequently found the defendant, who matched the description at that location. A frisk of the defendant produced a handgun, and the defendant was charged with firearms violations. The court held that the evidence was wrongfully obtained and should be suppressed.

The court pointed out the differences between this case and *White* that led to suppression of the evidence in *J.L.* The court stated:

> The tip in the instant case lacked the moderate indicia of reliability present in White *and essential to the Court's decision in that case. The anonymous call ... provided no* **predictive information** [emphasis added] *and therefore left the police without means to test the informant's knowledge or credibility ... All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information.*[38]

Here as in prior cases brought before the court, the issue of being able to verify predictive information is critical to determining the reliability and credibility of an anonymous tip. Had the caller provided law enforcement with information such as the defendant's plans to travel to a specific location or to meet another person who could have adequately been described, officers would have had information that could be corroborated. Lacking such information, officers are left with only the description of an individual that could have been relayed by direct observation of the caller at the time of the call.

It should be noted, however, that had the officers, in the course of observing the defendant, developed independent reasonable suspicion to believe that he was in possession of a handgun, the stop would probably have been upheld, even though the anonymous tip was lacking in reliability. In addition, the court in *J.L.* commented on the fact that not all locations or settings provide persons with the same expectation of privacy, nor are all potential threats to the public regarded equally:

> We do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm ... Nor do we hold that public safety officials in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports ... and schools ... cannot conduct protective searches on the basis of information insufficient to justify searches elsewhere.[39]

---

[38] *J.L.*, 529 U.S. at 271.
[39] *J.L.*, 529 U.S. at 273–274.

Ex. H

In these and related circumstances, officers would, according to the commentary of the court, be justified in acting on an anonymous tip that did not carry the predictive indicia otherwise required in court cases discussed here.

## B.  Circuit Court Cases.

In another recent case, *United States v. Lowe*, officers received an anonymous tip that a black male wearing a gray hoodie with a gun in his waistband was talking to a female subject in front of a house in an area known to the officers to be a high crime area with drug activity.[40] The officers also knew earlier that evening, a gunshot had been fired at a house around the corner from the location provided in the tip. Officers responded and saw a man fitting the description from the anonymous tip talking to a woman. The officers did not observe a gun and did not see or hear an argument or any other type of disturbance but approached the pair and frisked Lowe after he refused to remove his hands from his pockets. The officers found a handgun in Lowe's waistband and he was later charged with being a felon in possession of a firearm.

Lowe sought to have the handgun suppressed on the grounds that the officers did not have reasonable suspicion to conduct a frisk. The court agreed. After determining that Lowe was seized for Fourth Amendment purposes, it had to determine if that seizure was supported by reasonable suspicion. In this case, the facts known to the officers included an anonymous tip that a man matching Lowe's description possessed a gun, the location where they were responding was known for high crime activity, and a gunshot had been heard in that area just a short time earlier. The court found that those facts did not establish reasonable suspicion that Lowe was involved in criminal activity, and the anonymous tip alone did not support a stop and the subsequent frisk of Lowe.

In contrast, in *United States v. Edwards*, an unidentified person called 911 and reported that a young black male at the corner of West Boulevard and Hyde Park Boulevard was shooting at passing cars.[41] The caller provided a physical description, which included his approximate height, age, and dress. He also reported that the shooter had a black handgun and was entering Penny Pincher's Liquor Store. Officers responded within five minutes and observed a man matching that description approximately 75 feet from the liquor store. There was only one other person in the area, and he was a Hispanic male wearing different clothing than described by the 911 caller. After additional officers arrived, both men were ordered to their knees and handcuffed. An officer frisked the black male subject, later identified as Edwards, and a silver .22 caliber revolver was found.

Edwards was subsequently charged as a felon in possession of a firearm and sought to have the firearm suppressed. One of his arguments for suppression was that the anonymous 911 call did not provide the officers with reasonable suspicion to detain him. The court disagreed finding that information provided by the 911 caller was sufficiently reliable to provide reasonable suspicion to conduct a *Terry* stop; Edwards was the only person near the liquor store matching the description of the person who had been reportedly shooting at vehicles right before the officers arrived. The court stated that the 911 caller was an eyewitness who was reporting an "ongoing and dangerous situation and providing a detailed description of the suspect."

---

[40] *United States v. Lowe*, 525 F. App'x 167 (3rd Cir. 2013).
[41] *United States v. Edwards*, 761 F.3d 977 (9th Cir. 2014).

Ex. H

**Arrests and Investigatory Stops**                    Concepts & Issues

## APPENDIX C: ADDITIONAL APPLICABLE UNITED STATES CASE LAW

- *Arizona v. Hicks*, 480 U.S. 321 (1987): Provides an example of the plain-touch rule.
- *Florida v. Royer*, 460 U.S. 491 (1983): An individual's behavior and appearance provide sufficient reasonable suspicion to initiate a voluntary contact. An investigatory detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.
- *Hiibel v. Sixth Judicial District Court of Nevada*, 542 U.S. 177 (2004): Officers are not required to provide warnings related to custodial interrogations before demanding an individual provide his or her name pursuant to a state law that required such disclosure.
- *Illinois v. Wardlow*, 528 U.S. 119 (2000): An individual's flight from contact with law enforcement officers may be considered in determining whether reasonable suspicion exists to conduct an investigatory detention.
- *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979): Probable cause for arrest is defined.
- *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975): Nervous, evasive behavior is a pertinent factor in determining whether reasonable suspicion exists.
- *United States v. Cortez*, 449 U.S. 411, 412 (1981): Law enforcement officers have the authority to conduct investigatory detentions when they "have a particularized and objective basis for suspecting the particular person stopped of criminal activity."
- *United States v. Sokolow*, 490 U.S. 1, 7 (1989): For investigatory detentions, only reasonable suspicion is necessary, a standard that is "considerably less than proof of wrongdoing by a preponderance of the evidence."

Ex. H

# Arrests and Investigatory Stops

Concepts & Issues

© Copyright 2020. Agencies are encouraged to use this policy to establish one customized to their agency and jurisdiction. However, copyright is held by the International Association of Chiefs of Police, Alexandria, Virginia, U.S.A. All rights reserved under both international and Pan-American copyright conventions. Further dissemination of this material is prohibited without prior written consent of the copyright holder.

Ex. H



**International Association of Chiefs of Police**
44 Canal Center Plaza, Suite 200
Alexandria, VA 22314
703.836.6767 | FAX 703.836.4743
**www.theIACP.org**

Ex. H

# Trump says he doesn't want Somalis in the US, urges them to go back to their homeland and fix it

WASHINGTON (AP) — President Donald Trump on Tuesday said he did not want Somali immigrants in the U.S., saying residents of the war-ravaged eastern African country are too reliant on U.S. social safety net and add little to the United States.

Trump's contemptuous description of the entire immigrant community is the latest example of him pointedly attacking the Somali diaspora in the United States. Somalis have been coming to Minnesota and other states, often as refugees, since the 1990s. The president made no distinction between citizens and non-citizens.

The president's comment came days after his administration announced it is halting all asylum decisions following the shooting of two National Guard soldiers in Washington. The suspect in last week's incident is originally from Afghanistan but Trump has used the moment to raise questions about immigrants from other nations, including Somalia.

"They contribute nothing. I don't want them in our country," Trump told reporters near the end of a lengthy Cabinet meeting. He added: "Their country is no good for a reason. Your country stinks and we don't want them in our country."

Ex. I

Related Stories

Trump for years has criticized Rep. Ilhan Omar, a Minnesota Democrat who emigrated from Somalia in 1995 as a child. But he picked up the pace of his attacks on Somalis on social media last week after Christopher Rufo, a conservative activist, published unsubstantiated allegations in a magazine called City Journal, citing unnamed sources, that money stolen from Minnesota programs has gone to al-Shabab, an al-Qaida-linked militant group that controls parts of Somalia.

Trump vowed last week in a social media post to send Somalis "back to where they came from," and alleged Minnesota, home to the largest Somali community in the United States, is "a hub of fraudulent money laundering activity." On Tuesday, the president said Somalis in the U.S. should "go back to where they came from and fix it."

He specifically pledged to terminate temporary legal protections for Somalis living in Minnesota, a move that is triggering fear in the state's deeply-rooted immigrant community, along with doubts about whether the White House has the legal authority to enact the directive as described.

The announcement drew immediate pushback from some state leaders and immigration experts, who characterized Trump's declaration as a legally dubious effort to sow suspicion toward Minnesota's Somali community.

The move would affect only a tiny fraction of the tens of thousands of Somalis living in Minnesota. A report produced for Congress in August put the number of Somalis covered by Temporary Protected Status at

Ex. I

just 705 nationwide.

Trump also renewed his criticism of Omar, whose family fled the civil war in Somalia and spent several years in a refugee camp in Kenya before coming to the U.S.

"We can go one way or the other, and we're going to go the wrong way, if we keep taking in garbage into our country," Trump said. "Ilhan Omar is garbage. She's garbage. Her friends are garbage."

On Tuesday, Omar punched back at Trump on social media, saying: "His obsession with me is creepy. I hope he gets the help he desperately needs."

Trump added about Somali immigrants: "These aren't people that work. These aren't people that say, 'Let's go, c'mon. Let's make this place great.' These are people that do nothing but complain."

Minneapolis Mayor Jacob Frey called Trump's message "wrong" and said Somali immigrants have helped improve his community.

"They have started businesses and created jobs. They have added to the cultural fabric of what Minneapolis is," Frey said. "To again, villainize an entire group is ridiculous under any circumstances. And the way that Donald Trump is consistent in doing it, I think calls into question major constitutional violations. And it certainly violates the moral fabric of what we stand by in this country as Americans."

———

AP writer Steve Karnowski in Minneapolis contributed reporting.

Ex. I



## U.S. Foreign-Born Population

**Residential Map** | **10-Yr Numeric Change** | **National Profile** | **Comparative Profiles** | Notes

Select a place of birth: ⓘ
---------Somalia

Select a geography level:
States
Counties

Foreign-born from Somalia as a Percentage of State Population

**United States**
Estimate: 96,352

**Top States**

| | |
|---|---|
| Minnesota | 0.65% |
| North Dakota | 0.21% |
| Ohio | 0.12% |
| Nebraska | 0.12% |
| Washington | 0.10% |
| Maine | 0.07% |
| Vermont | 0.04% |
| Kentucky | 0.04% |
| Missouri | 0.03% |
| Iowa | 0.03% |

0.00% — 0.65%  Note: States shaded white are estimated to have zero counts. Z rounds to 0.00.

**United States®**
**Census**
**Bureau**

| **U.S. Department of Commerce**
**U.S. CENSUS BUREAU**
**census.gov**

Source: 2019–2023 American Community Survey 5-year estimates (Table ID: B05006)

Details

Ex. J

☆ 2 Favorites   👁 28,956 Views

U.S. Foreign-Born Population: 2019-2023 #CensusData #CensusDataViz

**Published on:** www.census.gov

**First Published Date:** Dec 12, 2024    **Last Published Date:** Dec 12, 2024

English (US)

Trust   Blog   FAQ   About   Tableau Products   Careers   Contact Us

LEGAL    TERMS OF SERVICE    PRIVACY INFORMATION    DATA POLICY    RESPONSIBLE DISCLOSURE    UNINSTALL    COOKIE PREFERENCES         YOUR PRIVACY CHOICES

in   f   X

© 2025 SALESFORCE, INC.

Ex. J

# WATCH: 20-year old U.S. citizen detained by ICE on Tuesday draws condemnation from Minneapolis' mayor and police chief

*Ari Bergeron, Susie Jones*

Dramatic video being released Wednesday of a 20-year old Somali-American man who was taken into custody in the Cedar Riverside neighborhood in Minneapolis.

"What you very clearly saw in that video was Mubashir, an American citizen, someone who has been here nearly his entire life, tackled, handcuffed, taken into custody for no reason at all, in clear violation of law and the Constitution of the United States," Minneapolis Mayor Jacob described. "For simply walking down the street and looking like he's Somali. This should make every single person in America, whether you are a Democrat or Republican, livid."

It happened on [Tuesday evening during an ICE raid](#) where a number of agents checked ID's of numerous people who all turned out to be U.S. citizens.

The young man, Mubashir, didn't want to give his last name, but stood with Frey and Minneapolis Police Chief Brian O'Hara who condemned the operation.

"I felt like I was getting assaulted," says Mubashir. "Like I was getting kidnapped, and that's exactly what it was. And the way they were treating me, it was inhumane. They dragged me across the road, they slammed me to the ground, choked me - that was uncalled for."

Mubashir told reporters he was kept at a facility on Fort Snelling for several hours. He claims he showed his passport several times before ultimately being released, adding they "didn't seem to care."

"Minneapolis is not going to stand by this kind of crap," said Frey.

"Like the mayor, I apologize that this happened to you in my city, with people wearing vests that say police. That's embarrassing," says Chief O'Hara. "But what really gets me is that this is just one story today. And it's a little overwhelming. Just the volume of stories we're trying to sift through, and figure out what's true and what's not, and kind of what may be happening."

Federal agents used pepper spray to push through an angry crowd that blocked their vehicles as they checked identifications in a heavily Somali neighborhood of Minneapolis on Tuesday, amid the Trump administration's [ongoing crackdown](#) targeting the community.

"Random efforts in which individuals, who are including American citizens, are being stopped because they appear to be Latino or because they appear to be Somali is wrong," says O'Hara who says the situation is 'not safe.'

City Council Member Jamal Osman, a Somali American who represents the neighborhood, said armed ICE agents went to East African restaurants in the neighborhood Tuesday, closed the doors and demanded people's IDs. They found only U.S. citizens and made no arrests, Osman said.

O'Hara added he was proud of the actions from his department who were dealing with the

Ex. K

aftermath, and monitoring the situation in Cedar-Riverside.

"We would just hope that at least from a tactical perspective, things could be well planned beforehand, both for the safety of law enforcement as well as for the safety of people in our community," O'Hara explained. "And that we wouldn't have to deal with so many stories after the fact, of what at the very least are just questionable methods and clearly a use of resources that doesn't appear to be getting a return on investment."

Frey, who has a background as a civil rights attorney, noted that the particular action that led to Mubashir being held are illegal.

"Under any law and under the United States Constitution, you can't tackle somebody because they look Somali without knowing who they are, what their name is, and you can't then detain them for purposes of immigration when they're a complete legal American citizen. When they have tried to provide information showing that they're an American citizen. Where you have declined to receive that information which you saw in this video," Frey explained.

Ex. K

# MINNESOTA DEPARTMENT OF PUBLIC SAFETY



## Driver and Vehicle Services

445 Minnesota Street • Saint Paul, Minnesota 55101
Driver Services Phone: 651.297.3298 • Vehicle Services Phone: 651.297.2126
Fax: 651.797.1205 • TTY: 651.282.6555
dps.mn.gov

December 23, 2025

**Alcohol
and Gambling
Enforcement**

**Bureau of
Criminal
Apprehension**

**Driver
and Vehicle
Services**

**Emergency
Communication
Networks**

**Homeland
Security and
Emergency
Management**

**Minnesota
State Patrol**

**Office of
Communications**

**Office of
Justice Programs**

**Office of
Pipeline Safety**

**Office of
Traffic Safety**

**State Fire
Marshal**

**<u>Sent via Electronic Mail and US Mail</u>**

The Honorable Kristi Noem
Office of the Executive Secretary
MS 0525 Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528-0525
publicaffairs.iceofficeof@dhs.gov

Re:     Misuse of Minnesota License Plates on Unmarked DHS Vehicles

Dear Secretary Noem:

The Minnesota Department of Public Safety – Driver and Vehicle Services division (DVS) has received numerous reports from concerned citizens that Department of Homeland Security (DHS) immigration enforcement agents are misusing Minnesota license plates that are assigned to unmarked DHS vehicles.  For example, DVS has received reports that DHS agents are swapping license plates between DHS unmarked vehicles.  DVS has also received reports that that identical license plates have been observed on the rear of two separate DHS vehicles.

