## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

MUBASHIR KHALIF HUSSEN,
MAHAMED EYDARUS, and JAVIER DOE
*on behalf of themselves and others similarly
situated,*

                          Plaintiffs,

v.

KRISTI NOEM, *in her official capacity as
Secretary of the U.S. Department of
Homeland Security*; U.S. DEPARTMENT OF
HOMELAND SECURITY; U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT; TODD M. LYONS, *in his
official capacity as Acting Director of U.S.
Immigration and Customs Enforcement*;
DAVID EASTERWOOD, *in his official
capacity as U.S. Immigration and Customs
Enforcement Field Office Director for St.
Paul, Minnesota*; U.S. CUSTOMS AND
BORDER PROTECTION; RODNEY S.
SCOTT, *in his official capacity as
Commissioner of U.S. Customs and Border
Protection*; U.S. BORDER PATROL;
MICHAEL W. BANKS, *in his official
capacity as Chief of U.S. Border Patrol*; and
GREGORY BOVINO, *in his official capacity
as Commander-at-Large of U.S. Border
Patrol,*

                          Defendants.

Case No. 0:26-cv-324-ECT-ECW

**PLAINTIFFS' REPLY IN
SUPPORT OF THEIR MOTION
FOR A PRELIMINARY
INJUNCTION**

**<span style="color:red">EXPEDITED HANDLING
REQUESTED</span>**

## TABLE OF CONTENTS

Introduction .................................................................................................... 1

Argument ........................................................................................................ 1

    I.    Plaintiffs Have Standing to Seek Prospective Relief. .................................. 1

        A.    Plaintiffs Have Demonstrated Policies and Practices Giving Rise to Standing. ................................................................................... 2

        B.    Plaintiffs Have Established a Real and Immediate Threat of Future Injury from Defendants' Stop and Arrest Policies. ......................... 12

        C.    Plaintiffs Independently Have Standing Due to Ongoing Injuries from the Challenged Policies .................................................................. 16

    II.    Plaintiffs Have Established Defendants' Stops and Arrests Pursuant to Their Policies and Practices Violate the Fourth Amendment and Section 1357(a)(2). ................................................................................... 18

        A.    Defendants' Policy and Practice of Conducting Stops Without Reasonable Suspicion Violates the Fourth Amendment. ................. 18

        B.    Defendants' Policy and Practice Conducting Arrests Without Probable Cause of Removability Violates Section 1357(a)(2). ....................... 24

        C.    Defendants' Policy and Practice of Conducting Arrests Without Probable Cause of Flight Risk Violates Section 1357(a)(2). ........... 27

    III.    The INA Does Not Bar Review. ................................................................ 27

    IV.    Plaintiffs Have Multiple Causes of Action, Including Under the APA. ...... 28

    V.    Plaintiffs and the Putative Class Are Experiencing Irreparable Harm, and the Equities and Public Interest Favor Plaintiffs. ............................................. 31

    VI.    The Proposed Injunction's Scope Is Narrowly Tailored to Remedy the Specific Harms. ....................................................................................... 31

Conclusion ..................................................................................................... 33

**INTRODUCTION**

The record before the Court is clear: Pursuant to policies set by DHS leadership, DHS agents are systematically stopping people throughout the Twin Cities without any individualized determination of reasonable suspicion that the person is removable from the United States.  They are systematically arresting people without probable cause to believe they are removable: indeed, they are systematically arresting people merely to determine their identity.  And they are systematically arresting people without any individualized determination of probable cause that the person is a flight risk.

Defendants largely do not dispute Plaintiffs' and declarants' accounts of stops and arrests.  To the extent they address the merits, they primarily attempt to recharacterize the facts—suggesting, for example, that Plaintiff Mahamed Eydarus was merely engaged in a consensual encounter when several agents surrounded him and demanded his identification "to make sure [he] was 'not illegal.'"  But these recharacterizations are unsustainable.  Defendants' threshold arguments also fail.  Preliminary injunctive relief is urgently necessary to halt DHS's blatantly unlawful actions that are harming Plaintiffs and putative class members on an ongoing basis.

**ARGUMENT**

**I.    Plaintiffs Have Standing to Seek Prospective Relief.**

Plaintiffs have demonstrated both (1) a "real and immediate threat that [they] would again" suffer similar injury in the future and (2) "continuing, present adverse effects" from Defendants' ongoing implementation of their policy—and so have standing for prospective

1

injunctive relief. *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000). Defendants' claims to the contrary are undercut by uncontroverted facts.

**A.      Plaintiffs Have Demonstrated Policies and Practices Giving Rise to Standing.**

A policy—or even an unofficial practice—of engaging in unlawful behavior supports standing for prospective injunctive relief. *Id.* at 1038-39; *accord Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. 25-3417, 2025 WL 3465518, at *15 (D.D.C. Dec. 2, 2025) (citing authorities). A "pattern of noncompliance" does as well. *Park*, 205 F.3d at 1039.

Here, the record demonstrates that Defendants are implementing three unlawful policies and practices in immigration stops and arrests in the Twin Cities: (1) a policy and practice of conducting ostensibly investigatory immigration stops without any individualized determination of reasonable suspicion of removability, particularly targeting Somali and Latino Minnesotans; (2) a policy and practice of arresting individuals without a warrant or individualized determination of probable cause of removability, in violation of the Fourth Amendment; and (3) a policy and practice of arresting individuals without a warrant or an individualized determination of probable cause of flight risk.

For each policy and practice, the record evidence is overwhelming:

1. As to suspicionless stops, Defendant Noem has directly stated that DHS agents are authorized to "detain" persons "in the surroundings" of immigration operations to "validate their identity" and determine "if they are breaking our federal laws," ECF No. 48-12 (Shrinath Decl. Ex. 12), even though "mere propinquity" cannot give rise to

reasonable suspicion, *United States v. Owens*, 101 F.3d 559, 562 n.2 (8th Cir. 1996). Secretary Noem has "control, direction, and supervision of all [DHS] employees," 8 U.S.C. § 1103(a)(2), and Defendants do not contest that she made that statement. Similarly, the Acting Director of DHS's main interior enforcement division, ICE ERO, has directly stated that "if [ICE officers] encounter anybody in the area of which they are operating," they can stop those people and ask if they are citizens. Shrinath Third Decl. Ex. 3. And that is what Defendants did to the Plaintiffs in this case: Defendants subjected each of them to investigatory immigration stops without reasonable suspicion. ECF No. 34 (Hussen Decl.) ¶¶ 5, 6; ECF No. 42 (Eydarus Decl.) ¶¶ 7-12; ECF No. 30 (Javier Doe Second Decl.) ¶¶ 4, 5. Plaintiffs have submitted 29 additional declarations, 27 from putative class members likewise subjected to such stops and 2 declarations from witnesses of such stops of putative class members. ECF No. 32 (Dahir Decl.); ECF No. 29 (Osman Decl.); ECF No. 35 (Vogt Decl.) (witness); ECF No. 37 (A.A. Decl.); ECF No. 38 (C. Castillo Decl.); ECF No. 39 (Martinez Garcia Decl.); ECF No. 40 (Julio Doe Decl.); ECF No. 41 (Luisa Doe Decl.); ECF No. 43 (M. Castillo Decl.); ECF No. 44 (Moreno Decl.); ECF No. 45 (Aguirre Castrejon Decl.); ECF No. 46 (Santiago Doe Decl.); ECF No. 103 (C.L. Decl.); ECF No. 103-1 (C.M. Decl.); ECF No. 93-1 (Antony Doe Decl.); ECF No. 93 (Jane Doe Decl.); ECF No. 92-10 (E.G. Decl.); ECF No. 92-8 (E.M. Decl.); ECF No. 93-2 (F.A. Decl.); ECF No. 92-5 (H.S. Decl.); ECF No. 92-13 (K.D. Decl.); ECF No. 92-12 (M.G. Decl.); ECF No. 92-7 (M.M. Decl.); ECF No. 95 (N.G. Decl.); ECF No. 92-9 (R.J. Decl.); ECF No. 92-16 (R.M. Decl.); ECF No. 92-2 (S.P. Decl.); ECF No. 103-2 (S.S. Decl.) (witness); ECF

No. 92-11 (T.G. Decl.); *see also* ECF No. 93-4 (Dhawan-Maloney Decl.); ECF No. 93-3 (Griffith Decl.).

