## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| MUBASHIR KHALIF HUSSEN, MAHAMED EYDARUS, and JAVIER DOE<br>*on behalf of themselves and others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; DAVID EASTERWOOD, *in his official capacity as U.S. Immigration and Customs Enforcement Field Office Director for St. Paul, Minnesota*; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection*; U.S. BORDER PATROL; MICHAEL W. BANKS, *in his official capacity as Chief of U.S. Border Patrol*; and GREGORY BOVINO, *in his official capacity as Commander-at-Large of U.S. Border Patrol*,<br><br>Defendants. | Case No. 0:26-cv-324-ECT-ECW<br><br><br>**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PROVISIONAL CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL** |

## INTRODUCTION

Operation Metro Surge is unprecedented in scale. Where 80 Immigration & Customs Enforcement (ICE) officers once worked in the Twin Cities metropolitan area, over 2,000 federal agents now flood the streets. Between December 1, 2025 and January 22, 2026, a staggering *344* habeas petitions alleging unlawful detentions were filed in Minnesota federal court—nearly as many as the combined total from 2016 to 2024.[1] And although the precise number of agents fluctuates, Defendants have stated that this operation has no end date.

The evidence shows that Defendants are implementing three unlawful practices and policies in this operation:

- making immigration stops without an individualized determination of reasonable suspicion that the individual is a removable noncitizen;

- making immigration arrests without a warrant and without a pre-arrest determination of probable cause of removability;

- making immigration arrests without a warrant and without a pre-arrest, individualized determination of probable cause of flight risk.

---

[1] *See* Third Decl. of Kshithij Shrinath Supp. Pls.' PI and Class. Mot. ("Third Shrinath Decl.") Ex. 12, Sarah Nelson & Jeffrey Meitrodt, *Wave of Immigrants File Lawsuits To Fight Ice Detention*, Star Trib. (Jan. 22, 2026), https://www.startribune.com/wrongful-detainment-complaints-spike-during-ice-surge/601567955.

These systematic policies and practices have ensnared thousands of people within the Twin Cities metropolitan area, including U.S. citizens and individuals with legal immigration status, and continue to do so every day.

The proposed classes satisfy the requirements of Rule 23, and class-wide preliminary injunctive relief is appropriate. The Court should grant Plaintiffs' motion for class certification.

## SUMMARY OF ARGUMENT

Class certification is proper because Plaintiffs satisfy the Rule 23(a) factors and have demonstrated, with evidence, that Defendants have "acted or refused to act on grounds that apply generally to the class," such that "final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Defendants do not dispute that actions (like this one) that seek to enjoin unlawful government policies and practices are particularly appropriate for class certification. *See Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980). Nor do Defendants dispute that courts around the country have certified similar classes in similar cases challenging Defendants' unlawful stops and arrests policies. *See Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. 25-3417 (BAH), 2025 WL 3465518, at *38 (D.D.C. Dec. 2, 2025); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 742–43 (E.D. Cal. 2025) (similar); *Ramirez Ovando v. Noem*, No. 1:25-cv-03183-RBJ, 2025 WL 3293467, at *12–14 (D. Colo. Nov. 25, 2025). Defendants do not even *acknowledge* these decisions, much less attempt to distinguish them.

Instead, Defendants raise three arguments opposing class certification, along with the same faulty no-standing argument that they raised in opposing a preliminary injunction.

As explained in the preliminary injunction reply brief, Plaintiffs have standing. This memorandum demonstrates why Defendants' class-specific arguments fail.

**First**, Defendants contend that, because Plaintiffs have only *alleged* that a policy and practice exist, Plaintiffs fail the commonality requirement in Rule 23(a) and the cohesiveness requirement in Rule 23(b)(2). But, in fact, a voluminous record establishes the existence of Defendants' unlawful policies and practices, including Defendants' own admissions and over three dozen sworn witness declarations. Put simply, the Court does not need to make individualized legal determinations about every stop and arrest to determine whether Defendants' *policies and practices* are lawful. That common question can, and should, be answered on a class-wide basis. *See Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1038–40 (8th Cir. 2018). Any factual variation in individual cases does not change the reality that, at wide scale, Defendants are implementing three metro-wide policies and practices that violate the law.

**Second**, Defendants argue that the classes and subclasses are overbroad because they include persons who were lawfully stopped or arrested. But the common question before the Court is not whether *every* stop or arrest was legal; it is whether Defendants' policies are unlawful. Stated differently, *every* putative class member is subject to Defendants' unlawful policies, patterns, and practices, regardless of whether their individual stop or arrest was lawful. That is enough for class certification under Rule 23(b)(2). *See Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) ("Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate."); 7A Wright & Miller, Federal Practice and Procedure § 1775 (3d ed.)

