UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MUBASHIR KHALIF HUSSEN,
MAHAMED EYDARUS, and JAVIER DOE
*on behalf of themselves and others similarly
situated,*

      Plaintiffs,

  v.

Case No. 0:26-cv-00324-ECT-ECW

KRISTI NOEM, *in her official capacity as
Secretary of the U.S. Department of Homeland
Security*; U.S. Department of Homeland Security;
U.S. Immigration and Customs Enforcement;
TODD LYONS, *in his official capacity as Acting
Director of U.S. Immigration and Customs
Enforcement*; DAVID EASTERWOOD, *in his
official capacity as Acting Director, Saint Paul
Field Office, U.S. Immigration and Customs
Enforcement*; *;* U.S. Customs and Border
Protection; RODNEY SCOTT, *in his official
capacity as Commissioner of U.S. Customs and
Border Protection;* U.S. Border Patrol; MICHAEL
W. BANKS, *in his official capacity as Chief of
U.S. Border Patrol*; and GREGORY BOVINO, *in
his official capacity as Commander of the U.S.
Border Patrol*, *in their official capacities,*

      Defendants.

**DEFENDANTS' SUR-REPLY
IN OPPOSITION TO
PLAINTIFFS' REPLIES IN
SUPPORT OF THE
MOTIONS FOR
PRELIMINARY
INJUNCTION AND
PROVISIONAL CLASS
CERTIFICATION**

## INTRODUCTION

Nothing in Plaintiffs' new evidence, raised for the first time in their February 5, 2026, Reply in Support of their Motion for Preliminary Injunction (ECF No. 138) and Reply in Support of their Motion for Provisional Class Certification and Appointment of Class Counsel (ECF No. 139), addresses or in any way undermines ICE's Constitutionally compliant policy on warrantless stops and arrests. Lyons Memo, ECF No. 85-1. Plaintiffs provided 27 additional non-party declarations and 4 videos in a failed attempt to reply to Defendants' case-dispositive standing arguments. *See* ECF Nos. 90, 90-1 – 90-14, 92, 92-15, 92-16, 93, 93-1- 93-9,94, 94-1, 94-2, 95, 142. Much of the additional evidence is irrelevant to Plaintiffs' original claims, with some declarations involving encounters occurring after the complaint and involving individuals that do not even claim they were targeted based on perceived Somali or Latino ethnicity. None of the newly provided declarations support the fantastic inference that Defendants have an unofficial but explicit policy and practice of stopping individuals without reasonable suspicion or arresting individuals without probable cause of immigration law violations or likelihood of escape.

Furthermore, given today's announcement,[1] Plaintiffs' speculations of future harm are all the more implausible.

---

[1] *Trump administration says it is ending its immigration surge in Minneapolis*, NBC News, (Feb. 12, 2026) https://www.nbcnews.com/news/us-news/trump-administration-homan-ice-operation-metro-surge-ending-rcna258720.

**ARGUMENT**

### I.     Plaintiffs Have Not Established Article III Standing

Plaintiffs' new declarations and exhibits fail to show that a single plaintiff or non-party declarant is threatened by a real and immediate risk of future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 110 (1983). None of Plaintiffs' new declarations allege that any citizen was subjected to a second stop, detention, or even so much as a second consensual encounter. *See Noem v. Vasquez Perdomo*, 146 S. Ct. 1 (2025) (stating that there is no "standing to obtain future injunctive relief . . . merely because [Plaintiffs] experienced past harm and fear its recurrence"). That absence of any immediate risk is demonstrated by various declarants alleging that ICE officers are in their neighborhood nearly every day—yet none allege being subjected to repeated unlawful conduct. ECF Nos. 92-2, 92-7, 92-8, 92-10, 92-12, 92-13, 92-16, 93, and 93-1. Moreover, even with the supplemental evidence, Plaintiffs have failed to identify a policy of unlawful arrests—nor could they, as the Lyons Memo reinforces longstanding prohibitions on "warrantless arrests under § 1357(a)(2) without probable cause of an immigration violation and without prior consideration of likelihood of escape." ECF No. 85-1. Thus, Plaintiffs lack standing to challenge Defendants' future lawful investigative stops and warrantless arrests, especially since Defendants' actual policy is the opposite of what Plaintiffs allege.[2]

---

[2] Even if Plaintiffs' new evidence aided their claims, "standing is to be determined as of the commencement of the suit." *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1038 (8th Cir. 2000) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 571-72 n.5 (1992)); *id*. (holding an injury-in-fact "may not be established by a development that occurs after the commencement of the litigation").

