UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Mubashir Khalif Hussen, Mahamed Eydarus, and Javier Doe, *on behalf of themselves and others similarly situated*,<br><br>    Plaintiffs,<br><br>v.<br><br>Kristi Noem, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; U.S. Department of Homeland Security; U.S. Immigration and Customs Enforcement; Todd M. Lyons, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; David Easterwood, *in his official capacity as U.S. Immigration and Customs Enforcement Field Office Director for St. Paul, Minnesota*; U.S. Customs and Border Protection; Rodney S. Scott, *in his official capacity as Commissioner of U.S. Customs and Border Protection*; U.S. Border Patrol; Michael W. Banks, *in his official capacity as Chief of U.S. Border Patrol*; and Gregory Bovino, *in his official capacity as Commander-at-Large of U.S. Border Patrol*,<br><br>    Defendants. | File No. 26-cv-324 (ECT/ECW)<br><br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Kathryn Huddleston and Lucia Goin, American Civil Liberties Union Foundation Immigrants' Rights Project, Washington, DC; Spencer Elijah Wittmann Amdur and Oscar Sarabia Roman, American Civil Liberties Union Foundation Immigrants' Rights Project, San Francisco, CA; Omar Jadwat, American Civil Liberties Union Foundation Immigrants' Rights Project, New York, NY; Teresa J. Nelson, Catherine H. Ahlin-Halverson, Alicia Lynn Granse, and Benjamin Casper, American Civil Liberties Union of Minnesota, Minneapolis, MN; Ian Bratlie, American Civil Liberties Union of Minnesota, Mankato, MN; X. Kevin Zhao, Aaron P. Knoll, Amran Farah, Benjamin L. Larson, Kshithij Shrinath,

Michelle Erickson Morrow, and Nicholas Scheiner, Greene Espel PLLP, Minneapolis, MN; Robert Fram, Covington & Burling, LLP, San Francisco, CA; Gregg H. Levy and Paul Killebrew, Covington & Burling, LLP, Washington, DC; Bree Peilen, Covington & Burling, New York, NY; and Raoul Shah, Bahram Samie, Ellen Levish, and Stacey P. Slaughter, Robins Kaplan, LLP, Minneapolis, MN; for Plaintiffs Mubashir Khalif Hussen and Javier Doe.

Kathryn Huddleston and Lucia Goin, American Civil Liberties Union Foundation Immigrants' Rights Project, Washington, DC; Spencer Elijah Wittmann Amdur and Oscar Sarabia Roman, American Civil Liberties Union Foundation Immigrants' Rights Project, San Francisco, CA; Omar Jadwat, American Civil Liberties Union Foundation Immigrants' Rights Project, New York, NY; Teresa J. Nelson, Catherine H. Ahlin-Halverson, Alicia Lynn Granse and Benjamin Casper, American Civil Liberties Union of Minnesota, Minneapolis, MN; Ian Bratlie, American Civil Liberties Union of Minnesota, Mankato, MN; X. Kevin Zhao, Aaron P. Knoll, Amran Farah, Benjamin L. Larson, Kshithij Shrinath, Michelle Erickson Morrow and Nicholas Scheiner, Greene Espel PLLP, Minneapolis, MN; Robert Fram, Covington & Burling, LLP, San Francisco, CA; Gregg H. Levy and Paul Killebrew, Covington & Burling, LLP, Washington, DC; and Bree Peilen, Covington & Burling, New York, NY, for Plaintiff Mahamed Eydarus.

Sean Skedzielewski, Shane Alan Young, James Walker, and Lori MacKenzie, Department of Justice, Civil Division, Washington DC; and Ana H. Voss, United States Attorney's Office, Minneapolis, MN, for Defendants Kristi Noem, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Todd M. Lyons, David Easterwood, U.S. Customs and Border Protection, Rodney S. Scott, U.S. Border Patrol, Michael W. Banks, and Gregory Bovino.

---

In December 2025, the Department of Homeland Security increased the number of immigration law enforcement officers in Minnesota as part of a deployment labeled "Operation Metro Surge." Plaintiffs are three American citizens who were stopped or arrested as part of the operation. They claim the officers who stopped or arrested them acted unlawfully. The alleged unlawful activities include racial profiling, detaining Plaintiffs without reasonable suspicion of immigration law violations, and arresting them without probable cause of immigration law violations. Plaintiffs claim these violations occurred pursuant to governmental policy.

2

Plaintiffs seek a preliminary injunction forbidding Defendants from continuing to implement their allegedly unlawful policies. To enable the requested injunction's broader enforcement, Plaintiffs also seek provisional certification of one or more classes of individuals who "have been or will be stopped for immigration purposes" in Minnesota.

I held two hearings on these motions. In a four-hour evidentiary hearing on February 17, two Plaintiffs and four non-party witnesses testified regarding their encounters with Defendants' agents. In addition to these witnesses' live testimony, Plaintiffs submitted many declarations of individuals who encountered ICE agents or who have personal knowledge regarding ICE agents' activities as part of Operation Metro Surge. Defendants cross-examined Plaintiffs' witnesses but offered no witness testimony of their own. The next day, the parties presented oral argument regarding disputed factual and legal questions relevant to Plaintiffs' motions. The parties submitted supplemental materials on February 23.

Plaintiffs' motions will be denied. The short version of a much longer story is this: A plaintiff lacks Article III standing to seek forward-looking injunctive relief unless he can show that he faces a "certainly impending" future injury (of the sort he seeks to have enjoined). Judged by the standards governing a preliminary-injunction motion, Plaintiffs have not made this showing. If that weren't correct, the result would not change. Though Plaintiffs have shown that Defendants likely maintained unconstitutional policies, Plaintiffs have not shown that irreparable injury is likely to befall them in the immediate future. This is largely owing to a significant reduction in the scope of Defendants' Minnesota-based operations.

Because the preliminary-injunction motion was the subject of extensive evidentiary submissions and an evidentiary hearing, and because I believe it will be more helpful to the parties and in connection with any appeal of this decision, I've chosen to issue findings of fact and conclusions of law in the manner described in Federal Rule of Civil Procedure 52(a).  I note that other courts have taken this approach.  *See, e.g.*, *FTC v. Sanford Health*, No. 1:17-cv-133, 2017 WL 10810016, at *1 (D.N.D. Dec. 15, 2017); *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405, 1411 (N.D. Iowa 1996).  Of course, in this posture, the findings and conclusions "are not binding at trial on the merits."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

## FINDINGS OF FACT[1]

### Operation Metro Surge

1.      Defendants in this case are the U.S. Department of Homeland Security ("DHS"); its component agencies U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and U.S. Border Patrol; and officials in leadership roles in those agencies.  Compl. [ECF No. 2] ¶¶ 20–29.  These agencies enforce federal immigration law.  ECF No. 83 ¶ 1; ECF No. 82 ¶ 5.

2.      ICE, the largest investigative branch of DHS, comprises "three core operational directorates": (1) Enforcement and Removal Operations (ERO); (2) Homeland

---

[1]      Citations to a document's page numbers are to pagination assigned by the Court's CM/ECF system, appearing in a document's upper right corner, not to a document's original pagination.

Security Investigations (HSI); and (3) the Office of the Principal Legal Advisor (OPLA). *See* ECF No. 82 ¶ 5.

3.     ERO primarily enforces immigration law in the country's interior. *See id.* ¶ 7. "ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States." *Id.* "This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community." *Id.*

4.     ERO has a field office in Saint Paul, Minnesota. *See id.* ¶ 9. Ordinarily, that office is "staffed with approximately 190 officers covering the five states of Minnesota, North Dakota, South Dakota, Nebraska, and Iowa," and about 80 officers are assigned to the Twin Cities of Saint Paul and Minneapolis. *Id.*

5.     In December 2025, DHS launched Operation Metro Surge to "significantly increase 'at-large' arrests of illegal aliens in the Twin Cities metropolitan area." *Id.* ¶¶ 8–10; Compl. ¶¶ 4–5; ECF No. 81 at 16. DHS detailed an additional 2,000 officers to the Saint Paul Field Office. ECF No. 82 ¶ 9. In early January 2026, CBP personnel began deploying in Minneapolis to assist ICE officers in carrying out Operation Metro Surge. ECF No. 83 ¶ 6. By February 3, 2026, there were approximately 1,029 CBP employees assigned to the Operation. ECF No. 169-1 ¶ 7. At its peak, Operation Metro Surge included more than 3,000 federal immigration officers or agents, acting primarily in the

Twin Cities.  *See* ECF No. 169-2 ¶¶ 3–4, 8 (noting that ICE officers also had conducted arrests in Greater Minnesota, including in the cities of Worthington, Austin, and Willmar).

### Minnesota's Somali and Hispanic Populations

6.      Minnesota is home to more than 76,000 people of Somali descent.  ECF No. 48-9 at 3 (showing 2024 U.S. Census Bureau statistics).  Of those, almost 40,000 were born in America and have American citizenship, while another 32,000 were born outside the country and are naturalized citizens.  *Id.* at 7.  Roughly 4,000 Somalis present in Minnesota lack U.S. citizenship.  *Id.*  According to Census Bureau figures, around 94 percent of Somalis in Minnesota are U.S. citizens.  *See id.* at 3, 7.

7.      Minnesota's Hispanic[2] population is larger, at around 388,000 people.  ECF No. 48-10 at 3.  About 76 percent are U.S. citizens.  *See id.*

8.      The record does not show how many noncitizen Somali and Hispanic Minnesotans are unlawfully present in the United States.  ICE believes that, "[b]ased on available data," there are about 66,000 noncitizens in Minnesota who "may be subject to enforcement actions under the Immigration and Nationality Act."  ECF No. 82 ¶ 11.  However, the data underlying this assertion, if any, are not provided.  On this record, it is not possible to make a factual finding of the number of Somali and Hispanic noncitizens who are in Minnesota and present in the United States unlawfully.

---

[2]      The U.S. Census Bureau treats "Hispanic" and "Latino" as one category, and the Declarants and parties appear not to distinguish the terms.  For these reasons, the terms will be used interchangeably here.

## The Disputed Policy-Related Fact Questions

9.    The parties dispute Defendants' policies and practices regarding carrying out immigration stops and arrests.

10.    Plaintiffs' evidence consists of witness testimony regarding several dozen immigration-related encounters in the Twin Cites metropolitan area (and in a few cases, Greater Minnesota) that occurred between December 9, 2025, and late January 2026.  ECF No. 27 at 6–11; ECF No. 138 at 5–11.  Plaintiffs also rely on several statements made by DHS officials.  ECF No. 27 at 11–12.

11.    The testimony and declarations offer, for the most part, a one-side picture. Plaintiffs provided detailed accounts of several dozen stops and arrests, alongside video and photograph evidence, and six witnesses testified for Plaintiffs at the evidentiary hearing.

12.    Defendants submitted declarations disputing four accounts, but only one— the Berry Declaration—offers a narrative of an at-issue immigration detention.  *See* ECF No. 84 (disputing account of Plaintiff Mubashir Hussen).  ERO Assistant Field Office Director Michael Bottjen provides brief accounts of the stops of Santiago Doe, Julio Doe, and Luisa Doe.  ECF No. 82 ¶¶ 18–20.  Assistant Field Office Director Bottjen does not say whether he was present on the scene of these encounters.  *See id.*  Defendants also produced Form I-213 records for Declarants Santiago Doe, Julio Doe, and Luisa Doe.  ECF No. 136 at 2; ECF No. 136-3; ECF No. 137-2; ECF No. 137-1.  Defendants cross-examined Plaintiffs' six witnesses at the evidentiary hearing.  Defendants' approach leaves almost all of Plaintiffs' declaration testimony undisputed.

### Evidence of Specific Immigration Encounters

*Plaintiff and In-Court Witness Mubashir Hussen*

13.     Plaintiff Mubashir Hussen is Somali and a U.S. citizen who lives with his family in Minneapolis, Minnesota.  ECF No. 34 ¶ 1.  Mr. Hussen arrived in the United States as a refugee when he was six or seven years old, and in 2019 he became a naturalized U.S. citizen.  *Id.*  ¶¶ 1–2.  He maintains a valid U.S. passport and, at the time of the events, possessed a valid U.S. passport card.[3]  *Id.* ¶ 2.

14.     On December 9, 2025,[4] Mr. Hussen was detained by ICE agents, including William A. Berry, a Detention and Deportation Officer with ICE ERO.  *Id.* ¶¶ 3–4; ECF No. 84 ¶¶ 1, 5–6.  Evidence for this encounter comes from Mr. Hussen, Officer Berry, and several videos and still images that Mr. Hussen produced and authenticated at the evidentiary hearing.  ECF No. 34; ECF No. 84; Hussen Ex. 1 (surveillance camera footage from back of restaurant); Hussen Ex. 2 (still photograph of the street); Hussen Ex. 3 (still photograph of restaurant); Hussen Ex. 4 (surveillance footage from stairwell); Hussen Ex. 5 (bystander footage of Mr. Hussen being put into ICE vehicle).  Mr. Hussen testified at

---

[3]     In a declaration, Mr. Hussen testified that his passport card was scheduled to expire on January 18, 2026, after the events in question and after his declaration was filed.  ECF No. 34 ¶ 2.  There is no dispute his passport card was valid on December 9, 2025.

[4]     In his declaration, Mr. Hussen testified that the event occurred on December 10.  ECF No. 34 ¶ 4.  At the evidentiary hearing, he corrected that statement and testified the correct date is December 9.  Evidentiary Tr. [ECF No. 162] 87:6–10.  Though it doesn't matter, the parties dispute the time of day of the encounter.  Mr. Hussen testified it happened around 1:30 p.m., *id.* ¶ 5, while Officer Berry testified it happened around 8:00 a.m., ECF No. 84 ¶ 6.  Two video exhibits show time stamps placing the encounter in the afternoon, Hussen Ex. 1; Hussen Ex. 4, but Mr. Hussen testified he did not know if the time stamps were accurate.  Evidentiary Tr. 89:17–22, 97:23–25.

the evidentiary hearing; Officer Berry did not.  At times the evidence from the declarations, videos, images, and witness testimony conflict.

15.     On December 9, 2025, Mr. Hussen was in the Cedar-Riverside neighborhood of Minneapolis, where he worked at a mental health services provider in a second-floor office above two restaurants that serve Somali and East African food.  ECF No. 34 ¶¶ 3–4; ECF No. 84 ¶¶ 5–6.  He saw ICE agents outside, whom he identified by their law enforcement gear and masks, and because bystanders were honking car horns and blowing whistles.  ECF No. 34 ¶ 4.  After the sounds died down, Mr. Hussen went outside for lunch and "noticed an unmarked, tan SUV approaching."  *Id.* ¶¶ 4–5.

16.     In the SUV was Officer Berry, who was "assigned to an ERO Team that was conducting an investigation in the Cedar Avenue area," a location which, he claimed, "was known for housing and concealing illegal aliens and for criminal activity."  ECF No. 84 ¶ 5.

17.     Officer Berry exited the SUV about 10–15 feet away from Mr. Hussen, and Mr. Hussen ran away from the officer toward a restaurant.  ECF No. 84 ¶ 6; ECF No. 34 ¶ 6; Hussen Ex. 1 at 0:35–0:40.[5]  Mr. Hussen ran about 20 to 30 feet toward a stairwell connected to the restaurant before Officer Berry caught up with him at the stairwell.  ECF

---

[5]     In his declaration, Mr. Hussen testified that he did not run away.  ECF No. 34 ¶ 6. At the evidentiary hearing, Mr. Hussen admitted he ran.  Evidentiary Tr. 87:11–16.

No. 34 ¶ 6; ECF No. 84 ¶ 8; Hussen Ex. 3 (showing distance from sidewalk to stairwell); Hussen Ex. 4 at 0:00–0:22 (showing video inside stairwell).[6]

18.    Officer Berry pursued Mr. Hussen because Officer Berry "suspected him of being a possible illegal alien after noticing my ICE badges and deciding to flee." ECF No. 84 ¶ 7.

19.    Once inside the stairwell, Officer Berry pushed Mr. Hussen against a wall. Hussen Ex. 4 at 0:09–0:11. Surveillance footage from the stairwell captured audio from the encounter, and though much of their language is indiscernible, Officer Berry can be heard to yell, "Why are you running? Why are you running?" *Id.* at 0:10–0:14. Mr. Hussen's response is not clear. Another ERO officer arrived at the stairwell, and the two officers restrained Mr. Hussen against a wall, pinning his arms behind his back and handcuffing him. *Id.* at 0:17–0:56. Mr. Hussen's undisputed testimony is that the officers "squeez[ed] [his] hand really hard." Evidentiary Tr. 98:10–12. Mr. Hussen can be heard saying, "I'm legal," and "I'm a citizen." *Id.* at 0:40–0:48. He testified that an officer responded to him, "That don't matter. That don't matter." Evidentiary Tr. 95:24–96:3. The footage supports Mr. Hussen's assertion that the officers "did not stop or ask to see my identification." ECF No. 34 ¶ 8; Hussen Ex. 4 at 0:40–0:48.

20.    The parties dispute whether Mr. Hussen resisted the officers in the stairwell. Officer Berry stated that Mr. Hussen "actively resist[ed] by aggressively pulling his arms and hands away in an attempt to avoid restraint," and that it took "several minutes to gain

---

[6]    In his declaration, Officer Berry testified that he "pursued Hussen on foot for 100–150 yards." ECF No. 84 ¶ 8. The video evidence shows the distance was much shorter.

control of him" because of his "violent obstruction and physical resistance." ECF No. 84 ¶ 8. At the hearing, Mr. Hussen testified that he did not resist and that he offered his hands to be cuffed. Evidentiary Tr. 129:24–130:22. I find that, based on the video evidence, Mr. Hussen resisted for about 30 seconds until officers restrained him, and he remained still while being handcuffed. Hussen Ex. 4 at 0:18–1:01.

21.     After the officers removed Mr. Hussen from the stairwell, they put him in the SUV. ECF No. 34 ¶¶ 10–12. Officer Berry testified that Mr. Hussen was "struggling aggressively the entire time" and "yelling extremely loud with an apparent attempt to incite the crowd" that had gathered around them. ECF No. 84 ¶ 9. A bystander's video shows officers walking Mr. Hussen to the car, and while Mr. Hussen apparently resists being taken to the car, it does not show him "struggling aggressively." *See* Hussen Ex. 5 at 0:00–0:24. Mr. Hussen shouts that he is a citizen and that he is handcuffed before being put into the SUV. *Id.*

22.     The officers attempted to scan Mr. Hussen's face, but Mr. Hussen did not allow them to do so. ECF No. 34 ¶ 13; ECF No. 84 ¶ 13.

23.     The parties dispute whether Mr. Hussen offered to provide identification, and whether the officers sought additional means to identify him. Mr. Hussen testified that he asked to show the officers a copy of his passport card on his phone or his driver's license, which was in his workplace, but they would not allow him to do either. ECF No. 34 ¶¶ 13–14. Officer Berry testified that, though they asked Mr. Hussen for his name, date of birth, and identification, "[h]e refused to answer and he ignored our questions," and he did not ask to show them anything on his phone. ECF No. 84 ¶¶ 13–14. Mr. Hussen testified that

his employer grabbed a copy of Mr. Hussen's passport card from an employee file, approached the vehicle, and "showed the copy of [the] passport card through the windshield, but the ICE officers ignored him and refused to take the document[] into account." ECF No. 34 ¶ 15. Officer Berry testified he "did not observe anyone attempting to present us with Hussen's passport card as our vehicle was attempting to leave the scene." ECF No. 84 ¶ 11. The bystander's video shows a man chase down the SUV after it left the scene and present a document through the windshield, leaning over the hood of the SUV, while others around him shout, "he's a U.S. citizen." Hussen Ex. 5 at 0:48–1:06.

24.    I find Mr. Hussen's account to be credible. His testimony at the evidentiary hearing was clear and direct on these questions. It was consistent with the declaration he provided, and it was supported by the video and audio evidence showing he asserted he was a citizen many times. Officer Berry, on the other hand, did not testify at the evidentiary hearing, making it more difficult to assess the veracity of his account. Regardless, his statement that he did not observe anyone present documentation through the windshield makes his account less credible; it would have been impossible for someone in the SUV not to notice the man standing at the front of the vehicle, obstructing the vehicle's path, showing the passport card copy.

25.    While in the car, Mr. Hussen asked the officers if they would loosen his handcuffs. ECF No. 34 ¶ 20. The officers instead "squeezed them tighter." *Id.*; *see* Evidentiary Tr. 140:12–18.

26.    The officers took Mr. Hussen to the ICE office near Fort Snelling, where they forced him to undergo a facial scan. ECF No. 34 ¶ 25. They uncuffed him and shackled

his feet.  *Id.* ¶ 26.  They did not provide Mr. Hussen with water or medical assistance, despite telling him earlier that medical assistance would be available.  *Id.* ¶ 26.  Mr. Hussen received his phone back and showed the photo of his passport card to a woman who worked at the ICE office, and he was fingerprinted.  *Id.* ¶ 27.  Despite Mr. Hussen's request, ICE did not give him a ride back to the site of his arrest; ICE officers told him to walk back, though the temperatures were freezing and the arrest site was roughly seven miles away. *Id.* ¶ 29.

27.    Throughout the encounter, ICE officers never asked Mr. Hussen about his citizenship, immigration status, ties to the community, time he had lived in the Twin Cities, or family in Minnesota.  *Id.* ¶¶ 22, 28.  Officers did not present a warrant, explain why he was stopped or arrested, or seem to know who he was (until he displayed his passport card at the Fort Snelling ICE office).  *Id.* ¶ 37.

28.    Mr. Hussen was detained by ICE for about an hour and a half to two hours. *Id.* ¶ 30; Evidentiary Tr. 105:10–13.

29.    The event terrified Mr. Hussen and his family, and he has had trouble sleeping ever since.  ECF No. 34 ¶¶ 34–35, 43–44.  His hands had marks from the cuffs for several days, and he continues to experience back pain because of the incident.  *Id.* ¶¶ 35, 43.