The above-described conduct violates Minnesota law and will not be tolerated.  To be clear, Minnesota law prohibits anyone, including the driver of an unmarked law enforcement vehicle, from displaying a Minnesota license plate other than the license plate assigned to that vehicle by DVS.  Minn. Stat. § 168.36, subd. 2.  Use of Minnesota license plates on a vehicle other than the vehicle to which the license plate is assigned unnecessarily puts DHS agents at risk of being stopped and cited under this section.

As you are aware, DVS has a robust undercover vehicle registration program used by DHS and other state and federal law enforcement agencies operating in Minnesota. This program, authorized by Minnesota Statutes, section 168.012, subdivision 1(c), allows law enforcement agencies to receive Minnesota license plates for use on their unmarked vehicles. This program ensures that vehicles driven on Minnesota roads are titled and registered as required by law while preserving the anonymity of law enforcement personnel performing sensitive work.

EQUAL OPPORTUNITY EMPLOYER

Ex. L

December 23, 2025
Page 2

Historically, DHS has used this program to protect the anonymity of law enforcement personnel performing sensitive work in Minnesota while adhering to state law and providing a mechanism for accountability in the event an unmarked vehicle is misused. There is nothing in the undercover license plate program or Minnesota law that allows DHS to transfer license plates between vehicles as has been reported to DVS. DPS expects that DHS leadership will take affirmative steps to: (i) ensure that any such conduct is immediately ceased; and (ii) confirm that all DHS undercover vehicles with Minnesota license plates bear the proper DVS-issued plate that is assigned to the particular vehicle.

If DHS is unwilling or unable to abide by these legal requirements, the agency's continued participation in the unmarked vehicle program will be jeopardized. Additionally, DVS may exercise its authority to revoke the registrations and license plates of the vehicles in question and to seize the license plates. Minn. Stat. § 168.17.

If you have any questions about the contents of this letter or about DHS's legal obligations with regard to unmarked vehicles registered in Minnesota, please feel free to contact me.

Respectfully,

Pong Xiong
Director, Driver and Vehicle Services
Minnesota Department of Public Safety
445 Minnesota Street, Suite 190
Town Square Building
St. Paul, MN 55101
Pong.Xiong@state.mn.us


cc:     Brian Hyer
        Brian.Hyer@hq.dhs.gov

        Kim Johnson
        Kim.Johnson@hq.dhs.gov

        ASAC Tonya Price
        Tonya.M.Price@ice.dhs.gov

Ex. L

# Minnesota DVS warns ICE agents they're violating state law by switching license plates

Jon Collins    December 24, 2025 2:22 PM



U.S. Immigration and Customs Enforcement agents changing the license plate on one of their vehicles in Minneapolis.

Courtesy photo

The director of Minnesota's Driver and Vehicle Services is warning U.S. Immigration and Customs Enforcement agents that they're violating state law and could be cited if they switch out or remove license plates on their unmarked vehicles.

The move comes after multiple reports from observers that ICE and

Ex. M

Department of Homeland Security agents have been seen changing or removing the license plates in the vehicles they have been using to patrol the state during the ongoing immigration crackdown in the Twin Cities.

Luke Mielke has been observing ICE agents outside the Whipple Federal Building since the agency's immigration enforcement surge started earlier this month. On the morning of Dec. 14, he and a friend filmed federal agents appearing to blatantly change license plates on vehicles they were using.

"We witnessed several ICE agents gathered in the back of a car, with a stack of license plates they were sorting through, then taking a plate off the car and putting a new license plate on the car," Mielke said.

Video shared with MPR News appears to confirm Mielke's account. ICE officials didn't immediately answer a request for comment.

The conduct that's been reported to the state "violates Minnesota law and will not be tolerated," said Pong Xiong, director of Minnesota Driver and Vehicle Services, in a letter to Department of Homeland Security Secretary Kristi Noem and the local ICE office on Tuesday.

"Use of Minnesota license plates on a vehicle other than the vehicle to which the license plate is assigned unnecessarily puts DHS agents at risk of being stopped and cited under this section," Xiong wrote.

Xiong told federal homeland security officials to stop license plate switching immediately and confirm that all vehicles being used by federal agents bear their assigned license plates.

Ex. M

Minnesota has an ongoing program to allow undercover law enforcement vehicles to receive license plates for unmarked vehicles. Xiong warned that the federal agency's participation in that program could be jeopardized if the behavior continues. He also said in the letter that the state also has the right to revoke the registrations and seize license plates of vehicles with misused plates.

In a statement to MPR News, Xiong said behavior like switching plates causes understandable concerns for Minnesotans: "Our responsibility is to ensure Minnesota laws are followed and that everyone using our roads can do so safely."

Gov. Tim Walz said earlier this week that agents should stop the practice and criticized federal officials for showing a lack of transparency during recent Minnesota operations.

"They're doing what criminals do. They're putting license plates on vehicles they're not registered to, so they're renting vehicles and putting on fake plates," Walz said. "That's not law enforcement, that's criminal activity."

Department of Public Safety Commissioner Bob Jacobson said observers who suspect plate swapping is occurring can lodge complaints with the U.S. Department of Homeland Security.

Activists have been sharing information and tracking ICE vehicles throughout the Twin Cities, partly by using their license plate numbers and the models of the vehicles.

"ICE does not like their activity being tracked or observed by the public," Mielke said. "They're trying to avoid scrutiny and be able to

Ex. M

operate in the shadows, without public transparency, so one of the ways they're doing that is driving vehicles without license plates or exchanging license plates on the vehicles."

Mielke said he's especially concerned about the precedent it sets to allow federal agents to go around without identification or to violate state laws. He's worried it could embolden copycats to pose as law enforcement agents and commit crimes against the public just a few months after Minnesota lawmaker Melissa Hortman and her husband Mark Hortman were assassinated by a man posing as law enforcement.

License swapping has been reported in other states that experienced immigration enforcement surges. In Illinois, Secretary of State Alexi Giannoulias has launched a public hotline to report license tampering and warned that penalties for violating state law could include jail time.

*MPR News reporter Dana Ferguson contributed to this report.*

Ex. M

CASE 0:26-cv-00324-ECT-ECW     Doc. 130-2     Filed 02/04/26     Page 154 of 242

# The Hill

*Alexander Bolton*

Senate Democratic Leader Chuck Schumer (N.Y.) on Wednesday laid out three major reforms to immigration enforcement operations under the Trump administration that he said would be necessary to earn Democrats' votes to pass a Homeland Security funding bill and avoid a government shutdown.

Schumer declared that Democrats won't vote for Homeland Security funding unless Republicans agree to three demands:

First, end roving patrols by Immigration and Customs Enforcement (ICE) officers and tighten rules governing the use of warrants by officers targeting migrants.

Second, enforce accountability by establishing a universal code of conduct governing federal law enforcement officers' use of force.

Third, prohibit federal officers from wearing masks and require them to wear body cameras and proper identification.

"Under President Trump, Secretary Noem and Stephen Miller, ICE has been unleashed without guardrails. They violate constitutional rights all the time and deliberately refuse to coordinate with state and local law enforcement," Schumer said at a press conference, referring to Homeland Security Secretary Kristi Noem and senior White House adviser Stephen Miller.

"This is not border security, this is not law and order, this is chaos — created at the top and felt in so many of our neighborhoods," Schumer said.

Schumer unveiled the Senate Democrats' list of demands for avoiding a partial government shutdown after holding a lengthy caucus meeting on Wednesday afternoon.

"After talking with my caucus, Senate Democrats are united on a set of common-sense and necessary policy goals that we need to rein in ICE and the violence," the Democratic leader announced.

Schumer has announced that Democrats will block a six-bill government funding package that is scheduled to get a vote on the Senate floor Thursday unless Senate Majority Leader John Thune (R-S.D.) agrees to split off the Homeland Security appropriations bill from the package.

**Sign up for the Morning Report**

Ex. N

The latest in politics and policy. Direct to your inbox.

By signing up, I agree to the Terms of Use, have reviewed the Privacy Policy, and to receive personalized offers and communications via email, on-site notifications, and targeted advertising using my email address from The Hill, Nexstar Media Inc., and its affiliates

He says Democrats are ready to quickly pass the other five bills in the package that cover the departments of Defense, Labor, Health and Human Services, Education, Transportation, State and a variety of agencies.

He said Republicans should then work with Democrats to implement the reforms he outlined Wednesday afternoon through the Homeland Security funding bill that Congress could then pass at a later date.

Copyright 2026 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Ex. N

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota, by and through its Attorney General Keith Ellison, City of Minneapolis, and City of Saint Paul, <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; JOHN CONDON, in his official capacity as Acting Executive Associate Director of Homeland Security Investigations; U.S. Department of Homeland Security; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations; U.S. Immigration and Customs Enforcement; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection; GREGORY BOVINO, in his official capacity as Commander of the U.S. Border Patrol; U.S. Border Patrol; DAVID EASTERWOOD, in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement, <br><br> Defendants. | Case No. 0:26-cv-00190-KMM-DJF <br><br><br><br><br> **DECLARATION OF TODDRICK BARNETTE** |

1

Ex. O

I, Toddrick Barnette, declare as follows based on my personal knowledge, review of City records, and/or discussions with appropriately knowledgeable persons:

1.      I have served as the Commissioner of Community Safety of the City of Minneapolis since October 2023. In my role, I oversee the City's public safety-focused departments: the Minneapolis Police Department, the Minneapolis Fire Department, the Minneapolis Emergency Communications Center (911), the City's Emergency Management Department, and the City's Neighborhood Safety Department.

2.      Operation Metro Surge's continued operations in Minneapolis have harmed the City's public safety system in many ways.  The chaos wrought by Operation Metro Surge has resulted in serious financial and personnel costs to the City's public safety system, has diverted City resources away from City priorities and normal City services, and has interfered with the City's ability to protect the health, safety, and welfare of the Minneapolis community.

3.      The Minneapolis Fire Department ("MFD") operates Emergency Medical Services ("EMS") alongside private emergency transportation providers to render medical aid and hospital transport.  Between December 1, 2025 to January 18, 2026, MFD and other EMS services have had to respond to at least 34 medical calls that resulted from the actions of Defendants' agents. This has included calls by community members requiring medical aid because they were injured in vehicle collisions involving Defendants' agents, and calls by community members who were negatively affected by Defendants' agents' use of pepper spray or tear gas, including one call for a baby reported as not breathing after exposure to tear gas thrown by Defendants' agents.

2

Ex. O

4. The volume of calls to the City's 911 system related to Operation Metro Surge has skyrocketed since the last information provided to the Court. From only January 8, 2026 – January 19, 2026, there have been at least 110 additional 911 calls which stem from ICE activity. That means in the past twelve days there were more calls received by 911 than the total number of calls received the prior 30 days from December 9, 2025 – January 7, 2026.

5. Between January 8-19, City of Minneapolis staff over all departments have received at least 130 reports or calls related to substantive ICE activities in the City, representing over 11 reports or calls per day, on average. This total is likely a substantial under-estimate, as certain community-facing City staff receive extensive direct reports from community members on a daily basis, making consolidated tracking and logging impossible. The majority of these reports (41%) relate to ICE agent sightings, followed by reported detentions (20% of reports), other issues (12%), verbal encounters (9%), protest actions (8%), physical assaults (7%), and ICE staging activities (3%).

6. Since January 8, 2026, the City's 911 system continues to receive calls where the caller is reporting suspicious activity that is ICE agents, but is mistaken for what would be otherwise illegal activity (stalking, kidnapping, assault, etc.) because the caller is not sure if the actors are indeed federal personnel. This is the natural outgrowth of ICE personnel not consistently wearing standardized uniforms and oftentimes being masked. 911 also continues to receive calls asking to report personal injury or property damage caused by Defendants' agents. These calls range from calls about reckless behavior by Defendants' agents, such as unsafe driving, to harm from uses of force by

Ex. O

Defendants' agents against community members who have required Police or Fire (EMS) response.

7.     In Mayor Jacob Frey's Declaration, dated January 12, 2026, he described the impact to scheduling for the Minneapolis Police Department ("MPD"), including cancelled days off and increased overtime, due to MPD's need to respond to Defendants' immigration enforcement activities.  Since then, MPD staffing continues to be strained on a daily basis in order to address the elevated needs resulting from federal actions. Officers continue to work longer shifts as a result, and additional scheduled days off have been cancelled in order to have sufficient staffing to address the threats to public safety caused by Operation Metro Surge.

8.     MPD currently has just above 600 active sworn police officers and has had to use costly overtime at an extremely elevated rated since Operation Metro Surge began. As was described in Mayor Frey's Declaration, on January 7, 2026, MPD created a new overtime code for officers working overtime to provide public safety in response to Defendants' immigration enforcement activities in Minneapolis.  As of the date of this Declaration, for the period between January 7 and January 11, 2026, officers have entered approximately 13,900 hours of overtime at the anticipated cost of $1.92 million.

9.     MPD continues to schedule two police lieutenants to monitor public safety needs due to Defendants' immigration enforcement activities.  Minneapolis SWAT, Strike Team, and Unmanned Aerial Vehicle Team continue to be on paid-on call status so they are prepared to respond to public safety needs due to Defendants' immigration enforcement activities.

Ex. O

10. Every 911 call that comes in related to ICE activities is assessed by the lieutenant on duty to determine whether there needs to be a response by MPD officers. This often requires additional investigation, such as attempting to locate a reported incident with city cameras, sending a drone, or sending an officer to assess the situation. This takes the time and resources not only of the 911 call-taker, the lieutenant, but all the MPD personnel that gather the intelligence needed to make those urgent decisions about whether a response is necessary to maintain public safety.

11. On December 15, 2025, at around 1:30 p.m., Minneapolis Police Department officers responded to a reported request for "HELP" from ICE agents at 29th Street and Pillsbury Avenue. A "HELP" request is a high-priority law enforcement distress call that requires an immediate response by multiple MPD units due to the presumed presence of an imminent threat to officer or public safety. Upon arrival, MPD officers determined that no law enforcement emergency existed. Approximately 100 demonstrators were present and were loud but peaceful, with no assaults, threats, property damage, or interference rising to the level of criminal conduct. ICE agents did not require police intervention related to officer safety. The actual assistance needed was logistical in nature. ICE vehicles had been parked in a manner that limited their ability to leave the area, and ICE personnel had not established an effective egress plan prior to their arrival. MPD officers tried to assist with safely disentangling the vehicles and facilitating their departure, but were not getting cooperation from agents. After almost 10 minutes, Assistant Chief Blackwell confirmed that no assaults or threats to life existed and then ordered all MPD personnel out of the area. The MPD personnel were all clear 9

Ex. O

minutes later.  MPD resources were diverted at emergency response levels for a situation that did not meet the threshold for a "HELP" call. MPD units cleared the scene without arrests, use of force, or further incident.

12.     There has been a huge public reaction against Operation Metro Surge which has manifested in several peaceful protests of thousands of people.  On December 20, 2025, there was a peaceful protest in South Minneapolis.  On January 7, the day that Renee Good was killed by an ICE agent, thousands of individuals attended a vigil at the intersection where the shooting occurred.  On January 10, 2026, an estimated 10,000 community members participated in a protest at Powderhorn Park which was also entirely peaceful.

13.     Because the public sentiment against Operation Metro Surge is so strong, other protests have not remained fully peaceful, but in those situations, the MPD has issued dispersal orders, used crowd control methods, or made arrests where appropriate to maintain public safety.  The protests that have not remained peaceful have been situations where Defendants' agents were present, such as the shooting of Renee Good on January 7, 2026, a protest outside of a hotel where ICE agents were believed to be staying, and a non-fatal shooting on January 14, 2026.  The situation de-escalates quickly once Defendants' agents have left the scene.