The supplemental declarations from detained individuals and witnesses further demonstrate DHS's policy and practice of suspicionless stops. For example, DHS agents stopped U.S.-citizen Declarant C.L. and her husband, claiming that they were looking for "somebody who is registered to this license plate" and demanding identification and birth certificates. C.L. Decl. ¶¶ 6-7. When asked, the agents claimed that person was a man— but the car was in fact registered to a woman and U.S. citizen. *Id.* ¶¶ 9-11. The agents nevertheless continued to demand birth certificates and identification. *Id.* ¶¶ 12-15. Agents stopped Latino U.S.-citizen Declarant S.P., pointing a gun at them and yelling to "get out of the fucking car," asking them if they were "from here." S.P. Decl. ¶¶ 2-7. The agents claimed that S.P.'s license plate came up as registered to an undocumented person but, also, that it was S.P.'s name and birth date that came up. *Id.* ¶ 7 (explanation "seemed made up").

DHS agents rammed U.S.-citizen Declarant C.M.'s car off the road, asked if they were a citizen, and then demanded documentary proof. C.M. Decl. ¶¶ 4-6. Agents likewise rammed into N.G.'s parked car while her Latino U.S.-citizen husband was in the driver's seat, demanded his (and not his white spouse's) identification, and asked him if he "came in on a visa." N.G. Decl. ¶¶ 4-14. SUVs boxed in and stopped 18-year-old Latina U.S.-citizen Declarant Jane Doe while she was driving her younger brothers to school. Jane Doe Decl. ¶¶ 4-20. Agents similarly swerved in front of and stopped Latina U.S-citizen Declarant E.M., demanding identification, E.M. Decl. ¶¶ 6-10, and maneuvered to stop

4

Latina U.S.-citizen Declarant M.G., asking if she were a citizen, M.G. Decl. ¶ 3. Masked agents boxed in and stopped Somali U.S.-citizen Declarant F.A., approaching her car with guns drawn, asking her if she was a U.S. citizen, and demanding identification. F.A. Decl. ¶¶ 8-16. Agents boxed in and stopped Latino U.S.-citizen R.J., pointing a gun at him, grabbing him from the vehicle, and pinning him to the ground. R.J. Decl. ¶¶ 4-10. Four vehicles likewise boxed in Antony Doe's car, parked in a Pollo Campero parking lot. Antony Doe Decl. ¶ 4. Eight agents approached—two with guns drawn—and an agent yelled, "Are you legal?" *Id.* ¶¶ 4-7.

The list goes on. Agents stopped Somali U.S.-citizen Declarant H.S. in the Dollar Tree parking lot, demanding identification and—after she showed her driver's license— her passport. H.S. Decl. ¶¶ 3-8. Agents dragged Somali U.S.-citizen Declarant M.M. from his car, kneed him in the back, elbowed him in the neck, and handcuffed him in a gas station parking lot. M.M. Decl. ¶¶ 3-7. Agents surrounded Latino U.S.-citizen Declarant K.D. in a Walgreen's parking lot, asking about his citizenship, demanding identification, and telling him they were "conducting an investigation." K.D. Decl. ¶¶ 2-11. Agents blocked in the car of a U.S.-citizen man who appeared "East African" and a teenage girl in a hijab leaving Starbucks and asked about the man's citizenship and for his "residency card." S.S. Decl. ¶¶ 6-18 (agents told bystander, "he's being detained"). Two agents stopped U.S.-citizen Declarant T.G. as he walked into work, one agent with a hand on his gun, demanding identification and asking where T.G. was born. T.G. Decl. ¶¶ 2-4. Agents approached Latino U.S.-citizen Declarant R.M. on his property, refused to leave when told to do so, asked what country he was from, "demanded to know where [he] was born and to see [his]

5

papers," scanned his face, and handcuffed him.  R.M. Decl. ¶¶ 5-12.  They stopped Latino U.S.-citizen Declarant E.G. while he was moving items from his truck to his home.  E.G. Decl. ¶¶ 3-5.  DHS agents had no basis in any of these stops for reasonable suspicion of removability.

2. As to arrests without probable cause, Defendants do not dispute that Defendant DHS has repeatedly publicly admitted that its agents use "reasonable suspicion"—*not* probable cause—as the standard for arrests.  But, as recognized by this Court just last week: "The Eighth Circuit applies a probable-cause standard to warrantless arrests made under 8 U.S.C. § 1357(a)(2)."  *Sara T. v. Bondi*, 0:26-cv-00462-PJS-JDF, ECF No. 7 at 5 (D. Minn. Jan. 29, 2026) (citing *United States v. Puebla-Zamora*, 996 F.3d 535, 538 (8th Cir. 2021)); *see also United States v. Sanchez-Velasco*, 956 F.3d 576, 581 (8th Cir. 2020).  So do courts across the country.  *See, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015); *Au Yi Lau v. I.N.S.*, 445 F.2d 217, 222 (D.C. Cir. 1971).  And a determination of removability is a prerequisite of a warrantless arrest under 8 U.S.C. § 1357(a)(2).  DHS has regularly described a policy and practice of making warrantless immigration arrests with less than probable cause, including repeatedly in commenting on Operation Metro Surge.  Mot. at 9-10.  In fact, DHS has publicly stated at least *seven more times* since the start of this litigation, and as recently as January 31, 2026, "law enforcement uses 'reasonable suspicion' to make arrests."  Shrinath Third Decl. Exs. 5-11.

Defendants admit these statements are legally incorrect, Opp'n at 38, but fail to demonstrate that arrests in the record were in fact based on probable cause of removability as required by 8 U.S.C. § 1357(a)(2).  Quite the opposite: Defendants astonishingly

argue—consistent with Defendant Noem's statement that DHS will "detain" individuals to "validate their identity"—that DHS agents may arrest an individual *to determine their identity*, with no other legal justification. *See infra* II.B, C. But "confirmation of identity" flips the probable-cause standard on its head and renders it meaningless, essentially requiring that to avoid arrest an individual must immediately establish that they are *not* removable. Here again, the record demonstrates the severe real-world consequences of Defendants' unlawful policy. Plaintiffs Javier Doe and Hussen were arrested without probable cause of removability. Javier Doe Second Decl. ¶¶ 7, 8, 11; Hussen Decl. ¶¶ 8, 10, 15, 22. Plaintiffs have submitted 9 declarations from putative class members similarly arrested. Osman Decl.; A.A. Decl.; Martinez Garcia Decl.; Moreno Decl.; Aguirre Castrejon Decl.; H.S. Decl.; M.M. Decl.; R.J. Decl.; R.M. Decl.; *see also* ECF No. 93-5 (Meyer-Thompson Decl.) ¶ 7.

Here too the supplemental declarations further demonstrate Defendants' policy of arresting *without* probable cause—purportedly to "verify" identity or citizenship/immigration status, even over assertions and efforts to prove U.S. citizenship. After an agent demanded U.S. citizen H.S.'s passport, H.S. called her husband to take a picture of her passport at home, but the agent demanded the photo be sent in three seconds. H.S. Decl. ¶¶ 6-8. When that did not occur, agents then handcuffed H.S. tightly and forced her into a vehicle, despite her protestations that she was a citizen and could, with more time, show them the picture. *Id.* ¶¶ 9-11. The agents then drove H.S. "around for about an hour," asking her where she was born, and finally—after making a phone call based on

7

information from her health insurance card and driver's license, and "apparently confirm[ing] that [she] was a U.S. citizen"—leaving her in a parking lot. *Id.* ¶¶ 12-14.