4

("All the class members need not be aggrieved by or desire to challenge defendant's conduct in order for some of them to seek relief under Rule 23(b)(2).").

Still, if the Court concludes that any class is overbroad, "[t]he Court has significant discretion to modify the class definition, even at the certification stage." *Deutsch v. My Pillow, Inc.*, No. 20-cv-00318 (SRN/ECW), 2023 WL 3125549, at *31 (D. Minn. Apr. 27, 2023); *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 267 F.R.D. 549, 558 (D. Minn. 2010), *aff'd*, 644 F.3d 604 (8th Cir. 2011) ("The Court has the authority to redefine a proposed class in such a way as to allow the class action to be maintained."). Specifically, as explained below, the Court has the discretion to re-define and narrow the classes by explicitly referring to Defendants' policies, as numerous other courts have done. *See, e.g.*, *United Farm Workers*, 785 F. Supp. 3d at 712–14; *Ramirez Ovando*, 2025 WL 3293467, at *12, 23. For example, the Court could certify a narrower "Stops" Class, limiting it to those who have been or will be subject to Defendants' policy and practice of conducting investigatory stops without individualized assessments of reasonable suspicion. Similarly, the Court could certify the "Arrests" Subclasses instead of the broader class.[2]

**Third**, Defendants argue that the named Plaintiffs are both inadequate and atypical because they are U.S. citizens and were, for example, released within hours of their arrest

---

[2] Plaintiffs seek provisional class certification for the limited purpose of obtaining preliminary injunctive relief. *See* Pls.' Class Mem. at 24 (ECF No. 52). Because Plaintiffs seek to preliminary enjoin Defendants' unlawful policies and practices in the Twin Cities metro area, Plaintiffs seek provisional class certification for the same geographic area. Plaintiffs have filed a revised proposed order reflecting this narrowing. Plaintiffs reserve the right to seek broader relief and class certification later in the litigation.

and detention. But Defendants' focus on the *post*-stop and *post*-arrest conduct is misguided. Only Defendants' *pre*-arrest and *pre*-stop conduct is at issue. That improperly stopped and detained U.S. citizens were belatedly released into freezing temperatures only further establishes the existence of common policies and practices that do not require reasonable suspicion or probable cause. Regardless of a person's citizenship or status, the legal violations are the same.

## ARGUMENT

### I.    Defendants Are Implementing Three Unlawful Policies and Practices.

The record evidence demonstrates that, as part of Operation Metro Surge, Defendants have, and are continuing to implement, three policies and practices.

**The Suspicionless Stops Policy:** Defendants have a policy and practice of subjecting persons in the Twin Cities metro area to investigatory stops for immigration purposes without individualized reasonable-suspicion determinations.

Based on their own statements, DHS officials are directing agents to conduct investigatory immigration stops without reasonable suspicion. ICE's Acting Executive Associate Director Marcos Charles said that federal officers in Minnesota are "authorized to talk to anybody" around the area where they are operating "and establish citizenship."[3] And DHS Secretary Kristi Noem confirmed that Americans can be detained merely for

---

[3] Third Shrinath Decl. Ex. 3, Cecilia Vega et al., *Minneapolis police chief fears possible 'moment where it all explodes' as ICE operation continues*, CBS News (Jan. 18, 2026), https://www.cbsnews.com/news/minneapolis-police-chief-worries-about-escalating-tensions-with-ice-60-minutes-transcript.

being *near* a suspected immigrant.[4]  In addition to Defendants' admissions, Plaintiffs have

submitted substantial evidence demonstrating that this policy and practice exist:

- While shoveling snow, Plaintiff Eydarus and his mother were surrounded by several armed ICE agents who demanded identification. Eydarus Decl. ¶¶ 10–11, 16 (ECF No. 42); *see* Dahir Decl. ¶¶ 6, 9 (similar) (ECF No. 32); K.D. Decl. ¶¶ 4, 8–9 (similar) (ECF No. 92-13).

- Declarant Mark Castillo was taking out the trash when ICE vehicles and officers cornered him and demanded his birth certificate. Even though he showed his identification, Castillo was forced to stand in the cold for nearly 30 minutes before an officer told him to move back to Texas. Mark Castillo Decl. ¶¶ 2, 5–11 (ECF No. 43).

- Declarant F.A. was wearing a hijab while driving when she was completely blocked by two DHS vehicles; the officers that emerged demanded her identification and accused her of using a fake driver's license. F.A. Decl. ¶¶ 9, 11, 14–15, 21 (ECF No. 93-2); *see also* PI Reply at 2–6 (additional examples).