First, Plaintiffs supplemental submissions fail to overcome Defendants' argument that Plaintiffs, three U.S. citizens now known to Defendants as citizens, lack standing to represent an overbroad class of citizens, lawful permanent residents, and illegal aliens alleging a risk of an unlawful stop or arrest in the future. None of the new declarations are from an individual alleging additional or repeat interactions with an immigration officer. Plaintiffs' mere assertions that declarants' past interactions with immigration enforcement constitute standing on their part are insufficient. ECF 138, at 3; *see also Lyons*, 461 U.S. at 103. Neither declarants nor Plaintiffs can show that another stop is imminent, and their own evidence shows the opposite to be the case since none of them have been subjected to recurring stops. *Perdomo*, 146 S. Ct. at 2 ("no good basis for believing any stop . . . is imminent"); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (claim was "too speculative to satisfy the well-established requirement that threatened injury must be certainly impending."). Following today's announcement, *see* footnote 1, *supra*, Plaintiffs' claims are even less plausible.

Plaintiffs' reliance on *Park v. Forest Serv.* is instructive, only not in the way that Plaintiffs imagine. ECF 138 at 12. Plaintiffs argue both criteria established by the Eighth Circuit in *Park* are met here: that there is a high probability that Plaintiffs would encounter immigration enforcement again, and that such an encounter would lead to an unlawful stop or arrest for the same impermissible grounds. ECF 138 at 13 (citing ECF Nos. 92-2, 92-7, 92-8, 92-10, 92-12, 92-13, 92-16, 93, and 93-1 describing the regular presence of officers in declarants' neighborhoods). However, on Plaintiffs' evidence, old or new, the probability of a repeat encounter appears to be zero since not one declarant had a second

3

encounter with Defendants. Additionally, the fact that U.S. citizen Plaintiffs are now known to Defendants weighs against Defendants initiating a second encounter, much less an encounter in which Defendants would need to obtain Plaintiff's identity.

Plaintiffs fail even more spectacularly to show the second factor in *Park* is met, "'the probability that' the officers would subject the Plaintiff[s] to the allegedly unlawful policy again." ECF 138 at 12 (citing *Park*, 205 F.3d at 1038). Indeed, Plaintiffs' new evidence fails to establish that there is any unlawful policy at all, let alone that the specific Plaintiffs in this case would be subject to it again. *Lyons*, 461 U.S. at 106. Neither could Plaintiffs ever show a discriminatory policy of targeting individuals based solely on impermissible factors—it simply does not exist. *See* ECF 81 at 22-23. Like defendants in *Park*, the government has shown official directives that contradict Plaintiffs' anecdotal allegations of a discriminatory policy of executing stops or arrests based solely on an impermissible factor. *See Park*, 205 F. 3d at 1038 ("There is no indication in the record in our case that the Forest Service maintained an official policy of using unlawful checkpoints against the Rainbow Family"); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355-56 (2011) (existence of affirmative non-discrimination policy overcame Plaintiffs' anecdotal evidence of a discriminatory hiring policy).

Plaintiffs bear a heavy burden: they need to "make the incredible assertion either, (1) "that *all* [law enforcement] officers in [the Twin Cities] *always* [conduct unconstitutional warrantless stops and arrests on] any citizen with whom they happen to have an encounter, whether for the purpose of arrest […] or for questioning or, (2) that [Defendants] ordered or authorized [law enforcement] officers to act in such manner."