30.    Mr. Hussen sees federal immigration agents every day in his Lake Street neighborhood, and he has avoided walking to grocery stores because immigration officials arrest people there.  *Id.* ¶ 38.  He has continued to participate in ordinary community life, like going to work, going to the gym, playing basketball, spending time with friends and

family, and attending Friday prayers at the mosque. *Id.* ¶ 40; *see* Evidentiary Tr. 110:15–21. Mr. Hussen now avoids walking to Karmel Mall—a Minneapolis mall with many Somali shops—a place he used to visit almost every day. Evidentiary Tr. 111:3–21. For this Ramadan, his family is not breaking fast with other families, but has decided to stay inside and break their fast indoors. *Id.* 112:14–23. Mr. Hussen has not been stopped or detained by immigration officers since December 9, 2025, though he voluntarily confronted an ICE officer on January 6, 2026. *Id.* 128:12–129:23.

*Plaintiff and In-Court Witness Mahamed Eydarus*

31.     Plaintiff Mahamed Eydarus is Somali and a U.S. citizen. ECF No. 42 ¶ 3. He was born in the United States, and he has lived in Minnesota since 2001. *Id.* Mr. Eydarus lives in Fridley, Minnesota, as do his parents. *Id.* ¶¶ 3–4. He graduated from the University of Minnesota in 2023, and works both as a full-time recovery coordinator and part-time as a personal care assistant. *Id.* ¶ 5.

32.     On the morning of December 10, 2025, Mr. Eydarus and his mother were traveling to the Cedar-Riverside neighborhood to provide care for a client. *Id.* ¶¶ 6–7. Parking was limited due to a recent snowfall, so Mr. Eydarus and his mother got out of their car and began to shovel snow to clear a parking space. *Id.* ¶¶ 8, 10. While they were shoveling, six to eight men from three unmarked vehicles approached without identifying themselves. *Id.* ¶¶ 10–11. Mr. Eydarus now understands these men to be ICE agents, though at the time he wasn't certain, as they were wearing different colored vests. *Id.* ¶¶ 12–13. The men were armed with "guns, tasers, and pepper spray." *Id.* ¶ 12. Two other individuals also got out of the unmarked vehicles and appeared to be livestreaming the

encounter, holding a camera about a foot away from Mr. Eydarus's face. *Id.* ¶ 14; Evidentiary Tr. 30:20–31:1. The agents stood a couple of feet away from Mr. Eydarus, surrounded him, and blocked his movement, so Mr. Eydarus assumed he was not allowed to walk away. Evidentiary Tr. 11:4–21.

33.    The ICE officers asked Mr. Eydarus for his identification to see if he was, in the officers' words, "not illegal." ECF No. 42 ¶ 16. The officers did not produce a warrant or indicate that they knew Mr. Eydarus's name or his mother's name. *Id.* ¶¶ 17–18. Mr. Eydarus did not hand over any identification for fear that the livestreamers would expose his personal information on the Internet, *id.* ¶ 16, but his mother handed over her driver's license, *id.* ¶ 24.

34.    The ICE officers determined Mr. Eydarus was a U.S. citizen and told him he was free to go, but they did not find his mother's license to be "federally acceptable" and continued to detain her, asking her when she was naturalized and telling her to remove her niqab. *Id.* ¶¶ 25–26. The officers did not allow Mr. Eydarus to stand near his mother, *id.* ¶ 26, and they questioned him about speaking to her in Somali, *id.* ¶ 27. Mr. Eydarus does not know how the officers determined he was a citizen; he never gave them his name or identification, and they asked no questions about his ties to the community. *Id.* ¶¶ 26, 38. The officers told Mr. Eydarus he was free to go after about 20 minutes, and they allowed his mother to leave about 10 minutes later. Evidentiary Tr. 16:6–10, 35:7–18. After about half an hour, the agents suddenly left the area without any explanation. ECF No. 42 ¶ 31.

35.    The officers did not seem to know who Mr. Eydarus or his mother were, never accused them of a crime, and never produced a warrant. ECF No. 42 ¶ 37. Mr.

Eydarus has no criminal record, other than parking tickets, and he timely paid the fines associated with these citations. *Id.* ¶ 39. The officers' comments about speaking Somali "also make [Mr. Eydarus] believe that [the officers] were stopping [him and his mother] just because" the two of them "looked like [they] could be 'foreign.'" *Id.* ¶ 38. I find that Mr. Eydarus and his mother were stopped and detained based solely on their race or ethnicity.

36.    Mr. Eydarus fears he will be stopped again and "physically harmed or even arrested." *Id.* ¶ 40. He lives in the metro area and is frequently in Minneapolis and the Cedar-Riverside neighborhood "for work and other community events." *Id.* Mr. Eydarus has shifted his daily activities—he has stopped going to most places other than work. Evidentiary Tr. 19:5–20. As an example, he used to go to the gym four times a week, but he has only gone twice since December 10. *Id.* 19:12–17. He has avoided "hotspots" of increased ICE presence, like South Minneapolis, and he has seen ICE officers a couple of times since the December 10 encounter. Evidentiary Tr. 20:6–23. For the last two months, he has heard about immigration officers questioning Somali people on the street or detaining them almost every day. *Id.* 20:24–21:10. He has not been stopped by immigration officers since the December 10 incident. *Id.* 29:18–24.

*Plaintiff Jonathan Aguilar Garcia*[7]

37.    Plaintiff Jonathan Aguilar Garcia is Hispanic and a U.S. citizen.  ECF No. 30 ¶ 1; ECF No. 18 ¶ 1.  Mr. Aguilar Garcia lives in the Twin Cities area and works at a Target in Richfield, Minnesota, a city where many Hispanic people live and work.  ECF No. 30 ¶¶ 1, 4.

38.    On the morning of January 8, 2026, Mr. Aguilar Garcia and his friend Andres (a pseudonym), who is also Hispanic and a U.S. citizen, were delivering drive-up orders to Target customers when unmarked vehicles arrived in the parking lot.  *Id.* ¶¶ 2–3.  Border Patrol agents, including former Border Patrol Commander-at-Large Gregory Bovino, approached Mr. Aguilar Garcia and Andres, who "were both keeping [their] distance and videoing them."  *Id.* ¶ 4.  Mr. Bovino asked the two men if they were U.S. citizens, and Mr. Aguilar Garcia responded, "fuck you," and refused to answer.  *Id.*  Mr. Aguilar Garcia's video of the event shows Mr. Bovino and masked DHS agents walking toward Mr. Aguilar Garcia, while Mr. Aguilar Garcia walked backward toward the Target entrance, filming the agents and uttering profanities.  ECF No. 31 at 0:00–0:30.  Another agent began walking quickly toward Mr. Aguilar Garcia and asked repeatedly if Mr. Aguilar Garcia was a citizen.  *Id.* at 1:00–1:30.

39.    Mr. Aguilar Garcia moved to enter the Target.  ECF No. 31-1 at 1:40–1:51 (showing second video account).  Though Mr. Aguilar Garcia's movement was sudden, he

---

[7]    Jonathan Aguilar Garcia initially moved to proceed under the pseudonym Javier Doe.  ECF No. 15.  He later withdrew that motion and elected to proceed under his name. ECF No. 175 at 2 n.1.

did not flee; he jumped inside the sliding doors and stopped to continue filming the agent. *Id.* The agent grabbed Mr. Aguilar Garcia and tackled him to the ground in between the two sets of sliding doors. ECF No. 30 ¶ 5. Other agents piled on top of him. *Id.* ¶ 6. One pressed a knee on Mr. Aguilar Garcia's neck, an officer handcuffed him, and several officers dragged him to the SUV. *Id.* ¶¶ 7–8. Officers also arrested Andres and put both men into the third row of the SUV. *Id.* ¶ 10. A third video confirms this account; in it, Mr. Aguilar Garcia can be heard shouting that he is a U.S. citizen and has a passport on him. ECF No. 31-2 at 1:38–2:10.

40.    With Mr. Aguilar Garcia and Andres in the back seat, the officers drove off and asked for identification. ECF No. 30 ¶ 11. The agents drove over the speed limit and played Mexican music loudly; Mr. Aguilar Garcia believed the agents played the music "because we were Hispanic." *Id.* ¶ 11. Mr. Aguilar Garcia told officers his passport was in his pocket and that officers could examine it; the officers then removed it and examined it. *Id.* Andres did not have a passport on him, but he did have a Minnesota identification card. *Id.* ¶ 12. The officers dropped Mr. Aguilar Garcia off in a Walmart parking lot in Bloomington, but they continued to detain Andres. *Id.* ¶¶ 14–17. Mr. Aguilar Garcia learned from social media that Andres was later released. *Id.* ¶ 21.

41.    Mr. Aguilar Garcia sustained injuries to his arm, shoulder, neck, and head from the encounter. *Id.* ¶ 20. Ever since, he has experienced pain in his ribs and chest and has had difficulty sleeping. *Id.* ¶ 22.

42.    There were many white people at Target the day Mr. Aguilar Garcia was arrested; they also yelled at the agents, but they were not questioned, photographed,

harassed, followed, tackled, or arrested—only Mr. Aguilar Garcia and Andres were. *Id.* ¶ 26.

43.    I find that Mr. Aguilar Garcia was stopped and detained based solely on his race or ethnicity.

44.    From the time Mr. Aguilar Garcia first encountered the officers until they released him at the Walmart parking lot in Bloomington, about two hours elapsed. *Id.* ¶¶ 3, 19 (starting at 11:00 a.m. and ending sometime before 1:00 p.m.).

45.    Mr. Aguilar Garcia fears a future encounter with ICE agents. He testified that "Richfield has been relentlessly targeted by federal immigration enforcement agents since Thanksgiving, [presumably] because there is a significant Hispanic population living there." *Id.* ¶ 27. As of mid-January 2026, he observed immigration officers "in Richfield neighborhoods, outside churches, and in and around businesses." *Id.* He regularly drives in Richfield to go to work, see family and friends, and go to the gym, and as of January 14, 2026, he regularly hears people whistling to signal ICE's presence. *Id.*

*Declarant Ali Dahir*

46.    Declarant Ali Dahir is Somali and a U.S. citizen who lives on Lake Street in Minneapolis, Minnesota. ECF No. 32 ¶ 1. Mr. Dahir immigrated to the United States in 2001 and naturalized in 2006. *Id.*

47.    On December 2, 2025, Mr. Dahir was leaving his apartment building to get food at Karmel Mall, a "major hub[] for Somali people in Minneapolis." *Id.* ¶¶ 2, 4. He saw five or six ICE officers in the elevator of his apartment building, and after he exited the elevator in the main lobby, one officer approached Mr. Dahir and said he needed to talk

to him. *Id.* ¶¶ 5–6. Four other officers gathered and surrounded Mr. Dahir. *Id.* ¶ 6. One ICE officer "said they were looking for somebody who looked like [him]," and asked to see identification, so Mr. Dahir produced his Minnesota driver's license. *Id.* ¶¶ 7, 9. The officer asked Mr. Dahir if he was a U.S. citizen, and another officer took a picture of Mr. Dahir's face. *Id.* ¶¶ 10–11. The first officer asked for proof of citizenship, and Mr. Dahir handed over his passport card. *Id.* ¶ 12. ICE agents did not let Mr. Dahir leave, however, until they had "more information from their headquarters." *Id.* ¶¶ 12, 15–16.

48.    The encounter lasted about twenty-five or thirty minutes, after which a media cameraperson and other neighborhood people arrived on scene. *Id.* ¶ 20. The ICE officers returned Mr. Dahir's passport and driver's license, gave no further information about why he was stopped, and left. *Id.* ¶ 21. The officers gave no indication they knew who Mr. Dahir was, and they only said that they were looking for someone who resembled Mr. Dahir, but without providing any specific description. *Id.* ¶¶ 7, 19. Without information regarding who the officers were looking for who assertedly resembled Mr. Dahir, this justification is not credible. I find therefore that Mr. Dahir was stopped and detained based solely on his race or ethnicity.

49.    Mr. Dahir is concerned ICE will seize him again. *Id.* ¶ 27. He tries not to go outside unless necessary because, as of January 10, 2026, "ICE officers are all over the city, in restaurants, supermarkets, shopping malls, gas stations, and schools." *Id.* ¶¶ 24, 27.

*Declarant Santiago Doe*[8]

50.    Declarant Santiago Doe is a Latino man from Honduras who has lived in the United States since 1995 and currently resides in New Hope, Minnesota.  *See* ECF No. 46 ¶ 1.  Santiago has applied to be a lawful permanent resident, but his application has yet to be approved.  *Id.* ¶ 2.

51.    Santiago is a maintenance worker, and on December 12, 2025, he was driving a work truck away from a Home Depot and Culver's parking lot in Chaska, Minnesota. *See id.* ¶¶ 3–5.  According to the Form I-213 Record of Deportable/Inadmissible Alien, ERO officers conducted a record check on Santiago's vehicle that day, and the search revealed that the vehicle was registered to someone unlawfully present in the United States. ECF No. 136 at 2; ECF No. 136-3 at 2.  The officers pulled Santiago's vehicle over.  *Id.*; ECF No. 46 ¶¶ 6–7.

52.    Six ICE officers exited their vehicles, called Santiago by name, and told him to get out of the car.  ECF No. 46 ¶¶ 8–9.  Officers handcuffed Santiago, shackled his ankles, and drove him to a nearby hospital parking lot.  *Id.* ¶¶ 11–12.  The officers asked for identification, and he produced his driver's license and explained his pending application.  *Id.* ¶ 13.  The officers responded that, since Santiago's lawful-permanent-residency application had not been approved, the application was not valid.  *Id.*

53.    After a few hours waiting in a parking lot "to pick up more people," the officers transported Santiago to the ICE office near Bloomington, Minnesota, and then

---

[8]    Santiago Doe is proceeding under a pseudonym, as are all other declarants identified by either the last name "Doe" or initials.

transported him to Freeborn County Jail, where, as of January 12, 2026, Santiago remains detained. *Id.* ¶¶ 15, 17–19.

54.    If he is released, Santiago fears being again detained by ICE. *Id.* ¶ 25.

55.    The parties dispute whether the officers informed Santiago why he was detained. *See* ECF No. 136-3 at 2 ("ERO officers took custody of [Santiago] and informed him that he was under arrest for being unlawfully present in the United States."); ECF No. 46 ¶ 19 ("I have still not received explanation as to why I was arrested and remain detained."). I find that ICE officers detained Santiago because, after running his license plate, they possessed evidence indicating that the vehicle was registered to someone unlawfully present in the United States.

*Declarant Luisa Doe*

56.    Declarant Luisa Doe is Latina from Honduras, and she has lived in Minnesota since 2019. ECF No. 41 ¶ 1. Luisa has a pending asylum application and is scheduled to appear in immigration court on May 5, 2026. *Id.*

57.    On December 12, 2025, Luisa was driving in Saint Paul, Minnesota, when ICE agents pulled her over. *Id.* ¶¶ 2–3. One agent asked her name; Luisa answered, and the agent arrested her, handcuffed her, and put her in an ICE vehicle. *Id.* ¶¶ 4–6. The agent scanned Luisa's face with a phone, and then spoke to another agent in English; Luisa did not understand that conversation. *Id.* ¶ 6. The agents never presented a warrant, explained why they arrested her, or asked about her ties to the community. *Id.* ¶ 9. The agents took her first to an unspecified detention facility where staff at the facility asked for her full name and passport and ran her fingerprints. *Id.* ¶ 10. Then they transferred her to the

Douglas County Jail in Wisconsin, where, as of January 12, 2026, she remains detained. *Id.* ¶¶ 10–12.

58.     The parties dispute why Luisa was stopped and arrested.  Luisa believes she was stopped solely because of her skin color and appearance, as the arresting officer did not know who she was or present a warrant.  *Id.* ¶ 17.  I find this is true; Defendants have presented no other reason to explain why the agents pulled Luisa over.  I do not reach this same conclusion regarding the arrest, however.  Luisa testified that she was arrested after the ICE agent learned her name.  *Id.* ¶ 4.  Defendants state that "Immigration Officers determined that [Luisa] was unlawfully present and placed her under arrest for an immigration violation."  ECF No. 82 ¶ 20; *accord* ECF No. 137-1 at 2 (Form I-213).

*Declarant Julio Doe*

59.     Declarant Julio Doe is Latino and from El Salvador, and he has lived in Minnesota since June 2024.  ECF No. 40 ¶ 1.  Julio has a pending asylum application with USCIS.  *Id.*

60.     On December 24, 2025, Julio and three co-workers, all of whom were Latino, were working at a construction site in Rosemount, Minnesota.  *Id.* ¶¶ 4–5.  Julio's I-213 Form describes a vehicle on site as a red Chevrolet Silverado registered to a noncitizen with a pending U visa application.  ECF No. 137-2 at 2.  The vehicle's owner was Julio's employer.  ECF No. 40 ¶ 5.

61.     ICE officers were surveilling nearby Lakeville, Minnesota, because "multiple arrests had previously occurred" there.  ECF No. 137-2 at 2 (Form I-213).  The officers observed a Dodge Ram with markings of a construction company circling the

officers' vehicles, and the Dodge Ram's driver slowed down to look inside the officers' vehicle. *Id.* "Moments later," another officer "monitoring a nearby residence" saw "four Hispanic males quickly exit a worksite" and drive away in the Chevrolet Silverado. *Id.*

62.    The parties dispute how the Silverado was driving: Julio testified that the driver was "obeying all traffic laws" and was "not speeding." ECF No. 40 ¶ 5. Defendants asserted that the Silverado was driving "at an extremely high rate of speed." ECF No. 82 ¶ 19; *accord* ECF No. 137-2 at 2.

63.    Four ICE officers in two cars pulled the Silverado over, and one of them aimed his firearm in the direction of the truck's windows. ECF No. 40 ¶¶ 7–8. The officers directed Julio and the truck's other occupants to exit the vehicle and provide their documents, and one officer asked the group why they left the job site so quickly. *Id.* ¶ 9.

64.    After reviewing Julio's papers, the officers determined he was not lawfully present in the United States, arrested and handcuffed him, and took him first to an ICE office and then to Freeborn County Jail, where Julio is currently detained. *Id.* ¶¶ 10–17; *see* ECF No. 137-2 at 2.

65.    Julio believes he was detained solely because of his skin color, appearance, and presence near a construction site. ECF No. 40 ¶ 20. The officers did not know Julio's name, tell him why he was stopped or arrested, or present a warrant. *Id.* The Form I-213 reports that Julio was stopped because his proximity to locations of arrests the previous day, because "the operator of the Dodge Ram seemingly notifying the four males, who then immediately left the scene," and because the Silverado was registered to a noncitizen with

a pending U visa. ECF No. 137-2 at 2. I find that the officers relied on those factors, not merely Julio's skin color and ethnicity, in stopping and arresting him.

*Declarant Crisareli Castillo*

66.    Declarant Crisareli Castillo is of Mexican descent and a U.S. citizen. ECF No. 38 ¶ 1. Ms. Castillo lives in Minneapolis's Powderhorn neighborhood and works in its Longfellow neighborhood as a support teacher at a Spanish-immersion daycare, caring for infants and toddlers. *Id.* ¶ 2. One of Ms. Castillo's co-workers is Rosa,[9] the aunt of Ms. Castillo's boyfriend. *Id.* ¶ 3. Rosa is from Ecuador, has a valid work permit, and is currently seeking asylum in the United States. *Id.* ¶ 3.

67.    On the morning of January 7, 2026, Ms. Castillo and Rosa were arriving at the daycare when they were confronted by several masked ICE officers who boxed in Ms. Castillo's car. *Id.* ¶¶ 4–6. The officers instructed Ms. Castillo and Rosa not to move and asked for identification. *Id.* ¶¶ 7–8. Ms. Castillo handed over her passport, and one officer showed Ms. Castillo a picture of a Latina woman, and asked if Ms. Castillo recognized her; she did not. *Id.* ¶ 8. Though Rosa did not say she was in the country without authorization, the officers nevertheless handcuffed her, put her in one of the vehicles, and drove off. *Id.* ¶ 11. ICE flew Rosa to Texas a day or two afterward, but Ms. Castillo does not know where Rosa is currently detained. *Id.* ¶ 16.

68.    Ms. Castillo does not know why she and Rosa were stopped. *Id.* ¶ 12. The ICE officers never presented a warrant, nor did they indicate they knew either woman's

---

[9]    Rosa is a pseudonym. ECF No. 38 ¶ 3.

name before the encounter. *Id.* Ms. Castillo and Rosa do not resemble the Latina woman in the photograph. *Id.* ¶ 13. About ten white bystanders were nearby, and the officers did not ask any of the bystanders for identification, nor did they ask if they bystanders recognized the woman in the photograph. *Id.* ¶ 14. I find that Ms. Castillo and Rosa were stopped based solely on their race or ethnicity. Rosa's subsequent arrest was based on her immigration status.

69.    Ms. Castillo is concerned that ICE will again detain her, and that they will target the daycare and Powderhorn neighborhood, which has a large Latino population. *Id.* ¶ 19.

*Declarant E.M.*

70.    Declarant E.M. is Mexican, Latina, and a U.S. citizen who lives in Maplewood, Minnesota. ECF No. 92-8 ¶ 1.

71.    On January 7, 2026, E.M. was driving near her neighborhood when immigration agents boxed in her car and approached her. *Id.* ¶¶ 2, 4, 6–7. The agents' clothing did not identify their agency. *Id.* ¶ 9. E.M. handed the agents her driver's license and passport, which they checked and returned, and they allowed her to depart. *Id.* ¶ 10.

72.    E.M. was angry, believing the agents had racially profiled her, as she could see no legitimate reason to stop her. *Id.* ¶ 11. She yelled at them and honked, and an agent yelled back, "You need to stop! If you don't I am going to detain you whether you are a citizen or not for reckless driving." *Id.* ¶¶ 11–12. The agents then drove away. *Id.* ¶ 12. I find that E.M. was stopped based solely on her race or ethnicity.

73.    As of January 31, 2026, E.M. observed immigration agents in her neighborhood several times, and she has avoided intersections where she has seen them to avoid being stopped again.  *Id.* ¶ 15.

### Declarant Said Osman

74.    Declarant Said Osman was born in Somalia and arrived in the United States as a refugee in 2015.  ECF No. 29 ¶ 1.  Mr. Osman has had a green card since 2017, but he is not a naturalized U.S. citizen.  *Id.* ¶ 2.  Mr. Osman lives in Louisville, Kentucky, and traveled to Minneapolis in January 2026 to visit his family, who had recently moved there. *Id.* ¶¶ 1, 4.