14.     Since January 7, 2026, MPD still has had to investigate or respond to multiple calls to address abandoned vehicles after the driver was taken from the vehicle by Defendants' agents.  The calls include situations in which Defendants' agents have left the vehicles in the middle of busy streets, and in more than one situation have left the car

Ex. O

running and not in park, causing the car to roll until it came to a stop, usually by crashing into something.

15. Our efforts are keeping the peace in Minneapolis, but at a high cost that cannot be remedied by dollars. All of these efforts to respond to the chaos caused by Operation Metro Surge strain limited City personnel, siphon City resources, and prevent City personnel and resources from being used to advance City priorities. I have no doubt that Operation Metro Surge has made Minneapolis less safe, not more.

16. Defendants have stated that Operation Metro Surge is necessary because, they assert, the City will not help them with violent criminals, but that is not the case. For decades, the City has worked cooperatively and effectively with the federal government to investigate violent crime, and this partnership has been successful. As an example, the City has worked successfully with the U.S. Attorney's Office and federal agencies to apprehend and prosecute some of Minneapolis's most violent offenders in groundbreaking ways (https://www.mprnews.org/story/2023/08/16/feds-charge-another-14-people-in-minneapolis-gang-crackdown) and have worked regularly on complex issues like drug and human trafficking.

17. The City of Minneapolis does not operate a jail. Adults arrested in Hennepin County are taken to the Hennepin County Public Safety Facility which is run by the Hennepin County Sheriff's Office. No City of Minneapolis employees decide whether to hold individuals in jail on ICE detainers.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 21st day of January, 2026 in Minneapolis, Minnesota

7

Ex. O

_Toddrick S. Barnette_
_____
Toddrick Barnette

Ex. O

# ICE put themselves, others at risk during south Minneapolis operation, former agent says

By

Updated on: December 18, 2025 / 6:42 PM CST

During an ICE operation on Monday, WCCO's cameras caught the stunning moment that an Immigration and Customs Enforcement agent dragged a woman along the ground by her arm, with her wrist seemingly attached to that of the federal officer's by a restraint.

At WCCO's request, Eric Balliet reviewed the footage. He spent 25 years with the agency now known as ICE, serving as a special agent who would go on to lead the ICE equivalent of internal affairs.

"I've arrested dozens upon dozens of human traffickers, human smugglers, child molesters, you name it. I've never dragged a suspect one-handed across a street," Balliet said.

According to ICE, agents found themselves in what they are calling a "riot" in south Minneapolis after pulling over a car with two people facing immigration charges. Officers allege in court documents that a woman attempted to vandalize ICE vehicles with spray paint — the crowd began forming as ICE attempted to detain her.

WCCO's cameras arrived with two officers surrounded by protesters; one of them was waving around a weapon that deploys chemical spray. The other was kneeling on top of the woman, his wrist attached

Ex. P

to hers with the restraint, using his other arm to wave around a Taser. Both of the officers fired their respective weapons; after using his Taser, that officer taunted the crowd, asking "who wants more?"

It was after this incident that the woman got up and tried to run. She was then dragged across the floor by the agent with the Taser before he detached from her; some in the crowd threw snowballs while his partner fired chemical spray in return.

Balliet said that these use-of-force tactics should be under review. He said that the agents appeared overwhelmed, highlighting what to him seemed to be poor operational planning and execution.

Balliet said that too often he sees agents unable to safely handle situations that they should never have put themselves in in the first place.

"There seems to be either a blatant disregard for training or a lack thereof, either of which is troubling and puts the agents and the general public at risk," Balliet said.

In a lengthy statement released on Thursday, an unnamed ICE spokesperson said that officers are showing restraint against "rioters." ICE did not respond to WCCO's questions about whether dragging someone along the floor by a restraint or verbally taunting a crowd of protesters is standard protocol. The agency also failed to say if any of the agents involved on Monday face internal discipline.

"ICE and CBP are trained to use the minimum amount of force necessary to resolve dangerous situations to prioritize the safety of the public and themselves. Our officers are highly trained in de-

Ex. P

escalation tactics and regularly receive ongoing use of force training," the statement reads in part.

In an interview with 60 Minutes in October, President Trump endorsed ICE agents using force in residential neighborhoods in cities throughout the country. This came after an incident in Illinois where cell phone video showed federal agents standing several stories above protesters and shooting less-than-lethal munitions towards their heads and torsos.

Protesters and media organizations in Chicago filed a complaint in federal court about tactics in the Chicago area as well as those captured on video recordings in Portland, Oregon; Los Angeles and other cities. In early November, U.S. District Court Judge Sara L. Ellis issued an order blocking federal agents from deploying chemical spray, tear gas or any other less-lethal weapon "unless such force is necessary to stop the immediate threat of physical harm to another."

The Trump administration has filed an appeal.

On Monday, ICE confirmed the arrest of four people. WCCO learned that the two people detained on immigration charges are an Ecuadorian couple in their early 20s; agents shattered their car window before detaining the pair. The other two arrested are U.S. citizens who ICE alleges assaulted officers; however, WCCO could only find evidence that one of the men is actually facing criminal charges.

According to ICE, a man named Noor Abdikadir is still in custody for assaulting an officer. WCCO could not find any publicly available

information regarding any kind of charges; ICE is ignoring clarifying questions about his whereabouts and alleged crimes.

A man with a very similar name, Abdikadir Noor, is among six people who are suing ICE for civil rights violations with the assistance of the American Civil Liberties Union of Minnesota. In the lawsuit, the Somali-American said that ICE tackled him during Monday's operation without provocation, leaving him with injuries. He stated that he was among the first on scene, driving to the nearby Karmel Mall when he noticed ICE pull over the car behind him. He said that once the crowd began to form he tried to keep the peace.

Noor said that once he was released from the Whipple Federal Building at Fort Snelling, where ICE operates from, he was given no documentation or explanation for why he was arrested in the first place.

While ICE failed to identify whether they have a different man still in custody, WCCO could identify documentation for the other man, Maxwell Collyard. In a complaint written by HSI Special Agent Michael Raiff, agents accuse Collyard of being part of the "mob" throwing ice, snow, rocks and other objects following Monday's vehicle stop.

Collyard allegedly repeatedly ignored commands from ICE officers to back up and instead threatened officers on scene.

At one point, an officer sprayed Collyard with "oleoresin capsicum" spray, a chemical agent. After this, the complaint alleges that Collyard and others tackled one of the officers while they were attempting to detain the woman seen pinned on the floor. From here, the complaint

Ex. P

states that Collyard followed the agents involved away from the scene in his pickup truck; this is where officers arrested him. According to court records, he's now under house arrest.

In audio released by the [Hennepin County Sheriff's Office](), a supervisor with the ICE operation based in St. Paul called for help from local law enforcement. Deputies with the Hennepin County Sheriff's Office and officers with the Minneapolis Police Department responded, only to find no evidence that agents were in life-threatening danger.

Balliet said from what he saw, there is evidence that ICE agents are deploying to cities like Minneapolis without being properly equipped to handle the public backlash.

"I feel like it falls on the lack of leadership, the lack of accountability, poor training, poor operational planning, poor execution," Balliet said.

## More from CBS News

Ex. P

# Witness, ICE offer conflicting accounts of chaotic clash in Minneapolis

**www.fox9.com**/news/witness-ice-offer-conflicting-accounts-chaotic-clash-minneapolis

By Mike Manzoni



## Witnesses conflict with ICE account

Protesters clashed with immigration authorities in south Minneapolis on Monday afternoon, but a day later both sides offered conflicting accounts of how the chaos unfolded.

**The Brief**

- Protesters and immigration authorities clashed near Karmel Mall on Monday afternoon.
- Video that circulated online shows agents dragging a pregnant woman across a street.
- The Department of Homeland Security on Tuesday said protesters attacked agents and shouted death threats.

**MINNEAPOLIS (FOX 9)** - Protesters clashed with immigration authorities in south Minneapolis on Monday afternoon, but a day later both sides offered conflicting accounts of how the chaos unfolded.

## ICE agents drag woman across street

What happened:

Federal immigration authorities conducted a targeted operation near Karmel Mall on Monday, where dozens of protesters started throwing chunks of ice at them and shouted death threats, according to the Department of Homeland Security (DHS).

Ex. Q

Video that circulated online shows agents dragging a woman across a street. The crowd said she was pregnant. The woman, who was not identified, was released over safety concerns, authorities said.

The other side:

DHS officials say the woman who was dragged tried to vandalize a squad car.

The agency said officers abandoned their attempt to arrest her over safety concerns after protesters hurled chunks of ice and rocks at agents and deployed pepper spray against them.

## Witness recounts chaos in south Minneapolis

What a witness says:

A witness who recorded some of the melee disputed a key portion of the government's account.

"They chased her down to the corner, and they took her, and they were really forceful and brutal with her," recalled Taneka Dortch. "That's a lie. She didn't rush. She didn't try to vandalize any of their vehicles."

Dig deeper:

Two U.S. citizens were arrested after they assaulted agents during the clash, according to authorities. Both remain in custody.

ImmigrationCrime and Public SafetyMinneapolisMinnesota

Ex. Q

# 'No Win' for Minneapolis Police Caught Between Trump and City Residents

With the Trump administration accusing local police of dereliction and some in the community feeling unprotected, outnumbered Minneapolis officers find themselves facing difficult choices.

---

 ▶  Listen to this article · 8:38 min   Learn more

**By Reis Thebault and Chelsia Rose Marcius**
Reporting from Minneapolis.

Jan. 28, 2026

The Trump administration has accused the Minneapolis Police Department of abandoning its beleaguered federal agents. Some city residents say they are the ones being abandoned, by police officers who are paid to protect them and have done nothing of the sort.

Even the police chief, Brian O'Hara, has taken sides, warning officers who don't intervene when federal agents use excessive force that they will lose their jobs.

Caught in the middle are the 600 officers of a police force badly outnumbered by the 3,000 federal immigration agents who have swarmed Minneapolis and St. Paul, and whose actions have threatened to undo a half decade of work to re-establish the trust between law enforcement and residents that was shattered by the murder of George Floyd in 2020.

"It's an almost no-win situation for them on the frontline," said Janeé Harteau, the Minneapolis police chief from 2012 to 2017.

The Minneapolis Police Department remains the largest in the state, but its leaders have battled a dire staffing shortage for years, exacerbated by Mr. Floyd's murder, the riots that followed and the prosecutions of the perpetrators in uniform. Since President Trump launched his Operation Metro Surge, the department has been stretched thinner than ever.

Mayor Jacob Frey of Minneapolis has said officers are overwhelmed. With both protesters and federal agents alike calling 911 for help, police across the region have struggled to respond. Police and union officials say morale has plummeted as officers find themselves caught between powerful political forces beyond their control.

Ex. R

"Both sides dug their heels in, and here we are in the middle of it," said Mark Ross, president of the Saint Paul Police Federation, the capital city's police union. "They are playing political football and we are the ones getting kicked around."

Local leaders, activists and ordinary citizens have urged officers to intervene directly with federal agents whose behavior appears unlawful and to investigate them for possible criminal charges, especially after the deaths of two citizens, Renee Good and Alex Pretti.

Officers are trying "to remain neutral," said Hennepin County Attorney Mary Moriarty, a hard-charging liberal prosecutor. But, she added, "I don't think it's a neutral thing to be there watching unlawful behavior against your community and not do anything."

Demonstrators have also pleaded for more protection from the Minneapolis Police Department, or M.P.D., an agency many of them have spent recent years stridently protesting and pushing to defund.

"M.P.D. should not be cleaning up Bovino's mess by setting up police lines to keep protesters out of the area," Simon Elliott, a community activist, said, referring to Gregory Bovino, the Border Patrol chief who was leading the immigration surge until Monday, when he was abruptly reassigned to California.

Ex. R

CASE 0:26-cv-00324-ECT-ECW    Doc. 130-2    Filed 02/04/26    Page 173 of 242

A Minneapolis police officer responded to the scene of a protest at the Home2Suites hotel where federal agents were believed to be staying.   Jamie Kelter Davis for The New York Times

Pressure is also coming from the Trump administration, which has demanded cooperation and collaboration from local law enforcement authorities. At a news conference last week, Mr. Bovino said local departments had "failed" because they had not responded to federal calls for assistance when protesters were "stalking" his agents.

"That's what you call 'missing in action,'" Mr. Bovino said. "When fellow law enforcement officers are in need, missing in action. Unconscionable."

The open display of friction has left virtually everyone in the Twin Cities frustrated and worried about the future of public safety.

The region is just the latest testing ground for the relationships between police, residents and federal law enforcement. Similar strains surfaced in Chicago late last year, and over the summer in Los Angeles, the first city to weather a surge of immigration enforcement. But the scale of the Trump administration's operation in Minnesota, the concentration of forces in a city the size of Minneapolis, the pushback from local leaders and the muscular resistance from residents have all raised the stakes.

And that was before the killing of two protesters by federal agents focused the world's attention on the city's streets. On Jan. 7, a federal agent fatally shot Ms. Good, 37, in the driver's seat of her S.U.V., setting off furious protests in Minneapolis and across the country. Tensions escalated again on Saturday when federal agents gunned down Mr. Pretti, also 37.

The two deadly episodes, along with other displays of aggressive force by federal agents

Ex. R

— including the shooting of a Venezuelan man and the arrest of a Hmong immigrant who was a U.S. citizen — have been "profoundly damaging," said Mr. O'Hara the Minneapolis police chief.

If the offending federal officers are not stopped or held accountable, "the result is not public order. It is public fear," the chief wrote in a Tuesday opinion piece for USA Today. "When fear eclipses trust, public safety suffers."

Chief O'Hara's threat, in an interview last month, to fire officers who fail to intervene when they see federal agents use excessive force stood in contrast to orders from other chiefs.

The chief of police in Bloomington, a suburb south of the Twin Cities, said his department must ensure the safety of residents and out-of-town federal agents. Bloomington officers might be called on to do crowd control, the chief, Booker Hodges, said, but directing them to intervene during immigration sweeps could put them in danger and spark a conflict that could quickly spiral out of control.

"If you go out here and arrest a federal agent, unless it's something egregious, what do you think is going to happen next?" Chief Hodges asked. "I don't want to start a civil war."

Amid those conflicting signals, anger has simmered among federal authorities and some community members. Both sides have questioned what they say have been slow responses and a thin officer presence during clashes between demonstrators and federal authorities.

Ex. R

Minneapolis Police Chief Brian O'Hara, right, and Mayor Jacob Frey at a news conference about protests earlier this month.  Ryan Murphy for The New York Times

On Sunday evening, when protesters began vandalizing and pushing into a hotel where they believed federal agents were staying, a single Minneapolis police officer was on hand initially to try to calm the scene.

Ex. R

More officers eventually swarmed the building, but before they arrived, one federal agent, wearing a tactical vest marked Bureau of Prisons, could be heard on video shouting to reporters, "Where's the local PD?"

Local law enforcement officials insist they are doing the best they can under difficult circumstances. Ms. Moriarty, the county attorney, called it unreasonable for federal agents to expect a local police presence wherever they meet protesters.

"Are they supposed to follow you around and be your personal bodyguard?" she asked. "ICE is creating this chaos, and yet when they create chaos, they're demanding that local police show up immediately and help them get out of a situation they created."

Hanging over this tug of war are fears about what comes next for the area's law enforcement community. Will this latest period of strife erase the progress that local departments have made since Mr. Floyd's murder? Will residents trust police after federal agents leave? Will staffing levels plummet once again?

Chief O'Hara has said the federal operation has already made the city less safe by eroding public faith in the justice system. But some local activists say there are key differences between the current moment and 2020, and they credit police for forming relationships with the communities they serve.

"We have built strong and meaningful friendships with officers — and with each other — and this has benefited our city," said Aileen Johnson, who founded the group Minneapolis Neighborhood Safety Clubs in 2021 to help bridge the divide between residents and police.