Defendants likewise arrested U.S. citizen M.M.—dragging him out of his car, kneeing him in the back, elbowing him in the neck, and handcuffing him—before they obtained more information about him. M.M. Decl. ¶¶ 3-8. Over M.M.'s protestations, "I am a U.S. citizen," and "my country is the USA," an agent responded, "Why don't you go back to your country?" *Id.* ¶¶ 5-6. And agents threw U.S. citizen R.J. out of his car, pinned him to the ground, put him in their car, and drove him around in handcuffs for roughly 20 minutes before determining that he "was clear." R.J. Decl. ¶¶ 9-12.

Perhaps DHS agents' stop of R.M. best encapsulates the policy and practice. An agent told U.S. citizen R.M. he was "required to show him proof of [his] citizenship, and asked if [he] was 'gonna do this the easy way' or if he was going to have to 'take [him] in.'" R.M. Decl. ¶ 9. R.M. stated that he was a U.S. citizen and that he had documentation, but—with no basis for probable cause of removability—the agents handcuffed him and only released him after scanning his face and checking his wallet for his passport card. *Id.* ¶¶ 10-12.

3. As to flight risk, Plaintiffs' unrebutted evidence demonstrates that Defendants have a policy and practice of arresting individuals without an individualized assessment of probable cause.[1] Plaintiffs have submitted 16 declarations from Plaintiffs and putative

_____

[1] Additionally, Defendants' admission that they make arrests based on "reasonable suspicion" reinforces that no probable cause determination is being made as to this requirement.

class members and 1 from a witness of arrests in which DHS did not provide any evidence of a specific intent to flee[2] and in which—undisputed at minimum for the twelve declarations initially submitted—DHS's agents did not inquire into ties to the community. Javier Doe Second Decl. ¶ 23; Hussen Decl. ¶ 22; Osman Decl. ¶¶ 7-9, 23; Vogt Decl. ¶¶ 10, 12 (witnessing arrest without flight-risk assessment); A.A. Decl. ¶¶ 1, 3, 12; C. Castillo Decl. ¶ 11; Martinez Garcia Decl. ¶¶ 7-10; Julio Doe Decl. ¶ 11; Luisa Doe Decl. ¶¶ 8, 9, 15; Moreno Decl. ¶¶ 5, 10, 19; Aguirre Castrejon Decl. ¶¶ 8, 9, 20; Santiago Doe Decl. ¶¶ 3, 11, 16; Antony Doe Decl ¶ 10; H.S. Decl. ¶¶ 1–9; M.M. Decl. ¶ 9; R.J. Decl. ¶¶ 1–9; R.M. Decl. ¶¶ 1–14; *see also* ECF No. 93-6 (Clark Decl.) ¶¶ 3, 6; Dhawan-Maloney Decl. ¶ 15.   Indeed, many of the arrests occurred in a context strongly indicating that the individual had community ties and would not flee, such as where the person was at work, shopping for family, or at home.  *See, e.g.*, Javier Doe Second Decl. ¶ 1; Martinez Garcia Decl. ¶¶ 3, 5, 9; A.A. Decl. ¶ 2; Aguirre Castrejon Decl. ¶¶ 2–3; Moreno Decl. ¶¶ 3–5; *see also* Griffith Decl. ¶¶ 12, 13.  Courts have long construed probable cause of flight risk under Section 1357(a)(2) to require evidence of a specific intent to flee or of an individual's lack of ties to the community.  Mot. at 23 (collecting cases); *Sara T.,* No. 0:26-cv-00462, ECF No. 7 at 5.

Defendants have not provided any evidence that they established probable cause of flight risk as to *any* arrest initially put forward by Plaintiffs.  Defendants argue that

---

[2] Even if Agent Berry perceived Mr. Hussen as fleeing on initial encounter, Opp'n at 21, 31, 40, Mr. Hussen's repeated claims of U.S. citizenship and efforts to provide corroborating information should have obviated probable cause as to flight risk.

"[n]umerous contextual factors" may provide the basis for a probable-cause determination, Opp'n at 39, and that an "officer's on-the-scene judgments" are critical, Opp'n at 40. But they proffer no evidence whatsoever of such factors' presence or that officers on the scene made any such judgment. *See also infra* II.C. (further discussion of flight risk analysis).

Defendants provide, in response, a memorandum from Defendant Lyons dated thirteen days after the filing of this suit (the "Lyons Memo"). Defendants state that it "reiterates longstanding DHS policy that warrantless arrests require 'probable cause.'" Mot. at 38. But this claim to "longstanding policy" flies in the face of (1) the evidence as to the arrests here, including after the Lyons Memo's January 28 issuance, Clark Decl. ¶ 6, Griffith Decl. ¶ 20; *see also* C.L. Decl. ¶ 2 (stopped Jan. 29); (2) DHS's repeated statements, including after the filing of this lawsuit, *see* Shrinath Third Decl. Ex. 5 (article published Jan. 31, 2026, with DHS spokesperson issuing statement that DHS uses "'reasonable suspicion' to make arrests"); and (3) courts' repeated findings that DHS agents implement policies and practices in targeted jurisdictions of warrantless arrests without probable cause. *Ramirez Ovando v. Noem*, No. 1:25-cv-03183, 2025 WL 3293467, at \*15 (D. Colo. Nov. 25, 2025); *Escobar Molina*, 2025 WL 3465518, at \*26–27 (D.D.C. Dec. 2, 2025); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672 (E.D. Cal. 2025); *Castañon Nava v. Dep't of Homeland Sec.*, No. 18-cv-3757, 2025 WL 2842146, at \*21, 23 (N.D. Ill. Oct. 7, 2025). Like a "sham affidavit" that contains a "sudden and unexplained revision of testimony [and] creates an issue of fact where none existed before," Defendants cannot use a document they created in response to litigation to disprove Plaintiffs' allegations or rebut

Plaintiffs' significant evidence.  *Button v. Dakota, Minnesota & E. R.R. Corp.*, 963 F.3d 824, 830 (8th Cir. 2020).

Further, at most the Lyons Memo is a further admission that ICE has a policy and practice of *not* making individualized probable-cause determinations that meet the legal standard of Section 1357(a)(2)'s flight-risk prong.[3]  For example, the Memo seemingly sweeps in anyone stopped in a traffic stop or even on the street: "age and health" and "ability and means to promptly depart the scene" are permissible flight risk factors.  ECF No. 85-1 at 4.  But there's no reason that these factors would make it less likely that agents with a warrant could locate this person in a "clearly identifiable location."  *Id.*  Further, the Memo seeks to render community ties irrelevant, even though community ties make it more likely that an individual will be located at a specific place in the community.  Mot. at 23; *see also Escobar Molina*, 2025 WL 3465518, at *13; *Sara T.*, No. 0:26-cv-00462, ECF No. 7 at 5.

In short, the Lyons Memo does not and could not meaningfully change the analysis.  The evidence that Defendants systematically implement a policy and practice of making warrantless arrests with less than probable cause as to flight risk and as to removability is overwhelming.

***

Defendants suggest without citation that standing requires a "written policy."  Opp'n at 16.  But this is unnecessary for injunctive relief, even when rights are deprived "pursuant

---

[3] Defendants and their counsel have previously referred to this prong as "flight risk." *E.g.*, *Escobar Molina*, ECF No. 50 (D.D.C., filed Oct. 31, 2025).

to a governmental 'custom'" that lacks "formal approval through . . . official decision making channels." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978). Plaintiffs have established that these policies and practices exist, whether or not written down, and that DHS agents are implementing them in the Twin Cities against Plaintiffs and putative class members.