**The Arrests Without Probable Cause of Removability Policy:** Defendants have

a policy, pattern, and practice of arresting persons in the Twin Cities metro area for

immigration purposes without warrants and without pre-arrest, individualized, probable

cause determinations.

Defendants, including DHS spokesperson Tricia McLaughlin on the day that this

lawsuit was filed, and even more recently, have stated that they arrest based on "reasonable

suspicion" of removability, rather than probable cause.[5] And Plaintiffs' and supporting

declarants' experiences demonstrate that arrests occur without reasonable suspicion, much

less the higher, correct standard of probable cause:

---

[4] ECF No. 48-12.

[5] ECF Nos. 57-11 to -16; *see* Third Shrinath Decl. Exs. 5–11.

- DHS agents handcuffed Plaintiff Javier Doe and, even after he said he was a citizen, pushed him into an unmarked vehicle, drove him around, and held him in the vehicle even after seeing his passport, which was in his jacket pocket the whole time. Second Javier Doe Decl. ¶¶ 8–11 (ECF No. 30).

- Declarant A.A. was grocery shopping when DHS agents handcuffed him, threw him in a car, and drove him for 30 minutes to a second location before any officer sought to see his green card, again in his wallet the entire time. A.A. Decl. ¶¶ 2–4, 6 (ECF No. 37).

- Declarant Moreno was at a worksite when officers demanded his identification; even though he showed them his green card, they accused him of showing fake papers, handcuffed him, and took him to the ICE office at Fort Snelling before releasing him. Moreno Decl. ¶¶ 3, 5–16 (ECF No. 44); *see also* PI Reply at 6–8 (additional examples).

**The Arrests Without Probable Cause of Flight Risk Policy:** Defendants have a policy and practice of arresting persons in the Twin Cities metro area for immigration purposes without warrants and without pre-arrest, individualized determinations of probable cause that they are likely to escape before a warrant can be obtained. Plaintiffs submitted sixteen declarations from Plaintiffs and putative class members (and one of a witness) in which Defendants did not provide any evidence of a specific intent to flee and in which DHS officers did not inquire into ties to the community. *See* PI Reply at 8–10. And Acting ICE Director Todd Lyons' memorandum, issued thirteen days after this litigation began, only further confirms Defendants' policy and practice. *Id.* at 10–11.

## II.    Plaintiffs Have Standing to Pursue Injunctive Relief.

For the reasons explained in Plaintiffs' preliminary injunction reply brief, Plaintiffs have Article III standing to pursue their claims and those of the absent class. *See* PI Reply

at 1–18. To avoid repetition, Plaintiffs incorporate their standing arguments here and will address two class-specific standing arguments.

First, Defendants cite *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), apparently for the proposition that the Court should disregard injury to class members when considering whether standing exists for prospective relief. Defs.' Class Opp'n at 16 (ECF No. 86). Even if *Spokeo* governs standing for existing harm, it does not control how a court should consider the likelihood of future injury at the preliminary injunction stage. *Cf. A.A.R.P. v. Trump*, 605 U.S. 91, 95, 97 (2025) (accounting for harm to putative class members in providing preliminary relief). Nor is it applicable where, as here, Plaintiffs themselves have established a clear risk of imminent future injury.

Second, with no accompanying analysis, Defendants cite *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023 (8th Cir. 2010), apparently for the principle that a named plaintiff cannot represent class members without standing. Defendants' reliance on *Avritt* is misplaced. Defs. Class Opp'n at 16. The cited language concerned California's Unfair Competition Law, which required only the named plaintiffs, not all class members, to show injury to seek damages. *Avritt* said nothing about standing for prosecutive injunctive relief. Moreover, to the extent that the Court is concerned about an overbroad class that may include individuals who were not personally subject to an unlawful stop or arrest, it may narrow the class, for example, by certifying only the Arrests Subclasses. *See infra* Section IV.

III.    **Plaintiffs' Proposed Classes Satisfy the Requirements of Rule 23(a).**

    A.    **Plaintiffs meet the numerosity requirement.**

Defendants cannot seriously contest that the classes are "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). To determine numerosity, the court may consider the size of the class, the nature of the action, and "any other factor relevant to the practicability of joining all the putative class members." *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559-60 (8th Cir. 1982). And as Defendants concede, the Eighth Circuit does not require a particular number for numerosity, although it has approved classes as small as twenty. *See, e.g.*, *Ark. Ed. Ass'n v. Bd. of Ed. of Portland Sch. Dist.*, 446 F.2d 763, 765–66 (8th Cir. 1971).