4

*Lyons*, 461 U.S. at 106. Plaintiffs have failed to meet that burden. Their own new declarations indicate many stops either raised no constitutional issues because they were consensual encounters, ECF Nos. 92-10, 92-11, or that officers had reasonable suspicion to stop the declarant. ECF Nos. 92-1, 92-2, 92-3, 92-6. This alone proves they cannot support the assertion that *all* officers *always* violate the Constitution in conducting stops and warrantless arrests, much less that there is a policy of doing so. In the absence of supporting evidence, Plaintiffs arguments hinge on speculative future interactions between U.S. citizens and immigration enforcement officers, while acknowledging regular visibility among immigration agents with no additional contacts. This broad speculation backed by no evidence that any declarant has had more than one brief investigatory stop with immigration enforcement officers fails to justify the extraordinary nature of a preliminary injunction or the stringent requirements to certify a class.

Plaintiffs here are "no more entitled to an injunction than any other citizen." *Lyons*, 461 U.S. at 105-06. As such, they lack standing to bring claims for an injunction and class certification at this stage in the litigation.

## II. Plaintiffs Have Not Established a Policy or Practice That Violates the Fourth Amendment or 8 U.S.C. § 1357(a)(2)

Defendants' policies on warrantless arrests are memorialized in the Lyons Memo and have been disseminated to "All ICE Personnel." ECF No. 85-1. Plaintiffs' 19 new declarants claiming they were unlawfully stopped or arrested simply do not speak to Defendants' policies. Admitting defeat, Plaintiffs no longer claim these stops are based on perceived Somali or Latino ethnicity as four declarants now claim they were encountered

5

because of their Asian ethnicity (ECF Nos. 92-3, 92-6, 92-11, 103) and one declarant states he is white but was questioned about his citizenship (ECF No. 92-15). None of these declarations suggest Defendants have a policy and practice of unlawful stops or warrantless arrests. The only thing they establish is that some declarants don't understand why they were stopped—but being unaware of an officer's reasons for stopping or arresting someone is very different than an actual absence of reasonable suspicion or probable cause.

It is undisputed that the Fourth Amendment prohibits unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 9 (1968). However, not all encounters with federal immigration law enforcement officers result in a seizure under the Fourth Amendment. *United States v. Ninety One Thousand Nine Hundred Sixty Dollars*, 897 F.3d 1457 (8th Cir. 1990). Rather, "[d]etermining which police-citizen contacts fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case." *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008). A court must "consider these matters on a case-by-case basis." *Id*.

During a *Terry* stop, officers can check for weapons and may take any additional steps that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Navarrete-Baron*, 192 F.3d 786, 790 (8th Cir. 1999) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)); *see also Amos v. Kelly*, No. 22-cv-2108, 2025 WL 2211259 at *3 (D. Minn. 2025) ("courts must look to the totality of the circumstances to determine whether an officer's conduct was objectively reasonable [and] evaluate the reasonableness of the force used not with the

benefit of hindsight, but through the lens of a reasonable officer on the scene.") (quotations and citations omitted)).

Where Plaintiffs seek not just to challenge the lawfulness of their own encounters with Defendants, but an allegedly unspoken, unwritten policy of violating the Constitution as to a whole class of individuals, they have a very high bar to meet. Plaintiffs' new declarations, like their old declarations, do not meet their burden. On the contrary, Plaintiffs' evidence supports finding Defendants have a policy of *complying* with Constitutional and statutory requirements. For example, AP was approached for a consensual encounter in an area where suspicious activity had been reported when she "instinctively ran" from the single officer approaching her because the officer was tall. (ECF No. 92-3 at ¶¶ 4, 6, 10). Given AP's flight, officers had further reasonable suspicion to stop and question her. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). After explaining the suspicious activity reports and asking for her ID, the officers "repeatedly emphasized that [she] should not run." *Id*. ¶ 11. The officers explained why AP was stopped and nothing in AP's own account suggests she was subjected to inappropriate force, restraint, or prolonged detention.