75.    On January 8, 2026, Mr. Osman was on his way to a mosque, walking on 31st Street or Lake Street—a neighborhood where "many Somali Americans live, worship, shop, and work"—when a black SUV pulled up next to him.  *Id.* ¶¶ 5–7.  Two agents exited the SUV and asked Mr. Osman if he was a citizen; Mr. Osman responded that he was in the country legally.  *Id.* ¶¶ 8–9.

76.    The agents did not answer or ask for Mr. Osman's identification but instead grabbed him by the arm and tried to put him in the SUV.  *Id.* ¶¶ 9–10.  Mr. Osman refused to enter the vehicle, not knowing if the agents were legitimate law enforcement,[10] and the agents pinned Mr. Osman to the ground, saying they would use additional force if he did

---

[10]    Mr. Osman does not identify the organization that employed these agents, or say when he learned that they were federal agents.  Defendants do not dispute that the men who detained Mr. Osman were federal agents carrying out immigration enforcement.

not get in the SUV.  *Id.* ¶¶ 10–11, 14.  An onlooker's video shows Mr. Osman's encounter with these agents that is consistent with Mr. Osman's account.  ECF No. 29-1.

77.    Mr. Osman was willing to show the agents his ID, but they would not let him present it.  ECF No. 29 ¶ 12.  The agents "shoved" Mr. Osman into the SUV and drove off with him.  *Id.* ¶¶ 13–15.  When Mr. Osman pointed out that agents didn't ask for his ID, the agents responded, "we are trying to implement the law of the land; if you are good, and you are okay, we will let you go."  *Id.* ¶¶ 15–16.

78.    Eventually, the agents examined Mr. Osman's identification, took a photo of his face, and "seemed to check [his] immigration status" on a phone.  *Id.* ¶ 18.  The agents drove back to the spot where they apprehended Mr. Osman and released him.  *Id.* ¶ 21.  Mr. Osman was in the car for about fifteen minutes.  *Id.*

79.    The agents did not know Mr. Osman's name, they presented no warrants, and they did not say why Mr. Osman was stopped or detained.  *Id.* ¶ 24.  Mr. Osman believes he was "targeted" because he appears to be Somali American, and he was wearing traditional Muslim clothing.  *Id.* ¶¶ 24–25.  Mr. Osman saw at least one other person on the street who was white, and the agents did not stop or detain that person.  *Id.* ¶ 26.  The agents never asked Mr. Osman about his ties to the community, where he lived, how long he had lived there, or about his family.  *Id.* ¶ 23.  I find that Mr. Osman was stopped and detained based solely on his race or ethnicity.

### *Declarant Lindsay Vogt*

80.    Declarant Lindsay Vogt is a resident of Minnetonka, Minnesota.  ECF No. 35 ¶ 1.  On January 8, 2026, two Latino construction workers were working on the siding

of her house.  *Id.* ¶ 5.  When one of the workers went to the front of Ms. Vogt's house to get supplies, two or three unmarked cars pulled up, and six ICE officers exited the vehicles and approached the worker.  *Id.* ¶ 6.  Ms. Vogt began recording the officers and told them to "get out of here," but the officers continued to approach the worker, handcuff him, and leave, all within fifteen to thirty seconds.  *Id.* ¶¶ 7–10.  The officers did not ask for the worker's identification, show him any paperwork, or ask about his community ties.  *Id.* ¶ 10.

81.    Ms. Vogt believes the officers were not looking for anyone in particular; in her view, "they just found a Hispanic or Latino man doing construction work, and took him away."  *Id.* ¶ 11.  Ms. Vogt's testimony does not permit me to make a finding regarding the reasons officers stopped and detained the worker.

*Declarant Mark Castillo*

82.    Declarant Mark Castillo is Hispanic and a U.S. citizen who was born in Texas and now lives in Saint Paul, Minnesota.  ECF No. 43 ¶¶ 1, 6 (noting he "looks like he is from Mexico").

83.    On January 9, 2026, Mr. Castillo was taking the trash out of his apartment building when four ICE vehicles "cornered" him, and ICE agents asked him if he had a birth certificate.  *Id.* ¶¶ 2, 5, 7.  Mr. Castillo said he was born in Texas.  *Id.* ¶ 7.  The agents asked for identification, and Mr. Castillo provided his Minnesota driver's license.  *Id.* ¶¶ 8–9.  The agents reviewed Mr. Castillo's license for twenty to thirty minutes, making Mr. Castillo stand in the cold without winter clothes before the agents returned the license.  *Id.* ¶¶ 2, 11.  One agent told Mr. Castillo he should go back to Texas.  *Id.* ¶ 11.

84.    Mr. Castillo believes the stop was discriminatory: "[The agents] saw a man who looked Mexican and pounced on him," and they "had no reason to think [Mr. Castillo] was in violation of any immigration law." *Id.* ¶¶ 12– 13.  Defendants have provided no contrary evidence.  I agree with Mr. Castillo.

*Declarant Julio Cesar Martinez Garcia*

85.    Declarant Julio Cesar Martinez Garcia is Hispanic[11] and a U.S. citizen.  ECF No. 39 ¶¶ 1, 12.  Mr. Martinez Garcia has a valid U.S. passport and Minnesota driver's license; he has applied for a REAL ID and is waiting for it to be mailed to him.  *Id.* ¶¶ 3– 4.  Mr. Martinez Garcia lives in Bloomington, Minnesota, and he works in cleaning and property removal.  *Id.* ¶¶ 1–2.

86.    On January 9, 2026, Mr. Martinez Garcia was working at a house in Brooklyn Center, Minnesota.  *See id.* ¶ 5.[12]  Two immigration agents with "border patrol" on their vests drove past the house, made a U-turn, and approached Mr. Martinez Garcia.  *Id.* ¶ 7. The agents asked Mr. Martinez Garcia where he was born, and Mr. Martinez Garcia replied that he was a U.S. citizen.  *Id.* ¶ 8.  Mr. Martinez Garcia showed the agents his driver's license and REAL ID paperwork, but the agents asserted that the REAL ID papers were

---

[11]    Mr. Martinez Garcia does not directly testify as to his race or ethnicity, but there is no other sensible inference.  He believes he was stopped because of his skin color and appearance.  ECF No. 39 ¶ 16.  One of the agents who stopped him conducted a facial recognition scan and told Mr. Martinez Garcia that Mr. Martinez Garcia was born in Mexico City.  *Id.* ¶ 12.  At least one agent, then, believed that Mr. Martinez Garcia appeared to be of Mexican descent.

[12]    The declaration gives the date of "January 9, 2025."  ECF No. 39 ¶ 5.  I understand "2025" to be a typographical error.

fake and that the driver's license proved nothing, and they handcuffed him. *Id.* ¶¶ 9–12. Mr. Martinez Garcia tried to show the officers pictures of his passport on his phone, but the agents did not allow it and confiscated his phone. *Id.* ¶ 13.

87.    After driving Mr. Martinez Garcia around for about thirty minutes, the agents met up with a different agent, who used a facial recognition scan to determine that Mr. Martinez Garcia was a U.S. citizen. *Id.* ¶ 14. After that, the officers released Mr. Martinez Garcia. *Id.* ¶ 15.

88.    I find that Mr. Martinez Garcia was stopped and detained based solely on his race or ethnicity. Without more, the assertions that Mr. Martinez Garcia's papers were "fake" or "proved nothing" are unsupported, pretextual justifications for prolonging the detention.

*Declarant A.A.*

89.    Declarant A.A. is Somali and a lawful permanent resident of the United States. ECF No. 37 ¶ 1. A.A. lives with his wife and children in Burnsville, Minnesota. *Id.*

90.    On January 9, 2026, A.A. was in the Burnsville Walmart parking lot putting groceries in his car, when two masked ICE officers came up, grabbed him, and reached into his pants pocket, asking if he had a knife. *Id.* ¶¶ 2–3. A.A. denied having a knife, but the officers continued to search his pockets. *Id.* ¶ 3. The officers removed A.A.'s wallet, which contained his driver's license and green card. *Id.* The officers did not ask A.A. questions about his identity or request documents. *Id.*

91.    The officers  handcuffed A.A., put him in the back of their sedan, and drove him for about half an hour to a police station, where two more ICE officers began searching A.A.'s pockets and asking where his documents were.  *Id.* ¶¶ 4–6.  A.A. explained that the other ICE officers had his documents.  *Id.* ¶ 6.  One of the officers began asking A.A. if he was Somali, how long he lived in the United States, and what his name was, and A.A. truthfully answered these questions.  *Id.* ¶ 7.

92.    A.A. requested a translator, and the officers called a translator on the phone, who told A.A. that A.A. "had the same first and last name as someone [the officers] were looking for," and the translator apologized to A.A.  *Id.*  After getting off the phone with the translator, the ICE officers asked A.A. if they should release him at the police station or return him to the Burnsville Walmart.  *Id.* ¶ 9.  A.A. chose the Walmart, so the officers returned him to that parking lot, but did not remove his handcuffs until they arrived.  *Id.* ¶ 9.

93.    A.A. was handcuffed for about an hour and a half.  *Id.* ¶ 10.  The officers never identified themselves, presented a warrant, indicated that they knew A.A. before arresting him, or asked about his ties to the community or family.  *Id.* ¶ 12.  A.A. believes he was detained solely because of his skin color and because he is Somali.  *Id.* ¶ 19.  He had never been stopped by law enforcement before, and has never been convicted of any crimes or offenses.  *Id.* ¶ 14.  Though the officers' translator said they were looking for someone with A.A.'s first and last name, the officers did not attempt to identify A.A. until they arrived at the police station.  *Id.* ¶ 19.  Defendants submitted no information that might identify the subject of their search or show that A.A. shared the subject's name.  On this

32

record, I find that A.A. was stopped and detained based solely on his race or ethnicity and that the explanation that officers were looking for an individual who shared A.A.'s name is pretextual.

94.     A.A. fears that he will be subject to a similar arrest in the future.  *Id.* ¶ 18. The Burnsville Walmart is his grocery store, and, as of January 13, 2026, A.A. knew that ICE officers are present in Twin Cities "restaurants, supermarkets, shopping malls, and gas stations."  *Id.*  A.A.'s wife and eleven-year-old daughter worry about his safety too.  *Id.* ¶ 17.

### *Declarant R.J.*

95.     Declarant R.J. is Hispanic and a U.S. citizen who lives in Brooklyn Park, Minnesota.  ECF No. 92-9 ¶ 1.

96.     On January 10, 2026, R.J. was driving in Brooklyn Park when two cars boxed him in on a busy road.  *Id.* ¶¶ 3–4, 10.  Immigration agents approached his car, banged on the windows, and aimed a firearm at him.  *Id.* ¶ 6.  The agents did not ask R.J. any questions or present a warrant.  *Id.* ¶ 7.  R.J. repeatedly stated he was a citizen.  *Id.* ¶ 9.  The agents handcuffed him and put him in their car.  *Id.* ¶¶ 9–10.

97.     R.J. filmed a video that partially shows this encounter up to this point; it appears that his phone or camera was propped facing forward on his dash.  *Id.* ¶ 5; ECF No. 94-1.  R.J. and the arresting officer do not appear in the frame, but the audio supports R.J.'s account.  A bystander also filmed a video of the encounter; it shows three ICE agents pull R.J. out of his car and restrain him on the ground while four other ICE agents surround him.  ECF No. 92-9 ¶ 25; ECF No. 94-2.

98.     After arresting R.J., the agents drove him around for about 20 minutes.  ECF No. 92-9 ¶ 11.   The only question the agents asked R.J. was his name, and R.J. gave it.  *Id.*  They never asked for or looked at his identification.  *Id.* ¶ 9. The agents eventually verified R.J.'s name and said he was free to go, explaining that they were searching for another person with the same name and birth date who was present in the country illegally.  *Id.* ¶ 12.

99.     Though R.J. believes agents targeted him based on his ethnicity and because he has a Mexican flag and other Mexico-connected stickers on his car, *id.* ¶¶ 23–24, it is not possible to determine why agents stopped R.J. on this record.  R.J.'s declaration omits testimony regarding whether agents were able to observe R.J.'s race or ethnicity prior to stopping him.  It does not eliminate the plausible explanation that agents determined based on the vehicle's license plate that R.J. owned the vehicle, and the agents were looking for an individual with the same name.

100.    R.J. had bruises on his hands, and the handcuffs caused him to lose circulation, so his hands were numb for several days.  *Id.* ¶ 18.  He has stopped going out of his home as often as before and even quit his job as an Amazon delivery driver for fear of being stopped again.  *Id.* ¶ 22.  As of late January 2026, R.J. often observed immigration agents in his community.  *Id.* ¶ 23.

*Declarant and In-Court Witness Raul Aguirre Castrejon*

101.    Declarant Raul Aguirre Castrejon is Hispanic[13] and a lawful permanent resident of the United States.  ECF No. 45 ¶ 1.

102.    On January 10, 2026, Mr. Castrejon's niece was driving him in Monticello, Minnesota, when two ICE vehicles followed them and tried to box them in.  *Id.* ¶¶ 2–7; Evidentiary Tr. 178:4.  Mr. Castrejon and his niece tried to get off the road, and the ICE vehicles swerved and parked in front of them, forcing his niece to slam on the brakes to avoid a collision.  ECF No. 45 ¶¶ 8–9.  Five or six officers demanded that Mr. Castrejon and his niece exit their vehicle.  *Id.* ¶ 10.  The officers handcuffed Mr. Castrejon and tried to push him into one of the ICE vehicles.  *Id.*  In total, there were about twelve vehicles and twenty agents on the scene.  Evidentiary Tr. 181:12–18.

103.    Mr. Castrejon told the officers he was "legal," and an officer responded, "you're not from here.  Where are you from?"  ECF No. 45 ¶ 12.  Though Mr. Castrejon had his driver's license and residence card, the officers did not allow him to produce that documentation.  Evidentiary Tr. 182:11–17.

104.    After a few minutes the officers released Mr. Castrejon and his niece and told the two they were stopped because the car was registered to a man but being driven by a woman.  ECF No. 45 ¶ 20.  Mr. Castrejon believes he and his niece were stopped because of his skin color and appearance.  *Id.* ¶ 24.  Based on Mr. Castrejon's trial testimony, I

---

[13]    Like Mr. Martinez Garcia, Mr. Castrejon does not testify directly as to his or his niece's race or ethnicity.  The only reasonable conclusion from his declaration and in-court testimony is that they are Hispanic, and no party disputes that.  *See* Evidentiary Tr. 186:4–6 (presuming Mr. Castrejon is Latino).

agree.  I do not understand how the fact that a male-owned vehicle is being driven by a female might in any rational world give immigration officers reasonable suspicion to believe an immigration-related offense is being committed.  The explanation is incredible and, I conclude, pretextual.

105.    Mr. Castrejon fears being targeted again and being subject to future detention and arrest by immigration agents.  *Id.* ¶ 26.

*Declarant Antony Doe*

106.    Declarant Antony Doe is Latino and from Honduras, and he has lived in the United States since 2021.  ECF No. 93-1 ¶ 1.  He has a valid work permit and a pending U visa application.  *Id.*

107.    On January 10, 2026, Antony was delivering food in Brooklyn Center, Minnesota, when his wife called, saying that immigration agents had surrounded their apartment complex.  *Id.* ¶¶ 2–3.  About two minutes later, approximately six or seven ICE vehicles entered the lot where Antony was parked.  *Id.* ¶ 4.  Agents yelled at Antony to open his doors, and two of the agents pointed their guns at the front of his car.  *Id.* ¶ 5.

108.    Antony rolled down his windows, and one of the agents yelled, "Are you legal?"  *Id.* ¶ 6.  Antony responded that he had a valid work permit and a pending U visa application.  *Id.*  Agents opened the door and pulled Antony out of the car; he did not resist.  *Id.* ¶¶ 7–8.  The agents asked for identification, and Antony produced his driver's license.  *Id.* ¶ 9.  The agents scanned Antony's face and handcuffed him.  *Id.* ¶ 11.  They still have not returned Antony's driver's license.  *Id.* ¶ 9.

36

109.    The agents drove Antony to a detention center in Bloomington, processed him, and the next day flew him and other detainees to El Paso, Texas. *Id.* ¶¶ 11–14. A week later, Antony was returned to Minnesota on January 20. *Id.* ¶¶ 17–18.

110.    Because the agents never indicated they knew who Antony was, failed to present a warrant, and did not explain why he was being stopped, Antony believes the officers stopped and arrested him solely because of his skin color and ethnicity. *Id.* ¶ 23. For these same reasons—and because Defendants have produced no contrary information regarding Antony—I agree. As of January 30, 2026, Antony observed federal agents "every day" around his apartment complex. *Id.* ¶ 24.

*Declarant K.D.*

111.    Declarant K.D. is Latino and a U.S. citizen who lives in Burnsville, Minnesota. ECF No. 92-13 ¶ 1.

112.    On January 11, 2026, K.D. was walking to his car in a Walgreens parking lot on the Richfield-Bloomington border. *Id.* ¶ 2. A vehicle pulled up, and four or five ICE officers jumped out and surrounded K.D. *Id.* ¶ 4. Two officers began asking K.D. in Spanish where K.D. was born and whether K.D. was a citizen. *Id.* ¶¶ 6–7. K.D. answered. *Id.* ¶ 7. The officers asked for identification, and K.D. produced a driver's license. *Id.* ¶ 8.

113.    After about ten minutes, the officers left without saying anything to K.D. *Id.* ¶ 11. They never indicated that they knew K.D.'s name, presented a warrant, or explained why they stopped K.D. *Id.* ¶ 15. I find that officers stopped K.D. solely because of K.D.'s race or ethnicity.

*Declarant and In-Court Witness Christian Eduardo Molina Silva*[14]

114.    Declarant Christian Eduardo Molina Silva is Hispanic and a U.S. citizen who lives in Coon Rapids, Minnesota.  ECF No. 103-1 ¶¶ 1, 3; Evidentiary Tr. 54:17–22, 55:2–3, 55:10–11.

115.    On January 12, 2026, Mr. Molina was driving in South Minneapolis when he passed an alley; in the alley was a black car with tinted windows.  ECF No. 103-1 ¶ 2; Evidentiary Tr. 56:6–57:22.  Mr. Molina observed ICE agents in the car wearing masks.  Evidentiary Tr. 56:22–57:1.  The car exited the alley and followed him.  *Id.* 57:2–10.  Mr. Molina made a left turn, and the car behind did the same, following for about half a block before its flashing emergency lights were activated.  *Id.* 57:23–58:6.  Mr. Molina made one more left turn, intending to park, when the ICE vehicle rammed Mr. Molina's vehicle from behind.  *Id.* 58:7–59:12.

116.    An agent approached, asking if Mr. Molina was a citizen and demanding proof.  ECF No. 103-1 ¶¶ 5–6.  Mr. Molina was angry and responded that he was a U.S. citizen and that did not have to prove it to them.  *Id.* ¶ 6.  After about 45 to 60 minutes, the officers drove off.  *Id.* ¶ 14.

117.    Mr. Molina believes the agents confirmed his citizenship by checking his license plate.  *Id.* ¶ 12.  The agents promised to pay for his car repair but failed to provide insurance information.  *Id.* ¶¶ 10, 14.  I find that agents stopped Mr. Molina solely because of his race or ethnicity.

---

[14]    Mr. Molina filed a declaration under a pseudonym, but he testified at the evidentiary hearing under his full name.

*Declarant H.S.*

118.    Declarant H.S. is Somali and U.S. citizen who lives in St. Cloud, Minnesota. ECF No. 92-5 ¶¶ 1, 21.

119.    On January 12, 2026, she was parked in a Dollar Tree parking lot when ICE agents stopped her and asked if she was a citizen.  *Id.* ¶¶ 3–5.  She said she was, and the agents then checked her driver's license.  *Id.* ¶¶ 5–6.

120.    One agent told H.S. she was free to leave, but after H.S. started walking away, the agent changed course and informed H.S. it was still necessary to see her passport. *Id.* ¶¶ 6–7.  H.S. said her passport was at home.  *Id.* ¶ 7.  H.S. called her husband, who said he would text her a photograph of her passport.  *Id.* ¶ 8.  The ICE agent said that H.S. "only had three seconds to provide them a picture of [the] passport," and "counted down, three seconds, two seconds, one second."  *Id.*  The photograph did not come through in that time. *Id.*

121.    An agent handcuffed H.S., pushed her toward the agents' car, took her phone by force, and turned it off.  *Id.* ¶ 9.  H.S. told agents they were hurting her and told them she could show them the photograph to prove her citizenship, "but they did not listen."  *Id.*

122.    A bystander's video shows the agents handcuffing H.S. and putting her in the car while she repeatedly says she will show them the picture.  *Id.* ¶ 19; ECF No. 94. Once she was in the car, the agents asked H.S. where she was born; she explained she was born in Somalia and was a U.S. citizen.  ECF No. 92-5 ¶¶ 11–12.

123.    The agents drove H.S. around for about an hour, and while they were driving, searched through her bag and found her health insurance card.  *Id.* ¶ 13.  With the insurance

39

card and driver's license, they apparently confirmed her citizenship. *Id.* Agents brought H.S. to a Walgreens but didn't explain why they would not bring her back to the Dollar Tree. *Id.* ¶ 14.

124.    H.S. suffered pain in her wrists, hands, and shoulders from the encounter. *Id.* ¶ 15. She believes she was stopped because is Somali, speaks Somali, and wears a Hijab. *Id.* ¶ 20. I agree. On this record, I find that agents stopped and detained H.S. solely because of her race or ethnicity.

125.    As of January 30, 2026, H.S. continued to observe ICE agents patrol St. Cloud, and testified that at that time they were "impossible to avoid for people trying to live a normal life in this community." *Id.* ¶ 21.

*Declarant Pedro Moreno*

126.    Declarant Pedro Moreno is from Mexico and has been a lawful permanent resident of the United States since 2024. ECF No. 44 ¶¶ 1, 5.

127.    On January 13, 2026, he was working at his construction job inside a house when at least six ICE vehicles arrived at the work site. *Id.* ¶ 3.[15] Two ICE agents entered a room in which Mr. Moreno was working and one agent asked Mr. Moreno where he was from. *Id.* ¶ 5. When Mr. Moreno provided his green card, the agent "said it was fake and that they had no way to prove it is real." *Id.* ¶ 6.

---

[15]    The declaration's date of "January 13, 2025" is presumed to be a typographical error. Though Mr. Moreno does not say where the worksite was located, the most sensible inference is that it was in the Twin Cities metropolitan area. It took only two hours for him to be arrested at the job site, driven to Fort Snelling, processed, and driven back to the job site. *See* ECF No. 44 ¶ 13, 21.