In recent days, Ms. Johnson has been visiting city police precincts to deliver hot meals to weary officers and speaking with residents about the limits of the police department's authority.

Cynthia Wilson, president of the Minneapolis branch of the N.A.A.C.P., said she believes many people by now understand the difference between local police and federal agents.

"At this point, our immediate disdain is with the Border Patrol and ICE, not so much our city police officers," she said.

Still, she acknowledged, it will fall to local police and community members to pick up the pieces. She said that can't be done until federal agents leave.

"Right now we've got to eat humble pie and wait," Ms. Wilson said. "We're under siege. What else are we going to do?"

**Reis Thebault** is a Phoenix-based reporter for The Times, covering the American Southwest.

Ex. R

**Chelsia Rose Marcius** is a criminal justice reporter for The Times, covering the New York Police Department.

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: In Minnesota, Local Officers In Tug of War

Ex. R

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota, by and through its Attorney General Keith Ellison, City of Minneapolis, and City of Saint Paul, <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; JOHN CONDON, in his official capacity as Acting Executive Associate Director of Homeland Security Investigations; U.S. Department of Homeland Security; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations; U.S. Immigration and Customs Enforcement; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection; GREGORY BOVINO, in his official capacity as Commander of the U.S. Border Patrol; U.S. Border Patrol; DAVID EASTERWOOD, in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement, <br><br> Defendants. | Case No. 0:26-cv-00190 (KMM-DJF) <br><br><br><br> **DECLARATION OF HEATHER ROBERTSON** |

Ex. S

Your Declarant is Heather Robertson, and she submits the following Declaration:

1. I am an Assistant City Attorney with the Minneapolis City Attorney's Office. I submit this declaration in support of Plaintiff's Motion for a Temporary Restraining Order based on my personal knowledge, review of City records, and/or discussions with appropriately knowledgeable persons.

2. In the first 11 months of 2025, from January 1 to November 30, there were no officer-involved shootings in Minneapolis where the Minneapolis Police Department ("MPD") was involved. There was a single incident in July of 2025 where there was deadly force directed at an MPD officer.

3. Since December 1, 2025, there have been three officer-involved shootings in Minneapolis where an agent of Defendants was the shooter.

4. According to emergency communication records, the following events occurred: On January 24, 2026, at 9:03 a.m., Minneapolis 911 received a call reporting that ICE just shot someone in Minneapolis, multiple 911 calls about the same subject immediately followed.

5. At 9:05 a.m., Minneapolis 911 callers also reported that ICE agents were attempting to detain 30 bystanders.

6. The first MPD squad on the scene at 9:07 a.m., confirmed that this was a shooting involving an immigration agent and requested further assistance. This call for assistance was sent to all available MPD officers in the City.

7. Paramedics associated with the Minneapolis Fire Department ("MFD") were attempting CPR at the scene at 9:10 a.m.

8. As other MPD squad began to arrive the officers blocked off traffic and put up

Ex. S

police tape.

9. By 9:15 a.m. there was a large crowd and the officers attempted to expand the perimeter.

10. At 9:16 a.m. MPD Police Chief O'Hara advised the Minnesota Bureau of Apprehension ("BCA") of the situation.

11. An MPD officer rode with the ambulance to the hospital with the shooting victim.

12. Metro Transit buses were routed off of Nicollet Avenue due to the street shutting down.

13. Around 9:20 a.m. MPD Mobile Field Force team readied to deploy if they were needed for crowd management or crowd control.

14. At 9:22 a.m. all on-duty tactical officers, that is SWAT, strike teams, and drone operators, were activated.

15. At 9:24 a.m. the MPD Watch Commander reported that federal agents on the scene were asking MPD officers to leave the crime scene, but MPD stayed to hold the crime scene.

16. At 9:28 a.m. the Minnesota State Patrol were reported as en route to the scene.

17. At 9:30 a.m. it was reported that there was a crowd gathering and becoming hostile.

18. The Watch Commander reported that federal agents were prepared to use chemical munitions.

19. Officers at Hennepin County Medical Center were alerted that a large number of agents were at HCMC to be prepared for potential crowds.

Ex. S

20. At 9:41 a.m. it was reported that the federal agents were leaving and that MPD was to stay at the scene.

21. At 9:45 a.m. the crowd was described as angry and yelling and officers noted that federal agents had possibly used chemical agents.

22. At 9:53 a.m. it was reported that ICE was deploying flashbangs and gas munitions, and there was a gas cloud moving eastbound.

23. At 9:55 a.m. Homeland Security Investigations requested that MPD stay on scene to assist with crowd control.

24. Brooklyn Park Police Department, Hennepin County Sheriff's Office, Minnesota State Patrol, and Minnesota Department of Natural Resources officers also responded to assist with holding the scene.

25. At 10:03 a.m. it was reported that the crowd had blocked the street.

26. At 10:04 a.m. medical was responding to a shortness-of-breath call from pepper spray.

27. Around 10:11 a.m. MPD officers cleared the scene temporarily, while the perimeter was held by State Patrol, so MPD could regroup at the Fifth Precinct Station.

28. At 10:51 a.m. a caller reported that Border Patrol/ICE agents were lining up wearing riot gear and masks and the caller wanted assurance that MPD was on the scene.

29. At 10:56 a.m. a caller reported that ICE agents were using rubber bullets, deploying tear gas, throwing flashbangs. The caller stated the agents started a fire in the dumpster with a flashbang which exploded.

30. At 11:04 a.m., MPD's Strike Team 1 went to join the line with State Patrol, and

Ex. S

joined with an MPD SWAT team.

31. A dumpster fire was reported at 29th Street and Blaisdell and the MPD Strike Team necessarily escorted the MFD to extinguish the fire.

32. With assistance of the Strike Team and SWAT Team as necessary escorts, MFD was able to reach the location of the dumpster fire and determine that the dumpster fire was contained. A mattress and a garbage can were also reported as on fire between 11:25 – 11:34 a.m., and those incidents were handled by the MFD.

33. At 11:40 a.m. all on-duty MPD personnel were instructed to respond to the First Precinct for staging.

34. At 11:42 a.m. all MPD officers that were off duty were activated and directed to respond to the First Precinct with Civil Disturbance gear.

35. By 11:50 a.m. the MFD truck was able to leave the scene with an MPD escort.

36. At 12:00 p.m. all MPD personnel that were not already assigned were to report to the First Precinct.

37. MPD and State Patrol continued to hold the scene against angry protestors and used necessary crowd-control measures.

38. Additional resources from St Paul Police, Ramsey County, and suburban Hennepin agencies were requested to backfill patrol across the City of Minneapolis to respond to 911 calls.

39. As a result of the drain on the MPD's resources caused by this incident, the two prior officer-involved shootings, and overall by Operation Metro Surge, Minneapolis Mayor Jacob Frey requested that Governor Tim Walz use the Minnesota National Guard to help

Ex. S

reinforce local law enforcement resources in Minneapolis.

40.     Attached as Exhibit A is a true and correct copy of a press release by the City of

Minneapolis explaining the reasoning behind the request for the assistance of the Minnesota

National Guard.


I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Signed in Ramsey County, Minnesota.


Dated: January 24, 2026                                   _/s/Heather Robertson_
                                                          Heather P. Robertson
                                                          Assistant City Attorney
                                                          Minneapolis City Attorney's Office

Ex. S



**JUNE 20, 2025** 11:19AM

# 65 Percent of People Taken by ICE Had No Convictions, 93 Percent No Violent Convictions

By **David J. Bier**

New nonpublic data from Immigration and Customs Enforcement (ICE) indicate that the government is primarily detaining individuals with no criminal convictions of any kind. Also, among those with criminal convictions, they are overwhelmingly not the violent offenses that ICE continuously uses to justify its deportation agenda. ICE has shared this data with people outside the agency, who shared the numbers with the Cato Institute.

As of June 14, ICE had booked into detention 204,297 individuals (since October 1, 2024, the start of fiscal year 2025). Of those book-ins, 65 percent, or 133,687 individuals, had no criminal convictions. Moreover, more than 93 percent of ICE book-ins were never convicted of any violent offenses. About nine in ten had no convictions for violent or property offenses. Most convictions (53 percent) fell into three main categories: immigration, traffic, or nonviolent vice crimes. The appendix table at the end of this post has data by detailed crime and broad crime categorization.

Ex. T

## ICE book-ins are primarily noncriminals and nonviolent offenders

ICE Book-Ins by Criminal Conviction Type, FY 2025 as of June 14

| Conviction | ICE Book-Ins | Share of Book-Ins |
|---|---|---|
| Property | 7,606 | 3.7% |
| Violent | 14,068 | 6.9% |
| Nonviolent Vice | 9,218 | 4.5% |
| Immigration | 14,227 | 7.0% |
| Traffic | 14,056 | 6.9% |
| Other | 11,435 | 5.6% |
| None | 133,687 | 65.4% |
| **Total** | **204,297** | **100.0%** |

Ex. T

# ICE detains very few serious public safety threats

ICE Book-Ins by Criminal Conviction, FY 2025 as of June 14



Property    Vice    Other    Violent    Traffic    Immigration    None

Source: Immigration and Customs Enforcement, "ICE Initial Book-Ins by Criminality and MSC: FY2025 YTD," June 16, 2025 • Get the data • Created with Datawrapper

Using **public data** from Customs and Border Protection (CBP)—which does not include details of criminal convictions—we can see the trend in ICE book-ins from the start of the Trump administration. During the first two weeks of June, ICE brought into its custody nearly 927 non-criminals. That represents a roughly threefold increase compared to the rate of non-criminals booked in during the first week of this administration.

This shift in policy resulted from White House Deputy Chief of Staff **Stephen Miller's meeting** at the end of May, when he ordered ICE to start arresting more non-criminals. "What do you mean you're going after criminals?" he said. "Why aren't you at Home Depot? Why aren't you at 7-Eleven?" Since then, ICE and Border Patrol have shifted to roaming US streets and workplaces to round up immigrants, regardless of the public threat they may pose.

Ex. T

## ICE is booking in many more noncriminals in recent weeks

ICE daily average book-ins of people with no criminal convictions

This understates the change in interior enforcement against non-criminals. This is mainly because ICE also books some people into custody who were originally detained by Border Patrol. Hence, the pre-Trump numbers include many non-criminals who had never lived in the United States before. Since then, the Trump administration has put Border Patrol in charge of mass deportation in California, and it is making interior arrests all along both the Mexican and Canadian borders. This means that the pre-Trump and post-Trump numbers are not directly comparable. We cannot say for certain how many peaceful individuals are being whisked off America's streets by government agents.

That said, when examining total ICE book-ins of individuals arrested by ICE, we can see a more extreme increase in interior enforcement. Since the beginning of this year, ICE book-ins based on ICE arrests have increased nearly sixfold, from a daily average of 215 to over 1,100 per day.

4

Ex. T

## ICE is arresting inside the United States vastly greater numbers of people

ICE daily average book-ins from ICE interior arrests

ICE also books individuals who have pending criminal charges into custody. As of June 14, the agency had booked 44,897 individuals with only a pending charge. The agency sometimes erroneously calls these people "criminals," even without a conviction. This is wrong. We believe in due process in America because many people charged are never ultimately convicted.

ICE admitted in court that it considers even people whose charges were dismissed to still be a "criminal" for purposes of removal, and many immigrants with pending charges are never convicted. For instance, ICE terminated the legal status of international student Suguru Onda for a dismissed fishing-related citation. The same thing happened to Akshar Patel, another international student, with a dismissed reckless driving charge. When ICE deports people without giving them their day in court, it not only deprives them of their right to clear their name but also denies justice to victims if they are guilty.

Regardless, ICE also hasn't listed what the charges are for, and we know that it is slapping thousands of "illegal entry" charges on long-time residents to brand them as criminals and force California and other states to help deport them.

Nonetheless, focusing on people without pending charges or convictions, the difference in policy is indescribable. ICE doesn't separately report the

5                                                                      Ex. T

criminal status of book-in specifically from ICE arrests. But ICE's public numbers on its currently detained population reveal a ninefold increase in immigrants being arrested by ICE and locked up by ICE for no other reason than their immigration status.

## ICE is detaining far more immigrants who have no convictions or criminal charges

Immigrants in detention (at that point in time) arrested in the interior by ICE who have no criminal convictions or charges, as of June 1



Source: Immigration and Customs Enforcement, "Detention Management," June 4, 2025 (and archived versions). • Get the data • Created with Datawrapper

If we look at the net increase in immigrants detained by ICE after an ICE arrest, 70 percent of the increase in detention has come from people without criminal convictions.

6                                        Ex. T

## Convicted criminals account for just 29% of the increase in people detained by ICE since January

People in ICE detention who were arrested by ICE, net increase since January 11, 2025 by conviction status



Convicted Criminal        No conviction

Source: Immigration and Customs Enforcement, "Detention Management", June 4, 2025 (and archived

My back-of-the-envelope calculation **based on the public numbers** is that in early January, ICE was arresting about 32 immigrants per day in the interior who had no criminal conviction or pending charge. By early June, these arrests were approximately 453 per day—a 14-fold increase. That is about 50 percent more than the daily average for ICE arrests of immigrants of all types in FY 2024.

This was the predictable result of President Trump's **executive order** rescinding ICE guidance, which required ICE to focus on public safety threats. As a consequence, the overall capacity of ICE to make arrests has grown thanks to shifting many resources from the military and other law enforcement agencies into ICE. It is also borrowing from end-of-the-year appropriations to pay for operations today, leaving it **$1 billion in the hole**. ICE is also detaining more people than ever in squalid, inhumane

7                                                              Ex. T

conditions that are worse than those permitted in prisons where serious violent offenders are serving their sentences.

The White House has ordered ICE to meet an unreasonable quota of **3,000 arrests per day**, a target they were nowhere near achieving as of June 14. Agents are complaining about how the quota is undermining public safety in interviews with conservative outlets like the ***New York Post*** and ***Washington Examiner***. The White House is focused on "quantity over quality," one agent **told** the *New York Post*. The agents told the *Post* that ICE's quota was forcing them to leave "some dangerous criminal illegal migrants on the streets." ICE shifted away from fugitive operations to focus on asylum seekers at courthouses, immigrants who regularly check in with ICE, and other non-threats.

ICE's deportation agenda is not what is being advertised to the American public. ICE is not interested in prioritizing public safety, yet it constantly pretends that anyone who objects to its tactics and priorities is defending violent criminals. But violent criminals are not ICE's primary focus. Indeed, it now has no focus altogether. That's the essence of *mass* deportation: it is indiscriminate, unfocused, and chaotic. Congress should mandate more transparent reporting from ICE and require that it target only those who pose genuine threats to public safety.

Ex. T

## Appendix Table: ICE book-ins are primarily noncriminals and nonviolent offenders

ICE Book-Ins by Criminal Conviction Type, FY 2025 as of June 14

Page 1 of 3  ›

| Criminal Charge (ICE detailed category) | Crime Broad Classification (Cato) | Book-ins |
|---|---|---|
| **Total** | **N/A** | **204,297** |
| No conviction | None | 133,687 |
| Arson | Property | 122 |
| Assault | Violent | 9,700 |
| Bribery | Other | 18 |
| Burglary | Property | 1,658 |
| Civil Rights | Other | 1 |
| Commercialized Sexual Offenses | Vice | 209 |
| Conservation | Other | 47 |
| Damage Property | Property | 289 |
| Dangerous Drugs | Vice | 8,741 |
| Embezzlement | Property | 17 |
| Extortion | Violent | 38 |
| Family Offenses | Other | 668 |
| Flight / Escape | Other | 617 |
| Forgery | Property | 691 |
| Fraudulent Activities | Property | 1,646 |
| Gambling | Vice | 13 |
| General Crimes | Other | 1,731 |
| Health / Safety | Other | 39 |

9

Ex. T

Source: Immigration and Customs Enforcement, "ICE Initial Book-Ins by Criminality and MSC: FY2025

**RELATED TAGS**

**Immigration**


This work is licensed under a **Creative Commons Attribution-NonCommercial-ShareAlike 4.0 International License**.