   **B.    Plaintiffs Have Established a Real and Immediate Threat of Future Injury from Defendants' Stop and Arrest Policies.**

Plaintiffs have established a real and immediate threat of future injury. *Park* is instructive. There, the Eighth Circuit explained that assessing likelihood of future injury in this context requires assessing two criteria: "the probability that the plaintiff would" encounter law enforcement again and "the probability that" the officers would subject the plaintiff to the allegedly unlawful policy again. *Park*, 205 F.3d at 1038. The first criterion was satisfied where, within a year, the plaintiff "would visit a national forest and potentially come into contact with the Forest Service." *Id.* ("an upcoming annual event is sufficiently temporally proximate to be considered an 'immediate' threat"). In *Park*, the second criterion was not satisfied because there was "no indication in the record . . . that the Forest Service maintained an official policy of" such checkpoints, there was no indication that there was an "unofficial" or "institutional" "animus" that would make it likely that the plaintiff would be subjected to an unconstitutional checkpoint, and there was "very little evidence" of a pattern of prior unconstitutional checkpoints. *Id.* at 1038-40.

Here, both criteria are clearly satisfied. First, as to the probability of encountering law enforcement again: while in *Park* a single visit within a year was sufficient, Plaintiffs

and putative class members in this case live every day in cities saturated by DHS agents, and in neighborhoods where DHS agents deploy in force. Javier Doe Second Decl. ¶¶ 25, 27 (describing presence of ICE agents in neighborhood while driving to and from work, going to see family and friends, and going to the gym); Hussen Decl. ¶¶ 38-41 (describing seeing federal immigration agents on a daily basis in his neighborhood and being pepper sprayed while observing an arrest); Eydarus Decl. ¶¶ 6-7, 33 (ongoing work in same neighborhood, including at location of stop); *see also, e.g.*, Antony Doe Decl. ¶ 24 ("I still see federal agents where I live. They're around every day near my apartment complex, waiting for people to exit their apartments so they can pick people up."); E.G. Decl. ¶¶ 12, 14 (after being stopped by ICE, observing "similar looking cars with tinted windows driving through" his private neighborhood "several times"); E.M. Decl. ¶ 14 (after being stopped, stating: "I have seen or heard of agents in the same areas of my neighborhood several times"); S.P. Decl. ¶ 11 ("Since [being stopped], while driving around, I have seen cars at least three times that I think might be agents."). An ICE agent told R.M., after arresting R.M. outside of his own home: "I don't care if you're a citizen, next time I'm going to take you. I don't care if I have to do extra paperwork." R.M. Decl. ¶ 14; *see also, e.g.*, ECF No. 36 (Sharkey Decl.) ¶¶ 9, 11; K.D. Decl. ¶ 16; Anthony Doe ¶ 24; M.G. Decl. ¶ 10 ("ICE agents have been in my neighborhood almost daily. I believe the ICE agents are here so often because it is a diverse neighborhood."); Jane Doe Decl. ¶ 13; M.M. Decl. ¶ 13 (observing "immigration agents in the parking lot" of a local "Latino market" "regularly").

13

And as to the second criterion, Plaintiffs have established the existence of unlawful policies and a clear, well-documented pattern of implementation. Indeed, the government has proclaimed Operation Metro Surge the "largest DHS operation ever," with thousands of federal agents deployed. ECF No. 48-8 (Shrinath Decl. Ex. 8). This massive force outnumbers the Minneapolis Police Department five to one and includes "nearly one agent for every 1,000 of the Twin Cities' 3.2 million residents."[4] Exacerbating the risk, these agents are particularly targeting the 76,320 Somali and 388,435 Latino residents of the Twin Cities. ECF Nos. 48-9, 48-10 (Shrinath Decl. Exs. 9-10); *cf.* ECF No. 92-15 (J.J. Decl.).[5] DHS agents are deployed in force to neighborhoods in which Plaintiffs and putative class members live and work. *Supra*.

Further, Plaintiffs and putative class members have been arrested while engaging in quotidian, daily activities sure to recur. *Park*, 205 F.3d at 1037. They are being stopped while outside their homes, Dahir Decl. ¶ 6; E.G. Decl. ¶ 3; R.M. ¶ 6; shoveling show, Eydarus Decl. ¶¶ 6-8, and at or going to or from work, Javier Doe Second Decl. ¶¶ 2-3; Hussen Decl. ¶ 5; C. Castillo Decl. ¶¶ 4-5; Antony Doe Decl. ¶ 2; F.A. Decl. ¶ 6; T.G. Decl. ¶ 2. They are also stopped when shopping, A.A. Decl. ¶ 2, Aguirre Castrejon ¶ 2; H.S. Decl. ¶ 3; K.D. Decl. ¶ 2; M.M. Decl. ¶ 2; S.S. Decl. ¶ 5; when taking out the trash, M. Castillo Decl. ¶ 2; when walking down the street, Osman Decl. ¶ 6; and when driving or parked, Luisa Doe Decl. ¶ 2; C.L. Decl. ¶¶ 4–5; C.M. Decl. ¶ 2; Jane Doe Decl. ¶ 6; E.M.

---

[4] ECF No. 57-5 (Shrinath Exhibit 5).

[5] This focus is not exclusive: DHS agents also appear to be targeting AAPI individuals. ECF No. 104 (A.P. Decl.); C.L. Decl.; T.G. Decl.; ECF No. 92-6 (V.N. Decl.); *see also* Javier Doe Second Decl. ¶ 15.

Decl. ¶ 6; M.G. Decl. ¶ 2; N.G. Decl. ¶ 2; R.J. Decl. ¶ 3; S.P. Decl ¶ 2. Such "exposure" to the government's illegal stops and arrests "while going about one's daily life . . . constitutes 'ongoing harm and evidence that there is "sufficient likelihood" that the Plaintiffs' rights will be violated again.'" *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012).

None of the cases on which Defendants rely are to the contrary. Defendants point to *Noem v. Vasquez Perdomo*, 146 S. Ct. 1 (2025), to argue that even with ongoing actions, plaintiffs are insufficiently likely to suffer future injury. Opp'n at 17. But of course, the Supreme Court's order in *Vasquez Perdomo* contains no reasoning, discussion, or findings about the *Vasquez Perdomo* plaintiffs' standing. And *Vasquez Perdomo* is, in any event, meaningfully different from this case.

For one thing (among many others), in *Vasquez Perdomo*, Plaintiffs alleged that DHS agents relied on unlawful factors in combination. *See* 146 S. Ct. at 3 (Kavanaugh, J., concurring). Any redressability concerns there as to the precise permutation of factors, and DHS agents relying on others to apprehend in future, are alleviated here—where the policies at issue are stops without *any* determination of reasonable suspicion and warrantless arrests without *any* probable cause. *Compare Escobar Molina*, 2025 WL 3465518 at *15; *Ramirez Ovando*, 2025 WL 3293467 at *15; *United Farm Workers*, 785 F. Supp. 3d at 734.

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), and *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), are further afield. In *Clapper*, Plaintiffs alleged standing based on fear "that the Government w[ould] target *other individuals*." 568 U.S. at 411. And

*Lyons* did not involve policies and practices deployed by thousands of agents indiscriminately. There, the Supreme Court explained there that the plaintiff could avoid being subject to any future unlawful action, even if he encountered the police, by "acting within the law." *Lyons*, 461 U.S. at 103. Here, by contrast, the indiscriminate nature of DHS's stops and arrests means that Plaintiffs and class members going about their daily lives cannot avoid being subject to Defendants' unlawful policies and practices.

### C.    Plaintiffs Independently Have Standing Due to Ongoing Injuries from the Challenged Policies

Plaintiffs also have standing, independently, due to ongoing harm: DHS's illegal policies are forcing them, and putative class members, to alter their lives in new and painful ways. Regardless of whether Plaintiffs are stopped or arrested again, they are taking reasonable steps to avoid the kinds of violations that Minnesotans continue to experience on a daily basis. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 154-55(2010) (finding standing for farmers who had to "conduct testing" and "take certain measures to minimize the likelihood of potential contamination" due to a government policy, "even if their crops [we]re not actually infected" due to the policy).