Defendants' policies operate on a scale that includes hundreds, if not thousands, of class members. As to the Stops Class, nearly 2,000 additional ICE federal immigration officers are in Minnesota to execute Operation Metro Surge, in contrast to the 80 officers that "[t]ypically" cover ICE's operation in the Twin Cities. *See* Bottjen Decl. ¶ 9 (ECF No. 82). Defendants have instructed these officers that, "if they encounter anybody in the area of which they're operating, they are OK to talk to those people. They've been authorized to talk to anybody that's around there and establish citizenship."[6] And DHS Secretary Noem has confirmed that Americans can be "detain[ed]" simply for being near

---

[6] Third Shrinath Decl. Ex. 3.

a suspected immigrant.[7] With such broad orders, Defendants cannot dispute that federal officers have stopped hundreds of people over two months—and counting.

As to the Arrests Class, Defendants boast that they have arrested over 3,000 immigrants as Operation Metro Surge continues.[8] For their part, immigration attorneys report that the ratio of warrantless arrests as a percentage of total immigration arrests is unprecedented. *See* Griffith Decl. ¶¶ 8–16 (ECF No. 93-3); Dhawan-Maloney Decl. ¶ 14 (ECF No. 93-4); Meyer-Thompson Decl. ¶ 11 (ECF No. 93-5). Indeed, in a two-week period from January 20, 2026, to February 3, 2026 alone, Plaintiffs identified 100 District of Minnesota orders granting habeas petitions and requiring release where the Court ordered the Government to defend a warrantless arrest, and Defendants did not produce or provide evidence of a warrant.[9] Moreover, the arrest numbers published by ICE do not appear to include the citizens and non-citizens that have been stopped and arrested without any basis for removability. *See, e.g.*, Hussen Decl. (ECF No. 34); Second Javier Doe Decl. (ECF No. 30); Osman Decl. (ECF No. 29); Moreno Decl. (ECF No. 44); Martinez Garcia Decl. (ECF No. 39). In short, Defendants have unlawfully stopped and arrested hundreds, if not thousands, of individuals according to their policies and practices.

---

[7] ECF No. 48-12.

[8] Third Shrinath Decl. Ex. 13, Christopher Magan & Jeff Hargarten, *The Trump administration calls them the 'worst of the worst.' Here's what we found.*, Star Trib. (Jan. 21, 2026), https://www.startribune.com/the-trump-administration-calls-them-the-worst-of-the-worst-heres-what-we-found/601555390.

[9] *See* Third Shrinath Decl. Ex. 2.

Defendants contend that Plaintiffs fail the numerosity requirement because they have not stated exactly how many individuals have been unlawfully stopped or arrested. Defs.' Class Opp'n at 22. But "it is not necessary for the class representatives to either identify each particular member of the class or the exact number of class members; instead the trial court may reasonably infer that numerosity is satisfied from the facts of the case." *Yarrington v. Solvay Pharms., Inc.*, No. 09-CV-2261 (RHK/RLE), 2010 WL 11453553, at *12 (D. Minn. Mar. 16, 2010) (quotation marks omitted).

Defendants' challenge fails for two additional reasons.

First, Defendants misconstrue Plaintiffs' claims. As explained above, Plaintiffs seek to enjoin Defendants' unlawful stops and arrest policies and practices in the Twin Cities metro area. Accordingly, the classes properly include persons who are or will be stopped or arrested without a warrant under those policies and practices, *regardless* of whether an individual stop or arrest was legal.

Second, Plaintiffs submitted evidence detailing the experiences of approximately three dozen members of the Stops and Arrests Classes (and Removability and Flight Risk Subclasses). *See* Third Shrinath Decl. Ex. 1. That showing alone satisfies numerosity. But the classes include more than those who have been stopped and arrested in the past. The classes also include an "unknown group [who] may in the future suffer harm," whose joinder is not practicable at this time. *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 944 (D. Minn. 2018); *see Nerland v. Caribou Coffee Co., Inc.*, 564 F. Supp. 2d 1010, 1030 (D. Minn. 2007) ("Plaintiffs need not prove the exact number of proposed class members to satisfy the numerosity requirement as long as they can reasonably estimate the size of

the class."). That Defendants will add future members to the classes is not speculative. In the days since filing the preliminary injunction motion, Plaintiffs identified eighteen additional declarants; Defendants confirmed that Operation Metro Surge has no end date;[10] and Defendants doubled down on the policies that govern Operation Metro Surge.[11] By any objective evaluation, class members number in at least the hundreds (if not thousands), and their ranks are growing. Joinder is impractical.