At least one declarant was stopped based on a license plate check by law enforcement officers, ECF No. 92-1, and various other declarants appear to have been pulled over based, in part, on license plate searches. ECF No. 92-2, 92-4, 92-5, 92-6, 92-8, 92-9, 92-12, 93, 93-1, 93-2, 95 103, 103-1. The results of a license plate search can

"provide[] more than reasonable suspicion to initiate the stop." *Kansas v. Glover*, 589 U.S. 376, 381 (2020) ("The fact that the registered owner of a vehicle is not always the driver of the vehicle does not negate the reasonableness of [the law enforcement officer's] inference."). Defendants developing reasonable suspicion to pull over individuals based on the results of license plate checks is entirely consistent with the Fourth Amendment.

During both consensual encounters and investigative stops, declarants refused to provide identification. ECF Nos. 92-4, 92-12. In tandem with other factors, failure to produce identification can indicate a potential violation of immigration law. *Ojeda-Vinales v. Immigr. & Naturalization Serv.*, 523 F.2d 286, 288 (2d Cir. 1975) ("Petitioner's failure to produce identification which might have established the legality of his employment could have been taken by the agents as further indication that he was in violation of the immigration laws."). Based on Plaintiffs' own evidence, law enforcement officers had more than enough articulable facts to develop reasonable suspicion in many of these allegedly unlawful encounters.

Nothing in the declarations by VN, EM, EG, TG, MG, KD, Jane Doe, and CL suggest they were subjected to inappropriate force, restraint, or prolonged detention during their encounters and, although officers are not required to state the reasonable suspicion that led to the stop, several declarations (VN, SP, AP, and RJ) included explanations from officers as to why they were stopped. *See* ECF Nos. 92-6, 92-8, 92-10, 92-11, 92-12, 92-13, 92-15, 93, 103. Two declarants (NG and CM) claim their vehicles were "rammed" by officers (ECF Nos. 95 and 103-1) and while each encounter may have taken longer because of the accident, nothing in their declarations show they were subjected to inappropriate

8

restraint or prolonged detention. SP and FA both state officers pulled guns during their stops. ECF Nos. 92-2 at ¶ 6 and 93-2 at ¶ 11. However, as explained in Defendants' response (ECF No. 126-1), the increased threats, violence, aggression, and obstruction of immigration operations during Operation Metro Surge pose risks to both public and officer safety. *Id*. at 19; *see also* ECF No. 83 at ¶ 9. This use of force must be considered under the totality of the circumstances. *See Amos v. Kelly*, 2025 WL 2211259 at *3.

HS, MM, RJ, and RM all state they were handcuffed during their encounters, ECF Nos. 92-5, 92-7, 92-9, 92-16, but this alone is not a Fourth Amendment violation. The use of handcuffs in an investigative stop complies with the Fourth Amendment where the officer has "some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose." *Pollreis v. Marzolf*, 9 F.4th 737, 745 (8th Cir. 2021) (quotations and citations omitted)). It is also "well established . . . that when officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *Id*.

MM and RM were handcuffed for a short period of time during which officers confirmed their identification. ECF Nos. 92-7, 92-16. HS and RJ were both handcuffed and transported in police vehicles while confirming their identity. ECF Nos. 92-5 and 92-9. Videos of these encounters (ECF Nos. 94, 94-2) demonstrate observers approaching officers. The officers relocated both HS and RJ for their own safety and to maintain the status quo. While transporting a suspect to another location may in some instances create an arrest, the totality of the circumstances must be considered. *See United States v.*

9

*Bloomfield,* 40 F.3d 910 (8th Cir. 1994) (holding the totality of the circumstances did not transform the *Terry* stop into a de facto arrest); *see also Navarrete-Baron*, 192 F.3d at 790.