128.    The agents handcuffed Mr. Moreno, put him in a vehicle, and drove him to the Fort Snelling detention center. *Id.* ¶¶ 7–13. At Fort Snelling, Mr. Moreno waited in a long line to present his green card documents to an immigration officer. *Id.* ¶ 16. When the officer reviewed the material, he yelled at Mr. Moreno and asked why Mr. Moreno didn't tell ICE agents he was a permanent resident. *Id.* Mr. Moreno responded that he did tell them that, and another agent apologized to him and said he was free to go. *Id.*

129.    Two agents drove Mr. Moreno back to the work site, and one told him that it "[s]erves you right for running away," to which the other agent responded that Mr. Moreno had not run. *Id.* ¶¶ 17, 19. Mr. Moreno believes he was stopped because he looks Hispanic. *Id.* ¶ 22. I agree. Defendants have provided no information explaining why they stopped Mr. Moreno initially or what reason they may have had to suspect his green card was not legitimate.

*Declarant and In-Court Witness Ramon Menera*[16]

130.    Declarant Ramon Menera is Hispanic and a naturalized U.S. citizen. ECF No. 92-16 ¶¶ 2, 13. He was born in Mexico and lives in Columbia Heights, Minnesota. Evidentiary Tr. 145:2–3, 172:4–7.

131.    On January 14, 2026, Mr. Menera left the house with his daughter, after roughly a week of "being cooped up" to avoid ICE agents. ECF No. 92-16 ¶ 2. When Mr. Menera returned home, there were ICE agents outside his property, and their car blocked his driveway. Evidentiary Tr. 146:25–147:13. Mr. Menera told the agents that he lived

---

[16]    Mr. Menera filed a declaration under a pseudonym, but he testified at the evidentiary hearing under his full name.

there and needed to park.  *Id.* 173:6–19.  After accompanying his daughter inside their residence, Mr. Menera went back outside, remained on his property, and observed a crowd of about ten people filming and protesting.  ECF No. 92-16 ¶¶ 3–4.

132.    One ICE agent approached, and Mr. Menera told the agent he was not allowed to enter Mr. Menera's property.  *Id.* ¶¶ 5–6.  The agent asked Mr. Menera where he was from, and he answered he was "from this country," as he had been a U.S. citizen and Minnesota resident for many years and considered the state his home.  *Id.* ¶¶ 6–7.  The agent responded, "Now, talking to you, seeing you, hearing that you have an accent, I have reason to believe that you are not born of this country.  What country are you from, do you have any documentation?"  *Id.* ¶ 8.  Mr. Menera said that he was not required to show the agent anything and reminded the agent that he was on Mr. Merena's property.  *Id.* ¶ 9.  He repeatedly explained that he had documentation but questioned why he was asked for it. *Id.* ¶ 10.  The agent said, "because of your accent," and did not give another reason.  *Id.*

133.    ICE agents handcuffed Mr. Menera.  *Id.*  Mr. Menera filmed a video of the encounter that ends at this point; it supports his account.  ECF No. 147.  Another agent scanned Mr. Menera's face with a phone, and an ICE supervisor told the agent that the face scan showed Mr. Menera was a U.S. citizen.  ECF No. 92-16 ¶¶ 11–12.  An ICE agent then checked Mr. Menera's wallet and found a U.S. passport card.  *Id.* ¶ 12.  The supervisor ordered his release, but the agent "resisted the order . . . two or three times."  *Id.* ¶ 13.  The agent believed Mr. Menera had lied about where he was from, as Mr. Menera was not born in the United States.  *See id.*  Before releasing him, the agent leaned in and whispered to

Mr. Menera in Spanish something to the effect of, "I don't care if you're a citizen, next time I'm going to take you. I don't care if I have to do extra paperwork." *Id.* ¶ 14.

134. Mr. Menera believes that the agent questioned him based on his race. *Id.* ¶ 17. Other individuals filmed and protested the agents, but they were not Hispanic, and Mr. Menera felt "singled out" for being Hispanic. *See id.* ¶¶ 4, 10. The agent provided a different reason—that Mr. Menera's accent provided reason to believe he was not born in America. *Id.* ¶ 8. The video shows that the agent approached Mr. Menera before Mr. Menera spoke to him. *Id.* ¶ 4; ECF No. 147 at 0:00–0:20. It is possible that the agent heard the accent earlier, as Mr. Menera had told the agents they were blocking his driveway, but Mr. Menera could not tell the agents apart because they were wearing masks. Evidentiary Tr. 173:6–174:5. Regardless, I find Mr. Menera's account to be credible, and on this record, I find that he was stopped and detained based solely on his race or ethnicity. Defendants have identified no evidence that might have given the officers reason to believe Mr. Menera was violating an immigration law when they stopped and detained him.

135. The experience has left Mr. Menera and his family in fear, and he worries about retaliation because of the agent's threat. *Id.* ¶¶ 16–17.

*Declarant Jane Doe*

136. Declarant Jane Doe is Hispanic and a U.S citizen who lives in Minneapolis, Minnesota. ECF No. 93 ¶¶ 1, 11.

137. On January 14, 2026, Customs and Border Patrol officers stopped her while she was driving in her neighborhood. *Id.* ¶¶ 4, 6, 15. Ms. Doe was carrying her passport, "aware that federal immigration enforcement was in [her] community stopping people who

look like [her]," and she held it out the car window.  *Id.* ¶¶ 13–14, 17.  The officers did not say anything to Ms. Doe; one grabbed her passport, inspected it, and said she was free to go.  *Id.* ¶¶ 18–21.  On this record, the information does not permit a finding regarding the reason or reasons officers decided to stop Ms. Doe.

138.    As of February 1, 2026, Ms. Doe "observed immigration enforcement around [her] house."  *Id.* ¶ 27.  This left her fearful of future stops and frightened to leave her house.  *Id.* ¶¶ 29–31.

*Declarant A.P.*

139.    Declarant A.P. is a Vietnamese American who an encountered an ICE officer on an early morning walk in Minneapolis on January 14, 2026.  ECF No. 90-3 ¶¶ 1–2, 4.  The officer had no "visible identification" and was much larger than A.P.; frightened, A.P. ran from the officer.  *Id.* ¶¶ 4, 6.  A.P. could not hear whether an officer shouted a command because A.P. is deaf in one ear and had an "AirPod" in the other ear.  *Id.* ¶ 5.  As A.P. ran, the officer returned to his vehicle, and eventually several vehicles pulled up and blocked A.P.'s path.  *Id.* ¶ 8.  The officers asked A.P. for identification, questioned why A.P. ran away, and left after verifying A.P.'s identity.  *Id.* ¶¶ 10–11.  I find A.P. was stopped because A.P. ran from officers.

*Declarant N.G.*

140.    Declarant N.G. is white and her husband is Latino; both are American citizens.  ECF No. 95 ¶¶ 1–2, 14.

141.    On January 14, 2026, they were parked in a residential area of New Hope, Minnesota, when ICE agents observed N.G.'s husband from another vehicle.  *Id.* ¶¶ 2, 4.

Moments later, three ICE vehicles sped towards N.G. and her husband's vehicle, and one rammed the vehicle from behind. *Id.* ¶ 5.  An agent approached and asked N.G.'s husband to produce identification. *Id.* ¶ 6.

142.    N.G.'s husband asked why they had been pulled over, and the agent responded, "We'll get it figured out in a sec." *Id.* ¶ 8.  The agent asked N.G.'s husband if he entered the United States on a visa, and the husband responded he was a U.S. citizen. *Id.* ¶ 12.  The agents ran checks and provided a number to call about a tort claim. *Id.* ¶ 15. Agents did not ask N.G. for identification or proof of citizenship. *Id.* ¶ 14.  N.G. filmed a video of the encounter, and it supports her account, though she began filming after the ICE vehicle hit her car, and she stopped filming before the agents confirmed her husband's citizenship and provided a number to call about a tort claim. *See id.* ¶ 5 (providing link to video).  I find that agents stopped N.G. and her husband based solely on her husband's race or ethnicity.  The agents had an opportunity to observe his race and ethnicity, the stop followed immediately after, agents gave no reason for the stop, and none is evident from the record.

### Declarant M.G.

143.    Declarant M.G. is Latina and a U.S. citizen who lives in Eden Prairie, Minnesota.  ECF No. 92-12 ¶ 1.

144.    On January 14, 2026, she was driving near her children's school in the Eden Prairie area when she saw a white pickup truck she suspected was an ICE vehicle. *Id.* ¶ 3. She took a photograph of the license plate. *Id.*  Shortly after, the pickup's emergency lights were activated, and officers pulled M.G. over. *Id.*  An ICE agent approached M.G. and

demanded identification. *Id.* M.G. had recently misplaced her driver's license. *Id.* She was frightened to lower her window and attempted to show the agent her employee identification through the window. *Id.* The agent threatened to break the car's window, produced what appeared to be a tool for breaking windows, and asked to see a passport. *Id.* M.G. did not have a passport; she offered to show the officers a photograph of her previous driver's license, which she had on her phone. *Id.* After some discussion, the stop ended. *Id.*

145.    On this record, it is not possible to determine why officers stopped M.G. It might have been in retaliation for her decision to photograph the officers' vehicle. It might have occurred because of M.G.'s race or ethnicity.

*Declarant T.G.*

146.    Declarant T.G. is Hmong and a U.S. citizen who lives in Saint Paul, Minnesota. ECF No. 92-11 ¶ 1.

147.    On January 15, 2026, T.G. parked at his workplace when ICE agents arrived and blocked him from walking through the parking lot. *Id.* ¶¶ 2–3. One agent had his hand on his gun, and that agent asked T.G. for identification. *Id.* ¶¶ 3–4. T.G. provided his driver's license, and agents asked T.G. where he was born. *Id.* ¶ 4. After T.G. told the officers he had been born in Minnesota, they let him go. *Id.* On this record, it is not possible to determine why officers stopped T.G.

148.    T.G. fears he will be stopped again because he is a minority, and he has limited his activities to avoid encountering immigration agents. *Id.* ¶ 7. As of January 30, T.G. was aware that "ICE [wa]s showing up at homes in [his] neighborhood." *Id.*

46

*Declarant and In-Court Witness Mustafa Mohamed*[17]

149.    Declarant Mustafa Mohamed is Somali and a U.S. citizen who lives in New Hope, Minnesota.  ECF No. 92-7 ¶ 1.

150.    On January 15, 2026, he was at a gas station in Shakopee, Minnesota, when five ICE agents surrounded Mr. Mohamed's car and two of them grabbed him.  *Id.* ¶¶ 2–3.  The agents dragged Mr. Mohamed out of his car, twisted his shoulder, and pushed him against the car.  *Id.* ¶ 4.  A bystander's video shows agents handcuffing him and pushing him against the car.  ECF No. 142.  One agent put his knee into Mr. Mohamed's back, and another agent put his elbow into Mr. Mohamed's neck.  ECF No. 92-7 ¶ 4.  The agents handcuffed him.  *Id.* ¶ 5.

151.    Mr. Mohamed yelled that he was a U.S. citizen, but the agents did not accept that answer and repeatedly asked him where he was born and what country he was from.  *Id.* ¶¶ 5–6.  They never asked for his name, and they searched his pockets and found and scanned his Minnesota driver's license.  *Id.* ¶ 7.  One of the agents called Mr. Mohamed a "son of a bitch," and another agent said to him, "shut the fuck up, motherfucker."  Evidentiary Tr. 43:3–5.  After apparently confirming Mr. Mohamed's citizenship, they removed the handcuffs and told Mr. Mohamed they were "doing [their] job."  ECF No. 92-7 ¶ 7.

152.    Mr. Mohamed believes he was detained solely because of his race or ethnicity, and I agree.  *Id.* ¶ 11.  The agents had the opportunity to observe Mr. Mohamed's

---

[17]    Mr. Mohamed filed a declaration under a pseudonym but testified at the evidentiary hearing using his full name.

race and ethnicity before pulling him from his car, they questioned his national origin and citizenship status immediately and without obtaining any other information from Mr. Mohamed, and Defendants introduced no evidence that might identify another reason for this stop.

153.    Mr. Mohamed is frightened he will be detained or arrested again because the agents made no attempt to identify him before handcuffing him, and, as of January 22, 2026, he observed immigration agents regularly at a market where he shops. *Id.* ¶¶ 12–13.

*Declarant V.N.*

154.    Declarant V.N. is Vietnamese and a U.S. citizen who lives in St. Louis Park, Minnesota. ECF No. 92-6 ¶ 2.

155.    On January 19, 2026, she was commuting to Minneapolis when an SUV cut her off and stopped her car. *Id.* ¶¶ 4, 6. Three federal immigration agents approached, two from the SUV and one from the car behind her. *Id.* ¶¶ 7–8. One agent asked V.N. if her name was Carla. *Id.* ¶ 9. V.N. said she didn't know who Carla was, and produced her REAL ID. *Id.* ¶ 10. After one agent told V.N. she looked like Carla, the agents ended the encounter and left the scene. *Id.* ¶ 12.

156.    On this record, I cannot find that agents stopped V.N. solely because of her race or ethnicity. The agents provided a reason for the stop—that V.N. resembled another person they were searching for—and ended the encounter immediately after learning that V.N. was not that person.

157.    V.N. was upset, and for nine days worked remotely to avoid a similar encounter. *Id.* ¶ 14.

*Declarant F.A.*

158.    Declarant F.A. is Somali and a U.S. citizen.  ECF No. 93-2 ¶¶ 2, 4.  F.A. wears a hijab.  *Id.* ¶ 2.

159.    On January 21, 2026, F.A. was driving to work in Rogers, Minnesota, in a car registered to her a mother, who is also a U.S. citizen.  *Id.* ¶¶ 6–7.  Two ICE vehicles pulled F.A. over, and five agents exited the vehicles.  *Id.* ¶¶ 9–11.  The agents did not have clothing identifying them as ICE, DHS, or Border Patrol, but they all wore bulletproof vests, and two or three of them had guns drawn.  *Id.* ¶¶ 11–12.  They approached and "aggressively demanded" to see F.A.'s ID and asked if she was a citizen.  *Id.* ¶ 14.  F.A. produced her ID and said she was a citizen.  *Id.*  One agent told F.A. he thought her ID looked fake, and another agent asked F.A. to produce a passport; F.A. did not have her passport with her.  *Id.* ¶ 15.  F.A.'s identification was valid.  *Id.* ¶ 16.  The officers told F.A. that they were unable to determine whether she was a U.S. citizen, but the officers returned F.A.'s ID allowed her to leave.  *Id.* ¶ 17.

160.    F.A. believes she was stopped because of her skin color, appearance, and hijab.  *Id.* ¶ 21.  I agree.  The agents gave no reason for the stop, they presented no warrant, and F.A.'s vehicle was registered in a citizen's name.  *Id.*

161.    Fearing future injury, F.A. and her family members have begun carrying their birth certificates with them and share their locations on their phones.  *Id.* ¶ 20.

*Declarant S.S.*

162.    Declarant S.S. is white and a U.S. citizen.  ECF No. 103-2 ¶¶ 1, 16.

163.   On January 21, 2026, S.S. was parked at a Starbucks in Bloomington, Minnesota, when S.S. observed an East African man exit the coffee shop with a teenage girl wearing a hijab—S.S. presumed she was the man's daughter. *Id.* ¶¶ 2, 5.  After the pair got into a car, an ICE vehicle parked directly behind them, and five or six DHS officers exited the vehicle. *Id.* ¶¶ 5–7.

164.   S.S. began to observe and record the incident. *Id.* ¶ 8.  One officer asked the East African man if he was a U.S. citizen; S.S. told the man that he did not need to answer questions unless the officers had a warrant. *Id.* ¶¶ 9, 11.  The officer told S.S. that the East African man was being detained, and no warrant was necessary to detain and question a person. *Id.* ¶ 11.  A few minutes later another officer asked for the man's residency card. *Id.* ¶ 13.  The man provided his U.S. passport, and in response to an officer's question, said he was a non-naturalized U.S. citizen. *Id.* ¶ 14.  Twenty or thirty seconds later, the officers stepped back, told the man to have a good day, and left. *Id.* ¶ 15.  The officers never asked S.S. for identification, proof of U.S. citizenship, or a residency card. *Id.* ¶ 16.  On this record, it is not possible to determine why officers stopped the man S.S. observed.

*Declarant E.G.*

165.   Declarant E.G. is a Mexican American who lives in Mounds View, Minnesota.  ECF No. 92-10 ¶ 1.

166.   On January 22, 2026, ICE agents approached him while he stood on the steps of his home. *Id.* ¶¶ 3–4.  The ICE officers asked E.G. to produce his identification and threatened arrest if he did not. *Id.* ¶ 5.  After E.G. gave the officers his ID, one officer

asked E.G. what country he was born in.  *Id.* ¶ 7.  Finding the question disrespectful, E.G. refused to answer.  *Id.*  The officers returned E.G.'s ID and left.  *Id.* ¶ 8.

167.  E.G. believes he was targeted for being Mexican American, *id.* ¶ 10, and I agree.  The fact that E.G. was standing on the steps of his home gave officers the opportunity to observe his race and ethnicity.  E.G. was not in a location that might have given officers a reason to question his immigration status—he was standing on the steps of his own home.  The officers gave no reason for their actions at the time, and Defendants have filed nothing that might explain the officers' actions.

168.  Following the incident, E.G. stayed home to avoid interacting with immigration officers.  *Id.* ¶ 14.

*Declarant S.P.*

169.  Declarant S.P. is Latino and a U.S. citizen by birth.  ECF No. 92-2 ¶ 1.

170.  On January 26, 2026, he was driving in Richfield, Minnesota, when he was pulled over by individuals who appeared to be law enforcement officers but who never identified themselves.  *Id.* ¶¶ 2–4, 8.  With weapons drawn, the officers asked S.P. if he was "from here," and he responded that he was a U.S. citizen.  *Id.* ¶¶ 6–7.  The officers told S.P. that they ran his license plate and his "car came up as belonging to someone who was in the country illegally."  *Id.* ¶ 7.  S.P. produced his driver's license.  *Id.*  After reviewing S.P.'s license, the officers told S.P. that his "name and birthday came up in their system when they ran [his] plates, but that it must have been someone else."  *Id.*

171.  S.P. believes he was stopped solely because of his race or ethnicity.  On this record, I agree.  The officers' explanation—as S.P. describes it—makes no sense, and

Defendants have introduced no evidence to counter S.P.'s account or identify a legitimate reason for the stop. I conclude that the senseless character of the officer's explanation justifies the conclusion that it is pretextual.

### Declarant C.L.

172. Declarant C.L. is Asian and a U.S. citizen, and lives in Minnesota. ECF No. 103 ¶¶ 1, 3, 20.

173. On January 29, 2026, she was driving in Saint Paul with her husband, who is also Asian. *Id.* ¶¶ 2, 20. Immigration agents stopped them and asked them to produce birth certificates and IDs. *Id.* ¶¶ 4–6. C.L. and her husband presented their birth certificates, IDs, and social security cards. *Id.* ¶¶ 15, 17. The agents explained that the license plates on the vehicle were registered in the name of a male they were attempting to locate. *Id.* ¶¶ 7,9. That was false. The car was registered to C.L.'s sister. *Id.* ¶ 10.

174. C.L. believes she and her husband were stopped solely because of their skin color and appearance, *id.* ¶ 20, and I agree. As C.L. explained, the agents' stated justification for the stop was not credible. The agents identified no other reason for the stop. And Defendants introduced no evidence to justify the stop. For these reasons, I find that the officers' explanation was pretextual.

### The Non-Influence of Social and News Media

175. At the evidentiary hearing, Plaintiffs' witnesses uniformly testified that they believed Defendants stopped and arrested individuals based solely on the individuals' race and ethnicity.

176.   Defendants sought to undermine this testimony.  As part of their cross-examination of every one of Plaintiffs' witnesses, Defendants attempted to elicit testimony suggesting the witnesses' beliefs (that Defendants stopped and arrested individuals based solely on the individuals' race and ethnicity) had their source in social media and news reports.  *See* Evidentiary Tr. 27:18–24, 50:21–51:18, 74:1–13, 124:3–13, 166:12–167:5, 187:6–188:9.  In other words, Defendants sought to show that Plaintiffs' witnesses were merely repeating a narrative they obtained from these sources.

177.   This approach did not persuade.  The witnesses' beliefs were tethered to the witnesses' personal experiences.  In other words, I find the witnesses would have held these same beliefs regardless of whether the witnesses read or observed others reporting these same beliefs on social or news media.

### The "Speculation" Issue

178.   Some of Plaintiffs' evidentiary-hearing witnesses acknowledged on cross-examination that their beliefs that Defendants stopped and arrested individuals based solely on the individuals' race and ethnicity were based on the witnesses' "speculation."

179.   Considered against the larger context of their entire testimony, I find that these witnesses understood "speculation" to mean inference-drawing.  In other words, some witnesses' beliefs were not based on direct evidence of anything Defendants or any of their officers said that might have been overtly discriminatory but were based instead on rational inferences drawn from facts of which the witnesses possessed personal knowledge. The testimony of Plaintiffs' witnesses was not based on speculation.

## Evidence Regarding Broader Community Impacts

### *Declarant Allison Sharkey*

180.    Declarant Allison Sharkey is the Executive Director of the Lake Street Council.  ECF No. 36 ¶ 1.  Lake Street has "[o]ver 2,500 small businesses, at least 60 percent of which are owned by immigrants or persons of color," and it contains "several Latino and East African shopping malls/centers, including Karmel Mall)."  *Id.* ¶¶ 3–4.  Since December 1, 2025, ICE officers have appeared on Lake Street, and the frequency of their presence increased through December and early January.  *Id.* ¶ 8.  They have used business parking lots "as staging grounds for operations."  *Id.* ¶ 9.  "Lake Street restaurant and shop owners have reported to [Ms. Sharkey] and [her] staff that, since ICE's operations began in December, business has fallen by 70 to 80 percent, as their regular customers (many of whom are immigrants) are too scared to visit."  *Id.* ¶ 10.  Ms. Sharkey has personally witnessed that "as of early January, just one out of the seven restaurants at a Latino shopping center is still open," and "at Karmel Mall, more than 200 of the 300 shops are now closed."  *Id.* ¶ 11.