Ex. T

# Stateline

## An ever-larger share of ICE's arrested immigrants have no criminal record

But arrests are up, more than doubling in 45 states, a Stateline analysis finds.

BY: **TIM HENDERSON** - DECEMBER 12, 2025     5:00 AM



📷 There were 105 immigration arrests in October at a horse racetrack in Wilder, Idaho. Idaho saw one of the country's largest increases in immigration arrests this year through mid-October compared with the same period in the Biden administration. (Photo courtesy of ACLU of Idaho)

Immigration arrests under the Trump administration continued to increase through mid-October, reaching rates of more than 30,000 a month. But, rather than the convicted criminals the administration has said it's focused on, an ever-larger share of those arrests were for solely immigration violations.

In 45 states, immigration arrests more than doubled compared with the same period last year, during the Biden administration. The largest increases: There were 1,190 arrests in the District of Columbia compared with just seven last year under the Biden administration. Arrests were also more than five times higher in New Mexico, Idaho, Oregon and Virginia.

"The result stands in contrast to the administration's objective of arresting the 'worst of the worst,'" said Ariel Ruiz Soto, a senior policy analyst at the nonpartisan Migration Policy

Ex. U

Institute. Heightened enforcement is likely increasing "collateral" arrests of people found during searches for convicted criminals, he said.

Comparisons between the Trump and Biden administrations were calculated by Stateline in an analysis of data released by the Deportation Data Project, a research initiative by the universities of California at Berkeley and Los Angeles. About 93% of arrests could be identified by state.

While more people were arrested this year, a lower percentage are convicted criminals.

The share of arrested immigrants who had been convicted of violent crimes has dropped from 9% in January to less than 5% in October. The share under Biden was consistently between 10% and 11% during the same period in 2024.

The same trend applies to people arrested solely on immigration violations: Immigration violations alone were behind 20% in April, then rose to 44% of arrests in October, according to Stateline's analysis.

In some states and the District of Columbia, a majority of arrests were for immigration violations alone: the District of Columbia (80%), New York (61%), Virginia (57%), Illinois (53%), West Virginia (51%) and Maryland (50%).

States with high immigrant populations also saw the most arrests this year. The largest numeric increases were in Texas (up 29,403, triple last year's figure), Florida (up 14,693, a fourfold increase) and California (up 13,345, a fourfold increase).

The two states with the largest arrest rate increases have responded very differently to President Donald Trump's deportation mission.

"We're going to resist like all of the Democratic states," New Mexico Democratic Gov. Michelle Lujan Grisham said in an interview with The Santa Fe New Mexican after last year's election, referring to mass deportation plans. She proposed legislation to ban U.S. Immigration and Customs Enforcement detention facilities in the state. The legislation failed this year, but Lujan Grisham urged the state legislature to reconsider next year. The state has three privately run ICE detention centers with the capacity for 2,000 people.

Idaho's Republican governor, Brad Little, is helping ICE under a 287(g) agreement by transporting what his office calls "highly dangerous illegal alien criminals" from county jails to federal custody. The 53 men pictured on the governor's website have charges ranging from drug possession to sexual assault.

In a news release, the office says the program is intended to take people "after the completion of their sentences," though an October review by the Idaho Capital Sun found

Ex. U

some were transported despite dismissed or still-pending charges.

Nationally, arrests have increased this year from around 17,000 in February, the first full month of President Donald Trump's current term, to more than 30,000 in September and October. The share of convicted criminals has dropped from 46% to 30%, though the number of convicted criminals arrested still has been higher each month than under President Joe Biden.

Some of the policies that have fed increased arrest numbers face new court battles. This month, a federal judge blocked the administration from making immigration arrests in the District of Columbia without warrants or probable cause.

In August, a federal court blocked the administration's expansion of expedited removal, which itself allows fast deportations without judicial review. The administration has appealed, arguing that immigrants who have been in the country for less than two years without legal authorization are not guaranteed due process.

Such fast deportations could be used on 2.5 million people, according to a Migration Policy Institute estimate published in September, including 1 million people released at the border with Mexico with court dates and 1.5 million people with temporary protections such as humanitarian parole.

This fall, the share of arrested immigrants with criminal convictions continued to decrease just before and during the federal government shutdown, with only 3% of those arrested and detained having convictions between Sept. 21 and Nov. 16, according to national information analyzed by Transactional Records Access Clearinghouse (TRAC), a data research organization at Syracuse University.

"While ICE is detaining more and more individuals, targeting has shifted sharply to individuals without any criminal convictions," the TRAC report noted.

*Editor's note: This story has been updated to clarify a reference to October detention statistics analyzed by Transactional Records Access Clearinghouse.*

*Stateline reporter Tim Henderson can be reached at thenderson@stateline.org.*

Ex. U



# News Releases

Subscribe to news releases  (https://public.govdelivery.com/accounts/MNCORR/signup/37100) from DOC via email or SMS alerts.

---

☒ View entire list

# Minnesota Department of Corrections Addresses False Claims by the Department of Homeland Security

January 15, 2026

The Minnesota Department of Corrections honors all federal and local detainers, including those issued by U.S. Immigration and Customs Enforcement (ICE). DHS's assertion that 1,360 non-U.S. citizens are in Minnesota's state custody is inexplicable. Minnesota's total state prison population is approximately 8,000 individuals, and only 207 (less than 3 percent) are non-U.S. citizens. Further, in 2025, 84 individuals with ICE detainers were released. In each case, ICE was notified in advance and DOC staff coordinated with ICE officials to facilitate the custody transfer when requested.

DHS has not identified which jurisdictions, systems, or timeframes were relied on to produce their numbers nor has any supportive documentation been offered. Again, the figures released by DHS do not align with DOC records or the reality of Minnesota's prison system.

Minnesota law requires DOC to notify ICE when an individual committed to DOC custody is not a United States citizen. DOC fully complies with this requirement and goes further by honoring all detainers as a matter of policy, even though state law does not require detainer compliance. ICE alone determines whether to place a detainer and is responsible for arranging pickup.

"The Minnesota Department of Corrections has always coordinated with ICE agents when individuals in our custody have detainers and will continue to do so," said Minnesota Department of Corrections Commissioner Paul Schnell. "Public safety depends on facts, not fear. When federal agencies make claims that are demonstrably false, it undermines trust and disrespects the dedicated professionals who work every day to keep Minnesotans safe."

Ex. V

The ongoing misstatements by DHS leadership reflect a fundamental misunderstanding of how the criminal justice system operates. Conflating local jail populations with state prison operations and confusing immigration enforcement authority with correctional custody misleads the public and obscures the truth. These claims by DHS do not withstand scrutiny and undermine public confidence in the justice system. It is imperative that we correct the public record.

# Media Fact Supplement: Minnesota Corrects the Record

The U.S. Department of Homeland Security (DHS) has issued multiple public statements alleging that Minnesota has released "violent criminal illegal aliens" from state custody and has cited a list of named individuals as examples. The Minnesota Department of Corrections (DOC) has reviewed each name referenced publicly by DHS or repeated in media reporting.

The facts below are based on DOC records and, where applicable, publicly available court information.

## Key Clarifying Facts for Media

- **Minnesota DOC operates state prisons, not local jails.**
  Many individuals cited by DHS were **never in DOC custody** and were instead held in **county jails**, under **ICE-only custody**, or in **other states' correctional systems** .

- **DOC honors all ICE detainers.**
  In cases where individuals were in DOC custody and an ICE detainer existed, DOC coordinated release to ICE and confirmed pickup.

- **DHS continues to conflate local jail custody, ICE custody, and state prison custody** , misleading the public about the role and authority of the Minnesota Department of Corrections.

## Individuals Cited by DHS as "Worst of the Worst"

**Leny Odemel Ramirez-Santos**

- **DOC custody:** None
- **Facts:** Held briefly in Sherburne County Jail in 2025 on an ICE hold. No DOC records. No verified DOC sentence.

**Edwin Amable Ashca Ninasuta**

- **DOC custody:** None
- **Facts:** Held in Hennepin County Jail for two days in 2023. Convicted of misdemeanor disorderly conduct. Never incarcerated in a Minnesota state prison.

**Lenda Neh Mama Epse George**

Ex. V

- **DOC custody:** None
- **Facts:** Held briefly in Anoka County Jail in 2025. Never in DOC custody.

### German Adriano Llangari Inga

- **DOC custody:** None
- **Facts:** Held in Hennepin and Freeborn County jails in 2024–2025, including on an ICE hold. Never incarcerated in a Minnesota state prison.

### Puol Both

- **DOC custody:** Yes (historical)
- **Facts:** ICE lodged a detainer in 2019 and later affirmatively lifted it. DOC complied fully with ICE direction at all times.

### Somsalao Thonesavanh

- **DOC custody:** Yes (historical (1990s))
- **Facts:** Convicted in 1996. DOC records reflect a term of probation. No current DOC sentence. DHS's implication of recent release is inaccurate.

### Francisco Salazar-Solorzano

- **DOC custody:** None
- **Facts:** On pre-trial supervision with Ramsey County.

### Teng Houa Vang

- **DOC custody:** Yes (historical)
- **Facts:** An individual with this first, middle, and last name was in and out of DOC custody since 2005. Released to ICE in 2006. For additional releases ICE informed the individual to report under an order of supervision.

### Lorenzo Armillas Llaurado

- **DOC custody:** No
- **Facts:** No Minnesota records

### Santiago Antunes Mendiola

- **DOC custody:** No
- **Facts:** No Minnesota records

### Michael Opeoluwa Egbele

Ex. V

- **DOC custody:** No
- **Facts:** Several county detention records

# Additional Individuals Cited by DHS or Media

In every instance where the individual was in DOC custody **and** an ICE detainer existed, DOC coordinated release to ICE and confirmed pickup:

- **Zakariya Abdi** — Released to ICE on 07/01/2025

- **Shwe Htoo** — Released to ICE on 11/17/2025

- **Aldrin Guerrero-Muñoz** — Released to ICE on 10/20/2025

- **Pedro Cortez-Soriano** — Released to ICE on 12/28/2009

- **Abdirashid Mohamed Ahmed** — Released to ICE on 04/19/2021

- **Aler Lisandro Gomez-Lucas** — Released to ICE on 11/24/2025

- **Galuak Michael Rotgai** — Released to ICE on 08/11/2025

- **Saeb Sivixay** - Released to ICE on 03/15/2009

# Other names cited by DHS:

- Were never in DOC custody;
- Were issued an ICE order of supervision instead of being taken into ICE custody;
- Were released to another jurisdiction; or
- Currently incarcerated with another jurisdiction and an active ICE detainer.

# Examples

- **Mariama Sia Kanu:** The Department could not locate this individual in our DOC system. They have numerous jail/police department bookings spanning from 2008 to today.
- **Thai Lor (193161):** Records reflect an individual with this name was released to an ICE detainer on 3/8/12.
- **Sriudorn Phaivan:** ICE lodged a detainer on 10/6/2025. The facility coordinated release to ICE, and an ICE officer confirmed pickup. He was released to ICE on 11/24/2025.
- **Jose Reyes Jovel:** The DOC received an ICE detainer for this individual in April 2024.  The facility coordinated release to ICE, and an ICE officer confirmed pickup. He was released to ICE on 08/04/25. Was held in Sherburne County on an ICE hold from 8/4/2025 until 12/3/2025.
- **Vannaleut Keomany:** Keomany was serving a sentence in Ohio and requested to be transferred to MN for his supervision time, and his request was ultimately denied. This individual was never under the custody or authority of the DOC.
- **Gabriel Figueroa-Gama:** An initial search could not locate this individual. An ICE publication indicates he was arrested by ICE for a murder occurring in Chicago, IL.

Ex. V

# Bottom Line for the Public

- DHS has not identified a single instance in which the Minnesota Department of Corrections released an individual from state prison custody in violation of an ICE detainer.

- DHS's public statements rely on mischaracterized cases, incorrect custody attribution, and jurisdictional confusion.

- When DOC had custody and ICE lodged a detainer, DOC coordinated the release with ICE.

Permalink: https://mn.gov/doc/about/news/news-releases/index.jsp?id=1089-719911 (https://mn.gov/doc/about/news/news-releases/index.jsp?id=1089-719911)

View entire list

# Archives

RSS feed (/doc/rest/rss/News Releases?id=1089-35332&detailPage=/doc/about/news/news-releases/index.jsp)

Ex. V

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

STATE OF MINNESOTA, by and through its Attorney General Keith Ellison, CITY OF MINNEAPOLIS, and CITY OF SAINT PAUL,

      Plaintiffs,

v.

KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; JOHN CONDON, in his official capacity as Acting Executive Associate Director of Homeland Security Investigations; U.S. Department of Homeland Security; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations; U.S. Immigration and Customs Enforcement; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection; GREGORY BOVINO, in his official capacity as Commander of the U.S. Border Patrol; U.S. Border Patrol; DAVID EASTERWOOD, in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement,

      Defendants.

Civ. No.: 0:26-cv-00190-KMM-DJF

## DECLARATION OF EMILIO VEGA

Ex. W

I, Emilio Vega, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.  I am a resident of the State of Minnesota, and I am over the age of 18.

2.  I am currently employed as a Financial Investigator at the Minnesota Attorney General. As part of my duties as a financial investigator, I review bank statements, internal accounting documents, and public records to investigate potential violations of Minnesota laws.

3.  Prior to working as a Financial Investigator for the MN AGO, I was a Special Agent for the Internal Revenue Service, Criminal Investigation (IRS-CI). This was a sworn federal law enforcement position where I investigated tax and other related financial crimes. I completed six months of training for this position at the Federal Law Enforcement Training Center (FLETC) in Brunswick, Georgia, where I received training on how to be a law enforcement officer and how to conduct financial investigations for the IRS. Before I became a Special Agent, I was employed as a Revenue Officer for the IRS. As a Revenue Officer, I conducted civil financial investigations of taxpayers with unpaid taxes and unfiled tax returns.

4.  Based on my training and experience, I have a working familiarity with a number of online search tools designed to aid law enforcement and investigators as they gather information regarding known targets. Pertinent to this declaration, these tools include PeopleMap, public databases maintained by government agencies, such as the Federal Bureau of Prisons, and statewide inmate record tools. The depth of data made

Ex. W

publicly available varies system to system, and a great deal of information regarding known subjects' criminal history and periods of incarceration are non-public, or at the very least, not centralized. For example, an investigator who does not have access to non-public law enforcement tools would likely need to know what state someone was previously incarcerated in to look up records related to that incarceration, and may not have access to details regarding the circumstances surrounding transfers or release.

5.   I have done a cursory review of the press releases Defendants cited in footnote two of their response brief (ECF 33, 10, fn. 2.)  In these press releases, DHS appears to claim that the individuals they are showcasing were apprehended by DHS while they were at large on the streets of Minnesota, and that such individuals were roaming free and unsupervised until DHS detained them as part of Operation Metro Surge.

6.   Already in that preliminary review, I have identified a number of individuals whose available records contradict DHS' characterizations.

7.   For example: I have identified a number of people who, according to Bureau of Prison records, appear to have been continuously housed in federal prison up until the moment the Bureau of Prisons transferred them into DHS custody. This type of federal agency-to-agency transfer would not typically involve a release from custodial setting, meaning such individuals would not have been arrested in the course of Operation Metro Surge field work.

8.   Similarly, I have identified a number of individuals whose state criminal records seem to reflect a continuous custodial hold in state prisons or county jails within

Ex. W

Minnesota up until dates of transfer to DHS custody, also making it less likely they were arrested in public settings during Operation Metro Surge.