Plaintiffs similarly face ongoing injury. Plaintiffs are experiencing ongoing psychological harm, physical effects, and interference with sleep and work from DHS agents' continued policies and practices, particularly because they must return to the neighborhoods of their encounters for work. Plaintiff Javier Doe explains: "I feel very anxious, angry and nervous. I have had difficulty sleeping. I feel vulnerable and scared all the time." Javier Doe Second Decl. ¶ 22; *see also id.* ¶ 27. Plaintiff Hussen regularly hears

screaming from people's encounters with DHS agents, and, when this occurs, his "heart starts beating fast and [he] can't breathe." Hussen Decl. ¶ 39. He explains the "terrifying" feeling: "It brings me back to what I went through, and it almost feels like [it] is happening to me again." *Id.* Plaintiff Eydarus explains that he is "still constantly stressed and afraid" and has been unable to sleep and unable to focus on tasks at work, to the extent that his coworkers have noticed, and that his mother and younger brother have also exhibited anxiety following the stop. Eydarus Decl. ¶¶ 32, 36. When Mr. Eydarus returns to the street where he and his mother were stopped, as he must for work, he is "constantly on guard and looking over my shoulder to make sure ICE agents are not sneaking up on [him] or trying to grab [him]." *Id.* ¶ 33.

The same is true for members of the putative class. As a result of Defendants' policies, class members are afraid to leave their homes. Jane Doe Decl. ¶¶ 31-32; K.D. Decl. ¶ 14; T.G. Decl. ¶ 7; E.G. Decl. ¶ 14; Antony Doe Decl. ¶ 21. They struggle to sleep. M.G. Decl. ¶ 7; Antony Doe Decl. ¶ 21. They have changed the documentation that they carry. C.L. Decl. ¶¶ 15–16 ("We had copies of both our birth certificates and social security cards on one page, because we heard that people were being harassed by ICE because they are not white."); F.A. Decl. ¶ 20; Jane Doe Decl. ¶ 14. They are changing their travel and shopping patterns. K.D. Decl. ¶ 14; S.P. Decl. ¶ 11; M.M. Decl. ¶ 13; *see also* V.N. Decl. ¶ 14. And, as in *Monsanto*, they are incurring financial costs "'to mitigate or avoid' the 'substantial risk' of harm caused" by the Defendants. *Bost v. Ill. State Bd. of Elections*, 2026 WL 96707, *5 (Jan. 14, 2026); Antony Doe Decl. ¶ 21 ("I am not working, and I have lost wages as a result."); R.J. Decl. ¶ 22 ("When this happened to me I had a second job

making deliveries for Amazon, but quit that job after it happened. I know immigration agents target Amazon and other delivery drivers, so I don't think it is safe for me to do that anymore."); M.G. Decl. ¶ 7 ("I have had to take time off from work.").

These ongoing injuries support prospective standing. *See Ramirez Ovando v. Noem*, No. 1:25-cv-03183-RBJ, 2025 WL 3293467, at *11 (D. Colo. Nov. 25, 2025).[6]

## II. Plaintiffs Have Established Defendants' Stops and Arrests Pursuant to Their Policies and Practices Violate the Fourth Amendment and Section 1357(a)(2).

### A. Defendants' Policy and Practice of Conducting Stops Without Reasonable Suspicion Violates the Fourth Amendment.

Defendants provide *no* information justifying a stop for the vast majority of Plaintiffs and declarants—confirming that Defendants have a policy and practice of conducting immigration stops without an individualized determination of reasonable suspicion. For example, DHS agents grabbed Declarant Osman while he was walking down the street and forced him into an unmarked vehicle despite his efforts to show them identification. Osman Decl. ¶¶ 7-15. Defendants do not dispute that account, arguing solely that Mr. Osman "was briefly detained while officers confirmed his identity," Opp'n at 32—conceding at least a *Terry* stop while providing no individualized reasonable suspicion.

---

[6] Further, reliance on injury of now-putative class members is appropriate in issuing preliminary injunctive relief, with provisional class certification or issuance of temporary relief to a putative class. *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 990 (D. Minn. 2006) ("[It] is appropriate for the Court to consider the threat of irreparable harm to the putative class members.") (collecting cases); *LaDuke v. Nelson*, 762 F.2d 1318, 1325 (9th Cir. 1985) (immigration enforcement class action relying on *Sosna v. Iowa*, 419 U.S. 393 (1975)); *A.A.R.P. v. Trump*, 605 U.S. 91, 95, 97 (2025).

Defendants' explanations for stops of other Plaintiffs and declarants are also patently deficient. Defendants do not even attempt to justify their stop of Mr. Aguirre Castrejon, a lawful permanent resident, and his niece, a U.S. citizen. Aguirre Castrejon Decl. ¶¶ 2-10. For two other stops, Defendants claim reasonable suspicion because the Latino drivers were "driving on their way to work/worksites." Opp'n at 32. But they provide no explanation as to why DHS could possibly have reasonable suspicion to pull over any driver (or any Latino driver) on their way to work, and no evidence that DHS agents in fact knew this information when they pulled over the driver. For one Latino U.S. citizen and one Latino permanent resident, Defendants claim only that they "were encountered at construction worksites that traditionally indicate illegal aliens." Opp'n at 32. Defendants provide *no* evidence to back up their assertion regarding construction sites; indeed, it is estimated that only 7.7% of construction workers are foreign-born in Minnesota—and the undocumented percentage is necessarily less. Shrinath Third Decl. Ex. 4. Finally, Defendants claim A.A., snatched from a Walmart parking lot post-shopping, A.A. Decl. ¶ 15, was "[s]topped based on misidentification," Opp'n at 32, but again provide no evidence.

For several investigatory stops, Defendants make no assertion of reasonable suspicion but instead erroneously attempt to recharacterize them as consensual encounters because they were "interactions with federal immigration agents in public places where individuals were asked for identification." Opp'n at 30. But in fact, the actual

circumstances of these stops make clear that each person was not free to leave. In this context, such questioning is a seizure, not a consensual encounter.[7]

It is bedrock Fourth Amendment law that a seizure occurs where, in the totality of the circumstances, the "coercive effect of [DHS agents'] conduct" leads "a reasonable person" to "believe[] that he [i]s not free to leave." *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008) (cleaned up). This includes where law enforcement questions individuals, if "a reasonable person would have believed he was not free to leave if he had not responded." *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984); *United States v. Vera*, 457 F.3d 831, 834-35 (8th Cir. 2006) (for questioning to be consensual, the "reasonable person" must "feel free to decline").

In each of these purportedly consensual stops, DHS agents indicated that "the person is the particular focus of an investigation"—a fact that weighs in favor of a finding that the individual was not free to leave. *Griffith*, 533 F.3d at 983. In particular, the DHS agents made clear that they were focused on investigating Plaintiffs' and declarants' immigration status. For example, when DHS stopped Plaintiff Eydarus, agents immediately told him "they needed to see [his] identification to make sure [he] was 'not illegal.'" Eydarus Decl. ¶ 16; *see also* M. Castillo Decl. ¶ 7 (first question from DHS: "you got a birth certificate?"); Dahir Decl. ¶¶ 11-12 (questioning citizenship and taking passport card for investigation); C. Castillo Decl. ¶¶ 8, 11 (asking for identification, scanning passport, and arresting

---

[7] Notably, Defendants provide no basis for why DHS agents approached *these particular* individuals, all of whom are Somali or Latino, for a purportedly consensual interaction. *See, e.g.*, C. Castillo Decl. ¶ 14.

undocumented coworker).  This is no different from a DEA agent asking an airport traveler if they have drugs, thus indicating that a person is "the particular focus of a narcotics investigation."  *United States v. Nunley*, 873 F.2d 182, 185 (1989); *United States v. Drinkard*, 900 F.2d 140, 142 (8th Cir. 1990) (similar); *cf. United States v. Villa-Gonzalez*, 623 F.3d 526, 528 (8th Cir. 2010) (statement that officer believed individuals "were drug dealers" made the "encounter more coercive").