### B.    Plaintiffs satisfy the commonality requirement.

Plaintiffs' motion for class certification identified two "common questions" that satisfy Rule 23(a)'s commonality requirement: whether DHS has policies subjecting individuals to immigration stops and arrests without individualized reasonable suspicion or probable cause, and whether those polices are unlawful. Pls.' Class Mem. at 16–19. Defendants' commonality challenges fail for the same reasons as above: Plaintiffs have sufficiently established that Defendants' unlawful stops and arrests policies exist, and those policies' legality is a classic issue capable of class-wide resolution.

---

[10] On January 29, 2026, President Trump said that "he would not pull back the operation, 'not at all.'" Third Shrinath Decl. Ex. 14, Zolan Kanno-Youngs, *Trump Called for 'De-Escalation' in Minneapolis. It Didn't Last Long.*, N.Y. Times (Jan. 30, 2026), https://www.nytimes.com/2026/01/30/us/politics/trump-minneapolis-dueling-messages.html. Thomas Homan, the President's "border czar" sent to Minnesota, has given no timeline for the operation and said that he's "staying until the problem's gone." Third Shrinath Decl. Ex. 15, Giovanna Dell'Orto & Rebecca Santana, *Trump's Border Czar Suggests a Possible Drawdown in Minnesota, but Only After 'Cooperation,'* AP News (Jan. 29, 2026), https://apnews.com/article/homan-minneapolis-immigration-enforcement-0d559bf53b630d7cc525fd3219f430ba.

[11] Defendants attached the January 28, 2026, memorandum from Acting ICE Director Todd Lyons, which confirmed that ICE officers will continue to make warrantless arrests without asking about community ties. *See* ECF No. 85-1 at 4–6.

As to the first question—whether Defendants' unlawful policies exist—Defendants argue that there is no commonality because Plaintiffs have improperly "presum[ed] the existence of a discriminatory policy or practice." Defs.' Class Opp'n at 25. Defendants' argument is wrong and fails to engage with Plaintiffs' evidence to the contrary. As demonstrated in Plaintiffs' numerous declarations, citations to news reporting, and statements by DHS officials, and as explained further in Plaintiffs' preliminary injunction reply brief, Plaintiffs have proved—not presumed or alleged—that DHS has effected stops and arrests pursuant to the unlawful policies and practices that Plaintiffs challenge. *See supra* pp. 6–8; PI Reply at 1–11.

In any event, whether an unlawful policy exists is itself "a common contention" that is "capable of classwide resolution[.]" *See Taqueria El Primo LLC v. Ill. Farmers Ins. Co.*, 577 F. Supp. 3d 970, 991 (D. Minn. 2021) (citations omitted). Although class certification requires a rigorous analysis, a "decision to certify a class is far from a conclusive judgment on the merits of the case." *Postawko*, 910 F.3d at 1036–37 (citing *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011)). On summary judgment and, if needed, at trial, Defendants will presumably challenge whether their policies and practices exist, and they will do so class-wide, not on an individualized basis. *Id*. at 1040 ("Defendants may continue to challenge the existence and parameters of the alleged policy at trial[.]").

Defendants' reliance on *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) does not save their argument. *See* Defs.' Class Opp'n at 24. There, the Supreme Court found that the plaintiffs' affidavits reporting individual discrimination at around 235 stores (out

14

of 3,400 stores nationwide) failed to demonstrate that the entire company operated under a general policy of discrimination and thus the evidence could not support certifying a nationwide, company-wide class. *Dukes*, 564 U.S. at 358. *Dukes* is inapposite. Here, Plaintiffs are seeking provisional certification of narrowly tailored classes, limited to the Twin Cities metro area, supported by declarations from individuals who were stopped or arrested in or around the Twin Cities. Also, unlike *Dukes*, Plaintiffs' evidence includes Defendants' repeated admissions that their agents have been directed to make arrests based on reasonable suspicion alone, and their admissions that proximity to an immigrant is sufficient for an investigative stop.[12] Wal-Mart never made point-blank admissions that an unlawful policy existed.

Defendants do not dispute that the second question—whether Defendants' policies and practices are legal—is a prototypical common question under Rule 23(a)(2). Defendants cite *Postawko* for the proposition that Rule 23(a)(2) was satisfied by a common question of whether the defendants' policies in that case violated the Eighth Amendment. Defs.' Class Opp'n at 25–26. Plaintiffs pose the same question here—whether Defendants' policies of making stops and arrests without the legal prerequisites violate the Fourth Amendment and federal statute. The answer to that question will be resolved on a classwide basis. *See Dukes*, 564 U.S. at 350 (commonality hinges on "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation" (quotations omitted)).