Further, declarants say they were not asked about community ties. But not every individual subjected to a stop was subject to a warrantless arrest. Further, there is no requirement to ask questions about community ties. Probable cause of likelihood of escape can be determined by any relevant factor. The Lyons Memo reinforces longstanding policy on this point first by reminding officers to consider whether an administrative warrant can be obtained immediately and if not, consider the totality of the circumstances to determine if an individual is likely to escape before the warrant can be obtained. (8 C.F.R. § 287.8(b)(2) and 8 C.F.R. § 287.8(c)(2)(i) and (ii)). ECF No. 85-1 at 3-6. Nothing in the Lyons Memo precludes consideration of community ties. Even so, community ties are more reliably considered when analyzing flight risk for an alien (a distinct standard from likelihood of escape before a warrant can be obtained) post-arrest, when a greater depth of information has been collected about that individual. ECF No. 85-1 at 5-6. In contrast to likelihood of escape, a flight risk analysis looks at "whether an alien is likely to attend future immigration court hearings, appear before ERO as directed, surrender for removal, and comply with other immigration obligations" *Id*. at 5; *see* 8 C.F.R. § 236.1(c)(3).

Plaintiffs' new evidence simply fails to show Defendants have a policy or practice of unlawful stops and arrests in violation of the Fourth Amendment or 8 U.S.C. § 1357(a)(2). No quantity of inconclusive declarations that merely speculate as to the reasons for law enforcement officers' stops or arrests support a finding that Defendants have an unconstitutional policy. On the contrary, Defendants' longstanding policy is

reinforced in the Lyons Memo as requiring probable cause of an immigration law violation

and likelihood of escape before a warrant can be obtained. ECF No. 85-1. Plaintiffs dispute

that this memo reflects longstanding policy, but Defendants' warrantless arrest policy was

codified in regulation in 2003.[3] Plaintiffs' consistent references to one-off social media

posts and statements made during press conferences do not equate to agency policy. Rather,

Defendants' warrantless arrest policy is clearly stated in 8 C.F.R. §§ 287.8(c)(2)(i) and

(c)(2)(ii) and the current Lyons Memo (ECF No. 85-1).

Of the more than 4,000 arrests in the Twin Cities metro area since Operation Metro

Surge began,[4] Plaintiffs have produced 33 declarants claiming unlawful stops and/or

warrantless arrests. But even among Plaintiffs' handpicked witnesses, none establishes a

single stop based solely on a factor like ethnicity, that requires additional facts to support

reasonable suspicion or probable cause. And many of the stops are reasonably justified by

the circumstances. Even if, *arguendo*, they were all violations, less than one percent of all

arrests does not demonstrate a policy or practice of unlawful conduct. *See* Defs' Class

Certification Opp., ECF No. 86, at 24 (a plaintiff "must provide 'significant proof' that

such a policy or practice exists.") (citing *Parker v. Bank of Am., N.A.*, 99 F. Supp. 3d 69,

81 (D.D.C. 2015); *Wal-Mart Stores, Inc.*, 564 U.S. at 354).

---

[3] 68 Fed. Reg. 35273, 35280-81 (June 13, 2003). Defendants note the investigative stops policy is codified at 8 C.F.R. § 287.8(b)(2) and has not changed since it was codified in 1994. 59 Fed. Reg. 42418 (Aug. 17, 1994).
[4]    https://www.dhs.gov/news/2026/02/04/dhs-reaches-more-4000-arrests-illegal-aliens-including-murderers-sex-offenders-gang

Rather, Plaintiffs claim to have shown, at the absolute maximum, that some officers failed to properly articulate their reasonable suspicion or probable cause and that some small number of stops amount to a violation of the agency's policy. For example, R.M.'s declaration (ECF No. 92-16 at ¶ 13) states the officer initially refused to follow his supervisor's orders. This example, however, defeats Plaintiffs' claims rather than supporting them because it, at most, shows one officer's momentary failure to follow agency policy and his supervisor's orders enforcing it. This is the opposite of evidence of a policy or practice to violate the Constitution or 8 U.S.C. § 287(a)(2)—it's positive evidence of a constitutional policy and of supervisors who enforce that policy.

Plaintiffs chose to undertake a very demanding course of litigation, seeking to certify multiple classes of individuals harmed by an alleged unofficial policy of violating the Constitution, an outrageous proposition—and to seek the extraordinary relief of a preliminary injunction that would directly interfere with every immigration stop and arrest in the state of Minnesota. Plaintiffs' burden is rightfully high, and their evidence falls far short, either to show a likelihood of success on the merits or to justify the certification of a class. The Court should deny both motions.