### *Declarant Ianni Houmas*

181.    Declarant Ianni Houmas, the Executive Director of the Southeast Community Organization, testified that his organization is aware of "documented significant impacts on local businesses following recent enforcement activity in the area" and he identified several impacted businesses.  ECF No. 93-7 ¶¶ 1, 3.  No Plaintiff or declarant, however, testified that they were stopped or arrested at any of these sites.

*Immigration Lawyers*

182.    Several immigration lawyers submitted declarations as well, namely Alison Griffith, ECF No. 93-3, Evangeline Dhawan-Maloney, ECF No. 93-4, Robyn Meyer-Thompson, ECF No. 93-5, and Kelly Kristine Clark, ECF No. 93-6.

183.    These lawyers' clients have reported stops, arrests, and detentions in much greater volume and of a "dramatically different" character than those in previous years. ECF No. 93-3 ¶ 8; *see* ECF No. 93-5 ¶ 11; ECF No. 93-6 ¶ 3.  As Ms. Dhawan-Maloney described the state of things, "officers seem to be approaching people who they think might not be a U.S. citizen, generally if they appear to be Hispanic or Somali, and demanding proof of citizenship or lawful permanent residence."  ECF No. 93-4 ¶ 9.  "[I]f the person does not have proof that they are a U.S. citizen or a lawful permanent resident, officers seem to be booking them into custody."  *Id.*  According to these attorneys, their clients have been stopped without facts supporting reasonable suspicion and arrested without facts supporting probable cause.  *See id.* ¶ 10; ECF No. 93-5 ¶¶ 9–10.

**Official Statements Regarding Defendants' Policies**

184.    In addition to the testimony above, Plaintiffs provided evidence of statements made by agency officials.

*Defendant Gregory Bovino*

185.    On October 7, 2025, Defendant Gregory Bovino—at the time the Commander-at-Large of U.S. Border Patrol—was reported to say about ICE operations in Chicago, "We need reasonable suspicion to make an immigration arrest. . . .  You notice I did not say probable cause, nor did I say I need a warrant.  We need reasonable suspicion

of illegal alienage that's well-grounded within the United States immigration law." Priscilla Alvarez & Michael Williams, *Border Patrol Official Denies Racial Profiling Factors in Immigration Arrests, Says Officers Do Consider Whether People Appear "Panicked" or "Scared,"* CNN (Oct. 7, 2025) (filed at ECF No. 48-1 at 12).

*Secretary of Homeland Security Kristi Noem*

186.    Secretary of Homeland Security Kristi Noem told a reporter on January 15, 2026, that DHS was "doing targeted enforcement," and that "[i]f we are on a target, there may be individuals surrounding that criminal that we may be asking who they are and why they're there and having them validate their identity."  Aaron Rupar (@atrupar), X (Jan. 15, 2026) (filed at ECF No. 48-12 at 2).

*Acting Executive Associate Director of ERO Marcos Charles*

187.    In an interview published January 18, 2026, Acting Executive Associate Director of ERO Marcos Charles told a reporter, "[o]ur officers are . . . conducting targeted enforcement looking for the worst of the worst.  If they encounter anybody in the area of which they're operating, they are okay to talk to those people.  They've been authorized to talk to anybody that's around there and establish[] citizenship."  Cecilia Vega et al., *Minneapolis' Police Chief Fears Possible 'Moment Where It All Explodes' as ICE Operation Continues*, CBS News (Jan. 18, 2026, 19:00 ET) (filed at ECF No. 140-3 at 10); *see ICE Leadership*, U.S. Immigr. & Customs Enf't, https://www.ice.gov/leadership (last visited Mar. 7, 2026) (showing Acting Executive Associate Director Charles's title).

*DHS Official X Account*

188.    On December 16, 2025, DHS posted on its official X account,

> Allegations that ICE engages in 'racial profiling' are disgusting, reckless and categorically FALSE. What makes someone a target for immigration enforcement is if they are illegally in the U.S.—NOT their skin color, race, or ethnicity. Under the Fourth Amendment of the U.S. Constitution, DHS law enforcement uses "reasonable suspicion" to make arrests.

Homeland Security (@DHSgov), X (Dec. 16, 2025) (filed at ECF No. 48-2 at 2); *see* ECF No. 140-8 at 2 (showing similar DHS statement on X on January 17, 2026); ECF No. 140-9 at 2 (showing similar DHS statement on X on January 16, 2026); ECF No. 140-10 at 2 (showing similar DHS statement on X on January 16, 2026).

*DHS Former Assistant Secretary for Public Affairs Tricia McLaughlin*

189.   DHS Former Assistant Secretary for Public Affairs Tricia McLaughlin told press multiple times that "[l]aw enforcement uses 'reasonable suspicion' to make arrests, as allowed under the Fourth Amendment to the U.S. Constitution."  Anthony Iafrate, *'Nothing but Green Lights': ICE Memo Expands Agents' Warrantless Arrest Powers*, Daily Caller (Jan. 31, 2026) (filed at ECF No. 140-5 at 2); *see* Michelle Hackman et al., *The Standoff that Has Turned Minneapolis into a Tinderbox*, Wall St. J. (Jan. 17, 2026) (filed at ECF No. 140-6 at 4).

190.   Defendants did not dispute that each of these officials or sources made each of these statements.

**Defendants' Evidence of Their Policies**

191.   Defendants' evidence of their policies falls into two categories: (1) evidence regarding ICE and CBP officer training; and (2) a memorandum from ICE Acting Director, Todd M. Lyons, dated January 28, 2026.

*Assistant Field Office Director Michael Bottjen*

192.    Assistant Field Office Director Michael Bottjen testified that ERO officers are trained at an initial training "that includes Fourth Amendment and arrest authorities," and that they receive a "refresher Fourth Amendment training twice a year." ECF No. 82 ¶ 13. The refresher training covers warrantless arrest authority under 8 U.S.C. § 1357 and standards for enforcement activity under 8 C.F.R. § 287.8. ECF No. 82 ¶ 13. Officers detailed to the Saint Paul Field Office received additional refresher training for officers entering a large-scale operation. *Id.*

193.    Under that training, officers are taught that they must have probable cause to make an arrest. *Id.* ¶ 14; *see* 8 U.S.C. § 1357(a)(2) (authorizing immigration officers to arrest noncitizens when the officer "has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest"). Additionally, "[i]n considering the 'likelihood of escape,' an ICE officer or agent must consider the totality of the circumstances known to the officer before the arrest. There is no exhaustive list of factors that should be considered in determining whether an individual is 'likely to escape before a warrant can be obtained.'" ECF No. 82 ¶ 14.

194.    Assistant Field Office Director Bottjen testified that ERO officers are "trained to identify when there is reasonable suspicion to briefly detain an individual for further investigation into alienage and immigration status." *Id.* ¶ 15. Reasonable suspicion may arise "in any number of ways," like "subjects making incriminating statements" or "failing to produce any documentation during consensual encounters," as well as by

58

"information from open-source investigations, other law enforcement agencies, informants, and surveillance; and information gleaned from records and database checks." *Id.* Officers may also consider whether subjects "produc[ed] documentation suspected to be fraudulent" or "exhibit[ed] suspicious behavior during consensual encounters." *Id.* According to Assistant Field Office Director Bottjen, "ERO officers do not develop reasonable suspicion or probable cause solely based on an individual's race, ethnicity, or national origin." *Id.* ¶ 16.

### *CBP Officer Kyle Harvick*

195.   CBP Officer Kyle Harvick provided a similar assessment of CBP officer training. Officers undergo basic training, which instructs them in "comprehensive tactical, operational, and legal training over the course of the months-long training program." ECF No. 83 ¶ 13. They receive 100 hours of legal instruction, some of which covers the Fourth Amendment and the Immigration and Nationality Act. *Id.* "Legal topics covered include criminal law, criminal procedure, courtroom testimony, customs law, forfeiture, immigration law, use of force, nationality law, and report writing." *Id.* CPB officers also receive on-the-job training and periodic refreshers, including on the Fourth Amendment. *Id.* ¶ 14.

196.   Officer Harvick attested that CBP officers in Minneapolis go to "targeted enforcement areas," and engage in "consensual encounters," in which "individuals were free to walk away and terminate the encounter, decline to answer questions, and refuse to provide requested identification documents." *Id.* ¶ 7. Officers may "engag[e] in investigative detentions" when they

> have reasonable suspicion that the individual committed or was committing a federal crime or federal immigration violation. This reasonable suspicion is based on various factors including intelligence sources; information from law enforcement and open-source databases; analysis of trends; facts developed in the field by agents or officers; rational inferences that led an agent or officer to suspect criminal or immigration violations; and the officers or agents' observations, training, and experience.

*Id.* ¶ 10. Officers look to the totality of the circumstances in assessing whether reasonable suspicion exists. *Id.*

> Additionally, 8 C.F.R. § 287.5(a)(1) specifically authorizes CBP officers and agents conducting a temporary, investigative detention based on reasonable suspicion to interrogate any alien or person believed to be an alien concerning his or her right to be, or to remain, in the United States. Furthermore, pursuant to 8 C.F.R. § 287.8(b)(2), if CBP officers and agents have a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, CBP officers and agents may briefly detain the person for questioning.

ECF No. 83 ¶ 10.

197.   Lastly, as to arrests, Officer Harvick attested that "CBP officers and agents have conducted warrantless arrests for immigration violations pursuant to applicable legal authorities, including 8 U.S.C. § 1357 and 19 U.S.C. § 1589a and federal criminal statutes, such as 18 U.S.C. § 111." ECF No. 83 ¶ 11.

*The January 28, 2026 Memorandum*

198.   Defendants locate relevant ICE policies in a memorandum dated January 28, 2026, which ICE's Acting Director, Todd M. Lyons, wrote to "All ICE Personnel." ECF No. 81 at 47; *see* ECF No. 85-1 ("Lyons Memo"). The Lyons Memo discusses the standard

60

for conducting a warrantless arrest; it does not discuss the standard for making an investigatory stop. *See* ECF No. 85-1. The memorandum states that immigration officers may

> execute a warrantless arrest of: (1) any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens; or (2) if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation **and** is likely to escape before a warrant can be obtained for his arrest.

ECF No. 85-1 at 1–2 (footnotes omitted).

199.    The Lyons Memo explains that courts have construed "reason to believe" as equivalent to "probable cause." *Id.* at 1 n.5. A removable alien is "likely to escape," according to the memorandum, "if an immigration officer determines he or she is unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained," a determination that must be "based on the totality of the circumstances known to the immigration officer at the time of the encounter and prior to the arrest." *Id.* at 4. Officers may consider several factors, such as the subject's behavior, ability to leave the scene of encounter promptly, age and health. *Id.* Officers may also consider the subject's "[p]ossession of identity or work authorization documents that the immigration officer suspects are fraudulent," and "[p]resentation of unverifiable or suspected false information to the immigration officer." *Id.* at 4–5. "This on-the-spot determination as to the likelihood of escape is often made with limited information about

the subject's identity, background, or place of residence and no corroboration of any self-serving statements made by the subject." *Id.* at 6.

200.    Under the Lyons Memo, after an ICE officer conducts a warrantless arrest, the officer must "clearly, succinctly, and contemporaneously document" in Form I-213 "all factors considered in determining that the alien was likely to escape before a warrant could be obtained." *Id.* at 6.  The Lyons Memo does not require officers to document consensual encounters or investigatory detentions that did not amount to an arrest, nor does it require them to document the factors supporting or undermining probable cause that the individual was violating or had violated federal immigration law.  *See id.*; Oral Argument Tr. [ECF No. 163] 39:20–22 (noting that it was "not policy to make a record of" "*Terry* stops or investigative stops").

### Operation Metro Surge Drawdown

201.    On February 12, 2026, Border Czar Tom Homan announced that Operation Metro Surge would be winding down, reducing the numbers of ICE and CBP officers and agents assigned to the mission.  *See* ECF No. 167 ¶ 3.  "On February 4, 2026, CBP demobilized approximately 680 CBP officers and Border Patrol agents assigned to Operation Metro Surge, leaving approximately 349 CBP officers, Border Patrol agents, [Air and Marine Operations] personnel and support staff to assist the operation."  ECF No. 169-1 ¶ 8.  On February 12, CBP demobilized around 200 more, and on February 16, it demobilized 82 more.  *Id.* ¶ 9.  And CBP intended to demobilize its remaining 67 employees by February 23, though whether that final demobilization happened is not in the record.  *Id.* ¶ 10.  There were approximately 3,000 additional ERO and HSI officers

detailed to the Saint Paul Field Office, but as of February 23, only 270 ERO officers and 700 HSI agents remained.  ECF No. 169-2 ¶¶ 4–5.  In a February 23 declaration, Field Office Director Samuel Olson stated that approximately 107 ERO officers and 300 HSI agents would be on detail to the Saint Paul Field Office by February 25, 2026.  *Id.* ¶ 6.

202.    Though many DHS personnel have left or are leaving Minnesota, Border Czar Homan told the press throughout February 2026 that ICE would continue to enforce immigration laws in Minnesota.  *See* PBS NewsHour, *Border Czar Tom Homan Announces End to Immigration Crackdown in Minneapolis*, at 2:00 (YouTube, Feb. 12, 2026), https://www.youtube.com/watch?v=ySTe_rVxJZc&t=3s ("Through targeted enforcement operations based on reasonable suspicion and prioritizing safety and security, ICE will continue to identify, arrest, and remove illegal aliens that pose a risk to public safety like we've done for years."); *id.* at 18:02 ("I'm not going to remove everybody, out of the safety of our officers . . . ."); *id.* at 19:15 ("[E]nforcement of Title 8 is not going to end.").  That same day, he told an outlet that "even though we're drawing down resources, we're still going to have hundreds of special agents here" focusing on fraud investigation and enforcement, and that "this is ending the surge, but we're not going away."  *Tom Homan Addresses ICE's Minneapolis Withdrawal: If We Need to Come Back, We Will*, Fox News: Ingraham Angle, at 2:26, 2:56 (Feb. 12, 2026), https://www.foxnews.com/video/ 6389151376112.  On February 19, Mr. Homan repeated that idea: "If you're in the country illegally, you're not off the table; we'll come for you too."  Austin Erickson, *Tom Homan Optimistic About ICE Agreements in MN, Says Federal Gov't Paying for Damage During MPLS Operations 'Ain't Gonna Happen,'* WDAY, at 8:47 (Feb. 19, 2026), https://www

.wdayradionow.com/news/regional-news/tom-homan-optimistic-about-ice-agreements-in-mn-says-federal-govt-paying-for-damage-during-mpls-operations-aint-gonna-happen.

## CONCLUSIONS OF LAW

### Plaintiffs' Standing to Pursue Forward-Looking Relief

1.    Defendants challenge subject-matter jurisdiction, arguing Plaintiffs lack standing to pursue injunctive relief.  ECF No. 81 at 25–33.[18]

*General Rules Regarding Article III Standing*

2.    Article III of the Constitution limits the federal judicial power (or jurisdiction) to adjudicating "Cases" and "Controversies."  This provision keeps the federal courts out of the business of the legislative and executive branches, and the Supreme Court's standing jurisprudence guides the federal courts in determining whether a litigant seeks adjudication of a genuine "Case" or "Controversy" or instead hopes to have the court act as if it were one of the political branches.  The general rules governing Article III standing are settled:

> Federal jurisdiction is limited by Article III, § 2, of the U.S. Constitution to actual cases and controversies.  Therefore, the plaintiff's standing to sue "is the threshold question in every federal case, determining the power of the court to entertain the suit."  *Warth* [*v. Seldin*, 422 U.S. 490, 498 (1975)].  To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an "injury-in-fact," (2) a causal relationship between the injury and the challenged conduct,

---

[18]    Defendants also argue that 8 U.S.C. § 1252 strips district courts of jurisdiction to decide this action as to some putative class members, though they concede § 1252 is no barrier to jurisdiction over Plaintiffs' claims.  ECF No. 81 at 51–52 & n.10.  Because Plaintiffs do not have standing to seek injunctive relief, and because, even if they did, the preliminary-injunction motion would be denied for other reasons, it is not necessary to address this argument.

and (3) that the injury likely will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

*Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000). An injury-in-fact is the "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation modified).

3.      To have standing to obtain injunctive relief, the plaintiff must show that he is likely to suffer future injury by the defendant and that the sought-after relief will prevent that future injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101–03 (1983). "In future injury cases, the plaintiff must demonstrate that the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *In re SuperValu, Inc.*, 870 F.3d 763, 769 (8th Cir. 2017) (citation modified); *see Lujan*, 504 U.S. at 564 n.2 ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." (citation modified)). "Allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation modified). And when a plaintiff seeks forward-looking declaratory or injunctive relief, "past injuries are relevant only for their predictive value." *Murthy v. Missouri*, 603 U.S. 43, 59 (2024). In other words, past injuries do not by themselves show a plaintiff's standing to seek prospective relief, but they may "serve as evidence of threatened future injury." *Id.*; *see Smook v. Minnehaha County*, 457 F.3d 806, 816 (8th Cir 2006) ("It is well settled that '[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied

by any continuing, present adverse effects.'" (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974))).

4.      "[S]tanding is based on the facts as they existed at the time the lawsuit was filed." *Steger*, 228 F.3d at 893; *see Conners v. Gusano's Chi. Style Pizzeria*, 779 F.3d 835, 840 (8th Cir. 2015) ("We must assess standing in view only of the facts that existed at the time the former employees challenged the enforceability of the arbitration agreement."); *Lujan*, 504 U.S. at 569 n.4 ("The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed*." (citation modified)).

5.      In the Eighth Circuit, evidence that postdates the complaint generally cannot be used to support standing to seek injunctive relief. *See Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000). In *Park*, the plaintiff alleged she was subjected to an unconstitutional checkpoint in 1996, and she sued to obtain an injunction. *Id.* In the Eighth Circuit's view, evidence that the defendant used checkpoints in 1997, 1998, and 1999 was not "relevant on the issue of standing because all of these events occurred after Ms. Park filed her original complaint." *Id.*

> We believe that it is Ms. Park's burden to show that, at the time she filed her suit in 1996, there was a real and immediate threat that she would again be subjected by the Forest Service to an unconstitutional checkpoint. We do not think that she may use evidence of what happened after the commencement of the suit to make this showing.

*Id.* Similarly, in *Steger*, plaintiffs alleged that one of defendant's buildings failed to comply with the Americans with Disabilities Act. 228 F.3d at 891. At the time of filing, one plaintiff presented no evidence that he had been in the building or intended to enter the

building.  *Id.* at 893.  The fact that he visited the building after filing suit could not support his standing to seek injunctive relief.  *Id.*  Other courts have reached similar conclusions.  *See Nat'l Football Players Ass'n v. Nat'l Football League*, 874 F.3d 222, 229 (5th Cir. 2017).[19]

6.     Standing "must exist not only at the time the complaint is filed, but through all stages of the litigation."  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation modified); *Twin Cities Safety, LLC v. Moe*, 139 F.4th 1015, 1019 (8th Cir. 2025) (per curiam).  "A case becomes moot—and therefore no longer a Case or Controversy for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *Already, LLC*, 568 U.S. at 91 (citation modified).  A case may be mooted by a defendant's voluntary conduct only "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)).

7.     Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Lujan*, 504 U.S. at 561).  "At the preliminary

---

[19]     The Eighth Circuit's rule seems inconsistent with Supreme Court decisions.  In *Murthy*, for example, the plaintiffs filed their complaint in May 2022.  603 U.S. at 54. Considering whether there was standing to pursue injunctive relief, the Court looked to events in April 2023, among other periods.  *Id.* at 66–67.

injunction stage . . . the plaintiff must make a clear showing that [it] is likely to establish each element of standing." *Murthy*, 603 U.S. at 58 (citation modified). When, as here, parties introduce evidence to support their positions regarding whether a preliminary injunction should be entered, "the plaintiff cannot rest on mere allegations, but must instead point to factual evidence." *Id.* (citation modified). The standing analysis can be "fact-intensive." *Denmon v. Kan. Couns., Inc.*, 149 F.4th 1010, 1014 (8th Cir. 2025).

8.    Plaintiffs who wish to represent an injunctive-relief class under Rule 23(b)(2) must themselves possess standing to seek injunctive relief. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6 (2016) ("That a suit may be a class action adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." (citation modified)); *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) ("Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief."); *John Does 1–100 v. Boyd*, 613 F. Supp. 1514, 1529 (D. Minn. 1985) (MacLaughlin, J.) (denying motion for Rule 23(b)(2) certification because the named plaintiffs lacked standing to pursue injunctive relief).

9.    Whether Defendants have a policy requiring or authorizing unlawful conduct is relevant for plaintiffs' likelihood of future injury. *See Lyons*, 461 U.S. at 105–06 (finding no standing to pursue injunctive relief where plaintiff did not allege "the City ordered or authorized police officers" to engage in unlawful conduct). "Courts generally agree that, 'when the threatened acts that will cause injury are authorized or part of a policy, it is

significantly more likely that the injury will occur again,' and it is consequently more likely that plaintiffs have standing to pursue equitable relief." *Escobar Molina v. U.S. Dep't of Homeland Sec.*, --- F. Supp. 3d ---, No. 25-3417, 2025 WL 3465518, at *15 (D.D.C. Dec. 2, 2025) (quoting *Hinton v. District of Columbia*, 567 F. Supp. 3d 30, 49 (D.D.C. 2021)); *see Church v. City of Huntsville*, 30 F.3d 1332, 1339 (11th Cir. 1994) (finding standing to pursue injunctive relief where "plaintiffs allege that municipal policy authorizes the constitutional deprivations that they claim to have suffered at the hands of City officials").