9.     I have also already identified two individuals whose records seem to reflect they were incarcerated in Nebraska state prison up until January 7, 2026 (the date Renee Good was shot) on which date their records reflect they were released on "discretionary parole." These records suggest either that at least two people on DHS' recent "worst of the worst" list were both released on the same date for discretionary reasons and then both made their way to Minnesota where they were promptly apprehended by DHS, or that DHS facilitated pick-up or transfer from an out of state prison system and then counted these individuals as part of Minnesota's apprehensions within Operation Metro Surge.

10.     I have also already identified several individuals who appear to have been detained by DHS before Operation Metro Surge began.

11.     My review is ongoing. I am aware that several publicly available media or other government agencies have also begun to fact-check DHS' "worst of the worst" claims and have identified similar discrepancies to those I have begun to investigate, as described in the following stories:

   a.  https://www.startribune.com/the-trump-administration-calls-them-the-worst-of-the-worst-heres-what-we-found/601555390 (MN-focused)

   b.  https://www.mprnews.org/story/2026/01/22/homeland-security-shares-update-on-minnesota-immigration-operations (ICE official publicly admitting that MN DOC is turning over "worst of the worst")

   c.  https://www.fox9.com/news/ice-minnesota-who-worst-worst-arrested-jan-2026 (MN-focused)

   d.  https://mn.gov/doc/about/news/news-releases/#/detail/appId/1/id/719911 (MN DOC press release)

Ex. W

Executed this 22nd day of January, 2026,

/s/ Emilio Vega
Emilio Vega

Ex. W

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

State of Minnesota,
by and through its Attorney General
Keith Ellison, City of Minneapolis, and
City of Saint Paul,

Case No. _____

Plaintiffs,

v.

KRISTI NOEM, in her official capacity as
Secretary of the U.S. Department of
Homeland Security; JOHN CONDON, in
his official capacity as Acting Executive
Associate Director of Homeland Security
Investigations; U.S. Department of
Homeland Security; TODD LYONS, in
his official capacity as Acting Director of
U.S. Immigration and Customs
Enforcement; MARCOS
CHARLES, in his official capacity as
Acting Executive Associate
Director, Enforcement and Removal
Operations; U.S. Immigration and
Customs Enforcement; RODNEY
SCOTT, in his official capacity as
Commissioner of U.S. Customs and
Border Protection; U.S. Customs and
Border Protection; GREGORY BOVINO,
in his official capacity as Commander of
the U.S. Border Patrol; U.S. Border
Patrol; DAVID EASTERWOOD, in his
official capacity as Acting Director, Saint
Paul Field Office, U.S. Immigration and
Customs Enforcement,

Defendants.

**DECLARATION OF ZOE THIEL**

Ex. X

1. My name is Zoe Thiel. I am employed by the City of Minneapolis as the Manager of the Small Business Team in the Department of Community Planning and Economic Development.

2. The Small Business Team provides navigation support to small businesses and entrepreneurs in Minneapolis directly by helping people understand the regulations of the City as they relate to small businesses and connects small businesses with community resources to provide additional consulting services, such as small business development centers, neighborhood business associations, legal services providers, marketing services, or financial advisors.

3. Through my work I have direct interaction with small business owners and hear about the small business community from community partners such as business associations and development centers.

4. Since the beginning of increased immigration enforcement in the City of Minneapolis, small businesses owners are reporting decreases in customer traffic, primarily along East Lake Street and Ceder Riverside, but also in other parts of the City as well. Customer-facing businesses are reporting decreases in revenues of 50-80% because their customer base was not comfortable to go out and go shopping.

5. A second impact we were hearing was on staffing. Employees were not feeling comfortable coming to work at the risk of being stopped by immigration agents and were not coming to work, or requesting reduced hours. This impacts the businesses' ability to operate and is an income loss for the employees.

Ex. X

6. As of this week, what we are seeing is that businesses are temporarily closed due to the federal immigration enforcement surge. There are so many examples of employees taken by ICE on their way into work that employers are concerned for employee safety. One example includes a daycare worker being detained on the way to work.

7. The Somali-owned businesses and daycares are concerned not only with federal immigration enforcement actions but also harassment as a result of amplification by the federal administration regarding the allegations of fraud. These businesses have faced break-ins, harassment, and damage to property.

8. The economic impact of the federal immigration enforcement has been decreased revenue for businesses and decreased income for employees. Additionally, schools and daycares being closed results in further decreased income when people cannot work due to childcare needs.

9. Intense targeting of a particular business corridor, as has been seen here on Lake Street and Cedar Riverside, results in the local economy being shaken, creating potential for long-term economic harm.

10. Apart from the devastating impact on individuals, this economically impacts the City. Declines in the wellbeing of the City's businesses and commercial districts creates risks for blight and decreased property values, and in turn the property taxes the city can collect.

11. Reduced revenue for business also results in reduced sales tax remissions to the City.

Ex. X

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, and that this declaration was executed on Jan 12, 2026, in Hennepin County, Minnesota.

Zoe Thiel

Ex. X

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

STATE OF MINNESOTA, by and through its Attorney General Keith Ellison, CITY OF MINNEAPOLIS, and CITY OF SAINT PAUL,

      Plaintiffs,

v.

KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; JOHN CONDON, in his official capacity as Acting Executive Associate Director of Homeland Security Investigations; U.S. Department of Homeland Security; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations; U.S. Immigration and Customs Enforcement; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection; GREGORY BOVINO, in his official capacity as Commander of the U.S. Border Patrol; U.S. Border Patrol; DAVID EASTERWOOD, in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement,

      Defendants.

Civ. No.: 0:26-cv-00190-KMM-DJF

**DECLARATION OF STEPHANIE GRAFF, DEPUTY COMMISSIONER OF THE MINNESOTA DEPARTMENT OF EDUCATION**

Ex. Y

I, Stephanie Graff, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am a resident of the State of Minnesota, and I am over the age of 18. I make this declaration based on personal knowledge, my professional experience and training, and information I have learned from various personnel whose work I rely upon and who have assisted me in gathering this information from our institution.

2.      I am the Deputy Commissioner for the Minnesota Department of Education ("MDE"). I have been employed by MDE for approximately fifteen years holding several positions during that time, including as Chief of Staff and Assistant Commissioner. Before I became employed with the State of Minnesota, I began my career in the classroom as a teacher, informing my work and my passion for education policy.

**General Overview of Minnesota Legal Framework Concerning Public Education**

3.      The fundamental importance of a public education system is enshrined in Minnesota's State Constitution. Specifically, Article XIII, Section 1 begins, "The stability of a republican form of government depending mainly upon the intelligence of the people, it is the duty of the legislature to establish a general and uniform system of public schools…"

4.      In keeping with the Minnesota Constitution, the Minnesota legislature has adopted a legislative framework for education set forth at Minn. Stat. Chapters 120-129C. The Minnesota Legislature also created the Minnesota Department of Education and made MDE responsible for ensuring Chapters 120-129C are carried out.

Ex. Y

5.      In addition to its general duties, the Minnesota Department of Education is responsible for overseeing education grants, and monitoring schools' compliance with a number of state and federal requirements, including but not limited to statewide academic standards, student assessments required under state and federal law, special education requirements under state and federal law, federal elementary and secondary education funding, supports for English language learners under state and federal law, specific learning initiatives such as the READ Act, and child nutrition and school lunch programs governed by state and federal law.

6.      Minnesota statute includes a number of requirements related to public education in Minnesota, including, but not limited to:

a. **Compulsory attendance.**  By law, every child in Minnesota between ages 7 and 17 is required to attend school; (Minn. Stat. 120A.22);

b. **Minimum hours per school year**. By law, schools in Minnesota are required to provide a minimum number of hours of education each school year (generally defined as 425 minimum hours for kindergarteners, 935 hours for grades 1-6, and 1,020 hours of instruction for grades 7-12.) (Minn. Stat. 120A.41.)

### The Importance of Continuity and Stability to Education

7.      I am familiar with certain basic foundational principles regarding childhood development, learning models, and research supporting education policy based on my training and professional experience

8.      It is well understood within the field of education that continuity and stability (especially continuous, stable attendance) are necessary for learning, and the opposite is also true: disruption and instability can create setbacks to learning.

Ex. Y

9. Missing even a small amount of school has a significant impact on learning because most curriculum draws off a concept of sequencing, builds off prior lessons, and requires a connection to prior material. This is true for students of any age.

10. These challenges are compounded when absence or interruption is due to negative or traumatic circumstances. Educators have long recognized that wellness, mental health, and stability within the home and community environment have close and direct ties to students' ability to access and master content that is being presented to them.

11. When students do not have stability in housing, meals, healthcare, or community safety, those instabilities impact their ability to receive and connect with educational content in a way they can retain and build upon. Research supports that childhood trauma also affects school performance and learning.

12. Accordingly, educational success is tied both to consistent, continuous attendance, and a number of other environmental factors outside the classroom.

13. Any circumstances that present more than a brief adverse impact either on attendance or on environmental stressors are likely to have an adverse impact on learning and are likely to increase the degree of intervention (and in some instances, funding) needed to support impacted students.

14. Although the COVID-19 pandemic was unique, it illustrates some of these principles well. COVID-19 presented both environmental stressors and interruptions to in-classroom learning. Parents, students, and teachers alike have identified ways those challenges and interruptions created lasting impacts on childhood development and learning. Increased impacts have also factored into increased state resources: the 2023

Ex. Y

Minnesota Legislative Session identified a need for investment in Minnesota's public education system, in part to remedy challenges compounded by COVID-19.

### Operation Metro Surge

15. MDE's duties and responsibilities include a significant degree of communication with, and oversight of, public schools and school districts within the State of Minnesota. As a result, I have either personally fielded calls from school administrators or have spoken with other MDE staff who have fielded those calls, within the past six weeks.

16. In the course of Operation Metro Surge, and particularly within 2026, MDE has received a significantly higher volume of concerns and outreach than typical, enumerating concerns about student attendance, and school safety, associated with Operation Metro Surge.

17. Multiple major school districts have described increased absences and have expressed feeling compelled to offer online learning tools or hybrid models because students or their families report feeling unsafe leaving their homes to bring children to and from school.

18. Although MDE did not participate in offering any comments or content to a recent article in The Star Tribune, based on my own conversations I believe it accurately captures many of the same concerns MDE has heard: https://www.startribune.com/attendance-drops-at-minnesota-schools-as-federal-immigration-enforcement-intensifies-anxieties/601560458.

Ex. Y

19.    I am aware of specific instances on school grounds or school bus routes impacting these concerns, although this list is not exhaustive of all reports or concerns brought to MDE in recent weeks:

    a. Multiple students and educators being exposed to chemical irritants and other displays of force on January 7, 2026 in a widely reported incident occurring at Roosevelt High School in Minneapolis.

    b. Reports of DHS agents pulling over vehicles transporting students or staff going to or from school.

    c. At least one parent has been reportedly detained at a school bus stop in a Minneapolis suburb while waiting with their child.

    d. Several schools have had reduced hours or closure associated with specific safety concerns due to DHS activity and use of force near school property.

    e. At least one high school student being detained by DHS agents.

    f. At least two students detained in the parking lot of a school.

    g. A five-year-old student taken into custody just after the child returned home from preschool.

20.    MDE continues to hear from districts expressing concerns regarding this school year's assessment testing in the event circumstances do not improve. Student assessment periods required by state and federal law begin in January and continue through May 2026. MDE continues to field concerns from districts that negative impacts on attendance and student focus will make it harder to administer that assessment testing and fulfill the state's obligations.

21.    Further, to the extent the impacts of Operation Metro Surge fall disproportionately on low-income or multilingual households, there are specific funding

Ex. Y

streams to address the additional needs for learning supports for these students, so addressing disruptions could require even more resources from those funding streams and state funds in general.

Executed this 22nd day of January 2026,

_____
Stephanie Graff
Deputy Commissioner
Minnesota Department of Education

Ex. Y

CASE 0:26-cv-00324-ECT-ECW    Doc. 130-2    Filed 02/04/26    Page 218 of 242



# The Growth and Impact of Minnesota's Foreign-Born Workforce

  

by Carson Gorecki (/deed/data/lmi-help/labor-market-experts/carson-gorecki.jsp), Tim O'Neill (/deed/data/lmi-help/labor-market-experts/tim-oneill.jsp) and Amanda Blaschko (/deed/data/lmi-help/labor-market-experts/amanda-blaschko.jsp)

March 2025

## Minnesota's Foreign-Born Population

Minnesota's foreign-born[1] population has grown significantly over the past decade, reaching nearly 490,000 residents in 2023 and comprising 8.6% of the state's total population, according to the U.S. Census Bureau's American Community Survey (https://data.census.gov/table/ACSST5Y2023.S0501?q=S0501:%20Selected%20Characteristics%20of%20the%20Native%20and%20Foreign-Born%20Populations&g=040XX00US27)[2]. This represents a 24.7% increase from 2013, highlighting the state's growing diversity and the important role immigrants play in Minnesota's demographic makeup. Additionally, foreign-born Minnesotans play an outsize role in the state labor force, relative to the total population. As of 2023, almost 11% of Minnesota's workers were immigrants.

While Minnesota's share of foreign-born residents (8.6%) remains below the national share of 13.9%, the state has seen more rapid growth in its immigrant population, with distinct patterns emerging between the Twin Cities metro area and Greater Minnesota. Among these foreign-born residents, 58.2% have become naturalized U.S. citizens, while 41.8% are not U.S. citizens.

Ex. Z

Foreign-born population growth and settlement patterns vary significantly across the state. The seven-county Twin Cities metro area serves as the primary hub, housing 77.8% of the state's foreign-born population (380,516 residents). That is much higher than the 55% of the state's total population living in the region. The Twin Cities metro area has more established immigrant communities, with 38.6% having arrived before 2000, and this stability is reflected in the metro area's higher naturalization rate of 60.6%. In contrast, Greater Minnesota, which contains 22.2% of the state's foreign-born population (108,381 residents), has a different demographic profile with lower naturalization rates at 49.9%, and a larger share of recent arrivals, with 40.5% having entered since 2010.



Looking at origin, Asia represents the largest share at 35.7% of foreign-born residents, followed by Africa at 28.3%, and the Americas at 26.7% (24.2% from Latin America and 2.5% from Northern America) (see Figure 1). This distribution differs notably from national patterns, where the Americas, particularly Latin America, represent over 50% of the foreign-born population.

Minnesota's African immigrant population has been particularly dynamic, showing the most dramatic growth with a 78.8% increase (+61,035 people) between 2013 and 2023. These patterns vary between the Twin Cities metro area and Greater Minnesota. The Twin Cities metro area shows a higher concentration of Asian immigrants (38.1%) and African immigrants (29.2%), while immigrants from the Americas make up 23.7% of the metro's foreign-born population - with 21.5% from Latin America and 2.1% from Northern America.

In contrast, Greater Minnesota shows a different pattern, with immigrants from the Americas comprising the largest share at 37.4% of the region's foreign-born population (33.5% from Latin America and 3.9% from Northern America), followed by Asia at 27.3% and Africa at 25.3%. The share of European immigrants remains similar between the Twin Cities Metro and Greater Minnesota at around 9%.

Ex. Z

The age demographics of Minnesota's growing foreign-born population create valuable opportunities for the state's workforce. The foreign-born population is heavily concentrated in prime working ages, with 61.4% between the ages of 25 and 54 years, compared to just 38.2% of the total population in these age categories. This concentration is particularly pronounced in the 35- to 44-year-old age range, where foreign-born residents make up 24.1% compared to 13.4% of the total population. As Minnesota faces the challenges of an aging population, these demographic patterns position foreign-born residents as a vital source of current and future workforce growth.

## The Growing Foreign-Born Workforce

As of 2023, more than 344,000 foreign-born workers accounted for 10.9% of the Minnesota's labor force (see Figure 3). The national foreign-born labor force (FBLF) share was higher, at 17.9%. Of the 43 states with foreign-born worker data available, Minnesota had the 24th highest share. Additionally, the foreign-born labor force participation rate (74.4%) was notably higher than the native-born participation rate (67.7%) in Minnesota.