There is substantial additional (and uncontroverted) evidence in the record that these were not consensual encounters.  Mot. at 12-14.  Agents *explicitly* told Mr. Dahir, twice, that he was not free to leave.  Dahir Decl. ¶¶ 15, 16.  "Several" armed agents "surrounded" Mr. Eydarus and his mother and directed bystanders "to stand back or they would be arrested."  Eydarus Decl. ¶¶ 16-19.  Armed agents from SUVs with flashing lights boxed in Ms. Castillo's car, approached her on the sidewalk, and "ordered [her] to stand where [she] stood and not move."  C. Castillo Decl. ¶¶ 5-6.  When Mr. Castillo asked for agents to return his driver's license, they "told [him] to stay where [he] was" and made him wait for 20-30 minutes in the cold before returning the license and ending the stop.  M. Castillo Decl. ¶ 11.  "A reasonable person would not believe that he was free to leave a scene where three uniformed officers . . . stood closely at either side of him, and took possession of his personal property—here, his driver's license—while conducting a brief interrogation." *United States v. Johnson*, 326 F.3d 1018, 1022 (8th Cir. 2003).  So too in each of these stops.

In fact, Defendants' characterization of Javier Doe's stop and arrest demonstrates that such questioning is not a mere consensual encounter.  Defendants claim that DHS was

21

justified in detaining Javier Doe because he "refused to answer questions when approached by federal immigration agents." Opp'n at 32. But if declining to answer questions is the basis for detention, then the initial questioning itself is not a consensual encounter. *Cf. Berkemer v. McCarty*, 468 U.S. 420, 439–40 (1984). Defendants provide no basis for agents singling out Javier Doe for a citizenship inquiry. Defendants' argument that Javier Doe attempted flight, Opp'n at 32, is unsupported by any evidence and nonsensical: he was walking into his place of employment, which Defendants could also enter. Javier Doe Second Decl. ¶ 5.

Defendants argue that the officer who arrested Mr. Hussen perceived him as fleeing. Opp'n at 31 (citing Berry Decl.). Even if so, given DHS agents' abuses in Minnesota—including suspicionless stops, use of force, and arrests without probable cause targeting Somalis—and the administration's remarks about the Somali community, make it understandable, and not indicative of any violation of law, that an individual in Mr. Hussen's position would seek to avoid such agents. Hussen Decl. ¶ 36; *see* A.P. Decl. ¶¶ 3-9. And in any event, Mr. Hussen's repeated protestations that he is a citizen, *id.* ¶ 10, and his and his supervisor's efforts to show a copy of his passport card, *id.* ¶¶ 11-15, would have "dispel[led] reasonable suspicion" for a reasonable officer. *Kansas v. Glover*, 589 U.S. 376, 389 (2020). But *subsequently*, DHS agents drove Mr. Hussen to a second location where they held him for thirty minutes and then to an ICE office, where he was told he "was getting deported." Hussen Decl. ¶¶ 15-17, 23-26.

\*\*\*

Notably, Defendants argue generally that they may use race as a relevant factor, Opp'n at 24, 27, but they do not argue that they have in fact done so in any instance. Perhaps that is because the law is clear that they may not use perceived ethnicity as a generalized proxy, and furthermore the overwhelming majority of Somali and Latino Minnesotans are U.S. citizens. Mot. at 14-16; *accord Trump v. Illinois*, 146 S. Ct. 432, 436 (2025) ("[O]fficers must not make interior immigration stops or arrests based on race or ethnicity."). Plaintiffs allege that Defendants stop Minnesotans for investigation of immigration status, particularly targeting Somali and Latino Minnesotans. The crux of the Fourth Amendment violation is *Defendants' policy and practice of systemic stops without reasonable suspicion*—and the evidence amply demonstrates such a policy and practice.[8]

---

[8] Justice Kavanaugh's *Illinois* concurrence reiterates the rule that ethnicity cannot be the, or a basis for interior immigration stops. While that statement breaks no new legal ground, it does underline that Defendants' reliance on the same Justice's prior concurrence in *Noem v. Vasquez Perdomo*, 146 S. Ct. 1 (Mem) is inapposite. The *Illinois* footnote speaks directly to the situation addressed in this case, unlike the *Vasquez Perdomo* concurrence. For example, the *Vasquez Perdomo* concurrence assumed that stops for individuals "legally in the country" are "typically brief" and, implicitly, that they do not cause substantial harm, 146 S. Ct. at 5—assumptions belied by the record here. The record here reflects that more than 90% of Somalis and more than 75% of Latinos in Minnesota are U.S. citizens (and the percentage who are not includes lawful permanent residents, visa holders, and others with authorization to remain in the United States), whereas the *Vasquez Perdomo* concurrence contemplated "extraordinary" proportions of undocumented residents. The record here also makes clear that there is no basis to presume that individuals in specific jobs in Minnesota are undocumented. Nor have Defendants proffered any evidence that individuals who "do not speak much English," 146 S. Ct. at 3, are presumptively undocumented—and indeed many citizens and immigrants with affirmative status regularly speak a language other than English. *See, e.g.*, Eydarus Decl. ¶ 27 (two U.S. citizens speaking to each other in Somali.).

**B.  Defendants' Policy and Practice Conducting Arrests Without Probable Cause of Removability Violates Section 1357(a)(2).**

Plaintiffs have produced eleven declarations demonstrating a shocking and consistent pattern of arresting people—U.S. citizens and immigrants alike—without *any* evidence suggesting that they are removable, much less probable cause.  Mot. at 4–9; *see supra* I.A.

Defendants do not appear to contest that any arrests initially identified by Plaintiffs were in fact arrests.  Nor could they.  If a "detention lasts too long, or if the officers' conduct is too intrusive, then the stop is converted into an arrest."  *United States v. Dixon*, 51 F.3d 1376, 1380 (8th Cir. 1995).  In many of these instances, DHS agents forced the individual into a vehicle, often handcuffed—frequently holding them for a time at a second location or transporting them to an ICE facility.  *See* Javier Doe Second Decl. ¶¶ 13, 14, 17; Hussen Decl. ¶¶ 24-26; Osman Decl. ¶ 21; Aguirre Castrejon Decl. ¶¶ 15, 18; Martinez Garcia Decl. ¶¶ 12, 14; Moreno Decl. ¶¶ 10, 13, 16; A.A. Decl. ¶¶ 4, 5, 8; *see also* Antony Doe Decl. ¶ 11; H.S. Decl. ¶¶ 9–11; R.J. Decl. ¶¶ 9–11.  "[T]ransporting a suspect to another location or isolating him from others can create an arrest."  *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994).  So too can "unreasonable force," *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010), including handcuffs, *Pollreis v. Marzolf*, 9 F.4th 737, 745 (8th Cir. 2021).  As can delay where agents refuse to examine or accept documentation that readily confirms an individual's citizenship or immigration status.  *See Shqeirat v. U.S. Airways Grp., Inc.*, 645 F. Supp. 2d 765, 784 (D. Minn. 2009).

24

Defendants fail to justify their arrests of three U.S. citizens and four legal permanent residents as based on probable cause of removability. As described *supra* I.A, Defendants are systematically acting on the basis that where they do not know an individual's identity, they can arrest that individual *to determine it*. Their efforts to justify these arrests further confirm their unlawful policy.

As to Plaintiff Javier Doe, for instance, Defendants state that he did not provide citizenship information to officers on request and stated that he was a U.S. citizen "[o]nly after being detained." Opp'n at 41. But that is not probable cause for an arrest. Defendants provide no legal basis—nor could they—that declining to provide citizenship information alone provides probable cause of removability. *See, e.g.*, *Terry v. Ohio*, 392 U.S. 1, 35 (White, J., concurring) ("[T]he person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest[.]"). Moreover, Defendants continued to hold Javier Doe while ignoring his repeated assertions and evidence of citizenship. Javier Doe Second Decl. ¶ 8 (repeating "I am a U.S. citizen"); *id.* ¶¶ 11-16 (agents continued to hold Javier Doe after examining his passport).