---

[12] *See supra* notes 3–5.

*Postawko* also belies Defendants' argument that determining whether class members were injured will require reviewing "each putative class member's record" or "the subjective facts of each encounter." Defs.' Class Opp'n at 24. Like Defendants in this case, the *Postawko* defendants argued that liability would hinge on "the unique medical condition of each member of the class[.]" 910 F.3d at 1038. The court explained that this "misunderst[ood] the nature of the class's claims." *Id.* The plaintiffs in that case were not seeking individual damages, but rather injunctive relief against a policy that "expose[d] all inmates suffering from chronic HCV to the *same* unconstitutional injury." *Id.* ("While a putative class seeking damages . . . might struggle to satisfy Rule 23(a)(2), a class certified under Rule 23(b)(2) seeking only injunctive and declaratory relief suffers no such difficulty.").

Here too, if Defendants' policies allow unlawful stops and arrests, all class members will have suffered the same injury: being subjected to unlawful procedures to evaluate the existence of reasonable suspicion (for stops) and/or probable cause (for arrests). That is why other courts have recently certified classes based on essentially identical questions. *See United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 723 (E.D. Cal. 2025) (whether alleged CBP policy of stops without individualized assessment of reasonable suspicion "violated the rights of the class members under the Fourth Amendment is a question that can be answered 'yes' or 'no' in one stroke as to the entire class[.]" (quotations omitted)); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. 25-3417 (BAH), 2025 WL 3465518, at *33 (D.D.C. Dec. 2, 2025) (holding that "the legality of the challenged policy and practice" of warrantless arrests without individualized determinations of escape risk did

not require individualized inquiry); *U.H.A. v. Bondi*, No. 26-cv-417-JRT-DLM, 2026 WL 222226, at *11 (D. Minn. Jan. 28, 2026) (holding that "whether Defendants' policy of arresting and detaining refugees who have not yet obtained lawful permanent resident status is unlawful is a narrow, clear, common question of law or fact . . . especially suited to class-wide resolution").

### C. Plaintiffs' claims meet the typicality requirement, and Plaintiffs are adequate representatives.

Plaintiffs easily satisfy Rule 23(a)'s typicality and adequacy requirements. Defendants do not dispute that "[t]he burden of showing typicality is not an onerous one," *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 562 (8th Cir. 1982), and "[f]actual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims[.]" *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).

Here, as explained above, Plaintiffs' claims, like those of absent class members, all arise from the same unlawful policies and practices deployed by Defendants in Operation Metro Surge. *See Escobar Molina*, 2025 WL 3465518, at *34 (finding typicality because, "notwithstanding the individual factual circumstances behind each arrest, individual plaintiffs at bottom suffered a similar injury from the same course of conduct" (cleaned up)). As the court explained in *United Farm Workers*:

> Factual differences related to the circumstances of the detentive stops and arrests—such as whether the proposed class representatives and putative class members provided agents with identification—do not preclude a finding of typicality, because the proposed representatives and putative class members were subjected to the same practices of Border Patrol.

785 F. Supp. 3d at 726. The same is true here, and Defendants do not argue otherwise.

Critically, the unlawful policies and practices that Plaintiffs seek to enjoin apply to U.S. citizens *and* non-citizens alike. For this reason, Defendants' fixation on Plaintiffs' citizenship is misplaced: the fact that Plaintiffs are U.S. citizens does not make their claims atypical of class members who may be non-citizens. *See* Defs.' Class Opp'n at 27–28. For example, U.S. citizen Plaintiff Eydarus was subject to the same unlawful stops policy as non-citizen Declarant Pedro Moreno (a legal permanent resident). How Eydarus and Moreno were treated *after* the stop is irrelevant to Plaintiffs' claim that Defendants are making stops in the first place pursuant to an unlawful policy.

Similarly, Plaintiffs Hussen and Javier Doe, both U.S. citizens, were arrested according to Defendants' policies and practices just like non-citizen declarants Luisa Doe and Julio Doe. Hussen and Javier were eventually released after federal officials finally accepted their proof of citizenship, while Luisa and Julio remained incarcerated. For this motion, the key is that all four were arrested without probable cause according to Defendants' policies and practices. Any *post*-arrest differences in experience are irrelevant to the unlawful-arrest claim. Again, the Eighth Circuit's decision in *Postawko* is instructive. There, the Eighth Circuit held that, although "the physical symptoms *eventually* suffered by each class member may vary," the commonality and typicality requirements were satisfied because *all* class members suffered "the *same* [initial] unconstitutional injury," namely, the withholding of DAA drugs. *Postawko*, 910 F.3d at 1038–39 (emphasis added). The same is true here. The stopping and arresting officers' conduct—whether interacting with a citizen or non-citizen—was governed by the same unlawful procedures.