## III.   Plaintiffs Have Retreated From Their Initial Claim of Stops and Arrests Based Solely on Appearance of Somali and Latino Ethnicity

In continuing their search for standing and a viable class definition, Plaintiffs' Replies in Support of their Motion for a Preliminary Injunction and Motion for Provisional Class Certification retreat from the core claim in their Complaint—that Defendants are targeting individuals perceived to be Somali and Latino. Plaintiffs' proffer new class

definitions that appear to abandon entire claims related to the alleged targeting of individuals perceived to be Somali or Latino.

Plaintiffs' core claim for relief in their Complaint is a "declar[ation] that Defendants' policy and practice of stopping Somali and Latino individuals . . . violates the Fourth Amendment of the U.S. Constitution." ECF No. 2, Prayer for Relief, ¶ C; *see id*. at ¶ 1 ("At the center of DHS's campaign are Somali and Latino people, who are being targeted for stops and arrests based on racial profiling motivated by prejudice."); *see also id*. at Prayer for Relief, ¶¶ C, F, K, J (seeking various forms of relief from an alleged policy of stopping perceived Somali and Latino individuals). Now, Plaintiffs appear to abandon those specific allegations in furtherance of generalized allegations that Defendants have a policy of making stops and arrests without reasonable suspicion or probable cause, respectively. *See generally* ECF No. 139 (No mention of targeting Somalis or Latinos throughout the document).[5] And no wonder: Defendants showed decisively that Plaintiffs have nothing but pure speculation to support that theory. ECF No. 81 at 18.

In response to Defendants' opposition correctly identifying the irreconcilable flaws in their class definitions and failure to establish a policy targeting Somalis or Latinos, ECF No. 127, Plaintiffs about-face and allege a broader range of violations, even inviting the Court to certify a different set of classes that make no reference to Somalis or Latinos. ECF No. 139 at 21. Plaintiffs attempt to move the goal posts for what claims and classes they

---

[5] Though to add to the confusion, Plaintiffs continue to press this angle in their Reply in Support of their Motion for Preliminary Injunction. *See* ECF No. 138 at 16 ("Exacerbating the risk, these agents are particularly targeting the 76,320 Somali and 388,435 Latino residents of the Twin Cities."); *see also id*. at 4, 24, 25.

are pursuing is nothing less than a tacit admission that they haven't supported their claims with sufficient evidence.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions.

DATE: February 12, 2026                Respectfully Submitted,

                                        BRETT A. SHUMATE
                                        Assistant Attorney General, Civil Division

                                        TIBERIUS DAVIS
                                        SEAN SKEDZIELEWSKI
                                        Counsel to the Assistant Attorney General

                                        JAMES J. WALKER
                                        Senior Litigation Counsel
                                        Office of Immigration Litigation

                                        LORI S. MACKENZIE
                                        Trial Attorney

                                        */s/ Shane A. Young*
                                        SHANE A. YOUNG (DC #1620020)
                                        Trial Attorney
                                        U.S. Department of Justice
                                        Civil Division
                                        Office of Immigration Litigation
                                        P.O. Box 868, Ben Franklin Station
                                        Washington, D.C. 20044
                                        Telephone: (202) 451-7483
                                        Shane.A.Young@usdoj.gov

                                        *Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants, certifies that this memorandum of points and authorities does not exceed 18,418 words (Sur-Reply 3,903, Response 14,515), which complies with this Courts' standing order at ECF No. 134, and Defendants' Motion at ECF No. 151. Undersigned counsel further notes that this memorandum of points and authorities is size 13, Times New Roman font in compliance with L.R. 7.1(h).

Date: February 12, 2026            */s/ Shane Young*
                                   SHANE YOUNG
                                   Trial Attorney
                                   United States Department of Justice
                                   Office of Immigration Litigation
                                   *Attorney for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed on February 12, 2026, through the ECF system, and that it will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Date: February 12, 2026            */s/ Shane Young*
                                   SHANE YOUNG
                                   Trial Attorney
                                   United States Department of Justice
                                   Office of Immigration Litigation
                                   *Attorney for Defendants*