10.    Assuming the policy that was absent in *Lyons* could be established in similar ways that plaintiffs may show § 1983 municipal liability, Plaintiffs have several options to demonstrate the policy's existence.  Plaintiffs can show there is an official agency policy, where "the decisionmaker in question possesses final authority to establish [agency] policy with respect to the action ordered." *Bolderson v. City of Wentzville*, 840 F.3d 982, 985 (8th Cir. 2016); *see Parada v. Anoka County*, 481 F. Supp. 3d 888, 895 (D. Minn. 2020) (finding, upon defendant's admission in discovery, an unwritten policy of referring all inmates born outside the United States to ICE).  Or they can show a "pervasive" unofficial custom "demonstrated by a continuing, widespread, and persistent pattern of unconstitutional misconduct." *Bolderson*, 840 F.3d at 986; *see R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 174–76 (D.D.C. 2015) (finding policy based on statistical evidence of ICE detention and release patterns and on affidavits of immigration experts and attorneys).  Outside this Circuit, courts have offered formal tests to establish the likelihood of future injury based on a policy or pattern theory.  *See Melendres v. Arpaio*, 695 F.3d 990, 997–98 (9th Cir. 2012) ("We have enumerated two ways in which a plaintiff can demonstrate

that such injury is likely to recur.  First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury stems from that policy.  Second, the plaintiff may demonstrate that the harm is part of a pattern of officially sanctioned behavior, violative of the plaintiffs' federal rights." (citation modified)).  Other courts have found unlawful policies relying on the bottom-up method.  *See Ramirez Ovando v. Noem*, --- F. Supp. 3d ---, No. 1:25-cv-03183-RBJ, 2025 WL 3293467, at *18 (D. Colo. Nov. 25, 2025) (finding policy of unlawful arrests by "harmonizing the plaintiffs' undisputed anecdotal experience with the many media statements from top immigration officials, the nature of ICE's ongoing enforcement operations, and the agency's own statistics regarding the criminal histories of those it has arrested" (citation modified)).

### Plaintiffs' Standing Theories

11.    Plaintiffs offer three theories of standing.  *See* Oral Argument Tr. 13:17–18 (explaining two theories); ECF No. 138 at 18–20 (pressing a third theory).

12.    The first theory is that their injury lies in the likelihood of future unlawful stops and arrests.  ECF No. 138 at 14–18.  Under this theory, Defendants are likely to enforce a policy of unconstitutional seizures against Plaintiffs, such that Plaintiffs are suffering "a real and immediate threat of future injury."  *Id.* at 14.

13.    The second theory is akin to the First Amendment's "chilling effect" doctrine: Plaintiffs claim they are injured going forward because "DHS's illegal policies are forcing them . . . to alter their lives in new and painful ways."  *Id.* at 18; *see Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016) (First Amendment chilling effect).  This second theory finds support in *Monsanto Co. v. Geertson Seed Farms*,

561 U.S. 139, 154–55 (2010).  In *Monsanto*, the Court concluded that alfalfa farmers had standing to challenge an agency's decision to deregulate a strain of genetically engineered alfalfa, because that decision created "[a] substantial risk of gene flow." *Id.* at 154.  "[T]o continue marketing their product to consumers who wish to buy non-genetically-engineered alfalfa," farmers would have to test their crops for contamination, which would be costly.  *Id.*  They would also incur costs in attempting to minimize contamination, such as by "contracting with growers outside of the United States to ensure [the supply of] genetically pure, conventional alfalfa seed."  *Id.* at 155.

14.    On the third theory, Plaintiffs' physical and psychological harms are ongoing.   ECF No. 138 at 18–19 (describing Plaintiffs' continuing fear, stress, sleeplessness, and anxiety).

15.    Though the theories are distinct, to be valid, each must meet the requirement of a "certainly impending" or significantly probable future injury.  *Park*, 205 F.3d at 1040 (finding that plaintiff failed to show "a significant probability" that defendant would subject her to the challenged action in the future); *see Bost v. Ill. State Board of Elections*, 146 S. Ct. 513, 522 (2026) ("Plaintiffs cannot manufacture standing by voluntarily incurring costs.  They must incur those costs to mitigate or avoid a substantial risk of some independent harm." (citation modified)); *Clapper*, 568 U.S. at 416 ("Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending.").

*Whether Defendants Maintain an Unlawful Policy or Policies – Rules*

16.    The three theories are premised on the conclusion that Defendants act according to unconstitutional policies, patterns, or practices.  Though it may seem that establishing whether an unconstitutional policy exists at the outset is putting the merits cart before the jurisdictional horse, it's necessary to address this question here.  The standing determination depends partially on the nature of Defendants' policies, so those policies must be determined at the outset.  *See Melendres*, 695 F.3d at 997–98 (reasoning that plaintiffs could establish standing for prospective relief by showing a harm occurring from officially sanctioned behavior that violated their federal rights).

17.    Plaintiffs claim that Defendants have three unconstitutional policies, patterns, or practices.  As they see it, Defendants have (1) a policy and practice of conducting stops without reasonable suspicion; (2) a policy and practice of conducting arrests without probable cause of removability; and (3) a policy and practice of conducting arrests without probable cause of flight risk.  ECF No. 138 at 20–29.

18.    The Fourth Amendment protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  A person is "seized" under the Fourth Amendment "when, by means of physical force or a show of authority, his freedom of movement is restrained," or, put another way, if "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *United States v. Mendenhall*, 446 U.S. 544, 553–54 (1980).  "Under well-settled Fourth Amendment case law, both investigative stops and arrests are 'seizures,' but an investigative stop must be supported by reasonable, articulable suspicion

that criminal activity may be afoot, whereas an arrest must be supported by probable

cause." *United States v. Miller*, 974 F.2d 953, 956 (8th Cir. 1992). "Probable cause exists

when the totality of the circumstances at the time of the arrest is sufficient to lead a

reasonable person to believe that the suspect has committed or is committing an

offense . . . ." *Garang v. City of Ames*, 2 F.4th 1115, 1121 (8th Cir. 2021) (citation

modified). In the immigration context, an immigration officer may

> arrest any alien who in his presence or view is entering or
> attempting to enter the United States in violation of any law or
> regulation made in pursuance of law regulating the admission,
> exclusion, expulsion, or removal of aliens, or to arrest any alien
> in the United States, if he has reason to believe [1] that the alien
> so arrested is in the United States in violation of any such law
> or regulation and [2] is likely to escape before a warrant can be
> obtained for his arrest.

8 U.S.C. § 1357(a)(2). "Because the Fourth Amendment applies to arrests of illegal aliens,

the term 'reason to believe' in § 1357(a)(2) means constitutionally required probable

cause." *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010). The Supreme

Court has not construed "likely to escape," but it treats that circumstance as "specific" and

"limited." *Arizona v. United States*, 567 U.S. 387, 410 (2012). Persuasive authorities

interpret the phrase to mean, "likely to evade detention by immigration officers." *Moreno

v. Napolitano*, 213 F. Supp. 3d 999, 1006–07 (N.D. Ill. 2016) (collecting cases); *see

Campos v. United States*, 888 F.3d 724, 734–35 (5th Cir. 2018) (interpreting it as likely to

"disappear before a warrant could be obtained"); *Araujo v. United States*, 301 F. Supp. 2d

1095, 1102 (N.D. Cal. 2004) (finding no likelihood of escape where arrestee was living

with his wife and had applied for lawful permanent resident status, "hardly evincing an intention to flee").

19.    Short of an arrest, "[a]n officer can 'conduct a brief, investigatory stop'— what we call a '*Terry* stop'—'when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *Haynes v. Minnehan*, 14 F.4th 830, 835 (8th Cir. 2021) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)); *see Terry v. Ohio*, 392 U.S. 1, 19–20 (1968). "A lawful *Terry* stop 'may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution.'" *Haynes*, 14 F.4th at 835 (quoting *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011)). In the immigration context, "officers 'may briefly detain' an individual 'for questioning' if they have 'a reasonable suspicion, based on specific articulable facts, that the person being questioned . . . is an alien illegally in the United States." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 1 (2025) (Kavanaugh, J., concurring) (quoting 8 C.F.R. § 287.8(b)(2)); *see* 8 U.S.C. § 1357(a)(1) (authorizing immigration officials "to interrogate" without a warrant "any alien or person believed to be an alien as to his right to be or to remain in the United States"). Whether reasonable suspicion exists depends on "the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

20.    An individual's race or ethnicity alone does not provide reasonable suspicion of criminal activity. *United States v. Brignoni-Ponce*, 422 U.S. 873, 886–87 (1975); *Trump v. Illinois*, 607 U.S. ---, 146 S. Ct. 432, 436 n.4 (2025) (Kavanaugh, J., concurring) ("The

Fourth Amendment requires that immigration stops must be based on reasonable suspicion of illegal presence, stops must be brief, arrests must be based on probable cause, and officers must not employ excessive force.  Moreover, the officers must not make interior immigration stops or arrests based on race or ethnicity."); *United States v. Clay*, 640 F.2d 157, 159 (8th Cir. 1981) ("Police cannot have grounds for suspicion based solely on the race of the suspect.").

21.    "A lawful *Terry* stop may become an arrest, requiring probable cause, if the stop lasts for an unreasonably long time or if the officers use unreasonable force."  *Irvin v. Richardson*, 20 F.4th 1199, 1206 (8th Cir. 2021) (citation modified); *see United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir. 1994) ("Although there is no bright line of demarcation between investigative stops and arrests, a *de facto* arrest occurs when the officers' conduct is more intrusive than necessary for an investigative stop." (citation modified)).  Factors that weigh in favor of an arrest are "delay unnecessary to the legitimate investigation of the law enforcement officers," "the degree of fear and humiliation that the police conduct engenders," whether the police transported the suspect to another location, whether they handcuffed the suspect, and whether they confined the suspect to a police vehicle.  *Bloomfield*, 40 F.3d at 917 (first quoting *United States v. Sharpe*, 470 U.S. 675, 687 (1985); and then quoting *United States v. Lego*, 855 F.2d 542, 545 (8th Cir. 1988)).

*Whether Defendants Maintain an Unlawful Policy or Policies – Analysis*

22.    Plaintiffs have demonstrated that Defendants' agents stopped twenty-three individuals without reasonable suspicion of immigration law violations, in Minnesota, between December 2025 and the filing of this suit.  *See* ECF No. 42 (Mr. Eydarus and his

mother); ECF No. 30 (Mr. Aguilar Garcia); ECF No. 32 (Mr. Dahir); ECF No. 41 (Luisa Doe), ECF No. 38 (Ms. Castillo and Rosa); ECF No. 92-8 (E.M.); ECF No. 29 (Mr. Osman); ECF No. 43 (Mr. Castillo); ECF No. 39 (Mr. Martinez Garcia); ECF No. 37 (A.A.); ECF No. 45 (Mr. Castrejon and his niece); ECF No. 93-1 (Antony Doe); ECF No. 92-13 (K.D.); ECF No. 103-1 (Mr. Molina); ECF No. 92-5 (H.S.); ECF No. 44 (Mr. Moreno); ECF No. 92-16 (Mr. Menera); ECF No. 95 (N.G. and her husband); ECF No. 92-7 (Mustafa Mohamed).

23.    These witnesses' accounts and related evidence show these witnesses were detained by DHS officers and questioned about their immigration status based solely on their race or ethnicity, and that a reasonable person in the same situation would not have felt free to leave. *See, e.g.*, Evidentiary Tr. 11:4–21 (officers surrounded Mr. Eydarus and blocked his movement); ECF No. 92-7 ¶ 3 (officers surrounded and grabbed Mr. Mohamed); ECF No. 43 ¶ 5 (noting that officers "cornered" Mr. Castillo).   These encounters were, at the very least, *Terry* stops, meaning the subjects were protected by the Fourth Amendment. *See Haynes*, 14 F.4th at 835.

24.    Plaintiffs have made a clear showing that there was not reasonable, articulable suspicion of criminal activity supporting the stops of these twenty-three individuals.[20] *See id.*  Plaintiffs and Declarants were stopped while going about their daily

---

[20]    To confirm, following *Steger* and *Park*, this standing analysis does not consider evidence of events that occurred after the filing of this suit—*i.e.*, evidence of stops or arrests that occurred after January 15, 2026.  Of course, that line of cases does not preclude consideration of stops that occurred before filing but were attested to in declarations signed after the suit commenced.  On the same logic, post-January-15 statements of policy or practice will be considered to the extent they refer to policies in place before January 15.

business—shoveling snow, ECF No. 42 ¶¶ 8–10, delivering pick-up orders at Target, ECF No. 30 ¶ 1, exiting a residence, ECF No. 32 ¶¶ 5–6, arriving at work, ECF No. 38 ¶¶ 4–6, walking to the mosque, ECF No. 29 ¶¶ 5–7—when they were stopped and questioned about their citizenship status.  Plaintiffs and Declarants repeatedly note that the officers did not indicate they knew Plaintiffs' or Declarants' identities before stopping them.  *E.g.*, ECF No. 42 ¶ 17; ECF No. 38 ¶ 12; ECF No. 29 ¶ 24; ECF No. 37 ¶ 12; ECF No. 93-1 ¶ 23; ECF No. 92-13 ¶ 15.  For reasons described in the findings above, I concluded that these individuals were stopped based solely on their race or ethnicity.  *E.g.*, ECF No. 42 ¶ 37; ECF No. 29 ¶¶ 24–25; ECF No. 43 ¶¶ 11–13; ECF No. 37 ¶ 19; ECF No. 45 ¶ 24; ECF No. 93-1 ¶ 23; ECF No. 92-5 ¶ 20; ECF No. 92-16 ¶ 17; ECF No. 92-7 ¶ 11.  This record is devoid of facts that would have given the officers reasonable suspicion to make immigration-related *Terry* stops of the twenty-three individuals.  *Cf. United States v. Nicholas*, 448 F.2d 622, 624–25 (8th Cir. 1971) (finding no reasonable suspicion to stop defendant for questioning where officers were not investigating any particular crime, had no information about the defendant's car or any of the car's occupants, had no information about suspicious activities in the area at the time, observed the car for a short period of time,  and where the time of the stop was a reasonable hour for people to be outside in the area, and the defendant was a black man in a predominantly black neighborhood).

25.    Defendants argue that Mr. Eydarus, Ms. Castillo, Mr. Castillo, and Mr. Dahir were consensual encounters, and therefore outside the protection of the Fourth Amendment, but this is unconvincing.  *See* ECF No. 81 at 39.  Mr. Eydarus testified that ICE officers approached him, armed with "guns, tasers, and pepper spray," ECF No. 42

¶ 12, and that they stood a couple feet away from him, surrounded him, and blocked his movement, Evidentiary Tr. 11:4–21. ICE officers boxed in Ms. Castillo's car, approached her wearing masks, and ordered her not to move. ECF No. 38 ¶¶ 6–7. Officers forced Mr. Castillo to stand in the cold without winter clothes for twenty to thirty minutes while they checked his license. ECF No. 43 ¶ 2, 11. Officers told Mr. Dahir that they needed to talk to him, and four of them surrounded him. ECF No. 32 ¶¶ 5–6. A reasonable person would not have felt free to leave in these circumstances. *Mendenhall*, 446 U.S. at 553–54.

26.    Defendants argue there was reasonable suspicion to stop Mr. Aguilar Garcia, A.A., Mr. Martinez Garcia, Mr. Moreno, and Mr. Osman, but the record does not support this contention with respect to any of these individuals. *See* ECF No. 81 at 41.

27.    Defendants argue that the following facts provided reasonable suspicion to stop Mr. Aguilar Garcia: He "refused to answer questions about his citizenship and attempted to flee when federal agents approached him outside of his department store worksite," and he "stated he went outside when he was notified that ICE agents might be in the parking lot of his workplace." *Id.* These fail to show reasonable suspicion that Mr. Aguilar Garcia was engaged in criminal activity. It is difficult to understand how walking *toward* the parking lot—where the ICE officers were—suggests evasion. And there is no evidence that the officers were aware that Mr. Aguilar Garcia had come out to confront them. *See Buffkins v. City of Omaha*, 922 F.2d 465, 470 (8th Cir. 1990) ("In order to constitute a reasonable articulable suspicion the *known* facts must reasonably relate to the person about to be stopped and demonstrate a reasonable suspicion that the person has engaged or will engage in criminal activity." (emphasis added)). Mr. Aguilar Garcia's

refusal to answer questions about his citizenship is not itself grounds for reasonable suspicion. *See United States v. Gray*, 213 F.3d 998, 1000 (8th Cir. 2000) ("[A]bsent reasonable suspicion justifying a *Terry* investigative stop, the citizen is free to refuse to answer questions and walk away."); *Florida v. Bostick*, 501 U.S. 429, 435 (1991) ("[W]hen officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage—as long as the police do not convey a message that compliance with their requests is required." (citations omitted)); *cf. Terry*, 392 U.S. at 34 (White, J., concurring) (stating that an individual properly subject to an investigatory stop "is not obliged to answer" an officer's questions, "and refusal to answer furnishes no basis for an arrest"). And Mr. Aguilar Garcia did not flee. The video shows him confronting the officers in the parking lot and backing away from them slowly. The officer who eventually tackled Mr. Aguilar Garcia walked directly toward him for about forty seconds. Mr. Aguilar Garcia's sudden movement toward the Target entrance cannot reasonably be understood as flight, and it does not support reasonable suspicion.

28.    Defendants argue that A.A. was misidentified and released upon confirmation of his identity. ECF No. 81 at 41. This record does not support this description. A.A. attested that officers grabbed him in a parking lot. ECF No. 37 ¶¶ 2–3. Though they reached into his pockets and took his wallet, they did not look through it; had they, they would have found his driver's license and green card. *Id.* ¶ 3. They handcuffed him, took him to a police station, and for the first time asked his name. *Id.* ¶ 7. After getting a translator on the phone, officers communicated through the translator that they

were looking for someone with the same first and last name as A.A.  *Id.*  No officer testifies

that A.A. was misidentified, and the fact that they did not attempt to identify A.A. until he

arrived at the police station undermines that explanation.  On these facts, ICE officers did

not have reasonable suspicion to stop A.A.

29.    Defendants argue there was reasonable suspicion to stop Mr. Martinez Garcia

and Mr. Moreno because they "were encountered at construction worksites that

traditionally indicate illegal aliens."  ECF No. 81 at 41.  As to Mr. Martinez Garcia, this is

incorrect.  His declaration states he works in cleaning and property removal and does not

mention construction.  ECF No. 39 ¶ 2.  Setting that aside, there is recent Supreme Court

precedent on this issue.  In a concurrence to an emergency order staying a district court's

injunction, Justice Kavanaugh listed several factors supporting reasonable suspicion for an

immigration-related stop in the Los Angeles area:

> that there is an extremely high number and percentage of illegal
> immigrants in the Los Angeles area; that those individuals tend
> to gather in certain locations to seek daily work; that those
> individuals often work in certain kinds of jobs, such as day
> labor, landscaping, agriculture, and construction, that do not
> require paperwork and are therefore especially attractive to
> illegal immigrants; and that many of those illegally in the Los
> Angeles area come from Mexico or Central America and do
> not speak much English.

*Vasquez Perdomo*, 146 S. Ct. at 3 (Kavanaugh, J., concurring).  In other words, Justice

Kavanaugh relied on specific facts about illegal immigrants in Los Angeles.  Facts like

those are not in this record.  *Compare id.* at 1 ("About 10 percent of the people in the Los

Angeles region are illegally in the United States—meaning about 2 million illegal

immigrants out of a total population of 20 million."), *with* ECF No. 48-10 at 3 (showing

that about 76 percent of the 388,000 Hispanics in Minnesota are U.S. citizens, and not showing any record now many Hispanic noncitizens living in Minnesota are in the country illegally).  What's more, other circumstances undermined the stops' justifications.  Both Mr. Martinez Garcia and Mr. Moreno provided identification, but the officers did not accept their documents.  ECF No. 39 ¶¶ 9–10; ECF No. 44 ¶ 6.  Absent any objective facts suggesting that the documents would appear to a reasonable officer to be invalid or untrustworthy, those documents dispelled any reasonable suspicion created by their presence at a construction site (or working in cleaning or property removal).  *See Kansas v. Glover*, 589 U.S. 376, 386 (2020).

30.    Defendants argue that Mr. Osman "was briefly detained while officers confirmed his identity[,] and then he was released."  ECF No. 81 at 41.  The length of the stop is relevant to whether the detention "exceeded the permissible scope of a *Terry* stop," *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005), but it is irrelevant to whether the officer had reasonable, articulable suspicion to "initiate" the stop, *Glover*, 589 U.S. at 380.

31.    Defendants argue that six individuals—H.S., E.M., Antony Doe, N.G. and her husband, and Mr. Molina—"appear to have been pulled over based, in part, on license plate searches."  ECF No. 153 at 8; *see Glover*, 589 U.S. at 381 (finding reasonable suspicion where officer conducted a license plate search, which revealed that the registered owner of the vehicle had a revoked license).  Defendants provided no evidence that a license plate search was run on the vehicles of H.S., E.M., Antony Doe, or N.G. and her husband.  Defendants instead argue that a search can be inferred from the declarations.  *See*

81

ECF No. 153 at 8. One declarant, Mr. Molina, attested that he believed a license plate check was run, but only after ICE agents had rammed his car. ECF No. 103-1 ¶ 12. That search revealed, he believed, that he was a citizen, *id.*, so a license plate search would not have supported reasonable suspicion that Mr. Molina was violating immigration law.

32.    Even if officers ran license plate searches for the other five individuals, the record does not show the searches' results. *See Glover*, 589 U.S. at 381. In some cases, it is not plausible to conclude that the result could have indicated that the stopped individual was violating immigration law. When H.S. was stopped, officers checked her driver's license, and then told her she had to produce a passport too. ECF No. 92-5 ¶¶ 6–7. No officer explained that there was a discrepancy between a license plate search and her driver's license. Agents stopped Antony Doe and apparently took his driver's license as confirmation that he was unlawfully present: They detained him, processed him, and flew him to El Paso, Texas. ECF No. 93-1 ¶¶ 9, 12–14. After a week, they flew him back to Minnesota and released him. *Id.* ¶¶ 17–18. This was not a case in which a license plate search gave reasonable suspicion, which was dispelled upon checking a driver's license. If Defendants had a legitimate reason to stop and detain Antony Doe based on a license plate search, it is not discernible on this record.

33.    Defendants argue that some Declarants' refusal to provide identification during consensual encounters and investigatory stops provided reasonable suspicion. ECF No. 153 at 9 (citing *Ojeda-Vinales v. INS*, 523 F.2d 286, 288 (2d Cir. 1975)). This argument confuses the timeline of events—officers must have reasonable suspicion *before* initiating a *Terry* stop, and in a consensual encounter, a person's refusal to provide

identifying information alone cannot furnish reasonable suspicion. *See Brignoni-Ponce*, 422 U.S. at 884 ("[T]he Fourth Amendment . . . forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens."). Defendants' citation to *Ojeda-Vinales* does not support their position; in that case, the officers had reasonable suspicion that the individual was unlawfully present in the country before they questioned him, so his "failure to produce identification" amounted to "*further* indication that he was in violation of the immigration laws." 523 F.2d at 288 (emphasis added).