Ex. Z



Figure 2. Foreign-Born Share of Labor Force by State, 2023

From 2013 to 2023 every state saw its FBLF grow. Only four states saw their overall labor force grow faster than their FBLFs: Arizona, California, Nevada and Oregon. Between 2019 and 2023, the FBLF grew faster than the total labor force in all but nine states. Nationally, the FBLF (+7.0%) grew more than twice as fast as the overall labor force (+3.3%).

In 2013, the foreign-born worker share in Minnesota was 9.0% (see Figure 3). Since then, 74,450 foreign-born workers joined the labor force, equivalent to a 27.6% increase. Over the same period, the overall labor force added 151,400 workers, a 5.1% growth. Foreign-born additions accounted for nearly half of Minnesota's labor force growth from 2013 to 2023. Furthermore, Minnesota's foreign-born workforce grew 10.8 percentage points faster than the nation's over the last decade. Despite this robust numeric growth, the state retained its foreign-born workforce share ranking.

Our neighbors to the east and south have relatively smaller foreign-born labor forces. Both Iowa's and Wisconsin's foreign-born population account for around 7% (see Figure 3). Since 2013, Wisconsin's FBLF grew 20.3% and Iowa's increased 28.7%, while Minnesota's growth equaled 27.6%. Among other states, the fastest FBLF growth occurred in Indiana (+51%), Delaware (+47%), Utah (+42%) and Tennessee (+41%). On the low end were California (+2.2%), New York (+2.4%), Illinois (+3.9%) and Oregon (+5.4%).

Minnesota's FBLF growth over this period ranked 18th fastest in the U.S., representing a slow-down from the years following the Great Recession. From 2010 to 2015, Minnesota had the fastest growing foreign-born labor force in the nation at +23%, as more than 56,000 foreign-born workers joined. More recently, FBLF growth in Minnesota slowed. From 2019 to 2023, the state FBLF grew 6.2%, or an average of 1.5% per year. National FBLF growth remained relatively steady, ticking up a tenth of a percentage point during the 2019-2023 period to an annual average of 1.7%.

Ex. Z



Figure 3. Foreign-Born Share of Labor Force by State, 2010-2023

## Foreign-Born Labor Force Characteristics

As was mentioned earlier, foreign-born residents are more likely to be in the labor force. Both nationally and in Minnesota, the foreign-born population has higher labor force participation. In Minnesota in 2023 the foreign-born labor force participation rate (FBLFPR) of 74.4% was six percentage points higher than the statewide labor force participation rate, which itself was the 6th highest among all states[3]. From 2013 to 2023, the FBLFPR increased while the overall LFPR decreased, meaning the labor force participation gap between the two groups grew in magnitude. In 2013, the average unemployment rate for the foreign-born workforce was 6%, more than two percentage points higher than the overall statewide rate. By 2023, this gap had closed to virtually zero as the foreign-born rate to fell to 2.2%, right above the 2.1% overall rate and within the margin of error.

Reflecting higher labor force participation, a higher share of foreign-born households recorded having earnings (90% vs. 79% of the total population), which are defined primarily as wages and salaries from employment. However, foreign-born households ($81,600) had lower median incomes than the total population ($85,100). Encouragingly, foreign-born median household incomes equaled 96% of the statewide median in 2023, up from 82% in 2013.

Ex. Z

CASE 0:26-cv-00324-ECT-ECW     Doc. 130-2     Filed 02/04/26     Page 224 of 242

**Table 1. Select Economic Characteristics for Foreign-Born and Total Population in Minnesota, 2023**

| Characteristic | Foreign-Born Population | Total Population |
|---|---|---|
| With Social Security income | 14.8% | 29.9% |
| With Supplemental Security Income | 4.8% | 3.7% |
| With cash public assistance income | 5.2% | 2.7% |
| With retirement income | 9.3% | 24.3% |
| With Food Stamp/SNAP benefits | 16.2% | 7.9% |
| No health insurance coverage | 12.0% | 4.2% |
| In renter-occupied housing units | 48.2% | 28.0% |
| Below poverty threshold | 13.8% | 9.3% |
| Carpooled to work | 15.1% | 8.0% |
| Public transit to work | 3.5% | 1.7% |

*Source: U.S. Census Bureau ACS, 1-yr Estimates*

Given that foreign-born residents are more likely to be of working age, immigrant households were about half as likely to receive social security income (14.8% vs. 29.9% of all households) and even less likely to have some sort of retirement income (9.3% vs. 24.3%).

Despite being more likely to have earnings, Minnesota's foreign-born population – when compared to the total population – was also more likely to be receiving cash public assistance and/or SNAP benefits. Just over 5% of foreign-born households had cash public assistance income and 16.2% were receiving food stamps or SNAP benefits in 2023 (see Table 1). By comparison, of all Minnesota households, 2.7% received cash public assistance income and 7.9% used food stamps or SNAP benefits.

Correspondingly, Minnesotan foreign-born residents had a higher poverty rate (13.8%) than the total population (9.3%). Finally, 12% of foreign-born residents were without health insurance, compared to 4.2% of the total population. Perhaps reflective of the population's concentration in the metro, foreign-born workers were less likely to drive alone to their jobs and about twice as likely to carpool or take public transportation. Foreign-born residents were also more likely to occupy rental housing units (48.2%) than the total population (28%).

The educational attainment of Minnesota's foreign-born population also shows varying levels of alignment with current job market demands, according to DEED's Job Vacancy Survey (/deed/data/data-tools/job-vacancy/index.jsp). Among foreign-born residents 25 years and older, 35.8% hold a bachelor's degree or higher (with 16% holding advanced degrees), while 20.5% have some college or an associate's degree, 20.7% are high school graduates, and 22.9% have less than a high school education (see Figure 4).

Ex. Z

CASE 0:26-cv-00324-ECT-ECW    Doc. 130-2    Filed 02/04/26    Page 225 of 242



According to the 2023 Job Vacancy Survey results (https://apps.deed.state.mn.us/lmi/jvs/Results.aspx), Minnesota's job openings span across various educational requirements, with 19% of vacancies requiring a bachelor's degree or higher, 11% requiring an associate degree, 7% requiring vocational training, 25% requiring a high school diploma or GED, and 39% having no formal education requirement. As Minnesota's workforce continues to age and retire, foreign-born workers across all education levels are positioned to help fill critical vacancies.

With nearly two-thirds of current openings requiring a high school diploma or less, and many others requiring higher education, foreign-born workers bring valuable skills and experience that align with the state's diverse labor market needs. Their participation is becoming increasingly crucial in industries facing persistent labor shortages, offering a vital solution to the state's evolving workforce needs.

# Foreign-Born Industry and Occupational Employment in Minnesota

The U.S. Census Bureau's American Community Survey's (ACS) 5-year estimates can provide insights into Minnesota's foreign-born employment distribution by industry and occupational employment. This data zeroes in on the civilian employed population 16 years of age and older. Of that population, about one-in-nine of the state's total workforce was foreign-born in 2023.

Ex. Z

Broken down by industry sector, Education & Health Services employed the most foreign-born workers in Minnesota. In fact, with more than 83,800 such workers in 2023, over one-quarter (26.1%) of the state's total foreign-born workforce worked in this sector. Manufacturing, with over 65,500 foreign-born workers, accounted for another fifth (20.1%) of the state's total foreign-born workforce. Coming in third with nearly 37,900 foreign-born workers, Professional & Business Services accounts for just over one-ninth (11.8%) of the state's total foreign-born workforce. Altogether, Education & Health Services, Manufacturing and Professional & Business Services accounted for over 186,200 foreign-born workers in 2023, or about three-fifths (58.0%) of the state's total foreign-born workforce. Retail Trade; Leisure & Hospitality; Financial Activities; and Transportation, Warehousing, & Utilities each had over 20,000 foreign-born workers, with both Construction and Other Services each accounting for over 10,000 foreign-born workers (see Figure 5).



Figure 5. Minnesota Foreign-Born Industry Employment by Industry, 2023

Source: U.S. Census Bureau, American Community Survey 5-Year Estimates

Where foreign-born workers make up a significant share of total industry employment in Minnesota, they are especially concentrated in Manufacturing (16.0% of the industry's total employment); Transportation, Warehousing, & Utilities (13.5%); and Professional & Business Services (12.1%). Foreign-born workers are less concentrated in Public Administration (6.4% of the industry's total employment), Information (6.7%), Construction (7.3%), Retail Trade (7.8%), Natural Resources & Mining (8.0%) and Wholesale Trade (8.2%).

Ex. Z

Data from the Census Bureau also allows for the analysis of Minnesota's foreign-born employment by occupation. At the broadest level, ACS data shows foreign-born workers to have a much higher share of employment in Production, Transportation, & Material Moving occupations (22.0%) than native-born workers (12.6%). Foreign-born workers also have a higher share of employment in Service occupations (20.6%) than native-born workers (14.3%). This broad occupational group includes Healthcare Support, Protective Service, Food Preparation & Serving, Building & Grounds Cleaning & Maintenance and Personal Care & Service occupations. Meanwhile, ACS data shows foreign-born workers to have lower shares of workers in the following occupational groups: Management, Business, Science, & Arts; Sales & Office; and Natural Resources, Construction & Maintenance (see Figure 6).



Figure 6. Minnesota Native and Foreign-Born Occupational Shares, 2023

Source: U.S. Census Bureau, American Community Survey 5-Year Estimates

According to 2023 ACS 1-year estimates extracted from the Integrated Public Use Microdata Series or IPUMS (https://www.ipums.org/), Minnesota had approximately 366,300 foreign-born workers making up over one-ninth (11.6%) of the state's total workforce, showing a continued increase. Nursing, Psychiatric & Home Health Aides had the most foreign-born workers of any occupation, with over 17,100 such workers in 2023. Other occupations with over 10,000 foreign-born workers included Registered Nurses, Managers and Other Production Workers. Minnesota's foreign-born workers were also significantly employed as Software Developers, Assemblers & Fabricators, Truck Drivers, Janitors & Building Cleaners, Chefs & Cooks and more (see Table 2).

Ex. Z

Where foreign-born workers made up 11.6% of Minnesota's total employment in 2023, such workers made up significantly higher shares of employment in specific occupations. For example, foreign-born workers accounted for three-quarters (75.0%) of the state's Taxi Drivers & Chauffeurs and nearly three quarters (72.3%) of the state's Postal Service Mail Sorters, Processors & Processing Machine Operators. Foreign-born workers also accounted for over half of the state's total employment in the following occupations: Dancers & Choreographers (64.6%); Roofers (55.1%); Carpet, Floor & Tile Installers & Finishers (52.6%); Laundry & Dry-Cleaning Workers (52.1%); Cutting Workers (51.3%); and Chemists & Materials Scientists (50.1%). There were over 50 specific occupations, accounting for over 100,000 foreign-born workers, where such workers accounted for between one-fifth and one-half of each occupation's respective total employment. These occupations varied from Packers & Packagers, Dentists and Software Developers, to Security Guards, Physicians and Childcare Workers.

These occupations span the breadth of typical education requirements, but roles more-often filled by foreign-born workers tend to occupy the extremes of the educational requirement spectrum. Foreign-born workers are both more likely to fill occupations that have low educational requirements like Drivers and Janitors/Building Cleaners as they are occupations with high educational requirements such as Chemists & Materials Scientists, Computer Scientists and Physicians. These trends reflect the bifurcated nature of educational attainment among foreign-born workers in Minnesota, who are both more likely than the native-born population to have less than high a high school degree and more likely to have attained a graduate or professional degree.

Ex. Z

| Table 2. Minnesota Top-Employing Occupations with Foreign-Born Workers, 2023 | | | | |
|---|---|---|---|---|
| | | | Total, All Employment | |
| Occupational Title | Number of Foreign-Born Workers | Foreign-Born Share of Total Employment | 2023 Job Vacancies | 2022-2032 Employment Outlook |
| **Total, All Occupations** | **366,311** | **11.6%** | **139,059** | **1,676,292** |
| Nursing, Psychiatric, & Home Health Aides | 17,154 | 30.3% | 3,374 | 131,628* |
| Registered Nurses | 12,028 | 13.8% | 4,382 | 26,773 |
| Managers | 11,989 | 10.1% | 3,698 | 91,084 |
| Other Production Workers Including Semiconductor Processors & Cooling & Freezing Equipment Operators | 11,307 | 31.9% | 374 | 22,042 |
| Software Developers, Applications & Systems Software | 11,278 | 25.9% | 1,015 | 16,753 |
| Assemblers & Fabricators | 9,971 | 25.4% | 647 | 20,662 |
| Driver/Sales Workers & Truck Drivers | 9,057 | 14.0% | 4,393 | 38,965 |
| Janitors & Building Cleaners | 6,763 | 15.5% | 1,573 | 34,482 |
| Chefs and Cooks | 6,644 | 16.4% | 3,469 | 36,647 |
| Computer Scientists & Systems Analysts/Network Systems Analysts/ Web Developers | 6,598 | 15.4% | 564 | 6,514 |
| Laborers and Freight, Stock, & Material Movers, Hand | 6,351 | 12.9% | 939 | 30,841 |
| Personal Care Aides | 5,509 | 15.1% | 5,669 | 131,628* |
| Customer Service Representatives | 5,434 | 9.4% | 1,664 | 35,082 |
| Taxi Drivers & Chauffeurs | 5,194 | 75.0% | 161 | 5,795 |
| Elementary & Middle School Teachers | 5,087 | 9.0% | 653 | 13,128 |
| Social Workers | 5,047 | 15.2% | 1,044 | 8,187 |
| Childcare Workers | 4,789 | 19.6% | 620 | 12,502 |
| Teacher Assistants | 4,756 | 11.6% | 1,922 | 21,353 |
| Cashiers | 4,670 | 9.4% | 3,334 | 53,901 |
| First-Line Supervisors of Sales Workers | 4,396 | 6.7% | 3,075 | 9,935 |
| *Source: IPUMS USA, DEED Job Vacancy Survey, DEED Employment Outlook* | | | | |
| *\*Includes data for Home Health & Personal Care Aides, Nursing Assistants, and Psychiatric Aides* | | | | |

Ex. Z

The 1-year estimates from ACS also reveal significant and rapid growth of foreign-born workers in Minnesota. Between 2013 and 2023, there were over 78,400 additional foreign-born workers in the state. This growth rate of 27.2% far outpaced the growth rate for total employment during this period, at 5.2%. Leading this growth, both Registered Nurses and Nursing, Psychiatric & Home Health Aides had an additional 8,500 foreign-born workers between 2013 and 2023. Manager positions across the state experienced an additional 7,500 foreign-born workers, Other Production positions forged an additional 6,600 foreign-born workers, and Software Developers welcomed an additional 5,200 foreign-born workers (see Figure 7).

All in all, nearly 40 specific occupations added at least 1,000 more foreign-born workers between 2013 and 2023. In terms of growth rates, the following occupations witnessed the most rapid increases in foreign-born workers between 2013 and 2023: Electrical Power Line Installers & Repairers; Chemists & Materials Scientists; Security Guards; Claims Adjusters, Appraisers, Examiners & Investigators; Special Education Teachers; Postal Service Mail Carriers; Construction Managers; Farmers, Ranchers & Other Agricultural Managers; Property, Real Estate & Community Association Managers; and Painting Workers & Dyers. In some of these occupations, the number of foreign-born workers increased by 1,000 to 2,000 percent between 2013 and 2023, though overall numbers of people employed were still relatively small.

Recent growth in the number of foreign-born workers across Minnesota's industries and occupations has proven to be critical, as the state is still experiencing tight labor market conditions. Future growth will be essential as DEED's employment projections (/deed/newscenter/publications/trends/september-2024/projections.jsp) reveal the need to not only fill newly created jobs, but also to fill a much larger number of existing jobs that become available due to retirements and career changes.