Mr. Hussen's arrest is another example of Defendants' arrests to determine identity. Like Javier Doe, Mr. Hussen repeatedly told agents that he was a U.S. citizen, and both he and his supervisor at work attempted to provide documentation of his citizenship—but he was nevertheless driven to a second location, held for thirty minutes, and then held at an ICE office. Hussen Decl. ¶¶ 8-30. Defendants' claim that DHS agents arrested Mr. Hussen "to confirm his identity" when he declined a facial scan ignores Mr. Hussen's readily available documentation. *Id.* ¶¶ 11-15. And in any event, Defendants do not and cannot

cite any legal authority for the alarming proposition that DHS agents have probable cause for immigration arrests because people on American streets have declined a facial scan (or otherwise declined to reveal their identity).

Defendants' arrests of Declarants Osman, Aguirre Castrejon, Martinez Garcia, and Moreno—and their justification of each as pursuant to "confirming their identities," Opp'n at 41—further confirm Defendants' policy and practice of arrests without probable cause of removability. Indeed, these arrests were made not only without any individualized suspicion, but in disregard of affirmative indications that the targeted individuals were not in fact removable. Mr. Martinez Garcia repeatedly stated that he was a U.S. citizen and attempted to show a photo of his passport. Martinez Garcia Decl. ¶¶ 8-9, 13. Mr. Osman stated that he was legally in the country and attempted to provide identification. Osman Decl. ¶¶ 9-12. Mr. Aguirre Castrejon repeatedly stated that he was legally in the country. Aguirre Castrejon Decl. ¶¶ 12-13. Mr. Moreno showed agents his green card. Moreno Decl. ¶ 6. Defendants claim that as to two individuals, agents needed to "confirm[] the documentation they provided was not fraudulent," but they provide no basis for a reasonable officer's reasonable belief that these non-fraudulent documents were fraudulent—and, notably, no sworn declaration regarding probable cause. In a similar vein, Defendants assert that they arrested A.A. pursuant to "mistaken identity," with no sworn declaration providing further information. Defendants did not ask A.A. any questions and failed to look at the driver's license and green card in his wallet. A.A. Decl. ¶ 3. A.A.'s arrest only further highlights Defendants' policy of arresting individuals without probable cause—or, even, knowledge of their identity before their arrest.

26

C.    **Defendants' Policy and Practice of Conducting Arrests Without Probable Cause of Flight Risk Violates Section 1357(a)(2).**

Defendants proffer *no* argument as to individualized likelihood of escape for *any* arrest of any Plaintiff or declarant. Defendants make a conclusory, blanket assertion that "the circumstances behind each arrest demonstrate that" Plaintiffs and declarants "were arrested with probable cause that they . . . were an escape risk." Opp'n at 40. But they provide no evidence demonstrating any such probable cause for these arrests, and no evidence (such as arrest documentation) that arresting agents regularly make individualized flight risk determinations. The three I-213s submitted by Defendants do not contain such individualized determinations. Plaintiffs' evidence—unrebutted as to the individual stops—demonstrates that Defendants have a policy and practice of arresting individuals without an individualized determination of probable cause of flight risk, in violation of Section 1357(a)(2). *Supra* I.A.

III.    **The INA Does Not Bar Review.**

Defendants' jurisdictional arguments are meritless. *See Escobar Molina*, 2025 WL 3465518, at *18-22 (rejecting these same arguments); *United Farm Workers*, 785 F. Supp. 3d at 698-704 (E.D. Cal. Apr. 29, 2025) (same); *Nava v. DHS*, 435 F. Supp. 3d 880, 888-95 (N.D. Ill. 2020).

Sections 1252(a)(5) and (b)(9) apply to issues remediable on appeal of a "final order of removal." But an illegal stop or arrest is already complete by the time, months or years later, that a removal order is entered and appealed. The Supreme Court has therefore held that detention is collateral to the validity of any removal order, and so §§ 1252(a)(5) and

(b)(9) do not apply to claims challenging illegal detention. *See Nielsen v. Preap*, 586 U.S. 392, 402 (2019); *United Farm Workers*, 785 F. Supp. 3d at 704. Moreover, many people who are unlawfully stopped or arrested by DHS—including but not limited to U.S. citizens—will never be placed in removal proceedings at all. Under Defendants' reading, unlawful stops and arrests like the ones here would be effectively unreviewable.

Similarly, Section 1252(g) does not give Defendants a free hand to stop and arrest people in violation of federal law and the Constitution. It only bars review of "three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders,'" not "all claims arising from deportation proceedings." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (emphasis in original). But that text cannot be read to sweep in Plaintiffs' claims in this case. Plaintiffs simply are not challenging any of those three things—instead, they are challenging stops and arrests that violate clear limits in the Fourth Amendment and § 1357(a)(2). *Accord Escobar Molina*, 2025 WL 3465518, at *20-22; *Nava*, 435 F. Supp. 3d at 895.

## IV.    Plaintiffs Have Multiple Causes of Action, Including Under the APA.

Defendants argue that Plaintiffs are unlikely to succeed on the merits of their "APA Claim" due to lack of final agency action. Opp'n at 33-37. Defendants are wrong. To begin, Plaintiffs asserted equitable causes of action, in addition to causes of action under the APA. *See* Compl. ¶¶ 173, 180, 186, 192, 198. And it is well-established that authority to grant injunctive relief for violations of federal law is one of the historic equitable powers of the judiciary, *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326-27 (2015),

28

and encompasses violations of federal law by federal officers, *see Raz v. Lee*, 343 F.3d 936, 937 (8th Cir. 2003) (availability of injunctive relief in this context).

Plaintiffs' APA causes of action are also fully viable. The three challenged policies each "mark[] the consummation of the agency's decision-making process and . . . [are policies] by which rights or obligations have been determined, or from which legal consequences will flow." *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024).

The consummation prong of the final agency action requirement asks "whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue, or is, instead, only the ruling of a subordinate official, or tentative." *Auto-Mark, Inc. v. Consumer Product Safety Comm'n*, 2025 WL 2675798, at *6 (D. Minn. Sept. 18, 2025) (quoting *POET Biorefining, LLC v. E.P.A.*, 970 F.3d 392, 404 (D.C. Cir. 2020)). Here, Defendants' policies come from the top. DHS leadership's statements—including those of the Secretary of Homeland Security, the leader of its interior immigration enforcement component, and the commander of Operation Metro Surge—demonstrate that each of the challenged policies here is from the top, Mot. at 9–10, *supra* I.A; and they confirm that "the action[s] [are] official and presently in effect," *Planned Parenthood of Greater N.Y. v. HHS*, 2025 WL 2840318, at *17 (D.D.C. Oct. 7, 2025). Defendants do not even address these statements in their opposition.

Critically, an agency action may "be final despite taking a more informal form." *Planned Parenthood*, 2025 WL 2840318, at *17. For example, an agency action is final where "the record leaves no doubt" as to a policy constituting final agency action despite

the policy's "details" being "still unclear." *Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925, 929-30 (D.C. Cir. 2008); *see also R.I.L.-R. v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (policy need not be "in writing to be final and judicially reviewable"). Here, as in *Escobar Molina*, "the record as a whole leaves no doubt that defendants in practice have consummated a decisionmaking process that resulted in the implementation of" the three policies. 2025 WL 3465518 at *22 (internal citations omitted).

This case is thus unlike *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), where plaintiffs had challenged "continuing (and thus constantly changing) operations" unconnected to any "identifiable 'agency action,'" and sought "*wholesale* improvement" of an entire arena of Bureau of Land Management Work, rather than challenging discrete agency actions. *Id.* at 890-94 (noting plaintiffs' ability to challenge "individual actions" by agency, rather than a generalized challenge to the agency's management of public land classifications writ large). Here, Plaintiffs challenge discrete agency actions: the three policies. *Supra* I.A, II.