18

Plaintiffs are also adequate class representatives under Rule 23(a)(4). Defendants do not dispute that Plaintiffs "will vigorously prosecute the interests of the class through qualified counsel." *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 613 (8th Cir. 2017) (quotations omitted). Instead, Defendants' sole adequacy argument mirrors their typicality argument: Plaintiffs are U.S. citizens, while the class includes non-citizens. Defs.' Class Opp'n at 29. But Plaintiffs, as U.S. citizens, have "common interests" with non-citizen class members in avoiding unconstitutional and unlawful stops and arrests. *See In re Target*, 847 F.3d at 613. They were all subjected to the same policies and practices employed by Defendants in Operation Metro Surge. And they seek the same injunctive relief to enjoin those policies in the future.[13]

## IV.    Plaintiffs' Proposed Classes Are Not Overbroad and Are Cohesive Under Rule 23(b)(2).

Defendants do not dispute that "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of class actions permissible under Rule 23(b)(2), *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997), or that "courts have regularly certified classes challenging immigration-related policies," *Escobar Molina*, 2025 WL 3465518, at *36 (collecting cases). And Defendants agree that, like the single injunction that Plaintiffs seek for each class, "the key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted . . . .'" Defs.' Class Opp'n at 21 (quoting *Dukes*, 564 U.S. at 360).

---

[13] To the extent the Court is concerned about citizenship status as a barrier to class certification, Plaintiffs respectfully seek leave to amend the complaint and add additional named Plaintiffs.

But Defendants argue that because Plaintiffs' classes include all individuals subject to immigration suspicionless stops or warrantless arrests in Minnesota after December 1, 2025, determining liability "would require deep individual analysis of each stop and arrest." *Id.* at 20. Again, Defendants misunderstand Plaintiffs' claims and the remedy sought. Plaintiffs are not looking for judgment over any putative class member's individual arrest or detention, and they are not seeking any individual remedy for an unlawful arrest or detention. Rather, Plaintiffs seek to enjoin Defendants' unlawful *policies and practices*, which apply to all class members equally. Put simply, relief under Rule 23(b)(2) is appropriate where defendants "have acted on grounds that apply generally" to the class by adopting a uniform policy. *U.H.A. v. Bondi*, No. 26-cv-417-JRT-DLM, 2026 WL 222226, at *12 (D. Minn. Jan. 28, 2026) (citing *Mercado v. Noem*, 800 F. Supp. 3d 526, 564 (S.D.N.Y. 2025)).

Nor is it relevant that Plaintiffs' proposed classes may include some people who were stopped after DHS found reasonable suspicion or were arrested with probable cause. Regardless of any particular stop or arrest's circumstances, Plaintiffs have shown that Defendants were operating pursuant to unlawful policies and practices that applied to all class members. Stated differently, whether agents *chose* to make a reasonable suspicion or probable cause determination in an individual case does not change the fact that DHS had larger, unlawful patterns, practices, and policies permitting stops and arrests without such

determinations. The proposed classes represent everyone standing under the shadow of those policies.[14]

That said, the Court may, in its discretion, narrow the classes by reference to the challenged policies and practices. *See In re Zurn Pex Plumbing Prods. Liab. Litig.*, 267 F.R.D. 549, 558 (D. Minn. 2010), *aff'd*, 644 F.3d 604 (8th Cir. 2011). If the Court were so inclined, it could certify the following classes instead:

> **Stops Class:** All persons in the Twin Cities metro area who, since December 1, 2025, have been or will be subject to DHS's policy, pattern, and/or practice of subjecting persons to an investigatory stop for immigration purposes without an individualized assessment of reasonable suspicion.
>
> **Removability Class:** All persons in the Twin Cities metro area who, since December 1, 2025, have been or will be subject to DHS's policy, pattern, and/or practice of subjecting persons to a warrantless arrest for immigration purposes without an individualized assessment of probable cause that the person is a non-citizen who is subject to removal from the United States.
>
> **Flight Risk Class:** All persons in the Twin Cities metro area who, since December 1, 2025, have been or will be subject to DHS's policy, pattern, and/or practice to a warrantless arrest for immigration purposes without an individualized assessment of probable cause that the person is likely to escape before a warrant can be obtained.