34.    Defendants argue that, because some stops were justified by reasonable suspicion, Plaintiffs "cannot support the assertion that *all* officers *always* violate the Constitution in conducting stops." ECF No. 153 at 6. Plaintiffs need not show, however, that all stops were unsupported by reasonable suspicion to meet their standing burden. *See Lyons*, 461 U.S. at 106. Along similar lines, Defendants argue that Plaintiffs' evidence of individual encounters amounts to "a handful of anecdotal experiences during an operation where over 3,000" illegal immigrants were detained, and that such limited information does not show the alleged policy. ECF No. 81 at 37. This is not persuasive. True, "[a]necdote is not policy," *id.* at 38, but it is evidence of policy, when authenticated and sworn-to under oath. Here, considering the breadth of Operation Metro Surge, Plaintiffs submitted a significant volume of testimony, especially considering the logistical challenges of this particular case and the general nature of expedited litigation.

35.    The record contains comparatively little evidence of official statements of policy for making investigatory immigration stops. Secretary Noem stated that DHS was

"doing targeted enforcement," and that "[i]f we are on a target, and doing an operation, there may be individuals surrounding that criminal that we may be asking who they are and why they're there and having them validate their identity."  ECF No. 48-12 at 2.  ERO's Acting Executive Associate Director Charles said, "[o]ur officers are . . . conducting targeted enforcement looking for the worst of the worst.  If they encounter anybody in the area of which they're operating, they are okay to talk to those people.  They've been authorized to talk to anybody that's around there and establish[] citizenship."  ECF No. 140-3 at 10.  I conclude that these comments do not help answer whether Defendants maintain a policy of making investigatory immigration stops without reasonable suspicion.

36.     Evidence from officer training offers glimpses into Defendants' immigration-stop policy.  Recall that Assistant Field Office Director Bottjen testified that ERO officers "are trained to identify when there is reasonable suspicion to briefly detain an individual for further investigation into alienage and immigration status."  ECF No. 82 ¶ 15.  The training explains that reasonable suspicion could arise "in any number of ways," like "subjects making incriminating statements" or "failing to produce any documentation during consensual encounters," as well as by "information from open-source investigations, other law enforcement agencies, informants, and surveillance; and information gleaned from records and database checks."  *Id.*  Officers may also consider whether subjects "produc[ed] documentation suspected to be fraudulent" or "exhibit[ed] suspicious behavior during consensual encounters."  *Id.*  "ERO officers do not develop reasonable suspicion or probable cause solely based on an individual's race, ethnicity, or

national origin." *Id.* ¶ 16.  Along these same lines, Officer Harvick testified that CBP

officers and agents are trained they were permitted to stop an individual if they had

> reasonable suspicion that the individual committed or was
> committed a federal crime or federal immigration violation.
> This reasonable suspicion is based on various factors including
> intelligence sources; information from law enforcement and
> open-source databases; analysis of trends; facts developed in
> the field by agents or officers; rational inferences that led an
> agent or officer to suspect criminal or immigration violations;
> and the officers or agents' observations, training, and
> experience.

ECF No. 83 ¶ 10.

37.    I conclude that Plaintiffs have made a clear showing that Defendants have

adopted a policy authorizing federal immigration officers to conduct investigatory stops

based on ethnicity or race without reasonable suspicion that the individuals were violating

immigration laws.  The evidence from individual encounters is compelling and troubling.

About two dozen people were stopped without reasonable suspicion in Minnesota from

mid-December 2025 to mid-January 2026.  *See generally Escobar Molina*, --- F. Supp.

3d ---, 2025 WL 3465518, at *3–9 (finding unlawful policy on evidence of twenty-one

individual stops and arrests); *Ramirez Ovando*, --- F. Supp. 3d ---, 2025 WL 3293467, at

*5–10 (finding unlawful policy on evidence of eight individual arrests, plus hearsay

evidence that of fifteen to twenty more arrests); *United Farm Workers v. Noem*, 785 F.

Supp. 3d 672, 689–93 (E.D. Cal. 2025) (finding unlawful policy on evidence of thirteen

stops and arrests), *appeal filed*, 25-4047 (9th Cir. June 30, 2025).  The stops share

similarities.  Defendants' agents approached people on the street, or pulled them over in

their vehicles, and requested identification without any explanation for why the stop

occurred and often without identifying themselves. The only salient factor in these cases was the individual's race or ethnicity. Officers stopped Somali and Hispanic individuals without reasonable suspicion while they did not stop similarly situated nearby white individuals. Race or ethnicity alone cannot furnish reasonable suspicion. *Clay*, 640 F.2d at 159. The stopped individuals understood that they were required to produce identification. *See Bostick*, 501 U.S. at 435 (allowing officers to question individuals without reasonable suspicion "as long as the police do not convey a message that compliance with their requests is required").

38. On this record, Defendants' evidence of officer training and policy carries little weight. Testimony that officers rely on "information from open-source investigations, other law enforcement agencies, informants, and surveillance; and information gleaned from records and database checks" is beside the point because that's not what happened here. ECF No. 82 ¶ 15; *see* ECF No. 83 ¶ 10 ("This reasonable suspicion is based on various factors including intelligence sources; information from law enforcement and open-source databases; analysis of trends; facts developed in the field by agents or officers; rational inferences that led an agent or officer to suspect criminal or immigration violations; and the officers or agents' observations, training, and experience."). Defendants produced no evidence about specific factors justifying the stops of any individuals other than Mr. Hussen, Santiago Doe, Luisa Doe, and Julio Doe. Defendants acknowledged at oral argument that they did not have a policy to make a record of *Terry* stops, Oral Argument Tr. 39:20–22, and the lack of evidence downstream from

that decision undermines the high-level testimony that reasonable suspicion justifies their immigration stops.[21]

39.     Plaintiffs have demonstrated that Defendants' agents arrested eleven individuals without probable cause that those individuals were violating immigration law, or that they were likely to escape before a warrant could be obtained, in Minnesota, between December 2025 and the filing of this suit.  *See* ECF No. 34 (Mr. Hussen); ECF No. 30 (Mr. Aguilar Garcia); ECF No. 29 (Mr. Osman); ECF No. 39 (Mr. Martinez Garcia); ECF No. 37 (A.A.); ECF No. 92-9 (R.J.); ECF No. 93-1 (Antony Doe); ECF No. 92-5 (H.S.); ECF No. 44 (Mr. Moreno); ECF No. 92-16 (Mr. Menera); ECF No. 92-7 (Mr. Mohamed).

40.     These witnesses' accounts show that federal immigration officials arrested them.  Some of the arrests began as investigatory stops, but officers detained them for an unreasonably long time or used excessive force in conducting the stop.  *See Bloomfield*, 40 F.3d at 916–17.  These individuals were detained for lengthy periods of time; for Mr. Hussen and Mr. Aguilar Garcia, about an hour and a half or two hours.  ECF No. 34 ¶ 30; ECF No. 30 ¶¶ 3, 19.  In some cases, that period was longer than necessary to determine citizenship status.  *E.g.*, ECF No. 34 ¶ 15 (stating officers ignored Mr. Hussen's employer presenting citizenship verification);  ECF No. 29 ¶ 12 (stating Mr. Osman was willing to

---

[21]     Amicus City of Minneapolis produced evidence that police departments of several large cities require their officers to document *Terry* stops.  ECF No. 130-2 at 18–19 (Minneapolis); *id.* at 35 (Dallas); *id.* at 37–41 (Chicago); *id.* at 50–52 (Cleveland); *id.* at 54–55 (New Orleans); *id.* at 74 (New York); *id.* at 92–94 (Baltimore).  The International Association of Chiefs of Police also recommends documenting *Terry* stops in its model policy.  *Id.* at 132.

show his identification, but the agents would not let him present it); *see* ECF No. 39 ¶ 14 (stating Mr. Martinez Garcia was detained for thirty minutes, despite showing his driver's license and REAL ID paperwork); ECF No. 37 ¶ 9 (stating A.A. was handcuffed after officers determined his lawful status until they returned him to the arrest site); ECF No. 93-1 ¶¶ 2, 12, 18 (stating Antony Doe was flown to Texas and was away from home for ten days); ECF No. 92-5 ¶¶ 8, 12 (stating officers would not allow H.S. to show her passport photo and drove her around for an hour). All but Mr. Osman were handcuffed. *See* Hussen Ex. 4 0:17–0:56; ECF No. 30 ¶¶ 7–8; ECF No. 39 ¶ 12; ECF No. 37 ¶ 4; ECF No. 92-9 ¶ 9; ECF No. 93-1 ¶ 9; ECF No. 92-5 ¶ 9; ECF No. 44 ¶ 8; ECF No. 92-16 ¶ 12; ECF No. 92-7 ¶ 5. Officers put some in DHS vehicles. *E.g.*, ECF No. 34 ¶ 12; ECF No. 30 ¶ 10; ECF No. 29 ¶¶ 14–15; ECF No. 39 ¶ 14; ECF No. 37 ¶ 4; ECF No. 92-9 ¶ 10. Some were subject to unreasonable force. *E.g.*, ECF No. 34 ¶ 20 (officers tightened Mr. Hussen's handcuffs); ECF No. 30 ¶¶ 5–6 (officer tackled Mr. Aguilar Garcia); ECF No. 29 ¶¶ 10–13 (officer pinned Mr. Osman to the ground); ECF No. 92-9 ¶¶ 6, 9, 18 (officers pointed a gun at R.J. and pinned him to the ground, and his hands were bruised and numb from the cuffs); ECF No. 92-5 ¶ 9 (agent pushed H.S. toward car); ECF No. 92-7 ¶ 4 (agents pushed knee against Mr. Mohamed's back and elbow against his neck). In some cases, the officers' conduct engendered fear and humiliation. *E.g.*, ECF No. 30 ¶ 11 (playing loud Mexican music while Mr. Aguilar Garcia and Andres were detained); ECF No. 44 ¶ 19 (telling Mr. Moreno his arrest "[s]erves [him] right for running away" when he did not run); ECF No. 92-16 ¶ 14 (telling Mr. Menera in Spanish, "I don't care if you're a citizen, next time I'm going to take you"); ECF No. 92-7 ¶ 4 (using profanity toward Mr. Mohamed).

41.     Defendants argue that the detentions of H.S., Mr. Mohamed, R.J., and Mr. Menera did not amount to arrests. *See* ECF No. 153 at 10–11.  They cite case law justifying handcuffs when officers have a reasonable belief that the suspect is armed and dangerous, *see Pollreis v. Marzolf*, 9 F.4th 737, 745 (8th Cir. 2021), but this record is devoid of evidence that would lead a reasonable officer to believe these four individuals posed a safety threat, *see Haynes*, 14 F.4th at 835 ("[H]andcuffing 'absent any concern for safety' violates the second *Terry* prong." (quoting *El-Ghazzawy*, 636 F.3d at 460)).  Defendants argue that Mr. Mohamed and Mr. Menera "were handcuffed for a short period of time during which officers confirmed their identification," ECF No. 153 at 10, but neglect to mention that Mr. Mohamed was subject to much more intrusive physical contact, ECF No. 92-7 ¶ 4, and that one officer resisted his supervisor's order to release Mr. Menera "two or three times," ECF No. 92-16 ¶ 13.  They argue that detaining H.S. and R.J. in a vehicle was necessary because observers were approaching the officers.  ECF No. 153 at 10.  Even taking the observers' presence into consideration, under the totality of the circumstances, these stops became de facto arrests because of the handcuffing, excessive force, and refusal to examine the proffered identification.

42.     Plaintiffs have made a clear showing that officers did not probable cause that any of these individuals were violating immigration laws.  I have already concluded that, except for Mr. Hussen and R.J., all these individuals were stopped without reasonable suspicion.  For those arrestees, nothing transpired that would have given a reasonable officer probable cause that those individuals had committed an immigration crime.  Instead, the arrestees provided reason to think they were citizens or lawfully present—they

repeatedly asserted as much or proffered documentation. *See* ECF No. 31-2 at 1:38–2:10 (Mr. Aguilar Garcia's statement that he was a citizen and had a passport); ECF No. 29 ¶ 12 (Mr. Osman's statement that he was willing to show his ID, but the agents wouldn't let him); ECF No. 39 ¶¶ 9–10 (Mr. Martinez Garcia's statement that he produced his driver's license and REAL ID paperwork, but the officer said those didn't prove anything); ECF No. 37 ¶ 3 (showing officers declined to look for A.A.'s documentation, even though they had his wallet, which contained his driver's license and green card); ECF No. 93-1 ¶ 9 (detaining Antony Doe despite confirming his identity through his driver's license); ECF No. 92-5 ¶¶ 5–6, 8 (demanding H.S.'s passport after reviewing her driver's license, and not giving her a reasonable time to produce the passport); ECF No. 44 ¶ 6 (reviewing Mr. Moreno's green card and telling him it was fake); ECF No. 92-16 ¶ 13 (resisting order to release Mr. Menera after he confirmed his citizenship).  In Mr. Hussen's case, while his flight gave officers reasonable suspicion of criminal activity, probable cause was absent because he offered to show his driver's license and a copy of his passport card on his phone. ECF No. 34 ¶¶ 13–14.  The officers did not allow him to do so, insisting on a facial scan, which Mr. Hussen refused.  *Id.* ¶ 13.  His employer presented a copy of the passport card through the ICE vehicle's windshield, but officers ignored it.  *Id.* ¶ 15.  On its own, Mr. Hussen's refusal to submit to a facial scan could support probable cause of criminal activity; combined with his offer to demonstrate citizenship in other ways, it does not.  *See Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) ("An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists.").  The agents who arrested R.J.

asked for his name, but did not ask for or look at his identification, similarly ignoring exculpatory evidence.  ECF No. 92-9 ¶ 9.  On this record, Defendants' agents did not have probable cause that any of these eleven individuals had violated or were violating immigration law.  *See* 8 U.S.C. § 1357(a)(2).

43.     Further, Plaintiffs have made a clear showing that federal immigration officers did not have probable cause that any of the eleven individuals were likely to escape before a warrant could be obtained for their arrest.  There is no evidence in the record that officers made an individualized inquiry into the arrestees' likeliness of disappearing or evading detention, as required by statute.   8 U.S.C. § 1357(a)(2) (authorizing an immigration officer to make warrantless arrests "if he has reason to believe that the alien so arrested is . . . likely to escape before a warrant can be obtained").   Defendants offer a list of justifications other courts have found to determine likelihood of escape: when removability is clear and undisputed; when the arrestee admitted he had been picked up before; when he appeared nervous and seemed to be "looking for an opportunity to run"; when he admitted he had previously been removed; when he attempted to evade custody; when he was stopped in a vehicle; and when he presented conflicting documents about his status.  ECF No. 81 at 48 (citing cases); *see* Oral Argument Tr. 33:19–25 (describing a person stopped "on the side of the highway" as likely to escape, since he would have left the scene by the time the officer obtained a warrant); *see also United States v. Murillo-Gonzalez*, 524 F. Supp. 3d 1139, 1151 (D.N.M. 2021) ("Casanova also had reason to believe that Defendant was likely to escape before a warrant could be obtained given that Defendant was stopped in a vehicle.  Although Defendant was not behind the wheel

during the encounter, Casanova testified that there was always the possibility that Defendant might attempt to flee and that a foot chase could ensue." (citation omitted)), *aff'd*, No. 22-2123, 2024 WL 3812480 (10th Cir. Aug. 14, 2024). Most of these justifications are inapplicable here. None of the eleven individuals was removable or stated they had been removed. None presented conflicting documentation regarding their status. For some of them, nothing about the location or circumstances of their arrest suggested flight. Mr. Menera was at home. ECF No. 92-16 ¶ 4. Mr. Osman was walking in his family's neighborhood. ECF No. 29 ¶¶ 5–7. Others were outside their workplace. ECF No. 30 ¶ 2 (Mr. Aguilar Garcia); ECF No. 39 ¶ 5 (Mr. Martinez Garcia); ECF No. 44 ¶ 3 (Mr. Moreno). It's true that several individuals were either in or near a car, and that Mr. Hussen initially fled. ECF No. 37 ¶ 2 (A.A., in a parking lot); ECF No. 93-1 ¶ 4 (Antony Doe, in a parking lot); ECF No. 92-5 ¶ 4 (H.S., in a parking lot); ECF No. 92-9 ¶¶ 4, 10 (R.J., on a busy road); ECF No. 84 ¶ 6 (Mr. Hussen). But no officer presented evidence showing the officer engaged in an individualized inquiry to determine if the arrestee would escape detention, including Officer Berry, who provided a declaration describing Mr. Hussen's arrest. *See* ECF No. 84. I cannot "defer[] to the officer's on-the-scene judgment[]" when none has been presented. *Murillo-Gonzalez*, 524 F. Supp. 3d at 1151. And objective factors indicate officers did not consider the totality of the circumstances that would have supported or discounted probable cause of flight. Officers did not ask A.A. his identity or for documents. ECF No. 37 ¶ 3. R.J. was only asked for his name, not where he lived or for his identification. ECF No. 92-9 ¶ 11. Antony Doe presented a valid work permit, but officers apparently did not accept it. ECF No. 93-1 ¶ 6. Officers did not

allow H.S. to present a photograph of her passport, ECF No. 92-5 ¶ 8, and did not let Mr. Hussen show them his identification, ECF No. 34 ¶¶ 8, 13.  A subject's possession of valid identification showing citizenship or lawful status is relevant to the flight-risk analysis. *See Davila v. United States*, 247 F. Supp. 3d 650, 669–70 (W.D. Pa. 2017).  On this record, officers' decisions to ignore that evidence or fail to develop it undercuts Defendants' argument that those individuals were likely to escape.

44.    Officials' statements support the conclusion that Defendants maintained a policy of arresting individuals without probable cause.  Plaintiffs produced evidence that Mr. Bovino told the press: "We need reasonable suspicion to make an immigration arrest. . . .  You notice I did not say probable cause, nor did I say I need a warrant.  We need reasonable suspicion of illegal alienage that's well-grounded within the United States immigration law." ECF No. 48-1 at 12.  They also point to multiple posts on DHS's official X account making the same basic claim.  *See* ECF No. 48-2 at 2 ("Under the Fourth Amendment of the U.S. Constitution, DHS law enforcement uses 'reasonable suspicion' to make arrests."); *see* ECF No. 140-8 at 2; ECF No. 140-9 at 2; ECF No. 140-10 at 2. Defendants did not disclaim these statements in briefing or oral argument, other than to assert that the Lyons Memo outlined the actual policy, and that it had been announced DHS spokesperson Tricia McLaughlin would be stepping down from her position.  Oral Argument Tr. 97:3–6.

45.    I conclude that Plaintiffs have made a clear showing that Defendants adopted a policy authorizing federal immigration officers to conduct warrantless arrests without probable cause that the arrestees were violating immigration laws, and without probable

cause that the arrestees were likely to escape before a warrant for their arrest could be obtained, in Minnesota from mid-December 2025 to mid-January 2026. The evidence from individual encounters is strong. Though there are fewer instances of arrests than stops, the eleven individuals arrested without probable cause of criminal activity or flight provide substantial evidence of a common policy, consistent with what other courts have found. *See generally Escobar Molina*, --- F. Supp. 3d ---, 2025 WL 3465518, at *3–9 (finding unlawful policy on evidence of twenty-one individual stops and arrests); *Ramirez Ovando*, --- F. Supp. 3d ---, 2025 WL 3293467, at *5–10 (finding unlawful policy on evidence of eight individual arrests, plus hearsay evidence that of fifteen to twenty more arrests); *United Farm Workers*, 785 F. Supp. 3d at 689–93 (finding unlawful policy on evidence of thirteen stops and arrests). The public statement made by Mr. Bovino—that officers arrest based on reasonable suspicion—is also evidence that Defendants have authorized arrests without probable cause. DHS's official X account repeated Mr. Bovino's statement. *See Escobar Molina*, --- F. Supp. 3d ---, 2025 WL 3465518, at *23–24 (considering DHS's social media posts as evidence of DHS policy).

46.    The Lyons Memo does little to convince otherwise because the record shows officers have not followed one of its key provisions. Its definition of "likely to escape" asks whether the subject "is unlikely to be located at the scene of the encounter *or another clearly identifiable location* once an administrative warrant is obtained." ECF No. 85-1 at 4 (emphasis added). There is no evidence that officers attempted to determine whether the subjects would be at their home, work, or any other clearly identifiable location. Witnesses repeatedly testified that Defendants did not ask about community ties. And as with the

reasonable-suspicion analysis, the high-level statements about Fourth Amendment training do not move the needle. I conclude that Defendants have a policy authorizing their officers to arrest individuals without probable cause to believe that the arrestee had committed a crime or was likely to escape before a warrant could be obtained.

*Likelihood that Plaintiffs Will Be Subject to Unconstitutional Policies – Analysis*

47. Recall that to prevail on any of the three theories of standing, Plaintiffs must show "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *In re SuperValu, Inc.*, 870 F.3d at 769 (citation modified). The question is whether the evidence shows a significant probability that Defendants will stop or arrest Mr. Hussen, Mr. Eydarus, or Mr. Aguilar Garcia in the imminent future. On this record, Plaintiffs have not shown that such an injury is sufficiently likely to meet their Article III standing burden.

48. *Lyons* and *Clapper* found no standing for injunctive relief where the plaintiffs' asserted injuries followed a speculative chain of events. To have standing to seek injunction of a future chokehold, the plaintiff in *Lyons* would have had to show that a Los Angeles police officer would stop him for a traffic violation or other offense, and the officer would then subject him to another chokehold "without provocation or legal excuse." 461 U.S. at 108. *Clapper* found a future injury speculative where

> (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy

95

> § 1881a's many safeguards and are consistent with the Fourth
> Amendment; (4) the Government will succeed in intercepting
> the communications of respondents' contacts; and (5)
> respondents will be parties to the particular communications
> that the Government intercepts.

568 U.S. at 410.

49.     Here, the chain of events is not so long, but it includes one speculative link. For Plaintiffs to suffer a future injury, they must show that (1) Defendants have a policy authorizing unconstitutional stops and arrests; and (2) Defendants are likely to subject Plaintiffs to a stop or arrest under those policies.  Plaintiffs have cleared the first hurdle, but not the second.  Several considerations point to that conclusion.