Figure 7. Minnesota Change in Foreign-Born Workers by Occupation, 2013-2023

Source: IPUMS USA

Ex. Z

Another vital segment of the workforce is those that are self-employed. The 2021 U.S. Census Bureau's Nonemployer Statistics (https://www.census.gov/programs-surveys/nonemployer-statistics.html) show a clear difference between Minnesota and national patterns of foreign-born business owners without employees. While the 66,000 foreign-born individuals operating Minnesota businesses without employees (13.9% of total nonemployers) is proportionally higher than their share of the total workforce, this percentage falls significantly below the national average of 24.0%. From 2018 to 2021, an estimated 12,000 additional foreign-born nonemployer establishments opened in Minnesota, accounting for the entire number of nonemployers added in the state over that three-year period[4].

In terms of foreign-born nonemployer ownership, the data shows that Minnesota lags U.S. averages in every sector except Transportation and Warehousing, where Minnesota's 44% surpassed the national rate of 43.1%. The largest gaps between Minnesota and U.S. rates appear in Construction (MN: 11.0% vs US: 28.2%), Wholesale Trade (MN: 9.1% vs US: 26.0%), and Administrative Services (MN: 12.7% vs US: 28.4%).

Despite foreign-born workers being more likely than native-born Minnesotan workers to be self-employed, these differences suggest significantly lower participation of foreign-born entrepreneurs in Minnesota's nonemployer businesses compared to national patterns. Transportation & Warehousing is a notable exception, where foreign-born independent contractors and gig workers maintain a strong presence, likely in ride-share and delivery services.

# Summary

Minnesota residents born outside of the United States arrive from all corners of the globe to live and work in Minnesota. Once here, foreign-born residents provide healthcare and childcare, produce needed goods, provide vital services, start their own companies and contribute in many other ways. Certain sectors such as Manufacturing and Transportation, and occupations like Nursing Assistants, Drivers, Software Developers and Production Workers rely more upon foreign-born workers. In a tight labor market, foreign-born workers account for almost 11% of Minnesota's labor force and there are 50 diverse occupations where at least one out of every five workers are foreign-born. Immigrants remain an integral and growing part of Minnesota's population and workforce.

# Additional Resources

- **Minnesota State Demographic Center:**
  - Immigration & Language (https://mn.gov/admin/demography/data-by-topic/immigration-language/)
  - Economic Status of Minnesotans (https://mn.gov/admin/assets/Economic%20Status%20of%20Minnesotans%202023_tcm36-569572.pdf)
- **Minnesota Department of Employment and Economic Development:** The Importance of Immigration (/deed/data/lmi-reports/importance-immigration/index.jsp)
  - Includes statewide and regional reports

Ex. Z

- **Minnesota Chamber of Commerce:**
  - The Economic Contributions of Immigrants in Minnesota (https://www.mnchamber.com/sites/default/files/The%20Economic%20Contributions%20of%20Immigrants%20in%20Minnesota%203.23.21.pdf)
  - Immigration became the leading component of population growth in Minnesota this decade (https://www.mnchamber.com/blog/immigration-became-leading-component-population-growth-minnesota-decade)
- **The Brookings Institution:** Which US states and occupations are most in need of foreign-born labor? (https://www.brookings.edu/articles/which-us-states-and-occupations-are-most-in-need-of-foreign-born-labor/)
- **U.S. Bureau of Labor Statistics:** Foreign-Born Workers Labor Force Characteristics, 2023 (https://www.bls.gov/news.release/pdf/forbrn.pdf)
- **U.S. Census Bureau:** Foreign-Born Workforce Visualization (https://www.census.gov/library/visualizations/interactive/foreign-born-workforce.html)
- **Center for Migration Studies:** Estimates of Undocumented and Eligible-to-Naturalize Population by State (https://data.cmsny.org/state.html)
- **Burning Glass Institute:** From Tech to Traditions: The Influence of Foreign-born workers on U.S. Jobs (https://www.linkedin.com/pulse/from-tech-traditions-influence-foreign-born-workers-us-gad-levanon-wgpic/)

---

[1]Includes anyone who was not a U.S. citizen at birth, including those who become U.S. citizens through naturalization.

[2]2019-2023 ACS 5-Year Estimates (https://data.census.gov/table/ACSST5Y2023.S0501?q=S0501:%20Selected%20Characteristics%20of%20the%20Native%20and%20Foreign-Born%20Populations&g=040XX00US27https://data.census.gov/table/ACSST5Y2023.S0501?q=S0501:%20Selected%20Characteristics%20of%20the%20Native%20and%20Foreign-Born%20Populations&g=040XX00US27)

[3]ACS 1-year Estimates, Table S0501 (https://data.census.gov/table/ACSST1Y2023.S0501?q=S0501:%20Selected%20Characteristics%20of%20the%20Native%20and%20Foreign-Born%20Populations&g=040XX00US27)

[4]US Census Annual Business Survey Nonemployer Demographic Table 2018 and 2021 (https://data.census.gov/table/ABSNESDO2021.AB2100NESD04?q=AB2100NESD04:%20Nonemployer%20Statistics%20by%20Demographics%20series%20(NES-D):%20Owner%20Characteristics%20of%20Nonemployer%20Firms%20by%20Industry,%20Sex,%20Ethnicity,%20Race,%20and%20Veteran%20Status%20for%20the%20U.S.,%20States,%20Metro%20Areas,%20and%20Counties:%202021&g=040XX00US27)

Ex. Z

Ã

Ex. Z

# The economic contributions of New Americans in Minnesota

This week, the Minnesota Chamber held its annual **Workforce Summit**, where we had a terrific turnout and important discussions about the future of our state's workforce. A key highlight was the **release of a new report**—the first in a series—analyzing the economic contributions of new Americans in Minnesota.

You might be wondering, why is the Minnesota Chamber talking about immigration? Simply put, we need more people and skilled workers to move to Minnesota. A growing economy depends on a growing population, and the numbers show that immigration plays a critical role in sustaining our workforce and economic prosperity. To break it all down, I talked with Sean O'Neil, the Chamber's Director of Economic Development and Research, who led this report. See our full conversation below:

**Doug Loon: Sean, give us the key takeaways from the report.**

**Sean O'Neil:** Thanks, Doug. The Chamber has been studying immigration and its impact on Minnesota's economy for over 15 years. Our research shows that new Americans contribute significantly—not only as workers but also as entrepreneurs, consumers, taxpayers, and connections to the global economy.

The data is staggering: 94% of Minnesota's net population growth this decade has come from immigration. This is somewhat unprecedented, with immigration now driving overall population growth in the state. It also accounts for about 60% of total job and labor force growth so far this decade. Over time, immigration is becoming a larger share of our economy and workforce.

**DL:** Let's take a step back and discuss Minnesota's broader workforce and population challenges. As I mentioned earlier, you can't have a growing economy without a growing workforce. While international migration has been a key factor, what do the numbers tell us about domestic migration?

**SO:** Good question. Population growth comes from three main sources: natural change (births minus deaths), domestic migration, and international migration. Over the past 24 years, Minnesota has experienced negative net domestic migration in 20 of those years, meaning we've lost more people to other states than we've gained. That trend has been a major headwind for our population growth.

At the same time, birth rates in Minnesota have declined, further slowing natural population growth. This leaves immigration as the key lever for sustaining healthy growth in our workforce and overall economy.

**DL:** It's clear that immigration is essential to our state's future. What are some of the unique contributions that new Americans bring to Minnesota's economy, particularly in business, innovation, and high-skilled industries?

**SO:** This is where the story gets even more interesting. Our research found that not only are new Americans making up a larger share of our workforce, but their economic impact is evolving. Over time, Minnesota's foreign-born population has become more highly educated and skilled, taking on high-demand jobs in technology, healthcare, and other critical sectors.

Additionally, entrepreneurship rates among new Americans have been rising steadily. Many are launching businesses, creating jobs, and driving innovation. This increased participation in high-productivity industries is accelerating Minnesota's economic growth.

This report is an important product of two Chamber initiatives—our Grow Minnesota! program and the Minnesota Chamber Foundation. If you want to dive deeper, I encourage you to visit our website at mnchamber.com and check out the Workforce Summit materials.

As we plan for the future, we must consider all the factors that contribute to a strong economy. The data is clear: new Americans are a key ingredient in Minnesota's continued economic success.

Thank you for your continued support of the Minnesota Chamber and Chamber Foundation, who puts out these crucial economic reports. You can hear more conversations like this on future **Minnesota Business Podcast** episodes.

Ex. AA

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota, by and through its Attorney General Keith Ellison, City of Minneapolis, and City of Saint Paul, <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; JOHN CONDON, in his official capacity as Acting Executive Associate Director of Homeland Security Investigations; U.S. Department of Homeland Security; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations; U.S. Immigration and Customs Enforcement; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection; GREGORY BOVINO, in his official capacity as Commander of the U.S. Border Patrol; U.S. Border Patrol; DAVID EASTERWOOD, in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement, <br><br> Defendants. | Case No.: <br><br><br><br> **DECLARATION OF JEFFREY JOHNSON** |

Ex. BB

I, JEFFREY JOHNSON, declare as follows:

1. I am the general manager of the Minneapolis Convention Center. I have worked in this role since May of 2010.

2. The Minneapolis Convention Center is a 1.6-million-square-foot meeting and event venue located in downtown Minneapolis, Minnesota, owned and operated by the City of Minneapolis.

3. The Minneapolis Convention Center provides about $250 million per year in economic impact to the regional economy and $20-25 million in direct revenue to the City of Minneapolis. Event activity in Minneapolis facilitates spending in the city which contributes sales and use taxes along with entertainment taxes in the amount of an estimated $100 million per year. These taxes help pay for the city's hospitality infrastructure.

4. The events at the Minneapolis Convention Center support over 8,600 local jobs and a larger hospitality workforce of more than 36,000.

5. Minneapolis Convention Center events also attract visitors to downtown Minneapolis and are vital to maintaining a safe and thriving downtown area.

6. On or about January 13, 2026, an event scheduled for the week of January 19, 2026, cancelled at the last minute. The event organizer cited concerns related to the increased federal immigration enforcement presence in Minneapolis. The event involved nearly 400 attendees from out-of-town.

Ex. BB

7.    The City subscribes to an industry economic calculator that estimates economic impact of Convention Center events based on the local tax rate, city size, and other metrics. Based on this calculator, the estimated economic impact of this cancellation of the City of Minneapolis is approximately $435,000. Most of that is money that would have been spent in the city, with about $15,000 in local sales tax collection.

8.    When an event with a large number of individuals from out-of-town cancels it is particularly hard on the hospitality industry in Minneapolis as those hotel rooms are unlikely to be filled at the last minute in Minnesota in January. Minneapolis also collects a local lodging tax which would be affected by the cancellation.

9.    Events are booked usually about five years in advance. This means both that a cancelled event cannot be replaced at the last minute by another event, and that events happening today that affect the public perception of the desirability and safety of Minneapolis as a destination have long-term effects on the ability of the City to book events at the Convention Center and the City's economic vitality.

10.    Last week multiple of the Minneapolis Convention Center's other clients sought reassurance from us that, despite the federal immigration enforcement surge here, Minneapolis is still a safe place to come and visit.

11.    Clients rarely ask about the immigration status of people in Minneapolis. I cannot remember an event cancellation that is tied to a deportable individual in my 21 years of work at the Minneapolis Convention Center. Other than during the pandemic, event cancellations are extremely rare occurrences.

Ex. BB

12. The future harms to the Minneapolis Convention Center from damage to Minneapolis' reputation caused by this federal surge is real but is impossible to quantify, and the sooner Minneapolis returns to normal operations the better it will be for the Minneapolis Convention Center.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 21st day of January, 2026 in Minneapolis, Minnesota

Jeffrey Johnson

Ex. BB

## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota, by and through its Attorney General Keith Ellison, City of Minneapolis, and City of Saint Paul,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; JOHN CONDON, in his official capacity as Acting Executive Associate Director of Homeland Security Investigations; U.S. Department of Homeland Security; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations; U.S. Immigration and Customs Enforcement; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection; GREGORY BOVINO, in his official capacity as Commander of the U.S. Border Patrol; U.S. Border Patrol; DAVID EASTERWOOD, in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement,<br><br>Defendants. | Case No.: |

## DECLARATION OF ERIK HANSEN

I, ERIK HANSEN, declare as follows:

1. Since June 2, 2023, I have served as the Director of the Minneapolis Department of Community Planning & Economic Development (CPED).

2. The Economic Policy & Development Division within CPED is responsible for reducing barriers for people and businesses by providing workforce skill building, small business support, commercial real estate and business development assistance, licensing information, and education. As part of this work, CPED administers the permit process for "block events" within the city, that is, any event that will close a city street.

3. In January there were two large events scheduled to take place in the City of Minneapolis which had been in the planning process for several months: The Great Northern Festival and the Red Bull Heavy Metal Qualifier. The Red Bull Qualifier was completely cancelled and the Great Northern Festival partially cancelled due to concerns about federal immigration enforcement presence in the City of Minneapolis.

4. The Great Northern is an annual winter festival held in Minneapolis. The 2026 festival will span 5 days from January 28 to February 1. Both indoor and outdoor events were scheduled for the 2026 festival. The 2026 festival was expected to draw 8,000-15,000 attendees and generate around $800,000 in revenue. That would mean several thousand dollars in tax revenue for the City.

5. In the course of my work, it was reported to me that, on January 17, 2026, organizers of the Great Northern notified city staff that they made the decision to cancel all outdoor events of the 2026 festival. The reason given for the cancellation was due to

Ex. CC

"safety and risk" concerns "given the current situation unfolding in Minneapolis," which we understood to refer to the large presence of federal immigration agents in Minneapolis and the risk that they might show up and disrupt the outdoor events.

6.      Organizers withdrew permit applications previously submitted to the city of Minneapolis and the Minneapolis Park Board for the 2026 festival.

7.      This reduction in event programming will lead to decreased sales tax revenue for the participating businesses and a reduced sales tax remission to the state and city.

8.      Red Bull Heavy Metal is an annual snowboarding contest. Each year, Red Bull hosts multiple qualifier events in cities across the United States. The Twin Cities have been selected to host a Qualifier each year since 2024.

9.      The 2026 Qualifier was scheduled to be held in Minneapolis on January 17, 2026, and was expected to draw over 1,000 attendees, with about 75% of those individuals coming from out of state.

10.     It is especially beneficial for Minneapolis to draw individuals from out-of-town who come and stay at hotels in the city, eat at restaurants, and visit our entertainment venues.    Additionally, showing Minneapolis to a national audience as a desirable destination has incalculable benefits to the city.

11.     In the course of my work, it was reported to me that, on January 14, 2026, Red Bull organizers notified city staff that they made the decision to cancel the Minneapolis Qualifier. The reason given for the cancellation was because of recent events in Minneapolis, which we understood as referring to the presence of federal immigration agents and events such as the fatal shooting of Renee Good by a federal immigration agent.

Ex. CC

12.     Organizers withdrew permit applications previously submitted to the city of Minneapolis and the Minneapolis Park Board for the Minneapolis Qualifier.

13.     This reduction in event programming will lead to decreased sales tax revenue for the participating businesses and a reduced tax remission to the State and the City.

14. Additionally, the harms trickle down to the local companies that provide tent rental, barricades, and other support for the events. The hotels lose out on the revenue from the guests, the restaurants from potential patrons, as well as entertainment venues and other local businesses.

15. Additionally, it is possible, if not likely, that, having cancelled their event in Minneapolis this year, Red Bull will find a new location to host the event and continue to use that location in future years.

16. The presence of these federal immigration enforcement agents is catastrophic for the event industry in Minneapolis in a way that I have not seen since the COVID-19 pandemic in 2020. The longer the massive presence of federal agents continues the more detrimental it will be to Minneapolis' event industry.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 21ST day of January, 2026 in Minneapolis, Minnesota

Erik O. Hansen

Ex. CC