And legal consequences flow from the policies: they "inflict some legal injury upon the party seeking judicial review," either compelling affirmative action or prohibiting otherwise lawful action. *Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. U.S. Corps of Eng'rs*, 888 F.3d 906, 915 (8th Cir. 2018). Indeed, each of the Plaintiffs and declarants has *already* been injured by at least one of the policies. Defendants' arguments to the contrary are largely premised on their erroneous contention that the policies do not exist. *But see supra* I.A. Their argument that the policies will not "assuredly" affect Plaintiffs if they

encounter immigration agents is merely their standing argument in other garb and should be rejected.

## V. Plaintiffs and the Putative Class Are Experiencing Irreparable Harm, and the Equities and Public Interest Favor Plaintiffs.

Plaintiffs have demonstrated that Defendants' policies and practices inflict irreparable harm on Plaintiffs and the putative class.  *See* Mot. at 25–38; *see also* Griffith Decl. ¶¶ 13, 21.  Defendants do not seriously contest irreparable harm, instead reasserting their standing argument.  Opp'n at 43–44.

Defendants' assertion that an injunction would "usurp[]" executive authority over immigration enforcement and thus inflict "substantial governmental harm," Opp'n at 45, misstates both the law and Plaintiffs' requested relief.  *See Escobar Molina*, 2025 WL 3465518, *29-30 (rejecting similar arguments); *UFW*, 785 F. Supp. 3d at 741-42 (similar).  The government suffers no cognizable harm from being prohibited from continuing to implement policies that violate the Constitution and federal law.  Mot. at 28–29.

## VI. The Proposed Injunction's Scope Is Narrowly Tailored to Remedy the Specific Harms.

Defendants contradictorily criticize Plaintiffs' proposed injunction as both "untenable" judicial "micromanaging" and an impermissible "follow the law" injunction. Opp'n at 45-47.  It is neither.  Plaintiffs seek classwide relief "narrowly tailored to remedy only the specific harms shown."  *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022 (8th Cir. 2015); *Ramirez Ovando*, 2025 WL 3293467, *23.  And "a person of ordinary intelligence could reasonably know what is prohibited."  *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 791 (8th Cir. 2004).

The proposed injunction is in accord with similar injunctions issued against DHS's similar unlawful policies in other jurisdictions. *Escobar Molina*, 2025 WL 3465518, *38-40; *Ramirez Ovando*, 2025 WL 3293467, *23-25; *UFW*, 785 F. Supp. 3d at 742-43. An order enjoining the government from implementing an unlawful policy and practice is ordinary. *See, e.g.*, *Holt v. Hobbs*, 571 U.S. 1019, 1019 (2013). Further, the injunction's language, rather than being follow-the-law, makes clear that Defendants will violate this Court's order if they continue to carry out their unlawful policies. Isolated instances of individual agents failing to make the requisite individualized determinations would not suffice to constitute a violation—minimizing any concerns about micromanagement.

Critically, the injunction—like those in other jurisdictions—contains documentation and reporting requirements to facilitate compliance and monitoring. Defendants do not argue that these provisions amount to a follow-the-law injunction, nor could they. *See* Mot. at 29; *Escobar Molina*, 2025 WL 3465518, *37 (such injunctive provisions are critical, particularly in light of agency actions suggesting recalcitrance); *cf. Melendres v. Arpaio*, No. 2:07-cv-02513, Doc. 880 (D. Ariz. Feb. 12, 2015) (where injunction lacked monitoring and compliance provisions, continued unlawful immigration enforcement actions came to light only by happenstance years later).[9]

Defendants' suggestion that the proposed classwide injunction somehow sweeps in "nonparties" and that an injunction can only run to the named plaintiffs, Opp'n at 49, is nonsensical. An injunction's scope is what is "necessary to remedy the underlying wrong."

---

[9] If necessary post-hearing, supplemental briefing can resolve any concerns regarding the scope of the proposed order. *See Escobar Molina*, 2025 WL 3465518, *12.

*Coca-Cola*, 382 F.3d at 790, and classwide injunctions are ordinary. "[C]ourts may issue temporary relief to a putative class," even prior to certification. *A.A.R.P. v. Trump*, 605 U.S. 91, 98 (2025). Plaintiffs concomitantly seek class certification for the class of individuals subject to Defendants' policies: as to suspicionless stops, persons who have been or will be subject to an immigration investigatory stop in the Twin Cities. ECF No. 50 at 2. *Trump v. CASA, Inc.*, on which Defendants rely, involved relief sought in the *absence* of a class. *See* 606 U.S. 831, 869 (Kavanaugh, J., concurring).

Finally, Plaintiffs do not oppose a nominal bond. *See Escobar Molina*, 2025 WL 3466518 at *38; *Barbara v. Trump*, 790 F. Supp. 3d 80, 104 (D.N.H. 2025).

## CONCLUSION

The Court should grant a preliminary injunction or a stay of agency action.

33

Dated:  February 5, 2026

s/ Kshithij Shrinath

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT**

Kathryn Huddleston (*Pro Hac Vice*)
Lucia Goin (*Pro Hac Vice*)
915 15th Street NW, 7th Floor
Washington, D.C. 20005
T: (212) 549-2500
khuddleston@aclu.org
lgoin@aclu.org

Spencer Amdur (*Pro Hac Vice*)
Oscar Sarabia Roman (*Pro Hac Vice*)
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
samdur@aclu.org
osarabia@aclu.org

Omar C. Jadwat (*Pro Hac Vice*)
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
ojadwat@aclu.org

**COVINGTON & BURLING, LLP**

Robert Fram (*Pro Hac Vice*)
415 Mission Street, Suite 5400
San Francisco, CA 94105
rfram@cov.com
415-591-7025

Gregg Levy (*Pro Hac Vice*)
Paul Killebrew (*Pro Hac Vice*)
850 Tenth Street, NW
Washington, DC 20001
glevy@cov.com
pkillebrew@cov.com

**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**

Teresa Nelson (#269736)
Catherine Ahlin-Halverson (#350473)
Alicia Granse (#400771)
Benjamin Casper (#0276145)
P.O. Box 14720
Minneapolis, MN 55414
Tel: (651) 529-1692
tnelson@aclu-mn.org
cahlin@aclu-mn.org
agranse@aclu-mn.org
bcasper@aclu-mn.org

Ian Bratlie (#319454)
424 N. Riverfront Dr. No. 34
Mankato, MN 56001
Tel: (507) 995-6575
ibratlie@aclu-mn.org

**GREENE ESPEL PLLP**

Amran A. Farah, Reg. No. 0395354
Aaron P. Knoll, Reg. No. 0393066
Benjamin Larson, Reg. No. 0504146
Michelle E. Morrow, Reg. No. 0504419
Nicholas Scheiner, Reg. No. 0402470
Kshithij Shrinath, Reg. No. 0505164
X. Kevin Zhao, Reg. No. 0391302
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
afarah@greeneespel.com
aknoll@greeneespel.com
blarson@greeneespel.com
mmorrow@greeneespel.com
nscheiner@greeneespel.com
kshrinath@greeneespel.com
kzhao@greeneespel.com
(612) 373-0830

Bree Peilen (*Pro Hac Vice*)
30 Hudson Yards
New York, NY 10001
bpeilen@cov.com

**ROBINS KAPLAN, LLP**

Raoul Shah, Reg. No. 0399117
Bahram Samie, Reg. No. 0392645
Ellen Levish, Reg. No. 0400878
Stacey Slaughter, Reg. No. 0296971
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
rshah@robinskaplan.com
bsamie@robinskaplan.com
elevish@robinskaplan.com
sslaughter@robinskaplan.com
(612) 349-8500

*Attorneys for Plaintiffs*