---

[14] For the same reason, Defendants' suggestion that Plaintiffs are seeking an "obey the law" injunction is misguided. Defs.' Class Opp'n at 19. Plaintiffs seek to enjoin Defendants from applying specific policies and to ensure Defendants' compliance through reporting and documentation. Courts have found similar injunctions to be sufficiently specific. *See Escobar Molina*, 2025 WL 3465518, at *36–37; *Bennie v. Munn*, 822 F.3d 392, 397 (8th Cir. 2016) (An "injunction against making inquiries or taking regulatory actions based on Bennie's protected expression of his political views would be sufficiently specific."). The Eighth Circuit's recent decision in the *Tincher* case, which did not involve a grant of class certification, is thus inapposite. *See Tincher v. Noem*, No. 26-1105, 2026 WL 194768 (8th Cir. Jan. 26, 2026).

Courts in recent cases have certified nearly identical classes, and doing so here would not change the relief sought by the Plaintiffs. *See, e.g.*, *United Farm Workers*, 785 F. Supp. 3d at 742–43 (certifying classes of (1) persons "subjected to a detentive stop by Border Patrol . . . without a pre-stop, individualized assessment of reasonable suspicion" and all persons since January 6, 2025, "who have been arrested or will be arrested . . . by Border Patrol without a warrant and without a pre-arrest, individualized assessment of probable cause[.]"); *Escobar Molina*, 2025 WL 3465518, at *38 (certifying class of "[a]ll persons who, since August 11, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses an escape risk."). Adjusting the class definitions should not become a barrier to achieving compliance with the law.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for class certification for the purposes of preliminary injunctive relief.

Dated:  February 5, 2026

s/ Kshithij Shrinath
_____

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT**

Kathryn Huddleston (*Pro Hac Vice*)
Lucia Goin (*Pro Hac Vice*)
915 15th Street NW, 7th Floor
Washington, D.C. 20005
T: (212) 549-2500
khuddleston@aclu.org
lgoin@aclu.org

Spencer Amdur (*Pro Hac Vice*)
Oscar Sarabia Roman (*Pro Hac Vice*)
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
samdur@aclu.org
osarabia@aclu.org

Omar C. Jadwat (*Pro Hac Vice*)
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
ojadwat@aclu.org

**COVINGTON & BURLING, LLP**

Robert Fram (*Pro Hac Vice*)
415 Mission Street, Suite 5400
San Francisco, CA 94105
rfram@cov.com
415-591-7025

Gregg Levy (*Pro Hac Vice*)
Paul Killebrew (*Pro Hac Vice*)
850 Tenth Street, NW
Washington, DC 20001
glevy@cov.com
pkillebrew@cov.com

**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**

Teresa Nelson (#269736)
Catherine Ahlin-Halverson (#350473)
Alicia Granse (#400771)
Benjamin Casper (#0276145)
P.O. Box 14720
Minneapolis, MN 55414
Tel: (651) 529-1692
tnelson@aclu-mn.org
cahlin@aclu-mn.org
agranse@aclu-mn.org
bcasper@aclu-mn.org

Ian Bratlie (#319454)
424 N. Riverfront Dr. No. 34
Mankato, MN 56001
Tel: (507) 995-6575
ibratlie@aclu-mn.org

**GREENE ESPEL PLLP**

Amran A. Farah, Reg. No. 0395354
Aaron P. Knoll, Reg. No. 0393066
Benjamin Larson, Reg. No. 0504146
Michelle E. Morrow, Reg. No. 0504419
Nicholas Scheiner, Reg. No. 0402470
Kshithij Shrinath, Reg. No. 0505164
X. Kevin Zhao, Reg. No. 0391302
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
afarah@greeneespel.com
aknoll@greeneespel.com
blarson@greeneespel.com
mmorrow@greeneespel.com
nscheiner@greeneespel.com
kshrinath@greeneespel.com
kzhao@greeneespel.com
(612) 373-0830

Bree Peilen (*Pro Hac Vice*)
30 Hudson Yards
New York, NY 10001
bpeilen@cov.com

**ROBINS KAPLAN, LLP**

Raoul Shah, Reg. No. 0399117
Bahram Samie, Reg. No. 0392645
Ellen Levish, Reg. No. 0400878
Stacey Slaughter, Reg. No. 0296971
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
rshah@robinskaplan.com
bsamie@robinskaplan.com
elevish@robinskaplan.com
sslaughter@robinskaplan.com
(612) 349-8500

*Attorneys for Plaintiffs*