50.      No Plaintiff or declarant has been unlawfully stopped or arrested a second time.  In a field of thirty-three total witnesses, the lack of a subsequent encounter makes it less likely that future violations are certainly impending.  *See Smith v. City of Chicago*, 143 F. Supp. 3d 741, 752 (N.D. Ill. 2015) (finding standing to seek prospective relief where plaintiffs alleged officers had "repeatedly subjected them to unconstitutional stops and frisks, which leads to the reasonable inference of the likelihood that [the] officers will unlawfully stop and first Plaintiffs in the future"); *Thomas v. County of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992) ("Repeated instances of violence and retaliatory confrontations are 'continuing present adverse [e]ffects' and cause the threatened injury to be 'sufficiently real and immediate to show an existing controversy.'" (quoting *O'Shea*, 414 U.S. at 496)).  If post-January-15 evidence could be considered to establish standing, no subsequent stop or arrest occurred in that period either.  Considered against this fact, evidence that witnesses regularly observe immigration agents does not show a substantial

96

risk of a future stop or arrest.  *See* ECF No. 34 ¶ 38; ECF No. 30 ¶ 27; Evidentiary Tr. 20:5–21:18; 29:6–21.

51.    Defendants' policy of authorizing unlawful stops and arrests, as opposed to requiring or mandating them, somewhat supports this same conclusion.  *Clapper*, 568 U.S. at 412 ("Moreover, because [the statute] at most *authorizes*—but does not *mandate* or *direct*—the surveillance that respondents fear, respondents' allegations are necessarily conjectural.").

52.    I conclude that "plaintiffs have no good basis to believe that law enforcement will unlawfully stop [or arrest] *them* in the future based on the prohibited factors—and certainly no good basis for believing that any stop [or arrest] of the plaintiffs is imminent." *Vasquez Perdomo*, 146 S. Ct. at 3 (Kavanaugh, J., concurring).[22]

53.    Other persuasive authorities reach different conclusions, but I am not persuaded they apply here.  Plaintiffs rely on another court that considered similar facts and reached the opposite conclusion, *Escobar Molina*, --- F. Supp. 3d ---, 2025 WL 3465518, at *15–17.  Similarly, after briefing was completed, a court in the District of

---

[22]    If Plaintiffs could show a substantial risk of a future unlawful *stop*, the likelihood of a future unlawful *arrest* is subject to more contingencies and therefore more speculative. On this record, most investigatory stops did not last long enough to become arrests.  The turning point usually occurred when officers reviewed and confirmed the individual's identity.  In some cases, that review and confirmation was unreasonably delayed, and the subject was arrested.  *See* ECF No. 34 (Mr. Hussen); ECF No. 30 (Mr. Aguilar Garcia); ECF No. 29 (Mr. Osman); ECF No. 39 (Mr. Martinez Garcia); ECF No. 37 (A.A.); ECF No. 92-9 (R.J.); ECF No. 93-1 (Antony Doe); ECF No. 92-5 (H.S.); ECF No. 44 (Mr. Moreno); ECF No. 92-16 (Mr. Menera); ECF No. 92-7 (Mr. Mohamed).  But the evidence does not show an obvious throughline between these cases.  In other words, when an individual is stopped without reasonable suspicion, it remains speculative whether that individual will be subject to an unconstitutional arrest.

Oregon found standing under similar circumstances. *M-J-M-A- v. Hermosillo*, --- F. Supp. 3d ---, No. 6:25-cv-02011-MTK, 2026 WL 562063, at *15–16 (D. Or. Feb. 27, 2026). In these cases, the courts determined that the plaintiffs had standing to pursue forward-looking relief based on a policy, plaintiffs' membership in the targeted group, and plaintiffs' inability to "avoid repeating the quotidian conduct that led to their" initial encounters. *Escobar Molina*, --- F. Supp. 3d. ---, 2025 WL 3465518, at *15–17; *see M-J-M-A-*, 2026 WL 562063, at *15–16. In the latter case, binding Ninth Circuit precedent found standing for injunctive relief when plaintiffs suffered "exposure" to an unconstitutional policy "while going about one's daily life," even when "the likelihood of a future stop of a particular individual plaintiff may not be 'high.'" *Melendres*, 695 F.3d at 998. To the extent this describes a lower standard than "certainly impending," or "a substantial risk," *In re SuperValu, Inc.*, 870 F.3d at 769, it does not support standing under Eighth Circuit precedent.

54.    Because Plaintiffs have not shown a substantial risk of future injury, Plaintiffs' other standing theories fail. The *Monsanto* theory requires a justified fear of future injury. *Bost*, 146 S. Ct. at 522. Plaintiffs have not shown that here. Plaintiffs' "ongoing psychological harm" theory does not provide a basis to seek injunctive relief. It is true that the Supreme Court has said that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects." *O'Shea*, 414 U.S. at 495–96. But *O'Shea* was discussing the defendant's ongoing unlawful treatment of the plaintiffs, not the lingering effects of the plaintiffs' injury. *Id.* at 496 ("[None] of the named plaintiffs

at the time the complaint was filed were themselves serving an allegedly illegal sentence or were on trial or awaiting trial before petitioners.").

55.    Because Plaintiffs have not shown a likelihood that a future injury is certainly impending or that there is a substantial risk of future injury, they likely do not possess standing to seek injunctive or declaratory relief, and their preliminary-injunction motion will be denied.[23]

### Preliminary Injunction

56.    Had Plaintiffs shown a likelihood of a future Article III-worthy injury, I would nonetheless conclude that they are not entitled to a preliminary injunction.

57.    A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The Eighth Circuit's familiar *Dataphase* decision describes the list of considerations applied to decide whether to grant preliminary injunctive relief: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 956 (D. Minn. 1999) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640

---

[23]    To be clear, had Plaintiffs established standing, this case would not be moot, as Defendants conceded at oral argument. Oral Argument Tr. 17:12–15. The drawdown of Operation Metro Surge has not "made it absolutely clear" that the unlawful stops and arrests "could not reasonably be expected to recur." *Laidlaw Env't Servs.*, 528 U.S. at 189 (*Concentrated Phosphate*, 393 U.S. at 203). As Bordar Czar Homan stated when announcing the drawdown, ICE would remain present in Minnesota and would "continue to identify, arrest, and remove illegal aliens that pose a risk to public safety like we've done for years." PBS NewsHour, *supra*, at 2:00.

F.2d 109, 112–14 (8th Cir. 1981) (en banc)).  The core question is whether the equities "so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.  "The burden of establishing the four factors lies with the party seeking injunctive relief." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (citing *Watkins*, 346 F.3d at 844).

*Likelihood of Success on the Merits*

58.    Plaintiffs are likely to prevail on the merits of their Fourth Amendment claim. As Justice Kavanaugh recently summarized:

> The Fourth Amendment requires that immigration stops must be based on reasonable suspicion of illegal presence, stops must be brief, arrests must be based on probable cause, and officers must not employ excessive force.  Moreover, the officers must not make interior immigration stops or arrests based on race or ethnicity.

*Illinois*, 146 S. Ct. at 436 n.4 (Kavanaugh, J., concurring).  For the reasons already explained, Plaintiffs have provided strong evidence that Defendants have adopted unconstitutional policies in the relevant time frame and geographic area: (1) a policy authorizing federal immigration officers to conduct investigatory stops based on ethnicity or race without reasonable suspicion that the individuals were violating immigration laws; and (2) a policy authorizing federal immigration officers to conduct warrantless arrests without probable cause that the arrestees were violating immigration laws and without probable cause that the arrestees were likely to escape before a warrant for their arrest could be obtained.

59.    The evidence after January 15, 2026, provides additional support that Defendants are stopping individuals in Minnesota without reasonable suspicion. *See* ECF No. 93-2 ¶¶ 2, 6–7, 9–11, 14–15; ECF No. 92-10 ¶¶ 3–4; ECF No. 92-2 ¶¶ 7, 10; ECF No. 103 ¶¶ 9–10. These declarations support the conclusion that Defendants maintain a policy authorizing their agents to stop individuals without reasonable suspicion that the individuals are committing immigration violations. In each of those cases, the stopped individual was Somali, Hispanic, or Asian. (The supplemental declarations do not contain any evidence of arrests.)

60.    Because Plaintiffs have made a clear showing of these policies, they are likely to succeed on their Fourth Amendment and Immigration and Nationality Act claims. The Fourth Amendment requires that immigration stops be based on reasonable suspicion, which does not arise solely from an individual's race or ethnicity. *Brignoni-Ponce*, 422 U.S. at 886–87; *Vasquez Perdomo*, 146 S. Ct. at 1 (Kavanaugh, J., concurring). It also requires immigration arrests to be based on probable cause of criminal activity. *Quintana*, 623 F.3d at 1239. Under the Immigration and Nationality Act, immigration officers must have probable cause "[1] that the alien so arrested is in the United States in violation of any such law or regulation and [2] is likely to escape before a warrant can be obtained for his arrest" to issue a warrantless arrest. 8 U.S.C. § 1357(a)(2); *see* 8 C.F.R. § 287.8(c)(2)(i)–(ii). Defendants' policies authorize stops and arrests below this constitutional and statutory threshold, so Plaintiffs are likely to succeed on the merits of their Fourth Amendment and Immigration and Nationality Act claims.

61.    Count VI of the Complaint alleges a violation of the equal protection component of the Fifth Amendment.    Compl. ¶¶ 202–11.    The Fifth Amendment's protection of due process of law contains an implicit guarantee of equal protection under the laws. *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954).    Plaintiffs may demonstrate a violation by showing that the federal government's conduct was motivated, at least in part, by intent to discriminate based on race, ethnicity, or national origin.    *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).    Plaintiffs did not advance their Fifth Amendment claim in the preliminary-injunction briefing, so I do not reach a conclusion regarding whether Plaintiffs are likely to succeed on the merits of this claim.

62.    Several causes of action advance violations of the Administrative Procedure Act ("APA").    Compl. ¶¶ 183–201 (Counts III, IV, and V); *see* 5 U.S.C. § 706(2)(A), (C) (authorizing "the reviewing court" to "hold unlawful and set aside agency action, findings, and conclusions" the court finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").    As with the Fifth Amendment claim, Plaintiffs did not rely on the APA claims in their initial preliminary-injunction brief, *see* ECF No. 27, though their reply brief argued the claims were viable, *see* ECF No. 138 at 30–33.    To determine whether an action is final, courts consider whether it "mark[s] the consummation of the agency's decisionmaking process" and whether it is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified); *accord Biden v. Texas*, 597 U.S.

785, 808 (2022). On this record—and considering the APA claims received minimal attention—I cannot conclude that the policies identified earlier are likely to meet either prong of *Bennett*'s test.

*Irreparable Harm*

63. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "The denial of a constitutional right is a cognizable injury and an irreparable harm." *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 998 (8th Cir. 2023) (citation modified). The harm must be "*likely* in the absence of an injunction," *Winter*, 555 U.S. at 22, "great[,] and of such imminence that there is a clear and present need for equitable relief," *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). A plaintiff must show more than a future risk of irreparable harm; "there must be a clear showing of immediate irreparable injury." *Berkley Risk Adm'rs Co. v. Accident Fund Holdings, Inc.*, No. 16-cv-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) (citation modified). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins*, 346 F.3d at 844; *see Gamble v. Minn. State Indus.*, No. 16-cv-2720 (JRT/KMM), 2017 WL 6611570, at *2 (D. Minn. Dec. 1, 2017) (collecting cases).

64. Plaintiffs have two factors in their favor: They are likely to show a constitutional harm, and there is at least a question whether they could be compensated by damages. Their alleged harm is a Fourth Amendment violation, and constitutional injuries are paradigmatic irreparable harms. *See Ng*, 64 F.4th at 998. Setting aside whether

damages could compensate this injury, it is at least questionable whether they are available to Plaintiffs, given the thorny interplay of federal sovereign immunity, the Federal Tort Claims Act, and the narrow scope of *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *See generally Campos v. United States*, 888 F.3d 724 (5th Cir. 2018); *Ramirez v. Reddish*, 104 F.4th 1219 (10th Cir. 2024).

65.     Regardless, Plaintiffs have not made "a clear showing of immediate irreparable injury." *Berkley Risk Adm'rs Co.*, 2016 WL 4472943, at *4 (citation modified). As explained with respect to standing, whether Plaintiffs will be subject to a future unconstitutional stop or arrest is speculative. The drawdown of Operation Metro Surge makes it less likely that irreparable harm will occur absent an injunction. *See Winter*, 555 U.S. at 22. At its peak, more than 3,000 federal immigration officers and agents were detailed to the Saint Paul Field Office, and by February 23, 2026, that number dropped below 1,000. ECF No. 169-2 ¶¶ 4–5. And it is reasonable to infer that scaling down law enforcement by 60–70% dramatically reduces the number of stops and arrests. If Defendants carried through on their intention to keep only about 107 ERO officers and 300 HSI agents at the Saint Paul Field Office, *id.* ¶ 6, the likelihood of irreparable injury would decline even further.

## Balance of Equities

66.     The final factors—the balance of harms and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Courts analyze "whether the movant's likely harm without a preliminary injunction exceeds the nonmovant's likely harm with a preliminary injunction in place." *Cigna Corp.*

*v. Bricker*, 103 F.4th 1336, 1347 (8th Cir. 2024). "There is generally no public interest in the perpetuation of unlawful agency action." *Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025) (quoting *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). When constitutional violations are alleged, the plaintiff's likelihood of success often tips the balance of the equities in his favor. *See Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023); *see Vasquez Perdomo*, 146 S. Ct. at 4 n.3 (Kavanaugh, J., concurring) ("[E]specially in cases involving a significant new law or government action, the interim harms and equities are typically weighty on both sides. In those situations, . . . resolving the application therefore often will depend on [the] assessment of likelihood of success on the merits.").

67.    Here, the balance of the equities favors Plaintiffs. Plaintiffs have shown it is likely that Defendants' policies authorize immigration agents to take unconstitutional actions as part of Operation Metro Surge. *See Vasquez Perdomo*, 146 S. Ct. at 4 n.3.

### Class Certification

68.    Plaintiffs seek to provisionally certify the following classes:

**Stops Class:** All persons who, since December 1, 2025, have been or will be subject to an investigatory stop for immigration purposes by DHS in Minnesota.

> **Equal Protection Subclass:** All persons who, since December 1, 2025, have been or will be stopped for immigration purposes by DHS in Minnesota pursuant to a policy of stopping Somali or Latino people based on race or ethnicity.

**Warrantless Arrests Class:** All persons who, since December 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in Minnesota.

> **Removability Subclass:** All persons who, since December 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in Minnesota without probable cause that the person is a non-citizen who is subject to removal from the United States.

> **Flight Risk Subclass:** All persons who, since December 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in Minnesota without probable cause that the person is likely to escape before a warrant can be obtained.

Compl. ¶ 160; *see* ECF No. 52 at 10–11. Perhaps recognizing these proposed classes are quite broad, Plaintiffs proposed alternative classes. These include the following:

> **Stops Class:** All persons in the Twin Cities metro area who, since December 1, 2025, have been or will be subject to DHS's policy, pattern, and/or practice of subjecting persons to an investigatory stop for immigration purposes without an individualized assessment of reasonable suspicion.

> **Removability Class:** All persons in the Twin Cities metro area who, since December 1, 2025, have been or will be subject to DHS's policy, pattern, and/or practice of subjecting persons to a warrantless arrest for immigration purposes without an individualized assessment of probable cause that the person is a non-citizen who is subject to removal from the United States.

> **Flight Risk Class:** All persons in the Twin Cities metro area who, since December 1, 2025, have been or will be subject to DHS's policy, pattern, and/or practice to a warrantless arrest for immigration purposes without an individualized assessment of probable cause that the person is likely to escape before a warrant can be obtained.

ECF No. 139 at 21.

69. "To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b)." *In re St. Jude*

*Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005); *see Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 477 (8th Cir. 2016).  Under Rule 23(a), plaintiffs must show that "the class is so numerous that joinder of all members is impracticable," that "there are questions of law or fact common to the class," that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," and "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  Plaintiffs move to certify a Rule 23(b)(2) class, in which "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  "A district court may not certify a class until it 'is satisfied, after a rigorous analysis,' that Rule 23(a)'s certification prerequisites are met." *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 612 (8th Cir. 2017) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011)).  "Though the Supreme Court has not articulated what, specifically, a 'rigorous analysis' of class certification prerequisites entails, at a minimum the rule requires a district court to state its reasons for certification in terms specific enough for meaningful appellate review." *Id.*

70.    "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360.  "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  Members do not have the opportunity to opt out, so "a Rule 23(b)(2) class requires even greater cohesiveness than a Rule 23(b)(3) class seeking damages." *Ahmad v. City of St. Louis*, 995

F.3d 635, 644 (8th Cir. 2021). "Thus, when named plaintiffs attempt to aggregate a plethora of discrete claims into one super-claim against a government agency, without demonstrating that the class members have been harmed in essentially the same way, the proposed Rule 23(b)(2) class is deficient." *Id.* (citation modified).

71.    Here, the proposed classes would not be certifiable. In this Circuit, a class may not be certified if some of its members lack standing to bring the suit themselves. *Avritt v. Reliastar Life Ins.*, 615 F.3d 1023, 1034 (8th Cir. 2010); *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011). Each class member is not required to "submit evidence of personal standing," but a class must "be defined in such a way that anyone within it would have standing." *Avritt*, 615 F.3d at 1034 (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263–64 (2d Cir. 2006)). Here, all proposed definitions include members without Article III standing to seek prospective relief, as they all comprise persons who "have been or will be subject to" the challenged policies. But "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *O'Shea*, 414 U.S. at 495. The named Plaintiffs lack standing to seek injunctive relief. Looking at the putative class, it is virtually certain that some individuals who were subject to unconstitutional immigration stops and arrests are not likely to be stopped or arrested unlawfully again. Consider Mr. Osman. He lives in Louisville, Kentucky, and was illegally stopped and arrested during a visit to Minneapolis. *See* ECF No. 29 ¶¶ 1, 4, 10–21. He left Minneapolis on January 9, 2026. *Id.* ¶ 4. He signed his declaration on January 14, 2026, in Kentucky. *Id.* at 6. He does not state whether he intends to return to Minnesota. Mr. Osman would be a member of each proposed class,

but there is no question his risk of a future stop or arrest in Minnesota (or the Twin Cities metro area) is speculative.

72.    There are other problems.   The classes Plaintiffs originally sought to be certified would have included members who suffered no legal wrong.  For example, the "Stops Class" as proposed originally included "All persons who, since December 1, 2025, have been or will be subject to an investigatory stop for immigration purposes by DHS in Minnesota."  Compl. ¶ 160.  As discussed, however, it is likely that one Plaintiff (Mr. Hussen) and several non-party witnesses were lawfully subjected to investigatory stops. That, in turn, would raise an adequacy problem for Mr. Hussen and commonality problems for the class.  Plaintiffs' narrowed definition of this class—to include persons subjected to "DHS's policy, pattern, and/or practice of subjecting persons to an investigatory stop for immigration purposes without an individualized assessment of reasonable suspicion"— poses at least practical problems.  ECF No. 139 at 21.  For example, answering whether a person is in this class would seem to require an individualized, fact-intensive, time-consuming determination that the person's investigatory stop lacked reasonable suspicion. But without that, it is at least difficult to understand how I might answer the numerosity question.  In addition to those issues, the class definition does not define the "Twin Cities Metro Area" boundaries, making it difficult to ascertain whether, for example, persons stopped in places like St. Cloud, Monticello, or Shakopee would fall within the class. Regardless, because the preliminary-injunction motion will be denied for other reasons, it is not necessary to address these questions at this time.

**The Pseudonyms Issues**

73.    Though "[f]ederal courts disfavor the use of fictitious names in legal proceedings," they have allowed parties to appear pseudonymously when "(1) the party seeking anonymity was challenging government activity; (2) identification threatened to reveal information of a sensitive and highly personal nature; and (3) a party would be required, absent anonymity, to admit an intention to engage in illegal conduct, thereby risking criminal prosecution." *Cajune v. Indep. Sch. Dist. 194*, 105 F.4th 1070, 1076–77 (8th Cir. 2024); *see Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. 1981).  Other factors may also be relevant, like danger of retaliation and prejudice to the defendants.  *Cajune*, 105 F.4th at 1077; *Doe v. City of Chicago*, 360 F.3d 667, 669 (7th Cir. 2004); *In re: Chiquita Brands Int'l, Inc.*, 965 F.3d 1238, 1247 (11th Cir. 2020); *Doe v. Innovate Fin., Inc.*, No. 21-cv-1754 (JRT/TNL), 2022 WL 673582, at *3 (D. Minn. Mar. 7, 2022).

74.    Several Declarants—A.A., Santiago Doe, Julio Doe, Luisa Doe, Jane Doe, N.G., F.A., and Antony Doe—moved to proceed under pseudonyms.  ECF Nos. 60, 98. Those motions were granted for the purpose the evidentiary hearing, subject to further consideration after the hearing.  ECF No. 150.  Plaintiffs submitted additional briefing and declarations in support of those motions.  ECF No. 175 (brief); ECF Nos. 176–88 (declarations).  Those additional materials provide sufficient evidence of retaliation and harassment that Declarants' fear of appearing in this case publicly is reasonable.  They will be allowed to proceed pseudonymously in this case for any remaining matters.

## ORDER

Therefore, based on the foregoing, and all the files, records, and proceedings herein,

**IT IS ORDERED THAT**:

1.    Plaintiffs' Motion for a Preliminary Injunction [ECF No. 25] is **DENIED**.

2.    Plaintiffs' Motion for Provisional Class Certification and Appointment of Class Counsel [ECF No. 50] is **DENIED**.

3.    Defendants' Motion to Strike [ECF No. 172] is **DENIED**.

4.    Plaintiffs' Motion to Supplement to Record [ECF No. 175] is **GRANTED** as follows:

   A.    Declarants A.A., Santiago Doe, Julio Doe, Luisa Doe, Jane Doe, N.G., F.A., and Antony Doe are permitted to proceed in this action under the pseudonyms identified in their declarations in all public filings and proceedings, unless otherwise ordered by the Court.

   B.    Defendants shall maintain those individuals' identities by using these pseudonyms and redacting their full names and personally identifying information in all filings, including all exhibits in which their names appear, unless otherwise ordered by the Court.

Dated: March 9, 2026                    s/Eric C. Tostrud
                                         Eric C. Tostrud
                                         United States District Court